**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NICOLE LURRY, as Special Administrator of the Estate of Eric Lurry, Jr., deceased, | ) ) | |
| | ) | Case No. 20 CV 4545 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| City of Joliet and Joliet Police Officers May (Star #056), McCue (Star #118), Tellez (Star #311), and Lt. Harrison (Star #039), | ) ) ) | Judge Virginia Kendall |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED CIVIL COMPLAINT**

NOW COMES Plaintiff, NICOLE LURRY, by and through her attorneys, Bakos & Maisuria Law Group, complaining against Defendants City of Joliet, and Joliet Police Officers May, McCue, Tellez, and Harrison, individually, as follows:

**INTRODUCTION**

1. This action, arising out of the death of Plaintiff's husband, Eric Lurry, is brought pursuant to 42 U.S.C. § 1983 to address deprivations of Mr. Lurry's rights under the Constitution of the United States.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, and venue is proper under 28 U.S.C. § 1391(b). On information and belief, all parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred within the district.

**THE PARTIES**

3. The Plaintiff, Nicole Lurry, is the wife of the deceased, Eric Lurry. Nicole Lurry resides in

1

the Northern District of Illinois and has been appointed Special Administrator of Eric Lurry's estate.

4. Decedent Eric Lurry was 37 years old at the time of his death on January 29, 2020.

5. Defendant City of Joliet is a municipal corporation duly incorporated under the laws of the State of Illinois and is the employer and principal of Defendant Officers.

6. Defendant Joliet Police Officers May, McCue, Tellez, and Harrison were at all relevant times duly appointed police officers of the City of Joliet acting within the scope of their employment and under color of law. They are being sued in their individual capacities.

**FACTS**

7. On or about January 28, 2020, at approximately 3:12 p.m., Eric Lurry and Keenan Kinney were pulled over by Joliet Police Officer Wietting near the intersection of S. Briggs Street and E. Washington Street in Joliet, Illinois.

8. Defendants McCue and Tellez arrived on-scene shortly thereafter.

9. Defendant McCue performed a pat-down search of Mr. Lurry and found $1,380.00 in the front pockets of Mr. Lurry's pants.

10. During that search, Defendant McCue recovered no contraband or weapons of any kind on Eric Lurry's person or within Eric Lurry's immediate vicinity.

11. Defendant McCue's search of Mr. Lurry's person did not produce any evidence that Mr. Lurry had committed or was in the process of committing a crime.

12. After confirming Mr. Lurry's identity, one of the Defendants retrieved an iphone from Kinney's vehicle, gave it to Mr. Lurry, returned the money to Mr. Lurry and then allowed Mr. Lurry to leave the scene.

13. While Mr. Lurry was walking away from the scene, Defendant Tellez re-initiated contact with Mr. Lurry and asked Mr. Lurry to return the iphone.

2

14. After Mr. Lurry returned the phone, Defendant Tellez retrieved and seized the currency from Lurry's front pant pockets and then proceeded to perform another pat-down search of Mr. Lurry's.

15. Defendant Tellez did not have probable cause to believe that Mr. Lurry committed any crimes either immediately prior to or during the second pat-down search.

16. Defendant Tellez did not have probable cause to believe that Mr. Lurry committed any crimes at any time on the day of the incident prior to the second pat-down search.

17. Defendant Tellez did not have reasonable suspicion to believe that Mr. Lurry had committed any crimes either immediately prior to or during the second pat-down search.

18. Defendant Tellez did not have reasonable suspicion to believe that Mr. Lurry had committed any crimes at any time on the day of the incident prior to the second pat-downsearch.

19. Defendant Tellez did not have any legal justification for performing the second pat-down search of Mr. Lurry.

20. Defendant Tellez did not have any legal justification for seizing Mr. Lurry's money.

21. Following the pat-down search, Mr. Lurry was taken into custody by Defendants, handcuffed behind his back, placed in the back of Defendant McCue's squad car and transported to the Joliet Police Station.

22. While in the backseat of the squad car, Mr. Lurry was breathing heavily and chewing on something.

23. Defendant Tellez stated something to the effect that he believed Mr. Lurry may have put "a bunch" of the drugs he had on him in his mouth. Tellez later adds "he's got some in his mouth. I don't know how much, but he's still got some in there."

24. Defendant Tellez and/or Defendant McCue witnessed Mr. Lurry making chewing motions while in the back seat of the squad car enroute to the Joliet Police Station.

3

25. Defendant Tellez and Defendant McCue did not transport Mr. Lurry to the hospital from the scene of Mr. Lurry's arrest.

26. Defendant Tellez and Defendant McCue did not activate the lights or sirens during their transport of Eric Lurry to the Joliet Police Station.

27. Neither Defendant Tellez nor Defendant McCue called for medical assistance/emergency medical aid for Mr. Lurry either at the scene of Mr. Lurry's arrest or enroute to the Joliet Police Station.

28. When they arrived at the station, Lieutenant Harrison approached McCue's squad car to assess and monitor the situation.

29. On that date, Lieutenant Harrison was Defendant May, McCue and Tellez's supervisor.

30. Upon arriving at the station, Defendant McCue gave verbal direction to Mr. Lurry to exit the squad car. Mr. Lurry did not physically or verbally respond to that direction.

31. At the direction of Defendant Harrison, Defendant May entered the rear of McCue's squad car where Mr. Lurry was seated and still handcuffed behind his back.

