## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE LURRY, as Special Administrator of the Estate of Eric Lurry, Jr., deceased, | ) ) ) | |
| *Plaintiff*, | ) ) | No. 20 C 4545 |
| v. | ) ) | Judge Virginia M. Kendall |
| CITY OF JOLIET et al., | ) ) ) | |
| *Defendants.* | ) | |

### MEMORANDUM OPINION & ORDER

Before the Court are motions to exclude testimony from five experts. Plaintiff Nicole Lurry, acting as special administrator of the estate of her late husband, Eric Lurry, moves to exclude testimony from two experts proposed by Defendants. (Dkts. 75, 76). Defendants City of Joliet and Officers Douglas May, Jose Tellez, Andrew McCue, and Jeremy Harrison move to exclude testimony from three experts proposed by Plaintiff. (Dkt. 77 (consolidated motion); *see also* dkts. 78, 79, 80 (memoranda for each expert)). For the following reasons, the Court grants in part and denies in part both of Plaintiff's Motions to Exclude Defendants' proposed expert testimony. [75, 76] The Court also grants in part and denies in part Defendants' Motion to Exclude Plaintiff's proposed expert testimony. [77]

### BACKGROUND

This case arises from the death of Eric Lurry, Jr., while in custody of Joliet police. Mr. Lurry was a passenger in his friend Kenan Kinney's car when Joliet Police Officer Wietting—not a defendant in this case—pulled Kinney over. Wietting arrested Kinney after searching his car and finding baggies thought to contain cocaine and heroin. Defendant Officers Tellez and McCue

arrived on the scene, patted Mr. Lurry down and, finding nothing, told him he could leave. But minutes later, they stopped him again, and Tellez performed another pat-down search. He felt through Mr. Lurry's clothes a plastic bag thought to contain narcotics. They arrested Mr. Lurry and, after a brief struggle, put him in the back of the squad car. At some point, Mr. Lurry put bags in his mouth.

The officers took him to the Joliet Police Station. When they arrived, Tellez told Defendant Officer Douglas May that Mr. Lurry had put drugs in his mouth and may have swallowed them. By then, Lurry was not verbally or physically responsive to the officers' instructions. May pulled Mr. Lurry's chin down, opened his mouth, and held his nose. McCue put his asp (baton) in Mr. Lurry's mouth and pulled out a bag containing a white powdery substance later determined to be a combination of cocaine, fentanyl, and heroin.

Defendant Lt. Jeremy Harrison called for medical assistance. Mr. Lurry was taken out of the squad car and another officer performed CPR. Lurry coughed up a plastic bag and then shook violently on the ground. EMTs arrived on the scene to transport him to the hospital, but Mr. Lurry did not survive. The medical examiner, Dr. Michel Humilier, ruled his death was caused by an accidental overdose of heroin, fentanyl, and cocaine.

Plaintiff Nicole Lurry, as special administrator of the estate of her husband, brings claims under 42 U.S.C. § 1983 against the individual Defendants for allegedly violating Mr. Lurry's Fourth and Fourteenth Amendment rights. (Dkt. 54 at 13–20). She also brings several state-law claims against individual Defendants. (*Id.* at 8–12). Finally, Plaintiff brings a *Monell* claim[1] and state-law indemnification and *respondeat superior* claims against the City of Joliet. (*Id.* at 20–28).

---

[1] The Court has bifurcated Plaintiff's *Monell* claim and stayed related discovery pending resolution of her other claims. (Dkt. 53).

Plaintiff has filed *Daubert* motions to exclude testimony from two of Defendants' expert witnesses. (Dkts. 75, 76). Defendants have filed *Daubert* motions to exclude testimony from three of Plaintiff's expert witnesses. (Dkts. 77–80). The Court held hearings on November 30, 2022, and December 1, 2022, to examine each proposed expert witness. (Dkts. 102, 103).

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert testimony for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Rule 702 permits opinion testimony from a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" if his or her expertise will assist the trier of fact "to understand the evidence or to determine a fact in issue," and "the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Thus, "the key to the gate is not the ultimate correctness of the expert's conclusions but rather the soundness and care with which the expert arrived at her opinion." *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 826 (7th Cir. 2021) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)) (internal quotation marks omitted). The Court must analyze each of an expert's conclusions individually. *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016).

District courts apply *Daubert* flexibly, consistent with the Court's gatekeeping function. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). The Court uses a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines: (1)

3

"whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Whether to admit expert testimony rests within the Court's sound discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

**DISCUSSION**

**A.      Plaintiff's Motions to Exclude Defendants' Expert Testimony**

Plaintiff objects that testimony proposed by two of Defendants' expert witnesses—Dr. William Smock, a physician of emergency medicine, and John "Jack" Ryan, a police practices and procedures expert—are inadmissible under Rule 702 and *Daubert*.

**1.      Dr. William Smock**

Plaintiff seeks to exclude all testimony and opinions of Defendants' expert Dr. William Smock related to: (1) Mr. Lurry's cause of death; (2) Mr. Lurry's purported "reckless, suicidal acts" during his arrest; (3) the propriety of Defendant Officers' conduct; and (4) Dr. Smock's prior work in the George Floyd case. (Dkt. 75 at 2). The Court takes each objection in turn.

*a.  Opinions on Mr. Lurry's Cause of Death*

First, Plaintiff contends that Dr. Smock is not qualified to opine on Mr. Lurry's cause of death or the rate at which Mr. Lurry absorbed the narcotics he ingested because this falls outside his medical specialization as indicated by his education and experience. (Dkt. 75 at 4–8). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the

witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trs. of Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) (internal citation omitted); *see also United States v. Truitt*, 938 F.3d 885, 889–90 (7th Cir. 2019) (explaining that a general physician may be qualified to testify about heart conditions regardless of whether he is a licensed cardiologist *depending on his experience* with such conditions).

Dr. Smock earned his bachelor's degree from Centre College and a master's degree in anatomy in 1987. (Dkt. 75-3 at 3). He earned his medical degree from the University of Louisville School of Medicine in 1990. (*Id.*) He then completed his residency in emergency medicine in 1993 and a fellowship in clinical forensic medicine in 1994. (*Id.*) He has over thirty years' experience working at Louisville area hospitals as a Doctor of Emergency Medicine. (*Id.* at 1–3). He has since held several professorships at the University of Louisville and is currently a Clinical Professor in its Department of Emergency Medicine. (*Id.* at 1–3). He also worked as an Assistant Medical Examiner for six years. (*Id.* at 3). During that time, he attended "thousands" of autopsies. (Dkt. 105 at 76:24–77:9). Since 1997, he has been a Forensic Consultant for Kentucky's Chief Medical Examiner's Office. (Dkt. 75-3 at 2–3). In that role, he "evaluate[s] the performance of other medical examiner's office[s and] the forensic pathologists." (Dkt. 105 at 76:1–3). Additionally, Dr. Smock has co-edited three textbooks on forensic and emergency medicine, including one on strangulation. (*Id.* at 7).

In his years of experience as a physician, he has treated "hundreds, if not thousands" of patients presenting with drug intoxication who experienced cardiac arrhythmias due to consumption of illegal drugs such as heroin, cocaine, and fentanyl. (*Id.* at 72:12–20). Likewise, as an attending ER physician, he has determined the cause and manner of death for patients who died from drug overdose "many, many times"—estimating at least one such death every shift. (*Id.* at 73:8–74:12; *see also* dkt. 105 at 74:22–75:2 ("At an inner-city emergency department, a large number of our patients have toxicologic issues, whether it's dealing with alcohol, cocaine, narcotics. That is something that the emergency physician, particularly in a busy hospital, has to deal with every shift due to the—just the prevalence of drug abuse in our society.")).

Dr. Smock has also worked with law enforcement as a tactical physician and police surgeon for decades. (Dkt. 75-3 at 2–3). He teaches courses at the police academy involving both toxicology and strangulation. (Dkt. 75-4 at 43–44; dkt. 105 at 86:7–10). He is also under contract with the FBI's Louisville Division to investigate in-custody injuries and deaths. (Dkt. 105 at 69). He regularly lectures to government medical and law enforcement bodies—domestic and international—on such topics as forensic medicine, toxicology, and in-custody deaths by suffocation, strangulation, and other forms of asphyxia. (*Id.* at 80). Dr. Smock is the medical director for the Training Institute on Strangulation Prevention, which trains physicians, nurses, law enforcement, the FBI, the U.S. Attorney's Office, and judges on strangulation-related topics. (*Id.* at 80–81). Dr. Smock has been recognized as an expert and testified in dozens of state and federal court cases, including in the fields of forensic medicine, strangulation/suffocation, and forensic toxicology. (Dkt. 75-3 at 84; dkt. 92-1).

The Court finds that Dr. Smock is qualified based on his training and experience gained from years of practicing emergency medicine and forensic medicine to offer opinions on the cause

of Mr. Lurry's death. He has treated innumerable patients who suffered overdoses from toxicological agents and ruled such agents the cause of death many times over twenty years as an attending ER physician. *See Truitt*, 938 F.3d at 889–90. Although Plaintiff points out that Dr. Smock is not board certified in pathology or toxicology, (dkt. 75 at 6), he clearly has extensive experience in these areas of medicine through his practice of emergency medicine, his teaching and research, and his attendance at "more than five thousand" autopsies, (dkt. 105 at 77:5–9). Further, his decades of working and consulting for the Kentucky Medical Examiner's Office and the thousands of autopsies he has attended qualify him to evaluate and comment on the findings of Dr. Michel Humilier, who performed Mr. Lurry's autopsy. As Dr. Smock explained at his *Daubert* hearing, "In my role as, one, a treating physician, but [also] two, as a consulting forensic physician, toxicology plays a role in clearly the vast majority of the patients that I see or consult on, either living or dead. So toxicology is part and parcel of, one, an emergency physician, but it's also part and parcel of the training of a forensic physician. Whether a forensic pathologist or a clinical forensic physician, toxicology is something that we evaluate in some aspect of nearly every patient that we see." (Dkt. 105 at 93:11–19).

Plaintiff also points to the lack of reported cases in Westlaw or Lexis where Dr. Smock was specifically qualified as an expert to testify on a death involving toxicological elements. (Dkt. 94 at 4–5). But this lack of reported cases is not significant, as any *unchallenged* testimony he has given in court would naturally have no case to report. Not every motion or order in a case is reported, particularly in state courts where Dr. Smock has also testified. Indeed, Dr. Smock testified that he has given expert opinion testimony "many times" when the case included an element of toxicology and the cause of death involved an overdose on illegal drugs, as well as opinions where he had "to weigh the evidence between evidence of toxicology and evidence of

asphyxia or strangulation and determine which of these or some third factor was the cause of the individual's death." (Dkt. 105 at 89:6–21). Specifically, Dr. Smock explained that he was permitted to testify in the trial of Derek Chauvin that George Floyd's death was not caused by the drugs in his system but by positional asphyxia. (Dkt. 105 at 91:9–20). He also testified based on his training and experience in a recent trial in Denver that a victim perished from strangulation and suffocation, and that toxicology did not play a role in her death. (Dkt. 105 at 91–92).

