**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Nicole LURRY as Special Administrator of the Estate of Eric Lurry, Jr., deceased. | ) ) ) | |
| Plaintiff, | ) ) | Case No. 20 CV 4545 |
| v. | ) ) | Hon. Virginia M. Kendall |
| CITY OF JOLIET, et al., | ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS'
LOCAL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL
FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT[1]**

**I.        THE PARTIES AND BACKGROUND.**

1.        Eric Lurry, Jr. ("Lurry") was at all relevant times prior to his death on January 29, 2020, a resident of the City of Joliet, and Plaintiff Nicole Lurry ("Plaintiff") was his wife and is the special administrator of his estate. (Dkt. # 58, Answer, ¶¶ 3, 4)

2.        Individual defendants Lt. Jeremy Harrison, Sgt. Doug May, Jose Tellez, and Andrew McCue were at all relevant times police officers employed by the City of Joliet and acting within the scope of their employment. (Dkt. # 58, Answer, ¶ 6)

3.        On January 28, 2020, Andrew McCue was a probationary officer in "stage one" of his field training program. McCue had only eight days experience on the streets and was doing "minimal police duties" while observing and being trained by his Field Training Officer, Jose Tellez. (Ex. A, McCue Dep. pp. 23, 26, 253)

---

[1] Defendants treat these facts as the "uncontested material facts" *solely* for purposes of their motion for summary judgment.

4.      On January 28, 2020, Lt. Jeremy Harrison was the leader of Joliet PD's Joliet Narcotics Unit ("JNU"), and Sgt. May was a member of that unit. (Ex. B, Harrison Dep. pp. 16–17)

5.      Prior to January 28, 2020, Lt. Harrison and Sgt. May had encountered Mr. Lurry numerous times. Both officers knew him to be a dealer of cocaine. (Ex. B, Harrison Dep. pp. 86, 88; Ex. C, May Dep. p. 39)

6.      Prior to January 28, 2020, Lt. Harrison and Sgt. May had never known Lurry to personally use drugs, or to be involved in the sale of heroin or fentanyl. (Ex. B, Harrison Dep. pp. 88, 95; Ex. C, May Dep. pp. 75, 206)

7.      Prior to January 28, 2020, Officers Tellez and McCue never met Lurry. (Ex. A, McCue Dep. p. 45; Ex. D, Tellez Dep. p. 178)

## II.      JOLIET POLICE STAKE OUT A DRUG DEAL.

8.      On January 28, 2020, Officer Mark Soustek of the JNU received a tip from a confidential informant, who had previously provided reliable information, regarding a suspected drug deal. (Ex. E, Soustek Dep. pp. 44. 53, 117)

9.      The tipster reported that a suspect named Ivan Davis would be driving a red car to the Speedway Gas Station at the intersection of Briggs Street and I-80 in Joliet, and there purchase cocaine. (Ex. B, Harrison Dep. pp. 143–44; Ex. E, Soustek Dep. pp. 53, 117)

10.      JNU officers, including Harrison, May, and Soustek, set up surveillance at the Speedway in response to the tip. Harrison and May saw a red Buick pull into the gas station, and the driver, instead of conducting any legitimate business at the station, walked over to a blue

Mazda, engaged in a hand-to-hand transaction with the front seat passenger of the Mazda, and then left. (Ex. B, Harrison Dep. pp. 144, 147–48; Ex. E, Soustek Dep. pp. 55–56)

11.     Eric Lurry was the passenger in the blue Mazda. The driver, Keenan Kinney, was inside the gas station for 10 to 15 minutes and had no idea what Lurry did during that time gap. (Ex. B, Harrison Dep. p. 146;  Ex. F, Kinney Dep. p. 49)

12.     JNU officers, including Harrison and Soustek, believed based on the corroborated tip and their experience that they had observed a drug deal between the driver of the red car (Ivan Davis) and the passenger of the blue Mazda, later identified to have been Lurry. (Ex. B, Harrison Dep. pp. 147–48; Ex. C, May Dep. p. 18)

13.      The officers allowed both cars to leave the gas station so that the drivers would not know that the other party to the transaction had been arrested. (Ex. B, Harrison Dep. p. 148; Ex. E, Soustek Dep. p. 60)

14.     JNU Officer Steurer and his partner followed the red Buick driven by Ivan Davis, with Lt. Harrison and Sgt. May, riding together, following Steurer. The Buick crashed, and Davis tried to flee on foot and toss away the drugs but was caught. By the time Harrison and May arrived, they saw Davis was in custody and that officers had recovered a substance suspected to be cocaine. (Ex. B, Harrison Dep. pp. 149-50; Ex. C, May Dep. p. 16)

15.     Officer Soustek called over the radio and asked for a non-JNU patrol officer to follow the blue Mazda and find an independent justification for a traffic stop. (Ex. G, Wietting Dep. p. 75; Ex. E, Soustek Dep. pp. 58–59)

16.     Soustek believed there was already probable cause to arrest the occupants of the Mazda, but wanted the additional grounds for a stop as an added justification in case the seizure was challenged in court. (Ex. E, Soustek Dep. pp. 59-60)

