**Page 1**

1  UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF ILLINOIS
3  EASTERN DIVISION
4  ------------------------------------------
5  Nicole Lurry, as Special Administrator of the Estate of
6  Eric Lurry, Jr., deceased,
7
8       Plaintiff,
9
10  vs.                    Case Number 1:2020cv04545
11
12  City of Joliet et al.,
13
14       Defendants.
15  ------------------------------------------
16      Deposition of Jose Tellez
17           Monday
18       November 22nd, 2021
19
20           -at-
21
22      Zoom Remote Deposition
23
24
25

**Page 2**

1      APPEARANCES
2
3    For the Plaintiff:
4        Abby Bakos
5        Ronak Maisuria
6      Bakos & Maisuria Law Group
7        1755 Park Street
8        Suite 200-1070
9      Naperville, Illinois 60563
10
11    For the Defendants:
12      G. David Mathues
13    Hervas, Condon & Bersani, P.C.
14        333 Pierce Road
15        Suite 195
16      Itasca, Illinois 60143
17
18    Also present:
19      Nicole Lurry
20
21      RECORDER: Zoom is recording. Good morning.
22  We're now on the record. Today is Monday, November
23  22nd, 2021. The time is now 9:32 a.m. We are meeting
24  remotely today for the deposition of Officer Jose
25  Tellez in the matter of Nicole Lurry, as Special

**Page 3**

1  Administrator of the Estate of Eric Lurry, Jr.,
2  deceased, et al. v. City of Joliet et al., case number
3  1:2020cv04545. The venue is Northern District of
4  Illinois, Eastern Division. Officer Tellez, my name is
5  Debra Westfall. I'm a notary public, and I'm recording
6  this deposition on behalf of Exhibit 5, LLC. This
7  deposition is being recorded remotely via Zoom in
8  accordance with Illinois Public Act 101-0640. Officer
9  Tellez, would you please confirm your identity by
10  placing a valid picture ID in front of the camera
11  briefly? Thank you very much. And Officer Tellez, are
12  you physically located within the state of Illinois
13  today?
14      MR. TELLEZ: Yes, I am.          0:01:09
15      RECORDER: Thank you. At this time, would
16  you please raise your right hand for the oath?
17           (Witness sworn)
18      RECORDER: Thank you. Would the attorneys
19  please state their appearances for the record?
20      MS. MAISURIA: Ronak Maisuria for Plaintiff.
21      MS. BAKOS: Abby Bakos for Plaintiff.
22      MR. MATHUES: David Mathues on behalf of the
23  Defendants.
24      RECORDER: That completes the required
25  information. We can -- oh, you know what, sorry, we

**Page 4**

1  also have Nicole Lurry present in -- in here. That
2  completes the required information. We can proceed.
3      MS. MAISURIA: Perfect. For the record, this
4  is the deposition of Officer Jose Tellez taken pursuant
5  to notice, in accordance with all applicable Federal
6  Rules of Civil Procedure and the local rules of the
7  Northern District of Illinois.
8           EXAMINATION
9  BY MS. MAISURIA:
10      Q. If you could please state and spell your full
11  name?
12      A. My name is Jose Tellez. That's J-o-s-e,
13  T-e-l-l-e-z.
14      Q. And my name is Ronak Maisuria. I'm one of
15  the attorneys for the Plaintiff in this case, and I'm
16  just going to be asking you a series of questions about
17  the underlying incident, okay?
18      A. Okay.                   0:02:16
19      Q. Have you ever given a deposition before?
20      A. I -- I believe one time. It was a long time
21  ago, but I believe once.
22      Q. And what context was that in? Were you a
23  named party, or were you a witness?
24      A. I believe it was in reference a case over an
25  arrest. So I would be on behalf of, I want to say the

**Page 21**

1 compared to hindsight, I mean, it -- my answer would
2 depend on that.
3    Q.  Okay.  Let's go with the first.  Based on
4 what you knew at the time, do you believe that you
5 acted appropriately on January 28th, 2020 and that you
6 were leading Officer McCue by example?
7       MR. MATHUES:  Objection to form and
8 foundation.  Go ahead and answer.
9    A.  Yes.
10    Q.  Based on hindsight, do you believe that you
11 acted appropriately on January 28th, 2020, and that you
12 were a good example and role model for Officer McCue
13 that day?
14       MR. MATHUES:  Same objection to form and
15 foundation.
16    A.  Hindsight being 20/20, I would have done a
17 couple things different, so that -- your question, I
18 would answer no.
19    Q.  What would you have done differently?
20    A.  In hindsight, over the whole case, or what
21 specific question are you asking?  I'm sorry.
22    Q.  Well, you just said that you would have -- in
23 hindsight, you would have done a couple different -- a
24 couple things differently.  So I'm asking you what are
25 those couple things?

**Page 22**

1    A.  Okay.  Hindsight now being 20/20, I realized
2 I should have probably asked -- tried to find out if he
3 -- he did have anything in his mouth at the scene, and
4 I probably shouldn't have shut the camera off when I
5 did.  I -- I should have just let it keep on going till
6 it was further along.
7    Q.  Well, with regards to keeping the camera on,
8 you're trained with regards to when that camera is
9 supposed to stay on, right?
10    A.  Yes.                         0:20:51
11    Q.  There's a general order on that, correct?
12    A.  Yes.
13    Q.  And you understand that there was a finding,
14 in accordance with an investigation undertaken by the
15 city, that you violated the general order pertaining to
16 the dash cam when you turned that off, right?
17    A.  Yes.  It was -- it was discipline, and yeah,
18 I was -- I'm sorry, disciplined for it, yes.  I agree.
19 There was a discipline.
20    Q.  Okay.  So, weren't you equipped with all the
21 knowledge you needed to be equipped with back on
22 January 28th, 2020 about when to keep that camera on?
23       MR. MATHUES:  Objection to form and
24 foundation.
25    A.  I'm not sure if I understand your question,

**Page 23**

1 "equipped with all the knowledge."  I mean, could you
2 explain that a little bit more?  I -- I'm not
3 understanding what you mean.
4    Q.  Sure.  Back on January 28th, 2020, you
5 understood what the general order was with regards to
6 when you're supposed to keep your camera running,
7 right?
8       MR. MATHUES:  Objection to form and
9 foundation.
10    A.  Yes.  I mean, I was aware of the general
11 orders on that day, yes.
12    Q.  Okay.  And you said, "based on hindsight,"
13 you would -- you would go back and you would keep your
14 camera on, right?
15    A.  Yes.                         0:22:00
16    Q.  When you say, "hindsight," is it really just
17 the fact that you were disciplined for it that makes
18 you wish that you had done the right thing then?
19       MR. MATHUES:  Objection to form.  Foundation.
20    A.  No.  I think, hindsight, what I mean is, when
21 I turned the camera off, if that's what we're talking
22 about right now, not the initial opening the mouth, if
23 we're concentrating on the camera right now, the
24 decision that I made at the time was just based on the
25 fact that I had observed Sergeant May slap Eric Lurry.

**Page 24**

1 It kind of threw me for a loop.  And I know you can't
2 -- you shouldn't slap somebody when they're in
3 handcuffs.  That was my initial thought.
4    Q.  Okay.
5    A.  That --
6    Q.  So your -- your main motivating factor for
7 turning off the camera was seeing your supervisor slap
8 somebody in custody that was handcuffed, right?
9    A.  There was --
10       MR. MATHUES:  Objection to form.  Foundation.
11 Facts not in evidence as to his supervisor.
12    A.  There was -- it was one of the reasons why I
13 turned the camera off.
14    Q.  Okay.  Well, let's assign percentages here.
15 Was it, like, 95 percent of the reason that you turned
16 the camera off?
17    A.  I -- I have never thought about percentages.
18 All -- all I ever thought of is one of the reasons that
19 I shut the camera off was because I know they --
20 Sergeant May slapped Eric Lurry, and you shouldn't slap
21 somebody in handcuffs.
22    Q.  Okay.  Well, let's think about percentages
23 now.  You say that it's one of the reasons, was it
24 your primary reason for turning off the camera?
25    A.  It was one of the reasons, and if you want me

Page 41

1  this incident?  Where you were --
2      A.   Near this incident?
3      Q.   -- a patrol officer?  In 2020, right?
4      A.   Yes.  Near the -- the tail end, I -- I am now
5  an FTO, of course.  I left the gang unit because, you
6  know, I felt that it was a young person's game.
7  They're more apt to that.  So I don't want to say that
8  I'm totally trying to be on easy street on day shift,
9  but it's -- it's definitely a lot lower percentage than
10  the gang unit would have been at the time.
11      Q.   50 percent be fair?
12      A.   As far as drug arrests on day shift, I'll --
13  I would go far as, say, 25, 30 percent.
14      Q.   Okay.  Do -- you received any training
15  related to drug overdoses?
16          MR. MATHUES:  Objection to form.  Vague as to
17  time.
18      A.   I would have to say, I'd imagine some time up
19  until the time -- you know, almost 20 years on the job,
20  I can't remember exactly the dates, but I -- I'd assume
21  I'd have to have some, yes.
22      Q.   What do you recall about that training?
23      A.   Not much.  I -- if I'm being -- I can't
24  recall when the dates or the times were.  As far --
25      Q.   Okay.  More about the substance of your

Page 42

1  training.  What do you recall being taught about drug
2  overdoses?
3      A.   Drug overdoses, I mean, maybe the drugs they
4  could be overdosing on, if I could remember.
5      Q.   Okay.  What -- what drugs were you taught
6  that people could be overdosing on?
7      A.   I guess, you know, on medications, the street
8  drugs, the popular ones being cocaine and heroin.  I
9  imagine, you know, I'm not sure as -- I don't remember
10  a whole much about the prescription meds, but I know
11  you -- I know you can overdose on pretty much anything
12  if you take enough of it, so I'm sure we had to cover
13  prescription medications at one time, also.
14      Q.   Were you trained for what the signs of an
15  overdose are?
16      A.   I don't remember.  I don't remember exactly.    0:42:00
17      Q.   Were you taught that time is of the essence
18  when dealing with someone who is suspected of
19  potentially overdosing on drugs?
20          MR. MATHUES:  Objection to form and lack of
21  foundation.
22      A.   Like I said, I don't recall.  I don't recall
23  time or a lot of it.  I don't, you know, remember
24  exactly when the training was.
25      Q.   Sure.  I'm not asking about when you had your

Page 43

1  training.  I'm asking, do you remember your training
2  involving that time is something to be conscious of
3  when you're dealing with somebody in the midst of a
4  drug overdose, that that qualifies as an emergency, and
5  you need to get them immediate attention?
6          MR. MATHUES:  Objection to form and lack of
7  foundation.
8      A.   Like I said, I don't recall.  But as far as
9  time, that -- that makes sense.  Of course, time is
10  going to be of the essence.
11      Q.   Okay.  And you understood that back in
12  January of 2020, right?
13      A.   Yes.  I'd imagine I had been trained by then
14  in this, yes.
15      Q.   So, on January 28th, 2020, you understood
16  that if someone was suspected of a drug overdose, that
17  it was necessary to get them immediate medical
18  attention, right?
19          MR. MATHUES:  Objection to mischaracterizes
20  testimony as to "suspected," and objection to lack of
21  foundation.
22      A.   Ma'am, if I believe somebody needs help, of
23  course I'm going to get them help.  If they're --
24      Q.   Okay.                              0:43:16
25      A.   -- exhibiting signs, absolutely.  Yes, I

Page 44

1  agree.
2      Q.   You were trained or you knew on January 28th,
3  2020 that drug overdoses can be fatal, right?
4      A.   Yes.  I believe drug overdoses, even just
5  based on experience, I don't know if I have to remember
6  my training.  Yes.  Drug overdoses can be fatal.
7      Q.   And because they can be life threatening, you
8  understood, on January 28th, 2020, that they qualified
9  as a medical emergency, right?
10          MR. MATHUES:  Objection to lack of
11  foundation.
12      A.   Anytime an overdose is suspected, of course,
13  it's going to be an emergency.
14      Q.   Okay.  Have you received any training on how
15  individuals may seek to conceal illicit drugs?
16      A.   I mean, there's ways -- like I said, I don't
17  remember the exact training, but I mean, I -- over --
18  just working over the course of my -- my career here, I
19  would know how people would try to conceal drugs, yes.
20      Q.   Okay.  We'll get to your experience in a --
21  in a moment, but I'm focusing for right now on
22  training.  As you sit here today, do you recall ever
23  having been trained, in the course of your almost
24  20-year career, on how people may seek to conceal
25  illicit drugs?

Page 45

1    A.  If you're asking me for dates, no, I don't
2  remember the dates, ma'am.
3    Q.  Well, I'm not asking you for dates.  I'm
4  asking you for the substance.  Do you recall ever being
5  taught how individuals may seek to conceal illicit
6  drugs?  I don't care when you were taught that.
7    A.  Okay.  I don't remember, but I -- I mean,
8  like I said, I'd had to have been, I just don't
9  remember when.
10    Q.  And you said, even putting aside your
11  training, you understand, from just your many years of
12  experience on the job, that people do seek to conceal
13  illicit drugs, right?
14    A.  Well, if they don't want to be arrested
15  further, yes.  They would have to hide them somewhere,
16  yes.
17    Q.  Yeah.  And most of the people you encounter
18  that you're about to arrest qualify as not wanting to
19  be arrested, right?
20    A.  I --
21    Q.  That's a fair assumption?
22    A.  I -- I don't know what's going through their
23  mind, ma'am.  I mean --
24    Q.  Okay.  You understand that people seek to
25  conceal illicit drugs when they don't want to be

Page 46

1  arrested, right?
2    A.  Yes.  That's a fair statement.          0:45:40
3    Q.  And what is your -- based on your training
4  and your experience, what is your understanding of how
5  they may seek to conceal them?
6      MR. MATHUES:  Objection to form and lack of
7  foundation.
8    A.  That would have to be somewhere on their
9  person.
10    Q.  Where on their person?
11    A.  It can be anywhere.  I mean, I've found that
12  they conceal them a lot of times in their socks, in
13  their shoes, in their boots, their crotch area.
14    Q.  Before January 28th, 2020, had you ever dealt
15  with an arrestee who would try to conceal drugs in
16  their mouth?
17    A.  Yes.                                     0:46:25
18    Q.  On how many occasions?
19    A.  Hard to say.  Not many.  Not many.  I'd --
20  I'd say a handful.
21    Q.  A handful can be up to five.  Do you believe
22  you had dealt with that --
23    A.  I would say that's a fair statement, around
24  five.  That would -- that would be a fair estimate.
25    Q.  And in those around five occasions, what did

Page 47

1  you do when you suspected them of concealing drugs in
2  their mouth?
3    A.  Just gain compliance to tell them to open
4  their mouth or spit it out.
5    Q.  So your only action would be ordering them to
6  open their mouth --
7      MR. MATHUES:  Objection to
8  mischaracterization.
9    Q.  -- or spit it out?
10    A.  I guess up to now, that's the only thing I've
11  ever had to do.  Most people, when they have drugs in
12  their mouth and I would have asked them in the five
13  times that -- you know, that I've dealt with, I've
14  never had an issue with them not spitting it out or
15  gaining compliance.
16    Q.  So in each of those five times that you're
17  thinking about, when you asked them to open their mouth
18  or spit it out, they complied with you?
19      MR. MATHUES:  Objection to mischaracterizes
20  testimony.  Lack of foundation.
21    A.  Yes.  I've never had any issues with people
22  not wanting to spit stuff out.
23    Q.  In those five occasions that you're thinking
24  of where you were able to gain compliance by telling
25  them to open their mouth or spit it out, and they then

Page 48

1  did so, did you ever have to use any physical force in
2  order to get them to spit out the drugs?
3      MR. MATHUES:  Objection to lack of foundation
4  and mischaracterizes testimony.
5    A.  No.  I gained compliance.  As far as I can
6  recall, I've never had to do anything other than advise
7  them, maybe talk to them a little bit, and other than
8  that, no.
9    Q.  Did you ever go hands on and try to open
10  their mouths yourself with your hands?
11    A.  No.                                       0:48:24
12    Q.  Did you ever put anything in their mouths?
13    A.  No.
14    Q.  Did you ever punch them?
15    A.  No.
16    Q.  Did you ever slap them?
17    A.  No.
18    Q.  Did ever threaten them with anything?
19    A.  No.  I mean, I would just tell them, "Hey,
20  you should spit it out.  The worst part is over.
21  You're already here."  It's just -- you know, I would
22  tell them about, you know, "It's probably just a
23  misdemeanor at this point, don't make it any worse,"
24  but no.
25    Q.  And they would just readily do so the minute

