**In the matter re:**

**Nicole Lurry, as Special Administrator of the Estate of Eric Lurry, Jr., deceased**

**V.**

**City of Joliet et al.**

**Case No: 20 CV 4545**

**United States District Court**

**Northern District of Illinois**

**Eastern Division**

---

**Report**

**of**

**CHARLES W. DRAGO**

**DRAGO PROFESSIONAL CONSULTANTS, LLC**

---

March 16, 2022

Ex. 5

## Table of Contents

**Introduction**……………………………………………………………………………………………….3

**Qualifications**…………………………………………………………………………………………….3

**Opinions**……………………………………………………………………………………………………5

**Materials considered in forming opinions**…………………………………………………21

**Past Expert Witness Testimony**………………………………………………………………..21

**Publications**……………………………………………………………………………………………30

**Compensation**………………………………………………………………………………………..30

Appendix 1 – Curriculum Vitae of Charles W. Drago

Ms. Abby D. Bakos
Ms. Ronak Maisuria
Bakos & Maisuria Law Group
1755 Park Street Suite 200-1070
Naperville, IL 60563

Dear Ms. Bakos, Ms. Maisuria,

I have been retained as a consultant and expert in the matter known to me as Nicole Lurry, as Special Administrator of the Estate of Eric Lurry, Jr., deceased v. City of Joliet et al. Case No: 20 CV 4545, United States District Court, Northern District of Illinois.

I was asked to review documents relevant to this matter and render expert opinions about the police actions of the defendants involved in this matter.

After evaluation of all the facts and circumstances that are known to the witnesses at the time of this incident, I employed comparative methodology in determining my opinions and in evaluating the officers' actions. This method of comparing the actions of the officers with accepted practice and training in the law enforcement profession is a common and consistently applied method when evaluating a law enforcement officer's action.

These accepted practices and training in law enforcement are national practices and/or standards which would be recognized within the State of Illinois. The practices and standards are established by nationally developed policies, federal case law, and the practices set forth by national police force organizations such as literature, trainings, and conferences which are conducted on a national level.

Therefore, I formed a number of opinions to a reasonable degree of professional certainty, as to the police procedures for providing medical aid, search and seizure and use of force executed by the City of Joliet and Joliet Police officers Jose Tellez, Douglas May, Andrew McCue and Jeremy Harrison in this matter and whether or not certain actions of the officers were consistent with accepted national police practices and standards that are recognized throughout the United States as well as in the Northern District of Illinois.

My opinions are based not only on the facts presented by all parties, but my experience and training concerning proper policies and police practices in use of force, arrest techniques, narcotics enforcement, supervision, and police training. Pursuant to the requirements of Rule 26 of the Federal Rules of Civil Procedure, I have studied the reports and other material provided to me regarding this case. Please be advised that if there are any additional depositions, policies, or other materials produced in this case, a supplemental report may be necessary; thus, I reserve the right to supplement my opinions and/or this report.

**Qualifications**

I am a 30-year career law enforcement officer who advanced through the ranks of the police department with an exemplary record. Recognized for integrity and leadership, I was appointed as assistant police chief, police chief as well as deputy chief of staff and senior law enforcement advisor to the Governor of Florida.

As a senior leader of major law enforcement agencies and a member of the department's review boards; I have investigated hundreds of police misconduct allegations in all areas including use of force/Taser/pepper spray, deadly force, k-9, and police pursuits. I have broad-based experience in high liability areas including the management and development of policies and procedures in those areas.

During my career, I have attained a significant amount of experience in police officer involved shootings as a police officer in the field as well as a line supervisor and homicide detective supervisor who investigated police officer involved shootings. As a police executive, I have also developed use of force policies and evaluated trends and individualized cases. In addition, I served as a union representative on many officer involved shootings. I received training in criminal investigations, homicide investigations, police officer bill of rights and internal police investigations.

In addition, I have consulted on numerous officer involved shooting cases and provided guidance on police tactics, procedures, and methods of investigation before, during and after officer involved shootings and in custody deaths. As a consultant, I have been called upon to provide direction as to the effects on an officer after he has been involved in a shooting. My opinions have been sought by the media, government and law firms in high profile officer involved shootings all over the country.

As an experienced frontline law enforcement officer who was directly or indirectly involved in thousands of arrests, my experience includes service in various capacities with direct hands-on involvement and/or supervision in areas such as patrol, street narcotics, SWAT, k-9, street crimes, criminal investigations, training and homicide. I have advanced through the ranks and served as a police officer, field training officer, detective, sergeant, detective sergeant, captain, major, assistant chief and police chief. My career includes considerable experience with the investigation of police officer use of force, as an officer, immediate supervisor and senior administrator.

I served as a supervisor of the police department's Street Narcotics Unit and the Countywide Anti-Drug Unit. As such, I participated in over three thousand narcotics investigations, executed over 1000 search warrants including numerous High Risk search warrants. I received hundreds of hours of training in narcotics investigations and taught thousands of police officers in narcotics investigations and the execution of narcotics search warrants. I served as the sole instructor for Narcotics Investigations at the Broward County Florida Police and Corrections Academy.

My education includes an Associate Degree in Criminal Justice from the State University of New York, a Bachelor Degree in Criminal Justice from St. Thomas University, and graduation from the Southern Police Institute Command Officer's School at The University of Louisville. In addition, I have had numerous hours of training in the use of force, Tasers, arrests, firearms, supervision, patrol procedures, criminal investigations, narcotics investigations and the management of those.

As a certified police instructor, I trained thousands of police officers in the use of force, criminal investigations, search warrant procedures, narcotics investigations, narcotics identification, substance abuse and patrol procedures. I served as the sole narcotics instructor in the Regional Police Academy, Corrections Academy and Police Civilian Academy for 10 years.

Note: The material reveals that there is conflicting information between witnesses and the police officers. Resolving such conflicts involves assessing witness credibility and assigning weight to the given testimony and is the responsibility of the trier of fact. Accordingly, the opinions offered in this case related to facts in dispute are based on assumptions that are identified in the basis for my opinion, and the totality of my knowledge, training and experience.

**Opinion A: Police Officers Jose Tellez and Andrew McCue disregarded Joliet Police Department (JPD) policies and accepted police practices for providing medical assistance to a person in custody with drugs in his mouth.**

1. On January 28, 2020, Officer Jose Tellez was serving as a Field Training Officer for Officer Andrew McCue. The officers responded to a traffic stop of two occupants by Officer Wietting. Once on the scene, the officers noted that there were five officers already on the scene. The two occupants were removed from the vehicle and Officer McCue patted down Mr. Lurry who had been sitting in the front passenger seat. Officer McCue found nothing of concern and Lurry was eventually released. Officer Wietting then told Officer Tellez that Lurry had walked away with his phone. Tellez volunteered to retrieve the phone from Lurry and returned to their vehicle and drove to Mr. Lurry who was walking westbound on Washington. It should be noted that the video system that was running from the initial stop was turned off shortly after the U-turn was made because the emergency lights were deactivated at the direction of Officer Tellez. Therefore, all of the video from that point until shortly before Mr. Lurry is placed into the police car is without audio. (Joliet 003037 DiNolfo Memo)

2. Officer Tellez approached Mr. Lurry and advised him that the driver claimed he had taken his cell phone. Mr. Lurry acknowledged that he did, in fact, have the phone and turned it over to Officer Tellez. Shortly after obtaining the phone, Officer Tellez received a radio call to telephone Officer Wietting. When asked if such a request is common, Officer Tellez did not offer a clear answer. Instead, Officer Tellez said that it just happened that way. As requested, Officer Tellez called Officer Wietting who advised him that the "drug guys" wanted any monies on Mr. Lurry confiscated, since the driver of the vehicle Mr. Lurry had been riding in was arrested for possession of a controlled substance. Officer Wietting also advised Officer Tellez to "search him good." (Joliet 003037 DiNolfo Memo)

