In Demand Electronic Court Reporting, Inc. www.InDemandReporting.com (773) 239-6008

---

**Page 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
-------------------------------------------------
Nicole Lurry,

      Plaintiffs,

  vs.              Case Number 1:2020cv04545

City of Joliet, et al.,

      Defendants.
-------------------------------------------------

Remote Videoconference Deposition of
Andrew Paul McCue
Friday
November 12, 2021

-Video Recorded Remotely by-

In Demand Video Court Reporting
216 South Jefferson Street
Suite 103
Chicago, Illinois 60661

---

**Page 2**

APPEARANCES

For the Plaintiff:

  Ronak P. Maisuria
  Abby Bakos
  Bakos & Maisuria
  1755 S. Park Street
  Suite 200
  Naperville, Illinois 60563

For the Defendants:

  David Mathues
  Michael Bersani
  Hervas, Condon, & Bersani, P.C.
  333 Pierce Road
  Suite 195
  Itasca, Illinois 60143

Also present:

  Nicole Lurry
  Jose Tellez

---

**Page 3**

EXAMINATION INDEX

| DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|
| 5 | 253 | 257 | -- |

EXHIBIT INDEX

| EXHIBIT NUMBER | PAGE NUMBER |
|---|---|
| 1 - | 185 |
| 2 - | 209 |
| 3 - | 242 |
| 4 - | 247 |
| 5 - | 248 |

---

**Page 4**

THE RECORDER: Good morning. We are now on record on November 12th, 2021. The time is 10:11 a.m. By agreement of all parties, we are convened via remote videoconference for the video-recorded deposition in the matter of Nicole Lurry versus City of Joliet, et al., Case No. 20 CV 4545, before the Northern -- before the United States District for the Northern District of Illinois, Eastern Division.    0:00:29

This deposition is being recorded remotely by In Demand Court Reporting, located at 216 South Jefferson Street, Chicago, Illinois 60661, on behalf of the Plaintiff and being taken at the instance of the Plaintiff. The witness today is Andrew Paul McCue.    0:00:41

Mr. McCue, my name is Christina Kollintzas. I'm a notary public and the video recording device operator for this deposition. At this time, would you please raise your right hand for the oath?    0:00:49

(Witness sworn)

THE RECORDER: Thank you.

Would the attorneys please state their appearances for the record?    0:00:58

MS. BAKOS: Abby Bakos on behalf of Plaintiff.

MR. MATHUES: David Mathues on behalf of the Defendant.

**Page 65**

1 pupil sizes, difference in, you know, their reaction --
2 reaction to, you know, what's around them.     1:21:11
3     Like we said, if -- if they're incoherent.
4 If they're even conscious. And it'd be like the
5 paraphernalia that's around them.     1:21:30
6     Q. Okay. Anything --
7     A. And --
8     Q. -- else?
9     A. No.     1:21:37
10     Q. Okay. And is all this information related to
11 the pupil size, reaction to what's going on around
12 them, being incoherent, conscious, and the
13 paraphernalia -- is that all information that you
14 received from other officers after January 28th, 2020
15 or before?     1:21:55
16     A. No, it would be after.
17     Q. You never received this information before
18 January 28th, 2020. Is that what you're saying?     1:22:02
19     A. Not that I can recall.
20     Q. Did you -- aside from what other officers
21 have told you, did you have any independent knowledge
22 about the effects of narcotics on an individual?     1:22:17
23     MR. MATHUES: Objection to foundation.
24     THE WITNESS: Any personal knowledge? No.
25 BY MS. BAKOS:

**Page 66**

1     Q. Okay. Were you ever trained that an
2 individual who may be under the influence of -- I'm
3 sorry. Give me one second here.     1:22:41
4     Maybe -- strike that.
5     Have you ever been trained about an
6 individual who may be overdosing, their eyes may roll
7 back?     1:23:01
8     MR. MATHUES: Objection to foundation and
9 vagueness as to overdosing. On what?
10 BY MS. BAKOS:
11     Q. On narcotics.     1:23:11
12     A. I know now that that is a symptom.
13     Q. The eyes rolling back?
14     A. That it is a -- it is a symptom, depending on
15 the individual, depending on the narcotic.     1:23:25
16     Q. Okay. And is that information that you
17 received from other police officers or did you get that
18 information elsewhere?
19     A. The other officers. Just -- just within
20 time.     1:23:36
21     Q. At any time when you were interacting with
22 Mr. Lurry on January 28th, 2020, did you observe his
23 eyes rolling back?
24     A. From what I recall, while we were in the back
25 of the patrol car, yes.     1:23:52

**Page 67**

1     Q. Okay. And was this before or after you were
2 at the Joliet police station with Mr. Lurry?
3     A. We were at the station already.     1:24:00
4     Q. And was this before or after you performed a
5 sternum rub on Mr. Lurry?
6     A. I can't recall.     1:24:18
7     Q. Do you remember seeing Mr. Lurry's eyes
8 rolling back when you were en route to the station?
9     A. No.     1:24:26
10     Q. We're going to look at the video, so we'll
11 discuss that a little more.
12     Were you ever trained that shallow breathing
13 is a sign -- is a potential sign of a drug overdose?     1:24:44
14     A. At the time of the incident, no.
15     Q. Are you aware of that now?
16     A. Yes.     1:24:49
17     Q. Is that information that you were given by
18 fellow police officers?
19     A. Yes.
20     Q. Did you get that information from anywhere
21 else?     1:25:00
22     A. From the incident.
23     Q. Okay. What do you mean from the incident?
24     A. Based on how Mr. Lurry's body responded in
25 the back of the car and on the ground outside of the

