```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    NICOLE LURRY, as Special      )  Docket No. 20 C 04545
      Administrator of the Estate of )
 4    ERIC LURRY, JR., Deceased,    )
                                    )
 5                   Plaintiff,     )  Chicago, Illinois
                                    )  December 1, 2022
 6            v.                    )  10:01 a.m.
                                    )
 7    CITY OF JOLIET, et al.,       )
                                    )
 8                   Defendants.    )


 9            TRANSCRIPT OF PROCEEDINGS - Daubert Hearing
10         (Dr. Kelly Johnson-Arbor, Dr. William Smock)
              BEFORE THE HONORABLE VIRGINIA M. KENDALL
11

12    APPEARANCES:

13
      For the Plaintiff:        BAKOS & MAISURIA LAW GROUP by
14                              MS. ABBY DANA BAKOS
                                One East Erie Street, Suite 525-4686
15                              Chicago, IL  60611

16                              BAKOS & MAISURIA LAW GROUP by
                                MS. RONAK PATEL MAISURIA
17                              1755 Park Street, Suite 200-1070
                                Naperville, IL  60563
18

19    For the Defendants:       HERVAS CONDON & BERSANI PC by
                                MR. MICHAEL D. BERSANI
20                              MR. GLENN DAVID MATHUES
                                333 West Pierce Road, Suite 195
21                              Itasca, IL  60143

22

23    Court Reporter:           GAYLE A. McGUIGAN, CSR, RMR, CRR
                                Official Court Reporter
24                              219 S. Dearborn Street, Room 2504
                                Chicago, IL 60604
25                              312.435.6047
                                gayle_mcguigan@ilnd.uscourts.gov
```

Ex. 7

Johnson-Arbor - Direct by Maisuria

1    plus I want to just move along.

2            Thank you.

3    BY MS. MAISURIA:

4    Q    Doctor, is that right?

5    A    Yes.

6    Q    Okay.  According to your review of the video footage in

7    this case, when you first observed Mr. Lurry placed in the

8    medical -- in the police car, did he appear to be in any

9    medical distress?

10   A    No.

11   Q    What did you observe him doing while in the back seat of

12   the police car prior to arriving at the station?

13   A    He made chewing motions with his mouth.  He became more

14   somnolent.  He was sort of blinking his eyes, but he was -- it

15   looked like he was not in a normal state of consciousness, as

16   he was not able to right himself going over bumps.  He would

17   kind of slump over and not right himself back to a normal

18   seated position.  So it appeared that he had a decreasing level

19   of consciousness as he was transported to the police station.

20   Q    Did your review of the record indicate whether Officer

21   Tellez was aware of the chewing motions?

22   A    Yes.  I believe Officer Tellez or somebody mentioned on the

23   police dash cam video that he was chewing -- or, actually, no,

24   I believe that Officer Tellez made a comment that he was

25   chewing to somebody in the police car.

Johnson-Arbor - Direct by Maisuria

1    Q    Did your review of the record indicate whether Officer
2    Tellez did anything when he observed this?
3    A    No.
4    Q    Did you -- strike that.
5            You talked about how the appearance of Mr. Lurry in
6    the back seat of the car suggested to you that he was in a
7    decreased level of consciousness; is that right?
8    A    Yes.
9    Q    Based on your training and experience as an ER physician
10   and medical toxicologist, what did this indicate to you?
11   A    In the context of understanding that he was chewing on and
12   ingesting drugs at the time, that strongly suggests to me that
13   he is having ongoing absorption of the drugs into his body, and
14   he's suffering from the systemic effects of the drugs on his
15   body.
16   Q    You reviewed the toxicology report from NMS in this case,
17   right?
18   A    Yes.
19   Q    And that's something you're certainly used to seeing in
20   your line of work?
21   A    Yes.
22   Q    What kind of sample were the toxicology results based on?
23   A    The testing was based on antemortem blood as well as urine.
24   And, I'm sorry, it was antemortem peripheral blood and urine.
25            COURT REPORTER:  I'm sorry, would you repeat that?  It

Johnson-Arbor - Direct by Maisuria

1  consistent with a fatal concentration.

2  Q   And what about the fentanyl?  What was the level there?

3  A   The fentanyl concentration was 32 nanograms per milliliter.

4  Q   And what does that level tell you?

5  A   That is a high postmortem fentanyl concentration in the

6  blood.

7  Q   And fentanyl and heroin are opioids, correct?

8  A   Yes.

9  Q   Okay.  And based on your review of the record, was there

10  any evidence in the record to suggest to you that he ingested

11  the fentanyl at any point before his interaction with the

12  police officers?

13  A   No.

14  Q   Based on your review of the evidence, is there any evidence

15  in the record to suggest that he had ingested any drugs before

16  his interaction with the police officers?

17  A   I don't believe so.

18  Q   Okay.  Are you able to take these levels and use them to

19  tell me how much of each of these drugs he had in his system at

20  any point during his encounter with the police officers or in

21  the back seat of the car?

