Page 1

1  UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF ILLINOIS
3  EASTERN DIVISION
4  -------------------------------------------------------
5  Nicole Lurry, as Special Administrator of the Estate of
6  Eric Lurry, Jr., deceased,
7
8     Plaintiff,
9
10    vs.                    Case Number 1:2020cv04545
11
12 City of Joliet et al.,
13
14    Defendants.
15 -------------------------------------------------------
16        Deposition of Jeremy Harrison
17              Tuesday
18           November 2nd, 2021
19
20             -at-
21
22        Zoom Remote Deposition
23
24
25

Page 2

1             APPEARANCES
2
3        For the Plaintiff:
4           Abby Bakos
5          Ronak Maisuria
6      Bakos & Maisuria Law Group
7          1755 Park Street
8          Suite 200-1070
9        Naperville, Illinois 60563
10
11
12       For the Defendants:
13        Michael D. Bersani
14     Hervas, Condon & Bersani, P.C.
15         333 Pierce Road
16            Suite 195
17       Itasca, Illinois 60143
18
19
20    For Defendant City of Joliet:
21          Sabrina Spano
22          City of Joliet
23     150 West Jefferson Street
24        Legal Department
25       Joliet, Illinois 60432

Page 3

1       Also present:
2          Nicole Lurry
3          Jose Tellez
4
5       RECORDER: Zoom is recording. Good morning.
6  We're now on the record. Today is Tuesday, November
7  2nd, 2021. The time is now 10:04 a.m. We're meeting
8  remotely today for the deposition of Lieutenant Jeremy
9  Harrison in the matter of Nicole Lurry, as Special
10 Administrator of the Estate of Eric Lurry, Jr.,
11 deceased, et al. v. City of Joliet et al., case number
12 1:2020cv04545. The venue is Northern District of
13 Illinois, Eastern Division. Lieutenant Harrison, my
14 name is Debra Westfall. I'm a notary public, and I'm
15 recording this deposition on behalf of Exhibit 5, LLC.
16 This deposition is being recorded remotely via Zoom in
17 accordance with Illinois Public Act 101-0640.
18 Lieutenant Harrison, would you please confirm your
19 identity by placing a valid picture ID in front of the
20 camera briefly?
21      MR. HARRISON: Sure.                0:01:00
22      RECORDER: Thank you very much. And
23 Lieutenant Harrison, are you physically located in the
24 state of Illinois today?
25      MR. HARRISON: Yes, ma'am.

Page 4

1       RECORDER: Thank you. At this time, would
2  you please raise your right hand for the oath?
3          (Witness sworn)
4       RECORDER: Thank you. Would the attorneys
5  please state their appearances for the record?
6       MS. BAKOS: Abby Bakos on behalf of
7  Plaintiff.
8       MR. BERSANI: Mike Bersani on behalf of
9  Defendants.
10      MS. BAKOS: And --
11      MS. MAISURIA: Ronak Maisuria for Plaintiff.
12      RECORDER: And I think we just had Sabrina
13 Spano join. I don't know that her audio is -- is
14 working just yet. Would anyone else in the virtual
15 room please take -- state their appearance for the
16 record?
17      MS. LURRY: Nicole Lurry.
18      MR. TELLEZ: Jose Tellez.              0:02:02
19      RECORDER: That completes the required
20 information. We can proceed.
21      MS. BAKOS: This is the deposition of Jeremy
22 Harrison, taken pursuant to the Federal Rules of Civil
23 Procedure and Rules of Evidence, in the case of Lurry
24 v. City of Joliet et al., case number 20cv4545,
25 currently pending in the United States District Court

Page 117

1 overdosing because they had drugs in their mouth, I
2 would attempt to pull it out of their mouth.
3   Q.  Is it your understanding that the City of
4 Joliet allows police officers to make an independent
5 assessment of whether or not an individual is -- is
6 feigning illness when they are exhibiting signs of a
7 medical emergency?
8   A.  Again, it -- it -- it's not -- there is
9 nothing written.  I -- I just think that -- again, that
10 that's more of a common sense thing, so I guess my
11 answer would be yes.  But it's --
12   Q.  Okay.                                    2:36:07
13   A.  -- not a black and white written policy.
14   Q.  Has there ever been a time where you believed
15 that an arrestee was feigning a medical emergency and
16 then later determined that the arrestee was not
17 feigning a medical emergency?
18   A.  No.
19   Q.  Are you aware that one of the signs or --
20 yeah, one of the signs of an individual who may be
21 overdosing are the eyes rolling back in the head?
22       MR. BERSANI:  Object to the lack of
23 foundation.
24   A.  I -- I suppose that could be a sign.
25   Q.  And what about shallow breathing?