32. At that time, Defendants McCue, Tellez, May and Harrison immediately recognized that Mr. Lurry was in medical distress and not fully conscious.

33. Specifically, Defendants McCue, Tellez, May and Harrison recognized that Mr. Lurry's eyes were rolling back into his head, that his breathing was shallow, and that he was not physically or verbally responding to Defendant McCue or Defendant May's verbal direction.

34. Despite Mr. Lurry's obvious objectively serious medical needs, no Defendant summoned medical attention for Mr. Lurry at that time.

35. Instead, Defendants May and McCue attempted to retrieve bags containing narcotics from Mr. Lurry's mouth while Defendants Harrison and Tellez looked on.

4

36. In doing so, Defendant May pinched Mr. Lurry's nose for close to two-minutes and grabbed him around his throat to intentionally restrict Mr. Lurry's breathing in an effort to get Mr. Lurry to open his mouth.

37. Defendant May also slapped Mr. Lurry in the face while saying, "Wake up, bitch!"

38. At this time, Defendant May knew that Mr. Lurry was no longer conscious and was in need of immediate medical assistance.

39. At this time, Defendants McCue, Harrison, and Tellez knew that Mr. Lurry was in need of immediate medical assistance.

40. Despite this, at that time, Defendants May, McCue, Harrison and Tellez did not call for medical assistance for Mr. Lurry or direct anyone else to do so.

41. At the same time, at the direction of Defendant Harrison, Defendant McCue inserted a baton in Mr. Lurry's mouth, obstructing his airway.

42. It is against Joliet Police Department's policy to intentionally restrict an arrestee's breathing in an effort to force the arrestee to open his mouth in order to remove evidence therefrom and/or to extract drugs from an arrestee's mouth for the purpose rendering medical aid.

43. Joliet Police Department has a policy that requires medical professionals to be immediately called if an arrestee is known to have or is believed to have inserted drugs into his mouth for the purpose of hiding evidence during the course of an arrest.

44. Joliet Police Department has a policy that requires that medical professionals be immediately called if an arrestee is known to have or is believed to have ingested narcotics during the course of an arrest.

45. It is against Joliet Police Department's policy to attempt to remove drugs from an arrestee's mouth without a medical professional's assistance or the arrestee's consent.

46. Defendant McCue then reached in Mr. Lurry's mouth to retrieve the narcotics and removed

part of a plastic bag.

47. Defendant McCue and May's conduct caused Mr. Lurry to ingest narcotics and suffocate.

48. Mr. Lurry was pronounced dead in the early morning hours of January 29, 2020.

49. The same day, Joliet Police Department Lieutenant Chris Botzum, issued a statement to the media indicating only that Eric Lurry swallowed a bag of cocaine while in custody and that Mr. Lurry later died at AMITA Health St. Joseph Medical Center.

50. Defendant McCue's squad car was equipped with an operable video camera on January 28, 2020.

51. Defendant McCue's squad car was equipped with an operable audio system on January 28, 2020.

52. Defendants' interactions with Mr. Lurry in the back of Defendant McCue's squad car, as set forth herein, were captured and recorded by the squad car video camera and audio system.

53. One or more Defendants edited, tampered with and/or destroyed the audio and/or video footage from the squad car video related to Mr. Lurry's arrest and detention in an attempt to destroy and conceal evidence of wrongdoing.

54. During the subject incident, while in the parking lot of the Joliet Police Station and while Mr. Lurry was still seated in the rear of Defendant McCue's squad car, Defendant Tellez intentionally turned off the squad car's audio recording capabilities.

55. In turning off the squad car's audio recording capabilities, Defendant Tellez and/or McCue violated Joliet Police Department's policies.

56. Additional cameras in and around the perimeter of the Joliet Police Station parking lot recorded portions of the incident set forth herein.

57. These recordings captured relevant, material evidence related to the death of Mr. Lurry and were not preserved by anyone at the Joliet Police Department.

58. Sgt. Esqueda, a 27-year veteran of the Joliet Police Department, viewed and then obtained a copy of the squad car video and shared it with various news outlets because he was disturbed by Defendant May and McCue's conduct.

59. Sgt. Esqueda also obtained and shared the video with various news outlets because he believed that the City of Joliet and/or employees of the Joliet Police Department, including Defendants, attempted to and/or had in fact destroyed incriminating material evidence related to the death of Eric Lurry.

60. In describing what he observed on the squad car video, Sgt. Esqueda said, "It was almost like the supervisor looks off and says something to somebody, and then you hear the sound cut out. That's what alerted me that possibly [the Joliet Police Department] were trying to get rid of evidence."

61. When asked if he believed that there was a deliberate, initial act to turn off the audio or get rid of the audio, Sgt. Esqueda said, "There had to be. There's no way that can happen."

62. Less than three weeks after Sgt. Esqueda's brave reporting of his fellow officers' misconduct, on July 6, 2020, Joliet Police Chief Al Roechner stripped Sgt. Esqueda of his police powers and placed him on administrative desk duty and initiated a criminal and internal investigation into his actions. Sgt. Esqueda has since been indicted on criminal charges and is facing prison time related to his courageous release of this video and his attempt to shut down the cover-up by the Joliet Police Department of Mr. Lurry's death.