The Court therefore finds Dr. Smock qualified based on his training and experience to opine on Mr. Lurry's cause of death. Once qualified, the Court assesses the reliability of the expert's methods. Dr. Smock must show how he reached his conclusions, either by linking them to generally accepted standards or by citing his own practical experience. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The critical inquiry is whether there is a connection between the data employed and the opinion offered."); *see also, e.g.*, *Potts v. Manos*, No. 11-cv-3952, 2017 WL 4365948, at *5 (N.D. Ill. Sept. 29, 2017) ("A witness who offers expert testimony based on his experience must connect his experience to the facts of the case in order to meet the standard for reliability under *Daubert* and the Federal Rules of Evidence.").

The Court finds Dr. Smock did not reach his opinions through "mere speculation," as Plaintiff posits, but rather through careful review of the relevant records and applying his training and experience. Dr. Smock based his conclusions in the challenged opinions #1 and #3 on the autopsy report, the toxicological report, the cardiac rhythm recorded by EMS upon arrival, videos where he viewed Mr. Lurry chewing material, and the fact that material was pulled out of Mr. Lurry's mouth. (Dkt. 105 at 105–06). He explained how he drew on his "20-plus years as a practicing emergency room medical doctor" as applied to this record to form his opinion. (Dkt. 105 at 106–08; *see also id.* at 108:22–25 ("My opinion is based on treating patients over . . . a long

8

career as an attending ER doctor, patients who overdose and come in with various cardiac arrhythmias, some non-fatal, some fatal.")). The same methodology is commonly employed by medical experts retained to opine on cause of death. *See Gayton*, 593 F.3d at 618 (finding reliable physician's methodology in arriving at his conclusions based on a "cold record" of autopsy report, medical records, and witness testimony); *Ortiz v. City of Chicago*, 656 F.3d 523, 537 (7th Cir. 2011) (same). His report also cites to medical literature he drew on to reach his opinions. (Dkt. 75-1 at 11; *see also* dkt. 105 at 108:11–15 (adding that his opinion also draws on published literature)). This is not guesswork; this indicates an expert drawing on his specialized knowledge, training, research, and experience to reach conclusions from the facts at hand. Dr. Smock applied a reliable methodology to the evidence to arrive at his conclusions.

Finally, to satisfy the *Daubert* framework, his opinion must be relevant. A central issue in this case is whether Mr. Lurry died solely from overdosing on drugs he intentionally ingested— Defendants' theory—or whether strangulation or asphyxia contributed to his death—Plaintiff's theory. Dr. Smock's testimony goes to this issue. He may opine on Mr. Lurry's cause of death.

### b. *Mr. Lurry's Purported "Reckless, Suicidal Acts"*

Next, Plaintiff objects that Dr. Smock's opinions about Mr. Lurry's purportedly "reckless" or "suicidal" actions are unreliable and irrelevant under Rule 702 and unduly prejudicial under Rule 403. (Dkt. 75 at 8–11). Dr. Smock refers to Mr. Lurry's action putting drugs in his mouth as "reckless" and "suicidal" five times in his report. (Dkt. 75-1 at 1, 7, 11, 12). Defendants contend Dr. Smock, by making these statements, never meant to suggest Mr. Lurry consciously intended to end his life. Rather, Defendants argue he was offering a "common, everyday way[ ] people describe extremely risky conduct . . . ." (Dkt. 92 at 11). Dr. Smock's testimony at his hearing likened the action to "jumping out of an airplane without a parachute," which is commonly

understood as "reckless, dangerous, because bad things can happen." (Dkt. 105 at 185:15–22). He conceded that when he said "suicidal" in the report, he meant to convey only that the act was both "intentional" and "reckless," not that Mr. Lurry consciously attempted to end his own life. (Dkt. 105 at 186–87). Dr. Smock agreed that there were "no facts [he could] point to that would support [Mr. Lurry] being suicidal other than [his] belief that putting the drugs in his mouth was a dangerous thing to do[.]" (*Id.* at 187:9–12).

The Court agrees that Dr. Smock's opinions characterizing Mr. Lurry's actions as "suicidal" and "reckless" should be excluded under Rule 702. They are not based on Dr. Smock's expert education, training, or experience as applied through a reliable methodology to the facts of this case. Moreover, they will not assist the jury to determine Mr. Lurry's ultimate cause of death. Dr. Smock's characterization of the action as "suicidal" is not based on any of his medical training or experience. He agreed he was not offering any expert opinion into Mr. Lurry's mental state at the time he put the drugs in his mouth. From a clinical perspective, an essential element of suicide is a person's intent to die from the behavior.[2] Dr. Smock admitted he had no information to show Mr. Lurry intended to end his own life.

To the extent Dr. Smock meant "suicidal" as a synonym for "reckless," conveying only the dangerousness of the action, he does not base this opinion off any special education, experience, or training, either. Rather, as both Defendants and Dr. Smock himself observed, it is a commonsense judgment about a particular action that takes no special expertise to recognize. The Court as a gatekeeper must "make certain that an expert, whether basing testimony upon

---

[2] *See* "Suicide," NAT'L INST. OF MENTAL HEALTH, NAT'L INSTS. OF HEALTH, https://www.nimh.nih.gov/health/statistics/suicide#:~:text=Suicide%20is%20defined%20as%20death,a%20result%20of%20the%20behavior (last updated June 2022) ("Suicide is defined as death caused by self-directed injurious behavior with intent to die as a result of the behavior."); "Facts About Suicide," CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/suicide/facts/index.html, (last updated Oct. 24, 2022) ("Suicide is death caused by injuring oneself with the intent to die.").

professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd.*, 526 U.S. at 152. While expert witnesses may serve a "dual role" in their testimony, the district courts "must guard against the 'inherent danger[ ]' that the jury may conflate a witness's lay testimony with the portion of that witness's testimony that is expert." *Patterson v. Baker*, 990 F.3d 1082, 1085 (7th Cir. 2021) (citing *United States v. Jett*, 908 F.3d 252, 267 (7th Cir. 2018)).

Here, Dr. Smock employs no intellectual rigor in passing judgment on the advisability of Mr. Lurry's actions. He further admits that the average person would have no trouble discerning the actions' dangerousness for herself. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("Expert testimony is permitted to assist the trier of fact with technical issues that laypeople would have difficult resolving on their own."); *Florek v. Village of Mundelein, Ill.*, 649 F.3d 594, 602–03 (7th Cir. 2011) ("And when the testimony is about a matter of everyday experience, expert testimony is less likely to be admissible."). His characterization adds nothing to the jurors' task in determining the medical cause of death between Plaintiff's and Defendants' versions of the facts. Defendants offer no explanation for how these characterizations will aid jurors to understand the evidence or determine a fact at issue. *See* Fed. R. Evid. 702(a); *Myers*, 629 F.3d at 644.

The Court thus grants Plaintiff's motion to exclude Dr. Smock's testimony to the extent that he characterizes Mr. Lurry's actions as "reckless" or "suicidal."

    *c. Propriety of Defendant Officers' Conduct*

Next, Plaintiff argues that Dr. Smock, as a medical doctor and not an expert in police practices and procedures, is not qualified to offer opinions on (1) whether putting a police baton in Mr. Lurry's mouth was an "appropriate medical intervention"; (2) whether pinching Mr. Lurry's

nose was a medically reasonable technique; and (3) whether officers timely called for medical assistance. (Dkt. 75 at 11–12 (citing dkt. 75-1 at 11–12)). Plaintiff agrees Dr. Smock is an ER doctor qualified to testify as to emergency medical techniques but would restrict this only to those administered "in a medical setting by trained medical professionals," not police officers. (Dkt. 75 at 12).

Plaintiff relies on *Boerste v. Ellis, LLC*, No. 17-CV-298, 2021 WL 6101678, at *12 (W.D. Ky. Sept. 29, 2021), to argue that Dr. Smock is not trained to offer insight into the propriety of police practices. (Dkt. 75 at 12). In *Boerste*, Dr. Smock was barred from offering his opinion that a police officer responding to an accident improperly allowed a car to be towed when an intoxicated person had climbed onto the car's roof, and that the responding tow-truck driver inappropriately drove off with that person still on top of the car. 2021 WL 6101678, at *11–*12. The court found Dr. Smock was not trained in any police practices and procedures relevant to this type of incident, nor in standards applicable to tow-truck drivers. *Id.*

Here, by contrast, Dr. Smock's experience and training directly relates to the medical situation the police officers encountered. Furthermore, he has direct experience training law enforcement officers on how to respond to similar situations they may encounter in the field. (*See* dkt. 75-3 at 2–3). He teaches such courses at the police academy. (Dkt. 75-4 at 43–44; dkt. 86:7–10). At his hearing, he explained that he has trained SWAT operators what to do when—upon executing a warrant—they suspect a subject has put narcotics in his mouth. (Dkt. 105 at 97:6–15). Dr. Smock pointed to the technique of pinching a patient's nose that he learned over 40 years ago as an EMT and one he has used prehospital and hospital to get a patient to open his mouth. (Dkt. 105 at 95:12–96:6). He testified that he personally has trained officers in this technique. (*Id.* at 95–

12

97). Dr. Smock's experience and qualifications here directly relate to the subject he will testify about. *See Trs. of Chi. Painters & Decorators Pension*, 493 F.3d at 787.

Similarly, Dr. Smock explained that in his training and experience, he has observed and placed improvised bite blocks in someone's mouth—both by medical professionals and laypersons— as a necessary intervention to prevent teeth biting down while extracting something from the person's mouth. (Dkt. 105 at 101–04). Further, based on his medical training, Dr. Smock explained that removal of narcotics from someone's mouth is necessary as an emergency intervention to prevent their absorption. (Dkt. 105 at 104). As applied in this case, Dr. Smock stated that it was necessary for officers to attempt to extract the baggies of drugs from Mr. Lurry's mouth as an emergency medical intervention. (Dkt. 105 at 104). Unlike in *Boerste*, the propriety of officers' actions did not relate to whether these were standard police procedures, but rather appropriate emergency medical intervention by non-medical personnel under these specific circumstances.

Dr. Smock has the necessary training and experience to offer such an opinion. He cited to his experience in training police and other laypersons in medical interventions in the field as the basis for his opinions about the propriety of officers' actions here in pinching Mr. Lurry's nose and improvising a baton as a bite block; therefore, his methodology is reliable. *See Potts*, 2017 WL 4365948, at *5 ("A witness who offers expert testimony based on his experience must connect his experience to the facts of the case in order to meet the standard of reliability under *Daubert* and the Federal Rules of Evidence."). Finally, these opinions are relevant to the jury's determination of whether officers are liable for causing or contributing to Mr. Lurry's death and whether they used excessive force, among other issues. They are admissible under Rule 702 and *Daubert*. As Plaintiff disagrees with these opinions and their factual underpinnings, she can further

13

question him on cross-examination. *See Sheldon v. Munford, Inc.*, 950 F.2d 403, 410 (7th Cir. 1991) ("Once the district court has found a sufficient foundation for an expert's testimony, it properly leaves questions concerning his methodology, findings, and expertise to cross-examination.").