17.     Officer Marcus Wietting responded and located the blue Mazda. He followed it for a couple blocks, believed he saw the Mazda pull into a Citgo gas station at Briggs and Washington without a turn signal, and then parked behind the Mazda and turned on his lights to conduct a traffic stop. (Ex. G, Wietting Dep. pp. 77–78; Ex. F, Kinney Dep. pp. 50–51)

18.     Officer Wietting spoke to the driver, Keenan Kinney, noted the smell of burnt cannabis because Kinney had been smoking marijuana, and asked Kinney for a license and insurance. Kinney did not provide insurance and eventually admitted he did not have a valid driver's license. (Ex. G, Wietting Dep. pp. 81–82; Ex. F, Kinney Dep. pp. 55–57)

19.     Officer Wietting ordered Kinney out of the car. About that time, several other officers arrived, including Officer Tellez and his trainee, Officer McCue, and Wietting asked Tellez and McCue to have Lurry get out of the car and to watch him because he (Wietting) was going to search the car. (Ex. G, Wietting Dep. pp. 89–90; *see also* Ex. D, Tellez Dep. pp. 82-83)

20.     Officer Wietting found illegal drugs in the driver's side panel of the blue Mazda, and then arrested Kinney. (Ex. G, Wietting Dep. pp. 92-93)

21.     Meanwhile, Officer Tellez had McCue pat down Lurry for possible weapons while Wietting was searching the car. McCue felt what he suspected to be wads of cash in Lurry's pocket and relayed this finding to Tellez, but Tellez did not pass this information on to anyone else or have McCue remove the suspected cash. (Ex. A, McCue Dep. p. 98-101; Ex. D, Tellez Dep. p. 87)

22.     Wietting asked Officer Soustek, who by this time had arrived and was sitting in a parked undercover van, if JNU had any reason to hold Lurry, and, when Wietting did not hear a response, Wietting allowed Lurry to walk away because Wietting did not see a reason to continue detaining Lurry. (Ex. G, Wietting Dep. pp. 95–96; Ex. E, Soustek Dep. p. 63)

23.     Lurry was told he could leave and began walking down Washington Street. But within a few minutes, Kinney, who was in the back seat of Wietting's police car, started yelling that Lurry had walked away with Kinney's cell phone, and Kinney wanted that cell phone back. (Ex. G, Wietting Dep. pp. 101–02; Ex. F, Kinney Dep. pp. 69–70)

24.     Wietting asked Tellez and McCue to go get the cell phone from Lurry and bring it back to Kinney. (Ex. G, Wietting Dep. pp. 101-02; Ex. A, McCue Dep. p. 112)

### III.     OFFICERS TELLEZ AND MCCUE ENCOUNTER ERIC LURRY ON WASHINGTON STREET.

25.     Around the time Kinney started yelling, Officer Soustek realized that Lurry had been allowed to walk away, concluded that Wietting must have misunderstood what JNU wanted, and told Wietting to have Lurry taken into custody. (Ex. E, Soustek Dep. pp. 63, 78–79)

26.     Soustek was aware that Ivan Davis, the driver of the red Buick, had been arrested, and had unsuccessfully attempted to throw away narcotics during a foot chase, at or before the time that Lurry was allowed to walk away from the gas station. (Ex. E, Soustek Dep. p. 116)

27.     Tellez and McCue drove several blocks to where Lurry was walking, got out of their car, and approached Lurry. Tellez told Lurry about Kinney's statements, and Lurry agreed that he had Kinney's phone and handed it back to Tellez. (Ex. A, McCue Dep. p. 114; Ex. D, Tellez Dep. pp. 98-99; Ex. H, McCue Video ending in "7627," Stream 2, at 15:54:12–15:57:35)

28.     Moments later, Wietting contacted Tellez over the radio and asked him to call

him. Tellez did. Wietting asked Tellez if Lurry had any money on his person, Tellez said he did

not know, and Wietting told Tellez that "the drug guys" wanted any money on Lurry's person

confiscated, and to "search him good." (Ex. D, Tellez Dep. pp. 99–101)

29.     Tellez told Lurry that he needed to take any cash on Lurry's person for the drug

investigation, removed two bundles of cash from Lurry's pockets, and told Lurry he "was going

to do a search of his person. (Ex. D, Tellez Dep. pp. 103–04, 107; *see also* Ex. H, McCue Video

ending in "7627," Stream 2, at 15:56:55–15:57:35)

30.     Lurry walked over to the squad car, put his hands on the car, and consented to

Tellez's actions by complying without giving any verbal or physical sign of refusal to consent.