Page 49

1  you told them to do it?
2      A.  I --
3         MR. MATHUES:  Objection to mischaracterizes
4  testimony yet again.
5      A.  I'm just telling you from what I recall from
6  memory, ma'am.  I don't know what they did immediately.
7  I just -- I can just safely say that I've never had an
8  issue getting anything when I suspected that, you know,
9  or when they had something in their mouth.
10     Q.  So it's fair to say that on January 28th,
11  2020, when you encountered Mr. Lurry and, at some
12  point, suspected him of having something in his mouth,
13  that you had 100 percent success rate with other
14  similar calls involving arrestees with drugs in their
15  mouth.  And your success rate was 100 percent in terms
16  of getting them to spit that out, right?
17        MR. MATHUES:  Objection to lack of
18  foundation.
19     A.  From what I can recall, yes.        0:49:45
20     Q.  Did you make any effort on January 28th, 2020
21  to get Eric Lurry to spit out the drugs that you
22  thought he had in his mouth?
23        MR. MATHUES:  Objection to form and lack of
24  foundation.
25     A.  If we're talking about on the scene after he

Page 50

1  was placed in the squad car, after he was taken and put
2  in handcuffs, correct?  Is that what we're talking
3  about?
4      Q.  I'm talking at any time that day.  Did you
5  try to get him to spit out the drugs that you suspected
6  were in his mouth?
7      A.  No.                               0:50:15
8      Q.  So why did you deviate from your normal
9  practice with regards to Eric Lurry?
10     A.  When we got Eric Lurry into the car, we had
11  just finished wrestling around, trying to get his hands
12  up from underneath.  It seemed like a long time.  I'm
13  not exactly sure how long we were on the ground
14  wrestling with him, but by the time we ended up getting
15  his hands in handcuffs, we had to try, yet again, to
16  flip him over because he would not let us turn him over
17  from onto his stomach.  And I was tired by -- I was
18  very -- I was winded.  I was adrenalized.  I was tired,
19  by the time we got him into the car, and then my whole
20  train of thought was, "Let's get this guy down to the
21  station, and get a strip search authorized."  I had
22  never seen him put anything to his mouth up to this
23  point, or any other point.  The -- I didn't find out
24  that he had anything in his mouth, 100 percent sure,
25  till he was in the back of my squad car and they were

Page 51

1  taking it out of his mouth.  I wanted a more secure
2  location, because at the time, I believe two females
3  had showed up, one of them was Mrs. Lurry.  I didn't
4  know who they were at the time, but obviously, they had
5  some vested interest in what was going on.  I didn't
6  want to deal with my -- now, my attention being divided
7  with them, and me having to try to -- anything that I
8  did see initially.  I suspected that he might have, but
9  that's why I went to the station.
10     Q.  Okay.  We'll come back to that.  Have you
11  ever been disciplined while a Joliet police officer?
12     A.  I have.  Yes.                      0:52:02
13     Q.  How many times?
14     A.  I believe two times.
15     Q.  When was the first occasion?
16     A.  The first time I was disciplined was because
17  I had -- I received a written or oral reprimand.  I'm
18  not 100 percent sure.  I've actually only received only
19  one ever suspension day prior to this.  It was because
20  there was a fight.  A local nightclub had let out, and
21  there was a sergeant on scene with me.  There was a lot
22  of going -- stuff going on.  There was a lot of ruckus,
23  and it -- it came down to two females fighting, and
24  somebody started damaging the other party's car with a
25  shoe.  And I believe that they said that we didn't take

Page 52

1  a report on scene, so they came back and complained
2  sometimes later, maybe a day or two.  I'm not sure of
3  the exact time frame.  And I was written up for not
4  taking this person's complaint of a criminal damage to
5  a car.
6      Q.  Okay.  And what about your second occasion
7  being disciplined?
8      A.  The second occasion that I was disciplined
9  for was when I was in the TAC unit, and that's the only
10  time prior to this incident that I had been -- actually
11  received a one-day suspension.  Everything else had
12  been written or oral reprimands.  This one was because
13  I did not call in a traffic stop, and which was deemed
14  a safety issue for officer safety.
15     Q.  Did you seek administrative review in those
16  two incidents where you were disciplined?
17     A.  I -- I don't even remember, ma'am.
18     Q.  Okay.  And then you were disciplined as a
19  result of the Eric Lurry incident, correct?
20     A.  Yes, I was.                        0:53:43
21     Q.  And you were advised that you would be
22  receiving a six-day suspension, is that right?
23     A.  That's correct.
24     Q.  Okay.  And you sought an administrative
25  review, correct?

Page 113

1  arrest Mr. Lurry that day for anything else, that you
2  would have had to find something other than cash on his
3  person?
4      A.  My understanding was that I was supposed to
5  take the money and then just pat him down, a good -- a
6  good search or pat-down, because I guess that I found
7  out that McCue had not done a search at the -- at the
8  scene.  That was my only -- that was my only train of
9  thought at that point.
10     Q.  Well, McCue had already done that at the gas
11 station right?
12     A.  As far as patting him down or searching him?
13 I'm sorry, you're breaking up.
14     Q.  That's okay.  McCue had already done a
15 pat-down search at the gas station, right?
16     A.  Yes.
17     Q.  Okay.  And you had already gone into Mr. Eric
18 Lurry's pockets and recovered his money, correct?
19     A.  Yes.                          2:01:20
20     Q.  Okay.  Did you have cause at that point to do
21 a more thorough search?
22     MR. MATHUES:  Objection to speculation as to
23 what the drug unit knew.  Objection to the extent it
24 calls for a legal conclusion.
25     A.  When -- excuse me.  When I advised Eric Lurry

Page 114

1  that I was going to pat him down and then subsequently
2  do a search of his person, I never got to do a search
3  of Eric Lurry's person because when I patted down
4  towards his left leg, that's when I felt that -- what I
5  believed to be narcotics.
6      Q.  You told Mr. Lurry that you were going to pat
7  him down again after you recovered the money, right?
8      MR. MATHUES:  Objection to foundation and to
9  the extent it mischaracterizes any prior testimony.
10     A.  I asked Eric Lurry if it was okay to me to do
11 a pat-down on him, and --
12     Q.  And those were your words, you asked him if
13 he was okay?
14     A.  I -- I can't remember the exact words, ma'am,
15 but that would have been my -- my train of thought.  I
16 don't tell anybody what they're going to do, I ask, but
17 I don't remember the exact words.
18     Q.  Well, you told him that you were going to
19 take his money, right?
20     MR. MATHUES:  Objection to asked and answered
21 multiple times.
22     A.  Yes, I told him that I was instructed to take
23 his money by the drug unit.
24     Q.  So that wasn't a request, right?      2:02:46
25     A.  No.  I mean, he complied, and he says that he

Page 115

1  was in -- you know, he let us take his money.
2      Q.  But in the case of a further search, you
3  remember asking him if you could search him, right?
4      A.  Well, what --
5      MR. MATHUES:  Objection to asked and answered
6  multiple times.
7      A.  I would have to, ma'am, because like I said,
8  he was allowed to let go.  In order for me to go ahead
9  and conduct a further pat-down, I would have had to
10 asked him and not just -- you know, he was -- he had
11 been allowed to let go, so I had to reintroduce the
12 consent.
13     Q.  Okay.  And what did he say?
14     A.  I don't believe he said anything, he just put
15 his hands on the hood and kept them there.
16     Q.  Did you believe that he thought he could say
17 no?
18     MR. MATHUES:  Objection to speculation and to
19 the extent it's contrary to governing Fourth Amendment
20 law.
21     A.  Ma'am, I'd have no idea what -- what he was
22 thinking.
23     Q.  Did you believe that he thought he was free
24 to leave?
25     MR. MATHUES:  Objection to speculation and to

Page 116

1  relevance under governing law.
2      A.  Again, I -- I don't know what -- what was
3  going on through his mind, ma'am.
4      Q.  Okay.  Well, he's in the presence of two
5  armed police officers, right?
6      A.  Yes.                          2:04:01
7      Q.  Right.  And he's just been told by you that
8  you were going to take his money and that he should put
9  his hands on the car, right?
10     MR. MATHUES:  Objection to the extent it
11 mischaracterizes prior testimony and to ask -- asked
12 and answered multiple times as to taking the money.
13     A.  I'm sorry, what was your question again?
14     Q.  He was in the presence of two armed police
15 officers, right?
16     A.  Correct.
17     Q.  Who came up and stopped him as he was walking
18 away from an earlier stop, correct?
19     A.  Correct.
20     Q.  And he -- while in your presence, you then
21 told him that you were going to take his money and go
22 into his pockets, correct?
23     MR. MATHUES:  Objection to asked and answered
24 multiple times.
25     A.  I told him that we were going to take his

Page 125

1 incompetent, don't pretend otherwise.
2    A.  Ma'am, I don't want to get into a whole --
3 I'm not arguing by -- by any means, I just interpret it
4 as a fact that you were calling me incompetent, and if
5 -- and if you weren't, I apologize, but that's just the
6 way it sounded to me.  But at the time of -- getting
7 back to the recording, I'm dealing with a new recruit,
8 I gotta worry about his well-being, obviously.  I'm
9 thinking about what's going on and what I'm going to
10 do, how to get this money, and then with the whole
11 phone call, that's -- it didn't -- it did not occur to
12 me.
13    Q.  You're dealing with a new recruit, right?
14    A.  Yes.                           2:13:54
15    Q.  That's what you just said?
16    A.  Yes.
17    Q.  Isn't part of your job, when dealing with a
18 new recruit, to make sure that he is trained
19 appropriately on the policies of the Joliet Police
20 Department and that he abides by those?
21       MR. MATHUES:  Objection to asked and
22 answered.
23    A.  Yes, that was -- that would be a fair
24 statement.
25    Q.  Okay.  Do you think you did that at that

Page 126

1 moment when you forgot to tell him to activate the
2 camera?
3    A.  No.  Like I said, hindsight being 20/20, I --
4 I should have activated the camera.
5    Q.  Where did you begin your pat-down, what part
6 of the body?
7    A.  I want to say it was across his chest and
8 then the -- the waistline, and then I started working
9 myself down towards the bottom -- towards the legs and
10 the feet.
11    Q.  Did you find anything when you went across
12 his chest?
13    A.  No.
14    Q.  What about his waistline?
15    A.  No.                            2:14:47
16    Q.  What about when you started working your way
17 down towards his feet?
18    A.  When I started working my way down towards
19 the inside of his leg, that would be his left leg,
20 that's when I initially felt something to me that was
21 consistent and immediately apparent as narcotics.
22    Q.  Okay.  When you say, "the inside of his left
23 leg," where about his leg?
24    A.  It would be approximately halfway down
25 towards his inner thigh quad area.

Page 127

1    Q.  Was it near his groin?
2    A.  No, it was a little bit lower.     2:15:30
3    Q.  Okay.  And what did you feel?
4    A.  I felt a substance that, when I squeezed it
5 between my fingers, was pliable and felt consistent
6 with a powder, as opposed to cannabis, which would have
7 been crunchy -- if you -- you know, it would be
8 breaking up.  It didn't make any noise, it was pliable
9 to the -- to the pressure that I had applied it with my
10 fingers, so I was trying to determine what it is.
11    Q.  Did you believe that it was some sort of
12 plastic wrapping?
13    A.  It had -- yes, it had to be some kind of --
14 something that was holding that -- what I interpreted
15 right away to be some kind of powder, holding it in --
16 in one as to not be falling apart or spilling all over.
17    Q.  And based on your significant experience,
18 what did you think the possibilities were for what this
19 powder was?
20    A.  This had to be some kind of illegal narcotic.
21    Q.  Cocaine?
22    A.  Yes, that's possible.            2:16:25
23    Q.  Okay.  Did you think it could have been
24 anything else?
25    A.  Based on my experience, cocaine was usually

Page 128

1 packed like that.  I had never encountered heroin --
2 that much heroin, if it was heroin, packed like that.
3 No, it would be packaged different.
4    Q.  Okay.  And what was the size of the object
5 that you felt?
6    A.  I would say it had to have been between --
7 somewhere between the size of a golf ball and a
8 racquetball, that's the best I could put it.
9    Q.  And based on your experience, that would have
10 been a significant amount of drugs, right?
11       MR. MATHUES:  Objection to form.
12    Q.  Something of that size?
13    A.  Yes, it would --
14    Q.  Enough that it would have gotten him arrested
15 for distribution versus possession, right?
16    A.  All --
17       MR. MATHUES:  Objection for -- to
18 speculation.                          2:17:17
19    A.  All I can say is the size, I -- I am not --
20 you know, between a golf ball and a -- and a
21 racquetball.  I'm not thinking, you know, as far as the
22 weight or anything, that I couldn't say.
23    Q.  Okay.  But it seemed to be -- to you, to be
24 more than just sort of a recreational amount that
25 someone was carrying, right, it was a significantly

Page 33 (Pages 129-132)

Page 129

1  sized object?
2      A.  I mean, yes, if it's -- if it's cocaine -- I
3  mean, it's not a kilo of cocaine which is a brick,
4  obviously that's a lot bigger, but it's -- it's the
5  size of a golf ball and a racquetball, somewhere in
6  between.
7      Q.  What -- did you say anything when you felt
8  that object?
9      A.  Yes, I said, "What's this?"        2:18:04
10     Q.  Okay.  And where was McCue at this point?
11     A.  McCue would have been to Mr. Lurry's right as
12 he had his hands on the -- on the hood of the squad
13 also by the headlight on the driver's side.  He would
14 have been in that area towards him.
15     Q.  And were you directly behind Mr. Lurry during
16 the pat-down?
17     A.  I -- I was now bent over on what would have
18 been Mr. Lurry's left.
19     Q.  But when you were patting him down
20 starting at his chest area and then moving down, you
21 were initially, at some point, behind him, right,
22 standing up?
23     A.  Yes.
24     Q.  Okay.
25     A.  That is correct.                    2:18:43

Page 130

1      Q.  Okay.  And then you moved on over to his left
2  side?
3      A.  I moved just slightly over to the left to
4  favor the leg, yes.
5      Q.  Okay.  And what, if anything, was said after
6  you said, "What's this?"
7      A.  I think somewhere in between -- I'm not
8  exactly sure of the order, when I said, "What's this?"
9  I hear McCue say something to the effect of "Hey, don't
10 go reaching" or "Get your hands out of there."  I'm not
11 exactly sure, but something -- he said it in an alarmed
12 voice, where it would indicate to me that now Eric
13 Lurry didn't have his hands on the hood anymore.
14     Q.  When you felt the object in Mr. Lurry's
15 pants, did Mr. Lurry show any sort of reaction?
16     A.  Not initially, because I said, actually, a
17 second time, "Hey, what is this?"
18     Q.  And you didn't hear him say anything,
19 correct?
20     A.  Correct.                            2:19:48
21     Q.  Okay.  And he didn't pull away from you at
22 that point, correct?
23     A.  After the second time I said it, yes.  Not
24 after the first time.  I did not see, I had heard
25 Officer McCue say, "Hey, don't go reaching" or

Page 131

1  something to that effect.
2      Q.  Okay.  So you asked, "What's this?" then you
3  heard Officer McCue say something to the effect of
4  "Don't go reaching," and then you said, "What's this?"
5  again?
6      A.  Correct.
7      Q.  Okay.  And after you said, "What's this?"
8  again, that's when Eric Lurry pulled away?
9      A.  That is correct.
10     Q.  Okay.  And describe how he pulled away.
11     A.  I'm directly behind him, he doesn't have a
12 whole lot of room to move, so he pulls away from the
13 squad, and by then, Officer McCue senses that maybe
14 he's trying to get away, and I just come around from
15 behind him and try to, you know, wrap him up from
16 behind as -- as opposed to letting him possibly get
17 away from where we're at.
18     Q.  Okay.  Did you think he was going to try to
19 flee?
20     A.  Yes.                                2:20:47
21     Q.  Okay.  So you wrapped him in a bear hug from
22 behind?
23     A.  As best I could, ma'am.  He was a very big
24 guy, I don't even know if I ever got around him, but I
25 did put my hands around him in an attempt to stop from

Page 132

1  what I thought was him leaving the scene.
2      Q.  Okay.  And where were his hands when you put
3  your arms around him?
4      A.  I couldn't really see because I was from
5  behind him, but now when we're starting to fall to the
6  ground, I see his hands were underneath his stomach
7  area.
8      Q.  Okay.  And then once you've -- once you've
9  got your arms wrapped around him, what do you do with
10 him, do you take him down to the ground?
11     A.  I don't even know if you could call it that.
12 I think we just all kind of slide down to the ground
13 all together.
14     Q.  Okay.  Well, do you believe any of your
15 momentum was part of the reason that you ended up on
16 the ground?
17     A.  I think me -- when I grabbed him, I think he
18 didn't -- he didn't take too many steps at all, we just
19 kind of just fell to the ground.
20     Q.  Okay.  So do you believe that he ended up on
21 the ground more as an unintentional fall because of the
22 way he was wrapped up with you?
23         MR. MATHUES:  Objection to speculation.   2:22:20
24     A.  I'm not sure, ma'am, I don't know -- I don't
25 know what the cause of the fall was.  All I know is

Exhibit 5, LLC

Page 145

1 around him and that's the extent of that.
2    Q.  Well, you put your arms around him in an
3 attempt to stop him from fleeing, right?
4    A.  Yes, but the way I interpret use of force is
5 the fact if -- if I had striked him, did I use any kind
6 of a taser or any other baton strike or anything.  I
7 just wrapped my hands around him and hung on and we
8 fell.
9    Q.  But you said that -- you testified that you
10 thought he was trying to flee and that's why you
11 wrapped your arms around him, and in this report, you
12 indicate, rather than trying to flee, you actually had
13 him sticking around by diving towards the ground, don't
14 you?
15    MR. MATHUES:  Objection to argumentative,
16 lack of foundation, and mischaracterizes testimony.
17    A.  Ma'am, in my past experience when somebody
18 pulls away from a police vehicle, they are going to
19 start running.  I have no idea what the subject is
20 going to do, all I know is he's pulling away.  I can
21 interpret the fact that -- based on my experience, that
22 he's going to run, but I'm not sure as to what he's
23 going to do.
24    Q.  And with all due respect, you didn't answer
25 my question, so I'm going to ask it again.