3. Officer Tellez then informed Mr. Lurry that he had been directed to seize any money on his person due to the nature of the arrest at the other vehicle. Officer Tellez asked Mr. Lurry to move towards his squad so, when they collected the monies, they could set it on the hood. Officer Tellez testified that he explained to Mr. Lurry how he could try to get the money back once seized. Some of this action can be seen on the "capture" video from the squad. Officer Tellez then began removing money from the pockets of Mr. Lurry and handing it to Officer McCue. (Joliet 003037 DiNolfo Memo)

4. Once Officer Tellez finished retrieving the money, he advised Mr. Lurry that he was going to pat him down. Mr. Lurry, after being told about the search, placed his hands on the squad. Officer Tellez began his search of Mr. Lurry starting from his head area and working his way down his person. Around his left inner thigh area, Officer Tellez felt a pliable object that he suspected to be some type of narcotics. Officer Tellez asked Mr. Lurry what the object was, but Mr. Lurry did not offer a response. As Officer Tellez began to further inquire about the object, he heard Officer McCue say to Mr. Lurry to "not go digging." Officer Tellez then felt Mr. Lurry rising up from the squad and this movement led him to believe that Mr. Lurry was going to flee. Officer Tellez also observed Mr. Lurry's right hand reach into his crotch area. Officer Tellez, in response, "wrapped him up" and Officer Tellez and Mr. Lurry fell to the ground. As they were falling, Officer Tellez testified that he saw Mr. Lurry pull his hands into his core with his arms crossed near his chest area. As Officer Tellez continued to struggle with Mr. Lurry, Officer McCue called

for backup. As they were struggling, Officer Tellez testified that he saw Mr. Lurry lower his face/chin downward towards his chest, but stated he was not sure if he placed anything into his mouth. (Joliet 003038 DiNolfo Memo)

5.  After a brief struggle, Officer Tellez was able to get Mr. Lurry's hands behind his back. Officer Tellez did not observe anything in Mr. Lurry's hands when he cuffed him. However, Officer Tellez did suspect that he may have placed some drugs into his mouth. Inexplicably, from the time the struggle stopped until the time Mr. Lurry was placed into the vehicle, Officer Tellez did not re-search Mr. Lurry to see if the object he felt during his initial search, which he suspected to be narcotics, was still in place. Even after back up arrived and Officer Tellez told these officers multiple times that Mr. Lurry may have put "dope baggies" in his mouth and/or swallowed some, he did nothing to confirm that. Officer Tellez never checked to see if any objects were present on Mr. Lurry's person, he never completed his search of Mr. Lurry's person to see if he had any other illegal or dangerous objects and, most surprisingly, Officer Tellez never asked Mr. Lurry to open his mouth. This is particularly surprising based upon Officer Tellez's own testimony that, in similar situations, he had asked individuals to open their mouths and they would often comply. Further, when asked what, as an FTO, he would have told McCue to do in a similar situation, he testified that he would have instructed him to ask the person to open their mouth. It must be acknowledged that there is no general order requiring such a request be made. (Joliet 003037 DiNolfo Memo)

6.  Officers Tellez and McCue placed Mr. Lurry into the squad without ever trying to ascertain if he had narcotics in his mouth, despite Officer Tellez's clear belief that Mr. Lurry had put narcotics in his mouth based on statements heard on the video. Additionally, no further search of Mr. Lurry's person was done to determine if the object felt on his thigh was still there. After looking briefly in the area where the struggle occurred, the officers began to transport Mr. Lurry from the scene to the jail without asking Eric Lurry to open his mouth. (Joliet 003037 DiNolfo Memo)

7.  McCue video Exhibit 1: Officer Tellez and McCue lift Lurry from the ground where it appears as though Lurry is handcuffed behind his back. The officers walk him out of the camera view. Lurry seems to be docile and cooperative at the time as he walks peacefully with the officers. Based on the evidence in this matter, it appears that this is when the officers place Lurry in the back seat of the police car. The audio is activated at 3:10 and Officer McCue says, "we're hot" and Tellez is heard saying "just so you know you're on audio and video camera" and McCue walks to the front of the police car.

8.  McCue video Ex.1: 4:49: Tellez is not in camera view but is overheard speaking to McCue and says, "Let's take him down to the jail because he's got something on him, but ah he might have put a bunch of it in his mouth."

9.  McCue video Ex.1 5:50: Officer Tellez then explains to the third officer that he felt a bunch of dope baggies when he searched him and "he might have gotten them in his mouth."

10. McCue video Ex.1 5:15: Officers Tellez and McCue are seen in the video walking to the front of the police car and search the ground for the suspected drugs. Tellez then tells McCue "It's in his mouth." A third police officer is then observed walking into the camera's field of view.

11. McCue video Ex. 1 6:12: Officer Tellez then tells McCue "Let's get him over to the station, we gotta go". The two officers walk out of the camera's view and can be heard entering the police car. 6:38: Tellez is overheard (not seen) telling someone that he might have swallowed some of the drugs "he might have swallowed some of it." Officer McCue then radios in that they are enroute to the station with one male for "Obstruction."

12. Officers Tellez and McCue placed Lurry into the police car without trying to determine if he had drugs in his mouth even though Tellez made it known that he believed that Lurry had put drugs in his mouth. (McCue Video Ex 1). The officers also didn't search Lurry to see if the drugs were still on his person or even ask Lurry to open his mouth. The officers looked briefly in the area where the original struggle occurred and then transported Lurry to the police station.

13. Officer Tellez stated in his report *" I then began a pat down of Lurry and did place my hand over his left inner thigh and did feel what was immediately apparent based on my experience as a plastic baggie containing a soft pliable substance."* Tellez indicated in his deposition that he believed it was a large amount of drugs: *(Tellez deposition 128:19) "All I can say is the size, I..I am not you know, between a golf ball and a and a racquetball."* Tellez also stated on the McCue video that he believed Lurry placed those drugs in his mouth which he knew to be a significant danger for Mr. Lurry. He knew that it could cause an overdose death.(Tellez deposition 172-173)

14. Therefore, not only did Tellez and McCue violate JPD policy but recklessly disregarded the very serious threat of death or serious injury that could be caused by cocaine poisoning, drug overdose or suffocation from the drug baggies.

15. **JPD Transporting Prisoners G.O. 13.1:** *1.7 Transporting Prisoners A. Prior to transporting a prisoner, he or she will be searched for weapons and/or contraband, unless extraordinary circumstances are present.*

16. Officer Tellez acknowledged that he was required by department policy to search Lurry before he put him in the police car. Tellez claimed that he didn't search Lurry because the officers struggled with Lurry when they tried to search him. (Tellez deposition 176) That claim is not supported by the video evidence. Mr. Lurry is seen walking calmly and complying with the officers as he is escorted to the police car. At least two back up officers had arrived as well and could have provided the support for the officers to remove Lurry from the police car and search him properly for the drugs. Nevertheless, Officers Tellez and McCue made the choice to disregard the danger that Lurry was in, disregard the JPD policy and disregard generally accepted police practices and drive him to the station instead.

17. **IACP Transportation of Prisoner Model Policy:** *IV C. Searches Prior to transport, all prisoners shall be thoroughly searched for any weapons or contraband.*

18. Police officers across the country receive basic narcotics identification and investigation training in the basic police academy and throughout their careers. Police understand that exposure to cocaine or other illegal drugs can cause a person to suffer serious injury or death from poisoning or overdose. One of the ways this can happen is when a person attempts to hide drugs from the police and then they either inadvertently or intentionally swallow the drugs.

19.   Therefore, police officers are trained to call for medical assistance whenever they suspect a person is suffering a medical emergency. Police recognize through training and experience that swallowing illicit drugs is considered a medical emergency which requires the police to call for medical assistance immediately. McCue and Tellez explained in their deposition that they knew the dangers of swallowing drugs, so it is inexplicable for Officer Tellez and McCue to ignore the dangers associated with a person putting bags of drugs in his/her mouth.