**Page 68**

1 car.     1:25:17
2     MS. BAKOS: Can you guys give me a second?
3 Can you give me two minutes?
4     MR. MATHUES: That's --
5     THE WITNESS: Yes.
6     MR. MATHUES: -- fine.     1:25:27
7     MS. BAKOS: Okay. I'm sorry.
8     THE RECORDER: Off the record, 11:49 a.m.
9         (Off the record)
10     THE RECORDER: Back on the record, 11:51 a.m.     1:25:34
11 BY MS. BAKOS:
12     Q. Okay. So we were talking about shallow
13 breathing. And I just want to be clear.     1:25:42
14     Did you observe Mr. Lurry experiencing what
15 you believed to be shallow breathing on the day of the
16 incident?
17     A. From what I can recall. Yes.     1:25:54
18     Q. Okay. And was that before or after you
19 arrived at the station with Mr. Lurry?
20     A. It would've been after.     1:26:05
21     Q. Was it before or after you performed the
22 sternum rub?
23     A. From what I can recall, it would've been
24 after.     1:26:17
25     Q. And was it before or after narcotics were

In Demand Electronic Court Reporting, Inc. www.InDemandReporting.com (773) 239-6008

**Page 69**

1 removed from Mr. Lurry's mouth?
2  A. I cannot recall at the time. 1:26:39
3  Q. And you are aware as you sit here today that
4 shallow breathing is a sign of narcotics intoxication
5 or a narcotics overdose, correct?
6  A. I know that now, yes. 1:26:55
7  Q. And again, that's just information that you
8 received from other police officers. Is that fair to
9 say?
10  MR. MATHUES: Objection to asked and
11 answered. 1:27:01
12  THE WITNESS: Yes.
13 BY MS. BAKOS:
14  Q. Okay. And is it your understanding that an
15 individual who is unconscious could also be in the
16 midst of an overdose? 1:27:16
17  MR. MATHUES: Objection to foundation.
18  THE WITNESS: I know that now, yes.
19 BY MS. BAKOS:
20  Q. Okay. Again, is that information that you
21 got from other officers? 1:27:27
22  A. Correct.
23  Q. Did you get that information from anyone
24 else?
25  A. No. 1:27:37

**Page 70**

1  Q. And do you know the name of -- of the
2 officers who gave you that information?
3  A. No, I do not.
4  Q. Do you know the names of the officers who
5 informed you about the -- the shallow breathing
6 symptom? 1:27:48
7  A. No, I do not.
8  Q. And then are you aware that an individual
9 whose body is limp -- that may be a sign of -- of an
10 overdose? 1:28:12
11  A. Yes, I know that now.
12  Q. You did not know that at the date of the
13 incident?
14  A. No, I did not. 1:28:18
15  Q. Is that information that you got from other
16 officers as well?
17  A. Yes.
18  Q. You do not have any formal training that
19 informed you that that is one of the symptoms of a drug
20 overdose. Correct? 1:28:36
21  A. Correct.
22  Q. Do you know what cocaine smells like?
23  A. No, I do not. 1:28:53
24  Q. Do you know what fentanyl is?
25  A. Yes.

**Page 71**

1  Q. And what is your understanding of what
2 fentanyl is? 1:29:10
3  A. That it's a deadly narcotic and it's illegal.
4  Q. Are you aware that an individual who is under
5 the influence of fentanyl may experience dizziness? 1:29:27
6  A. No, I do not know.
7  Q. What about confusion?
8  A. No. 1:29:33
9  Q. What about respiratory depression?
10  A. No.
11  Q. Okay. So no police officers have ever
12 explained to you what the symptoms of an individual who
13 is overdosing on fentanyl might be. 1:29:52
14  Is that fair to say?
15  A. No. It -- it's been discussed about
16 fentanyl. As far as exact -- as far as exact symptoms
17 an individual may have, I -- I cannot recall exactly,
18 no. 1:30:10
19  Q. Okay. You can't recall an officer explaining
20 that to you?
21  A. No. I do know we've talked about it, yes. 1:30:17
22  Q. Oh, you have talked about it with an officer.
23  A. Yeah, as a -- I mean, fentanyl's one of the
24 number one things right now that's -- officers are
25 worried about. 1:30:26

**Page 72**

1  Q. Okay. Why do you say that?
2  A. Because it's everywhere now.
3  Q. And -- oh, how do you know that it's
4 everywhere now? 1:30:37
5  A. The word through the department, social
6 media, news platforms.
7  Q. Have you ever seen anyone who you know to be
8 under the influence of fentanyl? 1:30:49
9  A. Not actively, no.
10  Q. How long has fentanyl been a -- this number
11 one thing that you're discussing? 1:31:08
12  MR. MATHUES: Objection to form, vague, and
13 foundation.
14  THE WITNESS: I don't know.
15 BY MS. BAKOS:
16  Q. Was it a -- a major issue back in January of
17 2020, if you know? 1:31:20
18  MR. MATHUES: Objection to form. Vague.
19  THE WITNESS: I know that it was covered
20 while at the Academy, that fentanyl was something being
21 placed into the common drugs now. 1:31:34
22  As far as anything further than that, no, I
23 do not know.
24 BY MS. BAKOS:
25  Q. What do you mean by placed into common drugs? 1:31:42