22  A   No.

23  Q   You can't extrapolate from these numbers the way you would

24  with ethanol; is that right?

25  A   That's correct.  So there's no way to back-extrapolate for

Johnson-Arbor - Direct by Maisuria

1  these particular drugs to say exactly how much of the drug was

2  ingested or consumed or was exposed by someone to.

3  Q   And there's no way to tell the absorption rates of these

4  drugs either from these numbers; is that right?

5  A   That's correct.

6  Q   Now, are you able to tell the purity level of the drugs he

7  consumed?

8  A   No.

9  Q   Does that make a difference to your opinions?

10  A   No.  Again, I've said this before, in the street drug

11  business, there is no quality control, so there is never a way

12  to tell the purity of a particular drug unless you have a

13  sample of the drug and can send it to the police lab.  However,

14  even in that case, it may not be accurate because, again, in

15  the illicit drug business, there's certainly intra- and

16  inter-batch variability of the purity and concentration of a

17  particular drug.  So, generally, no, we never know the purity

18  of street drugs.

19  Q   And is the fact that you don't know the precise amount of

20  drugs that someone consumed or the purity level of those drugs

21  unusual for you in terms of your clinical experience

22  encountering overdose patients?

23  A   Not at all.

24  Q   When someone comes into the ER suspected of a drug

25  overdose, do you typically know those things?

Johnson-Arbor - Direct by Maisuria

1  A    Generally not, for street drugs, no.

2  Q    But you still administer life-saving interventions based on

3  their signs and symptoms that can make a difference in their

4  clinical course; is that right?

5  A    That's correct.  We always say we treat the patient, not

6  the poison necessarily.

7  Q    Okay.  Now, does fentanyl injected -- does fentanyl that is

8  injected act differently in the body versus fentanyl that's

9  consumed orally?

10  A    It has the same effects on the body, but the way that the

11  body processes the drug to get those effects is different.

12  Q    Okay.  And would it be fair to say that injected fentanyl

13  goes directly into the bloodstream and acts more quickly?

14  A    Yes.

15  Q    Okay.  And is the process with oral consumption then

16  slower?

17  A    Yes, because the drug has to be absorbed into the body.  It

18  has to -- it goes through a little bit of metabolism in the

19  liver.  But it needs to be absorbed into the body, digested,

20  and absorbed into the bloodstream before it can actually reach

21  the brain and cause its effects.

22  Q    So fair to say that fentanyl, taken orally, doesn't kill

23  you as soon as you put it in your mouth, right?

24  A    That is correct.

25  Q    And so there's more time within which to reverse a fentanyl

Johnson-Arbor - Direct by Maisuria

1    overdose involving oral consumption than intravenous

2    consumption, right?

3    A    Yes.

4    Q    Based on your review of the evidence, Mr. Lurry consumed

5    the fentanyl and other narcotics involved here orally, right?

6    A    Yes.

7    Q    We'll get into the effects of fentanyl shortly.

8         When Mr. Lurry arrived at the police station, what

9    would you say his level of consciousness was?

10   A    When Mr. Lurry arrived at the police station, he had a

11   decreased level of consciousness.

12   Q    Okay.  Given the knowledge that he had been suspected at

13   that point of swallowing bags of drugs, would you consider him

14   to be in a state of emergency?

15   A    Can you define "emergency"?

16   Q    Yes.  Did he appear to be in a severely depressed level of

17   consciousness at the point that he arrives --

18   A    Yes.

19   Q    -- at the police station?

20   A    Yes.

21   Q    Okay.  Based on his condition at that point, did you think

22   it was warranted to call for EMS?

23   A    Considering that he was suspected -- suspected of putting

24   drugs in his mouth, absolutely, yes.

25   Q    Okay.  And not just suspected of putting drugs in his

Johnson-Arbor - Direct by Maisuria

1    mouth, but based on his level of consciousness at the point

2    that they pull into the police station, you would have

3    activated EMS at that time, right?

4    A    Yes.

5    Q    Okay.  Did you see anyone at that time activate EMS?

6    A    Not at that time.

7    Q    Okay.  What did you see happen instead of these officers

8    calling for EMS?

9    A    I saw officers perform a sternal rub.  I saw officers

10   slap -- or I saw an officer slap him in the face and say

11   expletives to him.  I saw officers put a baton in his mouth and

12   move it around.

13   Q    Did you see officers do anything with respect to his nose?

14   A    Yes.  I saw an officer pinch his nose shut for about 90

15   seconds.

16   Q    Okay.  And after that point, was Mr. Lurry ultimately

17   removed from the vehicle?

18   A    Yes, he was removed from the vehicle.

19   Q    And it was only then that he received any medical

20   treatment; is that right?

21   A    Yes.

22   Q    Okay.  And this may seem like an extremely common sense

23   question, but why is it important that someone who is -- who is

24   suspected of ingesting drugs be provided with immediate medical

25   attention?

Johnson-Arbor - Direct by Maisuria

1    A    So it's -- actually, it's a good question.

2           You know, the longer that you're exposed to the drug,

3    the more -- the higher of a dose of a drug you're going to be

4    exposed to.