Page 118

1       MR. BERSANI:  Same objection.  Lack of
2 foundation.
3   A.  I'm aware that could be a symptom.       2:37:08
4   Q.  And in your opinion, if an individual is
5 already having issues breathing and having -- I'm
6 sorry, strike that.  In your opinion, when an
7 individual is exhibiting signs of shallow breathing,
8 would it be safe to further inhibit the individual's
9 breathing by pinching their nose?
10       MR. BERSANI:  Same objection.  Also improper
11 hypothetical, incomplete.  Assumes facts not in
12 evidence.
13   A.  So you're asking my opinion?  No, I'll
14 disagree.
15   Q.  Okay.  So you think that further inhibiting
16 the breathing is not unsafe?
17   A.  Well, that's not what you said, you said,
18 "pinching the nose."  So I -- if I was to cover their
19 mouth and pinch their nose, I would say that's wrong.
20 If they're breathing --
21   Q.  Okay.                                    2:38:04
22   A.  -- pinching the nose, I -- I don't -- I
23 disagree, I -- I would say that that's not harming.
24   Q.  Okay.  If they're breathing through their
25 mouth?

Page 119

1   A.  Sure.
2   Q.  Okay.  Would it be important to determine --
3 well, strike that.  Are you aware that one of the signs
4 of overdosing is unconsciousness?
5       MR. BERSANI:  Same objection.  Lack of
6 foundation.
7   A.  Yes.
8   Q.  Okay.  And along with that, a limp body,
9 would you agree with that -- that could be one of the
10 signs as well?
11       MR. BERSANI:  Same objection.
12   A.  Could be.
13   Q.  And the head falling backward or to the side,
14 would you consider that to be another sign of an
15 overdose?
16       MR. BERSANI:  Same objections.
17   A.  It could be.                             2:38:59
18   Q.  And is this information related to the signs
19 of an overdose that we just went over, is that
20 information that you've obtained just based on your
21 experience as a police officer?
22   A.  I -- I don't know that I've had that all in
23 training.  I mean, some of it's a police officer, just
24 life experience.
25   Q.  And you've never seen anyone exhibit a -- and

Page 120

1 I'm not talking about Mr. Lurry, exhibit eyes rolling
2 back, shallow breathing, unconsciousness at the same
3 time.  Is that accurate?
4   A.  I'm not sure what you meant on that.      2:40:01
5   Q.  That's okay, that was a bad question, let me
6 skip it.  Are you aware that one of the effects of
7 fentanyl could be dizziness?
8   A.  I -- I would assume that that would be a part
9 of it.  Did I learn that in training?  I'm not sure.
10       MR. BERSANI:  Yeah, we don't want you to
11 assume anything.
12       WITNESS:  Okay, I'm sorry.
13       MR. BERSANI:  So just testify as to what --
14       WITNESS:  Okay.
15       MR. BERSANI:  -- you know or don't know.
16       WITNESS:  Okay.
17   Q.  Do you know whether one of the effects of
18 fentanyl is confusion?
19   A.  No.
20   Q.  Have you ever seen anyone under the influence
21 -- well, that you knew was under the influence of
22 fentanyl?
23   A.  I do not believe so.
24   Q.  Okay.  Are you aware that respiratory
25 depression is one of the effects of fentanyl?

Page 125

1  A. I don't know that I'd believe that they're
2  having a medical emergency, but I would err on the side
3  of caution. If both of those coupled together and I
4  saw them coupled together, I would get them medical
5  emergent -- I would deem them in a medical emergency,
6  get them medical help.
7  Q. Okay. All right. Officer, are you aware
8  that a cocaine overdose victim -- strike that. Are you
9  aware that a large amount of cocaine can cause an
10  individual's heart to stop pumping?
11  A. I know a large amount of cocaine can cause
12  heart issues.
13  Q. Okay. What do you mean by "heart issues"?    2:47:17
14  A. Well, I -- I know of instances from training
15  and being told that a large amount of cocaine in
16  someone's system could cause -- cause a heart attack.
17  Q. Okay. And same with heroin, are you aware
18  that a large amount of heroin can cause a heart attack?
19  A. I'll say I know that it can cause a medical
20  emergency. Heart attack --
21  Q. Okay.
22  A. -- specifically, no.
23  Q. Okay. And what about fentanyl, are you aware
24  that that can cause heart failure, large amounts of it?
25  A. A minimal amount could.