63. Defendant May, who pinched Mr. Lurry's nose shut thereby restricting his breathing for almost two minutes and slapped and cursed at him as he was losing consciousness, was not placed on desk duty until five months after the incident, and only after the video was leaked to the public.

64. Defendant Tellez drafted an initial report of the incident omitting from that report the fact that Defendant May slapped Mr. Lurry, that Defendant May did anything to restrict Mr. Lurry's breathing, that Defendant McCue put a baton in Mr. Lurry's mouth, or that Eric Lurry died.

65. Defendant Tellez's report was not supplemented until weeks after the incident to include this information.

## COUNT I: WILLFUL AND WANTON CONDUCT
### (Against all Individual Defendant Officers)

66. Plaintiff incorporates all previous paragraphs as though fully set forth herein.

67. At all times relevant herein, Defendant Officers engaged in a course of action which showed an actual or deliberate intention to cause harm or which, if not intentional, showed utter indifference to or conscious disregard for the safety of others.

68. The acts of Defendant Officers were willful, wanton, and executed with a conscious disregard for the safety of others.

69. In violation of their duty, Defendant Officers recklessly committed without limitation the following willful and wanton acts or omissions when they knew or should have reasonably known that Mr. Lurry's life was in danger:

   a. Failing to transport Mr. Lurry to a medical facility or immediately call for paramedics upon recognizing that Mr. Lurry had drugs in his mouth so medical personnel could safely remove the toxic items from his mouth;

   b. Failing to immediately summon medical attention for Mr. Lurry after observing him to be in significant distress and going in and out of consciousness;

   c. Performing an unreasonable search by attempting to remove toxic items from Lurry's mouth thereby causing Mr. Lurry to ingest the toxic substance;

    d.   Slapping Mr. Lurry in the face while observing him to be in significant distress and going in and out of consciousness;

    e.   Holding Mr. Lurry's nose closed to restrict his breathing knowing him to be in significant medical distress; and

    f.   Prying Mr. Lurry's mouth open with a baton and inserting said baton in his mouth.

70. As a direct and proximate result of the aforementioned willful and wanton acts and reckless conduct of Defendant Officers, Eric Lurry died.

    WHEREFORE, the Plaintiff prays for judgment against Defendant Officers, jointly and severally, for an award of reasonable compensatory and punitive damages, plus costs.

## COUNT II: WRONGFUL DEATH (State-law claim)
### (Against All Individual Defendant Officers)

71. Plaintiff incorporates all previous paragraphs as though fully set forth herein.

72. As set forth above, Defendant Officers caused the wrongful death of Eric Lurry, in violation of ILCS 740 180/1 et seq.

73. Defendant Officers actions proximately caused Mr. Lurry to suffer injuries, including without limitation great bodily harm and death as well as pain and suffering.

74. Under state law, this claim is considered to be an independent action by the administrator of Eric Lurry's estate, Nicole Lurry, to compensate the Estate for loss of society (including loss of companionship and loss of affection, love and support), burial and funeral expenses, and the Estate's grief, sorrow, including but not limited to the loss of a twin pregnancy and mental suffering as well as all direct economic losses stemming from Mr. Lurry's wrongful death.

75. As a result of Defendant Officers' conduct, the Estate has suffered injury, including without limitation medical and/or funeral expenses, loss of society, grief, sorrow, mental suffering and other economic losses.

**WHEREFORE,** the Plaintiff prays for judgment against Defendant Officers, jointly and severally, for an award of reasonable compensatory and punitive damages, plus costs.

## COUNT III: SURVIVAL ACTION (state law claim)
### (Against All Individual Defendant Officers)

76. Plaintiff hereby incorporates all previous paragraphs as though fully set forth herein.

77. After Defendants ultimately caused Mr. Lurry's death by their use of force, restriction of Mr. Lurry's breathing, and their inexcusable and unjustified failure to timely procure the necessary medical attention, Mr. Lurry survived for a period of time during which he experienced conscious pain and suffering.

**WHEREFORE,** Plaintiff prays for judgment against Defendant Officers, jointly and severally, for an award of reasonable compensatory and punitive damages, plus costs.

## COUNT IV: BATTERY (state law claim)
### (Against Defendants McCue and May)

78. Plaintiff incorporates all previous paragraphs as though fully set forth herein.

79. As set forth above, Defendant Officers McCue and May intentionally made physical contact with Mr. Lurry without just cause. The physical contact was offensive and harmful.

80. The actions of the Defendant Officers were intentional, willful, and wanton.

81. The misconduct set forth herein was undertaken with intentional disregard for Mr. Lurry's rights.

82. As a direct and proximate result of Defendant McCue and May's misconduct, Mr. Lurry sustained damages including pain and suffering before his death.

**WHEREFORE,** the Plaintiff prays for judgment against Defendants McCue and May, jointly and severally, for an award of reasonable compensatory and punitive damages, plus costs.

## COUNT V: Replevin (state law claim)
### (Against Defendant Tellez)

83. Plaintiff incorporates all previous paragraphs as though fully set forth herein.

84. Defendant Tellez unlawfully seized Mr. Lurry's money in the amount of $1,380.00.

85. The Estate of Eric Lurry is the rightful owner of such property and lawfully entitled to the immediate possession thereof.

86. Defendant Tellez has not returned Mr. Lurry's money to the Estate and as such, Defendant Tellez has intentionally and wrongfully detained it.