Finally, Plaintiff offers no explanation for why Dr. Smock was not qualified as a medical professional to opine that Lt. Harrison timely requested medical assistance. Plaintiff argues only, "this goes to the heart of Plaintiff's claims and is an ultimate issue to be decided by the jury." (Dkt. 75 at 12). While experts must refrain from offering legal conclusions that would decide the case, *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003), ultimate factual conclusions—even those within the province of the jury—are proper. *United States v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009); *see also, e.g.*, *In re Dealer Management Sys. Antitrust Litigation*, 581 F. Supp. 3d 1029, 1096–97 (N.D. Ill. 2022). Whether or not calling for emergency aid was "timely" relates to how close in time officers called for medical assistance based on what they knew and observed of Mr. Lurry's condition. Dr. Smock does not make a legal conclusion here; he does not reference any legal standard by which he bases the opinion. Nor is "timeliness" of medical intervention a question of law. This remains a factual conclusion that Dr. Smock is qualified to make based on his training and experience as applied to the evidence he referenced in forming his opinion.

Dr. Smock may, therefore, testify as to his opinion on the officers' use of the nose-pinch technique and their use of the baton as emergency medical interventions, as well as their timeliness in calling for emergency aid.

    *d.  Dr. Smock's Prior Work in the George Floyd Case*

Finally, Plaintiff argues that Defendants' identification of Dr. Smock with the prosecution of Derek Chauvin for causing the death of George Floyd will be unduly inflammatory and prejudicial. (Dkt. 75 at 12–13; dkt. 94 at 2–3). Defendants counter that this information is relevant to establishing Dr. Smock's credibility in relation to other expert witnesses, particularly if Plaintiff attempts to impeach Dr. Smock as biased toward police. (Dkt. 92 at 12). Neither argument relates to the witness's expert opinions under Rule 702 or the *Daubert* framework. Rather, this is a routine motion in limine under Rule 403. Neither side cites any caselaw to support its argument. The Court defers ruling on this specific element of Plaintiff's Motion and orders that, should Plaintiff wish to bar this evidence, she must renew it as a motion in limine in due course prior to trial.

In sum, the Court finds that Defendants' proposed expert Dr. William Smock is qualified to opine on the cause of Mr. Lurry's death and that he reached his opinions on this subject through a reliable methodology for an expert of his type. The Court also finds that Dr. Smock is qualified to offer his opinion on Defendants' use of the nose-pinch technique and their use of the baton as emergency medical interventions by officers in the field, as well as Defendants' timeliness in calling for emergency aid. These opinions were likewise reached through a reliable methodology and are relevant to issues in this case. The Court, however, bars Dr. Smock from characterizing Mr. Lurry's actions as "suicidal" or "reckless," as he did not reach such opinions through a reliable methodology, and they are not relevant to determining Mr. Lurry's cause of death. Finally, the Court defers ruling on the admissibility of Dr. Smock's work on the George Floyd case and will consider the issue if Plaintiff renews her objection as a motion in limine at the proper time.

## 2. John Ryan

Defendants propose John "Jack" Ryan as a police-procedures expert. Ryan was a police officer for 20 years with the City of Providence, Rhode Island. (Dkt. 91-1 at 1). He earned his

bachelor's degree and master's degree in Administration of Justice, and he also has a law degree from Suffolk University Law School. (*Id.*) Ryan has worked as a police consultant, trainer, and auditor for approximately 20 years. (*Id.*) He has been consulted on hundreds of cases and trained thousands of officers. (*Id.* at 2–27; dkt. 76-11 ¶¶ 3–13). He has published dozens of books and articles on topics related to law enforcement practices, including the use of force, holds, and searches and seizures, among others. (Dkt. 91-1 at 8–15).

Plaintiff admits—quite reasonably—that Ryan is qualified to offer expert opinions on police practices and procedures, given his extensive education, experience, and training. Other courts have agreed. *See, e.g.*, *Provost v. Crockett Cnty., Tenn.*, No. 17-cv-1060, 2018 WL 11416133, at *2 (W.D. Tenn. July 23, 2018) ("Ryan is undoubtedly qualified to render an expert opinion in this case due to his extensive personal knowledge and experience as a police officer, law enforcement consultant, teacher, speaker, and author of law enforcement manuals."). This Court finds the same.

Nor does Plaintiff challenge his methodology in general. Ryan's report shows he reviewed the information provided to him and based his opinions on his specialized experience, training and knowledge of police practices, and research and work with law enforcement nationally. (Dkt. 76-11 at 4). He lists the relevant facts he relied on from each deposition. He then offers his opinions as to whether the officers' actions comport with generally accepted standards for police policies and practices. (*Id.* at 40–50; ¶¶ 213–240; *see also* dkt. 104 at 189:22–190:5 ("I review case materials that are provided to me, including reports, depositions, video, everything that's available, which is included on a list that I provided. . . . And then I apply the police practices—generally accepted police practices and training to the facts that I glean from those materials. And then [I] determine if there's opinions that can aid the jury.")). This is a proper methodology for an expert

such as Ryan. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013). Still, Ryan must explain how he reaches each conclusion—either by linking it to generally accepted standards in the field or by citing information within his own practical experience. *See Manpower, Inc.*, 732 F.3d at 806; *Potts*, 2017 WL 4365948, at *5. Finally, each of Ryan's opinions must be relevant. *Myers*, 629 F.3d at 644

Plaintiff objects to certain of Ryan's opinions either as irrelevant or improper legal conclusions. (Dkt. 76 at 1).

### a. Opinions Challenged as Irrelevant

Plaintiff first objects to four opinions in Ryan's report as irrelevant. (Dkt. 76 at 8 (citing dkt. 76-11 ¶¶ 225, 229, 239, 240)). "An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal citation omitted).

In paragraphs 225 and 229, Ryan opines on Tellez's and McCue's use of force when they initially detained and arrested Mr. Lurry. But Plaintiff has not claimed these officers used excessive force against Mr. Lurry at that point. (*See generally* dkt. 54). The opinions about this conduct in these paragraphs will therefore not help the jury determine any fact at issue in this case. Defendants concede there is no Fourth Amendment claim against the officers for this specific conduct, but they seek to preserve the possibility of offering this expert testimony if Plaintiff at trial claims officers had their knee on Mr. Lurry's neck. They argue such hypothetical testimony would be equally irrelevant and is contradicted by the video evidence but should nevertheless come in if Plaintiff "challenges the force used by Tellez and McCue on scene." (Dkt. 91 at 8).

17

The Court agrees with both parties that any testimony from either side on Tellez's and McCue's use of force during Mr. Lurry's arrest would be irrelevant to the issues before the jury, as there is no Fourth Amendment claim for either officer's conduct at that time. Ryan's challenged testimony in paragraph 225—specifically, the section reading "by Officers Tellez and McCue at the scene of the arrest"—and paragraph 229 should not come in. Should Plaintiff seek to introduce her own testimony about Tellez's and McCue's use of force in this context, Defendants can object to its relevance as a motion in limine or at trial.

Next, in paragraphs 239 and 240, Ryan opines on the law enforcement policies and practices of the Joliet Police Department (JPD), and whether they are consistent with generally accepted policies nationwide. Plaintiff's *Monell* claim against the City of Joliet has been bifurcated from this action, so at this time, these opinions are not relevant. *See, e.g.*, *Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 819 (N.D. Ill. 2020) (excluding reference to police department's general "practices" when *Monell* claim has been bifurcated). Still, Plaintiff agrees to withdraw her objection to Ryan's opinions about the City and JPD policies until trial, "as it is conceivable that this opinion could become relevant at some point during trial." (Dkt. 95 at 5). The Court thus defers ruling on the admissibility of Ryan's opinions at paragraphs 239 and 240 of his report. Plaintiff may renew her objection in due course.

### b. *Opinions Challenged as Improper Legal Conclusions*

Experts must refrain from offering legal conclusions that would decide the case. *Good Shepherd Manor Foundation, Inc.*, 323 F.3d at 564. "It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence." *Jimenez*, 732 F.3d at 721. When the application of expertise necessarily overlaps with the applicable legal standard, however, it can be difficult to

18

disentangle the two. Still, "[t]here is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007). In the context of constitutional tort claims, "[w]hen an expert offers an opinion relevant to applying a legal standard . . ., the expert's role is 'limited to describing sound professional standards and identifying departures from them.'" *Jimenez*, 732 F.3d at 721 (quoting *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997)).

Jimenez provides a useful example for how a police-procedures expert can offer an opinion that will help the jury apply a legal standard without instructing on the law itself or opining as to the lawfulness of officers' behavior. There, the expert "testified about steps a reasonable police investigator would have taken," then explained "the information that a reasonable police investigator would have taken into account as the investigation progressed." 732 F.3d at 722. The expert "did not offer an opinion regarding whether the police had probable cause to arrest," but instead "point[ed] out ways in which evidence from other witnesses indicated that [the police] departed from reasonable investigation methods." *Id.* Here, Plaintiff identifies three areas where, she claims, Ryan crossed the proper boundary—identifying officers' departures from or consistency with standard police practices—into the realm of improper legal conclusions.

### i. Probable Cause

Plaintiff first contends that Ryan offers legal conclusion bearing on the officers' probable cause to arrest Mr. Lurry in paragraphs 213 through 220 of his report, and she seeks to bar these opinions. (Dkt. 76 at 10–11).

In his testimony before the Court at his *Daubert* hearing, Ryan identified the specific facts in the record on which he based his opinions that the police officers acted consistently with generally accepted practices and training during Mr. Lurry's arrest. (*See* dkt. 104 at 191:7–193:11

19

(explaining officers' training on when and how to make an arrest then applying facts in this case to those training standards); *id.* at 193:21–194:22 (applying facts of Mr. Lurry's initial stop and detention to typical police training and standards); *id.* at 195:4–196:7 (applying facts and circumstances of Mr. Lurry's second stop to police training and standards); *id.* at 196:23–198:16 (applying facts and circumstances of Mr. Lurry's second and third pat-downs and his arrest to generally accepted practices and standards)). Nowhere in his hearing testimony did Ryan opine that officers had a "reasonable suspicion" or "probable cause" for the relevant detentions or that such detentions were lawful. Nor did Ryan elaborate on these legal concepts. His hearing testimony thus provided a proper baseline of concrete information to help the jury evaluate Defendants' conduct. *See Jimenez*, 732 F.3d at 721–22.

However, in paragraph 213 of his written report, he concludes "the decision to stop, detain, patdown, search, and arrest Lurry was consistent with generally accepted policies, practices, training and *legal mandates* trained to officers for application in field operations." (Dkt. 76-11 ¶ 213 (emphasis added)). Paragraphs 214 through 218 then explain various legal concepts, including the "Terry stop," reasonable suspicion, probable cause, totality of the circumstances, the hearsay rule, and the collective-knowledge doctrine. (*Id.* ¶¶ 214–218). While Ryan cites law enforcement training manuals for these concepts to point to how officers are trained, the opinions offered in his written report adhere too closely to instruction on the law. *See Jimenez*, 732 F.3d at 721. Then, in paragraph 220, Ryan applies these legal concepts to offer the conclusion, "Lurry's arrest was also consistent with all of the above based on the illegal narcotics found in the vehicle." (Dkt. 76-11 ¶ 220). The reference "all of the above" is vague, but in the context of these paragraphs, Ryan appears to conclude that under the totality of the circumstances, officers had both reasonable suspicion to detain and probable cause to arrest Mr. Lurry.