(Ex. D, Tellez Dep. pp. 108–09; *see also* Ex. H, McCue Video ending in "7627," Stream 2, at

15:56:55–15:57:35)

31.     As Tellez was patting Lurry down, he felt a round, pliable bulge on the inside of

Lurry's upper left leg, between the size of a racquetball and a golf ball, which he suspected was

drugs, likely cocaine, and asked "what's this." (Ex. D, Tellez Dep. pp. 126, 129)

32.     Lurry immediately put his hands towards his waist. McCue saw Lurry's hands

and said "don't go reaching" or words to that effect, and both McCue and Tellez went to the

ground with Lurry. (Ex. A, McCue Dep. pp. 119-20; Ex. D, Tellez Dep. p. 130; Ex. H, McCue

Video ending in "7627," Stream 2, at 15:58:11–25)

33.     Officers Tellez and McCue struggled with Lurry on the ground for approximately

a minute and were eventually able to get control of him and have him sit up. (Ex. A, McCue Dep.

pp. 123, 128; Ex. D, Tellez Dep. pp. 147, 161-62; *see also* Ex. H, McCue Video ending in "7627," Stream 2, at 15:58:25–15:59:55)

34. Lurry was handcuffed behind his back and placed in the back of the squad car. Tellez turned the squad car camera on at that time and alerted Lurry that he was on video and audio camera. (Ex. A, McCue Dep. p. 135; Ex. H, McCue Video ending in "7627," Stream 2, at 16:02:15–16:03:13; Ex. I, McCue Video ending in "6054," Stream 3, at 16:03:14)

35. Nicole Lurry arrived on scene while Eric Lurry was still on the ground with the officers and remained there until after Eric Lurry was put in the squad car. During that time, he did not appear to be in any medical distress, and when she asked him if he was ok, he nodded his head to indicate "yes." (Ex. J, Lurry Dep. pp. 122, 130; Ex. D, Tellez Dep. p. 158)

36. Lurry did not appear to be chewing prior to being put in the squad car. (Ex. J, Lurry Dep. p. 130)

37. Officer McCue then counted the bundle of cash which had been removed from Eric Lurry's pockets following the struggle and sorted that and other contents from his pockets on the hood of the squad car. (Ex. H, McCue Video ending in "7627," Stream 2, at 16:04:00–16:04:15)

38. Tellez never saw Lurry put any drugs in his mouth or saw his face make contact with his hands. (Ex. D, Tellez Dep. pp. 190, 323)

39. McCue never saw Lurry put drugs in his mouth, swallow anything, or put his hands to his face or mouth area. (Ex. A, McCue Dep. p. 253)

40. At some unknown point, Eric Lurry put the package of drugs in his mouth in an attempt to conceal the drugs from the officers and thereby avoid criminal consequences for

possessing illegal drugs. (Dkt. # 79-1, Report of Pl.'s Expert Dr. Johnson-Arbor p. 5; Dkt. # 79-2, Pl.'s Expert Dr. Johnson-Arbor Dep. p. 131)

41.     Eric Lurry had been in prison from 2012 to early spring 2015 and again from June 2015 to June 2019. He was in the middle of a one-year term of parole (supervised released) on January 28, 2020, and understood that if he were caught with illegal drugs, he was likely going back to prison. (Ex. J, Lurry Dep. pp. 52–53; Ex. K, Certified Copy of Conviction, 2015 CF 000373 (Cir. Ct. Will County), *see also* Dkt. # 79-1, Report of Pl.'s Expert Dr. Johnson-Arbor p. 5; Dkt. # 79-2, Pl.'s Expert Dr. Johnson-Arbor Dep. p. 131)

42.     Lurry remained seated in McCue's squad car for about four and a half minutes before the officers left for the station. During that time, he began to chew the package of drugs that he had surreptitiously placed in his mouth. (Ex. I, McCue video ending in "6054,"Stream 3, at 16:02:55–16:07:35)

43.     At the time Eric Lurry was placed in the squad car, Tellez had a hunch that Eric Lurry may have drugs concealed somewhere on his person, including "a possibility that he put some in his mouth," but did not know the amount, location, or type of any concealed drugs. (Ex. D, Tellez Dep. pp. 171–72, 196)

44.     Tellez did not think Lurry had stuffed the entire package of drugs that Tellez had felt into his mouth because Tellez did not think it was possible, given the size of the package he felt, for Eric Lurry to fit the entire package in his mouth and yet not have any bulge in his cheeks or face. (Ex. D, Tellez Dep. pp. 171–72)

45.      Tellez voiced his hunch by stating that "let's take him down to the jail because I'm sure he has something on him, but, uh, he might have put a bunch of it in his mouth, and he's

still got some probably in his crotch." (Ex. D, Tellez Dep. p. 185; Ex. I, McCue video ending in "6054,"Stream 3, at 16:04:48–16:05:02)

46.     Tellez's plan, given that Lurry did not appear to be in medical distress, was to take Lurry to the controlled environment of the police station, get the needed authorization from a supervisor for a strip search, and then conduct such a search to locate any drugs Eric Lurry may have concealed on his person. (Ex. D, Tellez Dep. pp. 50-51)

47.     McCue had never seen anyone overdose before this incident. (Ex. A, McCue Dep. p. 253)

48.     McCue, given his minimal prior experience, was following the lead of his field training officer (Tellez) and later, the lead of Sgt. May. (Ex. A, McCue Dep. pp. 136, 145)