Page 146

1    A.  I'm sorry, go ahead.                2:37:31
2    Q.  You just testified that you put your arms
3 around him because you thought that he was going to
4 flee, and your report -- the statement in your report
5 where you say that he proceeded to turn around and dove
6 towards the ground, that statement has him not fleeing,
7 but sticking around at the scene of the incident and
8 diving towards the ground, right?
9    MR. MATHUES:  Objection to the -- to
10 speculation, to lack of foundation, and to
11 argumentative, beyond the document.
12    A.  Okay, I did say that I thought he was going
13 to flee, but that's just a thought, that's not what
14 happened.  Obviously he went and he -- we all fell
15 down.  I did put my hands around him, but if I'm trying
16 to remember your question that you're asking me, the
17 fact that I put my hands around him and we fell to the
18 ground, no, that is not in that -- that report.
19    Q.  Okay.  Did you ever go back and attempt to
20 correct your report when you realized that it wasn't
21 accurate?
22    A.  I don't believe so, no.
23    Q.  You have the ability to do that by filling
24 out a supplemental report, right?
25    A.  Yes.                              2:38:32

Page 147

1    Q.  Okay.  And you did not do that here, right?
2    A.  No.
3    Q.  Okay.  So after you all fell to the ground,
4 what happened next?
5    A.  After we all fall to the ground, it's
6 basically a struggle between myself and Officer McCue
7 to try to get his hands from underneath his stomach.
8    Q.  And how did you proceed to do that?
9    A.  We were trying to each grab an arm and remove
10 it from underneath his stomach.  And we were telling
11 him to put his hands behind his back.
12    Q.  When he -- when Eric Lurry landed on the
13 ground, were you on top of him?
14    A.  No.                                2:39:29
15    Q.  Where were you?
16    A.  I think when he fell to the ground, I
17 immediately got off and attempted to grab his hands
18 from around -- from underneath his stomach, torso area.
19    Q.  And his hands were around his torso area.  Is
20 that what you're saying?
21    A.  Yes, by his stomach --
22    Q.  Okay.
23    A.  -- clutched underneath.
24    Q.  And before he fell to the ground, you
25 understood, based on McCue's statements, that Eric

Page 148

1 Lurry had been reaching into his pants, correct?
2    A.  Yes, he said, "Don't go reaching."  At the
3 time, I'm not looking to where he's reaching to -- I
4 actually don't look up to where -- and he actually just
5 pulls away from the car.
6    Q.  Okay.  But based on those statements, you
7 thought there was a reasonable likelihood that Eric
8 Lurry was reaching into his pants, right?
9    A.  Yeah, when he said, "Don't go reaching," I
10 didn't know where he was reaching, into somewhere.
11    Q.  Okay.  And his pants were where you had felt
12 you believed to be drugs, right?
13    A.  Yes, along his left leg.            2:40:28
14    Q.  Okay.  And then when you landed on the ground
15 with him, he had his hands around his torso area,
16 correct?
17    A.  Yes, by his stomach, torso area.
18    Q.  Okay.  At some point, did they move up to his
19 chest?
20    A.  His torso area, chest, like, in a cross --
21 across his chest -- yes.
22    Q.  And were his hands clenched like you're doing
23 now?
24    A.  They were, like, in an X pattern, like a --
25 he was trying to cover them underneath his body, and we

Page 149

1 were trying to get them out from underneath.
2 Q. Okay. And were his fists clenched or could
3 you -- were his hands open?
4 A. I don't remember seeing.
5 Q. Okay. Could you see what he had in his
6 hands?
7 A. No.
8 Q. Okay. Could you feel what he had in his
9 hands?
10 A. No, I never went for his hands, my hands --
11 my hands were actually trying to get up from his elbow
12 and bicep area to bring them up. I wasn't messing with
13 his hands.
14 Q. Okay. And at some point while you're on the
15 ground, you see Eric Lurry moving his -- his chin, his
16 mouth towards his hands, correct?
17 A. Yes, when he was like this, I thought he was
18 just putting his head like this, I suppose, to make it
19 harder for us to get anything for -- his hands from
20 underneath his -- his chest.
21 Q. Okay. How would that make it harder to get
22 his hands out from underneath his chest, him moving his
23 head down?
24 A. Create more -- more resistance that way.
25 Q. Okay. Did you also think that there was a

Page 150

1 reasonable likelihood that he was taking what he may
2 have in his hands and putting it in his mouth to
3 conceal that from you?
4 A. At that point in time, I -- my sole objective
5 was -- objective was trying just to get his hands from
6 underneath, I had no idea what he was doing at the
7 time.
8 Q. Okay. And then how long did you see him
9 moving his head towards his hands?
10 A. That -- I -- that's unknown. I know I seen
11 him momentarily do it. Did he leave it there the whole
12 time? I don't know, I couldn't say, ma'am.
13 Q. Did you see him open his mouth?
14 A. No.                              2:42:24
15 Q. Okay. Did you -- where was McCue at this
16 point?
17 A. He was on the opposite side of where I was
18 at, trying to do the same thing.
19 Q. All right. Were you on the right side of Mr.
20 Lurry's body or the left?
21 A. I'm trying to remember where I was at. I'm
22 not sure. I'm not sure what side I was on.
23 Q. Okay. And you both were trying to grab a
24 hold of his biceps and get him up off the ground?
25 A. No, we were initially just trying to get his

Page 151

1 hands up from underneath his stomach to put him in
2 cuffs.
3 Q. Okay. And ultimately, were you successful in
4 doing that?
5 A. Yes, it -- we got him into handcuffs.
6 Q. Okay. How long would you say went by from
7 the time that you all ended up on the ground together
8 to when you were able to get him cuffed?
9 A. It's hard to say. It felt like a long time
10 -- felt like a long time. Felt like a minute and a
11 half or so, two minutes, I'm not sure.
12 Q. Were you saying anything to Mr. Lurry while
13 you were all on the ground?
14 A. While we were all on the ground?
15 Q. Yeah.                           2:43:24
16 A. Telling him to "Stop resisting, put your
17 hands behind your back."
18 Q. Okay. Did Mr. Lurry ever hurt you while you
19 were on the ground?
20 A. No.
21 Q. Did he ever attempt to strike you?
22 A. I'm sorry, you broke up.
23 Q. Sure. Did he ever attempt to strike you?
24 A. No.
25 Q. Did you ever see him hurt Officer McCue or

Page 152

1 attempt to strike Officer McCue?
2 A. No.
3 Q. Okay. So he was resisting, but he was not
4 being combative with you. He just did not want to be
5 arrested, it appeared, correct?
6 A. Yes.
7 Q. Okay. And is Mr. Lurry saying anything while
8 he's on the ground?
9 A. No.
10 Q. Do you hear McCue saying anything while on
11 the ground?
12 A. I don't think so, I think he's just following
13 my lead. I think I'm doing more of the verbal commands
14 as to "Stop resisting, put your hands behind your
15 back," and we're just trying to get the hands out.
16 Q. Do you see anyone else in the area, are there
17 any civilians walking by?
18 A. Actually, yes, there was two females that
19 ultimately pulled over on the side of the road and
20 started making their way towards location.
21 Q. Okay. Do you know who those two females
22 were?
23 A. I know now who one of them is, I don't know
24 who the other one was.
25 Q. Okay --

Page 173

1  A.  Yes.                                3:05:03
2  Q.  Okay.  And after they ingest those drugs,
3  because you don't know how many drugs they have in
4  their mouth, that may lead to an overdose situation,
5  correct?
6  A.  Yes, I don't know how much -- how many drugs
7  they might have in their mouth, but I mean, yeah,
8  that's a possibility if somebody does have them.
9  Q.  And as you testified earlier, you understand
10 that overdoses can be fatal, correct?
11     MR. MATHUES:  Objection to asked and
12 answered.
13 A.  Yes, overdoses can be fatal.
14 Q.  So you understood on scene, when you
15 suspected that there was a possibility that he put
16 drugs in his mouth, you understood there was also a
17 possibility that he may overdose on them and die,
18 correct?
19     MR. MATHUES:  Objection to incomplete
20 hypothetical.  Objection to form.
21 A.  I guess if you're going off a scenario, yes,
22 it's -- it's all possible.
23 Q.  Okay.  So you understood there was a
24 possibility that he may die as a result of the --
25 whatever quantity of drugs that he had in his mouth,

Page 174

1  and you decide then not to search him, correct?
2  A.  I decided not to search him because I never
3  saw him put anything into his mouth.
4  Q.  Okay.  You understand that you're supposed to
5  search an arrestee that you're transporting before they
6  get in your car, right?
7  A.  Yes.                                3:06:28
8  Q.  You understood that you felt the drugs on his
9  inner thigh and that you weren't able to complete that
10 search and recover the drugs before he was put in your
11 car, right?
12 A.  Yes, I felt the drugs, and no, we didn't
13 finish the search.
14 Q.  Okay.  So you know that it's not like magic,
15 the drugs didn't just disappear, so you understood that
16 the drugs had to be somewhere, either on his person or
17 in his mouth, right?
18 A.  Or on the snow that we were checking --
19 Q.  Okay.
20 A.  -- we were checking --
21 Q.  And the best way to determine whether he had
22 drugs on his person would have been to search him,
23 correct?
24 A.  Yes.
25 Q.  You wanted to figure out where those drugs

Page 175

1  were, right?
2  A.  Yes.                                3:07:10
3  Q.  Not just because they are evidence in this
4  arrest, but because they pose a safety hazard, right?
5  A.  Yes, we wanted to find out -- yes.
6  Q.  Okay.  And you are to search an arrestee that
7  you're transporting both for their safety and your
8  safety, right?
9  A.  We're supposed to search to get any
10 contraband, yes, ma'am.
11 Q.  Yeah.  And -- and that's to keep them safe,
12 right?
13 A.  It would -- yes.  I mean, you could look at
14 it that way, yes.
15 Q.  Okay.  And it's also to keep you safe, right?
16 You don't want them in the back seat with weapons that
17 you haven't discovered because you haven't done a
18 proper search, right?
19 A.  Correct.
20 Q.  And you don't want them in the back seat with
21 contraband that you haven't discovered they have that
22 they can then die from, right?
23     MR. MATHUES:  Objection to argumentative.
24 A.  Like I said, ma'am, in a scenario, anything's
25 possible.  That wasn't going through my train of

Page 176

1  thought at that time.
2  Q.  You have 18 years of experience on the job.
3  This is probably not the first arrestee that you've had
4  to struggle with in order to place them under arrest,
5  is that correct?
6  A.  Correct.                             3:08:13
7  Q.  Okay.  Do you make a habit of not searching
8  every arrestee who poses any sort of struggle when
9  they're -- when they're getting arrested?
10     MR. MATHUES:  Objection to argumentative.
11 A.  Absolutely not.  Like I said, no --
12 Q.  So what made you decide to not search Eric
13 Lurry before you put him in your squad car?
14     MR. MATHUES:  Objection to asked and
15 answered.
16 A.  The fact that we had just struggled with this
17 gentleman, I didn't think I was going to get any kind
18 of compliance from him because up to that point, he
19 hadn't complied with anything.  Anything we had to do
20 just basically exhausted me at least -- I can't speak
21 for my recruit, but I was exhausted.  We get him now
22 into the car, I'm happy that we get him into the car,
23 and then to me to go and start a search over there
24 again, I felt we were going to meet the same kind of
25 resistance.

Page 185

1 you're walking him to the car?
2    A.  That would have been ten days ago.
3    Q.  Do you recall making multiple statements in
4 that video about how you believed Mr. Lurry had drugs
5 in his mouth?
6    A.  Yes.                                3:17:42
7    Q.  Okay.  Do you recall saying something to the
8 effect of "Going to take him down to the jail, I'm sure
9 he has got something on him, might have put a bunch of
10 it in his mouth," does that ring a bell?
11    A.  Yes.
12    Q.  Okay.  And do you recall a little while later
13 saying, "It's in his mouth"?
14       MR. MATHUES:  Objection to foundation.
15    A.  I'm trying to remember.  I agree with you up
16 to the point.  I'm not 100 percent sure.  If it's on
17 video, it's my voice, I obviously said it.  I just
18 don't remember if I did those exact --
19    Q.  Okay.
20    A.  -- words or not.
21    Q.  Let's run through the video then.
22       MS. MAISURIA:  Abby, are you able to screen
23 share that?
24       MS. BAKOS:  I think we need to get it
25 prepared to -- real quick, why don't we take a short

Page 186

1 break?
2       MS. MAISURIA:  Okay.
3       RECORDER:  Off record, 1:03 p.m.
4       (Off the record)
5       RECORDER:  On record, 1:09 p.m.
6    Q.  Okay.  Officer, I'm going to play a little
7 snippet from the video of the scene, and then I'll
8 periodically pause and ask you a couple questions,
9 okay?
10    A.  Yes.                               3:18:50
11    Q.  Okay.  This is marked -- I think it's marked
12 McCue Dep Exhibit 1, and we're starting at time stamp
13 4:30.
14      (McCue Deposition Exhibit 1 video played)
15    Q.  Okay.  I'm going to take you back over two
16 statements that I'd like to know.  Did you hear
17 yourself say a little while ago something to the effect
18 of "Take him down to the jail, I'm sure he's got
19 something on him, might have put a bunch of it in his
20 mouth"?
21    A.  Yes.                               3:20:17
22    Q.  Okay.  And that was your voice, correct?
23    A.  Correct.
24    Q.  Okay.  And you -- you were -- it sounded like
25 you were telling someone that he might have some

Page 187

1 explaining to do, were you talking to Ms. Lurry?
2    A.  Yes, I believe that's who that was.
3    Q.  Okay.  And then right before we stopped it,
4 did you hear yourself again say, "It's in his mouth"?
5    A.  Yes.
6    Q.  Let's resume play.
7      (McCue Deposition Exhibit 1 video played)
8    Q.  Okay.  Did you hear yourself say a little
9 while ago, "Bunch of dope baggies, might have got some
10 in his mouth"?
11    A.  Yes.                               3:21:39
12    Q.  Okay.  Do -- as you're watching yourself
13 here, do you appear to look very tired?
14       MR. MATHUES:  Objection to foundation.
15    A.  Do I look tired?  I mean, I -- I don't know
16 how I would look tired, ma'am.  I don't -- I'm doing my
17 best to save face for the new guy possibly.
18    Q.  Okay.  I mean, are you, like, slurring your
19 speech, is your speech slower than it normally would
20 be, are you blinking a lot, do you look like you're
21 about to fall asleep, do you show any visible signs of
22 fatigue?
23       MR. MATHUES:  Objection to form.
24    A.  I'm breathing a little bit harder than I
25 usually do, ma'am.