20.   It is my opinion that Officer Tellez and McCue could have prevented Lurry's medical emergency that occurred in the back seat of the police car and resulted in the death of Mr. Lurry if they had followed accepted police policies and practices. If the officers would have searched Mr. Lurry while at the scene, he wouldn't have had access to the drugs and couldn't have swallowed the drugs. The officers also should have called for medical assistance as soon as they believed Lurry had placed drugs in his mouth.

**Opinion B:  Officer Jose Tellez and Officer McCue failed to follow Joliet P.D. policies and accepted police practices when they transported Lurry to the police station without first searching Lurry and calling for medical assistance.**

21.   **IACP Transportation of Prisoners Concepts and Issues Paper:** *IIIG :In the first instance, transporting officers should be aware of physical reactions by keeping close watch over prisoners following arrest and during transportation. Indications of lethargy or unresponsiveness on the part of prisoners should be addressed immediately. Any obvious physical injuries should be treated as soon as possible rather than waiting for such a determination to be made at booking. All prisoner complaints of serious injury or physical problems should be taken seriously, and medical aid summoned immediately.*

22.   Officers Tellez and McCue violated accepted police practices and JPD policy when they placed Lurry in the back seat of the police car without securing him in properly as required. By doing so, Lurry was able to move around in the back seat at will and at times turn his body away from the camera and hide his face while he chewed vigorously on the drugs in his mouth. Those actions are consistent with a person trying to conceal the fact that they are chewing the drugs in their mouth. Those actions should have been suspicious to Officer Tellez and McCue especially since they believed that he put a significant amount of drugs in his mouth.

23.   **JPD Policy 13.1 7** (*B) Transporting Prisoners in Vehicles: The prisoner will be handcuffed behind his or her back (unless reasonable circumstances exist to not use handcuffs or not cuff behind his or her back) and securely belted to prevent movement under normal circumstances.*

24.   Officer McCue drove the police car and Officer Tellez sat in the front passenger seat. The vehicle was equipped with a rear seat video camera which could be viewed by the officers on a monitor in the front of the vehicle. The rear seat video (McCue video dep.2) depicts Lurry seated in the back seat chewing on and off throughout the video and occasionally turning his head away from the front seat and towards the back corner of the rear seat. Lurry appears to be trying to hide his face when he turns to the back of the seat. This maneuver is made possible because he is not properly secured in the seat.

25. According to McCue, he never monitored or checked on Lurry at all throughout the entire ride to the police station even though he had a monitor close by that would have allowed him to see Lurry chewing and moving his mouth in the back seat. (McCue deposition 150:1)

26. Officer Tellez said that it was difficult to see the video feed due to the location of the video monitor, but he was able to see Lurry well enough to notice Lurry chewing on at least two occasions. Officer Tellez stated that when he saw Lurry chewing he would turn around and look at Mr. Lurry. Officer Tellez said he turned around twice and looked back at Lurry when he saw Lurry chewing on something in his mouth. He didn't see Lurry chewing either time he turned around. (Tellez deposition 228-231)

27. Officer Tellez believed that Lurry had put a significant amount of illegal drugs in his mouth prior to transporting Lurry to the station. Nevertheless, neither he nor McCue made any serious effort to monitor Lurry or surveil him for signs of drugs in his mouth or signs of a medical emergency.

28. McCue Video Ex.2: 2:55: Officer Tellez and McCue place Lurry in the rear of the police car. 3:36: The officers close the rear passenger door and Lurry begins chewing and making movements with his mouth consistent with having drugs in his mouth. The officers have walked off to search the ground for the missing drugs and are not watching or monitoring Lurry. Tellez states his belief that Lurry may have the drugs in his mouth several times.

    4:55: Tellez: "He might have put a bunch of it in his mouth."

    5:25: Officers talk about finding the drugs and Tellez states: "It's in his mouth." Lurry can be seen chewing and making movements with his mouth.

    5:57: Tellez: "He might have gotten some in his mouth"

    6:37: Tellez: he might have swallowed some of it, so we have to get him to the station"

    7:57: Officer McCue radios that they are going to be heading to the station. Lurry is continuing to chew while in the back seat.

    1010: Officer Tellez talking on the phone: "We have to search him more; he might have gotten some to his mouth".

    15:55: Officer McCue radios that they have arrived at the jail. 16:06: Officer McCue opens the rear passenger door and tells Lurry "kick your feet out "

29. The officers left Lurry in the back seat of the police car for approximately 12 minutes and 19 seconds without seriously monitoring his behavior before they arrived at the police station. The officers didn't call for medical care while at the scene or any time during the transport to the police station. The officers didn't indicate any sense of urgency or that they were concerned about Lurry's condition as they responded to the police station in a non-emergency, routine mode.

30. The officers should have called for medical assistance back at the scene of arrest. The officers didn't do that and decided to drive Lurry to the police station. The officers then should have ensured that they

were able to constantly monitor Lurry for any signs that he had the drugs in his mouth or any signs that he was suffering a medical emergency. The officers ignored Lurry most of the way and didn't see the obvious signs that he had drugs in his mouth and was suffering a medical emergency.

31. **IACP Transportation of prisoners Model Policy:** *IV F. Prisoner Well-Being: The physical well-being of prisoners shall be monitored at all times. 1. Particular attention shall be directed to persons reported or suspected of being under the influence of drugs and/or alcohol, those with mental illness or an intellectual/developmental disability, or who have a history or propensity for violence. 2. Prisoners who are visibly injured or report/display symptoms of injury or illness shall be provided emergency medical attention.*

32. Officers Tellez and McCue still may have been able to prevent Lurry's medical emergency if they surveilled Lurry properly while in the rear of the police car in accordance with JPD policy and accepted police practices and then called for medical assistance.

33. **JPD 13.1 Arrests of Offenders (5.) Medical care for Arrested Persons**: *5.2: Procedures: A. If an officer has reason to believe that anyone in his custody requires medical attention or is in need of mental evaluation/treatment, that person will be transported to the appropriate hospital by the Joliet Fire Department ambulance prior to processing, unless circumstances prohibit.*

34. Officer Tellez made it clear that he believed that Lurry put a substantial amount of drugs in his mouth and possibly swallowed them. Officer Tellez stated in his deposition that he knew that swallowing a large amount of cocaine could result in an overdose. He also acknowledged that a person could die from an overdose. Therefore, it was incumbent upon Tellez and McCue to call for medical assistance as soon as they believed Lurry put the drugs in his mouth.

35. **IACP Transportation of Prisoners Model Policy II**: *It is the policy of this agency to treat all prisoners in a humane manner and with due regard for their physical safety and protection consistent with sound principles of prisoner security. Officers shall take the precautions necessary while transporting prisoners to protect the lives and safety of officers, the public, and the person in custody.*

**Opinion C: Sergeant May violated JPD polices and accepted police practices when he hit Lurry in the head with an open hand strike.**

36. Law enforcement officers are trained in the use of force and that the United States Supreme Court ruled "All claims that law enforcement officials have used excessive force –deadly or not- in the course of an arrest, investigatory stop, or other seizure of a free citizen are properly analyzed under the fourth amendment's" objective reasonableness standard. The objectively reasonable standard has been used in law enforcement training programs to instruct police officers on the use of force since 1989 when the standard was established by the U.S. Supreme Court in Graham v. Connor.

37. As such, police organizations and police departments across the country have adopted the objective reasonableness standard in their police training and department policies. I cite *Graham v. Connor*, not because it is the legal standard in the use of force, but because it is part of the use of force training for police officers nationwide.

38. Police officers are trained that not only might they receive civil and criminal penalties for using unreasonable force, but they could also receive departmental discipline. Therefore, the objectively reasonable standard has become the accepted police practice when a police department is evaluating an officer's use of force administratively as well as criminally. Since the policy requires that an officer meets that standard then any unreasonable use of force would be determined to be a violation of the department policy.