In Demand Electronic Court Reporting, Inc www.InDemandReporting.com (773) 239-6008

1  A. The cocaine, heroin, that everybody's putting
2  the fentanyl into that.
3  Q. Okay. So just so I understand you right.
4  Are you saying that at the Academy, you were trained
5  that individuals have been, at least recently at that
6  time, mixing cocaine with fentanyl and mixing fentanyl
7  with other drugs?					1:32:08
8  A. Correct.
9  Q. Okay. So when you were at the Academy, did
10 they train you about the specific things to look for to
11 determine if someone is under the influence of
12 fentanyl?						1:32:24
13 A. Fentanyl -- fentanyl itself directly, no.
14 Q. Okay. What about cocaine?
15 A. Oh. The Academy -- so yes, the Academy did a
16 basic drug course to show new officers what kind of
17 drugs are out there, what they look like, and the
18 basics of what they're used for.			1:32:58
19     Very basic possible symptoms, differences
20 between the street values of them. You know, where
21 they're coming from, and stuff of that nature.	1:33:10
22     Everything was -- it's a very -- it's a very
23 broad and basic class.
24 Q. Okay. So would it be fair to say you've
25 never had any real in-depth training with respect to

73

1  the effects of specific drugs?			1:33:26
2      MR. MATHUES: Objection to form and
3  foundation.
4      THE WITNESS: Okay, I feel like I need to
5  rephrase this as -- as you asked me prior if -- if I
6  had any formal training.				1:33:43
7      And the Academy should be considered formal
8  training. As far as an in-depth class on a specific
9  narcotic, no. As a basic of narcotics and what they do
10 to you as a -- as a -- as a -- as a symptom, yes.	1:34:02
11     But everything is very -- once again, very
12 basic.
13 BY MS. BAKOS:
14 Q. Okay. So what were you trained that fentanyl
15 does to a person?					1:34:10
16 A. Just that it -- it enhances the drug that
17 it's in.
18 Q. Okay. And what do you mean by enhances?	1:34:21
19 A. I can't recall. I just -- and I never -- how
20 do I word this? It makes the drug more potent.	1:34:32
21 Q. Okay. And then with respect to heroin, were
22 you -- were you ever given information either by the
23 City of Joliet or by the Academy about what heroin does
24 to someone?						1:34:54
25 A. I can't recall. I'm sure it was discussed.

74

1  I can't recall what the -- the symptoms are.	1:35:04
2  Q. Okay. Are you aware that heroin can cause
3  disorientation?
4  A. I'm not sure.
5  Q. Are you aware that heroin can cause delirium?	1:35:16
6  A. I'm not sure. Once again, I'm not sure of
7  the -- the symptoms of heroin.
8  Q. Okay. Did Mr. Lurry at any time in your
9  presence appear to be disoriented?			1:35:31
10 A. No. Let me rephrase that. Not until we -- I
11 reencountered him in the rear of the patrol car.	1:35:47
12 Q. Okay. So you're saying he did not appear to
13 be disoriented at the scene of the arrest on Briggs and
14 Washington, right?					1:35:56
15 A. Correct.
16 Q. And he did not appear to be disoriented when
17 he was in the rear of the squad car, your squad car?
18     MR. MATHUES: Objection to form. Vague as to
19 time.						1:36:08
20     THE WITNESS: He appeared that way after
21 Sergeant May have already entered the vehicle.
22 BY MS. BAKOS:
23 Q. Okay. How soon after Sergeant May already
24 entered the vehicle did he appear to be disoriented?	1:36:26
25 A. I can't recall what time.

75

1  Q. Okay. Was it relatively quickly or was it
2  several minutes after May entered the vehicle that you
3  observed this disorientation?			1:36:39
4  A. I'd say briefly after.
5  Q. What do you mean by briefly?
6  A. It'd be when -- well, Sergeant May was
7  interacting with Mr. Lurry. It'd be when Mr. Lurry's
8  body went limp.					1:37:01
9  Q. Okay. And was that -- was that -- well,
10 strike that. We'll watch the video. We'll go more
11 into that.						1:37:13
12     Give me one second. What about cocaine?
13 Have you ever been trained on what cocaine does to an
14 individual?						1:37:36
15 A. Yes. Basic symptoms, basic -- you know, the
16 pupils. Very --
17 Q. Okay.
18 A. -- basic information.				1:37:50
19 Q. Okay. And when you say the pupils, are you
20 saying dilated pupils?
21 A. I can't recall exactly what they do, but I
22 believe that -- I believe they do dilate. I'm not a
23 hundred percent sure.				1:38:06
24 Q. Okay. What are the other -- the other things
25 that an individual will exhibit if they're under the