5           If you are treated in a prompt fashion, we can do

6    things to reduce absorption of the drug, increase the

7    elimination of the drug, and prevent toxicity from occurring.

8           So we do like to treat patients promptly when they are

9    suffering from a drug overdose because the quicker that we can

10   treat a patient, the higher the likelihood it is that the

11   patient will not have as severe signs or symptoms from the

12   overdose in the majority of cases.

13   Q    And you say you can do things to treat the patient and

14   reverse the effects of that overdose.  What does that include?

15   A    So it varies based on the overdose.  And I will say that

16   for the majority of poisons that we have in the world, we don't

17   have antidotes for them.

18          Opioids are a little special in that we do have

19   antidotes or reversal agents for opioids.

20          So for opioids in particular, you could administer

21   fentanyl [sic.], either in a hospital setting or as a

22   bystander, to counteract the effects of the drug on the body.

23   And that will work -- that's true for any opioid.

24          But there's other things that we can do to reduce

25   toxicity as well.

Johnson-Arbor - Direct by Maisuria

1    So in some cases, we can provide breathing assistance

2    to a patient.  You can insert a breathing tube if the patient

3    is not breathing to help them breathe, or you can put a bag

4    and, you know, bag-mask ventilate the patient.

5    We can also administer activated charcoal to absorb

6    certain drugs and prevent them from being absorbed by the body.

7    And for certain overdoses, we can actually flush the

8    drug out of the body.

9  Q    Okay.  And that's a bowel irrigation, correct?

10 A    Whole bowel irrigation, yes.

11 Q    And had EMS been activated on the scene of the arrest when

12 Officer Tellez first made his statements indicating that he

13 believed Mr. Lurry had put the drugs in his mouth and swallowed

14 them, and had Mr. Lurry been taken to a local ER, you have no

15 reason to disbelieve that these interventions would not have

16 been available to him, right?

17 A    That's correct.

18 Q    So here you opine that if the officers had called for an

19 ambulance or taken him to the hospital at the time they first

20 suspected he put drugs in his mouth, that he likely would have

21 survived, correct?

22 A    Yes.

23 Q    And that's your opinion to a reasonable degree of medical

24 certainty?

25 A    That's correct.

Johnson-Arbor - Direct by Maisuria

1  that are introduced into their system and can cause significant

2  toxicity.

3  Q   Again, maybe another obvious question, but why are

4  narcotics such as the ones ingested by Mr. Lurry dangerous?

5  A   By "narcotics," do you mean opioids?

6  Q   Let's break it down.  Thank you.

7        Why was the fentanyl and the heroin dangerous?

8  A   Those are both opioid drugs, and opioids are dangerous

9  because they work on the brain to cause an abnormally slow or

10 absent respiratory rate.  So they can make an individual not

11 breathe effectively or stop breathing in some cases, and that

12 can result in death.

13 Q   And I know you said earlier that he had, based on the tox

14 report, a non-fatal concentration of cocaine in his system.

15       How does cocaine operate in the body?

16 A   Cocaine is what we -- it's a sympathomimetic drug or what

17 we call an "upper" in lay person's term.  So cocaine makes

18 people generally agitated, have high blood pressures, rapid

19 heart rates, and abnormal behavior that is more of an agitation

20 type of behavior than somnolence and sleepiness --

21 Q   Fair to say --

22 A   -- as observed in this case.

23 Q   Sorry.  I didn't mean to cut you off.

24       So fair to say that toxicity from opioids looks very

25 different than toxicity from cocaine or some other stimulant,

Johnson-Arbor - Direct by Maisuria

1  correct?

2  A  Yes.

3  Q  And based on your review of the dash cam video in this case

4  and seeing signs and symptoms that Mr. Lurry was exhibiting in

5  the back seat of the car, what were his signs and symptoms more

6  consistent with?  What kind of toxicity?

7  A  Mr. Lurry's signs and symptoms in the back of the car were

8  more suspicious of an opioid intoxication than cocaine

9  intoxication.

10  Q  Okay.  And a drug overdose with opioids essentially works

11  because it causes you to stop breathing, right?

12  A  It causes you to have a slow or absent breathing.  So it

13  may not cause you to stop breathing in all cases, but it will

14  slow your respiratory rate.  In severe cases, it can cause you

15  to stop breathing, yes.

16  Q  And you said earlier that you believe that Mr. -- that an

17  ambulance should have been called by these officers for

18  Mr. Lurry once they believed he ingested drugs.

19       Why is it not medically appropriate to wait until he

20  starts physically exhibiting the symptoms of an overdose?

21  A  The reason for that is because the drug can work on the

22  body in ways that may not be visible to the naked eye, and also

23  the individuals observing the affected patient may not be able

24  to recognize all the signs and symptoms.

25       So for opioids in particular, you know, it's not

Johnson-Arbor - Direct by Maisuria

1  common for a lay person to know how to count a respiratory rate

2  and determine that somebody has adequate respirations or

3  ventilations.  So although somebody may look like they're

4  breathing normally, they may not be after an opioid overdose.