Page 126

1  Q. A minimal amount could?
2  A. Yes.
3  Q. Did you have any reason to believe that --
4  well, strike that. Were you aware that fentanyl was a
5  drug that was being sold and used in the City of Joliet
6  in January of 2020?
7  A. Fentanyl specifically?
8  Q. Yeah.                                       2:48:16
9  A. We didn't have any trends on that.
10  Q. Okay. And by "trends on that," can you just
11  say what you mean?
12  A. Yeah, so some of it is just your experience
13  of what happens. So on an almost daily basis, we speak
14  to drug users, sometimes drug dealers, and other
15  confidential informants. I also, through part of my
16  duties, deal with a diversion program with the DEA with
17  a -- with a person that will contact me and let me know
18  that somebody in the area has overdosed on fentanyl,
19  who's been arrested for fentanyl, and likewise, he'll
20  ask for information on stuff we have, so all of that
21  coupled together, I didn't have any information that
22  fentanyl was -- was trending in the area, was becoming
23  a popular drug at that time being sold or used in the
24  area.
25  Q. Okay. Officer, were you aware that back

Page 127

1  around the -- well, in the year of 2020 that patrol
2  officers were responding to overdose calls on a weekly
3  basis?
4  A. I -- I didn't know the statistics on it.    2:49:48
5  Q. Did you know that that was a common
6  occurrence at that time?
7  A. I don't know that I'd use the word
8  "comments," I -- or "common occurrence," I know that
9  there were times that patrol officers would respond to
10  overdoses, I don't know --
11  Q. Okay.
12  A. -- how often necessarily that it was -- I
13  wouldn't use the word "common."
14  Q. Okay. Are you trained -- I know you've been
15  -- you've had Narcan training, are you certified to
16  carry Narcan?
17  A. I don't think there's a certification that
18  they offer for us, it -- and I'm not trying to talk --
19  I --
20  Q. Oh.
21  A. -- hope I'm not talking out of turn with it,
22  I think we had a brief -- brief training block on the
23  administration of Narcan, but I don't know of a
24  certification or a certificate or anything like that.
25  Q. Okay. So as far as you know, there is no --

Page 128

1  if you know, are there specific courses for an
2  individual who opts to carry Narcan?
3  A. We could carry Narcan off that half hour
4  block, to answer your question, as -- as far as I know.
5  There -- there may be more after that.
6  Q. You're saying that you can carry Narcan as
7  long as you've had that half hour training, is that
8  what you're saying?
9  A. Yes, and -- and --
10  Q. I don't know what a block --
11  A. -- please -- yeah, please don't hold me to it
12  being a half hour, it may have been a little bit longer
13  there, but it wasn't like an eight-hour training day,
14  it was -- it was a short training with an officer and I
15  believe maybe even a PowerPoint or a film -- say --
16  "film," I'm dating myself, but you know what I'm
17  saying, like a PowerPoint with it, it was a small block
18  of training, and if you took that and chose to carry
19  Narcan, you could. Hopefully, that answers it.
20  Q. Okay. Yeah. Did you choose to carry Narcan
21  in January of 2020?
22  A. I did.                                      2:51:53
23  Q. And when you -- where did you carry the
24  Narcan on you on the date of that -- of the incident?
25  A. So it would be in the glove box of my squad

Page 129

1 car.
2    Q. Okay. Is there any particular reason why you
3 decided to carry Narcan?
4    A. Yeah, there are some personal reasons behind
5 it as well, but I -- I always thought that, if I got a
6 chance to help a citizen, that I would do it.
7    Q. Okay. Do you know if Officer McCue or Tellez
8 were Narcan carriers?
9    A. I do not know.
10    Q. What about Officer May?
11    A. I do not know.       2:52:52
12    Q. Okay. Are there any requirements about --
13 that -- that you're aware of about -- well, strike
14 that. Can you tell me how -- how are you trained to
15 administer Narcan?
16    A. To administer it? So the -- the -- the form
17 that I have, it's a nasal spray, so I spray it in the
18 nostrils.
19    Q. Okay. And what were -- are you trained are
20 the circumstances in which you should take that action?
21    A. If I feel that somebody's overdosing on an
22 opioid.       2:53:56
23    Q. Did you, at any point during the interaction
24 between Joliet police officers and Mr. Lurry in the
25 parking lot of the Joliet Police Department believe

Page 130

1 that Mr. Lurry was in the midst of an overdose?
2    A. At any point, did I believe he was?
3    Q. Yeah.
4    A. I did, yes.
5    Q. And at any point, did you administer Narcan
6 to Mr. Lurry?
7    A. No.
8    Q. Do you know if anyone else did, not including
9 the EMTs?
10    A. No, I don't believe they did.
11    Q. Do you know if Officer Ranstead was a Narcan
12 carrier?
13    A. I do not know.       2:54:59
14    Q. Do you remember seeing Officer Cardwell on
15 scene at the -- the -- in the parking lot or the
16 station?
17    A. I don't.
18    Q. Okay. Is it your understanding that you are
19 -- well, strike that. Can you tell me why you did not
20 administer Narcan to Mr. Lurry --
21    A. Sure.
22    Q. -- when you determined that he was actually
23 in the midst of an overdose?
24    A. Well, I'll go back, I -- I never determined
25 that he was in -- in the midst of an overdose.