87. The money at issue has not been taken for any tax, assessment, or fine levied by virtue of any law of this state, against the property of plaintiff, or against the plaintiff individually, nor seized under any lawful process against the goods and chattels of plaintiff subject to any lawful process. The money is not held by virtue of any order for replevin against plaintiff.

88. As a result of Defendant Tellez's conduct, the Estate has been injured and deprived of its use and enjoyment of the money.

**WHEREFORE,** the Plaintiff prays for judgment against Defendant Officer Tellez for an award of reasonable compensatory and punitive damages, plus costs.

## COUNT VI: SPOLIATION (state law claim)
### (Against All Defendants)

89. Plaintiff hereby incorporates all previous paragraphs as though fully set forth herein.

90. At the time of the individual Defendants' encounter with Eric Lurry, the audio and video of Defendant McCue's squad car camera were operable and recording.

91. At the time of the individual Defendants' encounter with Eric Lurry, the video camera affixed to the outside of the police station and pointed in the direction of Defendant McCue's squad car, was operable and recording.

92. The video and audio of Defendant McCue's squad car camera captured the individual Defendants' interaction with Mr. Lurry while Mr. Lurry was in the rear of that squad car.

93. The video of the parking lot of the Joliet Police Station captured Defendants' interactions with Mr. Lurry.

94. Portions of the audio recording from the squad car video were edited, tampered with and/or deleted by an employee or employees of the Joliet Police Department

95. Portions of the audio recording from the squad car video were edited, tampered with and/or deleted by one or more individual Defendants.

96. Portions of the video recording from the squad car video were edited, tampered with and/or deleted by an employee or employees of the Joliet Police Department.

97. Portions of the video recording from the squad car video were edited, tampered with and/or deleted by one or more individual Defendants.

98. The surveillance video from the camera that was affixed to the outside of the Joliet Police Department building that depicted portions of the subject incident was intentionally destroyed for the purpose of hiding incriminating evidence.

99. All individual Defendants, all employees of the Joliet Police Department, and the City of Joliet have an obligation to preserve and maintain the integrity of all evidence that may be reasonably related to any ongoing or potential legal action.

100. The video evidence at issue from the surveillance camera and from Defendant McCue's squad car video  constitutes material evidence supporting Plaintiff's underlying claims in this action.

101. In the event that the finder of fact in this case is unable to determine whether or not Defendants acted lawfully during their interactions with Eric Lurry or finds againstPlaintiff on Plaintiff's underlying claims, Plaintiff pleads in the alternative to the prior underlying counts that such loss of evidence proximately caused her inability to prove her underlying claims.

**WHEREFORE**, the Plaintiff prays for judgment against all Defendants, jointly and severally, for an award of compensatory and punitive damages (punitive damages against the individual Defendants only), plus attorney's fees and costs.

## COUNT VII: 1983 FOURTH AMENDMENT - UNREASONABLE SEARCH AND SEIZURE FOR DEFENDANT TELLEZ'S ON-SCENE SEARCH AND SEIZURE OF LURRY'S PERSON AND SEIZURE OF CURRENCY
### (Against Defendant Tellez)

102. Plaintiff incorporates all previous paragraphs as though fully set forth herein. At all times relevant herein, Eric Lurry was vested with, possessed and was guaranteed by the Fourth Amendment of the United States Constitution the right to be free from an unlawful search and seizure.

103. Defendant Officer Tellez, acting under the color of law, caused Mr. Lurry to be seized when he stopped Mr. Lurry from walking away from the scene.

104. Defendant Tellez invaded Mr. Lurry's privacy by searching his person via a "pat-down" search.

105. Defendant Tellez did not have probable cause to believe that Mr. Lurry had committed a crime when Tellez searched and seized Mr. Lurry.

106. Defendant Tellez did not have reasonable suspicion to believe that Mr. Lurry had or was about to commit a crime when he searched and seized Mr. Lurry.

107. Defendant Tellez had no lawful justification for seizing or searching Mr. Lurry's person.

108. Such actions constitute deliberate indifference to Mr. Lurry's rights under the United States Constitution in violation of the Fourth and Fourteenth Amendments.

109. Defendant Tellez's conduct in unlawfully seizing and searching Mr. Lurry was undertaken with malice, willfulness and reckless indifference to Mr. Lurry's rights.

110. Acting under the color of law, Defendant Tellez also seized Mr. Lurry's money without

probable cause or any other legal justification.

111. Defendant Tellez's conduct constituted an illegal seizure of property in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

112. Defendant Tellez's conduct was objectively unreasonable and undertaken intentionally with willful and wanton indifference to Mr. Lurry's constitutional rights.

113. As a direct and proximate result of the wrongful actions of Defendant Tellez, Mr. Lurry suffered loss of liberty, emotional distress, and loss of the use and enjoyment of his property.

**WHEREFORE**, the Plaintiff prays for judgment against Defendant Officer Tellez for an award of reasonable compensatory and punitive damages, plus attorneys' fees and costs.

## COUNT VIII: 1983 FOURTH AMENDMENT - UNREASONABLE SEARCH OF LURRY'S PERSON
### (Against Defendants McCue and May)

114. Plaintiff incorporates all previous paragraphs as though fully set forth herein.

115. At all times relevant herein the Decedent, Eric Lurry, was vested with, possessed and was guaranteed by the Fourth Amendment to the United States Constitution the right to be free from an unreasonable search.