Ryan may not offer such legal conclusions, and his testimony must take care to avoid them. Other courts have made similar rulings. *See, e.g.*, *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 4417257, at *6 (N.D. Ill. Aug. 19, 2016) (barring Ryan's testimony to the extent that he opines on an officer's probable cause to arrest and instruct on the totality of the circumstances test); *Murphy v. City of Tulsa*, No. 15-CV-528, 2018 WL 468286, at *7 (N.D. Okla. Jan. 18, 2018) (barring Ryan from offering legal conclusions and opinions related to defendant violating plaintiff's constitutional rights); *Provost v. Crockett Cnty., Tenn.*, No. 17-cv-01060, 2018 WL 11416133, at *3 (W.D. Tenn. July 23, 2018) (barring Ryan from testifying as to legal conclusions on matters of law or legal standards, including "legal mandates" and whether something is "objectively reasonable" under the Constitution or case law). Ryan may, however, testify to the rest of his opinion in paragraph 220, where he explains what specific facts and circumstances surrounding Mr. Lurry's detention and arrest led him to conclude that the officers acted consistently with generally accepted police practices and training. This accords with manner of testimony he offered before the Court in his *Daubert* hearing and strikes the proper balance. *See Jimenez*, 732 F.3d at 721–22.

### ii. Disregarding Serious Medical Need

Plaintiff next objects to opinions in Ryan's report at paragraphs 221 through 224 because (1) "Ryan attempts to usurp the role of the Court in explaining the law," and (2) "Ryan's opinion that Mr. Lurry did not have an objectively serious medical need . . . is not within the scope of his expertise as a police procedures expert . . . and does not assist the jury." (Dkt. 76 at 13 (citing dkt. 76-11 ¶¶ 221–24)).

At his hearing, Ryan explained how police are trained to recognize medical needs for arrestees and what to do in specific situations. (Dkt. 104 at 199:3–25; *id.* at 200:11–201:5). He

then explained what facts and circumstances he observed from reviewing the record that led him to conclude that Defendants acted consistently with standard practices and training in responding to Mr. Lurry's medical situation throughout the arrest and transport. (*Id.* at 201:16–202:1; 202:23–203:19; 203:21–204:17; 205:17–206:17; 207:12–208:15). Ryan never testified as to what the law requires of officers or whether Defendants here acted lawfully. He confined his opinions to whether they acted according to their training and standard practices in similar situations. This is proper. *See Jimenez*, 732 F.3d at 721–22.

But in paragraph 221 of his written report, Ryan opines that the officers "*did not disregard a serious medical need* of Mr. Lurry but instead acted consistently with generally accepted policies, practices, training, industry standards as well as legal mandates trained to officers for application in field operations." (Dkt. 76-11 ¶ 221). Plaintiff's due-process claim requires proving that Mr. Lurry had an objectively serious medical need and that Defendants were deliberately indifferent to that need. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002). Ryan's opinion in paragraph 221 essentially concludes the officers' actions were lawful. This invades the province of the jury. *See Jimenez*, 732 F.3d at 721. Ryan may not offer the conclusion that the officers "did not disregard" Mr. Lurry's "serious medical need."

In paragraph 222, Ryan explains the training police officers receive on recognizing medical needs. (Dkt. 76-11 ¶ 222). In paragraph 223, he further describes general practices for arresting individuals who have ingested drugs, stating that "where there are no signs of a serious medical need or distress, the generally accepted practice in a law enforcement [sic] is to take the subject to jail." (*Id.* ¶ 223). Finally, in paragraph 224, he details the degree of medical training officers typically receive and applies this knowledge of police training to the facts and circumstances of

Mr. Lurry's arrest to conclude that "when Lurry's condition deteriorated after arrival at the station and was recognized by the officers, medical aid was sought without delay." (*Id.* ¶ 224).

Rule 702's relevance requirement restricts an expert's opinion testimony to that which will help the jury. *See* Fed. R. Evid. 702(a); *Myers*, 629 F.3d at 644. The Court finds this requirement is met here. While Defendants argue that jurors, as laypersons, are no less qualified than Ryan to determine whether Mr. Lurry was experiencing a serious medical need, Ryan's opinion helpfully informs their understanding of the officers' actions in the context of this situation. He casts this judgment considering both the officers' medical training and their other specialized training, which includes not only the objective visual cues of the suspect, but also the greater context of minimizing security concerns for all involved and the practical realities of law enforcement.

While Ryan cannot testify as to the ultimate issue that officers did not disregard a serious medical need, nor that they acted consistent with "legal mandates," the rest of his testimony in paragraphs 221 through 224 is admissible.

### iii.    Excessive Use of Force

Finally, Plaintiff contends paragraphs 225 through 235 of Ryan's report offer "an in-depth legal explanation on how officers are trained on use of force, when it is and is not appropriate to use force on a subject, and what kind of force is permitted under different circumstances." (Dkt. 76 at 14 (citing dkt. 76-11 ¶¶ 225–35)). First, she points to paragraph 225 and paragraph 235 as problematic because they offer opinions on the lawfulness of officers' conduct.[3] At his hearing, Ryan explained why, based on his experience, officers' actions in slapping Mr. Lurry and pinching

---

[3] *See* dkt. 76-11 ¶ 225 ("[T]he force used during this event by Officer Tellez and McCue at the scene of the arrest, by Sergeant May in trying to arouse Lurry and by May and McCue in attempting to remove the drugs from Lurry's mouth was consistent with generally accepted police practices, training and legal mandates trained to officers for application in field operations."); *id.* ¶ 235 ("Here, the pinching of the nose, pressure under the jaw, and the use of an asp to provide a spacer, were all consistent with generally accepted police practices, training and legal mandates trained to officers for application in field operations."). Regarding paragraph 225, the Court has already excluded as irrelevant the section reading "by Officer Tellez and McCue at the scene of the arrest." *See* Section A.2.a *supra*.

his nose comported with their training and generally accepted standards. (Dkt. 104 at 210:16–213:12). He also opined on the use of a bite block as a standard aspect of police training. (Dkt. 104 at 214:12–215:17). These opinions are reliable applications of an accepted methodology that will be relevant to the jury's determinations. In his in-court testimony, Ryan properly steered clear of instructing on the law or making legal conclusions by applying the law to the facts and circumstances. Ryan may explain how the officers' use of force was consistent with standard police practices and training according to his experience, but he may not state they acted consistently with "legal mandates." *See Jimenez*, 732 F.3d at 721–22. This implies they acted lawfully, an improper legal conclusion.

Next, in several of the following paragraphs, Ryan's written report contains certain statements that too closely parallel legal instruction and invade the Court's role instructing the jury on the law. Paragraph 226 describes officers' training in the use of force specifically referencing the "mandates announced by the United States Supreme Court in *Graham v. Connor*." (Dkt. 76-11 ¶ 226). Subsequent paragraphs likewise provide legal standards for the use of force.[4] It is permissible to note that police training is based off the relevant legal standards announced in cases like *Graham*. But Ryan must take care to avoid explaining these specific standards or concluding that officers acted consistently with them, even where they overlap with police training. Other statements make improper legal conclusions, applying the facts and circumstances of the case to

---

[4] *See* dkt. 76-11 ¶ 226 ("The training [per *Graham v. Connor*] directs officers to consider the seriousness of offense; whether or not the subject poses an immediate physical threat to the officer or anyone else; and finally whether the subject is actively resisting or attempting to evade arrest by flight."); ¶ 228 ("[E]ach [of various force options] must be objectively reasonable under the circumstances with which the officer is faced."); ¶ 231 ("Officers may also use force on a person who poses a threat to themselves by their conduct."); ¶ 232 ("It is well understood in law enforcement that the use of force must be judged from the perspective of the officer on the scene, taking into account what the officer reasonably believed to be the circumstances at the time and not with 20/20 hindsight."); ¶ 234 ("[I]s force degree of force [sic] reasonably necessary to overcome the threat [to themselves or others]; and the force used must be proportional (reasonable and necessary) to overcome the threat under the circumstances.").

the applicable legal standards.[5] Ryan must avoid such statements in his testimony. *See, e.g.,* *Sanders v. City of Chicago Heights*, 13 C 0221, 2016 WL 4417257, at \*7 (N.D. Ill. Aug. 19, 2016) (barring Ryan from providing legal interpretations and conclusions in which he opines that Defendants' conduct was consistent with "legal mandates" as outcome determinative and potentially misleading or confusing the jury).

In sum, Defendants' police-procedures expert Jack Ryan may not testify as to his opinions on Defendants Tellez's and McCue's use of force when they arrested Mr. Lurry. The Court defers ruling on the admissibility of Ryan's opinions regarding the law enforcement policies and practices of the Joliet Police Department (JPD), and whether they are consistent with generally accepted policies nationwide. The Court further bars Ryan from testifying that officers acted consistently with "legal mandates" or offering similar conclusions that officers acted lawfully, as explained more fully above. The Court also bars Ryan from providing the specific legal standards by which officers' conduct is to be evaluated, as this is the Court's role. But the Court otherwise finds that Ryan is qualified to testify why, based on his experience, Defendants acted consistently with generally accepted police practices and training. Ryan reaches each of these opinions through a reliable methodology for an expert of his type, and his opinions on this subject are relevant.

---

[5] *See* dkt. 76-11 ¶ 227 ("[W]hen it became apparent at the station that Lurry had a large bag in his mount, the physical threat Lurry posed to himself increased *thereby justifying force to be used* in order to prevent self-harm."); ¶ 231 ("It is noted that once it was determined that Lurry had put a large amount of narcotics in his mouth, any reasonable and well-trained officer would recognize that Lurry posed a threat to himself and *force could be used* to try and stop that self-threatening conduct."); ¶ 233 ("[T]actics like officers recognizing an attempt to swallow and destroy what appears to be narcotics to attempt to pry open the suspect's mouth by placing pressure against his jaw and nose *are proper* and consistent with generally accepted training and *legal mandates* trained to officers for application in field operations."); ¶ 234 ("When an officer reasonably perceives that a subject is swallowing narcotics in an effort to avoid detection, *the officer would be justified in concluding that force* to protect the subject from swallowing narcotics *was consistent with . . . legal mandates* trained to officers for application in field operations. Here, the pinching of the nose, the pressure under the jaw, and the use of an asp baton to provide a spacer, *were all consistent with . . . legal mandates* that are the foundation for this training provided to officers.").

**B.** **Defendants' Motions to Exclude Plaintiff's Expert Testimony**

Defendants object that testimony proposed by three of Plaintiff's expert witnesses—Charles Drago, a police practices and procedures expert; Dr. Kelly Johnson-Arbor, an emergency medicine physician; and Dr. Judy Melinek, a forensic pathologist—is inadmissible under Rule 702 and *Daubert*.

**1.** **Charles Drago**

Plaintiff has retained Charles Drago as her police procedures expert. Drago's career as a law enforcement officer spans thirty years in the Fort Lauderdale Police Department, advancing through the ranks to become Assistant Chief of Police and then Chief of Police of the City of Oviedo. (Dkt. 78-1 at 3; dkt. 93-1 at 4). He was appointed Deputy Chief of Staff and Senior Law Enforcement Advisor to the Governor of Florida, serving in that role from 2007 to 2011. Since 2011, he has operated his own consulting business as a police practices and procedures expert for attorneys, government agencies, and media. (Dkt. 93-1 at 3). In his work, he has investigated hundreds of police misconduct allegations, including use-of-force cases. (Dkt. 78-1 at 3).