49.     McCue drove to the station, which took about eight minutes. (Ex. A, McCue Dep. pp. 147-148; Ex. I, McCue video ending in "6054,"Stream 3, at 16:07:35–16:15:35)

50.     While en route to the station, Lurry continued intermittently chewing the package of drugs in his mouth, and at some unknown point, chewed through the plastic packaging and began directly ingesting the drugs through the mucus membranes of his mouth. (Ex. I, McCue video ending in "6054,"Stream 3, at 16:08:08–16:09:45, 16:11:45-16:12:15; *see also* Dkt. # 79-2, Pl.'s expert Dr. Johnson-Arbor Dep. pp. 60, 80)

51.     The body absorbs fentanyl "very rapidly" and it is colloquially known as the "drop dead drug" because of how quickly and powerful it can cause death. (Dkt. # 80-3, Dr. Humilier Dep. p. 58)

52.     Lurry never, throughout the entire incident, told officers around him that he put drugs in his mouth or was ingesting drugs, and he never asked for medical help. (Ex. A, McCue Dep. p. 151; Ex. I, McCue video ending in "6054,"Stream 3, at 16:03:12–16:16:45)

53.     Lurry remained silent about having ingested drugs or needing medical care even though, by the time the squad car was approaching the police station, he was becoming "increasingly somnolent." (Ex. I, McCue video ending in "6054,"Stream 3, at 16:03:12–16:16:45; Dkt. # 79-1, Report of Pl.'s Expert Dr. Johnson-Arbor p. 3)

54.     Eric Lurry actively tried to conceal that he was chewing (and thereby ingesting) drugs from the officers by turning his head / body towards the door of the car. (Ex. I, McCue video ending in "6054,"Stream 3 at 16:09:16–30, 16:10:15–25, 16:11:05–15, 16:12:20–30; Dkt. # 78-1, Report of Pl.'s Expert C. Drago ¶ 22)

55.     Officer McCue did not observe Eric Lurry in the back seat because he was focused on driving. (Ex. A, McCue Dep. pp. 151, 212)

56.     Officer Tellez partially observed Eric Lurry through the rear seat camera and on a couple of occasions thought he may have seen Eric Lurry chewing, but every time Tellez would shift position in order to get a better look at the camera monitor, which was slanted away from him, Lurry would turn his body or stop chewing, leaving Tellez uncertain about Lurry's actions. (Ex. D, Tellez Dep. pp. 224, 228-29)

57.     Officer McCue arrived at the police station, parked the car, and informed his dispatcher of this by calling over the radio "23 at the jail." Ex. L, McCue video ending in "6054," Stream 2, at 16:15:50–16:16:25; Ex. M, Joliet Police and Fire Logger Timeline, JOLIET 7478)

58.     Almost immediately thereafter, Officer Tellez got out and spoke to Sgt. May, who by this time had returned to the police station, for about roughly 30 seconds. (Ex. D, Tellez Dep. p. 247; Ex. L, McCue video ending in "6054," Stream 2, at 16:15:50–16:16:25)

## IV.     EVENTS IN THE JOLIET POLICE STATION PARKING LOT.

59.     Officer McCue attempted to get Lurry out of the car, telling him several times in a few seconds that he needed to get out. Lurry looked towards Officer McCue when McCue opened the door but did not make any motions to get out of the car. (Ex. I, McCue video ending in "6054," Stream 3, at 16:16:10–30)

60.     Eric Lurry's eyes were open and blinking, and he turned towards McCue when McCue opened the car door. (Ex. I, McCue video ending in "6054," Stream 3, at 16:16:10–12)

61.     McCue saw Lurry turn toward him, noted that Lurry's eyes were open and not rolling back in his head, and believed, based on his limited experience, that Eric Lurry was alert and oriented. (Ex. A, McCue Dep. pp. 159–60)

62.     Eric Lurry did not get out of the car or make physical steps towards doing so, and McCue said that if Lurry did not get out, he was "about to get pushed out" of the car. (Ex. A, McCue Dep. pp. 153–55; Ex. I, McCue video ending in "6054," Stream 3, at 16:16:30–42)

63.     Lt. Harrison, who had also returned to the station by this point, heard McCue's statements, walked over, looked into the car, recognized Eric Lurry, and said aloud "it's Eric Lurry" or words to that effect. Sgt. May heard this statement. (Ex. B, Harrison Dep. pp. 162-64; Ex. C, May Dep. p. 38)

64.     Lt. Harrison had prior experience with arrestees faking illness in order to avoid going to jail, something he saw "quite often." (Ex. B, Harrison Dep. pp. 169, 171-72)

65.     Lt. Harrison saw that Eric Lurry's eyes were making "a little weird blinking," but Eric Lurry's body did not appear to be limp, but rather appeared consistent with other detainees Lt. Harrison had seen who were faking illness. (Ex. B, Harrison Dep. pp. 169, 171-72)

66.     Sgt. May also had prior experience with arrestees faking illness or medical emergencies in order to avoid going to jail. (Ex. C, May Dep. pp. 47-49)