Page 188

1    Q.  Is that it?                         3:22:21
2    A.  I mean, I don't see my hands on my knees or
3 anything like I had just run a marathon, if that's what
4 you're asking, no.
5    Q.  Okay.  And do you -- do you seem to be in a
6 state of high adrenaline?
7       MR. MATHUES:  Objection to form and
8 foundation.
9    A.  I think at this point, I'm trying to save
10 face, I'm not trying to show, I guess, that I'm -- all
11 of the stuff that I told you, I'm trying to do my best
12 to maintain my character.
13    Q.  So you have enough wherewithal to put on an
14 appearance for your recruit because you want to save
15 face, but you can't think ahead enough to figure out a
16 way to get your arrestee searched before he's put in
17 your car, right?
18       MR. MATHUES:  Objection to argumentative.  3:23:07
19    A.  I said -- like I said, I didn't want to go
20 through the whole scenario that we had just went
21 through right there and then, I thought it was a better
22 safe -- more safer, secure place to do it at the police
23 station.
24    Q.  Safer for who?  Was it safer for Mr. Lurry to
25 wait until he got to the station to see what he had in

Page 189

1  his mouth?
2      MR. MATHUES: Objection to argumentative.
3  Lack of foundation. Facts not in evidence.
4      A. Ma'am, there's no way to predict anything
5  that subsequently happened at this point right here or
6  any other point. I'm just -- as far as I know, we got
7  a guy who's got -- who's going to be in custody for
8  drugs. The fact that I'm supposed to know or anything
9  like this is going to happen, that's -- that's unreal,
10 that's preposterous.
11     Q. Well, you told me earlier you agreed with me
12 that you understood that once somebody put drugs in
13 their mouth, they were at risk of an overdose that
14 could be fatal, right?
15     MR. MATHUES: Objection to incomplete
16 hypothetical and foundation.
17     A. Ma'am, I -- I did tell you that.
18     Q. Okay.                    3:24:08
19     A. But, like I said, at this point --
20     Q. So when you -- when you say there is no way
21 to predict that, that's not quite true because you know
22 that the natural course of things, when somebody has
23 drugs in their mouth and they're left there, that puts
24 them at serious risk of a drug overdose, which could be
25 fatal, correct?

Page 190

1      MR. MATHUES: Objection to --
2      Q. We've established that.
3      MR. MATHUES: Objection to argumentative, to
4  mischaracterizes previous testimony, and to incomplete
5  hypothetical and lack of foundation.
6      A. I had never seen him -- or actually, any
7  drugs into his mouth, so even though I am saying this,
8  I'm speculating that it's a possibility, ma'am.
9      Q. Okay. Well, you're -- you're not just
10 throwing stuff out to see what sticks, you're
11 speculating based on observations that you made and
12 what you felt when you were searching him, right?
13     A. Yes.                     3:24:57
14     Q. Okay. And you have now said this not once,
15 not twice, but three times on camera, you are recorded
16 saying that you think that you have him putting drugs
17 in his mouth?
18     A. Correct.
19     Q. At one point, you say, "I'm sure he has got
20 something in his mouth," so it's more than just a
21 possibility, right, you were pretty darn sure?
22     MR. MATHUES: Objection to argumentative and
23 mischaracterizes testimony.
24     A. Like I said, I was saying a lot of things on
25 video, and yes, that is my voice saying them, but I

Page 191

1  think just the fact that I never saw him put anything
2  into his mouth, I think that that's just why I didn't
3  do it at the time.
4      Q. Okay. I understand you didn't see him put
5  anything in his mouth, but you're an officer with 18
6  years on the job, you've worked six years in the gang
7  unit, you've worked with a lot of people who have drugs
8  on them, and even though you didn't see anything, at
9  the time you were confident enough to say, quote, "I'm
10 sure he has got something in his mouth," right?
11     MR. MATHUES: Objection to argumentative and
12 mischaracterizes testimony. Form.
13     A. Yes, I did say those things on video, ma'am.
14     Q. Let's play again.              3:26:03
15     (McCue Deposition Exhibit 1 video played)
16     Q. Did you hear that huffing and puffing?
17     A. Yes.
18     Q. Okay. Do you believe that was Officer McCue
19 --
20     A. Yes.
21     Q. -- because he's wearing the microphone?
22     A. Yes.
23     Q. Okay. So if anyone seems tired here, it's
24 him, right?
25     MR. MATHUES: Objection to argumentative.

Page 192

1  Foundation.
2      A. Yes, he was huffing and puffing, ma'am.
3      Q. Okay. Let's play.             3:26:55
4      (McCue Deposition Exhibit 1 video played)
5      Q. Do you hear yourself just say, "Swallowed
6  some of it"?
7      A. Yes, I did, ma'am.
8      Q. Okay. And we've already established that
9  once somebody swallows some illicit drugs, that they
10 are at risk for a fatal overdose, right?
11     A. Yes.
12     Q. Okay. And what you just said was, "Let's get
13 him over to the station," right?
14     A. Yes.
15     Q. You didn't say, "He swallowed some of it,
16 let's call 911," right?
17     A. No, I did not.
18     Q. You didn't say, "He swallowed some of it,
19 let's make sure he gets over to a hospital," right?
20     A. No, I did not.              3:27:56
21     Q. You didn't say, "He swallowed some of it,
22 let's make sure he gets some Narcan in him. Does
23 anyone have some Narcan?" right?
24     A. No, I did not.
25     Q. Were you carrying Narcan that day?

Page 193

1    A.  I don't remember.
2    Q.  Your training records show that you took a
3  class in Narcan in 2019.  Once you were trained in it,
4  were you carrying it?
5    A.  You would have to be carrying it, but I
6  seriously doubt I had some, on this day, on me.
7    Q.  Why not?
8    A.  Because it would have been administered on
9  another incident and I just never got it again.  We are
10  not required to carry Narcan, ma'am.
11    Q.  I understand, but once you got trained in
12  Narcan, isn't the point of being trained in Narcan to
13  be of assistance to someone who might need Narcan?
14    A.  Yes.                              3:28:54
15    Q.  Okay.  So --
16    A.  But I can't -- I'm sorry, go ahead.
17    Q.  Oh, go ahead.  Once you got trained in
18  Narcan, did you make it customary to carry it so that
19  you could be of assistance to those in your community
20  who might need it?
21    A.  I think I might have used it and just never
22  replenished it, that's probably the reason why I didn't
23  have it.
24    Q.  Do you have a specific memory of not having
25  it that day?

Page 194

1    A.  I don't have one, no.
2    Q.  Okay.  Do you have a specific memory of using
3  it on someone and not replenishing it?
4    A.  I remember using it, but I can't tell in
5  regards to the timeline of this incident when it --
6  when it occurred, ma'am, no.
7    Q.  Okay.  So you're just speculating and
8  throwing out possibilities for why you didn't
9  administer Narcan to Mr. Lurry that day, right?
10    MR. MATHUES:  Objection to foundation and
11  argumentative.
12    A.  I am not sure if I had Narcan on that -- on
13  me that day or not, ma'am.
14    Q.  Okay.  So once you said on video that he
15  swallowed some of it, you didn't take any of the
16  actions which you agree with me would have been
17  reasonable for you to take, right?
18    MR. MATHUES:  Objection to lack of
19  foundation, form, and argumentative.
20    A.  Did I take any of the actions you asked me as
21  far as up to now after not -- that?  No, I did not.
22    Q.  Do you agree that, once you believe that
23  someone has swallowed illicit drugs, that it's
24  reasonable to call 911 and ask for medical assistance?
25    MR. MATHUES:  Objection to foundation and

Page 195

1  incomplete hypothetical.
2    A.  The reason I did not call for any --
3    Q.  That's not my question, sir.  My question is,
4  do you agree with me that, once you have -- once you
5  believe someone has swallowed illicit drugs, that it's
6  reasonable to call 911 and ask for medical assistance?
7    MR. MATHUES:  Objection to -- again, to form,
8  foundation, and incomplete hypothetical.
9    A.  My -- my answer would be that if I see
10  somebody in medical distress, I would call an ambulance
11  for them.  Like I said, I did -- never saw this man in
12  medical distress up to this point, so my goal was to
13  get him to the station to perform that, since I did not
14  see him in any kind of distress or him even asking for
15  an ambulance at that point.  No, I did not call for
16  one, ma'am.
17    Q.  Okay.  I understand very well that you did
18  not call for an ambulance.  Again, you are not ask --
19  answering my question.  My question is, would you agree
20  with me that a reasonable course of action to take once
21  you believe someone has swallowed illicit drugs is to
22  call 911 and get some medical assistance?
23    MR. MATHUES:  Objection once again to form,
24  foundation, and incomplete hypothetical.
25    A.  Let's see.  The scenario -- the question

Page 196

1  you're asking me is -- I -- my answer would be if I see
2  that somebody needs help and they're in obvious medical
3  distress, I would call for them, ma'am.  Is there a
4  possibility, like your question says, that somebody
5  swallows drugs and I should call?  I -- I don't know
6  what effect it's going to be -- a drug -- the drug's
7  going to have on him, ma'am.  It could be -- it could
8  be marijuana that, you know, offenders regularly
9  swallow on a regular basis and has no affect them
10  (sic), I have no idea what is in this gentleman's mouth
11  or if there even is anything in his mouth.
12    Q.  Well, that's not quite true, right, because
13  earlier you testified that had it been marijuana, it
14  would have been crunchy, and you -- you did -- did not
15  believe that he was carrying marijuana, right?
16    A.  Right, but I think you're confusing my -- my
17  example.  I did not -- no, I did not believe he was
18  carrying marijuana.
19    Q.  Okay.  And you testified earlier that you
20  believe that it was actually quite likely that he was
21  carrying cocaine, right?
22    A.  Correct.                          3:32:29
23    Q.  Based on the way it was packaged, right?
24    A.  Correct.
25    Q.  And ingesting a whole bunch of cocaine is a

Page 197

1  lot different than ingesting a whole bunch of
2  marijuana, right?
3      A.  That is correct, but I had no idea how much
4  of this drug -- like I stated earlier, I had no idea
5  how much he had put into it, and my opinion was that he
6  -- there is no way he could have got all that, I felt,
7  into his mouth, and on top of that, there was no
8  obvious bulge in his cheeks or anything that would
9  indicate he got the -- that amount of drugs into his
10 mouth.
11     Q.  Well, wouldn't -- wouldn't a safe way to
12 check whether he had been able to get all of it in his
13 mouth, wouldn't that have been to search his person and
14 see if there was anything still left on him?
15     MR. MATHUES:  Objection to argumentative and
16 incomplete hypothetical.
17     A.  Yes, like you say, it was a -- a search that
18 should have been conducted at that time.  Hindsight
19 being 20/20, I agree, but I explained the reason as to
20 why I didn't at the time.
21     Q.  But one way to assure yourself of how much
22 drugs he may have put in his mouth would have been to
23 search him and see if you could have come up with a
24 pretty big bag left right there on his inner thigh
25 where you had felt it, right?

Page 198

1      MR. MATHUES:  Objection to argumentative and
2  objection to asked and answered multiple times
3  regarding the search.
4      A.  Yes, ma'am.  Like I said --
5      Q.  Okay.                          3:33:43
6      A.  -- it just wasn't done.  What I did is --
7  what I -- what I did, we gotta get him to the station.
8  The fact that we had just met with resistance earlier,
9  it was -- I believe that we were going to run into the
10 same thing, and I didn't go back -- want to go back to
11 step one, I just wanted to get to the station and do it
12 then.
13     Q.  Okay.  And you said that you didn't believe
14 that he could have gotten all of it in his mouth,
15 right?
16     MR. MATHUES:  Objection to asked and answered
17 multiple times.
18     Q.  Did you ask him what he put in his mouth?
19     A.  Did I ask him what he put in his mouth on the
20 scene?
21     Q.  At any point did you ever ask him, "Hey, did
22 you put something in your mouth?"
23     A.  No, I did not.
24     Q.  Did you ever ask him what he put in his
25 mouth?

Page 199

1      A.  No, I did not.
2      Q.  Did you ever ask him to open his mouth?
3      A.  No, I did not.
4      Q.  Did you ever tell him to spit it out?
5      A.  No, I did not.
6      Q.  The actions that you previously testified
7  that you had taken on at least five occasions with
8  other arrestees who had put drugs in their mouth, did
9  you do any of those things with Eric -- Eric Lurry on
10 January 28th, 2020?
11     MR. MATHUES:  Objection to asked and
12 answered.                              3:34:47
13     A.  I did not investigate or ask him what was in
14 his mouth, ma'am, no, not at the time.
15     Q.  If someone on the scene had said, "Hey, I'm
16 going to call 911 and make sure we get some medics here
17 because you just said he swallowed some drugs," would
18 you have stopped them from taking that action because
19 you would have felt it was unreasonable to do?
20     MR. MATHUES:  Objection to incomplete
21 hypothetical.  Argumentative.
22     A.  I can't say for sure, ma'am, if somebody -- I
23 -- I don't know what I would have done.
24     Q.  You think you might have stopped a fellow
25 officer from calling 911 for your arrestee who you just

Page 200

1  said put drugs in his mouth and swallowed them?
2      MR. MATHUES:  Objection to mischaracterizes
3  testimony.
4      A.  Ma'am, I have never stopped medical attention
5  when it was requested for somebody since I've been
6  here, so I have no reason to tell you that I would, but
7  the fact that it did not happen, I cannot tell you for
8  sure, ma'am.
9      Q.  Okay.  So there's no reason to think that you
10 would have considered that course of action
11 unreasonable had someone elected to take it, correct?
12     MR. MATHUES:  Objection to incomplete
13 hypothetical and argumentative.
14     A.  Okay, I just want to make sure I understand
15 your question that you just asked me, and no, I would
16 not -- I just want to say no, I would not stop somebody
17 who wanted to call for an ambulance or medical
18 assistance at this time, no, I would not.
19     Q.  Okay.  And had Officer McCue said to you,
20 "Hey, you said that he swallowed some drugs, I think we
21 should drive him over to the hospital," would you have
22 stopped him from doing that?
23     A.  I -- actually, yes, I would have stopped him
24 because we do not transport, we would call for an
25 ambulance and an ambulance would have done that, so.

Page 201

1    Q.   Okay.  So if Officer McCue had said, "Hey, I
2 think we should take him to a hospital because you just
3 said he swallowed a bunch of drugs," would you have
4 said, "No, take him to the police station so I can do a
5 strip search," or would you have said, "No, call 911
6 and get some medical assistance because we don't
7 transport"?
8    A.   Again, my answer, I have never done that
9 since I've been on this job, but the fact that that did
10 not happen, I can only speculate that I would say,
11 "Yes, go ahead."  I would not deny them any medical
12 care.
13    Q.   Okay.  Because you would have felt that
14 Officer McCue wanting to get Mr. Lurry medical
15 attention after hearing that he had swallowed a bunch
16 of illicit drugs was reasonable, right?
17    MR. MATHUES:  Objection to form and to the
18 extent it calls for a legal conclusion.
19    A.   Ma'am, like I said, I made the statements on
20 video, I believe he had some.  I -- I -- it was unknown
21 the amount that he had put in his mouth.  I'm not sure
22 -- I --
23    Q.   That's -- that's not my question.  My
24 question is, had Officer McCue said, "I want to get
25 this man some medical attention because you just said

Page 202

1 that he swallowed some drugs," you would not have
2 stopped him and said, "Hey, recruit, that's
3 unreasonable"?
4    MR. MATHUES:  Objection to asked and
5 answered.                              3:37:36
6    A.   No, I would not -- I would not have denied
7 him medical care, ma'am.
8    Q.   Okay.  So you just -- you wouldn't have
9 gotten in the way, but you felt no -- no need to
10 prioritize Mr. Lurry's well-being that day, correct?
11    MR. MATHUES:  Objection to argumentative,
12 mischaracterizes the testimony, and lacks foundation.
13    A.   Ma'am, like I said, it is unknown how many --
14 how many -- how much drugs he had just based on my
15 speculating, but I did not observe any signs of medical
16 distress at the time, that is why I did not call for an
17 ambulance then and there.
18    Q.   Are you aware of how quickly someone can die
19 or go into cardiac arrest as a result of ingesting
20 drugs?
21    MR. MATHUES:  Objection to the form, vague,
22 which drugs, how many, and lacks foundation.
23    A.   Ma'am, I am not an expert on drugs and their
24 effect on the human body.  I have arrested people for
25 drugs, but I am not -- by far not an expert on the

Page 203

1 effects they have on people.
2    Q.   And my point entirely.  You are not a trained
3 medical professional, you have no idea -- you have said
4 multiple times it is unknown how many drugs this man
5 just ingested, yet you decided to take it upon yourself
6 to delay medical treatment, right?
7    MR. MATHUES:  Objection, "multiple times."
8 Mischaracterizes facts, it mischaracterizes the
9 testimony.  He did not testify that Mr. Lurry ingested
10 any -- any narcotics among other mischaracterizations
11 of testimony in that question.
12    Q.   You can answer the question.           3:39:07
13    A.   The fact -- like I said, I -- I believe I'm
14 -- I'm -- I'm trying to remember what you said.  I did
15 not --
16    Q.   I said, you're not a trained medical
17 professional?
18    A.   No.
19    Q.   You don't know how many -- you've testified
20 already that you don't know how many drugs he's
21 ingested, you're on video saying that he swallowed some
22 of it, so as an untrained -- as someone who's not
23 trained in medicine, you don't know how much he's
24 ingested and how quickly that can cause his condition
25 to deteriorate, right?