39. The reasonableness standard is an accepted police practice and recognized as such by most police organizations in the United States including the Joliet Police Department.

40. **JPD Use of Force 3.1(2.1)**: *Members will use only that force that is reasonably necessary to effectively accomplish legal objectives.*

41. The International Association of Chiefs of Police (IACP) brings police chiefs together from all over the country to create Model Policies to guide local police agencies in police best practices. While police agencies are not obligated to follow these model policies, they do serve as generally accepted police practices. IACP formulated a Model Policy on the use of force which clearly delineates Objective Reasonableness as the standard for police use of force.

42. **National Consensus Policy on Use of Force**: *It is the policy of this law enforcement agency to value and preserve human life. Officers shall use only the force that is objectively reasonable to effectively bring an incident under control, while protecting the safety of the officer and others. Officers shall use force only when no reasonably effective alternative appears to exist and shall use only the level of force which a reasonably prudent officer would use under the same or similar circumstances.*

43. **National Consensus Policy on Use of Force:** *OBJECTIVELY REASONABLE: The determination that the necessity for using force and the level of force used is based upon the officer's evaluation of the situation in light of the totality of the circumstances known to the officer at the time the force is used and upon what a reasonably prudent officer would use under the same or similar situations.*

44. Therefore, police officers are trained to understand the level of force that would be appropriate in response to a certain level of resistance. This is often described as a response to resistance.

45. Police policies and training enforce the reasonableness standard and officers are expected to understand and follow the dictum when considering the use of force. The question the officer asks himself should be do I need to use force? And when using force, what amount of force is reasonably necessary under these circumstances? Police officers can only use force when it is reasonable to do so under the circumstances facing them.

46. Police officers can only use the amount of force necessary to control a situation or to protect themselves or others from imminent harm. An officer's use of force must be proportional to the amount of resistance offered by the suspect.

47. The use of force must be proportional and to be proportional, the level of force applied must reflect the totality of circumstances surrounding the situation at hand, including the nature and immediacy of any

threats posed to officers and others. Officers must rely on training, experience, and assessment of the situation to decide an appropriate level of force to be applied. Reasonable and sound judgment will dictate the force option to be employed. Proportional force does not require officers to use the same type or amount of force as the subject. The more immediate the threat and the more likely that the threat will result in death or serious physical injury, the greater the level of force that may be proportional, objectively reasonable, and necessary to counter it.

48. The officer must consider the potential for injury that could result from the force used. This is known as "Quantum of Force."

49. Quantum of Force: The reasonably foreseeable (to the officer) effects and injuries of a chosen force option under the totality of the circumstances of the force used

50. In this case, Eric Lurry was sitting very quietly in the rear seat of the police car with his eyes closed when they arrived at the police station. (McCue Video 2): 16:05:  Officer McCue opened the rear passenger door and told Lurry to kick his feet out. Lurry seemed startled and glanced at McCue before he closed his eyes again. McCue told Lurry to get out of the car again and Lurry stared off into the distance without any response to McCue's commands. 16:26: McCue reached into the rear seat and grabbed Lurry by the shirt and tied to pull him out of the car. Lurry didn't take any physical action to defeat the officer's grip on his shirt. In fact, Lurry didn't make any voluntary moves or take any physical action to prevent the officers from taking him out of the car.

51. The totality of the circumstances should have alerted the police officers that Lurry might be suffering a medical emergency at this point. Officer Tellez believed that Lurry put a large amount of cocaine in his mouth. Officer Tellez shared that belief with Officer McCue and the backup officers at the scene that were now at the rear of the station with Lurry. Additionally, there is evidence to support the fact that Officer Tellez also told Sergeant May that he believed that Lurry had placed drugs in his mouth.

52. Officer Tellez also stated in his deposition and statement that he saw Lurry chewing something in his mouth during the transport to the police station. When the offices arrived at the station, McCue saw Lurry acting in a way that would be consistent with a person suffering cocaine poisoning or a drug overdose. Lurry seemed to have a hard time keeping his eyes open, he had a "1000-yard stare" when he did open his eyes and gave no response to any of McCue's commands.

53. In spite of all those indicators that Lurry was suffering a medical emergency, none of the officers called for medical assistance. McCue continued to pull Lurry towards the passenger side rear door and began sternum rubs to Lurry's chest. Lurry had his hands restrained behind his back and was facing towards McCue while looking up at the roof in a blank stare. (McCue video 2 16:43) Sergeant May entered the rear seat compartment through the driver's side rear door and without any warning or command of any kind stated "hey" and hit Lurry in the face and eye. Lurry reacted with a startle and turned his head towards Sergeant May when May said, "wake up bitch."  McCue was still doing sternum rubs and pulling on Lurry's shirt when May struck Lurry in the face.

54. (McCue Video 2) 16:46: Sergeant May then grabbed Lurry around the front of his throat (area of Adams apple) with his left hand and squeezed his throat. May maintained his grip on Lurry's throat and then used his fingers to squeeze Lurry's nose at the same time. There is no reaction from Lurry when May used this force against him. He didn't try to pull his head away from May to free his nose or try to get May to release his throat. It would be highly unusual for a person to allow another person to seal off his nose and throat without at least trying to free himself so that he could breathe. Based on the totality of circumstances, any reasonable police officer would have believed that Lurry was suffering a medical emergency and in need of medical assistance. Nonetheless, the police officers didn't call for any medical assistance and instead use unnecessary and unlawful force against Mr. Lurry.

55. **DiNolfo Internal Affairs Memo**: "*P6: Conclusions: With regard to the conversation between Officer Tellez and Sgt. May, although there is no sound on the video, it shows Officer Tellez being very animated while speaking with Sgt. May. Officer Tellez is observed making movements towards his crotch and mouth while speaking with Sgt. May, which, logic dictates, is Officer Tellez relaying that he had felt a suspected "dope" package on Mr. Lurry's upper thigh and suspected that he had put the "dope" in his mouth. Sgt. May's possession of this information is important in considering Sgt. May's conduct with Mr. Lurry in the backseat of the McCue squad.*"

56. **McCue Video 1: 15:40**: Officer McCue and Tellez arrived at the police station with Lurry in the rear seat. Tellez immediately walks towards Sergeant May and engages him in conversation. Officer Tellez gestures towards his mouth and groin area as if explaining that Lurry put the drugs in his mouth. The officer's voice cannot be heard but the conversation would be consistent with Officer Tellez's actions previously when he told several other officers that he believed Lurry put the drugs in his mouth.

57. Officer Tellez agreed that he was likely telling Sergeant May that he believed Lurry had ingested drugs.(Tellez deposition 251-252)

58. Prior to entering the rear seat of the police car, Sergeant May knew that Lurry was a suspect in an illegal drug transaction involving cocaine on the day of this incident. May also knew that Lurry had a history of being a crack/cocaine dealer. There is also reason to believe that Tellez told Sergeant May that he believed Lurry swallowed cocaine before the officers transported him to the police station. Additionally, Sergeant May admitted in his statement and deposition that Lurry wasn't offering any physical resistance or threatening the officers or him in any way. Therefore, the use of force by Sergeant May was in violation of JPD policy and accepted police practices. In fact, the internal affairs investigation made the same findings regarding Sergeant May' use of excessive force.