76

1 remove your mic from your person? 1:50:11
2   A. No. Not that I can recall.
3   Q. Was there a way that you could activate
4 video, the -- the squad car video, if you were not
5 inside the squad car? 1:50:34
6   A. Not to my knowledge, no.
7   Q. So it's your understanding that at least the
8 system on the date of the incident in the vehicle that
9 you were driving -- you had to get into the squad car
10 to turn the video cameras on and off if you were to do
11 it manually. 1:50:53
12   A. Correct.
13   Q. Do you know whether or not the video records
14 during the entire time that the lights are on? 1:51:25
15   A. To my understanding, if the lights are on,
16 the video's recording.
17   Q. Okay. And if at any point you're still
18 interacting with an arrestee but you turn the lights
19 off, is it still, to your understanding, your
20 responsibility to make sure that the camera is still
21 on? 1:51:43
22   MR. MATHUES: Objection to form, foundation.
23   THE WITNESS: No. Once you're turning the
24 lights off and your interaction is complete, you turn
25 the camera off. 1:51:55

85

1 BY MS. BAKOS:
2   Q. Okay. But what if you turn the lights off
3 but your interaction is not complete? Do have a
4 responsibility to ensure that the camera is then
5 recording the remainder of your interaction? 1:52:04
6   MR. MATHUES: Objection to form and
7 foundation.
8   THE WITNESS: If you turn your lights off,
9 you turn your camera off. If you're -- are -- are you
10 referring to if your interaction is not complete? 1:52:16
11 BY MS. BAKOS:
12   Q. Yes.
13   A. I can only assume that if you're -- if you're
14 interacting with somebody and the lights are on, you
15 wouldn't shut them off until your interaction is
16 complete. 1:52:27
17   Q. Okay.
18   MS. BAKOS: I'm sorry. You know what, guys?
19 I think it's probably a good time to take a lunch,
20 because my computer's about to die, and I gotta get
21 plugged in and -- and it's almost 12:20. 1:52:39
22   Are we okay taking a lunch?
23   MR. MATHUES: Fine by me.
24   MS. BAKOS: Okay. How long do you guys want?
25   THE RECORDER: Let me just go off the record.

86

1   Off the record, 12:19 p.m. 1:52:49
2   (Off the record)
3   THE RECORDER: Back on --
4   MS. BAKOS: Back on?
5   THE RECORDER: We are back on the record at
6 1:03 p.m. 1:53:00
7   During the break, we switched reporters. My
8 name is Allyson Pritchard. I'm a notary public and the
9 recording device operator for the remainder of the
10 deposition. I am taking over for Christina Kollintzas. 1:53:11
11   Mr. McCue, do you understand that you are
12 still under oath?
13   THE WITNESS: Yes, I do.
14   THE RECORDER: Okay. We can proceed. 1:53:17
15 BY MS. BAKOS:
16   Q. Okay. I want to go back to the date of the
17 incident. When you left the station with Officer
18 Tellez, you went to a gas station on the corner of
19 Washington and Briggs. 1:53:35
20   Is that correct?
21   A. We initially left to assist with a pursuit.
22 We ended up ultimately being at the assistance of a
23 traffic stop at the intersection of Washington and
24 Briggs. Correct. 1:53:49
25   Q. Okay. So when you arrived at that

87

1 intersection, where specifically did you go?
2   A. I positioned the squad car on Washington,
3 facing eastbound at the southeast corner. Do not
4 recall the name of the gas station there. 1:54:08
5   Q. Were you actually parked like on the street
6 or did you pull into the gas station parking lot?
7   A. Oh, because of the room at the gas station, I
8 positioned my squad on the street, facing eastbound. 1:54:23
9   Q. Okay. And who, if any, officers were already
10 at the gas station when you arrived?
11   A. Officer Wietting was there. He's the one
12 that initiated the stop. 1:54:38
13   Officer Struna. And Officer Mitchell. From
14 what I can recall.
15   Q. Okay. Was that the first time that you had
16 ever seen Officer Wietting, or had you met him before? 1:54:55
17   A. No, I had seen him prior. I cannot recall if
18 it was on a call or -- or not. I had seen him prior to
19 the -- the duties of patrol. 1:55:07
20   Q. Okay. And same with Officer Struna?
21   A. Correct.
22   Q. And same with Officer Mitchell? 1:55:13
23   A. Correct.
24   Q. Okay. And so as far as you could tell, did
25 Officer Struna and Mitchell come together, or were they

88

**Page 129**

But he sat and then he kicked his legs out again.

Q. Okay. So you got him into a seated position. And then so was your leg touching is back? 2:46:35
Is that you're saying?

A. Yes. Yeah, to prop -- to prop him up so he didn't lay back down again. 2:46:41

Q. At that point, did you know whether or not Mr. Lurry had anything in his hands?

A. We could not tell at the moment. We were still trying to get him just to stand up. 2:46:49

Q. Okay. And Mr. Lurry then -- you said once he was in seated position, he had again put his legs out in like a V, for lack of a better term, in -- 2:47:02

A. Correct.

Q. -- order to prevent you from getting him up again?

A. Correct.

Q. At that point, where was Officer Tellez? 2:47:11

A. He would've been right next to me.

Q. Behind Mr. Lurry as well?

A. I can't recall exact position, but within approximately -- he would've had his hands on Mr. Lurry. 2:47:27

Q. Okay. Were your hands on Mr. Lurry at that

**Page 130**

point?