5  They may have very shallow breathing.  That can be very

6  dangerous and can be causing them to be deprived of oxygen,

7  even though they may appear to be breathing.

8  Q   And you mentioned earlier that one of the interventions

9  that -- one of the several interventions that would have been

10  available to Mr. Lurry had he been taken to the ER right away

11  was Narcan, right?

12  A   That's correct.

13  Q   What's Narcan?

14  A   Narcan is a trade name for Naloxone, and that is the

15  antidote for opioid overdose.

16  Q   Okay.  And based on your review of the record here, it's

17  your understanding that Officer Tellez was trained and

18  certified to administer Narcan, right?

19  A   That's correct.

20  Q   Okay.  And based on your review of the record here, you

21  understand that he failed to do so, right?

22  A   That is correct.

23  Q   And does Narcan work best when it's administered close in

24  time to when someone is exhibiting signs of an opioid overdose?

25  A   The reason to give Narcan is when somebody has a decreased

Johnson-Arbor - Direct by Maisuria

1      COURT REPORTER:  I'm sorry.  I didn't hear you.

2  BY MS. MAISURIA:

3  Q    You reviewed Officer Steurer's deposition testimony in this

4  case?

5  A    Yes.

6  Q    And what medical interventions are available to

7  emergency -- strike that.

8         In your decades as an emergency medicine physician,

9  have you ever heard, ever seen, any medical professional

10 utilize the technique to pinch someone's nose shut to get them

11 to open their mouth?

12 A    Never.

13 Q    That's not the recommended way to clear an airway, is it?

14 A    It is not.

15 Q    Okay.  And that's what you saw Sergeant May do with respect

16 to Mr. Lurry's nose in the back seat, isn't it?

17 A    Yes.

18 Q    And it's your opinion that this was detrimental to his

19 condition and worsened it, right?

20 A    Yes.

21 Q    And why is that?

22 A    Because at that point, by the time that Officer May pinched

23 his nose shut, Mr. Lurry was already very altered, at a very

24 reduced level of consciousness, and more likely than not had a

25 decreased ventilatory rate at that time.  So in somebody who is

Johnson-Arbor - Direct by Maisuria

1    not breathing normally, pinching their nose further deprives

2    them of oxygen and worsens their clinical condition.

3    Q    What did you see Officer McCue do on the video while May

4    was pinching his nose shut?

5    A    Sorry.  My phone turned on all of a sudden.

6          I believe Officer McCue was the individual who placed

7    the baton in Mr. Lurry's mouth.  Is that correct?

8    Q    Correct.  And --

9    A    Yes, so with -- I just -- I couldn't remember if he was the

10   one who did it.  But, yes, Officer McCue did place the baton in

11   Mr. Lurry's mouth, and he moved it around in his mouth.

12   Q    Okay.  Like a probe, right?

13   A    Like a probe, and then he extracted several bags from the

14   mouth.

15   Q    Are you familiar with the term "bite block"?

16   A    Yes.

17   Q    What does that term mean?

18   A    So a bite block is a rigid device that's placed in an

19   individual's mouth, usually between their teeth, to keep the

20   mouth open so that you can perform interventions within the

21   mouth without getting bit.

22   Q    Okay.  And what you saw Mr. -- or Officer McCue doing on

23   the video, was he using that baton like a bite block or like

24   the way you would with a blind finger sweep?

25   A    It didn't seem to me that he was using it as a bite block

Johnson-Arbor - Direct by Maisuria

1   because, again, a bite block is something that's stationary in

2   the mouth.  It's not something that you move around the mouth.

3   To me, he was using it more as a probing device.

4   Q    Okay.  And what's a blind finger sweep?

5   A    A blind finger sweep is just what it sounds like.  It's

6   placing a finger in somebody's mouth and moving it around,

7   trying to find an obstruction that you can relieve.

8   Q    Okay.  And so you would say here that the baton was being

9   used more like a blind finger sweep than a bite block, correct?

10  A    It was.  It was being used in a sweeping manner in his

11  mouth.

12  Q    Is a blind finger sweep recommended for bystanders to do?

13  A    Not as far as I know, no.

14  Q    Does the American Heart Association recommend a blind

15  finger sweep?

16  A    The American Heart Association specifically recommends

17  against blind finger sweep.

18  Q    And why is that?

19  A    Because it can potentially worsen an existing airway

20  obstruction.  If you can't see the obstruction and you put your

21  finger in, generally, in a child's mouth, you can potentially

22  worsen the obstruction, push it farther into the oropharynx,

23  and cause a worsening obstruction.

24  Q    And that practice was not recommended back in 2020, right?

25  A    As far as I'm aware, that is correct.

Johnson-Arbor - Direct by Maisuria

1    Q    Now, you reviewed evidence photos of the recovered bags in

2    this case, right?

3    A    Yes.

4    Q    Okay.  And on page 7 of your report, you indicate that they

5    measured 1 to 2 inches in length, right?