Page 131

1    Q. Okay.
2    A. I felt he was, but I felt it had nothing to
3 do with fentanyl or heroin. I never knew Eric Lurry,
4 through the course of my career or my relationship with
5 him or information I've ever received on his drug
6 dealings, that he was involved in the dealings or the
7 usage of any opioids.
8    Q. Okay.       2:56:02
9    A. So it -- it was only cocaine, so -- so --
10    MR. BERSANI: Hang -- hang on a second, let
11 him finish, please.
12    A. It -- it was only cocaine as his dealings and
13 crack cocaine, so administering Narcan would do nothing
14 for that.
15    Q. Okay. I want to circle around to that, then,
16 while we're on it.
17    A. Okay.
18    Q. Would it be fair to say that you were
19 involved in a JNU investigation immediately prior to
20 the incident on the same day as the incident?
21    A. We're talking about this incident basically,
22 right, or are you talking about the incident --
23    Q. Yeah.
24    A. When you're saying, "incident," are you
25 describing the station at the police department in the

Page 132

1 squad car?
2    Q. Yeah, yeah.
3    A. I guess because I don't want to confuse -- so
4 I was involved in investigation, but it was this one
5 that he's involved in, if that's what you're asking.
6    Q. That morning, right?
7    MR. BERSANI: You're -- are you asking him
8 prior to what happened in the parking lot?
9    MS. BAKOS: Yeah.       2:57:04
10    MR. BERSANI: Okay.
11    A. Okay, so just prior to that, yes.
12    Q. And did that incident -- well, I guess let's
13 just go there for now.
14    A. Okay.
15    Q. You -- hold on one second, I need a second.
16 Okay. So tell me, what is -- what shift were you
17 working that day?
18    A. It -- it was a normal shift that we would
19 work for the narcotics unit. I -- I mean, I'd rather
20 not divulge the hours if I didn't have to.
21    Q. That's okay. Okay. And that day, you were
22 -- you shared a vehicle with Sergeant May. Is that
23 correct?
24    A. I -- I hope you don't think I'm trying to be
25 difficult with it. So I -- no, I -- I don't normally

Page 141

1  incident?
2  A. Not that I can recall.
3  Q. Have you ever received an email related to
4  this incident that did not include your attorney on it?
5  A. Yes.
6  Q. And do you remember the -- or generally the
7  contents of the communication that you received?
8  A. Yes, offhand, the one I can remember is from
9  a reporter from USA Today, wanted me to call and give
10 an interview, reference this incident and Sergeant
11 Javier Esqueda, and I did not respond.
12 Q. Okay. Anything other than that?
13 A. Not that I can recall.           3:10:52
14 Q. Okay. Okay. So tell me, what is the very
15 first thing you remember about January 28th, 2020?
16     MR. BERSANI: You mean the first thing that
17 -- that's a little vague. I assume that you want him
18 to start at the beginning of the day or something or --
19     MS. BAKOS: Yeah, yeah, the beginning of the
20 day.
21 Q. What did you do after you woke up?
22     MR. BERSANI: Okay, go ahead.
23 A. I --
24     MR. BERSANI: I think she's asking about the
25 JNU -- JNU --

Page 142

1      WITNESS: Yeah.
2      MR. BERSANI: -- investigation.
3  A. I -- I don't remember other than once I'm at
4  work, eventually after -- after lunch, the incident
5  happening.
6  Q. Was -- the narcotics investigation, did that
7  start after lunch as well?
8  A. After I took my lunch, yes, that's when it
9  happened.
10 Q. Okay. After you took your lunch. Got it.
11 So about what time was -- was that that you took your
12 lunch?
13 A. I don't recall the exact time.    3:12:13
14 Q. Okay. So what's the first thing that you
15 remember about the investigation?
16 A. Sergeant May had notified me that they were
17 getting ready to try and conduct surveillance, make a
18 stop on a car, so I jumped in a car with him.
19 Q. Okay. Were you at the station when he
20 notified you of this?
21 A. When he notified me of it? I -- I -- I can't
22 say that I was for sure at that very moment --
23 Q. Okay.
24 A. -- that he notified me.
25 Q. Okay. And after you got in the car with

Page 143

1  Sergeant May, what happened?
2  A. We were heading to the area of Briggs and
3  what ends up being New Lenox Road, and -- and Officer
4  Soustek was keeping us apprised of the information he
5  was receiving from a confidential informant.
6  Q. Okay. And what happened next?    3:13:15
7  A. We -- we kept getting information from
8  Officer Soustek as to what was happening, so we were
9  trying to coordinate units in the area.
10 Q. Okay. Did you, at that point, know the
11 target of the investigation? Did you know who the
12 target of the investigation was?
13 A. I did not.
14 Q. Did you know -- did you know that the
15 investigation -- you were trying to investigate a
16 potential drug deal?
17 A. Yes.
18 Q. Okay. And did you know what kind of drugs
19 were believed to be involved?
20 A. It was believed to be cocaine.    3:14:09
21 Q. Okay. And so after you continued to get all
22 this information, what happened?
23 A. We sat in the area of New Lenox Road and wait
24 -- waited for more information to come to eventually
25 make a -- what -- if the information changed and to