116. Defendants McCue and May deprived Mr. Lurry of this Fourth Amendment right by using unreasonable methods to retrieve narcotics from Mr. Lurry's mouth.

117. Defendant McCue deprived Mr. Lurry of this Fourth Amendment right by forcing a baton into Mr. Lurry's mouth to retrieve narcotics without medical assistance and while Mr. Lurry was handcuffed behind his back in obvious distress and in need of immediate medical attention.

118. Defendant Officer May deprived Mr. Lurry of this Fourth Amendment right by pinching Mr. Lurry's nose closed thereby restricting his ability to take in oxygen for almost two minutes to retrieve narcotics, without medical assistance and while Mr. Lurry was

handcuffed behind his back in obvious distress and in need of immediate medical attention.

119. Defendant Officer May deprived Mr. Lurry of this Fourth Amendment right by slapping Mr. Lurry in his face and saying "Wake up, bitch" in an effort to retrieve narcotics from Mr. Lurry's mouth without medical assistance and while Mr. Lurry was handcuffed behind his back in obvious distress and in need of immediate medical attention.

120. Defendants' conduct was objectively unreasonable and undertaken intentionally with willful and wanton indifference to Mr. Lurry's constitutional rights.

121. As a result of Defendants' conduct, Eric Lurry died.

**WHEREFORE**, the Plaintiff prays for judgment against Defendants McCue and May, jointly and severally, for an award of reasonable compensatory and punitive damages, plus attorneys' fees and costs.

## COUNT IX: 1983 FOURTH AMENDMENT - EXCESSIVE FORCE
### (Against Defendants McCue and May)

122. Plaintiff incorporates all previous paragraphs as though fully set forth herein.

123. At all times relevant herein the Decedent, Eric Lurry, was vested with, possessed and was guaranteed by the Fourth Amendment to the United States Constitution the right to be free from unreasonable, unjustifiable and excessive force.

124. Defendant Officer McCue deprived Mr. Lurry of this Fourth Amendment right by forcing a baton into Mr. Lurry's mouth to retrieve narcotics without medical assistance and while Mr. Lurry was handcuffed behind his back in obvious distress and in need of immediate medical attention.

125. Defendant Officer May deprived Mr. Lurry of this Fourth Amendment right by pinching Mr. Lurry's nose closed thereby restricting his ability to take in oxygen for almost two minutes to retrieve narcotics, without medical assistance and while Mr. Lurry was

handcuffed behind his back in obvious distress and in need of immediate medical attention.

126. Defendant Officer May deprived Mr. Lurry of this Fourth Amendment right by slapping Mr. Lurry in his face and saying "Wake up, bitch" in an effort to retrieve narcotics from Mr. Lurry's mouth without medical assistance and while Mr. Lurry was handcuffed behind his back in obvious distress and in need of immediate medical attention.

127. The actions of Defendant Officers were willful, intentional and malicious and/or done with reckless indifference to and callous disregard for Plaintiffs' rights.

128. As a result of Defendant Officers' conduct, Eric Lurry died.

**WHEREFORE**, the Plaintiff prays for judgment against Defendant Officers McCue and May, jointly and severally, for an award of reasonable compensatory and punitive damages, plus attorneys' fees and costs.

## COUNT X: 1983 SUBSTANTIVE DUE PROCESS - FAILURE TO PROVIDE MEDICAL ATTENTION/STATE-CREATED DANGER
### (Against All Individual Defendants)

129. Plaintiff incorporates all previous paragraphs as though fully set forth herein.

130. At all relevant times, Defendants were acting under color of law.

131. At all times relevant herein the Decedent, Eric Lurry, was vested with, possessed and was guaranteed by the Fourteenth Amendment to the United States Constitution the substantive due process right to life, liberty and personal security.

132. Defendants' conduct violated Plaintiff's substantive due process right to be free from a state-created danger.

133. Eric Lurry was in Defendants' custody at the time of the subject incident.

134. As such, Defendants had a duty to protect and provide medical services to Mr. Lurry who was in obvious need of such services.

135. Between the time Defendant Tellez was first recorded on the dash-cam video saying that he

believed Mr. Lurry ingested drugs and the time they arrived at the police station, Defendants left Mr. Lurry in the backseat for at least 11 minutes.

136. While Mr. Lurry was in the backseat of the squad car enroute to the Joliet Police Station, Defendant McCue and/or Defendant Tellez observed Mr. Lurry chewing and proceeded to the Joliet Police Station instead of transporting him to the hospital immediately or calling for medical assistance immediately.

137. By the time the Defendants and Mr. Lurry reached the precinct parking lot, Mr. Lurry was barely conscious and was in serious, obvious medical distress requiring immediate medical attention.

138. This objectively serious medical need was evinced by Eric Lurry's heavy breathing, the Defendants' observations and knowledge that he was chewing on something, the Defendants' observations and knowledge that he had drugs in his mouth and had swallowed drugs, Eric Lurry's inability to understand, comprehend and comply with the Defendants' directives, Eric Lurry's eyes rolling back into his head, Eric Lurry's inability to stay alert, and his inability to speak.

139. Defendants knew that Eric Lurry had an objectively serious medical need because they observed the behavior set forth in Paragraphs 136-138 and were deliberately indifferent to that need.