In addition to earning his associate degree and bachelor's degree in criminal justice, Drago has logged additional training hours in the use of force, arrests, supervision, patrol procedures, among other topics. (Dkt. 78-1 at 4). He is also a certified police instructor who has trained thousands of police officers in the use of force, search warrant procedures, and substance abuse and patrol procedures. (*Id.*) He served specifically as the sole narcotics instructor in the Regional Police Academy, Corrections Academy, and Police Civilian Academy for ten years. (*Id.*) He has trained officers in narcotics identification, narcotics investigations, and a course entitled "Recognizing Substance Abusers." (Dkt. 104 at 13).

He employed a "comparative methodology" in which he evaluated from the record all the facts and circumstances known to the witnesses at the time of the incident and evaluated the officers' actions against the "accepted practices and training in law enforcement are national practices and/or standards which would be recognized within the State of Illinois." (Dkt. 78-1 at 3; *see also* dkt. 104 at 24–25). He explained that these practices and standards are established by "nationally developed policies, federal case law, and the practices set forth by national police force organizations such as literature, trainings, and conferences which are conducted on a national level." (Dkt. 78-1 at 3; *see also* dkt. 104 at 24–25). This is a commonly accepted methodology for an expert such as Drago. *See Jimenez*, 732 F.3d at 721. But Drago must also explain how he reaches each of his conclusions—either by linking them to generally accepted standards in the field or by citing information within his own practical experience. *See Manpower, Inc.*, 732 F.3d at 806; *Potts*, 2017 WL 4365948, at *5. Drago's opinions must also be relevant. *Myers*, 629 F.3d at 644.

Defendants do not challenge Drago's qualifications "to opine on generally accepted police practices." (Dkt. 78 at 5). The Court also finds Drago qualified in this area by his education, training, and experience. Rather, Defendants challenge aspects of his opinions as either unreliable or irrelevant. (*Id.*)

### a. Opinions on Violations of Joliet Police Department Internal Policies

Drago offers seven primary opinions—and several subopinions—where he concludes the Defendant Officers violated Joliet Police Department ("JPD") policies as well as nationally accepted police practices. (*See* dkt. 78-1 at 5–20). Defendants argue that Drago's opinions regarding officers' violations of JPD policies are irrelevant. (Dkt. 78 at 5–6). Experts may testify only to relevant issues that will help the factfinder understand the evidence or determine a fact in controversy. *Daubert*, 509 U.S. at 591. Violations of internal departmental policies are irrelevant

to constitutional standards. *Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006); *see also Whren v. United States*, 517 U.S. 806, 815 (1996) (internal police department rules are an unreliable guide to measuring the reasonableness of police conduct). JPD policy violations, therefore, are completely irrelevant to any of Plaintiff's § 1983 claims against Defendants. Plaintiff's *Monell* claim is not currently before the Court. (*See* dkt. 53).

Plaintiff seeks instead to admit Drago's testimony about JPD policy violations to "undermine the Defendants' credibility and to satisfy the elements of Plaintiff's willful and wanton misconduct and punitive damages claims." (Dkt. 93 at 2). Plaintiff first argues that Drago's opinions regarding Defendants' noncompliance with JPD policies is relevant to their credibility and motive to lie. (*Id.* at 3–4). If the jury cannot hear that officers violated JPD policies, Plaintiff argues, "they will not be able to fully appreciate how egregious this conduct was or be able to appropriately weigh the credibility" of defendants' statements or testimony. (*Id.* at 4).

But even if tangentially relevant to the officers' credibility and motive, the Court finds this evidence's probative value is outweighed by its tendency to confuse the issues and mislead the jury. This is particularly true when the witnesses can be effectively impeached on cross-examination without using an expert witness as a mouthpiece. *Cf. Agnew v. Cater*, No. 18-cv-50035, 2022 WL 313756, at *5 (N.D. Ill. Feb. 2, 2022) ("The District Court must 'prevent testimony from carrying more weight with the jury than it deserves.'" (internal citation omitted)); *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) ("[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.").

On the probative side of the equation, evidence of Defendants' actions that appear to violate JPD policies tends to diminish Defendants' credibility. After all, officers who knowingly violate

department policies are likely not acting in good faith. It also shows officers' motive to lie, because violating departmental policies could expose them to harsh consequences, such as losing their jobs. But the probative value here is low because any plaintiff could argue the same in a § 1983 case and bypass *Thompson*. Moreover, Drago's opinion would be cumulative of the same impeachment that an able trial attorney should be able to elicit from these witnesses on cross-examination. Plaintiff herself points only to Defendants' own depositions to impeach their credibility, not to Drago's opinions about JPD policy violations. (Dkt. 93 at 3–4). On the other side of the Rule 403 equation, evidence of internal policy violations in § 1983 cases—even when relevant for other purposes—tends to confuse the jury, as it appears to go to officers' liability despite being legally irrelevant for that purpose. *See Thompson*, 472 F.3d at 457 (explaining that evidence about specifics of police department's policies, which can only be used as evidence of breach of protocol in a disciplinary proceeding, would have caused confusion with officers' liability for both state and federal claims, where this evidence was irrelevant); *see also, e.g.*, *Garrit v. City of Chicago*, No. 16-cv-7319, 2022 WL 124554, at *4, *6 (N.D. Ill. Jan. 13, 2022) (barring as irrelevant testimony about local department policies). Appropriate jury instructions can only minimize, but not eliminate, the prejudicial effect. *See United States v. Strong*, 485 F.3d 985, 991 (7th Cir. 2007).

Plaintiff next argues that Drago's opinions regarding Defendants' non-compliance with JPD's policies are admissible because this evidence is relevant both to punitive damages and Plaintiff's "willful and wanton misconduct" state-law claim. (Dkt. 93 at 5). Defendants' failure to comply with certain JPD rules and regulations tends to show they acted with intent, rather than mere negligence or ignorance. This is relevant both to Plaintiff's punitive damages claim and her willful and wanton misconduct claim. *See Barr v. Cunningham*, 89 N.E.3d 315, 319 (Ill. 2017) ("[For a willful and wanton misconduct claim] Plaintiff must prove that the Defendant made a

conscious choice of a course of action, 'either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.'"); *Smith v. Wade*, 461 U.S. 30, 56 (1983) ("[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."). But again, Drago's testimony is not the only evidence of Defendants' intent in the record. The jury will not only hear witnesses' extensive testimony about this incident, but they will also see video footage of the officers interacting with Mr. Lurry.

Even if relevant, the Court nevertheless concludes the prejudicial effect outweighs its minimal probative value under Rule 403. Balanced against the limited evidentiary value of Drago's testimony, Drago's opinion is highly prejudicial on the issue of liability for the constitutional claims, where internal policies are irrelevant. Many courts have found the same. *See Thompson*, 472 F.3d at 457; *see also, e.g.*, *Paine ex rel. Eilman v. Johnson*, No. 06-cv-3173, 2010 WL 785400, at *2, *3 (N.D. Ill. Feb. 26, 2010) (finding evidence of violation of internal department orders highly prejudicial on issue of liability, even if relevant to punitive damages claim, which cannot be adequately mitigated by limiting instruction); *Berg v. Culhane*, No. 9 C 5803, 2010 WL 3420081, at *2 (N.D. Ill. Aug. 27, 2010) (finding evidence of consistency with internal department procedures highly prejudicial on issue of liability); *Delgado v. Mak*, 2008 WL 4367458, at *8 (N.D. Ill. Mar. 31, 2008) (deferring admissibility until trial but stating that such evidence faces "a very high hurdle under Rule 403").

Drago, therefore, may not testify that Defendants here violated JPD policies. This ruling applies only to expert testimony, and the Court will address the parties' other contemplated evidence of or references to JPD policy if they submit later motions in limine on the subject.

### b. *Legal Conclusions, Speculations, Credibility Judgments*

Defendants next argue that some of Drago's opinions amount to improper legal conclusions, speculation, and credibility judgments. Experts must refrain from offering legal conclusions that would decide the case. *Good Shepherd Manor Foundation, Inc.*, 323 F.3d at 564. Drago's report refers once to individual officers' actions as "unlawful." (Dkt. 78-1 ¶ 54 ("[Officers] use unnecessary and unlawful force against Mr. Lurry.")). In his deposition, Drago opined that Officer May's use of force was "excessive." (Dkt. 78-2 at 153:22–23). Both characterizations are clearly legal conclusions and thus inadmissible; Plaintiff does not argue otherwise.

Defendant further objects to Drago's statements about what "any reasonable police officer would have believed," (dkt. 78-1 ¶ 54), or that officers "recklessly disregarded" (*id.* ¶ 14) or showed "deliberate disregard for," (*id.* ¶ 100), Mr. Lurry's rights. Defendants argue these phrases "recast the Fourth and Fourteenth Amendment standards in slightly different words." (Dkt. 78 at 7). But when legal standards are intertwined with everyday language, an expert's testimony will not necessarily be inadmissible solely because he uses such terms in his opinion. *See Jimenez*, 732 F.3d at 721. It is the substance of the expert's opinion that matters; the expert must describe the officer's actions in terms of their consistency with or departure from sound police practices. *Id.*

It its full context, Drago's report at paragraph 54 cites one of the videos to observe that May "grabbed Lurry around the front of his throat . . . with his left hand and squeezed his throat" and then pinched his nose. (Dkt. 78-1 ¶ 54). Drago further observed that Lurry did not react at all to this force, which he considered unusual because a person would normally resist such restrictions on their breathing. (*Id.*) He then declared, "Based on the totality of the circumstances, any reasonable police officer would have believed that Lurry was suffering a medical emergency and

31

in need of medical assistance. Nonetheless, the police officers didn't call for any medical assistance and instead use unnecessary and unlawful force against Mr. Lurry." (*Id.*)

Considering the full context, this opinion crosses the permissible boundary. It reaches a legal conclusion by applying the relevant legal standard for a § 1983 claim for denial of medical care while under arrest. An officer violates an arrestee's Fourth Amendment rights if "the officer's conduct was 'objectively unreasonable under the circumstances.'" *Braun v. Village of Palatine*, No. 20-3227, 2022 WL 17985707, at *6 (7th Cir. Dec. 29, 2022) (quoting *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)). The inquiry further considers: "(1) whether the officer ha[d] notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigative concerns." *Id.* (quoting *Ortiz*, 656 F.3d at 530). Drago's opinion appears to apply the facts to the relevant legal standard; he essentially concludes that police acted unreasonably under the circumstances and therefore violated Mr. Lurry's rights. This effectively tells the jury how to decide the case, which the expert may not do. *Good Shepherd Manor Foundation, Inc.*, 323 F.3d at 564; *see also* Fed. R. Evid. 704, advisory committee note (expert may not "merely tell the jury what result to reach"). Drago must confine his opinion to objective observations of where and how officers departed from generally accepted police practices in such situations.