67.     Lt. Harrison told McCue to use a sternum rub to "arouse" Lurry because Harrison "thought Lurry was just playing asleep … and not wanting to get out" of the car. (Ex. B, Harrison Dep. pp. 168-70; Ex. I, McCue video ending in "6054," Stream 3, at 16:16:40–42)

68.     McCue performed a sternum rub on Lurry, per Harrison's directive, but the sternum rub "did not appear to have affected him. (Ex. A, McCue Dep. p. 174–75; Ex. I, McCue video ending in "6054," Stream 3, at 16:16:42)

69.     Lt. Harrison asked May to go around the car and assist in getting Eric Lurry out of the car. Sgt. May did that, saw that Eric Lurry's eyes were closed, but did not think that was unusual because of his prior experience with persons feigning illness, and Lurry looked to him like another such person. (Ex. C, May Dep. pp. 44, 47)

70.     Sgt. May entered the back seat on the opposite side as McCue and used an open left hand, which is not his dominant hand, to strike Lurry in the face and said, "wake up, bitch." (Ex. C, May Dep. pp. 109–110; Ex. I, McCue video ending in "6054," Stream 3, at 16:16:45)

71.     May deliberately used the word "bitch" towards Eric Lurry because he knew it would be offensive and jarring to an experienced street criminal such as Eric Lurry and would likely provoke a hostile response and thereby expose if Eric Lurry was faking an illness. (Ex. C, May Dep. pp. 70–71)

72.     Eric Lurry turned toward May after the strike and the cursing, opened his eyes, and appeared to have been aroused but did not make movements to get out of the car. (Ex. C, May Dep. pp. 54, 78; Ex. I, McCue video ending in "6054," Stream 3, at 16:16:45–46)

73.      Eric Lurry did not appear to May to be experiencing a medical emergency at that time and May was not sure if Lurry was genuinely unresponsive or "attempting to appear … as if he was unresponsive." (Ex. C, May Dep. pp. 54–55, 78; Ex. I, McCue video ending in "6054," Stream 3, at 16:16:45–46)

74.     Medical professionals commonly use a "painful stimulus" technique to assess a person's level of consciousness and evaluate whether the person is feigning a medical condition. (Ex. N, Murphy Dep. p. 35; *see* also Dkt. # 79-2, Pl.'s Expert Dr. Johnson-Arbor Dep. pp. 98–99)

75.     The sternum rub is a common painful stimulus technique, in which a person rubs their knuckles on a person's sternum, which creates an unpleasant sensation but no risk of permanent injury. Another option is using a pen to apply pressure to a person's fingernail. (Ex. N, Murphy Dep. pp. 35, 36; Dkt. # 79-2, Pl.'s Expert Dr. Johnson-Arbor Dep. pp. 98–99)

76.     Some doctors and paramedics will also use a slap to the face as a painful stimulus to determine a patient's consciousness. (Ex. N, Murphy Dep. p. 36)

77.     Sgt. May's intent in striking and swearing at Lurry was to get a response and determine if he was faking a medical condition or why he was ignoring orders. (Ex. C, May Dep. pp. 70-71, 75)

78.     Regardless of his intent, Sgt. May's strike and swearing did not cause or contribute to Lurry's death. (Dkt. #80-2, Pl.'s Expert Dr. Melinek Dep. p. 136)

79.     Lt. Harrison did not see May strike Lurry. (Ex. B, Harrison Dep. p. 181–82)

80.     Tellez did see May strike Eric Lurry and heard the profanity, and within a few seconds after the slap turned off the squad car video. Tellez did that in part due to being surprised by May's actions and thinking them improper, and in part because it is both policy and standard practice at Joliet PD to turn off the camera once arriving and parking back at the police station. (Ex. D, Tellez Dep. pp. 23-25)

81.     Tellez's manual deactivation of the camera resulted in further audio not being captured, but due to the camera system's internal memory and recording features, investigators were able to recover the (silent) video of the subsequent events despite Tellez's actions, and were also able to recover additional (silent) video of earlier parts of the incident when the camera had not been manually turned on. (Ex. O, City's Answers to Interrogatories ¶¶ 10, 14–15)

82.     Potential indicators of an opioid overdose include disorientation, unresponsiveness, shallow breathing, eyes rolling back in the head, a limp body, and cessation of breath, but each of these signs could also indicate other issues. (Ex. N, Murphy Dep. pp 58–59)

83.     The only definitive way to determine if a person is experiencing an *opioid* overdose, as opposed to some other type of overdose or medical event, is constricted pupils. (Ex. N, Murphy Dep. pp. 29-30)

84.     The medication naloxone, commonly referred to by its brand name of Narcan, can be effective in reversing opioid overdoses. But Narcan is not effective for cocaine overdoses or non-opioid medication overdoses (Dkt. #78-2, Pl.'s Expert C. Drago Dep. pp. 164–65)

85.     Even in the case of opioid overdoses, Narcan may not be effective for a variety of reasons, including but not limited to the quantity of opiates ingested, the person's physical condition, and the person's tolerance levels, and if a person ingests a "massive amount" of

opiates, sometimes no amount of Narcan will reverse the overdose. (Ex. N, Murphy Dep. pp. 24, 57, 130)