Page 204

1    A.   Right.  Like I said, I want to answer your
2 question in two steps, and if you don't mind refreshing
3 if I forget, I just want to make something clear.  Like
4 I said, it is true, I'm not a trained medical
5 professional, I have very basic training as far as
6 that's concerned and it entails CPR.  Nothing with
7 drugs.  You're correct on that.  The fact that I did
8 not see anybody having a medical episode of my
9 observance, that's me speculating.  I don't know how
10 much drugs of anything he had in his mouth, that's me
11 speculating.  I had never seen him actually put or --
12 anything in his mouth, ma'am.
13    Q.   You were confident enough on the scene to say
14 four times that he had something in his mouth, you used
15 the word "sure," and you said that he swallowed some of
16 it.  I understand you're trying to walk back your
17 certainty, but on the scene, you sounded pretty darn
18 sure, right?
19    MR. MATHUES:  Objection to form, compound,
20 multiple questions, argumentative, and lacks
21 foundation.
22    A.   Ma'am, I'm not trying to walk back anything,
23 I am just trying to tell you that on the scene, I'm
24 adrenalized and I'm -- I'm saying a lot of things.  I'm
25 -- I'm speculating scenarios that were possible.  But

Page 52 (Pages 205-208)

Page 205

1 like I said, I don't want to make it seem like I
2 observed this gentleman have -- suffering from a drug
3 overdose while he was in the back of my squad and I
4 seen and denied him any medical attention, that's not
5 true.
6 Q. Yeah, and I'm not saying that's true. What
7 I'm saying is true is that you made multiple statements
8 on scene characterizing it as you being pretty sure
9 that he swallowed some illicit drugs and not doing
10 anything about it, right?
11 MR. MATHUES: Objection to mischaracterizing
12 the testimony, mischaracterizing the video as to how
13 many times he said, "swallowed," argumentative, and
14 lacks foundation.
15 A. Ma'am, I agree, everything that's on video --
16 because obviously I'm looking at it, I am recognizing
17 my voice, I -- I'm not denying that, but also, like I
18 said, I'm speculating as to what -- and I guess what
19 led me to believe that the fact that there was no issue
20 going on with Mr. Lurry was the fact that he was in the
21 back of the squad car not suffering from any kind of
22 medical distress.
23 Q. Well, were you keeping an eye on him at this
24 point as you're wandering around telling people that
25 you believe that he swallowed some drugs?

Page 206

1 A. He is in the back of the squad car with a
2 camera running and I'm not sure if there was Officer
3 Ranstead or anybody else at that scene, I'm -- I'm in
4 the front of the car trying to make sure that there is
5 nothing on the ground in the snow.
6 Q. Okay. So at this point as you put Mr. Lurry
7 in your car where you suspect him of having ingested
8 some drugs, have you directed anyone to keep an eye on
9 him to see if he goes into medical distress?
10 MR. MATHUES: Objection to form. Foundation.  3:42:08
11 A. I don't -- I don't recall if I specifically
12 told anybody, "Keep an eye on him," no.
13 Q. Well, did you document that in any of the
14 reports that you did or any of the statements you made
15 in this case?
16 A. The fact that I told somebody to keep an eye
17 on him while we looked, that -- I -- I don't believe
18 so, no.
19 Q. Okay. And since you didn't document it, do
20 you think that tends to imply that you didn't do it?
21 MR. MATHUES: Objection to argumentative.
22 Q. You're trained on what to document, right?
23 A. I'm sorry, you broke up. Could you repeat
24 that?
25 Q. I said, the fact that you documented it

Page 207

1 nowhere in any of your statements, would that lead you
2 to believe that you just didn't do it?
3 A. Yes, it's a possibility, but I can't tell you
4 100 percent sure, ma'am. Absolutely, there's a
5 possibility that I didn't do it, but I don't remember
6 if I did or not.
7 Q. Okay. Did you tell anyone to sit in the car
8 and watch the video to make sure that Mr. Lurry wasn't
9 going into medical distress in the back seat of your
10 squad car?
11 A. No, I did not.                     3:42:59
12 Q. Did you keep the windows down so you could
13 hear him if he was moaning or asking for help?
14 A. I don't remember if the windows were down or
15 not, but my plan was not to be outside any length of
16 time.
17 Q. Well, do you understand that he could have
18 gone into medical distress at any moment after having
19 ingested drugs?
20 MR. MATHUES: Objection to speculation, and
21 incomplete hypothetical, and lacks foundation.
22 A. Ma'am, by no means am I trying to be
23 argumentative, but I guess a lot of things could have
24 happened. I don't remember if that was something that
25 crossed my mind or not.

Page 208

1 Q. You don't remember if it crossed your mind
2 that he could have gone into medical distress from the
3 drugs that you believe that he swallowed?
4 MR. MATHUES: Objection to lacks foundation
5 and argumentative.
6 A. I don't know exactly how much time passed
7 from the time that we put him into the -- into the back
8 of the squad where -- and then you show -- and then we
9 -- we're seeing the video to the front, I guess I
10 wasn't -- since we put him into the back of the squad,
11 and I'm speculating whether he had something -- when we
12 put him in, he was fine, so I guess --
13 Q. I understand that. You're not answering my
14 question.
15 A. Okay. I'm sorry, I'm trying to understand.
16 Would you repeat it then?
17 Q. My question is, did you take any action on
18 scene to assure his well-being after you suspected him
19 of swallowing illicit drugs?
20 MR. MATHUES: Objection to form and
21 foundation.                          3:44:21
22 A. I think we just put him in the back of the
23 squad, and I don't recall directing anybody
24 specifically to say, "Hey, keep an eye on him."
25 Q. So the answer to that question would be no,

Page 209

1  correct?
2      A.  Yes, that is correct.
3      Q.  When you did carry Narcan, where did you
4  carry it?
5      A.  It was actually in my squad hanging on one of
6  the coat hangers by where you would -- not a coat
7  hanger, I'm sorry, but with the arm -- it's got a
8  handle where you would -- if you needed --
9      Q.  Okay.
10     A.  -- to brace yourself with your arm --
11     Q.  Okay.
12     A.  -- that's where.
13     Q.  And would it be in a bottle?
14     A.  It was in a packet where -- a Velcro packet
15  where you opened it and it dispense one dose of Narcan.
16     Q.  Okay.  Did you ask anyone to go and check if
17  you had Narcan in the car?
18     A.  No, I did not.
19     Q.  Did you check if you had Narcan in the car
20  when you got in the car?
21     A.  No, I did not.                          3:45:24
22     Q.  Have you ever dealt with someone overdosing
23  before?
24     A.  My extent with overdose -- with overdoses is
25  that when we arrived on scene, they're usually

Page 210

1  unconscious.  I have never seen anybody on scene
2  actually start to go into a seizure or convulse or
3  whatever leads to an overdose.  By the time I get
4  there, they're always either not conscious but
5  breathing or not conscious and not breathing.
6      Q.  Did you believe that you would be rewarded in
7  some way by the police department if you recovered
8  drugs from Mr. Lurry at the police station?
9          MR. MATHUES:  Objection to speculation and it
10  lacks foundation.                             3:46:25
11     A.  Ma'am, there has never been any kind of
12  compensation or reward or anything when you make a drug
13  arrest, that's -- that's not my intention, that's --
14  that -- that played no role in my thinking that day.
15     Q.  And I'm not talking about a -- a
16  compensation, I'm talking about you -- you have some
17  commendations in your personnel file, right?
18     A.  Yeah, that's -- that's -- that's been a
19  while, that's when I was younger and more active in
20  police work, ma'am.
21     Q.  Okay.  And did you believe that, if you were
22  successful in -- in recovering a fairly sizable amount
23  of illicit drugs from Mr. Lurry at the police station,
24  that that would somehow lead maybe to another
25  commendation or make you looked upon more favorably

Page 211

1  than if you took him to the hospital and they did it
2  there?
3          MR. MATHUES:  Objection to foundation and
4  speculation.                                  3:47:13
5      A.  Ma'am, the -- the question that you're asking
6  me, I mean, it's -- that played no role -- no bearing
7  in my thought process at all that day.  Like I said, I
8  left the gang unit, I -- I am not telling you I was
9  ever officer of the year or anything, but that played
10  little motivation as far as me making any -- or
11  retrieving any kind of drugs with Mr. Lurry.  Like I
12  said earlier, I was just going down there to get a
13  phone when this all started.
14     Q.  Would you agree with me that it's fair to say
15  that you were doing the bare minimum on January 28th,
16  2020 when you were dealing with Mr. Lurry?
17         MR. MATHUES:  Objection to argumentative, to
18  lacks foundation, and to form, vague.
19     Q.  The bare minimum?  I mean, that could be
20  interpreted many ways.  I want to -- I want to answer
21  your question, I kind of understand what you're saying,
22  but I did at the time what I thought was going to lead
23  to a safe arrest or safe whatever -- none of this ever
24  crossed my mind in my wildest dreams.
25     Q.  I'm -- I'm pretty sure it didn't cross your

Page 212

1  mind, but what I'm asking you is, was -- was your
2  priority -- strike that.  If your priority had been a
3  safe arrest, don't you think that Eric Lurry would have
4  been safer had you called for medical assistance once
5  you knew that he had swallowed some drugs?
6          MR. MATHUES:  Objection to lacks foundation.
7  Objection as to speculation.
8      A.  Like I said, I believe we have covered this
9  already.  A couple times I've answered, and I explained
10  why I did what I did at the time.
11     Q.  Sure.  And I want you to focus on my
12  question.  My question is not asking you to explain
13  anything, my question is asking you, do you believe
14  that Eric Lurry would have been safer had you called
15  for medical attention after you said that he swallowed
16  some drugs?
17         MR. MATHUES:  Objection to foundation, and to
18  speculation, and to incomplete hypothetical.
19     A.  Would he have been safer if we would have got
20  the -- the ambulance there?  I guess if we would have
21  called if he were in any -- any kind of medical
22  distress, we would have got the ambulance there, yes.
23     Q.  Okay.  So would it be fair to say that your
24  priority on January 28th, 2020 was not the safety of
25  Mr. Lurry, it was making for as uncomplicated an arrest

Page 213

1  as possible and getting from point A to point B --
2        MR. MATHUES: Objection to --
3     Q. -- with a minimal amount of work?        3:49:40
4        MR. MATHUES: Objection to mischaracterizes
5  testimony, lacks foundation, incomplete hypothetical,
6  and argumentative.
7     A. No, that was not my intent at all, ma'am.
8     Q. Okay. So that's -- that's not why you
9  disregarded the search procedures, right?
10        MR. MATHUES: Objection to argumentative and
11  --
12     Q. The -- like I said, the reason I didn't want
13  to --
14     Q. It's a yes or -- question, Officer.
15     A. Yes --
16     Q. That's not why you disregarded the search
17  procedures, right? Looking for the least complication?
18     A. Could you repeat the question again? I'm
19  sorry then. I want to answer your -- make sure --
20     Q. Did you --
21     A. -- I understand your question.
22     Q. Did you disregard the search procedures
23  because you were just trying to get on with your arrest
24  and get to the station?
25        MR. MATHUES: Objection to argumentative.

Page 214

1     Q. You testified before that you were focused on
2  just getting him to the station, right?
3     A. That's correct.                3:50:30
4        MR. MATHUES: Objection --
5     Q. Okay. So your focus was disregarding the
6  search and getting him to the station as quickly as
7  possible, right?
8        MR. MATHUES: Objection to mischaracterizes
9  the testimony, lacks foundation, and argumentative.
10     A. My point was to get him to the station to
11  search him there. I'm -- I'm -- I apologize if -- I'm
12  trying to answer your question, but you said was my
13  sole intention just to get him to the station? Yes, it
14  was to retrieve any -- anything that he had on his
15  person, and the fact that he wasn't exhibiting any
16  signs of medical distress, that -- that played a lot
17  into my decision.
18     Q. Well, as you're sitting there and you -- as
19  you're wandering around the street on this video, you
20  don't even know if he's in medical distress sitting in
21  the back of your car, do you?
22     A. Well, no, not 100 percent sure, but there's
23  other officers who are close to that that I -- you
24  know, I -- I would assume that they would have alerted
25  me to that fact.

Page 215

1     Q. You don't even know if they were watching
2  him, do you? Did you --
3     A. I -- I don't -- I don't --
4     Q. -- anyone to watch him?
5     A. I don't --
6     Q. We already went over that.        3:51:40
7     A. I don't, ma'am, but like I said, but -- when
8  we go back to start going towards the station, he is
9  not in any kind of medical distress when we leave.
10     Q. Okay. Did you open the -- the door -- the
11  back door of your squad car to peek in at him to see if
12  he was in any medical distress before you took off from
13  the scene?
14     A. I'd imagine if he would have been in any kind
15  of distress, when I opened the front door, I would have
16  seen that, but no, I did not open the back door.
17     Q. Okay. Did you try to talk to him when you
18  got in the vehicle, other than to tell him that there
19  was now going to be a recording of the events that were
20  in the car?
21     A. No.
22     Q. Okay. Did you -- did he respond to that
23  statement?
24     A. To the fact that I told him that he's now on
25  audio and video?

Page 216

1     Q. Yeah.
2     A. I don't -- no, I don't think so, no.
3     Q. Did you try to elicit a verbal response from
4  him to see if his lack of a verbal response was due to
5  being in some sort of medical distress?
6        MR. MATHUES: Objection to foundation.    3:52:39
7     A. I'm trying to remember the fact -- I didn't
8  -- I -- I just told him the fact that he was in -- on
9  audio and video, and obviously I'm looking at him when
10  I'm doing this, and no, he was not in any kind of
11  medical distress when I told him that.
12     Q. Okay. Do you know if he had the ability to
13  understand what you were saying as you took off and you
14  told him that?
15     A. I -- I don't know what he's able to
16  understand, ma'am. He seemed --
17     Q. Did he acknowledge --
18     A. -- completely --
19     Q. -- your statement in any way?
20     A. I'm sorry, I was talking over you, I
21  apologize.
22     Q. Did he acknowledge your statement to him in
23  any way?
24     A. No, he did not say anything, no.
25     Q. Okay. Did he acknowledge it nonverbally?

Page 217

1        MR. MATHUES: Objection to speculation.
2    Q. Did he nod his head, did he shrug, did he
3  make some sort of purposeful gesture?
4        MR. MATHUES: Object --
5    A. I don't --
6        MR. MATHUES: Objection to speculation.    3:53:34
7    A. I don't remember, ma'am, but that would be on
8  video.
9    Q. Okay. And let's say he didn't because the
10  video doesn't show him doing that, so did you do
11  anything at that point to ascertain whether his lack of
12  acknowledgment was due to an inability to communicate
13  because of his state?
14        MR. MATHUES: Objection to facts not in
15  evidence and lacks foundation.
16    A. My interpretation when I was looking at him
17  making that statement to him was that he was not in any
18  medical distress, so I guess I just closed the door and
19  went and did on the next step, whatever I did after
20  that.
21    Q. Okay. Did it cross your mind that he did not
22  acknowledge your statement because he could not?
23    A. No, no, it did not.                3:54:22
24    Q. Once you got in the squad car -- strike that.
25  Before you left the scene, you were looking around on

Page 218

1  the street to see if he had dropped any drugs there,
2  right?
3    A. Yeah, or if there was anything. My main
4  concern was that -- was that nobody else picks that up,
5  that, you know, some little kids walking around, so --
6  if there was anything that was dropped.
7    Q. Did you use anything to aid your search?
8    A. I want to say a flashlight, I think.
9    Q. Okay. And you looked around for a good
10  amount of time, right?
11    A. I don't recall the exact amount of time,
12  ma'am. I -- I didn't think it was that long.
13    Q. Okay. It was more than a handful of seconds,
14  right, it wasn't just like a quick, five-second kind of
15  thing, right?
16    A. I would agree to that, yes.        3:55:08
17    Q. Okay. So even though you were tired, you
18  decided that it was important enough to look on -- on
19  the street to make sure he didn't drop drugs out there,
20  right?
21    A. Yes.
22    Q. You -- that a priority, right?
23    A. Yes, that's correct.
24    Q. Despite your adrenaline surge and your
25  fatigue, right?