59. **DiNolfo Internal Affairs Memo: P6: Conclusions**: "*The video in the backseat of the McCue squad shows all of Sgt. May's direct conduct with Mr. Lurry. Sgt. May stated that he went into the backseat on the McCue squad because he was directed to do so by Lt. Harrison. By his own admission, when Sgt. May looked into the squad, Mr. Lurry was not being combative, was not posing a risk to the officers, and was not trying to hurt himself. Accordingly, based upon Joliet Police Department General Order 3-1, Addendum B, there was no reason for Sgt. May to employ non-deadly force, being an open hand strike,*

*against Mr. Lurry. In fact, at that point, Sgt. May was not accomplishing any legal objective through his use of force."*

**Opinion D: Sergeant May violated JPD policies and accepted police practices when he closed Lurry's nose and squeezed Lurry's throat while Lurry was suffering a mental emergency.**

60.     **National Consensus Policy on Use of Force:** *(IV) (A) General Provisions: 3. Once the scene is safe and as soon as practical, an officer shall provide appropriate medical care consistent with his or her training to any individual who has visible injuries, complains of being injured, or requests medical attention. This may include providing first aid, requesting emergency medical services, and/or arranging for transportation to an emergency medical facility.*

61.     **Police Executive Research Forum 3 Guiding Principles on Use of Force:** *Respect the sanctity of Life by promptly rendering first Aid. Officers should render first aid to subjects who have been injured as a result of police actions and should promptly request medical attention.*

62.     There was significant evidence that Lurry was suffering a medical emergency. Sergeant May admitted in his deposition that Lurry was exhibiting all the symptoms of a drug overdose. (May deposition 58-59) Nevertheless, Sergeant May said he was assessing Lurry's condition when he struck Lurry in the head, called him a bitch, closed off his nose, squeezed Lurry's throat and pulled open Lurry's mouth. May admitted that he didn't have any medical training beyond the minimum received by police officers. In spite of the huge amount of evidence demonstrating that Lurry was in need of medical assistance, May contended that he was assessing Lurry's need for medical attention. Lurry's condition was obviously long beyond the point for an initial visual assessment that might be conducted by a police officer when he first arrives on the scene. Trained police officers know that they are not trained to assess the level of medical emergency but instead required to call for trained medical personnel as soon as they see a person present symptoms of a medical emergency.

63.     McCue Video 2: 16:53: Sergeant May is still obstructing Lurry's breathing by squeezing his nose and tells Lurry "open your mouth." May then moves his left hand from Lurry's throat area and squeezes Lurry's cheeks while still holding Lurry's nose closed with his right hand.(16:56: Officer Tellez turned off the audio portion of the video). Sergeant May continued to hold Lurry's nose closed while Lurry's mouth was closed. Lurry appears to be unconscious (eyes closed, no physical, noticeable reaction to the officer's contact) while May continues to hamper his breathing by holding his nose closed. (17:33): Sergeant May grabbed Lurry by the hair on his chin and pulled his mouth open while still holding Lurry's nose closed. There is no physical reaction from Lurry when May opened his mouth. May turned Lurry's head towards him and looks in Lurry's mouth.

64.     Sergeant May's actions after the open hand strike are consistent with the actions of an officer who believed that Lurry had drugs in his mouth. A police officer with that knowledge would be compelled by JPD policy and accepted police practices to call for medical assistance. Especially when they knew he had the drugs in his mouth since his arrest. Therefore, it goes without saying that the police should have called for medical assistance when they saw that Lurry presented symptoms of a drug overdose. The findings of the internal affairs investigation concurred with the fact that Sergeant May knew Lurry had

drugs in his mouth. Sergeant May also admitted that he believed Lurry could have drugs in his mouth when May squeezed Lurry's nose with his fingers.

65. May deposition 113:2: *Q. Okay. But at this point, at 16:48, you…would it be fair to say you believed that there was something in Mr. Lurry's mouth? A. I believe there could be Q. Okay. And no one told you that that was a possibility, that was just simply you're… You're thought that it was a possibility? A. Nobody had told me and based on the circumstances was experiencing that I had experienced in my previous interactions with people; I felt that it could be a possibility.*

66. **DiNolfo Internal Affairs Memo:** *P6: "Conclusions: Sgt. May's actions following his open hand strike of Mr. Lurry seem to indicate that he was aware that Mr. Lurry was suspected of having concealed drugs in his mouth. Sgt. May said he plugged Mr. Lurry's nose in attempt to get him to open his mouth so he could see if there were drugs in his mouth. It is notable that he did not request Mr. Lurry to open his mouth prior to plugging his nose. Sgt. May testified that the purpose of plugging Mr. Lurry's nose was to restrict air from entering his nose, so that he would have to open his mouth to breath. Sgt. May also maintained that a person cannot swallow with their nose plugged."*

67. Sergeant May was an experienced narcotics enforcement officer and admitted to seeing people put drugs in their mouth on prior occasions. Experienced police officers also know that a person can block his airway in his throat by trying to swallow a large amount of drugs in a plastic bag. Trained police officers know that people have died after swallowing drugs either by drug poisoning or by suffocating. In spite of this information, Sergeant May squeezed Lurry's nose so he couldn't breathe through his nose. Accordingly, Sergeant May would have known that the combination of closing his nose and an obstruction in his throat could completely occlude Lurry's ability to breathe. Not only did Sergeant May know that the swallowed drugs could cause asphyxia, but May also squeezed Lurry's throat while he held Lurry's nose closed compounding the danger.

68. **JPD Use of Force G.O. 3.1: 2.2**: *Members are authorized to use Department approved nondeadly force techniques and issued equipment that is necessary to effect an arrest or resolve an incident when necessary: A. to protect themselves or others from physical harm; or B. to restrain or subdue a resistant individual, or C. to bring an unlawful situation safely and effectively under control.*

69. It is my understanding that an officer's use of force is governed by the reasonableness standard set forth in *Graham v. Connor*; the "reasonableness" analysis in an excessive force case is an objective one. That means that the question is whether the officer's actions are "objectively reasonable" based on the facts and circumstances confronting him/her without regard to his/her underlying intent or motivation. The officer's own personal feelings, fear, anger, frustration, etc., are not factors but rather the assessment is based on the perspective of a reasonable officer on the scene. Courts are supposed to determine the reasonableness of the officer's actions based upon whether another officer placed in that same set of circumstances would reasonably perceive that there was a need to use the amount of force used in the given situation

70. Eric Lurry was suffering a medical emergency while in the back seat of the police car. Lurry was not threatening to harm police officers or himself nor was he physically resisting. Instead of seeking medical

assistance for Lurry, Sergeant May used physical force against Lurry while he sat in a semi unconscious or unconscious state. Sergeant May should have sought medical assistance for Lurry instead of using force against him. Sergeant May claimed that he was attempting to open Lurry's mouth so he could extract the drugs. The situation had gone long past a time when a police officer would be concerned about protecting any evidence that might be in Lurry's mouth. Sergeant May was more concerned about preserving evidence in his criminal case then he was about Lurry's safety. Lurry needed medical attention and the Joliet police officers did not provide it.

71.   Police officers are discouraged from using force to seize evidence especially when the officer tries to restrict the suspect's breathing. **Lexipol Model Policy: 300.3.5 USE OF FORCE TO SEIZE EVIDENCE**: *In general, officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, officers are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, officers should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Officers are encouraged to use techniques and methods taught by this agency for this specific purpose.*

**Opinion E:  Lieutenant Harrison, Officer McCue and Sergeant May violated JPD polices and accepted police practices when Officer McCue inserted a police baton inside Lurry's mouth.**

72.   McCue Video 2: 17:47: Sergeant McCue is seen in the video pulling on Lurry's chin hair to open his mouth while still holding Lurry's nose closed. Sergeant May stated in his deposition that Lurry had bags in his mouth. May notified the other officers including Lt. Harrison. Sergeant May stated "We didn't want them to be an issue or he possibly ingest them or..or cause any problems." (May dep. 149). According to May, Lt. Harrison announced "Hey, don't stick your hand in there, he can bite you're your finger off. Use a flashlight or..or a baton or something to prop his..Basically..basically so your finger doesn't get bit off." (May dep. 150) None of the officers, including Lt. Harrison and Sergeant May made any effort to call for medical assistance. By Lieutenant Harrison's own admission, the police were not equipped to remove chewed bags of cocaine from someone's mouth. The para medics would have been better trained and better equipped to remove the bags from his mouth and treat his medical condition. Additionally, Sergeant May admitted that the police department hadn't trained them in how to remove drugs from a person's mouth either. (May deposition 144:13)

73.   McCue Video 2: 17:48: Sergeant May still held Lurry's nose closed and his mouth open. Officer McCue then introduces an extended metal ASP baton and inserts it into Lurry's open mouth. By doing so, McCue reveals what has been described as bags of cocaine in Lurry's mouth. McCue then inserts the baton in deeper into his mouth and tries to hold open Lurry's mouth so he can remove the bags. McCue pries and probes inside Lurry's mouth striking inside Lurry's mouth including his teeth. In spite of having a metal baton inside his mouth, Lurry doesn't react or attempt to pull away from the baton. Lurry is showing definite signs of a medical emergency due to a drug overdose and the police still ignore those signs and fail to call for medical assistance.