A. I believe I would've had a hand on him. Yes. 2:47:36

Q. And -- on his arm?

A. Either on an arm or a shoulder or some means of -- of stabilizing him so he didn't-- 2:47:42

Q. Okay.

A. -- roll backward.

Q. So when Mr. Lurry was seated at any time, did he say anything to you? 2:47:50

A. No.

Q. Did -- never mind. Strike that.
What's the next thing you remember? 2:48:01

A. I remember one of us -- I remember -- well, I remember myself calling on the radio exactly where our location was at. Because we have already called for backup -- and that we were fighting with the subject. 2:48:20
And also as that was going on, I remember Officer Tellez speaking with -- it appeared to be two females in the roadway.

Q. Okay. So you made a call on the radio for what purpose? 2:48:38

A. To let them know of our exact location and that we were -- so that officers knew where exactly to go.

Q. Okay. And at that time did you say anything

**Page 131**

about needing assistance? 2:48:49

A. No. From what I can recall, we called for needing assistance as soon as Mr. Lurry started to resist. 2:49:02

Q. But was that --

A. It would have been --

Q. -- before --

A. Right before we went to the ground. 2:49:08

Q. Okay. So was there some time that passed -- well, strike that.
Okay. When you called for an assistance the first time, what information did you -- what -- what did you say at that point? 2:49:29

A. I cannot recall. I'd have to see the -- the transcript.

Q. Okay. Once you call out your location on the radio, I believe you said that you saw Officer Tellez or Tellez speaking to somebody who had arrived on scene? 2:49:53

A. Yeah. He was speaking to -- it was two females in the -- in the roadway that arrived.

Q. As you sit here today, do you know who either one of those females are? 2:50:05

A. I know now, yes. One of them was Nicole Lurry.

**Page 132**

Q. And when you saw Officer Tellez speaking to Ms. Lurry and another individual, where was Eric? 2:50:22

A. He was still sitting on the ground.

Q. And where were you?

A. Directly behind him still. 2:50:28

Q. Okay. And did you overhear any of the conversation between Ms. -- Ms. Lurry and Officer Tellez?

A. I can't recall. 2:50:40

Q. How far away were you from Officer Tellez when he was conversing with Ms. Lurry?

A. We would've been within arm's reach. 2:50:51

Q. Okay. Do you have any idea what they spoke about?

A. At the time of the incident, no. I know now what they spoke about. 2:51:01

Q. Okay. What do you know now about what they spoke about?

A. I know Nicole Lurry was asking like what was going on. It was mentioned that, you know, like he wasn't cooperating. 2:51:20
And I know somewhere in the conversation it was mentioned that, you know, we were going to be taking him in and that, you know, he was going to have to answer some questions. 2:51:33

1  Q. Okay. And where is this information --
2  A. [inaudible] --
3  Q. -- where did you get this information from,
4  if anywhere else, aside from your lawyer?
5  A. That would be based on the videos that have
6  been released and the videos that I watched with my
7  attorneys.                                    2:51:43
8  Q. Okay. So at any point did you hear Officer
9  Tellez ask Ms. Lurry to assist in getting Mr. Lurry to
10 cooperate?
11 A. I can't recall their exact dialogue, but
12 something of those lines does sound -- does sound
13 familiar.                                     2:52:07
14 Q. Okay. Do you have any idea what, if
15 anything, Ms. Lurry did to try to get Mr. Lurry to
16 cooperate?
17 A. I cannot recall.                          2:52:18
18 Q. Do you remember ever seeing Ms. Lurry trying
19 to converse with Mr. Lurry on scene?
20 A. Not that I can recall.                    2:52:28
21 Q. Did you ever see Mr. Lurry -- did Mr. Lurry
22 ever say anything to Nicole Lurry that you saw on
23 scene?
24 A. No.                                       2:52:39
25 Q. Did you say anything to Nicole?

133

1  A. No.
2  Q. What was Nicole's demeanor like when you saw
3  her have this conversation with Officer Tellez?   2:52:52
4  A. From what I can recall, she stayed in the
5  roadway area. And just seemed a little concerned. 2:53:06
6  Q. Okay. In your opinion, was she doing
7  anything unlawful at that point?
8  A. No. I don't -- I wouldn't say unlawful. No. 2:53:20
9  Q. Was she obstructing your ability to arrest
10 Mr. Lurry in any way?
11 A. No. From what I can recall, she didn't --
12 she didn't approach us on a -- in a -- in a bad manner
13 or anything of that nature.                   2:53:35
14 Q. Okay. She wasn't yelling or screaming at
15 you, correct?
16 A. Not that I can recall. No.                2:53:42
17 Q. She wasn't cursing at anyone, right?
18 A. Not that I can recall.
19 Q. Okay. And do you know how long it was that
20 Officer Tellez was talking to Ms. Lurry?      2:53:54
21 A. It had to be a short period of time. I don't
22 think over a minute. It could have been shorter than
23 that.                                         2:54:07
24 Q. Okay. What is the next thing that you
25 recall?