6    A    Yes.

7    Q    And on page 7 of your report, you concluded that the type

8    and size of the foreign body here can cause an upper or lower

9    airway obstruction when pushed into the back of the oropharynx

10   with an item like a baton, right?

11   A    That's correct.

12   Q    And you reviewed the deposition testimony of Dr. Humilier,

13   the pathologist who conducted the autopsy, right?

14   A    Yes.

15   Q    Are you aware that he testified that he believed it was

16   unlikely that Mr. Lurry experienced an airway obstruction due

17   to the lack of gag reflex seen in the videos?

18   A    Yes.

19   Q    And do you agree or disagree with that?

20   A    I disagree with that.

21   Q    Why?

22   A    So there's two reasons for that.

23        First of all, we know that Mr. Lurry was intoxicated

24   with opioids like fentanyl, and opioids do depress the gag

25   reflex.

Johnson-Arbor - Cross by Mathues

1    But, secondly, the degree of gag reflex can actually

2    vary from one individual to another.  So even without having

3    any fentanyl in his system, Mr. Lurry may have had just a

4    decreased gag reflex at baseline.

5    But definitely, in his case, I believe that his gag

6    reflex was decreased because of his opioid intoxication.

7    Q    Okay.  And I asked you earlier if you reviewed

8    Officer Steurer's deposition testimony in this case, and you

9    said yes.

10   You know that he testified that Mr. Lurry coughed up a

11   bag during CPR and then took some breaths of air.

12   If you assume that testimony to be true, does that

13   suggest to you that Mr. Lurry likely had an airway obstruction?

14   A    Based on that deposition testimony, yes.

15   Q    And so it's your opinion then that the actions of Officers

16   McCue and May worsened this existing airway obstruction then?

17   A    Yes.

18            MS. MAISURIA:  I have nothing else, your Honor.

19            THE COURT:  Okay.

20            MS. MAISURIA:  Thank you.

21            MR. MATHUES:  Ronak, would you like your computer

22   back?

23            MS. MAISURIA:  No, you can leave it there.

24                        CROSS-EXAMINATION

25   BY MR. MATHUES:

Johnson-Arbor - Cross by Mathues

1    timely fashion for care and survive, or you can take a large

2    amount of a drug and not get treated and die.

3    Q    That is -- that is true.  But isn't it also true that it is

4    possible to take a large enough quantity of drug that even if

5    one receives medical care within five minutes, it's highly

6    likely that you're going to succumb to the drug?

7    A    That depends on the drug.  For a drug that has an antidote,

8    I would say that's not true.  For a drug that does not have an

9    antidote, such as maybe a -- I'm trying to pull something out

10   of my head here -- Ricin, for example.  If somebody ingests a

11   certain amount of Ricin, there is not really an antidote for

12   that.  All we can do is supportive care.  And they may survive,

13   they may die.

14         For somebody who takes a drug that has an antidote

15   available, such as acetaminophen, such as heroin, such as

16   fentanyl, if that patient gets medical treatment within a

17   prompt amount of time, there is a very, very good chance that

18   that patient will survive.

19   Q    And, here, the antidote for opiates, specifically fentanyl

20   and heroin, would be naloxone a/k/a Narcan, correct?

21   A    Yes.

22   Q    And there's a range of time during which Narcan needs to be

23   given in order for it to have odds of working; also correct?

24   A    Yes.

25   Q    For example, Mr. Lurry did receive a number of doses of

Johnson-Arbor - Cross by Mathues

1   Narcan from the paramedics, correct?  You know that from your
2   review of the medical records?
3   A    He received it when he was already in cardiac arrest.  And
4   at that point, it's almost too late.  By the time somebody's
5   heart has stopped, Narcan is less likely to be able to
6   resuscitate them.
7   Q    And so the bottom line from that is Mr. Lurry did get
8   Narcan, but because of the amount of time that had passed, it
9   did not -- it did not -- unfortunately, did not benefit him; is
10  that correct?
11  A    That's correct.  If Mr. Lurry had received Narcan earlier
12  in the course of his intoxication, I believe that it's highly
13  likely, within a reasonable degree of medical certainty, that
14  he would have survived.
15  Q    And my question for you is:  How much earlier in terms of
16  minutes?  Can you give us a time or a time range within which
17  Narcan needs to be administered to a person who has overdosed
18  on fentanyl, heroin, or both in order for it to be effective?
19  A    Narcan could be administered at any time after the person
20  displays signs of intoxication, including a decreased
21  respiratory rate.  But, again, once the patient has cardiac
22  arrest, it's much less likely to be effective.
23          And I think we've already established that I did not
24  have timestamps on these videos.  I can't tell what time was
25  happening at what frame of the video.  And I'm also not able to

Johnson-Arbor - Cross by Mathues

1   count Mr. Lurry's respiratory rate because of the poor quality

2   of the video.  So I can't tell you because of the lack of

3   adequate video quality here exactly what time the naloxone

4   should have been given.  All that I can say was it should have

5   been given earlier in the course of his intoxication when he

6   was exhibiting signs and symptoms of intoxication, well before

7   he had a cardiac arrest.