Page 144

1  survey a narcotics transaction.
2  Q. Okay. And at some point, were you given
3  information that made you leave the area that you were
4  initially parked at?
5  A. Yes.
6  Q. Okay. What information did you get, just
7  that the --
8  A. That there --
9  Q. Go ahead.
10 A. That a male was going to be in a red vehicle
11 and he was going to make an exchange with another
12 subject to -- to get the narcotics.
13 Q. Okay. And you know today that that
14 individual in the red vehicle was Ivan Davis, correct?
15 A. That's correct.                   3:15:18
16 Q. Okay. Did you have any information about who
17 the exchange was supposed to be between?
18 A. No.
19 Q. Okay. So where did you go when you got that
20 information?
21 A. We ended up going to the Speedway off of
22 Briggs near I-80.
23 Q. And where did Sergeant May park the vehicle
24 you were in?
25 A. He parked right in front of the -- the

Page 149

1 where did the red Buick ultimately stop?
2  A. Ultimately stopped in a driveway, I believe,
3 at the 1100 block, I believe, of New Lenox Road. I may
4 be off on the hundred block, but it was on New Lenox
5 Road if -- crashed.
6  Q. Okay. And when you -- did you pull up to
7 wherever this -- the crash was, wherever the vehicle
8 was stopped on New Lenox?
9  A. Yeah, a little bit down the street.
10  Q. Okay. Did you get out of your vehicle or --
11  A. Eventually --
12  Q. -- Sergeant May's vehicle?
13  A. I -- I'm sorry. Eventually, we did.     3:21:49
14  Q. Okay. And when you got out of the vehicle,
15 what happened?
16  A. I saw subject who I knew on-site to be Ivan
17 Davis sitting on the ground talking to officers, and I
18 asked the officers if -- you know, if there was a
19 reason why he was sitting there, and they go -- they
20 just -- they just got done getting in a car chase -- in
21 a -- in a foot chase with him. I said, "Get him up off
22 the ground and get him in the car."
23  Q. Okay. At that point, did you know whether or
24 not anyone had recovered any drugs on Mr. Davis?
25  A. They were in the process of doing that.

Page 150

1  Q. In the process of searching him?
2  A. No, recovering what he threw.
3  Q. Oh, okay. Did you, at any point, view
4 whatever it is that he threw?
5  A. Yes.
6  Q. Okay. When did you view it?
7  A. Shortly after someone had recovered it. I
8 don't remember which officer had recovered it.
9  Q. Okay. And what did it look like?
10  A. Cocaine.                              3:22:55
11  Q. It was a white powdery substance?
12  A. I believe so.
13  Q. And -- okay. Did you have any conversations
14 with Mr. Davis?
15  A. I did.
16  Q. Can you tell me about that conversation?
17  A. I had known Ivan for -- throughout the course
18 of my career and I had talked to him several times
19 throughout my career, he wanted to offer up some
20 information. Specifically at that very moment, I -- I
21 told him I had a lot going on, so I would talk to him a
22 little bit, but specifically at that moment, he wanted
23 to let me know that there was a female inside the
24 residence that we were in the driveway of that had a
25 warrant.

Page 151

1  Q. Okay. Okay. Did he give you any information
2 about the individual who he purchased the drugs from?
3  A. I do not believe so.
4  Q. Did you ever ask?
5  A. I don't believe I inquired.           3:23:59
6  Q. Okay. And after you had this conversation
7 with Mr. Davis, what's the next thing that happened?
8  A. I talked to the -- the homeowner of the
9 residence and I had asked her if there was someone in
10 the -- in -- in her house hiding, and she said there
11 was, she didn't want to get herself in trouble. I was
12 debating about how to go about doing it, and I
13 eventually said, "Listen, it's your house, you can let
14 us in."
15  Q. Okay. And then what?
16  A. So she let us in, and I found a female hiding
17 in the basement with a partially shaved head.
18  Q. Okay. And then what?
19  A. Asked her her name, she -- she was crying,
20 said she had a warrant, we took her into custody.
21  Q. Okay. And after you took her into custody,
22 did you have any other information before leaving that
23 scene about the individuals in the Mazda?
24  A. I did.                                3:25:07
25  Q. What information did you have?