140. Further, when Defendant May acted intentionally to hinder Eric Lurry's breathing to extract drugs from his mouth for the purpose of obtaining evidence to secure criminal charges against Mr. Lurry for possession of narcotics and with the knowledge that Mr. Lurry was in need of immediate medical attention, Defendant May created and/or increased the risk that Mr. Lurry faced - namely, death.

141. When Defendant McCue acted intentionally inserting an asp into Eric Lurry's mouth at the

17

direction of Defendant Harrison, for the purpose of extracting drugs from Mr. Lurry's mouth to obtain evidence to secure criminal charges against Mr. Lurry for possession of narcotics and with the knowledge that Mr. Lurry was in need of immediate medical attention, Defendant McCue created and/or increased the danger that Mr. Lurry faced - namely, death.

142. Despite their observations of Mr. Lurry and their knowledge that he had an objectively serious medical need, Defendants failed to summon immediate medical attention as required for Mr. Lurry.

143. Despite their observations of Mr. Lurry and their knowledge that he had an objectively serious medical need, Defendants used excessive and unlawful force against Mr. Lurry, thereby exacerbating his condition and causing his death.

144. Defendants' conduct as set forth above constitutes deliberate indifference as the conduct was intentional, willful, and wanton and committed with reckless disregard to Mr. Lurry's rights, thereby shocking the conscience.

145. As a direct result of the Defendants' misconduct, Eric Lurry died.

**WHEREFORE**, the Plaintiff prays for judgment against Defendant Officers, jointly and severally, for an award of reasonable compensatory and punitive damages, plus attorneys' fees and costs.

## COUNT XI: 1983- FAILURE TO INTERVENE
### (Against All Individual Defendants)

146. Plaintiff incorporates all previous paragraphs as though fully set forth herein.

147. Defendants Tellez and Harrison had a reasonable opportunity to prevent Defendant McCue and May's (1) unreasonable search of Mr. Lurry's person and (2) excessive force against Mr. Lurry, but failed to do so.

148. Defendants McCue and May had a reasonable opportunity to prevent each other's

unreasonable search of Mr. Lurry's person and excessive force against Mr. Lurry, but failed to do so.

149. Defendant McCue had a reasonable opportunity to prevent Defendant Tellez's unlawful seizure and unlawful pat-down search of Mr. Lurry's person as well as Defendant Tellez's unlawful seizure of Mr. Lurry's money, but failed to do so.

150. All Defendants had a reasonable opportunity to prevent one another from violating Mr. Lurry's substantive due process right receive immediate medical attention and to secure Mr. Lurry's right to be free from a state-created danger, but failed to do so.

151. As a result of the Defendant Officers' failure to intervene, Mr. Lurry suffered physical and emotional injuries as well as loss of liberty, loss of the use and enjoyment of his property, and death.

152. Defendant Officers' misconduct was objectively unreasonable and was undertaken intentionally with malice, willfulness and reckless indifference to Mr. Lurry's rights.

**WHEREFORE**, the Plaintiff prays for judgment against Defendant Officers, jointly and severally, for an award of reasonable compensatory and punitive damages, plus attorneys' fees and costs.

## COUNT XII: 1983- SUPERVISORY LIABILITY
### (Against Defendant Harrison)

153. Plaintiff incorporates all previous paragraphs as though fully set forth herein.

154. At all relevant times, Defendant Harrison was the supervisor of Defendants May, McCue and Tellez.

155. Defendant Harrison was personally involved in depriving Mr. Lurry of his constitutional rights in that he facilitated, approved of, and condoned the unreasonable force used against Mr. Lurry by Defendants May and McCue as set forth in Count IX of this Complaint.

156. Defendant Harrison was personally involved in depriving Mr. Lurry of his constitutional rights in that facilitated, approved of, and condoned the conduct ofDefendants May, McCue and Tellez in their failure to provide immediate medical attention to Mr. Lurry despite Mr. Lurry's objectively serious medical needs.

157. Defendant Harrison's conduct was undertaken intentionally with malice, willfulness, and reckless indifference to Mr. Lurry's rights.

**WHEREFORE**, the Plaintiff prays for judgment against Defendant Harrison for an award of reasonable compensatory and punitive damages, plus attorneys' fees and costs.

## COUNT XIII—*MONELL*
### (Against City of Joliet)

158. Plaintiff hereby incorporates all previous paragraphs as though fully set forth herein.

159. The Joliet Police Department (the "Department") is a subsidiary division of Defendant City of Joliet. The City maintains and exercises exclusive control over the Department, its policies and procedures, as well as the conduct of all of its employees, including all the individual Defendants, their fellow officers, and their supervisors.

160. Defendant City of Joliet, through its subsidiary the Joliet Police Department, has established certain *de facto* policies, practices, and/or customs which were adopted and promulgated through the actions and inactions of senior and intermediate supervising employees of the Joliet Police Department and were thereby ratified by the City.

161. The actions of the individual Defendants were done pursuant to one or more of the following *de facto* policies, practices and/or customs of the City that are so pervasive that they carry the force and effect of law.

162. The Defendant City of Joliet maintains a *de facto* policy, practice, and custom of failing to adequately train, supervise, discipline, and control its police officers. As a matter of both policy and practice, Defendant City of Joliet facilitates the very type of misconduct at issue

here by failing to adequately investigate, punish and discipline prior instances of similar misconduct, thereby leading Joliet Police Officers to believe their actions will not be properly scrutinized or result in any significant consequences, and in that way, directly encouraging future abuses such as those that resulted in the death of Mr. Lurry.