Paragraph 14 of Drago's report follows his descriptions of Tellez's and McCue's observations that Mr. Lurry had likely put a bag of drugs in his mouth before being arrested. (Dkt. 78-1 ¶ 14). The prior paragraph details the facts that gave Tellez and McCue notice of Mr. Lurry's medical distress. (*Id.* ¶ 13). Drago then concludes, "Therefore, not only did Tellez and McCue violate JPD policy but recklessly disregarded the very serious threat of death or serious injury that could be caused by cocaine poisoning, drug overdose or suffocation from the drug baggies." (*Id.*

¶ 14). Drago again applies the relevant legal standard to the facts and draws a conclusion that invades the province of the jury. Drago may point out all the times the officers—based on generally accepted police practices and their training—may have had notice of Mr. Lurry's medical needs. But he may not take that final step to tell the jury that Defendants acted unreasonably by "recklessly disregarding" a serious medical need.

Finally, in paragraph 100 of Drago's report, he states "Officer Tellez showed a deliberate disregard for JPD policies and the rights of Mr. Lurry" by intentionally turning off the video system in the rear of the police vehicle while Lurry was still in the vehicle. Here, the characterization of a "deliberate disregard" for Mr. Lurry's rights by turning off a police camera is irrelevant under Rule 702. It does not help the jury understand the evidence or determine a fact at issue. A citizen's legal rights do not depend on the existence of video documentation of his interactions with a police officer. Nor does it add anything meaningful for Drago to state, "The purpose of a police video system is to document law enforcement interaction with the public through video and audio recordings. It is intended to better protect the rights of citizens and police officers." (Dkt. 78-1 ¶ 100). In this era of enhanced public video surveillance and the widespread use of police body cameras—often shared in the media when police-public interactions go awry—the average person understands the importance of police video systems and why turning them off is particularly suggestive of police misconduct. Drago may not testify his opinion stated in paragraph 100.

Defendants additionally challenge as unreliable speculation Drago's statement that "Sgt. May was more concerned about preserving evidence in his criminal case than he was about Lurry's safety." (Dkt. 78 at 8 (citing Dkt. 78-1 ¶ 70)). Drago's opinions must connect his practical experience to the conclusions he reaches to pass the reliability test. *See Manpower, Inc.*, 732 F.3d at 806; *Potts*, 2017 WL 4365948, at *5. Here, he does no more than speculate as to a defendant's

motive. This conclusion is not the result of a reliable methodology and inadmissible. *See also, e.g.*, *Davis v. Duran*, 277 F.R.D. 362, 369 (N.D. Ill. 2011) (experts have no way of "crawling into peoples' minds") (citing Richard Posner, Overcoming Law, 276 (1995)); *DePaepe v. GMC*, 141 F.3d 715, 720 (7th Cir. 1998) (engineering expert could not testify that defendant's motive for a particular design was to save money). Plaintiff offers no argument to the contrary. Drago may not testify his opinion in paragraph 70 about May's motive—nor the motive of any other officer.

Defendants also challenge certain statements as impermissible credibility judgments. (Dkt. 78 at 8–9). Credibility determinations and sorting out conflicting testimony are the jury's task. *Goodwin v. MTD Prod. Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ("[A]n expert cannot testify as to credibility issues. Rather, credibility questions are within the province of the trier of fact, in this case a jury."); *see also, e.g.*, *Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 816 (N.D. Ill 2020) (expert cannot opine on the consistency of one version of events with another). The expert may, however, base his opinions on a version of the facts that conflicts with another, as long as he makes clear what he bases his opinions on. *See Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015) ("[S]oundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

In paragraph 16 of Drago's report, he cites Tellez's deposition transcript claiming he did not search Mr. Lurry because of the struggle when they tried to search him, and then states, "That claim is not supported by the video evidence." (Dkt. 78-1 ¶ 16). He then explains what he observed in the video. (*Id.*) Similarly, he states that a statement by May is "not consistent" with a statement from a former Joliet Police Chief. (Dkt. 78-1 ¶ 80). Drago may explain that he relies on the video or other evidence in the record in forming his opinions, as this employs a reliable methodology.

34

But he must steer clear of evaluating a witness's credibility or pointing out inconsistencies between a witness's version of events and his own observations. This invades the province of the jury. *See Goodwin*, 232 F.3d at 609.

### c. Medical Opinions

Defendants next object that Drago is not qualified to give opinions about the possibility of officers "prevent[ing]" the overdose or "sav[ing]" Mr. Lurry from the overdose had they called for medical attention more quickly.[6] (Dkt. 78 at 9–10 (citing dkt. 78-1 ¶¶ 32, 93)). They contend these are medical opinions beyond Drago's expertise. Drago is unquestionably not a physician, nor does he have any specialized medical training or experience. His opinions here relate to the survivability of the overdose after Mr. Lurry had already put the bags in his mouth. It takes medical knowledge and training to estimate the odds of surviving a medical emergency under a given set of circumstances—Drago lacks this training. Drago may point out under what circumstances calling for medical assistance is appropriate during an arrest, according to generally accepted police practices and training. He can also explain what signs of a medical emergency an officer is trained to recognize and respond to. He can point to times where the officers' actions departed from generally accepted practices and training. But he must avoid opining that officers might have saved Mr. Lurry or prevented his overdose by calling for medical assistance at any particular time after noticing he has put drugs in his mouth. That opinion requires medical expertise.

### d. Opinions on the Use of the Baton (Opinion E) and Turning Off Video (Opinion G)

Finally, Defendants object that Drago's Opinion E and Opinion G are not reliable because Drago does not cite to any national models, standardized policies, training materials or literature,

---

[6] "Officers Tellez and McCue still may have been able to prevent Lurry's medical emergency if they surveilled Lurry properly while in the rear of the police car in accordance with JPD policy and accepted police practices and then called for medical assistance." (Dkt. 78-1 ¶ 32). "The defendant police officers had numerous opportunities and remedies to protect Lurry and save him from the overdose." (*Id.* ¶ 93).

or his personal experience in the field as a basis for his opinions.[7] (Dkt. 78 at 10–11). An expert may "draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co., Ltd.*, 526 U.S. at 156. But he must also cite to that experience and connect it with the conclusion he draws for his opinion to be reliable. *See Manpower, Inc.*, 732 F.3d at 806; *Potts*, 2017 WL 4365948, at *5.

Regarding Opinion E, Drago explains that the police baton is "a weapon used for striking when a subject poses active resistance." (Dkt. 78-1 ¶ 74). He also notes that JPD has a policy about use of the baton that is consistent with accepted practices nationally. (*Id.*) This includes the prohibition on using the baton above the neck. (*Id.*) Furthermore, he explained at his hearing testimony that "when officers are trained to use a baton, there's never any reference whatsoever to inserting that baton into mouths or anywhere else in—on a person's body. They are trained to use that baton in a specific way and they're trained to follow that training and the rules as it relates to that." (Dkt. 104 at 55:1–6). He also pointed out that it is unnecessary to make policies expressly prohibiting every conceivable scenario for police using tools inappropriately; "some things have been left up to common sense." (*Id.* at 7–13). While the Court has ruled that Drago may not testify as to violations of JPD policies, the Court finds he is qualified to testify as to proper uses of a police baton that officers are trained on. His opinion here that putting a baton in someone's mouth does not accord with the generally accepted use of that tool is a reliable application of his specialized experience. He has referenced his own knowledge from his career and the general accordance with national practices; his opinion is sufficiently reliable. The Court also finds this

---

[7] "Opinion E: Lieutenant Harrison, Officer McCue and Sergeant May violated JPD policies and accepted police practices when Officer McCue inserted a police baton inside Lurry's Mouth." (Dkt. 78-1 at 16). "Opinion G: Officer Tellez violated JPD policies and accepted police practices when he intentionally deactivated the video system on the police vehicle rear camera." (*Id.* at 20).

opinion will be helpful for a jury to hear, because training on proper uses of a police baton is outside the general realm of understanding of most jurors. This opinion is admissible.

In Opinion G, by contrast, Drago cites to JPD policies about in-squad video systems operations, but he does not identify any way this policy is consistent with national policies or other generally accepted police practices. (*See* dkt. 78-1 ¶¶ 98–99). At his hearing he referenced an International Association of Police Chiefs policy about cameras, but this was not disclosed in his report. (Dkt. 104 at 58). Nor did he reference any other material or personal experience in his report to give a basis for his opinion that deactivating a police camera is inconsistent with accepted police practices. He stated only, "The purpose of a police video system is to document law enforcement interaction with the public through video and audio recordings. It is intended to better protect the rights of citizens and police officers." (Dkt. 78-1 ¶ 100). But as explained, this observation takes no specialized experience to recognize. Average people understand why police use video cameras and why they should not be intentionally deactivated. Opinion G is neither reliable nor relevant, so it is not admissible.

In sum, Drago may not testify as to his opinion that officers violated Joliet Police Department policies because they are irrelevant under Rule 702 and unduly prejudicial under Rule 403. Drago must also refrain from characterizing officers' actions as "unlawful," or that the force they used was "excessive." He may not offer the legal conclusions described in paragraphs 54, 14, and 100 of his report; paragraph 100 is further inadmissible as irrelevant. He is not qualified to offer opinions on whether medical intervention at a particular time would have saved Mr. Lurry from overdose as stated in paragraphs 32 and 93. His Opinion E is admissible to the extent that it is based on nationally accepted policies and Drago's own experience, but Opinion G is not admissible.

### 2. Dr. Kelly Johnson-Arbor

Defendants seek to bar the testimony of Dr. Kelly Johnson-Arbor. (Dkt. 79 at 1–2). Dr. Johnson-Arbor is a board-certified physician in emergency medicine, medical toxicology,[8] and undersea and hyperbaric medicine. (Dkt. 79-1 at 1). She has worked as an ER attending physician for approximately eight years and treated hundreds of patients, many of whom experienced opioid/drug overdose. (*Id.*) She has also treated individuals suffering from asphyxiation. (*Id.*) Dr. Johnson-Arbor is also currently the co-medical director of the National Capital Poison Center in Washington, D.C. (*Id.*) She is the attending physician at an outpatient medical toxicology clinic at MedStar Georgetown University Hospital. (*Id.*) She teaches medical toxicology to Georgetown emergency medicine residents and medical students, and she is a toxicology consultant for the Connecticut Poison Control Center. (*Id.*) She has provided expert testimony in the field of medical toxicology for several courts. (*Id.*)

According to her general methodology, Dr. Johnson-Arbor reviewed the extensive factual record, including witness depositions; video and audio recordings; police reports; Dr. Judy Melinek's report; and the hospital, medical, and autopsy records for Mr. Lurry. (Dkt. 79-1 at 2). She then applied her training, education, and experience to the facts in the record to develop her medical opinions. (Dkt. 105 at 9–10). The same general methodology is commonly employed by medical experts retained to opine on cause of death and the effectiveness of medical interventions. *See Gayton*, 593 F.3d at 618; *Ortiz*, 656 F.3d at 537. Dr. Johnson-Arbor offers two primary opinions in her report, and Defendants object that both fall short of *Daubert*'s requirements. The Court therefore analyzes each opinion within the *Daubert* framework. *Hall*, 840 F.3d at 926.

### a. Opinion on Survivability of Mr. Lurry's Overdose

---

[8] According to Dr. Johnson-Arbor, "Medical toxicology is a subspecialty of emergency medicine that deals with the prevention, diagnosis, and treatment of all types of poisonings." (Dkt. 105 at 5:10–12).

Defendants argue that Dr. Johnson-Arbor's Opinion A stems from unreliable methodology, speculates without proper support, and extends beyond her expertise.[9] (Dkt. 79 at 1–2). First, they argue that her methodology is unreliable because it does not adequately account for the possibility that Mr. Lurry ingested sufficient cocaine to independently cause his death—in which case Defendants' failure to use Narcan would be irrelevant. (*Id.* at 5–6).