86.     The threshold for giving Narcan is a depressed respiratory rate combined with other indicators of an opioid overdose. Even if a person is semi-conscious and showing other possible indicators of an opioid overdose, medical professionals do not give Narcan if the person is breathing on his or her own. (Ex. N, Murphy Dep. pp. 40-41)

87.     Some doctors and paramedics use a technique of pinching a patient's nose in order to get the patient to open his or her mouth, as a person's natural drive to breathe will cause the patient to open his or her mouth reflexively even if the person is trying to keep his or her mouth shut. (Dkt. #80-3, Dr. Humilier Dep. pp. 106-07; Ex. N, Murphy Dep. pp. 47, 122–3)

88.     Sgt. May was aware of the nose-pinch technique, had used it prior to January 28, 2020, and had been taught by other officers in the field that this technique was an option to get a person to open his or her mouth. (Ex. C, May Dep. pp. 134–35)

89.     Given the circumstances, Sgt. May suspected that Eric Lurry may have been concealing drugs in his mouth. Sgt. May wanted to get those drugs out and thus told Lurry to open his mouth while pinching his nose shut. (Ex. C, May Dep. pp. 90-91; Ex. I, McCue video ending in "6054," Stream 3, at 16:16:48–50)

90.     May continued pinching Lurry's nose shut for about ninety seconds, and during some of that time applied pressure to Lurry's jaw. (Ex. I, McCue video ending in "6054," Stream 3, at 16:16:48–16:18:18)

91.     Sgt. May pulled Lurry's mouth open after about 48 seconds of that time, meaning that Lurry's nose and mouth were both closed for only 48 seconds. (Ex. I, McCue video ending in "6054," Stream 3, at 16:17:35); [Dkt. #78-2, Pl.'s Expert C. Drago Dep.](#) pp. 141, 145)

92.     It takes 3-5 minutes without oxygen for a person to lose consciousness. (Ex. N, Murphy Dep. p. 53)

93.     After Lurry's mouth was opened, Sgt. May smelled the distinct smell of cocaine, saw a large plastic baggie in Lurry's mouth, and said aloud that he saw the baggie. (Ex. C, May Dep. p. 88; Ex. B, Harrison Dep. p. 184)

94.     Very soon after hearing May's statements, Harrison said "we gotta get that out." At this time, Harrison did not know if Eric Lurry had already ingested drugs or swallowed a plastic baggie or part thereof, but was concerned that if the baggie remained in Lurry's mouth, the plastic could cause choking and Lurry might ingest any drugs that may be in the baggies. (Ex. B, Harrison Dep. pp. 186, 189–90; Ex. A, McCue Dep. p. 176)

95.     Harrison told McCue to use a baton to prop Eric Lurry's mouth open while retrieving the baggies, so that Lurry did not bite down and thereby injure McCue's finger, and McCue did so. (Ex. B, Harrison Dep. pp. 186, 196; Ex. A, McCue Dep. p. 227; Ex. I, McCue video ending in "6054," Stream 3, at 16:17:50)

96.     The baton was in Lurry's mouth for about twenty-five seconds, and during that time several plastic baggies or pieces of plastic baggies were pulled out of his mouth. (Ex. I, McCue video ending in "6054," Stream 3, at 16:17:50–16:18:15 )

97.     During this time in the back seat of the car, Eric Lurry never demonstrated any gag reflex and never exhibited any physical struggle, two actions which, if present, would have

indicated that Lurry was experiencing difficulty breathing or had a foreign object obstructing his throat. ([Dkt. #80-3, Dr. Humilier Dep.](#) p. 104)

98.     Sgt. May believed that Lurry was experiencing a medical emergency at approximately 16:18:30 on the video, when Lurry's body dropped to the side and Lurry was not responding to several sternum rubs by different officers. (Ex. C, May Dep. pp. 160–61; Ex. I, McCue video ending in "6054," Stream 3, at 16:18:30)

99.     At or a moment after [the point above], Sgt. May observed that Eric Lurry did not appear to be breathing and said "We gotta get him out, I don't think he's breathing" or words to that effect. (Ex. B, Harrison Dep. p. 200)

100.     Harrison, who up to that point had no indication that Eric Lurry was not breathing, immediately called over the radio for an ambulance by saying "send a 52 outside the jail for male who swallowed narcotics." (Ex. B, Harrison Dep. pp. 200, 207; Ex. P, Joliet Fire Logger Radio Recording, JOLIET 5944, at 16:13:43; Ex. M, Joliet Police and Fire Logger Timeline, JOLIET 7478)

101.     Harrison made this call for an ambulance less than 3 minutes after McCue parked the squad car with Lurry in the back seat. ([Dkt. #78-2, Pl.'s Expert C. Drago Dep.](#) p. 175; Ex. P, Joliet Fire Logger Radio Recording, JOLIET 5944, at 16:11:01 and 16:13:43; Ex. M, Joliet Police and Fire Logger Timeline, JOLIET 7478)