Page 219

1    A. Yes, I'm -- I guess I'm trying to look out
2  for the well-being of anybody who might run across
3  this. Like I said, what -- the first thing that popped
4  into my mind is I don't want some ten, 11 year old
5  picking up possibly what could be dangerous drugs.
6    Q. Okay. But you weren't wanting to look out
7  for the well-being of Mr. Lurry by searching him,
8  right?
9        MR. MATHUES: Objection to argumentative.
10  Form.                                3:55:48
11    A. No, that's -- that's -- that's not true.
12  Like I said, I had never met this man, I have no reason
13  to have any ill will towards him. I did not see him in
14  any kind of medical distress, if not -- I would have
15  called for some kind of medical ambulance to show up.
16    Q. You were more concerned about a hypothetical
17  ten or 11 year old running around down the street who
18  was not even in your view than you were about an
19  arrestee in your custody, sitting in the back seat of
20  your car, who you knew had swallowed some drugs and you
21  hadn't searched, right?
22        MR. MATHUES: Objection to foundation.
23  Mischaracterizes testimony. Form.
24    A. Ma'am, I'm worried about somebody who has no
25  idea what's going on or what they're encountering as

Page 220

1  opposed to somebody who is a grown adult.
2    Q. Okay. Did you feel that Mr. Lurry had made
3  some poor choices that day by choosing to carry drugs?
4        MR. MATHUES: Objection to form, foundation,
5  and relevance.                        3:56:45
6    A. Ma'am, I don't even know how to answer that
7  question, because like I said, people, they carry
8  drugs, or they sell drugs or whatever for different
9  reasons. I don't know what his reasoning was, ma'am.
10    Q. Okay. But did you believe that he should
11  suffer the consequences of those choices and that you
12  were less responsible for looking out for him than
13  somebody who is wandering down the street?
14    A. No, that's completely untrue -- untrue. It's
15  not up to me to decide what happens to people when they
16  carry drugs, ma'am, it's -- that never crossed my mind.
17  I -- I'm just taking a precaution, which I thought was
18  a pretty reasonable precaution that some ten year old
19  doesn't find any drugs in their parkway as opposed to
20  somebody, like I said, who is a full-grown adult.
21    Q. Okay. But this is a full-grown adult who has
22  just swallowed some drugs, right?
23        MR. MATHUES: Objection to lacks foundation,
24  incomplete hypothetical, and argumentative.
25    Q. Based on what you have said on this video,

Page 221

1 right?
2 A. Yes, and -- and again, I never saw him
3 actually place drugs in his mouth, it is all
4 speculation. Do I have a strong suspicion he did?
5 Yes, I'm not arguing that, ma'am.
6 Q. Did you find any drugs when you were
7 searching outside?
8 A. Outside where the video is right now in front
9 of us still?
10 Q. Yeah.                                    3:57:56
11 A. No, I did not find any.
12 Q. I mean, did you find any drugs anywhere on
13 the scene?
14 A. I did not find any drugs on the scene
15 anywhere, no.
16 Q. Did that lead you to believe that Mr. Lurry
17 had to still have them on his person?
18 A. Yes, on his person, yes.
19 Q. In his person, right?
20 A. On his person.
21 MR. MATHUES: Object.
22 Q. Or in his person based on the swallowing
23 comment you made earlier, right?
24 A. Objection to foundation.
25 A. I suspected --

Page 222

1 Q. Right?
2 A. I suspected that Mr. Lurry had drugs on his
3 person, ma'am.
4 Q. Okay. Once you did your search of the
5 exterior, what did you do then, you got into the car?
6 A. Yes, and I told Officer McCue that we were
7 going to go to the station.
8 Q. Do you recall from your viewings of the video
9 somebody saying, "We're hot"?
10 A. Yes.                                    3:58:45
11 Q. Okay. And do you believe that was you?
12 A. No, I know that was me.
13 Q. Okay. And that was your way of announcing to
14 Officer McCue that the camera was rolling, right?
15 A. That was my way of announcing -- telling him,
16 yes, the camera is rolling and we're going to be
17 leaving soon because we need to go to the station.
18 Q. Well, did -- is your understanding -- have
19 you ever heard of a hot mic?
20 A. A hot mic? Yeah, that means that the mic is
21 on and recording.
22 Q. Okay. And a hot mic usually means that
23 someone can be caught saying something that they didn't
24 want overheard because they didn't know the mic was on,
25 right?

Page 223

1 MR. MATHUES: Objection to speculation --
2 Q. Is that your understanding of that phrase?
3 A. My understanding of a hot mic, ma'am, means
4 that there is audio and video recording, and I was
5 telling Officer McCue, "We're hot, we're rolling, we're
6 going to be rolling soon," as in leaving towards the
7 station.
8 Q. Okay. Were you cautioning him to watch what
9 he would say during the drive there?
10 A. Absolutely not, I had no reason to. He has
11 not said or done anything up to that point that would
12 lead me to think in that manner.
13 Q. Okay. Once you got in the car and started
14 going towards the station, did you direct Officer McCue
15 to turn on lights and sirens?
16 A. No, I did not.                          4:00:07
17 Q. Okay. You guys stopped at some traffic
18 lights along the way, right, some red lights?
19 A. Yes.
20 Q. Okay. Did you make any effort to hurry that
21 along by telling Officer McCue at those points to turn
22 on lights and sirens so you could get to the station a
23 little quicker?
24 A. No.
25 Q. Okay. So you did nothing to get to the

Page 224

1 station any faster, correct?
2 MR. MATHUES: Objection to argumentative.
3 A. No, it was a routine drive, not -- with no
4 lights or -- or sirens activated, correct.
5 Q. Okay. So you made no effort to try to get
6 Mr. Lurry seen by anyone other than you, despite
7 knowing that he was in the back seat of your car having
8 ingested some drugs, right?
9 MR. MATHUES: Objection to foundation,
10 argumentative, and form.
11 Q. Ma'am, the whole time we were driving, I did
12 not see any reason to expedite, there was never any
13 medical distress that I observed, ma'am.
14 Q. You didn't see any reason to expedite?
15 A. As far as getting to the station quicker you
16 mean?
17 Q. Yeah.                                    4:01:20
18 A. Yeah, like I said, we were watching him on
19 the little screen on the video camera, and the one time
20 that I did look back, like I said, it appeared that he
21 -- I -- what -- what I thought was making chewing
22 motions, but when I turned around and looked, he was
23 just not chewing anything, his mouth was not moving.
24 Q. How big is that monitor?
25 A. We have a different computer system now, but

Page 225

1  that monitor at the squad at that time was not very big
2  at all. If I had to make an educated guess, I want to
3  say three and a half by three and a half maybe.
4      Q.   Okay. And was it pointed towards you or
5  Officer McCue?
6      A.   No, the monitor was tilted or canted in the
7  direction of the driver at the time, who would have
8  been Officer McCue.
9      Q.   Okay. And it's adjustable, right?
10     A.   Yes, I believe it is.          4:02:21
11     Q.   Okay. And you understand, by virtue of
12 Officer McCue driving, that we've talked about divided
13 attention before, that Officer McCue could not dedicate
14 all of his attention to that monitor and watching Mr.
15 Lurry to make sure he didn't go into medical distress,
16 right?
17     A.   Yes.
18     Q.   Okay.
19     A.   He would have the camera moved towards him,
20 but I don't know what capacity he had at that point to
21 monitor that or not.
22     Q.   Okay. Well, I mean, you had a pretty strong
23 reason to believe that Officer McCue would not be able
24 to dedicate all of his attention to paying attention to
25 Mr. Lurry, right, because he's driving?

Page 226

1      A.   Yes, but --
2      Q.   And he -- sure that he can operate his
3  vehicle safely and not crash, right?
4      A.   Well yes, just based on his experience, I
5  don't know how much of that he could do, ma'am, you're
6  correct.
7      Q.   Okay. So did you think that it would have
8  been more prudent at that point, in order to keep an
9  eye on Mr. Lurry to make sure that he didn't go into
10 medical distress, that adjusting the camera your way so
11 that you as the passenger could keep your attention on
12 Mr. Lurry was warranted?
13     MR. MATHUES: Objection to form.       4:03:28
14     A.   I guess the route I took was to turn back and
15 try to look as opposed to me trying to look at a
16 smaller screen that was faced away from me. I guess my
17 -- the choice I took instead of that was just -- just
18 to try to turn around and look at him where he was in
19 the back seat by actually turning my body.
20     Q.   Well, the smaller screen that was turned away
21 from you, we already established that that very easily
22 could have been turned towards you, right, and you just
23 didn't do that, right?
24     MR. MATHUES: Objection to asked and
25 answered.

Page 227

1      A.   The -- the fact that I did not turn it or I
2  -- I did not turn it at the time, that is correct. I
3  think that's mostly out of habit. When I drive by
4  myself, it's always been turned my direction. I don't
5  know that that camera -- or the screen, I mean, has
6  ever been moved because since I'm usually a one-man
7  car, I drive by myself, it was not a habit that I would
8  get into.
9      Q.   I understand that, but you're also not in the
10 habit of transporting arrestees that you haven't
11 searched that you know have swallowed some drugs,
12 right?
13     MR. MATHUES: Objection to argumentative and
14 lacks foundation.
15     A.   Ma'am, the question you asked me about the --
16 about the video not turned in my direction, yes, it is
17 adjustable, and no, I did not turn it in that direction
18 at that time.
19     Q.   And you said that the choice that you elected
20 to make was to turn around and look at Mr. Lurry,
21 right?
22     MR. MATHUES: Objection to asked and
23 answered.                               4:04:44
24     A.   When I turned around like you said, instead
25 of turning the monitor, I would just lean over and try

Page 228

1  to look at the monitor, and then when I seen that I
2  didn't have a good view or the screen was small,
3  because it split -- on top of it being a small screen,
4  it's split into three different screens, I just chose
5  to turn around and look in his direction.
6      Q.   Okay. And how many times did you look in his
7  direction?
8      A.   I did that at least twice.
9      Q.   Okay. And when you turned and looked in his
10 direction, did you keep your eyes on him the entire
11 time from the moment that you took off from the scene
12 to the time you got to the police station?
13     A.   No, I did not, ma'am.
14     Q.   Okay. So you did it for a fleeting second or
15 so when you turned around and looked at him, right?
16     MR. MATHUES: Objection to mischaracterizes
17 prior testimony.
18     A.   When we left -- I cannot tell you when
19 exactly it was, at what point in time on our trip to
20 the station from the incident site I turned, but I know
21 I looked at least two times.
22     Q.   Okay. And each of those two times that you
23 looked, it was a very quick glance, correct?
24     MR. MATHUES: Objection to mischaracterizes
25 testimony.                              4:05:45

Page 229

1    A.   It was enough to me to ascertain that nothing
2  was going on.
3    Q.   Okay.  Was it longer than one or two seconds
4  that you were looking at him each of the two times you
5  turned around?
6    A.   I want to say it was approximately one or two
7  seconds.
8    Q.   Okay.  So your idea of monitoring a man who
9  may go into medical distress at any moment from the
10  drugs that you know that he has swallowed is to look at
11  him twice over the course of your ride there for one to
12  two seconds each time?
13       MR. MATHUES:  Objection to lacks foundation,
14  form, argumentative, and incomplete hypothetical.
15    A.   Ma'am, when I looked at Eric Lurry -- I didn't
16  remember if it was the first or second time when I did,
17  I thought that I thought I seen his mouth moving, and
18  I'm thinking to myself, "Did I -- did I just see that?"
19  but then when he saw that I had -- was looking at him
20  for the one or two seconds, he did -- he would stop,
21  his mouth was not moving, so at that point in time, I'm
22  thinking, "If I did see what I just saw, I mean, this
23  person is playing games or is not in any medical
24  distress."
25    Q.   Did you think it was possible for a person to

Page 230

1  be in medical distress but still be actively trying to
2  conceal something that would result in his arrest and
3  prosecution?
4       MR. MATHUES:  Objection to incomplete
5  hypothetical --
6    Q.   Are those things mutually exclusive?    4:07:21
7    A.   I -- I -- I don't know.  I don't know if that
8  was possible or not, ma'am, I'm just going off his
9  condition.  Like I said, if his -- his condition, he
10  wasn't exhibiting any kind of medical distress.
11    Q.   Okay.  Well, we've established that he did
12  not say a word on the entire ride to the police
13  station, right?
14    A.   Yes.
15    Q.   Okay.  Did you ever see him tilting his head
16  back and leaning it against the -- the back seat?
17    A.   No.  On the way there, no.  I -- I had seen
18  it subsequently on video.
19    Q.   Okay.  So you saw him doing it during the car
20  ride to the police station, but you didn't learn that
21  he was doing it until after the fact because you
22  weren't watching him closely enough on the way there,
23  right?
24       MR. MATHUES:  Objection to mischaracterizes
25  testimony and form.

Page 231

1    A.   Like I said, I did not see him in person.
2  When I saw him in person, he was sitting up normal, and
3  when I appeared to have saw him making a chewing
4  motion, whenever he realized that I was looking at him,
5  it almost seemed like he stopped and was -- his mouth
6  was still.
7    Q.   Okay.  Officer, this will go quicker if you
8  just answer the questions that I'm asking you.
9    A.   I'm --
10    Q.   My question is, I think what you just told me
11  is that, based on your review of the video, after the
12  fact, that you understand that on the way to the police
13  station, Mr. Lurry was tilting his head back against
14  the back seat, correct?
15    A.   Yes, to his right.                    4:08:41
16    Q.   But you didn't see that in real time on the
17  way there because you weren't paying close enough
18  attention to him, correct?
19       MR. MATHUES:  Objection to argumentative.
20    A.   No, I did not see that on the way to the
21  station.
22    Q.   Okay.  Did you ever see his eyes closed on
23  the way to the police station?
24       MR. MATHUES:  Counsel, just several times,
25  something keeps popping up.  It's a W-9 form, some

Page 232

1  other things that --
2       MS. MAISURIA:  Abby, can you stop your screen
3  share?  Perfect.
4    Q.   Did you ever see his eyes closed on the way
5  to the police station?
6    A.   No.
7    Q.   Okay.  When you watched the video, did you
8  ever see his eyes closed on the way to the police
9  station?
10    A.   Yes.
11    Q.   Okay.  So that's another sign of possible
12  distress that you missed because you weren't paying
13  close enough attention to him, right?
14       MR. MATHUES:  Objection to lacks foundation.    4:09:41
15    A.   No, I did not see that on the way to the
16  police station.
17    Q.   Okay.  Because you weren't paying close
18  enough attention to him, correct?
19    A.   I want to say it's because I didn't look
20  anymore after the two times that I initially looked.
21    Q.   And because you weren't keeping your eyes
22  trained on the monitor that you could have simply
23  adjusted your way, right?
24    A.   No, I wasn't looking at the monitor, no.
25    Q.   And you did, in fact, see him chewing on the

Page 233

1  monitor when you looked, right?
2      A.  I think that's a fair statement, yes.  It was
3  a small screen, but that's when I initially thought I
4  saw it, that's why I looked back to confirm if what I
5  saw was accurate.
6      Q.  Okay.  But you are not just saying you
7  thought you saw it, you did, in fact, see him making a
8  chewing motion on the screen when you did look,
9  correct?
10     A.  Correct.                    4:10:45
11     Q.  Okay.  In your experience, based on what
12  already transpired on the scene, you understood that
13  him chewing on drugs that you thought he put in his
14  mouth would put him at even more risk of ingesting
15  drugs that could put him at risk of a fatal overdose,
16  right?
17         MR. MATHUES:  Objection to form, incomplete
18  hypothetical, and lacks foundation.
19     A.  Like I said, just based off your statement,
20  if somebody is chewing drugs and they are illicit, I
21  don't know that it's going to be fatal, but it's
22  definitely possible that it's an overdose, ma'am.
23     Q.  Okay.  Well, it's -- even if it's not fatal,
24  it's definitely possible that it's going to put him in
25  the midst of a medical emergency, right?