74.    The Police Baton (ASP) is an impact weapon authorized as a use of force by the Joliet P.D. The baton is a weapon used for striking when the subject poses active resistance. The baton is not to be used against a compliant subject or certainly not against a person needing medical assistance. The JPD General Order is consistent with accepted policies across the country in that officers are prohibited from using the baton above the neck at any time. There is nothing in the JPD General Order which provides an exception for "inserting" a baton inside a person's mouth. There is, however, a prohibition against using the baton above the neck.

75.    **JPD Use of Force G.O. 3.1: 4. 2:** *When using the police baton, members should aim blows to the area below the neck. A blow to the head or neck area with a police baton could cause death or great bodily harm.*

76.    **JPD 7.1 Code of Conduct** *:1.1I  Members shall use department Department equipment only for its intended purpose, in accordance with Department procedures and shall not abuse, damage, or negligently lose Department equipment. All Department equipment issued to members shall be maintained in proper working order. Any damaged or missing equipment shall be reported in writing to the member's direct supervisor.*


**Opinion F. The failure of the defendant police officers to follow JPD policies and accepted police practices prevented Lurry from receiving adequate and timely medical care.**

77.    Joliet police officers had numerous opportunities to help Mr. Lurry. Officer Tellez and Officer McCue believed that Lurry put cocaine in his mouth when they tried to search him prior to his arrest. Police officers are trained in recognizing drug overdoses and the fact that overdoses can cause serious injury and death. The officers also know that a person can overdose by swallowing cocaine. In addition, the Joliet police officers are aware that it has become common across the country and in Will County for cocaine to be mixed with opiates such as fentanyl.

78.    **Will County Illinois Website:** *What's happening in Will County: Article: Local Authorities report sudden spike in overdose deaths due to cocaine mixed with fentanyl: 9/25/19 : "When people use illegal narcotics, they never know what is truly in them," said Joliet Police Chief Al Roechner. "Unfortunately, this can lead to people overdosing on potentially fatal substances. We want to let the public know we are fully investigating these cases. We also want to make the public aware that it appears cocaine is now being mixed with fentanyl. I encourage anyone dealing with addiction issues to please seek help."*

79.    The Joliet Police Officers have received the training to recognize a drug overdose and the training for treating the individual having an overdose by administering "Narcan." In fact, Officer Tellez was trained and authorized to use "Narcan." However, Officer Tellez stated in his deposition that he didn't have "Narcan" with him that day and never administered the treatment to Lurry. Tellez didn't try to acquire "Narcan" either when he first learned that Lurry swallowed drugs or when Tellez was at the police station with Lurry.

80. Sergeant May was asked in his deposition why he didn't ask someone to administer "Narcan" to Mr. Lurry. Sergeant May claimed that he didn't think they would deal with heroin or fentanyl since the drug deal involved cocaine. (May 206) That claim by Sergeant May is not consistent with the statement made by Chief Roechner in 2019 warning the public  "cocaine is now being mixed with fentanyl". It would seem unlikely that the police chief knew this, but the supervisor of the drug unit didn't.

81. Officers Tellez and McCue placed Lurry in the rear of the police car without searching him for the drugs or even asking him to open his mouth. Tellez and McCue then transported Lurry to the police station in routine mode without any signs of urgency. The officers didn't properly monitor Lurry in the back seat and the video revealed Lurry chewing during the drive to the police station. Tellez saw Lurry chewing twice but didn't stop the car, didn't call for an ambulance and didn't take any measures to ensure Lurry's safety. Tellez could have called for another police unit to bring him "Narcan", but he didn't. The officers continued their routine drive to the police station and parked in the rear of the station.

82. Officers Tellez and McCue had enough information to believe that Lurry had placed cocaine in his mouth. The officers failed to follow the JPD policy which requires officers to protect anyone in their custody.

83. **JPD 13.1 Arrests of Offenders** *(5.) Medical care for Arrested Persons: 5.2: Procedures: A. If an officer has reason to believe that anyone in his custody requires medical attention or is in need of mental evaluation/treatment, that person will be transported to the appropriate hospital by the Joliet Fire Department ambulance prior to processing, unless circumstances prohibit.*

84. The accepted police practices throughout the country require police officers to protect anyone in their custody.

85. **IACP Transportation of prisoners Model Policy:** *IV F. Prisoner Well-Being: The physical well-being of prisoners shall be monitored at all times. 1. Particular attention shall be directed to persons reported or suspected of being under the influence of drugs and/or alcohol, those with mental illness or an intellectual/developmental disability, or who have a history or propensity for violence. 2. Prisoners who are visibly injured or report/display symptoms of injury or illness shall be provided emergency medical attention.*

86. **IACP  Transportation of Prisoners Model** *Policy II: It is the policy of this agency to treat all prisoners in a humane manner and with due regard for their physical safety and protection consistent with sound principles of prisoner security. Officers shall take the precautions necessary while transporting prisoners to protect the lives and safety of officers, the public, and the person in custody.*

87. **IACP Arrest Model Policy:** *5 (a): Post-Arrest Protection a. Officers shall be aware that, following an arrest, they are legally responsible for the safety of the arrestee, any victims present, and all bystanders. Therefore, officers shall take all steps reasonably necessary to protect(1)the officer from the arrestee,(2)victims and third persons from the arrestee, and(3)the arrestee from self-injury or injury by others.*

88. When Officer Tellez and McCue arrived at the station, Lurry was showing signs of suffering from a drug overdose consistent with police training and the JPD policy.

89. **JPD Opioid Overdose Prevention Initiative**: *5.1: The member will first determine if the person may be suffering from an overdose of an opiate by conducting a patient assessment for the following signs: A. Shallow or no breathing B. Cyanotic Lips C. Unresponsive to pain stimuli (i.e., sternum rub) D. Presence of drugs, paraphernalia, or instruments associated with its illegal use.*

90. The officers on the scene believed that Lurry had placed cocaine in his mouth. The officers knew that cocaine in the mouth could cause an overdose which could cause death. It was well known at the time that cocaine was being mixed with opiates. Sergeant May, Lt. Harrison, Officer Tellez and Officer McCue still made no effort to administer the treatment for a drug overdose.

91. **American Addiction Centers:** *1/28/22: Cocaine Overdose Signs, Symptoms & Treatment: Polydrug use in cocaine overdoses is common, especially in overdoses resulting in death. Opioids, a drug group that includes prescription painkillers, are associated with a large number of cocaine deaths every year. It's a trend that is on the rise as well, according to NIDA. In 2010, the numbers of cocaine overdose deaths involving opioids and those not involving opioids were essentially equal. By 2015, the number of annual cocaine overdose deaths involving opioids had more than doubled, while overdose deaths not involving the use of opioids had increased at a much less significant rate. This implies that not only is polydrug use with cocaine increasing, but it's also becoming more fatal.*

92. **JPD Opioid Overdose Prevention Initiative:** *1.1: Joliet Police Department members may administer Narcan when an opioid overdose is indicated in accordance with the mandated training guidelines as determined and provided by the Will County Health Department (WCHD) and pursuant to 20 ILCVS 301/5-23 (Public Act 96-361)*

93. The defendant police officers had numerous opportunities and remedies to protect Lurry and save him from the overdose. A. a search would have confirmed Tellez's belief that he had drugs in his mouth. B. The officers should have called for an ambulance as soon as they believed Lurry placed drugs in his mouth. C. Officer Tellez could have called for another unit to bring him "Narcan". D. The officers should have called for an ambulance during Lurry's transport especially when Tellez saw Lurry chewing. E. Lt. Harrison, Sergeant May and Officers Tellez and McCue witnessed all the symptoms of an opiate drug overdose and should have called for "Narcan", should have called for an ambulance immediately upon arrival.