134

1  A. Eventually, Mr. Lurry complied and stood up.
2  Once we got him to his feet, we were able to get him to
3  the rear passenger side of the patrol car.    2:54:27
4      And then at that time, we placed him in the
5  car. Once he was placed in the car, that's when
6  Officer Tellez turned the back seat camera on. 2:54:41
7  Q. Okay. I just want to back you up here. How
8  was it that you were able to get Mr. Lurry up off the
9  ground?                                       2:54:54
10 A. I can only -- like I said, I don't remember
11 the dialogue of that day. I can only assume by just
12 telling him, hey, come on, you gotta get up.  2:55:10
13     You know, get to your feet. Let's go.
14 You're under arrest.
15 Q. Did you in any way assist Mr. Lurry to his
16 feet?                                         2:55:17
17 A. Yeah, we both would've had to have helped him
18 to his feet.
19 Q. By that, you mean you and Officer Tellez?   2:55:25
20 A. Yes. And that also being -- because his hand
21 is -- his hands are behind his back. Mr. Lurry
22 would've tucked one leg in and -- and tried to roll to
23 his feet.                                     2:55:35
24     And -- but we still have to assist because,
25 you know, we're not going to let you fall to the

135

1  ground.
2  Q. Did Mr. Lurry ever verbally respond to your
3  orders for him to get up?                     2:55:44
4  A. No.
5  Q. All right. So did you and Officer Tellez
6  assist Mr. Lurry to his feet by grabbing I guess his
7  arms? How did you do it?                      2:55:57
8  A. Yes. It would've been under the arm area.
9  Q. And then did you walk Mr. Lurry to the rear
10 passenger side of the squad car?              2:56:09
11 A. Yes.
12 Q. Who put Mr. Lurry inside the squad car?
13 A. It would've been both of us placing him in
14 there. Helping to get him in there and sit down. 2:56:21
15 Q. Okay. At any point did you search Mr. Lurry
16 again before putting him in the squad car?
17 A. No.                                       2:56:30
18 Q. Any reason why not?
19 A. I was just following the lead of my field
20 training officer.
21 Q. Okay. Were you at all concerned about what
22 may have been in Mr. Lurry's pants that he was reaching
23 for?                                          2:56:48
24 A. It's honestly something I was not thinking
25 about that day. Like I said, day eight of training.

136

1  A. At the time, I just don't know what he put in
2  his mouth. I don't know. I --
3  Q. Well --
4  A. -- knew --                                    3:08:29
5  Q. Go ahead.
6  A. -- he was fighting to get away from us for
7  something.
8  Q. Mm-hmm.
9  A. And then after that, we proceeded to put him
10 in our car to take him to the station.            3:08:38
11 Q. Mm-hmm.
12 A. I was following the orders of my field
13 training officer.
14 Q. Okay. So the -- Officer, my question is --
15 I'm just going to ask this very directly.         3:08:49
16     Did you have any suspicion whatsoever that
17 Mr. Lurry had put drugs in his mouth at the scene of
18 the arrest?
19 A. No, I did not.                                 3:08:59
20 Q. Okay. Do you know whether or not Officer
21 Tellez had any suspicion that Mr. Lurry had put drugs
22 in his mouth at the scene of the arrest?          3:09:10
23     MR. MATHUES: Objection to speculation.
24     THE WITNESS: No.
25 BY MS. BAKOS:

145

1  Q. So as far as you recall, you don't remember
2  any conversation about Mr. Lurry putting anything in
3  his mouth at the scene of the arrest.             3:09:28
4      Is that your testimony?
5      MR. MATHUES: Objection to asked and
6  answered.
7      THE WITNESS: Yes.                             3:09:33
8  BY MS. BAKOS:
9  Q. So -- okay. Did you see Officer Tellez say
10 anything to anyone -- strike that.                3:09:47
11     Did you see Officer Tellez having a
12 conversation with Officer Ranstead at any time on
13 scene?
14 A. Not that I can recall. No.                     3:09:57
15 Q. How long were you on scene from the time that
16 Mr. Lurry was put in the rear of the squad car until
17 the time that you left the scene with Mr. Lurry and
18 Officer Tellez?                                   3:10:21
19 A. Maybe only a couple minutes.
20 Q. What's the next thing that you remember?      3:10:37
21 A. I remember getting in the squad at that time
22 and then proceeding to the station.
23 Q. Do you remember the route you took to get to
24 the station?                                      3:10:48
25 A. Vaguely. I know it was westbound on

146

1  Washington. Then I believe we turned north on Richards
2  and then west on -- it would've been Jefferson.   3:11:02
3      Then north on Eastern. And then we would've
4  turned west at -- I just can't recall the street name.
5  It was the first available street after you go
6  northbound on Eastern.                            3:11:15
7      And I believe we took that to Joliet Street
8  and then Joliet Street south to the station.
9  Q. Okay. At any point before you got to the
10 station did Officer Tellez ever instruct you to call
11 for medical assistance for Mr. Lurry?             3:11:31
12 A. No.
13 Q. Do you have any reason to believe that
14 Officer Tellez called for medical assistance for Mr.
15 Lurry?
16 A. No.                                            3:11:38
17 Q. When you went to the -- well, strike that.
18     There was nothing that prevented you from
19 calling medical assistance for Mr. Lurry at any time
20 before you got to the station with him, right?    3:11:56
21 A. Correct.
22 Q. When you got into the vehicle and transported
23 Mr. Lurry to the station, you were driving. Correct? 3:12:08
24 A. Correct.
25 Q. Officer Tellez was in the passenger seat.