8   Q   And you also can't tell us a specific range of time within

9   which Narcan needs to be given in order for it to be highly

10  probable to be effective.

11  A   Well, I can say that if you have a cessation of oxygen

12  delivery to your brain, you can get brain damage within

13  minutes.

14          So based on that, I would say that you would need to

15  give Narcan as soon as possible, ideally within minutes of

16  signs of intoxication, including decreased respiratory rate, to

17  have the best effect.

18          But, again, we do not have randomized controlled

19  studies on, you know, people that are intoxicated with opioids

20  that receive Narcan.  It would be completely unethical to take

21  people, make them swallow fentanyl, and then give them Narcan

22  to see if they survive.

23  Q   Putting aside studies that obviously would be ethical --

24  ethically problematic, if not wicked, are there any published

25  studies that would help go to this question -- let me strike

Johnson-Arbor - Cross by Mathues

1    their mouth?

2    A    That's possible.  So you're basically saying oral ingestion

3    versus sublingual ingestion?

4    Q    That is correct.

5    A    It's possible.  I actually don't -- off the top of my head,

6    I cannot tell you the pharmacokinetics of sublingual fentanyl

7    absorption.  But, yes, I would -- I believe that it is

8    faster-acting when it is sublingually absorbed.

9    Q    And as I think you've already told us, in the police video,

10   we see Mr. Lurry making chewing motions while he's in the back

11   seat of the car, correct?

12   A    Yes.

13   Q    And he's making those chewing motions intermittently

14   throughout the whole roughly seven minutes that he's being

15   taken back to the police station.  Also true?

16   A    I think for the majority of the time, he's making chewing

17   motions, yes.

18   Q    I'll agree with that.  The majority of the time, he's

19   making chewing motions.

20        And you would also agree that at least for the -- at

21   least some of those chewing motions are voluntary on

22   Mr. Lurry's part.

23   A    I don't know.  I mean, honestly, I -- I don't know if they

24   were voluntary or why he was doing it.  I wasn't there.  I

25   don't know his mental state at every moment during that video.

Johnson-Arbor - Cross by Mathues

1   you worked at?

2   A    In multiple states, yes.  The medical examiner criteria

3   varied based on -- based from state to state.  But in at least

4   two states that I can recall, drug overdoses would be

5   considered medical examiner cases.

6   Q    Now, you discussed what you believe to be Officer McCue

7   using the bite block, moving it around in Mr. Lurry's mouth,

8   correct?

9   A    Yes.

10  Q    But you would at least agree that it appeared to you the

11  officer's intent was to use the baton as a bite block?

12          MS. MAISURIA:  Objection.  Calls for speculation.

13          THE COURT:  I think that's true.  Sustained.

14  BY MR. MATHUES:

15  Q    Now, with respect to the use of the baton obstructing

16  Mr. Lurry's airway, you're not telling us that it's the baton

17  itself that obstructed Mr. Lurry's airway, correct?

18  A    I don't know.  I was not inside Mr. Lurry's mouth.  The

19  baton itself certainly could have posed an obstruction.  The

20  baton also could have caused a bag of drugs to become lodged in

21  the airway.

22  Q    Dr. Johnson-Arbor, do you remember a few months ago I took

23  your deposition?

24  A    You're sort of far away, so I can't really see you, but

25  I'll take your word for it that it was you.

Johnson-Arbor - Redirect by Maisuria

A    Yes.

Q    The clock on when to give Narcan and have it be effective
for Mr. Lurry didn't start ticking as soon as he put that bag
in his mouth, did it?

A    Correct.  So, again, we don't give Narcan just because
somebody is chewing drugs.  We give Narcan because somebody is
exhibiting respiratory depression from exposure to drugs.

Q    So if --

A    Specifically opioids.

Q    So if the officers had called for an ambulance at the scene
of the arrest, after they made statements believing that he had
taken drugs, put them in his mouth, and EMS had arrived and
taken him to a hospital, you wouldn't have necessarily given
him Narcan right away, right?

A    Correct.

Q    You would --

A    It would depend on his clinical condition.

Q    You would have waited until he started showing signs of
decreased respiration in the hospital, right?

A    From my experience as a medical toxicology and emergency
medicine physician, I would consider other treatments at the
hospital to decrease the absorption of the drug into his system
at that point or maybe even to flush the drugs out of the
system, but I would not give Narcan if he was awake and alert
and had a normal respiratory rate.

Johnson-Arbor - Redirect by Maisuria

1   Q    And those other treatments that you would have given him at

2   the hospital would have increased the chances that he wouldn't

3   even suffer decreased respiration then, right?

4   A    That would be the point of those treatments, yes.

5   Q    You were -- you -- I think counsel asked you in the context

6   of Officer McCue putting the baton in his mouth and these

7   officers taking the bags of drugs out of Mr. Lurry's mouth in

8   the back seat of the car, whether it's a good idea to get a

9   foreign body obstruction out sooner rather than later.