Page 152

1  A. I had asked someone on the scene, and I don't
2 know who it was, what had happened with the traffic
3 stop, they said Officer Wietting had someone in custody
4 for driving while suspended and PCS, meaning possession
5 of a controlled substance.
6  Q. Okay. Anything other than that?
7  A. Yes, before we left, I heard sector 14, that
8 -- that's the sector car for the City, I heard them --
9 between the channels scanning on my radio, I heard them
10 asking for another unit, sounded like they were
11 struggling with someone, huffing and puffing, so I -- I
12 wasn't sure if that had something to do with Officer
13 Wietting's stop or not.
14  Q. Okay. Did you inquire about it?
15  A. Not at that moment.                   3:26:05
16  Q. Okay. When did you inquire about it?
17  A. When I got back to the police department.
18  Q. Before Officer McCue pulled up with Mr.
19 Lurry?
20  A. Yes, ma'am.
21  Q. Okay. And who did you inquire about it with?
22  A. I believe it was Officer Mike Steurer.
23  Q. And was that a conversation that had in
24 person?
25  A. Yes, been in the parking lot, he was walking

Page 153

1 in with his computer in hand, so I asked him to look on
2 his computer to see what call sector 14 was on because
3 I had felt it probably had something to do with sector
4 15, which was -- or I -- I believe Officer Wietting was
5 sector 15, but Officer Wietting's stop. I believed
6 with -- you know, the struggle that they had had
7 involved his stop, but I wasn't sure so I wanted him to
8 check for me.
9   Q.  Okay. And then what information did he give
10 you?
11   A.  You know, I just asked him, are they on his
12 call, and he said that they were.
13   Q.  Okay. At that point, did you know that Eric
14 Lurry was involved in any way?
15   A.  I did not.                           3:27:12
16   Q.  At that point, did you know that the
17 individual who was in custody -- in the custody of
18 Officer Tellez and McCue was the individual -- inside
19 of the Mazda during the drug transaction?
20   A.  You know, you -- you broke up or it went
21 silent right in a crucial part of that question, so can
22 you repeat that?
23   Q.  Okay, yeah. Did you know -- when you had
24 those conversations with Officer Steurer, did you know
25 that the individual who was -- the individual believed

Page 154

1 to have done the hand-to-hand transaction with Ivan
2 Davis was the individual who was in custody with Tellez
3 and McCue?
4   A.  Knowing now, I did not. At that time, I
5 thought it was.
6   Q.  You thought it was. What led you to believe
7 that?                                       3:28:10
8   A.  So oftentimes what happens in our -- in our
9 city when we have a field training officer and a
10 recruit, which was the case with Officers Tellez and
11 McCue, Officer Tellez being the training officer and
12 Officer Cue -- McCue being the trainee, oftentimes when
13 another sector car has an arrest and if they're not
14 tied up on a call, the training officer and the recruit
15 will come and take the arrestee, so another form of
16 learning some police work, they'll go down there and
17 help process them for the -- for the other sector, so
18 that is what I assumed had happened, that -- that
19 Officer Wietting, his arrestee that he had for driving
20 while suspended and PCS, I thought that that's what
21 they did, they went over and -- at that time, that's
22 what I thought, that they grabbed his arrestee from him
23 and was transporting him down.
24   Q.  So you thought -- I'm sorry, I'm just trying
25 to understand. At the time, you thought that Tellez

Page 155

1 and McCue were transporting the driver of the Mazda?
2 I'm sorry, I'm -- maybe I'm just misunderstanding what
3 you're saying.
4   A.  No, you're not, that -- that's exactly what I
5 thought.
6   Q.  Okay. You thought it was the driver, it was
7 not the individual who did the hand-to-hand
8 transaction. That's what you thought, right?
9   A.  Yes, ma'am.                          3:29:31
10   Q.  Okay. Did you come to learn, at any point
11 before McCue went to the station, that the individual
12 who was being transported by McCue was believed to have
13 any drugs on his person?
14   A.  Can you repeat that?
15   Q.  Yeah. Before McCue got to the station, did
16 you have any information that the individual that they
17 were transporting to the station had been found with
18 drugs on his person?
19   A.  So my answer is yes, but I -- I thought --
20 because I thought that was the driver of the vehicle.
21   Q.  Okay, okay. And you had some information
22 that the driver of the vehicle was found to have what
23 officers believed to be drugs, right?
24   A.  Right, when I had asked -- when I was on the
25 scene, New Lenox Road, I asked what happened with the

Page 156

1 stop, and -- and an officer advised me that Officer
2 Wietting had somebody in custody for DWLS, which is
3 driving while suspended, and -- and PCS, possession of
4 a controlled substance, so that -- that would be one
5 person, so I thought it was that person. So if they --
6   Q.  Okay.
7   A.  -- were arrested -- I thought it was the
8 driver.
9   Q.  Okay. Did you have any information from
10 anyone that the arrestee -- McCue and Tellez's arrestee
11 had put anything in his mouth during the course of the
12 arrest?
13   A.  No.                                 3:31:06
14   Q.  Okay. All right. So what happened after you
15 left the scene where you encountered Mr. Davis?
16   A.  So myself and Sergeant May drove to the
17 police department, we got there. That's when I ran
18 into Officer Steurer and I had him check on what sector
19 14 was on. I still thought it was the driver of the
20 car. I told Sergeant May I -- and what I had thought
21 had happened, because as I said, I thought they had the
22 driver in custody and I thought they were transferring
23 -- this is -- was what I thought in my head, I thought
24 they were transferring them -- the arrestee over from
25 Wietting's car to theirs and the subject tried running,