163. Specifically, Joliet Police Officers accused of excessive force, unreasonable searches and detentions, and deliberate indifference to the constitutional rights of the citizens they are sworn to serve, are aware of and can be confident that: police officers that receive frequent citizen complaints remain employed with the Department; that the Department will not investigate those accusations in earnest, refusing to find complaints with merit justified or recommend discipline even where the officer has engaged in excessive force or other misconduct; that the Department aims to exonerate officers involved in misconduct; and that the City's response to citizen complaints of police misconduct is to defend/settle civil suits as opposed to disciplining or terminating problem officers.

164. The City of Joliet has a *de facto* policy, practice and/or custom of concealing and/or suppressing officer misconduct, including the use of unlawful force and deliberate indifference to citizens' constitutional rights, particularly with regards to racial minorities. The concealment and suppression of the existence of misconduct includes, but is not limited to: failure to sufficiently and timely investigate allegations of misconduct; delaying investigations of police misconduct; failure to accept complaints from citizens against police officers; failure to promptly record witness statements or preserve evidence; failure to promptly interview the suspected officer, *including* in such circumstances where it would be plausible to suspect misconduct on the part of the officer; failure to properly and sufficiently discipline an officer, even where the evidence of misconduct is clear and convincing, and even where the citizen complaint is either: corroborated by other evidence, or sustained;

fabrication of exculpatory evidence or destruction of evidence; failure to prohibit the fabrication of exculpatory evidence or destruction of incriminating evidence of police misconduct; and, failure to initiate prompt disciplinary procedures related to the alleged misconduct, even when the allegation of misconduct is supported by corroborating evidence.

165. The City has a *de facto* policy, practice and/or custom in which a "code of silence" is pervasive within all aspects of the Department. This code is manifest as a universal practice among sworn members of the Department. There is an express or implicit understanding and agreement among Joliet police officers which results in a refusal or failure by Joliet police officers to intervene to prevent or stop the unnecessary and often gratuitous abuse of citizens through the use of excessive force. As part of this code, officers who do wish to report the misconduct of their fellow officers know they will face retaliation and adverse employment consequences for doing so, as occurred in the instance case with respect to Sgt. Esqueda. The code also causes officers to refuse or fail to report or testify against fellow officers regarding instances of misconduct of which they are aware, despite their obligation to do so as sworn peace officers.

166. This *de facto* policy applies to Joliet police officers who remain silent or give false or misleading information during official investigations and sworn testimony in criminal cases and in related civil litigation involving allegations of misconduct against a fellow officer, in order to protect themselves or their fellow officers from discipline, criminal prosecution, or to shield them from civil liability.

167. Individually and collectively, the above-described *de facto* policies, practices and/or customs of the City proximately result in the pervasive culture and widespread attitude among members of the Joliet Police Department, including the individual Defendants, that they may engage in misconduct against the citizenry with impunity, and without fear of official

consequence. In every sense of the term, Joliet police officers consider themselves "above the law."

168. In or about June 2020, based upon a request to investigate the circumstances of Mr. Lurry's death, the Illinois Attorney General's Office began a preliminary review of Joliet Police Department records and other information, including over 20,000 records relating to interactions between the Joliet police officers and civilians. As a result of concerns raised by this preliminary review, on September 8, 2021, Illinois Attorney General Kwame Raoul announced a formal investigation into whether the Joliet Police Department has engaged in patterns or practices of unconstitutional or unlawful policing, including specifically with respect to officers' use of force, officers' decisions surrounding searches and detentions, and the Department's investigation of misconduct complaints and its policies regarding disciplinary action.

169. The Defendant City of Joliet maintains a *de facto* policy, practice, and custom of failing to adequately train its police officers in (1) how to recognize a drug-related medical emergency/overdose; (2) how to administer proper emergency first aid to victims of overdose; (3) the proper life-saving procedures to ensure that the arrestee is provided with immediate medical care by a certified medical professional; and (4) in proper procedures for conducting searches of an arrestee's oral cavity for recovery of contraband so as to prevent choking, restricted breathing, asphyxiation, narcotic ingestion, and death.

170. Alternatively, the City of Joliet maintains a *de facto* policy, practice, and custom whereby the City is aware that its officers routinely disregard their training regarding drug-related medical emergencies and that they are allowed to do so without any consequence.

171. The Defendant City of Joliet maintains a *de facto* policy, practice, and custom of permitting its officers to restrict the breathing of arrestees by holding their nose closed to encourage the arrestee to open his mouth so narcotics can be retrieved therefrom.

172. The Defendant City of Joliet maintains a *de facto* policy, practice, and custom of permitting its officers to slap arrestees in the face who are suspected of suffering from a drug overdose to test their pain response and alertness.

173. Joliet Police Officers are not trained on the physical effects of cocaine, heroin, or fentanyl among other narcotics despite the fact that Joliet Police Officers respond to drug overdose calls 3-4 times per week. These drug overdose calls almost always involve the victim consuming high amounts of cocaine, heroin and/or fentanyl.

174. Joliet Police Officers are not required to, and most do not, carry Narcan or any other medication that counteracts the effects of narcotics for the purpose of saving the lives of drug-overdose victims/arrestees.

175. Individually and collectively, the above-described *de facto* policies, practices and/or customs of the City in failing to properly train and implement proper procedures and protocols related to narcotics and oral cavity searches as promulgated above, proximately results in injury and death that is pervasive and widespread.