In her review of the record, Dr. Johnson-Arbor stated that Mr. Lurry had a non-fatal concentration of cocaine in his system in his postmortem toxicology report. (Dkt. 79-1 at 4 (noting 560 ng/mL of benzoylecgonine); dkt. 105 at 16 (explaining that benzoylecgonine is metabolite of cocaine and this concentration indicates a non-fatal level)). She then identified the post-mortem levels of heroin and fentanyl in the toxicology report, concluding the heroin level was "consistent with a fatal concentration" and the fentanyl concentration was "high." (Dkt. 105 at 16–17; dkt. 79-1 at 4 (noting 64 ng/ML of morphine and 32 ng/mL of fentanyl)). She then concluded that the delay in receiving medical interventions that could have counteracted the drugs' effects—including administration of naloxone, to counter the heroin and fentanyl—"was more likely than not a significant causative factor in Mr. Lurry's . . . death." (Dkt. 79-1 at 5–6; *see also* dkt. 105 at 22–23).

As a board-certified specialist in medical toxicology, she is qualified to speak to the fatal and non-fatal concentrations of toxic substances in the body. *Trs. of Chi. Painters & Decorators Pension*, 493 F.3d at 787 ("extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert"). Her methodology also shows that she took

---

[9] "Opinion A: It is my opinion, to a reasonable degree of medical certainty, that the delay in providing Mr. Lurry with immediate medical attention (including failing to administer naloxone) once he was reasonable [sic] suspected of placing drugs in his mouth and/or ingested the drugs, increased the likelihood of death. It is my opinion that Mr. Lurry would have survived if medical treatment had been provided close in time to when Officer Tellez suspected that Mr. Lurry had ingested narcotics." (Dkt. 79-1 at 4).

the relative amounts of cocaine versus heroin and fentanyl into consideration in forming her opinion. She did not disregard Defendants' alternative explanation for Mr. Lurry's death and supported her conclusion. Whether her conclusion is correct is not for the Court to decide. *See Daubert*, 509 U.S. at 595. That the Defendants' expert concluded otherwise does not negate the admissibility of Dr. Johnson-Arbor's opinion. This goes to the weight the jury should give to the respective experts' opinions, to be tested on cross-examination. *See Sheldon*, 950 F.2d at 410; *Gayton*, 593 F.3d at 616 ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.").

Next, Defendants argue that Dr. Johnson-Arbor's opinion as to survivability is pure speculation because she does not know how much of the three toxic drugs Mr. Lurry consumed, nor their purity level, nor the timing of their ingestion. Therefore, according to Defendants, she cannot know the odds of surviving the overdose if Mr. Lurry had received medical attention at any particular time. (Dkt. 79 at 6–7).

Dr. Johnson-Arbor is undisputedly a specialist in both emergency medicine and medical toxicology with years of experience treating overdose patients. She satisfies the Court's first condition that her "qualifications provide a foundation for [her] to answer a specific question." *Gayton*, 593 F.3d at 617 (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)); *see also Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000) (finding expert had extensive academic and practical experience in field, such that his testimony had reliable basis in knowledge and experience of relevant discipline). She has specific knowledge of the effectiveness of medical interventions for treating overdose patients, which she detailed in her report and at her hearing. (Dkt. 105 at 22–23; *see also* dkt. 79-1 at 5). In *Gayton*, the court found that a physician

40

was unqualified to give his opinion as to the survivability of a medical condition because he had no "specific knowledge of cardiology and pharmacology." *See Gayton*, 593 F.3d at 617–18. Here, by contrast, Dr. Johnson-Arbor has very specialized knowledge of the medical interventions for drug overdoses and their effectiveness. She has personally treated many such patients. She is thus qualified to opine on the relative likelihood of survival if medical interventions had been delivered close-in-time to ingestion.

Dr. Johnson-Arbor then applied her experience and training in these medical specialties to the factual record. She described how several minutes' delay in seeking medical assistance, in her opinion, significantly worsened Mr. Lurry's odds of survival due to the increasing level of toxicity of the drugs in his system and the decreasing level of oxygen to his organs over time. (Dkt. 79-1 at 5–6). Her methodology accounts for the inability to know certain factors. She explained at the hearing that it is never possible to know for sure the purity and dosage of drugs ingested in the field. (Dkt. 105 at 18). In her clinical experience, it is not unusual for physicians to make judgments about effective treatment options without knowing this information, but rather based on observable signs and symptoms. (Dkt. 105 at 18–19). Here, she noted Mr. Lurry was "initially awake and alert" while chewing in the back of the police car, but he "became increasingly somnolent during the drive" to the station. (Dkt. 79-1 at 3). By the time they reached the station, Mr. Lurry was "barely responsive to verbal stimuli" and did not respond to a sternal rub. (*Id.*) She detailed the worsening progression of observable symptoms over time and ultimately concluded that the severity of the overdose could likely have been prevented if Mr. Lurry had received medical attention right away to reverse their effects. (*Id.* at 4–5).

Further, she explained that in her experience, prompt treatment means doctors can reduce the effects of absorption of the overdose through various interventions. (Dkt. 105 at 22–23; *see*

*also* dkt. 79-1 at 5). Based on her clinical experience delivering these interventions—including administering fentanyl for opioids, providing breathing assistance, administering activated charcoal to absorb drugs, flushing drugs from the system in bowel irrigation—to prevent overdose in patients with unknown drug combinations in their system, she reached her opinion that Mr. Lurry would likely have survived had officers called for medical attention when they first suspected he had put drugs in his mouth. All these interventions would have been available and their potential effectiveness maximized. (Dkt. 105 at 22–23). Dr. Johnson-Arbor connected her own knowledge and experience with the evidence in the record to form her conclusion. She has reliably applied a proper methodology. *See Manpower, Inc.*, 732 F.3d at 806; *Potts*, 2017 WL 4365948, at \*5.

Finally, Defendants argue that Dr. Johnson-Arbor is not qualified to give her opinion on Mr. Lurry's odds of survival, because none of her many peer-reviewed publications, presentations or research projects mention Narcan/Naloxone, none address fentanyl, and only a couple mention cocaine and heroin but do not focus on overdose. (Dkt. 79 at 8). Regardless, the Court concludes that Dr. Johnson-Arbor's extensive experience in emergency medicine and medical toxicology— both specialties in which she is board certified—qualifies her to testify on topics related to opiate overdoses, cocaine overdoses, and the effectiveness of Narcan. *See United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002) ("[G]enuine expertise may be based on experience or training."). Defendants' challenge goes to the weight the jury should give to her testimony, which they can test on cross-examination. *See Sheldon*, 950 F.2d at 410; *Gayton*, 593 F.3d at 616. The fact that she has not specifically published, presented, or researched Narcan/Naloxone, fentanyl, or cocaine or heroin overdoses does not render her unqualified.

    *b.*   *Opinion on Use of Nose Pinch and Baton as Exacerbating Mr. Lurry's Condition*

Defendants argue that Dr. Johnson-Arbor's Opinion B is likewise unreliable and speculative.[10] (Dkt. 79 at 2, 9). First, they claim that her methodology does not sufficiently consider Mr. Lurry's cardiac rhythms, which their own expert says indicates an overdose-induced cardiac arrest rather than any suffocation or strangulation. (Dkt. 79 at 5–6). Defendants claim Dr. Johnson-Arbor's opinion employed an unreliable methodology primarily because their own expert reached a different conclusion—that the cardiac rhythms conclusively prove Lurry was not asphyxiated. (*See* dkt. 79 at 5 (citing Dr. Smock's report)). The Court does not resolve which expert's conclusions are correct, as the jury must decide the weight and credibility given to the respective expert's testimony. *See Gayton*, 593 F.3d at 616; *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony."). If the expert follows a reliable methodology and supports her conclusions, the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Kawasaki Kisen Kaisha, Ltd.*, 782 F.3d at 360 (internal citation omitted).

Here, Dr. Johnson-Arbor considered Mr. Lurry's cardiac rhythms but ultimately disagreed with the conclusions Dr. Humilier—who performed the autopsy—and Dr. Smock—Defendants' expert—drew from them. She reviewed the records of Lurry's cardiac rhythms when EMTs arrived on the scene and attached monitors to him. (Dkt. 105 at 28–29). She noted that his initial rhythm showed pulseless ventricular tachycardia ("v-tach"), and then later became asystole. (Dkt. 105 at 29–30). She conceded that EMS never reported Mr. Lurry had the pulseless electrical activity

---

[10] "Opinion B: It is my opinion, to a reasonable degree of medical certainty, that Officers May and McCue exacerbated Mr. Lurry's condition and further increased his risk of death when May pinched Mr. Lurry's closed [sic] for approximately 90 seconds. Officer McCue's conduct in putting the baton in Mr. Lurry's mouth may have further exacerbated his condition." (Dkt. 79-1 at 7).

(PEA) typically associated with asphyxia. (Dkt. 105 at 29–30). But in her experience, someone suffering from asphyxia does not always show PEA. (Dkt. 105 at 29:25–30:2). She therefore did not consider the change in Mr. Lurry's cardiac rhythms from v-tach to asystole without evidence of PEA relevant to her ultimate opinion. (Dkt. 105 at 31:1–4). She followed a reliable methodology and did not fail to consider alternative explanations. Whether the absence of evidence of PEA is conclusive in Mr. Lurry's cause of death goes to the "soundness of the factual underpinnings" of Dr. Johnson-Arbor's analysis, not its reliability. *See Kawasaki Kisen Kaisha, Ltd.*, 782 F.3d at 360.

Defendants next contend that Dr. Johnson-Arbor can only speculate that the nose pinch and baton exacerbated Mr. Lurry's condition and increased his risk of death. They argue that she had no baseline to judge Mr. Lurry's likelihood of death because the toxicity of the drugs he consumed and timing of their ingestion is unknowable. (Dkt. 79 at 9). Further, they posit that she has no way to know whether or to what degree Lurry's airway was obstructed. (Dkt. 79 at 9–10).

The Court again concludes that Dr. Johnson-Arbor's expertise as a board-certified emergency medicine physician and medical toxicologist with many years' experience treating drug overdose patients and patients suffering from asphyxia qualifies her to testify to the various contributing factors of Mr. Lurry's death. Moreover, Dr. Johnson-Arbor's opinion is not speculative merely because she identifies a potential airway obstruction as a contributing factor to Mr. Lurry's worsening condition without stating conclusively that this caused his death. *See Gayton*, 593 F.3d at 619 ("[A]n expert need not testify with complete certainty about the cause of an injury; rather he may testify that *one factor could have been a contributing factor* to a given outcome." (emphasis added)) (citing *Walker v. Soo Line R. Co.*, 208 F.3d 581, 587–88 (7th Cir. 2000)).