102.     At about the same time as Harrison radioed for the ambulance, May, McCue, and other officers managed to get Lurry, who weighed around 260 pounds, out of the back seat and onto the pavement. (Ex. I, McCue video ending in "6054," Stream 3, at 16:18:30–16:19:10;

Ex. Q, Ranstead Video, Stream 2, at 16:18:30–16:19:10; Ex. B, Harrison Dep. pp. 200–01; Ex. J, Lurry Dep. p. 48 )

103.     At about the time Lurry was removed from the car, May called for an AED (automated external defibrillator), which is used to help persons experiencing sudden cardiac arrest. May did not know the status of Lurry's cardiac rhythms at the time but knew the machine could assess those rhythms and deliver a shock (defibrillation) to help restore a proper cardiac rhythm if the machine's diagnostics found that appropriate. (Ex. C, May Dep. pp. 167–68; *see also* Ex. Q, Ranstead Video, Stream 2, at 16:20:15–30)

104.     Officers Pete Ranstead and Chris D'Arcy started to give CPR and other first aid interventions to Lurry while he was on the pavement. Ranstead and D'Arcy have specialized paramedic training and are two of the most medically trained Joliet PD officers, so the other officers on scene stepped back and allowed Ranstead and D'Arcy to work without interference. (Ex. C, May Dep. pp. 182, 185; Ex. R, Steurer Dep. pp. 77–78; *see also* Ex. Q, Ranstead Video, Stream 2, at 16:19:30–16:21:15)

105.     At some point between Lurry being removed from the car and the arrival of the ambulance, Lurry was breathing and had a pulse. (Ex. B, Harrison Dep. p. 122)

106.     Officers McCue, Tellez, and May did not have Narcan on their person as Joliet PD officers were not required to carry Narcan at the time. (Ex. A, McCue Dep. p. 51; Ex. C, May Dep. p. 13; Ex. D, Tellez Dep. p. 193)

107.     An ambulance arrived within three minutes to five minutes of Harrison's call for the ambulance. (Ex. N, Murphy Dep. p. 80; *see also* Ex. Q, Ranstead Video, Stream 2, at 16:23:40)

108.     Upon arrival, the paramedics, including Nick Murphy, noted that Lurry was not conscious, secured Lurry's airway, tried to restore his heartbeat, and, over a period of minutes, gave him all the Narcan that they had on the ambulance. The Narcan did not have any effect. (Ex. N, Murphy Dep. pp. 85, 93, 105–06, 129; *see also* Ex. Q, Ranstead Video, Stream 2, at 16:23:35–16:33:00)

109.     Lurry was taken to Presence St. Joseph's Hospital. He did not regain consciousness and was pronounced dead the following day. (Ex. J, Lurry Dep. pp. 146, 154)

## V.     AFTERMATH AND INVESTIGATIONS

110.     On the afternoon of January 28, 2020, while at the hospital awaiting word on Lurry's status, Tellez told Lt. Harrison that he had turned off the dash camera video. This was the first time Harrison knew that the camera had been turned off. (Ex. B, Harrison Dep. pp. 42–43)

111.     The following morning, Harrison alerted his supervisor, Deputy Chief Reid, about Tellez's actions. DC Reid told Harrison that the Will / Grundy Major Crimes Task Force would be taking over the investigation of Lurry's death, and that the Task Force would handle all issues regarding preservation of evidence or lack thereof. (Ex. B, Harrison Dep. pp. 47–48)

112.     The Task Force did, in fact, take over the investigation of Lurry's death. (Ex. S, Will County State's Attorney Press Release, July 2, 2020)

113.     Lt. Harrison, Sgt. May, and Officers McCue and Tellez did not alter or delete any video footage and did not even have the technological ability to do so. (Ex. A, McCue Dep. p. 238; Ex. B, Harrison Dep. p. 35; Ex. C May Dep. p. 280; Ex. D, Tellez Dep. p. 315; Ex. O, City's Answers to Interrogatories ## 10, 11)

114.     No employee of the City of Joliet altered or deleted any video footage. (Ex. O, City's Answers to Interrogatories ## 10, 11, 14)

115.     On January 28, 2020, there were several outdoor perimeter video cameras at the Joliet Police Station. These cameras were constantly recording footage. Captured footage was automatically overwritten after 60 days unless downloaded and saved. (Ex. T, D'Aleo Aff. ¶ 2)

116.     The City of Joliet did not receive any communication referencing a need to preserve audio or video related to Lurry's death within 60 days of January 28, 2020, or requesting such preservation. (Ex. U, Spano Aff. ¶¶ 4-5; Ex. T, D'Aleo Aff. ¶ 4 )

117.     The first communication the City of Joliet received from a person representing Plaintiff which in any way mentioned a need to preserve evidence, or concern that evidence would not be preserved, was in July of 2020, well after the 60-day period for overwriting outdoor footage had passed. (Ex. U, Spano Aff. ¶¶ 5-6; Ex. T, D'Aleo Aff. ¶ 4 )