Page 234

1         MR. MATHUES:  Objection to found -- lacks
2  foundation.
3      A.  It is possible again, like I said, but that's
4  not what I observed.
5      Q.  Well, I -- I'm not asking you what you
6  observed.  We're -- we're talking about once you see an
7  arrestee who is chewing on what you believe to be drugs
8  in their mouth, that is a cause for concern, correct?
9      A.  Yes.                        4:11:48
10     Q.  Okay.  Because it can put them at risk of a
11  medical emergency, correct?
12         MR. MATHUES:  Objection to -- lacks
13  foundation.
14     A.  I would say that's a fair statement, yes.
15     Q.  Okay.  And all you did after you saw him
16  doing that on the monitor was to turn around and look
17  at him twice for one to two seconds --
18         MR. MATHUES:  Objection.
19     Q.  -- correct?
20         MR. MATHUES:  Objection to form, incomplete
21  hypothetical, and lacks foundation.
22     Q.  Correct?
23     A.  The fact that I saw him chewing and then him
24  stop, I guess, didn't alert me.  I thought, like I
25  said, he was just playing games at the time, but no,

Page 235

1  that's -- I did not do anything else after that.
2      Q.  Well, you say, "playing games," but you
3  understand that the reason that someone conceals drugs
4  in their mouth to begin with is because they don't want
5  to be arrested and prosecuted for drugs, right, they
6  are trying to conceal it, right?
7      A.  Yes, I guess that's what they're trying to
8  do, yes.
9      Q.  So when you turned around and you looked at
10  him and he stopped chewing, that's not an unreasonable
11  action for an arrestee who is trying to conceal drugs
12  to take, right?
13         MR. MATHUES:  Objection to speculation, lacks
14  foundation, and incomplete hypothetical.
15     Q.  It's consistent with his behavior of
16  concealing the drugs to begin with, right?
17         MR. MATHUES:  Same objections.        4:13:10
18     A.  Ma'am, like I said, I don't -- I have no idea
19  what's going on through his -- to his mind, I don't
20  know what his intentions are.
21     Q.  Well, did you think he was just going to open
22  up his mouth and show you the drugs?
23     A.  Well, just based on my experience and the --
24  and the comment I made before we left the scene, I told
25  him, "You're on audio and video, and if there is

Page 236

1  anything in the car, it's going to be yours," so if he
2  does have anything on his person -- people try to hide
3  it in the past, you know, by just dumping it in the
4  car.
5      Q.  Okay.  But you knew at that point that he had
6  something in his mouth because he was chewing on it,
7  and you believed that he put something in his mouth,
8  right?
9         MR. MATHUES:  Objection to foundation and
10  mischaracterizes testimony.
11     A.  If --
12     Q.  You didn't think -- chewing on candy, right?
13     A.  No, no, that's -- that's not -- correct.    4:13:58
14     Q.  Okay.  So after you saw him chewing on what
15  you believed to be illicit drugs in his mouth -- strike
16  that.  We've established that you didn't think he was
17  chewing on candy, did you believe he was chewing on
18  illicit drugs that he had concealed in his mouth,
19  correct?
20         MR. MATHUES:  Objection to mischaracterizes
21  prior -- prior testimony and lacks foundation.
22     A.  Ma'am, like I said, I was speculating, I
23  never seen what he actually had in his mouth.  It was
24  just a strong suspicion at the time.
25     Q.  Okay.  I understand you didn't see it, that's

Page 237

1  not my question.  My question is, you suspected that he
2  was chewing on illicit drugs that he had concealed in
3  his mouth, right?
4      MR. MATHUES:  Objection.  Lacks foundation.
5  Incomplete hypothetical.  Form.
6      A.  At the time when I turn around and see him
7  chewing, yes, it's -- he's chewing on something.
8  That's --
9      Q.  Okay.  That something is what I'm trying to
10  establish.
11      A.  Okay.                                4:14:50
12      Q.  You suspected at that time that what he was
13  chewing on was illicit drugs that he had concealed in
14  his mouth, correct?
15      MR. MATHUES:  Objection.  Lacks foundation.
16  Form.  Argumentative.
17      Q.  I mean, this is not a hard question, I can
18  play the video for you again where you've gone over
19  four statements on the scene saying he put it in your
20  mouth.
21      A.  No, I -- I agree, but like I said, I'm trying
22  to figure out what he's got in his mouth, and was there
23  a possibility -- a strong possibility, like I said,
24  that it was drugs?  Yes.
25      Q.  Okay.  So again, my question -- I'm trying to

Page 238

1  get a response to my question.  My question is, at the
2  time as you are in the squad car transporting him to
3  the station, when you see him chewing, you believe that
4  he is chewing on illicit drugs that he has concealed in
5  his mouth, yes or no?
6      MR. MATHUES:  Objection.  Lacks foundation.
7      A.  I would say yes.
8      Q.  Okay.  And when you saw him chewing on what
9  you believed to be illicit drugs in his mouth, did you
10  then decide to turn the monitor in your direction so
11  that you could keep an eye on him the whole way there?
12      A.  No, I did not.                        4:15:57
13      Q.  Okay.  Did you tell Officer McCue to go ahead
14  and call ahead for medical assistance to meet you at
15  the station?
16      A.  No, I did not.
17      Q.  Did you go ahead and call for medical
18  attention to meet you at the police station?
19      A.  No, I did not.
20      Q.  Did you radio or call any supervisors to let
21  them know what you had just seen and to ask for help in
22  figuring out what to do with him?
23      A.  No, I did not.
24      Q.  Did you do anything other than just keep
25  going about your way on the way to the police station,

Page 239

1  eager to strip search this guy?
2      A.  No, we just continued our -- our trip to the
3  station.
4      Q.  Did you try to get Mr. Lurry's attention by
5  talking to him?
6      A.  No, I did not.
7      Q.  Did you ask him if he was okay?
8      A.  No, I did not.
9      Q.  Did you ask him how he was feeling?
10      A.  No, I did not.
11      Q.  Did you ask him if he could hear you?
12      A.  No.                                   4:17:04
13      Q.  Did you ask him to open his mouth?
14      A.  No.
15      Q.  Did you ask him to spit out whatever was in
16  his mouth?
17      A.  Nope.
18      Q.  Did you ask him if he could breathe?
19      A.  No, I did not.
20      Q.  Did you tell McCue what you saw?
21      A.  I don't know that I mentioned that to him.
22  No, I think I just made an observation.
23      Q.  What observation -- you mean you just made an
24  observation and kept it to yourself?
25      A.  Yeah, about -- that I thought that he was

Page 240

1  chewing on something and then he would stop?  Yeah, I
2  don't think I told Officer McCue that.
3      Q.  How long did it take you to get to the
4  station from the scene?
5      A.  I don't know, I'd have to guess.  It wasn't
6  that far, seven to ten minutes.
7      Q.  So you had seven to ten minutes that you
8  could have called for medical attention, and you
9  didn't, right?
10      A.  Well, that's how long the -- about how long
11  the trip was, yes.
12      Q.  Okay.  Did you, at any point after you saw
13  him chewing on what you believed to be illicit drugs in
14  the back seat of your car, tell McCue to pull over and
15  stop the vehicle so that you could get out and check on
16  him in the back?
17      A.  No.                                   4:18:27
18      Q.  Care whether he lived or died?
19      A.  Do I -- I'm sorry?
20      Q.  Did you care whether Eric Lurry lived or died
21  that day?
22      A.  Absolutely.  I'm not a monster.
23      Q.  Okay.
24      A.  I have no reason to -- like I said, I've said
25  it plenty of times in the past, I've never met this guy

Page 245

1  ask that police officer for advice on how to deal with
2  the situation that was transpiring in your squad car?
3      A.  Like I said, ma'am, I don't remember the
4  content of the conversation.  I -- I -- it's -- it's on
5  video, it's on audio.  I don't know who it was.  All I
6  can tell you is I can speculate just by the content.
7  From what I remember, it had to have been somebody
8  else.  I don't know who it was.
9      Q.  Okay.  Do you believe, though, that you used
10  that opportunity to ask that person to call for medical
11  attention or anything or ask them whether you should
12  call for medical attention?
13      A.  Do I believe if I did or not?
14      Q.  Yeah.
15      A.  I don't think so.                    4:23:40
16      Q.  Okay.  So that's another opportunity you
17  passed up, right?
18          MR. MATHUES:  Objection to argumentative and
19  lacks foundation.
20      A.  I'm just answering the question you asked me.
21  I mean, if that's --
22      Q.  And my question is, that's another
23  opportunity where someone called you and you could have
24  asked for medical attention to be ready for Mr. Lurry,
25  right?

Page 246

1          MR. MATHUES:  Objection again to
2  argumentative and lacks foundation.
3      A.  If I would have wanted to, I -- I -- I guess
4  I could have answered him on the phone, but my habit --
5  my -- my normal procedure would be to answer -- ask for
6  help on the radio, not on the phone.
7      Q.  Okay.  Well, did you ask for help on the
8  radio?
9      A.  No, I did not.
10      Q.  Okay.  When you get to the police station,
11  you said your normal practice is to turn off the
12  camera, right?
13      A.  That is correct.
14      Q.  Okay.  And you didn't do that here because
15  you forgot?
16      A.  No, because Officer McCue is driving the
17  vehicle, and whoever was driving, that's who shuts off
18  the camera.
19      Q.  Okay.  So you were counting on Officer McCue
20  to turn off the camera?
21      A.  Yes.                                 4:24:47
22      Q.  And because you had been his field training
23  officer for the eight or nine shifts that he had been
24  on duty, you believed that's what he was going to
25  do, right?

Page 247

1      A.  Yes, that's fair to say.
2      Q.  So you get out and you go over, you see
3  Sergeant May standing outside, right?
4      A.  Correct.
5      Q.  You see Lieutenant Harrison?
6      A.  Yes, I do.
7      Q.  Okay.  And were you surprised to see both of
8  them?
9      A.  I had figured at the time that this was part
10  of the investigation, so yeah, they would -- they would
11  be there.
12      Q.  Did you know that they were going to be
13  waiting outside for you?
14      A.  No, I didn't.
15      Q.  Sergeant May appears to be saying something
16  on video when you guys pull up, do you know what he
17  said?
18      A.  No, I don't.
19      Q.  Okay.  You walk over to Sergeant May,
20  correct?
21      A.  Correct.                             4:25:37
22      Q.  Okay.  And you have, it seems to be, at least
23  a good 35-second, 45-second conversation with him.
24  Would you disagree with that?
25      A.  I have never looked it -- at the exact time,

Page 248

1  but yeah, it would have to be off the video, whatever
2  the video shows me talking to him, ma'am.
3      Q.  Okay.  And you have seen the video, right?
4      A.  Yes.
5      Q.  Okay.  And you see yourself talking pretty --
6  with some animation to Sergeant May, right?
7          MR. MATHUES:  Objection to form.
8      A.  I'm speaking with him and I'm moving my
9  hands, yes.
10      Q.  Okay.  And at some point, you gesture to your
11  crotch, right?
12      A.  If it's on the video, I guess.  I don't
13  recall.
14      Q.  I can -- I can play it for you.
15      A.  Okay, that's fine.                   4:26:31
16      Q.  Before we go to the video, do you believe
17  that you told Sergeant May what had happened on the
18  scene and that you believe that Eric Lurry put drugs in
19  his mouth?
20      A.  I was bringing him up to speed as to what
21  happened because I assumed, since he was not on the
22  scene and he is the sergeant of the drug unit, that I
23  would just kind of give him a briefing up -- as to what
24  had happened up to that point.
25      Q.  Okay.  You knew that he was involved in the

Page 249

1  drug operation, right?
2      A.  At that time, now I did, yes.
3      Q.  Okay.  So he's a -- he's a supervisor even if
4  he's not your direct supervisor that day, right?
5      A.  Yes.
6      Q.  Okay.  So you believe that part of your
7  responsibilities would be to advise him of what had
8  happened on the scene and anything of note that
9  happened on the way to the station, correct?
10     MR. MATHUES:  Objection to form and
11  foundation.
12     A.  I think it was more of a, like, "We just had
13  this go down," kind of like a courtesy thing, and since
14  he was there, it seemed like they had been there
15  waiting for me, even though I didn't know they were.
16  So I was just going over to him to explain what had
17  happened and what my intentions were.
18     Q.  Okay.  And in terms of explaining to him what
19  had happened, you believe that you told him that you
20  suspected Eric Lurry of putting illicit drugs in his
21  mouth, right?
22     MR. MATHUES:  Objection mischaracterizes
23  testimony.                           4:27:48
24     A.  What I remember about talking with -- with
25  Sergeant May when we got to the police station was I

Page 250

1  was going to speak with him about getting the strip
2  search authorized and only a lieutenant could do that,
3  so I figured he'd be the one to go and talk to the
4  lieutenant about getting that approved.
5      Q.  Do you believe that you told Sergeant May
6  that Eric Lurry had drugs in his mouth or that you
7  suspected him of putting drugs in his mouth?
8      A.  I don't remember exactly the words, but after
9  seeing the video, I can only go off my actions that --
10  you know, that I remember, like, my hand motioning
11  towards my mouth.
12     Q.  Okay.  And you also remember your -- your
13  hand going in the vicinity of your crotch or leg area,
14  correct?
15     A.  Like I said, I don't remember that exactly,
16  but if it's something that's on video, I mean, I -- it
17  -- that's me with -- talking with Sergeant May, yes, I
18  would have to agree.
19     MS. MAISURIA:  Okay.  Let's just take a quick
20  break, then we can pull up the video.  Two minutes or
21  so?
22     MR. MATHUES:  Could we have five?  I'm going
23  to use the restroom.
24     MS. MAISURIA:  Yeah, that's fine.    4:28:48
25     RECORDER:  Off record, 2:20 p.m.

Page 251

1      (Off the record)
2      WITNESS:  Yes, we're ready.
3      MS. MAISURIA:  Perfect.  Abby, are you able
4  to go ahead and play that video?
5      MS. BAKOS:  Yeah.
6      MS. MAISURIA:  Thanks.
7      RECORDER:  Sorry, in case we didn't hear it,
8  it's on record, 2:23 p.m.
9      MS. MAISURIA:  Thanks.
10     MS. BAKOS:  Can you see it?       4:30:09
11     MS. MAISURIA:  Yeah.  Are we starting at
12  15:45, I think?
13     MS. BAKOS:  Yeah, hang on --
14     MS. MAISURIA:  And for the record, this is
15  still marked Andrew McCue Video Exhibit --
16     (McCue Deposition Exhibit 1 video played)
17     Q.  Okay.  Did you see on the video your hand
18  going towards your crotch area?
19     A.  Yes, I did.               4:31:19
20     Q.  Okay.  And do you believe that it's
21  reasonable to assume that you were telling Sergeant May
22  that when you searched Eric Lurry, you initially felt
23  drugs around that area?
24     A.  Yes.
25     Q.  Okay.  And then did you see your hand go

Page 252

1  towards your mouth area?
2      A.  Yes.
3      Q.  Okay.  And do you believe that it was
4  reasonable to assume that you were telling Sergeant May that you
5  believed Mr. Lurry had ingested drugs --
6      MR. MATHUES:  Objection to speculation --
7      Q.  -- or put some in his mouth at least?
8      A.  Yes.
9      Q.  Okay.  You then point, do you know what
10  you're pointing at?
11     A.  No, I -- I have no recollection of what --
12  what I'm pointing at.
13     Q.  Okay.  And you hear -- right before we
14  stopped the video, you hear -- it sounds like some
15  officers are having trouble getting Mr. Lurry out of
16  the car, right?
17     A.  It sounds like they're telling him to get
18  out, yes.
19     Q.  Okay.  And that it -- he is not just
20  immediately bouncing out of the car, right?
21     A.  Correct.               4:32:21
22     Q.  Okay.  Do you, at that point, worry that he
23  may be in distress and unable to get out of the car,
24  based on what you had observed on the car ride over
25  with him chewing?