94. According to the information provided, the defendant officers knew that Lurry had placed drugs in his mouth for at least 13 minutes and 9 seconds before they called for medical assistance. The McCue video 2 indicates that Officer Tellez acknowledged that Lurry had placed drugs in his mouth at 4:55; "He might have put a bunch of it in his mouth." According to Lieutenant Harrison, they didn't call for medical assistance until the time when the officers began to remove Lurry from the vehicle. *"Next thing that I remember happening is at some point, Sergeant May had said "We gotta get him out, I don't think he's breathing and at that point, I immediately got on our radio to…requested an ambulance…".* (Harrison deposition 200: 16). It is difficult to tell the exact time that Harrison called for the ambulance but based on the video and Lieutenant Harrison's deposition, it would have been some time after McCue removed the asp from Lurry's mouth at McCue video 2 18:14 since they were not making any efforts to take Lurry

from the vehicle prior to that. The police officers failed to call for medical assistance for at least 13 minutes and 9 seconds. In my opinion, Lt. Harrison, Sergeant May, Officers Tellez and McCue violated accepted police practices and JPD policies when they failed to take the appropriate measures to provide medical care for Mr. Lurry throughout that extended time.

**Opinion G: Officer Tellez violated JPD policies and accepted police practices when he intentionally deactivated the video system on the police vehicle rear camera.**

95. (McCue video 2 16:43) Sergeant May entered the rear seat compartment through the driver's side rear door and without any warning or command of any kind stated "hey" and hit Lurry in the face and eye. Lurry reacted with a startle and turned his head towards Sergeant May when May said, "wake up bitch."

96. (McCue Video 2 16:56) Officer Tellez turned off the video system for the rear seat in the police vehicle thereby disabling the audio portion of the recording. There wasn't any further sound on the video after that point. Officer Tellez admitted in his deposition that he intentionally turned the video off after he saw Sergeant May strike Lurry in the head and yell "Wake up bitch." Tellez said he turned off the video because he was surprised by May's actions; "You're..you're not supposed to do that" (Tellez deposition 262:14). Tellez agreed that May's actions were "wholly inappropriate" so he turned off the video. (Tellez deposition 261)

97. Officer Tellez turned off the video system for the rear seat even though Lurry and the police officers were still in the back seat. Tellez admitted in his statement to Stephen DiNolfo that he turned off the video system in part, because of Sergeant May's misconduct when he struck Lurry in the head and called him a "bitch". Tellez agreed that Sergeant May's conduct was in violation of JPD policies. (DiNolfo memo p. 7)

98. **Joliet Police Department General Order 9-21**: *In-squad Video System Operations, Subsection: 3. C. Members will have their ISVS activated during transports of custodial and non-custodial arrests or any other citizen transport.*

99. As a result of an internal affairs investigation, charges for violation of General Order 9-21 were sustained against Officer Tellez. **DiNolfo Memo p. 8**: "*Conclusions: Upon arrival at the police station, Officer Tellez's conduct of checking and turning off the system in the parking lot once Mr. Lurry was slapped and called a "bitch" also violated General Order 9-21.*"

100. Officer Tellez violated JPD polices and accepted police practices when he intentionally deactivated the video system for the rear of the police vehicle while Lurry was still in the vehicle. The purpose of a police video system is to document law enforcement interaction with the public through video and audio recordings. It is intended to better protect the rights of citizens and police officers. Officer Tellez showed a deliberate disregard for JPD policies and the rights of Mr. Lurry.

**Materials Considered:**

First Amended Complaint
McCue Video Ex. 1
McCue Video Ex. 2
Depositions:
Nicholas Murphy
Andrew McCue
Jose Tellez
Jeremy Harrison
Douglas May
JPD G.O. 9032 Opioid Overdose
Police reports: Hunt, Tellez, Shaughnessy, Ranstead, Wieting, Soustek, Sepulveda, Harrison, May, Darcy, Hernandez
Coroner's Report
CAD
Booking Documents
Photographs of Deceased
JPD 13.1 Arrests of Offenders
JPD 7.1 Code of Conduct
JPD Use of Force G.O. 3.1: 4. 2
JFD Reports
Rules of Conduct
Harrison Training File
McCue Training Files
May Training File
Grundy Force Case Report
Internal Affairs Investigation
IACP   Transportation of Prisoners Model Policy II
IACP Transportation of Prisoners Concepts and Issues Paper
Police Executive Research Forum 3 Guiding Principles on Use of Force:
IACP National Consensus Policy on Use of Force
Will County Illinois Website
IACP Arrest Model Policy


**Expert Witness Testimony for the Past Four Years:**

Perez v. Collier County (plaintiff)
United States District Court
Middle District of Florida
Case No.: 2:15-cv-238-FTM-CM
Use of force/Taser/Flashlight

Testified in deposition

Doel Santiago v. City of New Haven (plaintiff)
Superior Court at New Haven, Ct.
Case No.: NNH-CV-13-6037147-S
Use of Force
Testified in deposition

Parnoff v. Aquarion Company et Al. (plaintiff)
Superior Court, Bridgeport, Ct.
Case No.: CV14-6045191-S
Criminal Investigations/Arrest Procedures
Testified in deposition

Secic v. City of St. Louis (plaintiff)
Missouri Circuit Court
Twenty Second Judicial Circuit (St. Louis City)
Case No: 1522-cc-00228
Vehicular Pursuit
Testified in Trial

Lowrie v. General Motors et al. (plaintiff)
Missouri Circuit Court
Twenty Second Judicial Circuit, St. Louis , Mo.
Case No: 1422-CC08909
Traffic management/control

Michael Ray West v. Bartow County, Georgia et al. (plaintiff)
United States District Court
Northern District of Georgia
Case No: 15-CV-00168
Use of Force (Taser)
Testified in deposition

Ray v. Markley, Cain & Washington City  (Plaintiff)
United States District Court
Western District of Pennsylvania
Pittsburgh, Pa.
Case No.: CV-13-1483-DSC
Use of Force /handcuffing
Testified in trial

Myers v. City of Haleyville et al (plaintiff)
Circuit Court of Marion County, Alabama
Case No.: 49-CV-2015-9000152
Emergency vehicle operation
Testified in deposition
James v City of Chicago (plaintiff)
United States District Court
Northern District of Illinois
Eastern Division
Case No.:14 CV 7955
Use of Force
Testified in deposition

Capasso, et al. v. City of Westlake, Ohio et Al. (plaintiff)
United States District Court
Northern District of Ohio, Eastern Division
Case No.: 1:16-cv-01753
Vehicular Pursuit/Stop Sticks
Testified in deposition

Janice Wilson v. City of New Haven et Al. (plaintiff)
Judicial District of New Haven
New Haven Connecticut
Case No: CV10-6010876-S
Narcotics Investigation/Fail to provide medical aid
Testified in deposition

Otha Johnson v Daytona Beach (defense)
United States District Court
Middle District of Florida, Orlando Division
Case no.: 6:16-cv-9410Orl-40-TBS
Use of force /Temporary Detentions//Arrest
Testified in deposition

BethAnne Thomas v. City of Blue Island et Al. (plaintiff)
United States District Court
Northern District of Illinois
Case No.: 14-cv-11183
Criminal investigation/internal affairs
Testified in deposition

David Shearon v. Womack et Al. (defense)
United States District Court, Middle District of Tennessee
Nashville Division
Case No.: 3:15-cv-01061
Internal affairs/Supervision
Testified in deposition