147

1  Right?
2  A. Correct.                                       3:12:13
3  Q. And Mr. Lurry was seated behind the passenger
4  -- the front passenger seat. Correct?
5  A. Correct.                                       3:12:20
6  Q. And you did not proceed to the station with
7  lights or sirens. Right?
8  A. Correct.
9  Q. And you went immediately to the station. You
10 did not stop anywhere else?                       3:12:31
11 A. Correct.
12 Q. Did you have any phone calls with anyone when
13 you were on your way to the station?
14 A. No.                                            3:12:38
15 Q. Do you know if Officer Tellez called anyone?
16 A. I remember that there was a phone call. I
17 just -- I don't know who it was with or -- or the
18 details of it. I can't recall.                    3:12:49
19 Q. Okay. Do you know anything about that
20 conversation? What was discussed or anything?
21 A. No.                                            3:12:59
22 Q. Did you ever ask Officer Tellez who he was
23 talking to?
24 A. No.
25 Q. When you were driving to the station in the

148

```
 1   front driver seat, were you able to see Mr. Lurry in
 2   the back seat?  I mean, was there a -- like a mirror or
 3   something that would've enabled you to be able to see
 4   behind you?                                    3:13:20
 5       A.  No.  Well, there's a mirror to -- to see
 6   traffic behind you and then, yeah, there would've been
 7   the monitor to the back seat.                  3:13:33
 8           That would be the two options to see to the
 9   rear.
10       Q.  Okay.  And the monitor that is -- where is
11   that located in the front?                     3:13:43
12       A.  If I recall, it would've been the upper
13   inside to the right of the -- the rearview mirror.
14       Q.  Okay.  So if you're in the driver seat, you
15   have the rearview mirror up and a little to -- to your
16   right.  Correct?                               3:14:05
17       A.  Correct.
18       Q.  And then you're saying to the right of that
19   rearview mirror is -- there's a monitor that allows you
20   to see the -- behind you.  Right?              3:14:15
21       A.  Correct.
22       Q.  And that monitor allows you to see the
23   individual who's in the back seat of your squad.
24   Correct?                                       3:14:20
25       A.  Yes.  But the -- the way the monitor's set up
                                                        149
```

```
 1   is it's the initial front view.  And then there's a
 2   smaller picture inside of that monitor that shows the
 3   -- the back seat.                              3:14:35
 4       Q.  Okay.  And how big is that picture?
 5       A.  Which one?  The monitor or the small picture? 3:14:42
 6       Q.  The small picture.
 7       A.  I can't recall.  Maybe -- maybe an inch or
 8   two square.                                    3:14:54
 9       Q.  Okay.  And are both the driver and the
10   passenger of the squad car able to see that monitor?
11       A.  I can't recall.  I -- I don't remember if
12   that monitor is moveable or if we moved it.  Usually -- 3:15:15
13       Q.  Okay.
14       A.  -- it's -- usually it's favored towards the
15   driver, as you're the one that needs the camera while
16   you're operating the vehicle.                  3:15:24
17       Q.  Okay.  And as the driver of the vehicle, was
18   it your responsibility to be monitoring the arrestee?
19   Or was that the responsibility of the passenger, who in
20   this case was Officer Tellez?                  3:15:41
21           MR. MATHUES:  Objection to foundation.
22           THE WITNESS:  At the time, I'm not sure whose
23   responsibility it would've been.  My time -- I'm
24   focusing on getting the vehicle back to the station
25   with the arrestee.                             3:15:53
                                                        150
```

```
 1           I was focusing on the road, having to ask my
 2   FTO on which route to take.
 3   BY MS. BAKOS:
 4       Q.  Okay.  So you weren't -- were you watching
 5   Mr. Lurry in the back seat through --          3:16:05
 6       A.  No.
 7       Q.  -- that monitor when you were en route to the
 8   station?
 9       A.  No, I was not.
10       Q.  Did Mr. Lurry say anything when you were en
11   route to the station?                          3:16:12
12       A.  No.
13       Q.  Did anyone say anything to Mr. Lurry?
14       A.  No.
15       Q.  At any point did Officer Tellez say anything
16   to you about Mr. -- what Mr. Lurry was doing in the
17   back seat?                                     3:16:26
18       A.  No.
19       Q.  Did Officer Tellez ever express any concerns
20   to you about anything that Mr. Lurry was doing in the
21   back seat?                                     3:16:38
22       A.  No.
23       Q.  Did you ever see Mr. Lurry making any chewing
24   motions in the back seat?
25       A.  No.                              3:16:47
                                                        151
```

```
 1       Q.  Do you know whether or not Officer Tellez
 2   observed that?
 3       A.  Not to my knowledge.
 4       Q.  When you got to the station, what's the next
 5   thing that happened?                           3:17:03
 6       A.  We pulled in.  We pulled into the parking
 7   spot.  It was a tight parking spot.            3:17:11
 8           I got out and proceeded to the rear passenger
 9   door to have Mr. Lurry step out of the vehicle.
10       Q.  Where did Officer Tellez go, if you know?    3:17:24
11       A.  I remember he got out of the vehicle and then
12   proceeded towards the station or towards the building.
13       Q.  Okay.  Did you immediately get out of the
14   driver side and go around to the rear passenger door to
15   try to get Mr. Lurry out of the vehicle?       3:17:40
16       A.  Yes.
17       Q.  Did you hear any conversations that Officer
18   Tellez was having with anyone --
19       A.  No, I --
20       Q.  -- when --
21       A.  -- did not.                           3:17:51
22       Q.  -- you went around the car?
23       A.  No, I did not.
24       Q.  At that point had Officer Tellez said
25   anything to you about Mr. Lurry having put anything in
                                                        152
```