10           Do you remember that question?

11  A    Yes.

12  Q    And you said yes, right?

13  A    Correct.

14  Q    It's a good idea for trained medical professionals to do

15  that, right?

16  A    Yes.

17  Q    Because they receive training on how to do that without

18  further harming someone, right?

19  A    Yes.  But, I mean, I think if you know BLS, as this

20  officers did, if there's an airway obstruction, you could give

21  abdominal thrusts or use other basic life support measures to

22  dislodge a foreign body if it's there.

23  Q    And that's the training that these officers received in the

24  case of an airway obstruction, right?  They were trained in

25  ALS?

Johnson-Arbor - Redirect by Maisuria

1  A   So I know they had BLS training.

2  Q   Okay.  And you didn't see them utilize that training, did

3  you?

4  A   I did not.

5  Q   You saw them decide to pinch his nose shut --

6  A   Sorry, wait.

7  Q   Sorry?

8  A   I'm sorry.  They had -- they had CPR training.  So -- yes.

9  So based on their training histories, they should have been

10 aware of BLS techniques, yes.

11 Q   Okay.  And you didn't see them utilize that training.  You

12 saw them pinch his nose shut and put a baton in his mouth to

13 fish out some drugs, right?

14 A   Correct.

15 Q   You were talked -- you were asked some questions about the

16 American Heart Association recommendations and how the blind

17 finger sweep applied specifically to children, right?

18 A   Yes.

19 Q   Adults can suffer foreign body obstruction, too, right?

20 A   Yes.

21 Q   And the practice of a blind finger sweep is equally

22 dangerous on an adult, isn't it, for the same reasons that it's

23 dangerous on a child?

24 A   For adults, the general recommendation for a foreign body

25 obstruction is to use the Heimlich maneuver or abdominal.

Johnson-Arbor - Recross by Mathues

1  Q   The reason that you don't know -- strike that.

2          Because you don't know where something is in someone's

3  mouth when there's an airway obstruction, that's precisely the

4  reason you don't go in blindly, right?  That's why it's not

5  medically recommended to stick a baton in someone's mouth like

6  that?

7  A   Again, the reason to not do that is because, yes, if you

8  don't know where the obstruction is, you could potentially

9  worsen the obstruction by pushing it farther down into the

10 airway, make it more difficult to retrieve.

11 Q   Okay.

12         MS. MAISURIA:  That's it, your Honor.

13         Thank you so much.

14         THE COURT:  Okay.  Do you want to add anything else?

15         MR. MATHUES:  I have one or two questions, your Honor.

16         THE COURT:  Sure.

17                     RECROSS-EXAMINATION

18 BY MR. MATHUES:

19 Q   I want to clarify one precise point of your opinions,

20 Dr. Johnson-Arbor.

21         You have opined that if Mr. Lurry had received medical

22 care at or near the time Officer Tellez made those statements

23 about suspecting Mr. Lurry had drugs in his mouth, that he

24 would have survived, correct?

25         MS. MAISURIA:  Objection, your Honor.

Johnson-Arbor - Recross by Mathues

1    BY THE WITNESS:

2    A    I think that within a reasonable --

3            THE COURT:  What's your objection?

4            MS. MAISURIA:  That wasn't within the scope of my

5    redirect.

6            THE COURT:  Oh.  I'll let him ask the question.  It's

7    okay.

8    BY THE WITNESS:

9    A    I think, within a reasonable degree of medical certainty,

10   had Mr. Lurry received medical care much sooner in the course

11   of his events, especially at or around the time that he was

12   initially witnessed ingesting the drugs, his chances of

13   survival would have been substantially higher.

14   BY MR. MATHUES:

15   Q    More precisely, though, you cannot say, to a reasonable

16   degree of medical certainty, that if Mr. Lurry had gotten

17   medical care at the moment he arrived at the station, he would

18   have survived.

19   A    There's no absolutes in medicine.

20           Can you repeat that question again?  I think I may

21   have missed something.

22   Q    You cannot say, to a reasonable degree --

23   A    At the time he arrived at the station?

24   Q    You cannot say, to a reasonable degree of medical

25   certainty, that if Mr. Lurry would have gotten medical care at

Johnson-Arbor - Recross by Mathues

1    the moment he arrived at the police station, he would have

2    survived, and the reason you can't say that is you don't know

3    the condition of his internal organs at the time.

4    A    That is not correct.  I would not agree with that

5    statement.

6            THE COURT:  That's it?  Oh.

7        (Pause in proceedings.)

8    BY MR. MATHUES:

9    Q    Just so you're not confused, I'll ask you again.

10           Can you say, to a reasonable degree of medical

11   certainty, that if Mr. Lurry would have gotten medical care at

12   the moment he arrived at the police station, he would have

13   survived?

14   A    That's not the question that you just asked me, though.

15   Q    Fair enough.  So I will ask what I hope to be the question

16   I just asked.

17           Can you say, to a reasonable degree of medical

18   certainty, whether -- if Mr. Lurry would have gotten medical

19   care at the moment he arrived at the police station, he would

20   have survived?