Exhibit 5, LLC

Page 165

1  car," something to that effect, and then I had advised
2  -- I believe Officer Steurer was near me and towards
3  Sergeant May, I said, "It's Eric Lurry."
4     Q.  Okay.  So you -- you told Mr. Lurry to get
5  out of the car, right?
6     A.  Not those exact words, but something to that
7  effect.
8     Q.  Okay.  And then you turned and told Sergeant
9  May that it was Eric Lurry?
10    A.  No, I believe it was actually towards Officer
11 Steurer, but towards that direction of where those guys
12 were at.
13    Q.  Okay.  Where was Officer Steurer in relation
14 to you when you told him that?
15    A.  Specifically, I would say off to the west.
16    Q.  Okay.  And at any point, did you take your
17 eyes off of Mr. Lurry to communicate to Steurer?
18    A.  I don't know.                       3:42:36
19    Q.  Okay.  So what is the next thing that you
20 recall happening?
21    A.  I remember telling Sergeant May to go over to
22 the passenger's side of the car, we may -- he may to --
23 need to assist in pushing Eric out.
24    Q.  Okay.  And did you remain in the same
25 position that you were previously when you said this to

Page 166

1  Sergeant May?
2     A.  I don't know.  Through the course of this,
3  there were times I would be walking towards -- from
4  side to side from the -- the -- the passenger's side to
5  the driver's side.  I -- I'm trying to instruct people
6  what to do, trying to be involved, but I also realize
7  that I'm a supervisor, so I'm trying to -- trying to
8  handle the situation.  So at any moment throughout this
9  whole thing, unless I saw the video, I won't be able to
10 tell you specifically, definitively exactly where I was
11 unless I saw the video, and it's not to be difficult,
12 it's just I -- I know I walked back and forth -- or at
13 least in my head, I walked back and forth between both
14 sides, it seemed like several times.
15    Q.  And when you walked back and forth between
16 both sides, do you mean you walked back and forth from
17 -- like, you started walking closer to the front of the
18 vehicle and then moved back towards the rear of the
19 vehicle but stayed on the passenger's side?
20    A.  So -- so what I mean is, like, I was near
21 McCue's side, the passenger's side, but I know at some
22 point, I had Doug May, I told him he may need -- need
23 to go to the driver's side to push him out.  I don't
24 know if it's at that point that I -- I walk over
25 towards the driver's side, walk around the front of the

Page 167

1  vehicle toward -- I -- I believe all my movements were
2  towards the front of the car back around, so you see
3  what I'm saying?  The -- from the -- from the -- the
4  passenger's side rear door to the driver's side and
5  back and forth a couple times because I'm trying to
6  instruct people what to do, it's confined quarters, and
7  it -- it's really not -- it's -- it's not conducive to,
8  you know, a situation like that, you know, when it
9  happens.
10    Q.  Okay.  So give me one second.  At any point,
11 did you get into the driver's -- passenger's -- the
12 front passenger's seat?
13    A.  I don't believe so, but I -- I don't want to
14 definitively say no.  I -- I don't recall that.
15    Q.  Did you ever see anyone else go into the
16 front passenger's seat?
17    A.  No, I don't recall seeing that.        3:45:06
18    Q.  Did you see anybody go into the current
19 driver's -- the driver's seat?
20    A.  I don't recall seeing it.  I may have seen
21 that after I'd watched the video later.
22    Q.  Okay.  So -- so after you gave Sergeant May
23 the order to go into the passenger -- or the rear
24 driver's seat to push Mr. Lurry out, what's the next
25 thing that you recall?

Page 168

1     A.  Okay, I just -- I -- I don't want -- I'm not
2  trying to -- I'm not trying to be difficult, but I just
3  want to -- I want to make sure that we're clear on it.
4  I didn't tell Doug to push him out, I told him to --
5     Q.  Oh.
6     A.  -- go over to the passenger's side in case we
7  have to push him out, so I just want to make sure.
8     Q.  Okay.                                3:45:51
9     A.  Like, I didn't just say, "Hey, you need to go
10 over to the -- the passenger's side and push him out."
11 I said, "You may need to assist pushing him out."
12    Q.  Okay.  And Sergeant May complied with that
13 order, correct?
14    A.  It -- it seemed to me that that's what he was
15 doing, yes.
16    Q.  Okay.  And when Sergeant May initially got
17 into the vehicle, where were you?
18    A.  I don't remember.
19    Q.  Do you remember seeing him get into the
20 vehicle?
21    A.  I don't because there were -- there was a lot
22 of different things happening very quickly.  I remember
23 instructing Officer McCue to give a sternum rub and he
24 looked at me like he didn't know what a sternum rub
25 was, so I told him, "You dig your knuckles into his