176. Municipal policymakers have long been aware of the City of Joliet's policy and practice of failing to properly train, monitor, and discipline its police officers, but they have not enacted appropriate measures to address that failure.

177. The aforementioned *de facto* policies, practices and/or customs of the City, individually and collectively, have been maintained and/or implemented with utter indifference by the City which has encouraged and/or motivated the individual Defendants to commit the aforesaid

24

wrongful facts against Mr. Lurry and, therefore, *de facto* policies, practices and/or customs of the City are a direct and proximate cause of the injuries sustained by Mr. Lurry.

178. Plaintiff's injuries were proximately caused by the policies and practices on the part of Defendant City of Joliet for failing to adequately train, supervise, discipline, and control its police officers. Indeed, the individual Defendants' misconduct was undertaken pursuant to the City's policy and practice in that:

    a.  As a matter of both policy and practice, the City directly encourages and is thereby the moving force behind the very type of misconduct at issue here by failing to adequately train, supervise, and control its officers, such that its failure to do so manifests deliberate indifference;

    b.  As a matter of both policy and practice, the City facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct, thereby leading Joliet Police Officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those that resulted in the death of Mr. Lurry specifically, Joliet Police Officers accused of excessive force and misconduct can be confident that the Department will not investigate those accusations in earnest and will refuse to recommend discipline even where the officer has engaged in misconduct;

    c.  As a matter of both policy and practice, the City directly and indirectly encourages, condones and facilitates the very type of misconduct at issue here by failing to properly train its police officers to recognize drug overdose victims, provide emergency first aid treatment to overdose victims including the administration of Narcan, and ensure immediate medical care is provided to overdose victims thereby causing physical injury and death.

d. As a matter of both policy and practice, the City directly and indirectly encourages, condones and facilitates the very type of misconduct at issue here by permitting its officers to slap and/or otherwise physically harm an overdose victim for the purpose of testing his/her pain response and alertness.

e. As a matter of both policy and practice, the City directly and indirectly encourages, condones and facilitates the very type of misconduct at issue here by allowing its officers to restrict the breathing of individuals suspected and/or known to have narcotics in his/her mouth for the purpose of extracting the narcotics.

f. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Joliet Police Department abuse citizens in a manner similar to that alleged by Plaintiff on a frequent basis, yet the Joliet Police Department makes findings of wrongdoing in a disproportionately small number of cases;

g. Where citizens complain to the Joliet Police Department that they have been subjected to criminal violations by Joliet Police Officers, the Department's policy and practice is to affirmatively discourage those persons from pursuing criminal charges against the offending police officers; the City's training in that regard is equally deficient. This policy and practice and lack of adequate training encourages Joliet Police Officers, such as the individual Defendants in this case, to use violence without fear of legal consequences.

h. Municipal policymakers are aware of, and conduct and facilitate by their inaction, a "code of silence" in the Joliet Police Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case;

i. The City and the relevant policy makers have failed to act to remedy the patterns of abuse described herein, despite actual knowledge of the same, thereby causing the types of injuries.

**WHEREFORE**, the Plaintiff prays for judgment against Defendant City of Joliet for an award of reasonable compensatory damages, plus attorney's fees and costs.

## COUNT XIV—INDEMNIFICATION

179. Plaintiff hereby incorporates all previous paragraphs as though fully set forth herein.

180. At all relevant times, Defendant City of Joliet was the employer of the individual Defendants.

181. The individual Defendants committed the acts alleged above under the color of law and in the scope of their employment as employees of the City of Joliet.

182. In Illinois, public entities are directed to pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

183. As a proximate cause of the unlawful acts of the individual Defendants, which occurred within the scope of their employment, Plaintiff was injured.

**WHEREFORE**, should any of the individual Defendants be found liable on one or more of the federal claims set forth above, Plaintiff demands, pursuant to 745 ILCS 10/9-102, that Defendant City of Joliet be found liable for any compensatory judgment Plaintiff obtains against said individual Defendant(s), plus attorneys' fees and costs awarded and such other and additional relief that this Court deems equitable and just.

## COUNT XV—*RESPONDEAT SUPERIOR*

184. Plaintiff hereby incorporates all previous paragraphs as though fully set forth herein.

185. In committing the acts alleged in the preceding paragraphs, the individual Defendants were agents of the City of Joliet and were acting at all relevant times within the scope of their

employment and under color of law.

186. Defendant City of Joliet is liable as principal for all torts committed by its agents.

**WHEREFORE**, should any of the individual Defendants be found liable on one or more of the state claims set forth above, Plaintiff demands that, pursuant to *respondeat superior*, Defendant City of Joliet be found liable for any compensatory judgment Plaintiff obtains against said Defendant(s), as well as costs awarded.

**JURY DEMAND**

Plaintiff requests trial by jury.

**NOTICE OF ASSIGNMENT**

Please be advised that all rights relating to attorneys' fees have been assigned to the undersigned counsel.

By:    /s/ Abby D. Bakos
*One of Plaintiff's Attorneys*

Abby D. Bakos
Bakos & Maisuria Law Group
1755 Park Street., Suite 200-1070
Naperville, Illinois 60563
T: (833) 800-2654
E: abby@bakosmaisuria.com
Website: www.bakosmaisuria.com