Dr. Johnson-Arbor relied on observations from the video recordings and her experience regarding patients with systemic opioid exposure to explain why she concluded the officers' actions exacerbated Mr. Lurry's degree of hypoxia. She noted the "several small bags" and "a larger torn bag" that McCue extracted from Mr. Lurry's mouth. (Dkt. 79-1 at 7). Those bags were in his mouth when May pinched Mr. Lurry's nose closed for about 90 seconds. (*Id.*) In her experience, the opioid exposure would have already decreased oxygen delivery in Mr. Lurry's system, and the bags in his mouth at least partially blocked his airway. (*Id.*) Therefore, she reasoned, pinching Mr. Lurry's nose further deprived him of access to oxygen. (*Id.*; *see also* dkt. 32:22–33:2 ("[B]y the time that Officer May pinched his nose shut, Mr. Lurry was already very altered, at a very reduced level of consciousness, and more likely than not had a decreased ventilatory rate at that time. So in somebody who is not breathing normally, pinching their nose further deprives them of oxygen and worsens their clinical condition.")). Dr. Johnson-Arbor sufficiently connects the evidence with the conclusions she draws using her training and experience. The application of her methodology is reliable, so her opinion is admissible.

Dr. Johnson-Arbor also observed from the video that McCue inserted the baton into Mr. Lurry's mouth and, in her view, used it similarly to a blind finger sweep to extract an obstruction. (Dkt. 79-1 at 7; dkt. 105 at 33–34). But according to her training and experience, this is not a recommended practice because it can potentially worsen an airway obstruction. (Dkt. 79-1 at 7; dkt. 105 at 34). Here, she found it likely that McCue's placing his baton into Mr. Lurry's mouth may have caused or worsened an airway obstruction. (Dkt. 79-1 at 7; dkt. 105 at 34–35). She concludes this largely because she knew bags were in his mouth, the baton was moving around, and such movement often can worsen an obstruction. The support for this opinion is admittedly "shaky." *See Gayton*, 593 F.3d at 616. But it is not unsupported speculation; she reached this

opinion through the same reliable methodology of applying her training and experience to her observations.

Finally, she found it likely that Mr. Lurry's airway was, in fact, obstructed by the bags because he coughed up a bag after CPR and took some breaths. (Dkt. 79-1 at 7; dkt. 105 at 35). This opinion differs from Dr. Humilier's conclusion that Mr. Lurry had no airway obstruction. (Dkt. 79-1 at 7). But Dr. Johnson-Arbor explained why she disagreed with this conclusion. She said Dr. Humilier had based his conclusion on Mr. Lurry's lack of a gag reflex, but "opioid intoxication can suppress the gag reflex, and some individuals also have a variable gag reflex at baseline." (Dkt. 79-1 at 7). The basis for her disagreement with the physician who performed the autopsy can be tested in cross-examination, but her opinion is nevertheless admissible. It comes from the application of a reliable methodology that connects her experience with her observations of the data. *See Manpower, Inc.*, 732 F.3d at 806; *Potts*, 2017 WL 4365948, at *5.

In sum, the Court denies Defendants' motion to bar Dr. Kelly Johnson-Arbor's testimony. (Dkt. 77). The Court finds that Dr. Johnson-Arbor is qualified to offer her opinions, and they are reliable and relevant.

### 3. Dr. Judy Melinek

Defendants also seek to bar the testimony of Dr. Judy Melinek. (Dkt. 80 at 1). Dr. Melinek is a forensic pathologist who received her medical degree from the University of California Los Angeles School of Medicine and completed her pathology residency at the UCLA Medical Center. (Dkt. 80-1 at 2). She trained in forensic pathology at the Office of the Chief Medical Examiner in New York City and worked as Assistant Medical Examiner in San Francisco for nine years. (*Id.*) She then worked as a contract pathologist for the Alameda County Sheriff's Coroner's Office for seven years. (*Id.*) Currently, she practices forensic pathology and performs coronial and forensic

autopsies in Wellington, New Zealand. (*Id.*) She serves as Clinical Senior Lecturer at the Department of Pathology and Molecular Medicine at Otago University School of Medicine, and she has previously taught and lectured at several other institutions in the U.S. (*Id.* at 2–3). She has been published on many topics, including pathology and toxicology. (*Id.* at 2). She is board certified in anatomic, clinical, and forensic pathology, and she routinely interprets autopsy reports, toxicology reports, medical records, and police reports to determine mechanisms of injury and cause of death, as well as to evaluate the contributory effects of natural disease or intoxicants. (*Id.* at 3).

Defendants do not challenge Dr. Melinek's general qualifications to opine on the cause of Mr. Lurry's death. (Dkt. 80 at 2–3). The Court also concludes she is qualified to do so based on her education, training, and professional experience. Rather, Defendants contend she did not reach her opinion that "[a]sphyxia for several minutes due to obstruction of [Mr. Lurry's] airway is a significant contributing condition to his death" through any application of reliable methodology. (Dkt. 80 at 3 (quoting dkt. 80-1 at 3)). Instead, they argue, she is just speculating because she does not and cannot know the location of the plastic bags inside Lurry's throat. (*Id.*; *id.* at 4 ("[H]er entire opinion hangs on an unverifiable hunch that the plastic bags physically obstructed Lurry's airway.")).[11]

---

[11] Defendants purport to bar Dr. Melinek from testifying completely. (Dkt. 80 at 8; dkt. 97 at 5). But they meaningfully challenge only one opinion: that Mr. Lurry's airway was obstructed, and asphyxiation due to this obstruction contributed to his death. (*See generally* dkt. 80). They fail to address Dr. Melinek's additional opinions regarding (1) how officers' delay in seeking medical attention increased the time period for drug absorption; (2) how Lurry's death could have been averted had officers searched him and removed the drugs, or called for medical support right away; (3) why the mere absence of a gag reflex is an insufficient reason to rule out—as the medical examiner did—asphyxia as a contributing factor; and (4) why pinching someone's nose is not a proper technique to clear a patient's airway. (*See* dkt. 80-1 at 4–5). None of these opinions bear on the challenged opinion that asphyxia was a significant contributing condition to Mr. Lurry's death. As such, Defendants have forfeited any argument that such opinions are not admissible. *See Hall*, 820 F.3d at 927 (failure to argue why an expert lacked requisite qualifications and/or methodology to testify as to his opinion was fatal to argument that testimony was inadmissible).

Dr. Melinek reviewed the medical, hospital, and coroner records for Mr. Lurry, as well as the video and audio files, deposition transcripts, and the expert report of Dr. Kelly Johnson-Arbor. (Dkt. 80-1 at 1–2). She then reached her conclusions by applying her knowledge and experience to the pertinent facts and analyzing the referenced records in the context of the current peer-reviewed medical literature. (Dkt. 80-1 at 5–20; *see also* dkt. 104 at 98–99). This general methodology is sound, as Dr. Melinek—like the other expert physicians in this case—uses her experience and specialized knowledge to draw conclusions based on her observations of the available data. *See Kumho Tire Co., Ltd.*, 526 U.S. at 148–49; *Gayton*, 593 F.3d at 618; *Ortiz*, 656 F.3d at 537. But each conclusion must be analyzed individually under *Daubert*. *Hall*, 840 F.3d at 926.

At her hearing, Dr. Melinek first explained how "the common forensic understanding of asphyxia is that it encompasses a category of injury or death whereby people cannot get oxygen into their bloodstream. But the oxygen can be restricted from getting into the bloodstream in multiple different ways, so it's a very broad category." (Dkt. 104 at 112:1–5). She listed (1) external obstruction of the nose and mouth, (2) external pressure on the neck blocking air flow to the lungs and blood flow to the brain, (3) internal airway obstruction, and (4) chemical asphyxia limiting oxygen in the bloodstream all as various asphyxiating processes. (*Id.* at 112–13). Dr. Melinek then explained that, to reach her conclusion that asphyxia contributed to Mr. Lurry's death, she relied on certain physical findings at autopsy, including "a petechial hemorrhage" and "hemorrhage in the strap muscle on the right side of the neck," that showed substantial external pressure applied to the neck. (Dkt. 104 at 115:22–24; *see also* dkt. 80-1 at 3). She also pointed to observations she made from the video and from the autopsy report and testimony of Dr. Humilier to conclude that the officer's pressure on Mr. Lurry's neck, rather than medical intervention,

caused the strap muscle hemorrhage. (Dkt. 104 at 120–25; *see also* dkt. 80-1 at 3). This evidence of external pressure on the neck, combined with evidence that Mr. Lurry had baggies in his mouth, led Dr. Melinek to conclude his ability to breathe was compromised, contributing to asphyxia. (Dkt. 104 at 125; *see also* dkt. 80-1 at 3).

Furthermore, Dr. Melinek relied on her observations of samples of Mr. Lurry's lung, which she said showed evidence of foreign material, indicating aspiration of foreign material—drugs—in his airway. (Dkt. 104 at 127–29; *see also* dkt. 80-1 at 3). Finally, she noted the testimony that Mr. Lurry stopped breathing "after pressure was placed on his neck and his nose was pinched," when plastic material was still in his mouth. (Dkt. 104 at 130:9–11; *see also* dkt. 80-1 at 3). But after receiving CPR, he coughed up plastic material, gasped, and started breathing again. This, to Dr. Melinek, indicated there was an airway obstruction that caused him to stop breathing. (Dkt. 104 at 130:14–22; *see also* dkt. 80-1 at 3). The fact that Mr. Lurry coughed it up, according to Dr. Melinek, indicated it was in the back of his throat, because "a cough reflex is usually something that's at the back of the throat where it's obstructing. If it's just in the mouth, you spit it out. You don't cough it out. You don't cough things that are in your mouth. You cough things that are in the back of your throat or airway, blocking your airway." (Dkt. 104 at 134:22–135:2; *see also* dkt. 80-1 at 3).

Dr. Melinek, in sum, cited several observed facts that her training and experience led her to conclude Mr. Lurry's airway had been obstructed, such that asphyxia contributed to his death. She has adequately bridged the analytical gap between the general principles she relies on and the specific conclusions she drew. *See Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 536 (7th Cir. 2005) ("Some greater methodology is required to bridge the analytical gap between general principles and particular conclusions, and to vest thereby the opinion with requisite reliability."). Dr. Melinek

reached her conclusion through the application of a reliable methodology for her field. Her opinion is admissible so long as it is relevant. Defendants have not challenged the relevancy of this opinion, and indeed, the Court finds Dr. Melinek's opinion helpful for the jury to understand many of the issues, including whether the officers' actions contributed to Mr. Lurry's death. To the extent Defendants challenge the accuracy of the conclusions Dr. Melinek reaches or the factual underpinnings of her conclusions, they can attack this on cross-examination and through the testimony of their own expert witnesses. *See Sheldon*, 950 F.2d at 410; *Gayton*, 593 F.3d at 616; *Kawasaki Kisen Kaisha, Ltd.*, 782 F.3d at 360.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Plaintiff's Motion to exclude the testimony of Dr. William Smock; the Court permits him to testify consistent with this opinion but bars certain testimony. [75] The Court also grants in part and denies in part Plaintiff's Motion to exclude the testimony of John Ryan; the Court permits him to testify consistent with this opinion but bars certain testimony. [76]

The Court grants in part and denies in part Defendants' consolidated Motion to exclude the testimony of Charles Drago, Dr. Kelly Johnson-Arbor, and Dr. Judy Melinek. [77] The Court permits Drago to testify consistent with this opinion but bars certain testimony. The Court denies Defendants' Motion to exclude Dr. Johnson-Arbor's and Dr. Melinek's testimony.

Virginia M. Kendall
United States District Judge

Date: February 21, 2023