118.     On July 7, 2020, then-Interim Corporation Counsel for the City of Joliet, Sabrina Spano, directed the City's police and fire departments to preserve all evidence relating to the in-custody death of Eric Lurry. (Ex. U, Spano Aff. ¶ 7)

119.     The City of Joliet did not receive any formal request to preserve evidence from Plaintiff's counsel prior to filing the lawsuit. (Ex. U, Spano Aff. ¶ 6; Ex. T, D'Aleo Aff. ¶ 4 )

120.     The Will County Coroner's Office retained Dr. Michel Humilier, a board-certified forensic pathologist in private practice who has done thousands of autopsies, to determine Eric Lurry's cause of death. Dr. Humilier conducted an autopsy on Lurry's body, reviewed police reports, the video of Lurry in the back seat of the police car, and the medical records. (Dkt. #80-3, Dr. Humilier Dep. pp. 8, 26–29)

121.     A toxicology analysis from Eric Lurry's blood and urine, which were drawn before he died, showed fentanyl and metabolites of cocaine and heroin. The minimum toxic level of fentanyl in a person's blood is 3 ng/mL, and a level of 10 ng/mL is almost certainly fatal. Lurry's level was 32 ng/mL. (Dkt. #80-3, Dr. Humilier Dep. pp. 56–59, 120–21)

122.     Dr. Humilier conducted a more intensive autopsy of Lurry's body than he would do in most cases because this was an in-custody death, and he was looking for evidence of physical injury that might otherwise be missed. (Dkt. #80-3, Dr. Humilier Dep. pp. 123–24; *see also* Dkt. #80-2, Pl.'s Expert Dr. Melinek Dep. p. 42 (Plaintiff's expert not disputing physical autopsy findings).

123.     Dr. Humilier did not find any sign of injury to Lurry's mouth, throat, larynx, or tongue, and he did not see evidence of any foreign object in Lurry's mouth, throat, or trachea, the presence of which would have been evidence that Lurry's death was due to suffocation or strangulation. (Dkt. #80-3, Dr. Humilier Dep. pp. 112–15; *see also* Dkt. #80-2, Pl.'s Expert Dr. Melinek Dep. p. 42 (Plaintiff's expert not disputing physical autopsy findings).

124.     Dr. Humilier identified a long petechia hemorrhage in Lurry's right sclera (part of the eye) but did not view this as significant because a petechial hemorrhage is a non-specific sign and petechia can be caused by CPR. (Dkt. #80-3, Dr. Humilier Dep. pp. 45, 109–10)

125.     Dr. Humilier ultimately determined that the sole cause of Lurry's death was a mixed drug overdose from cocaine, heroin, and fentanyl intoxication. (Dkt. #80-3, Dr. Humilier Dep. pp. 8, 26–29)

126.     The Will County Coroner, based on and in agreement with Dr. Humilier, classified Lurry's death as an accident and found that the officers "played no role and shared no

responsibility in the unfortunate and untimely accidental drug overdose death" of Lurry. (Ex. V, Coroner's Press Release, JOLIET 136)

127. The Task Force eventually provided its investigatory file to the Will County State's Attorney's Office. The Office reviewed that file, along with the police reports, videos, medical records, and autopsy report, and State's Attorney James Glasgow agreed with the Coroner that the sole cause of Lurry's death was "the ingestion of fatal amounts of heroin, fentanyl, and cocaine, and did not result directly or indirectly from any action or inaction by an officer of the Joliet Police Department, and therefore no criminal charges were warranted. (Ex. S, Will County State's Attorney Press Release, July 2, 2020)

Respectfully submitted,

**/s/ G. David Mathues**
MICHAEL D. BERSANI, ARDC No. 06200897
G. DAVID MATHUES, ARDC No. 6293314
*Attorneys for Defendants*
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156
P: 630-773-4774      F: 630-773-4851
mbersani@hcbattorneys.com
dmathues@hcbattorneys.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Nicole LURRY as Special Administrator )
of the Estate of Eric Lurry, Jr., deceased. )
                                    )
         Plaintiff, )        Case No. 20 CV 4545
                                    )
     v. )        Hon. Virginia M. Kendall
                                    )
CITY OF JOLIET, et al., )
                                    )
        Defendants. )

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on **April 28, 2023,** I electronically filed the foregoing ***Defendants' LR 56.1 Statement of Uncontested Material Facts in Support of Their Motion for Summary Judgment*** with the Clerk of the District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, which will send notification to the following CM/ECF participants:

**TO:**    Abby D. Bakos
          Ronak Maisuria
          Bakos & Maisuria
          1755 Park Street
          Suite 200-1070
          Naperville, IL 60563
          abby@bakosmaisuria.com
          ronak@bakosmaisuria.com

                          **/s/ G. David Mathues**
                          MICHAEL D. BERSANI, # 06200897
                          G. DAVID MATHUES # 6293314
                          *Attorneys for Defendants*
                          HERVAS, CONDON & BERSANI, P.C.
                          333 Pierce Road, Ste. 195
                          Itasca, IL  60143-3156
                          P: 630-773-4774  F: 630-773-4851
                          mbersani@hcbattorneys.com
                          dmathues@hcbattorneys.com