Page 261

1  Eric Lurry and say, "Wake up, bitch," you thought that
2  he was trying to get him to wake up, correct?
3       MR. MATHUES: Objection to mischaracterizes
4  the testimony, objection to speculation, and to form.
5       A.  Like I said, based on what I recall of my
6  conversation with Sergeant May, my intention was to try
7  to get a strip search authorized. After seeing the
8  video, I -- I don't know exactly what I was saying, but
9  yes, I was grabbing towards my crotch and made a motion
10 towards my mouth. I don't know his intentions after
11 that.
12      Q.  Okay. That's not my question. My question
13 is, you, as a trained police officer with the ability
14 to make deductions, when you saw your sergeant go over
15 there and slap someone in your care and custody that
16 was handcuffed in the face and say, "Wake up, bitch,"
17 you knew that was wholly inappropriate, right?
18      A.  The slapping and calling him, "Wake up,
19 bitch," yes.
20      Q.  And you -- you decided to then go ahead and
21 turn off your camera, right?
22      A.  That was one of the reasons, yes.      4:41:36
23      Q.  Okay. What you saw was concerning enough to
24 you that you decided you need to -- needed to check
25 whether your camera was rolling or not and capturing

Page 262

1  all of this, right?
2       MR. MATHUES: Objection to mischaracterizes
3  testimony and foundation.
4       A.  The reason that that caught my attention,
5  like I said, was one of the reasons I shut the camera
6  off, yes, because that's not something that I do when I
7  deal with subjects who are in custody, that's not --
8  that's not my style.
9       Q.  Okay. And because that's not your style, you
10 decided you were going to cover up for another officer
11 whose style it was?
12      MR. MATHUES: Objection to argumentative and
13 mischaracterizes testimony. And lack of foundation.
14      A.  Absolutely not. When I observed him slap
15 Eric Lurry, it caught me by surprise. It threw me for
16 a loop. I'm like, "You're -- you're not supposed to do
17 that." Then I realized, okay --
18      Q.  Sure.      4:42:23
19      A.  -- now we're at the police station, Officer
20 McCue -- I'm going to check to see if he turned the
21 camera on or off, and I said, "We're at the police
22 station, we're going to get this guy out of here, and
23 we're going to go," and so I shut the camera off. I
24 had no idea or can predict what would -- Sergeant May
25 was going to do after the slap. It just threw me for a

Page 263

1  loop, caught me off guard, that's why I decided to go
2  ahead and do that, and the fact that we're at the
3  police station, "Okay, we're getting ready to go, we're
4  going to shut this camera off."
5       Q.  That's a really long answer to a question
6  that doesn't necessitate such a long response, so let
7  me ask another question, okay? I understand that you
8  disagreed with what Sergeant May did. Would you agree
9  with me that when you went to turn off that camera,
10 after he had slapped your arrestee in the face, that
11 you were helping him cover up any additional use of
12 improper force?
13      MR. MATHUES: Objection to speculation,
14 objection to argumentative, and objection to
15 mischaracterizes previous testimony.
16      A.  No, I would not say that at all.
17      Q.  Okay. You understand that the findings of
18 the IAD investigation made clear that you violated the
19 code of conduct in addition to the -- the squad camera
20 policy by turning off the video when you did, right?
21      A.  Yes, I do.      4:43:49
22      Q.  Okay. So you understand that most people
23 take your actions and conclude -- including internal
24 affairs investigators, conclude that you were covering
25 up for Sergeant May?

Page 264

1       MR. MATHUES: Objection to foundation, to
2  mischaracterizes testimony, and to speculation as to
3  what most people may think.
4       A.  Ma'am, I understand that I was disciplined
5  and that it was sustained, the fact that I shouldn't --
6  I turned the camera off when I shouldn't, but was I
7  trying to cover anything up? The only thing I was
8  reacting to was the fact that I don't slap people in
9  handcuffs -- threw me for a loop. At that point in
10 time, it was a decision I was making, based on top of
11 the fact that we're already at the police station, so I
12 shut the camera off.
13      Q.  You don't slap people, but you don't stop
14 officers from slapping people, right?
15      MR. MATHUES: Objection to argument --
16 argumentative. Lacks foundation.
17      A.  I think it goes back to the same premise that
18 I thought that now you have his superior there also,
19 and if he believed that he was doing something wrong or
20 continued to do something wrong, he would have
21 mentioned it to him.
22      Q.  Yeah, but you have your own beliefs, and you
23 are a sworn police officer, right?
24      A.  Yes.      4:45:00
25      Q.  Okay. And you very well had the ability at

Page 277

1    A.  I'm telling you that when we're on the scene,
2  if I would have asked him to -- we were to have
3  searched him or if I would have asked him to open his
4  mouth, like I said, hindsight being 20/20, if he didn't
5  want to and I suspected that he had stuff in his mouth
6  and by him refusing to do that, I probably would have
7  called an ambulance by then, yes.
8    Q.  So your -- your testimony is that if you
9  would have asked him on the scene to open his mouth and
10  he refused, you would have called an ambulance, because
11  you believed that he was at risk of ingesting drugs,
12  right?
13       MR. MATHUES:  Objection to mischaracterizes
14  testimony.
15    Q.  You just said that?
16    A.  Okay, yes, yes.
17    Q.  Okay.  But nothing's changed, the only thing
18  that changed is that you didn't take the affirmative
19  step of asking him to spit out the drugs, but you still
20  believe that he had ingested something, and you didn't
21  call for an ambulance.  Why not?
22       MR. MATHUES:  Objection to form,
23  argumentative, and asked and answered multiple times.
24    A.  I think the fact that if I would have asked
25  him or searched him on the scene, we would have

Page 278

1  discovered that -- the fact that he did have, for sure,
2  the drugs in his mouth, and that would have warranted
3  us calling an ambulance for him at the scene.
4    Q.  Okay.  For sure.  Even though you said,
5  "sure" on the video and "swallowed," right?
6       MR. MATHUES:  Objection to mischaracterizes
7  the evidence.
8    Q.  Do you think any of your fellow officers bear
9  any responsibility for Mr. Lurry's death?
10       MR. MATHUES:  Objection to relevance, lack of
11  foundation, calls for speculation.
12    A.  No.                              4:58:27
13    Q.  Did you see any officer put an ASP in Mr.
14  Lurry's mouth?
15    A.  Yes, I did.
16    Q.  Who did you see?
17    A.  Officer McCue.
18    Q.  Okay.  And where did you see that from?
19    A.  It would have had to been from the time me
20  trying to look into the gap that I had when he was
21  inside trying to put it into his mouth.
22    Q.  Okay.  And did you see -- at that point, you
23  were able to see enough that you knew that it was McCue
24  putting the ASP in his mouth, right?
25    A.  Correct.

Page 279

1    Q.  Okay.  So why didn't you at that same moment
2  see Sergeant May pinching his nose shut?
3    A.  There is no reason, maybe I was looking at
4  McCue doing the -- the ASP thing in his mouth.  I don't
5  know what Sergeant May was doing.
6    Q.  So you're telling me that you were able to
7  observe the ASP going in Eric Lurry's mouth held by
8  McCue, but you were unable to observe what was going on
9  literally one inch above that?
10    A.  Well --
11       MR. MATHUES:  Objection to argumentative and
12  asked and answered multiple times.
13    A.  Like I said, when I had -- I had a limited
14  view of what he was doing, I was able to see that.  A
15  lot of the stuff that I remember seeing now is actually
16  from watching the video.
17    Q.  Okay.  But that's not what I just asked you.
18  I asked you if you saw the ASP being put in his mouth
19  and you said, "yes"?
20    A.  Yes, that's correct.              4:59:52
21    Q.  Okay.  So as you're standing on the scene
22  looking through your gap, you are able to see your
23  recruit putting an ASP in Mr. Lurry's mouth, right?
24    A.  Yes.
25    Q.  Okay.  But you are unable to see, for some

Page 280

1  reason, Sergeant May pinching his nose shut at the same
2  time, right?
3       MR. MATHUES:  Objection.  Asked and answered
4  multiple times.
5    A.  Okay, like I said, I'm trying to tell you
6  what I remember.  Maybe I -- I had to have seen it --
7  like I said, if I was there, but I'm trying to tell you
8  what I remember.  I remember paying attention to McCue
9  obviously putting the ASP in Eric Lurry's mouth.
10    Q.  Okay.  So now you're saying that you believe
11  you did see Sergeant May pinching his nose shut?
12       MR. MATHUES:  Objection to mischaracterizes
13  the testimony.
14    A.  Like I said, it's possible that I have seen
15  it, ma'am, I -- just like I said, I recall more Andrew
16  McCue putting the ASP in his mouth.
17    Q.  If you had seen that, would you have agreed
18  with that?
19    A.  Agreed with what, with the --
20    Q.  Nose --
21    A.  -- nose?  It's a way for him to try to get
22  the -- the drugs out of his mouth, to get him to open
23  his mouth.
24    Q.  So is that a yes or a no?
25    A.  Would --

Page 281

1   Q.  Something --
2   A.  -- I agree --
3   Q.  -- would have done?
4   A.  -- yeah -- yes.        5:00:53
5   Q.  You would have pinched his nose shut?
6   A.  I don't know what I would have done, I've
7  never had to resort to that.  But do I agree in him
8  pinching his nose like that to open his mouth?  Yes.
9   Q.  Okay.  Do you agree with Sergeant May's call
10 to not call for an ambulance when all of this was going
11 on?
12      MR. MATHUES:  Objection to form.  Foundation.
13 When?
14   A.  Sergeant May was the one that actually called
15 for an ambulance.
16   Q.  I understand, but he didn't do that when he
17 was pinching his nose shut for 90 seconds and telling
18 someone to put a baton in his mouth, right?
19      MR. MATHUES:  Objection to argumentative.
20 Objection to lacks foundation.  Objection to
21 mischaracterizes the evidence and testimony.
22   A.  No, he did not call for an ambulance at that
23 time.
24   Q.  Okay.  So do you agree with that?
25      MR. MATHUES:  One -- same objections to the

Page 282

1 previous question.  Foundation.  Mischaracterizes the
2 evidence.  Lacks foundation.
3   A.  I would say yes, I agree, because he was
4 still trying to get the -- the drugs out of his mouth.
5   Q.  So you're not -- he's not capable of doing
6 more than one thing at a time?
7   A.  I don't know what -- he did what he did,
8 ma'am.  I -- I don't know.  I can't --
9   Q.  You --
10   A.  -- speak --
11   Q.  -- tell anyone to call for an ambulance until
12 he did?
13   A.  That -- that's -- I -- that's the time that I
14 felt, I guess, he was in medical distress.  I don't
15 know -- I don't know what -- how to answer that, that's
16 not me.
17   Q.  When you saw them putting a baton in Eric
18 Lurry's mouth, were his eyes open or closed?
19   A.  I don't remember.  I don't remember exactly.   5:02:24
20   Q.  Okay.  Was his head tilted back?
21   A.  I believe so, yes.
22   Q.  Okay.  Did he appear to be alert?
23   A.  Like I said, all these I'm making off what
24 I've seen on video.  A lot of this stuff I didn't see
25 because, like I said, I had a limited view --

Page 283

1   Q.  Well, you --
2   A.  -- for --
3   Q.  -- putting an ASP in his mouth, so I'm asking
4 you at the time that you saw that, did he appear to be
5 alert?
6   A.  His eyes were open, yes.       5:02:50
7   Q.  Did he ever seem woozy to you?
8   A.  Could you clarify that?  Like I said, I
9 didn't see him woozy till after.  On scene or on video?
10   Q.  In real time as you're looking at him, does
11 he ever look --
12   A.  I --
13   Q.  -- like someone to you who is not alert --
14      MR. MATHUES:  Objection to found --
15   Q.  -- and in full control of their faculties?
16   A.  I'm just asking for clarification, ma'am,
17 that's all I was doing.  When I was there and I seen
18 him, I didn't realize that he was in any kind of danger
19 until after that -- Sergeant May called for a 52, and I
20 peek in, and he looked like he was not -- his eyes were
21 closed, and it looked like he was slumped over not
22 moving.
23   Q.  Okay.  And that's the first time you saw his
24 eyes closed, is that right?
25   A.  I did not say that.  I don't recall.  I don't

Page 284

1 recall if his eyes were opened or closed for an
2 extended period of time.  I don't remember.
3   Q.  Well, did you -- do you remember ever seeing
4 his eyes closed before that?
5   A.  No.            5:04:12
6   Q.  Okay.
7   A.  No, every time I had seen him, his eyes were
8 open.
9   Q.  And he's slumped over in the vehicle, at that
10 point, when you see him?
11      MR. MATHUES:  Objection to foundation.
12   A.  This is after Sergeant May had exited the
13 vehicle and said, "Get me an ambulance here right now."
14 That's when I suspect that he was in medical distress.
15   Q.  That was your first clue, right?
16      MR. MATHUES:  Objection to mischaracterizes
17 the testimony.
18   A.  I'm just telling you from my -- I remember
19 seeing, that's the first time, and that's after
20 Sergeant May had called for an ambulance, I said, "So
21 there is obviously something wrong that he feels he
22 needs to get an ambulance here."
23   Q.  At that point, did you look in your car to
24 see if you had some Narcan?
25   A.  No.            5:04:59

Page 285

1    Q.  Did you go into the station to see if they
2  had some Narcan -- that you're a -- qualified officer?
3    A.  No, I did not.  By then, there was other
4  officers coming out.
5    Q.  Okay.  Well, did you see any of them with
6  Narcan, did you ask them if they had Narcan they were
7  going to use on this guy?
8    A.  No, I did not.
9    Q.  Okay.  So again, another opportunity that you
10  passed up, right?
11    MR. MATHUES:  Objection to foundation and
12  mischaracterizes testimony.
13    A.  They had already called for an ambulance at
14  the time, so no, I didn't -- not ask anybody else or
15  no, I did not use Narcan.
16    Q.  Well, they called for an ambulance, but did
17  you see that ambulance in the parking lot?
18    A.  No, they can't teleport there, they were --
19    Q.  Okay.
20    A.  They were pretty close, I think there was one
21  at station one, they were there pretty quick.
22    Q.  So while you're waiting for that ambulance to
23  get there to help this man who you have now finally
24  realized is in medical distress, you don't do anything
25  to help him with Narcan, right?

Page 286

1    A.  No, I don't, no.
2    Q.  Correct?  Okay.
3    A.  Correct.                    5:05:56
4    Q.  Did you see Eric Lurry taken out of the
5  vehicle?
6    A.  Yes.
7    Q.  Okay.  Did you help get him out of the
8  vehicle?
9    A.  No.
10    Q.  Who took him out of the vehicle?
11    A.  It was Officer Ranstead and Sergeant May.
12    Q.  And then once they take him out of the
13  vehicle, where do they put him?
14    A.  He -- they brought him down to the ground and
15  started administering first aid.
16    Q.  What were they doing?
17    A.  CPR.
18    Q.  Okay.  Did you think that might have been a
19  good time to come over and say, "Hey, guys, I'm trained
20  in Narcan, let me go see if I can get some"?
21    MR. MATHUES:  Objection to argumentative.    5:06:42
22    A.  Sure, I guess it's possible, but that's not
23  what -- I didn't do that.
24    Q.  You didn't do that.  Were you able to see any
25  response from Eric Lurry after he was taken out of the

Page 287

1  car?
2    A.  I just remember the officers working on him,
3  I don't remember if they were able to get any -- any
4  response like you say.  No, I don't remember.
5    Q.  Did you ever see him have a seizure or what
6  appeared to be a seizure?
7    A.  No.
8    Q.  Did you ever see him vomiting?
9    A.  I don't remember vomiting or not, I don't
10  remember, no.
11    Q.  What's jaw jacking?                5:07:28
12    A.  Jaw jacking?  I mean, it's maybe two people
13  arguing with each other.
14    Q.  You said, at some point during your interview
15  with Attorney DiNolfo as part of this investigation,
16  that you thought that those guys were going to go in
17  there and do some jaw jacking?
18    MR. MATHUES:  Objection to foundation.
19    Q.  Did you -- did you take that -- were you
20  saying that you thought that they were going to
21  forcibly pry his mouth open?
22    A.  No, jaw jacking on the street is when two
23  people are arguing, that's all I've ever known to mean.
24  Oh, jaw jacking, prying somebody's -- no, I've never
25  heard of that.

Page 288

1    Q.  Give me a minute.
2    A.  Okay.                        5:08:24
3    Q.  I'm -- just a second, I'm trying to share
4  something with you.  Okay.  Do you see what I'm looking
5  at?
6    A.  Yes, I can see it.                5:10:57
7    Q.  Okay.  This is pre-marked Exhibit 4, okay,
8  and it is a transcript of your interview with Attorney
9  DiNolfo taken on November 20th, 2020, do you see that?
10    A.  Yes, I do.
11    Q.  Beginning Bates numbers Joliet 3234, and it
12  goes to 3319, okay, and I'm going to direct your
13  attention to page 3310.  Okay.  Do you see this
14  question, "I understand why it didn't happen like that,
15  but why -- why -- why was it your first instinct, I
16  guess at that point, after you saw Sergeant May reach
17  into the car, slap him, call him a bitch, to see if the
18  video was on?"  Your answer, "Because Eric Lurry
19  reacted to him when he hit him, he turned towards him,
20  and I'm thinking to myself, 'This guy is playing
21  around.'"  Did you see Eric Lurry react when he was
22  slapped in the face?
23    A.  Yeah, when he gets slapped in the face, he
24  turns towards his left where Sergeant May -- Sergeant
25  May was, and I thought, "Okay, he's fine, he's you