James v City of Chicago (plaintiff)
United States District Court
Northern District of Illinois
Eastern Division
Case No.:14 CV 7955
Use of Force
Testified in trial

David Potter v. City of Dothan (plaintiff)
United States District Court
Northern District of Alabama, Southern Division
Case No.: CV-1:16CV-749-CSC
Use of Force
Testified in deposition

Andrew Aragon v. City of Espanola et Al. (plaintiff)
First Judicial District, Rio Arriba, New Mexico
Case No.: D-117-CV-2016-00147
Use of Force (Taser)
Testified in deposition

Myers v. City of Haleyville et al (plaintiff)
Circuit Court of Marion County, Alabama
Case No.: 49-CV-2015-9000152
Emergency vehicle operation
Testified in trial

Julian Ray Betton v. Bill Knowles et al (plaintiff)
Case No. : 4:15-cv-04638-RBH-KDW
United States District Court
District of South Carolina
Florence Division
Officer Involved Shooting/Search Warrant Execution

Testified in deposition

McGowan v. County of Kern (plaintiff)
Case No.: 1:15-CV-01365-DAD-SKO
United States District Court
Eastern District of California
Emergency driving
Testified in deposition

Nelson v. Brevard County Sheriff's Office (plaintiff)
Case No: 05-2013-CA-038400
Eighteenth Judicial Circuit, Brevard County
Narcotics investigation/Search Warrants
Testified in deposition

Chelsey Marie Browder V. Greenville County Sheriff's Office, et al. (defense)
Case No: 6:16-cv-02493-HMH-JDA
United States District Court
District of South Carolina
Officer Involved Shooting/Failure to supervise/train
Testified in deposition

Byron Jordan v. Iverson Mall (plaintiff)
Case No.: 8:14-cv-00037-RWT
United States District Court
District of Maryland
Use of force/Taser
Testified in trial

Childress v. North Charleston Police Department (plaintiff)
Case No.: 2017-CP10-1119
State of South Carolina
County of Charleston
Temporary detention/use of force
Testified in deposition

LeGrier v Chicago (plaintiff)
Case No.: 15-L 12964
Circuit Court of Cook County
Cook County, Illinois
Testified in deposition

OIS/Use of Force

Estate of Fritz Severe v. City of Miami (plaintiff)
Case No.: 17-cv-22153-DPG
United States District Court
Southern District of Florida
OIS/Use of Force
Testified in deposition

Ortega v. Pierce County (plaintiff)
Case N.: 17-2-11836-8
Superior Court of the State of Washington
Pierce County, Washington
Domestic Violence/Criminal Investigation
Testified in deposition

Joseph v. Bartlett, et al. (plaintiff)
Case No.: 17-cv-5051
United States District Court
Eastern District of Louisiana
Use of Force/Taser/Medical Care
Testified in deposition

Lweh Htoo    (plaintiff)
Case No.: HHD-CV17-6079945-S
Superior Court, Hartford, Ct.
Vehicle Pursuit
Testified in deposition

Annas v. Pierce County (plaintiff)
Case No.: 18-2-07321-4
Superior Court of the State of Washington
County of Pierce
Domestic Violence/Criminal Investigation
Testified in deposition

Prosper v. Martin (plaintiff)
Case No.: 17-20323-CIV-Altonaga/Sullivan
United States District Court
Southern District of Florida
Officer Involved Shooting

Testified in deposition

Moreno v. Meriden Police Department (plaintiff)
Case No.:27943.001
Holding Cell Procedures
Holding Cell Procedures
Testified in deposition

Amanda Hoskins v. Knox County et al. (plaintiff)
Case No.: 17-cv-84
United States District Court
District of East Kentucky
Criminal Investigation
Testified in deposition

Evans v. Melara (plaintiff)
Case No.: 439733V
Circuit Court for Montgomery County, Maryland
Emergency Driving Operation
Testified in trial

Pendry, Adm. of the Estate of Anthony Hufford v. City of Troy P.D et al. (Plaintiff)
Case No.: 2018-cv-01676
Common Pleas Court
Montgomery County, Ohio
Vehicular Pursuit
Testified in deposition

Howard v. City of Durham (Plaintiff)
Case No.: 1:17-cv-477
United States District Court
Middle District of North Carolina
Criminal Investigation
Testified in deposition

Holmes v Hernandez et al (Plaintiff)
Case No.: 14CV8536
United States District Court
Northern District of Illinois
Eastern Division
Officer Involved Shooting

Testified in deposition

Ann Tracy DeLeo v Ryan Houk et al. (Plaintiff)
Case No.: 5:19CV00027-RH-MJF
United States District Court
Northern District of Florida
Use of Force
Testified in deposition

James B. Griffin as Personal representative of James Olvey, Deceased v.
Donald Hornsby Wright II et al. (Plaintiff)
Case No.: CV-2018-903480
Circuit Court of Jefferson County, Alabama
Birmingham Division
Vehicular Pursuit
Testified in deposition

Peralta v. State of Arizona (Plaintiff)
Case No.: CV-17-01868-PHX-DJH (BSB)
United States District Court
District of Arizona
Holding cell/police procedures
Testified in Trial

Beltran v. City of Tacoma (Plaintiff)
Case No.:15-2-11618-1
Superior Court of the State of Washington
County of Pierce
Officer Involved Shooting
Testified in deposition

DeGraw  v. Pinellas County Sheriff's Office (Plaintiff)
Case No.: 8:18-cv-02116-WFJ-SPF
United States District Court
Middle District of Florida
Use of Force, Taser
Testified in deposition

William Anderson v. Knox County et Al. (Plaintiff)
Case No.: 17-cv-133
United States District Court

Eastern District of Kentucky
Criminal Investigation
Testified in deposition

William Anderson v. Knox County et Al. (Plaintiff)
Case No.: 17-cv-133
United States District Court
Eastern District of Kentucky
Criminal Investigation
Testified in deposition

Johnnie Williams v. Strickland (Plaintiff)
Case No.: 9:15-cv-01118-DCN
United States District Court
District of South Carolina
Officer Involved Shooting
Testified in deposition

Miller v Montgomery County (plaintiff)
Case No.: 18-CV-619
United States District Court
Eastern District of Kentucky
Criminal Investigation
Testified in deposition

Hall v. City of Atlanta (defense)
Case No.: 1:18-cv-04710-ELR
United States District Court
Northern District of Georgia
Atlanta Division
Admin/IA investigation

Howard v. City of Durham (Plaintiff)
Case No.: 1:17-cv-477
United States District Court
Middle District of North Carolina
Criminal Investigation
Testified in trial

Howard v. Kirksey (plaintiff)
Case No.: CV-19-904908

Circuit Court of Jefferson County, Alabama
911 Operator procedures
Testified in deposition

Canney, Bestenlener v. Phoenix et al. (plaintiff)
Case No.: CV2019-011516
Superior Court of the State of Arizona
County of Maricopa
Vehicular Pursuit
Testified in deposition

Skeen v. Sparks et al (Plaintiff
Case No: 1:200cv00017
United States District Court
Western District of Virginia
Arbingdon Division
OIS/Use of Force
Testified in deposition

**Publications:**

Dig Deeper to Address Officer Involved Shootings: Orlando Sentinel, 5/26/13

Police Leaders Must Walk the Walk, Pursuit Driving: Orlando Sentinel, 2/19/12

Save Community Policing: Orlando Sentinel, 5/25/11

State Cracks Down on Unlicensed Activity, Orlando Sentinel, 3/18/09

The Threat Abatement Group, Police and Security News, 11/95

**Compensation:**

My fees for this case are $225.00 per hour to review and analyze relevant material and $325.00 per hour to testify in depositions or trial in the State of Florida and $2,500.00 per day plus expenses to testify in deposition or trial out of the State of Florida.

Submitted by:

**Charles W. Drago**