**Page 233**

1 to the side to release one of the cuffs so we can get
2 his arms out.  5:04:35
3    Q. Okay. And did you uncuff him?
4    A. I believe I did. Or at -- at a minimum, I
5 would've assisted with uncuffing them, yes.  5:04:46
6    Q. Okay. What's the next thing that you
7 remember happening after Mr. Lurry was out of the car?  5:04:51
8    A. Then, if I remember right, another officer
9 started to -- to start rendering aid.
10    Q. Do you know who that was?
11    A. I know Officer Ranstead was there. Officer
12 -- I know Officer Darcy showed up.  5:05:10
13     I do remember seeing at least one AED. I
14 thought there was two. I know Sergeant Darcy sent his
15 recruit to retrieve a -- a first aid kit, like a
16 medical kit.  5:05:29
17    Q. Okay.
18    A. And I'm trying -- I can't really recall who
19 else was there exactly.
20    Q. Okay. And at some point did -- did you see
21 anyone administer Narcan to Mr. Lurry?  5:05:49
22    A. No, I did not.
23    Q. At some point did the EMTs arrive?
24    A. They did.  5:05:55
25    Q. Did you have any conversations with the EMTs?

**Page 234**

1    A. The EMTs? No.
2    Q. Give me one second, please.
3     Did -- were you aware that anyone had
4 recognized Mr. Lurry on scene? Did anyone say
5 anything, like, oh, I know that guy, or anything like
6 that? When --  5:06:41
7    MR. MATHUES: Objection --
8 BY MS. BAKOS:
9    Q. -- you were in the --
10    MR. MATHUES: -- foundation.
11    THE WITNESS: Not to what I can recall, no.  5:06:47
12 BY MS. BAKOS:
13    Q. Okay. Have you ever been trained on how to
14 get an arrestee to open his mouth to retrieve evidence?
15    A. No.  5:07:31
16    Q. From an arrestee's mouth? At any time in the
17 back seat of the squad car, did you see Eric kick any
18 of the officers?  5:08:28
19    A. No.
20    Q. Did you see him in any way exhibit any sort
21 of violent behavior against any officers in the rear of
22 the squad?
23    A. No.  5:08:40
24    Q. Did he verbally threaten any of the officers?
25    A. No.

**Page 235**

1    Q. Could you actually hear the slap that Officer
2 May used on Mr. Lurry?  5:09:14
3    A. I do recall hearing it. Yes.
4    Q. You do recall hearing it?
5    A. Yes.  5:09:20
6    Q. Did it appear to be pretty hard in your
7 opinion?
8    MR. MATHUES: Objection. Objection to
9 foundation and speculation.  5:09:28
10    THE WITNESS: Yeah. Hard enough to where it
11 projected a noise.
12 BY MS. BAKOS:
13    Q. Okay. Okay, Officer. I know we were just
14 watching some videos.  5:09:50
15     And -- and I know that you said that you
16 created a report. Did you watch any videos prior to
17 you creating your report that is related to this
18 incident?  5:09:59
19    A. No, I did not.
20    Q. All right. Did you ever see Mr. Lurry
21 seizing?
22    A. Not that I can recall.  5:10:41
23    Q. Did you ever see him foaming at the mouth?
24    A. No.
25    Q. After Mr. Lurry was removed from the vehicle,

**Page 236**

1 did you have any further physical contact with him at
2 any time?  5:10:57
3    A. No.
4    Q. Did you ever see Mr. Lurry cough anything up,
5 like cough up a baggie, when he was outside of the
6 vehicle?
7    A. No, the -- the only thing I seen was once he
8 got placed into the ambulance, the paramedics -- I
9 don't know if they were sucking something out of his
10 stomach or -- or what the procedure is.  5:11:27
11     It's a -- like a red fluid or something going
12 into the tube. That's it.
13    Q. Okay. But you didn't see like a -- a bag
14 come out of Mr. Lurry's mouth.  5:11:43
15     Aside from the ones that you took out of his
16 mouth.
17    A. No, I did not.
18    Q. Did you ever talk to Officer Wietting in the
19 parking lot of the -- of the station that day?  5:12:05
20    A. After the incident?
21    Q. Yeah.
22    A. Not that I can recall.  5:12:12
23    THE RECORDER: Abby, do we still need this
24 video up or can we take it down?
25    MS. BAKOS: Oh, I'm sorry. We could take it