21   A    I think that if Mr. Lurry had received medical care at the

22   moment that he arrived at the police station, that his chances

23   of survival would have been substantially higher.

24   Q    Fair enough.  I understand that testimony.

25           My question that I hope I asked was a little bit

1   that?

2           "Answer:  That -- I don't know.  Just the fact that he

3   started -- he -- he was able to gain some breaths once he

4   obviously coughed the baggie up."

5           21.

6           "Question:  Audibly heard that, you heard him gasping?

7           "Answer:  Right.  Once -- once the baggie had come

8   up" --

9       (Pause in proceedings.)

10          MS. MAISURIA:  Sorry.

11  BY MS. MAISURIA:

12  Q   (Reading:)

13          "It seemed like he was, like I said, again, coughing

14  and gasping somewhat for air."

15          So that was in the deposition transcript that you

16  reviewed, right?

17  A   Yes, ma'am.

18  Q   And we just went through that hypothetical where if

19  somebody, no matter what rhythm they're in, if they have an

20  obstruction and they cough it up, and then that resumes their

21  breathing, that that suggests that there was an airway

22  obstruction, right?

23  A   That would.  Yes, ma'am.

24  Q   So, here, Officer Steurer's deposition testimony tells you

25  that he had an airway obstruction, doesn't he -- doesn't it, if

Smock - Cross by Maisuria

1   you assume that testimony to be true?

2   A    If you assume that to be true and it was -- if that is

3   medically true, that would be correct.  I don't know what

4   medical background he has.  But if that is true, that would an

5   accurate statement.

6   Q    Well, he doesn't need to have a medical background, does

7   he, to testify as to his own observations of what he saw

8   Mr. Lurry doing while CPR was being performed, does he?

9         MR. MATHUES:  Objection to the form of the question --

10  BY THE WITNESS:

11  A    No, sir -- no, ma'am --

12        THE COURT:  Hold on.  Remember, you have to wait.

13        And I'm not going to sustain that, but at least let me

14  put the ruling on the record.

15        Overruled.

16  BY MS. MAISURIA:

17  Q    He doesn't need to have a medical background, does he, in

18  order to hear with his ears that he took some breaths, right?

19  A    No, ma'am.  That is -- assuming he has CPR training, that

20  would be an accurate statement.

21  Q    Okay.  Now, you saw on the dash cam video that Mr. Lurry

22  only became unconscious and stopped breathing after

23  Defendant May pinched his nose shut, right?

24  A    I don't -- let me look at the timeline.

25        No.  What I have in my notes is the nose pinch at

Smock - Cross by Maisuria

1    medical need to call the fire department.  If the officers knew

2    that there were drugs in there, clearly, you want to get those

3    drugs out, if they knew that.  But Mr. Lurry didn't tell them

4    that.

5    Q   Well, you watched the video in this case, right?  You know

6    it's undisputed that Officer Tellez made four separate

7    statements on video over the course of approximately two

8    minutes, saying, "I think he swallowed the drugs, pretty sure

9    he put dope in his mouth."  He also says it in the car on the

10   way to the station.

11          MR. MATHUES:  I would object to this --

12   BY MS. MAISURIA:

13   Q   Are you disputing the fact that the officers believed that

14   he put the drugs in his mouth?

15          THE COURT:  Okay.  Wait.

16          MR. MATHUES:  Objection to the line of questioning.

17   While it may well be relevant for trial, it's not relevant to a

18   *Daubert* hearing.

19          THE COURT:  I agree with you.  That's sustained.

20   BY MS. MAISURIA:

21   Q   You'd agree that in cases of drug intoxication, generally,

22   that the earlier you get medical attention, the more likely the

23   person will survive, right?

24          MR. MATHUES:  Same objection, your Honor.

25          THE COURT:  Overruled.

Smock - Cross by Maisuria

1    You can answer that one.

2    BY THE WITNESS:

3    A   Yes.  In general, the sooner you get the drugs -- either

4    prevent the drugs from going in or, once the drugs are in, you

5    can provide supportive care, in general, the better the chance

6    of survival.

7         However, again, as I've said earlier, there are cases

8    where, based on the quantity of drugs, it makes no difference.

9    You're dead either way.

10   BY MS. MAISURIA:

11   Q   You talked about the rapidity of drug --

12   A   In general, you're correct.

13   Q   You talked about the --

14   A   I'm sorry.

15   Q   -- rapidity of drug absorption in your opinion.

16        You didn't do anything to determine the drug

17   absorption rate here, did you?

18   A   Of course not.  As a physician, I know that drugs in the

19   mouth under the tongue are rapidly absorbed.  No need to do any

20   testing, ma'am.

21   Q   You keep saying under the tongue.  How do you -- you say

22   that he absorbed it sublingually.  How do you know he absorbed

23   it sublingually?

24   A   Well, because the tongue is part of the mouth.  Oral

25   absorption is rapidly, and that's because of the quantity of