Page 197

1  around Mr. Lurry's throat?
2     A.  No.                                    4:23:52
3     Q.  Did you ever see Sergeant May with his hand
4  near Mr. Lurry's throat?
5     A.  I believe I saw his hand appear feeling for
6  his jaw to see if he was clenching his jaw.
7     Q.  Okay.  And --
8     A.  Of course I've got -- I -- of course I've got
9  a beard in the way, but what I saw was not around his
10 throat or any pressure on his throat.
11    Q.  Okay.  Have you ever -- have you ever done
12 that?  Have you ever felt below an arrestee's jaw to
13 determine whether or not they're clenching their jaw?
14    A.  I don't believe I have.
15    Q.  Do you know one way or another whether you
16 can even tell if someone is clenching their jaw by
17 pushing up on the bottom underneath their jaw?
18    A.  I -- I believe you can.
19    Q.  Okay --
20       MR. BERSANI:  Can I ask a question?
21    Q.  -- what is it --
22       MR. BERSANI:  Whose number is 312-237 --
23 whose number is that?
24       MS. BAKOS:  Hold on.  Mine is 371-6467.  Is
25 that what you're looking at?

Page 198

1        MR. BERSANI:  There's a bottom --
2        MS. BAKOS:  Yeah, that's me.           4:24:59
3        MR. BERSANI:  Who is the 312 --
4        MS. BAKOS:  I'm using my cell phone for the
5  audio because my computer --
6        MR. BERSANI:  Oh, okay.  Got it.
7        MS. BAKOS:  -- doesn't have good audio,
8  that's all.
9        MR. BERSANI:  That's your -- so that's your
10 cell phone?
11       MS. BAKOS:  Yes.
12       MR. BERSANI:  Okay, thank you.  Sorry.
13       MS. BAKOS:  Yeah.
14    Q.  So is that a tactic that you've ever seen any
15 other officers use to determine if someone's clenching
16 their jaw?
17    A.  I believe I have seen it done before.  A
18 specific incident, I -- I can't say 100 percent sure.
19 In fact, I do know a specific incident.
20    Q.  Okay.  Can you tell me about that?     4:25:54
21    A.  Yeah, that was in -- either in tactical or
22 narcotics and we were assisting another narcotics unit
23 in a buy bust operation and a subject had put a large
24 object into his mouth, and they were -- people from the
25 other narcotics unit were on the ground with him,

Page 199

1  wrestling with him, and an agent from that other
2  narcotics unit had done that and said, "He's clenching
3  his mouth, he's got something in his mouth," and they
4  just were in a stalemate for a little while, and the
5  guy eventually spit the -- a large quantity of drugs
6  out.
7     Q.  Okay.  And when you say, "he did that," he --
8  that officer put his hands underneath the arrestee's
9  jaw and pressed upward?
10    A.  Yes.                                   4:26:38
11    Q.  Okay.  And do you know what it is that you
12 feel when a person's got their jaw clenched?
13    A.  Me personally, I haven't used that, so I've
14 seen others use it.  I feel that you would be able to
15 feel somebody clenching their jaw if you did that.
16    Q.  Okay.  Okay.  So after Sergeant May told you
17 that there was a large bag in Mr. Lurry's mouth, do you
18 remember where you were physically when this happened?
19    A.  I do not specifically, no.             4:27:34
20    Q.  Okay.  And what's -- what's the next thing
21 you recall?
22    A.  That's when I had advised, I said, "Someone
23 get an ASP or a flashlight, something to prop his mouth
24 open and get the bags out, need to get them out right
25 away."

Page 200

1     Q.  Okay.  And then did you observe McCue take
2  out his ASP?
3     A.  I -- I don't think I -- I physically observed
4  him do it, but he obviously did.
5     Q.  Okay.  Did you observe what McCue was doing
6  with his ASP once he went into -- once he was --
7  started using it with Mr. Lurry?
8     A.  I -- I could not see that, no, not till after
9  the fact.  At the time, no.
10    Q.  Okay.  And after reviewing the video, is
11 there anything about what Mr. McCue did that is at all
12 concerning to you today?
13    A.  No.                                    4:28:35
14    Q.  Okay.  Okay.  So what's the next thing that
15 happened?
16    A.  Next thing that I remember happening is at
17 some point, Sergeant May had said, "We gotta get him
18 out, I don't think he's breathing," and at that point,
19 I immediately got on our radio to -- requested an
20 ambulance to the -- just outside the sally port for an
21 arrestee that ingested -- possibly ingested narcotics
22 and is -- appears to not be conscious, something to
23 that effect.
24    Q.  Okay.  That was a radio call?
25    A.  Yes, ma'am.

Exhibit 5, LLC