Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4 ------------------------------------------------------
 5 Nicole Lurry, as Special Administrator of the Estate of
 6 Eric Lurry, Jr., deceased, et al.,
 7
 8        Plaintiff,
 9
10      vs.                    Case Number 1:2020cv04545
11
12 City of Joliet et al.,
13
14        Defendants.
15 ------------------------------------------------------
16            Deposition of Douglas May
17                    Thursday
18              October 28th, 2021
19
20                     -at-
21
22           Zoom Remote Deposition
23
24
25
```

Page 2

```
 1                APPEARANCES
 2
 3        For the Plaintiff:
 4             Abby Bakos
 5            Ronak Maisuria
 6        Bakos & Maisuria Law Group
 7            1755 Park Street
 8             Suite 200-1070
 9         Naperville, Illinois 60563
10
11        For the Defendants:
12          Michael D. Bersani
13      Hervas, Condon & Bersani, P.C.
14             333 Pierce Road
15               Suite 195
16           Itasca, Illinois 60143
17
18   For the Defendant City of Joliet:
19             Sabrina Spano
20              City of Joliet
21        150 West Jefferson Street
22             Legal Department
23           Joliet, Illinois 60432
24
25
```

Page 3

```
 1           Also present:
 2             Jeremy Harrison
 3              Nicole Lurry
 4
 5       RECORDER:  Zoom is recording.  Good morning.
 6  We are now on the record.  Today is Thursday, October
 7  28, 2021.  The time is now 10:14.  We are meeting
 8  remotely today for the deposition of Sergeant Douglas
 9  May in the matter of Nicole Lurry, as Special
10  Administrator of the Estate of Eric Lurry, Jr.,
11  deceased, et al. v. City of Joliet et al., case number
12  1:2020cv04545.  The venue is Northern District of
13  Illinois, Eastern Division.  Sergeant May, my name is
14  Katie Jasinski.  I'm a notary public, and I'm recording
15  this deposition on behalf of Exhibit 5, LLC.  The
16  deposition is being recorded remotely via Zoom in
17  accordance with Illinois Public Act 101-0640.  Sergeant
18  May, would you please confirm your identity by placing
19  a valid picture ID in front of the camera briefly?
20  Thank you so much.
21       MR. MAY:  I don't know.  You good?
22       RECORDER:  Yep.  Good.
23       MR. MAY:  All right.
24       RECORDER:  Thank you.  And Sergeant May, are
25  you physically located within the state of Illinois
```

Page 4

```
 1  today?
 2       MR. MAY:  Yes, ma'am.              0:01:09
 3       RECORDER:  Thank you.  At this time, would
 4  you please raise your right hand for the oath?
 5          (Witness sworn)
 6       RECORDER:  Thank you.  Would the attorneys
 7  please state their appearance for the record?
 8       MS. BAKOS:  Abby Bakos on behalf of
 9  Plaintiff.
10       MS. MAISURIA:  Ronak Maisuria on behalf of
11  Plaintiff.
12       MR. BERSANI:  Mike Bersani on behalf of the
13  Defendants.
14       MS. SPANO:  Sabrina Spano on behalf of the
15  City of Joliet.
16       RECORDER:  And anyone else in the virtual
17  room, please state their appearance.
18       MR. HARRISON:  Jeremy --
19       MS. LURRY:  Nicole --
20       MR. HARRISON:  Jeremy Harrison.
21       MS. LURRY:  And Nicole Lurry.
22       RECORDER:  I'm sorry.  I -- what was the name
23  before Nicole?
24       MR. HARRISON:  Jeremy -- Jeremy Harrison.
25       RECORDER:  Thank you.  That completes the
```

Page 21

1   A.  Not yet.
2   Q.  Did you hear any calls about the arrest of
3 Eric Lurry prior to getting to the station with
4 Lieutenant Harrison?
5   A.  All I had heard on the way down is there is
6 one in custody for PCS, which is possession controlled
7 substance, and some type of driving violation, I don't
8 know if it was driving suspended or revoked.  And then
9 I had heard what I construed as to be maybe someone ran
10 or there was a struggle or something, and that was it.
11 I didn't know any charges or whatnot or what had
12 happened.
13   Q.  Would it be fair to say that you did not know
14 whether the individual who was in custody from PC --
15 PCS and driving violations was the same individual who
16 was involved in some sort of an altercation with Tellez
17 and McCue?
18   A.  I'm sorry.  Repeat that again, please.
19   Q.  Did you know whether the individual who was
20 in custody for PCS and driving violations was the same
21 individual who was in a physical altercation, for lack
22 of a better word, with Tellez and McCue?
23   A.  No.  I did not know that.
24   Q.  You didn't know whether or not that was the
25 same person?

Page 22

1   A.  That's correct.                    0:20:56
2   Q.  Okay.  So you were standing outside when
3 Officers Tellez and McCue pulled in to -- is it the
4 sally port?
5   A.  Outside the sally port, yes.
6   Q.  Okay.  And can you describe what a sally port
7 is?
8   A.  A sally port is essentially a garage that you
9 can drive arrestees into that can be used, you know, to
10 unload arrestees.
11   Q.  Okay.  And the sally port -- the vehicle
12 driven by McCue -- well, strike that.  Who was actually
13 driving that vehicle, if you know?  Was it McCue or
14 Tellez?
15   A.  I believe it was Officer McCue.
16   Q.  Okay.  And the vehicle that they arrived in
17 was a marked vehicle?
18   A.  Yes.                              0:22:05
19   Q.  What did it -- what kind -- do you know the
20 make and model?
21   A.  It's one of the newer SUVs.
22   Q.  All right.  They arrived and they parked
23 directly in front of the sally port?
24   A.  Yes.
25   Q.  So what -- after they pulled in, what did you

Page 23

1 see?
2   A.  Both officers came out or got out of their
3 vehicle.  Officer McCue walked around to the
4 passenger's side.
5   Q.  Both officers, you're referring to Officers
6 McCue and Officer --
7   A.  Tellez.
8   Q.  -- Tellez?
9   A.  Yes.
10   Q.  Okay.  And you said that McCue was driving,
11 so McCue then walked around to the passenger's side of
12 his squad car?
13   A.  That is correct.                  0:22:59
14   Q.  And where did Officer Tellez go?
15   A.  He came over to me.
16   Q.  And when Officer Tellez came over to you, did
17 you have any verbal interaction with Officer Tellez?
18   A.  Yeah.  There was a conversation.
19   Q.  And what was that conversation?
20   A.  I don't remember the context of that
21 conversation.
22   Q.  Do you remember if Officer Tellez told you
23 anything about what had happened at the scene of Mr.
24 Lurry's arrest?
25   A.  Yeah.  Again, I don't remember the context of

Page 24

1 that conversation at all.
2   Q.  So it's fair to say you don't remember if
3 Officer Tellez said anything to you about suspecting
4 that Mr. Lurry had narcotics on him?
5   A.  That's correct.
6   Q.  You knew that there had been some sort of a
7 physical altercation between Officers Tellez and McCue
8 and Mr. Lurry at that time?
9   A.  No.  I did not, no.                0:24:11
10   Q.  You did not?
11   A.  No.  Only what I had heard over the radio.
12   Q.  Okay.  So did you know, when you heard it
13 over the radio, that the altercation had occurred
14 between Tellez, McCue, and Lurry?
15   A.  I didn't know.  I wasn't exactly sure of --
16 of what had transpired, or you know, I -- just that
17 there was some commotion over the radio.
18   Q.  Okay.  My question is, did you know who was
19 involved in that commotion that was over the radio?
20   A.  No.  I did not know.
21   Q.  Okay.  You had a radio on you?
22   A.  I did, but we had two channels going.
23   Q.  Okay.  And the two channels, one was -- can
24 you describe for me the two channels?  What does that
25 mean?

Page 25

1   A. Well, I know that one was the east side
2 channel, which is a dedicated east side channel.
3   Q. Okay.             0:25:04
4   A. And the other channel that we use is kind of
5 like our talkaround for our -- it's our narcotics
6 channel. But there may have been a conversation on
7 east from the New Lenox Road incident, also. I don't
8 remember exactly how much was going over the east side
9 channel and how much was going over our narcotics
10 channel.
11   Q. The narcotics channel, that's just -- just so
12 I'm clear, that's just a channel where you can
13 communicate and hear communications from members of the
14 JNU team?
15   A. Yes. But there's also other officers who
16 have that channel on their radios --
17   Q. Okay.
18   A. -- that when we use them for any narcotics
19 operations, they'll -- they'll also get on that
20 channel, so it's not a channel that's open to the
21 entire police station.
22   Q. I understand. So do you remember any of the
23 officers, aside from JN -- JNU officers, who were
24 communicating on the talkaround -- is that what you
25 called it, "the talkaround channel"?

Page 26

1   A. Yes. Yeah. We -- the narcotics channel?
2   Q. Yeah.
3   A. I don't know who all had it that day.   0:26:17
4   Q. Okay. Do you remember hearing -- or just
5 strike that. Do you remember whether or not you heard
6 Officers Tellez -- Tellez and/or McCue talking on that
7 channel at any time during the altercation or commotion
8 that they had with Mr. Lurry?
9   A. That channel being the narcotics channel?
10   Q. Yeah.
11   A. I don't believe that they were on the
12 narcotics channel.
13   Q. Okay. Do you -- did you hear them speaking
14 during the arrest of Mr. Lurry on the east side
15 channel?
16   A. I wasn't paying attention to that.   0:26:53
17   Q. How did you know that there was some sort of
18 a commotion?
19   A. You can hear it, you know. So the -- the
20 channels, when you're listening to the radio, I mean,
21 it'll bounce, you'll hear multiple channels, you'll
22 hear east side, you'll hear central, you'll hear west,
23 and then it'll cut out in portions of it, whatnot. So
24 you may not always hear the entire, you know, thing
25 unless you're on that dedicated channel.

Page 27

1   Q. So if you're listening to one channel, can
2 you simultaneously listen to the other? How does that
3 work?
4   A. So the way that works is if I'm on my
5 narcotics channel, and there's someone talking on the
6 narcotics channel, or -- let me back that up. So if
7 I'm on the narcotics channel on our radio and I can
8 hear east side, but the minute someone starts talking
9 on the narcotics channel, that takes priority and now I
10 can't hear east side anymore.
11   Q. Okay.
12   A. Until the push is -- the push to talk is
13 released, and then you may catch a small amount. And
14 then, obviously, if I return the conversation, I'm not
15 hearing that east side channel, or west side, or
16 central.
17   Q. Okay. As far as you know now, were Tellez
18 and McCue communicating on the east side channel as
19 opposed to central channel or other channels?
20   A. I believe they were on the east side, yes.   0:28:17
21   Q. Okay. Were you -- strike that. Were there
22 any other channels that you could hear on your radio
23 coming through?
24   A. I don't remember what other channels I could
25 hear that day.

Page 28

1   Q. Okay. Were you alarmed by the -- well,
2 strike that. So again, what did you hear that led you
3 to believe there was a commotion?
4   A. I don't remember exactly what I heard. It
5 just sounded like people, I -- I don't want to say
6 yelling, but when there's something going on, you know,
7 it -- I don't remember exactly if there was breathing,
8 or -- or, you know, people talking fast or loud. It
9 was something that led me to believe, like, oh,
10 something's going on.
11   Q. Okay. And wouldn't you agree that it's
12 important that -- that -- it would be important for you
13 to know what's going on when you have someone maybe
14 heavy breathing or talking loudly or quickly?
15   A. Well --
16     MR. BERSANI: Object to the form. Vagueness.
17 He can answer. Go ahead.
18   A. There's a lot of things that go on in the
19 city that I don't necessarily have knowledge on or
20 whatnot, you know, so I'm -- so it's not always
21 possible to know everything, you know, all the time.
22   Q. You had testified earlier that you understood
23 that -- well, strike that. Did you know that the
24 commotion that was going on was commotion that involved
25 Mr. Lurry, or at the time, you didn't know Mr. Lurry,

Page 29

1 but it was Mr. Lurry -- strike that. At the time that
2 you heard the commotion, did you know that the
3 commotion involved one of the arrestees from the drug
4 transaction?
5    A.  No.                          0:30:16
6    Q.  Did you know that the commotion involved
7 Officer Tellez and/or McCue?
8    A.  Not initially.
9    Q.  At some point, did you come to find out that
10 it involved Tellez and McCue?
11    A.  I asked Lieutenant Harrison what was -- you
12 know, what was going on, or "What was that?" and he
13 says, "I think that was McCue," or maybe it -- not
14 McCue, but Tellez's recruit, because I didn't know his
15 name at the time.
16    Q.  And Tellez's recruit you know now to be
17 Officer McCue?
18    A.  That's correct.
19    Q.  When did Lieutenant Harrison give you this
20 information?
21    A.  As we were clearing, I think, the New Lenox
22 Road scene.
23    Q.  That was before you got to the station with
24 Lieutenant Harrison?
25    A.  Yes.                         0:31:08

Page 30

1    Q.  Okay. So at the time that you were at the
2 station with Lieutenant Harrison, before McCue and
3 Tellez arrived, you did know that the commotion had
4 involved Officers Tellez and/or McCue?
5    A.  I knew that Tellez and McCue were
6 transporting somebody from that traffic stop that went
7 north on Briggs Street.
8    Q.  Did you know that they were involved in
9 whatever commotion you heard over the radio?
10    A.  Yes.
11    Q.  But at the time, you didn't know that the
12 arrestee was Eric Lurry, is that correct?
13    A.  That's correct.
14    Q.  Okay. So when they -- do you know or -- did
15 Lieutenant Harrison tell you why he believed that that
16 was McCue that was involved in that commotion?
17    A.  No.                          0:32:12
18    Q.  Did he tell you anything about the details
19 that McCue had relayed over the radio related to that
20 commotion?
21    A.  No.
22    RECORDER: I'm sorry. I didn't catch that,
23 Mike.
24    A.  No.
25    RECORDER: No. I'm sorry, was there

Page 31

1 objection, Mike?
2    MR. BERSANI: Oh, I'm sorry. No, I didn't
3 say anything.
4    RECORDER: Okay.
5    Q.  Aside from Lieutenant Harrison informing you
6 that -- well, strike that. Do you remember anyone
7 being outside when McCue pulled up with Mr. Lurry,
8 aside from you, Lieutenant Harrison, and Officer -- was
9 it Steurer?
10    A.  Steurer.
11    Q.  Steurer. I'm going to get that wrong every
12 time.
13    A.  It's okay. No.                 0:33:19
14    Q.  When you spoke to Officer Tellez when he got
15 out of the vehicle, did he seem to be out of breath or
16 upset about something? Can you recall that?
17    A.  Not that I recall.
18    Q.  Did you talk to McCue before McCue went
19 around the vehicle to get Mr. Lurry out?
20    A.  No.
21    Q.  Did either McCue or Officer Tellez ever
22 inform you that they believed that Mr. Lurry had any
23 narcotics on his person?
24    A.  Not that I remember.            0:34:03
25    Q.  At some point -- well, strike that. Did

Page 32

1 Officers McCue and/or Tellez ever inform you that --
2 that they had some sort of a struggle with Mr. Lurry?
3    A.  Not that I remember.
4    Q.  Did Officers McCue and/or Tellez ever inform
5 you that they observed Mr. Lurry making a chewing
6 motion when he was in the back seat of their vehicle?
7    A.  No.
8    Q.  Did Mr. -- or Officers Tellez and/or McCue
9 ever tell you that they believed that Mr. Lurry had put
10 anything in his mouth at the scene of the arrest?
11    A.  No.
12    Q.  Did Officers Tellez and/or McCue ever tell
13 you that they did not do a complete search of Mr. Lurry
14 prior to putting him in the back seat of the car?
15    MR. BERSANI: Object to the form. Assumes
16 facts not in evidence. Lack of foundation. Go ahead.
17    A.  Could you repeat that, please?    0:35:08
18    Q.  Yeah. Do you know now that Officers --
19 Officer Tellez had searched Mr. Lurry at the scene of
20 the arrest?
21    MR. BERSANI: Just -- let me just say --
22 counsel my client that information that you learned
23 through communications that we had, you're not to talk
24 about. So you can answer her question to the extent
25 it's anything beyond that, okay? Is that understood?

Page 53

1  MR. BERSANI: I'm going to just object to the
2 hypothetical, it's --
3  RECORDER: I'm sorry, Mike. Can you speak
4 up?
5  MR. BERSANI: I sure can. I'm objecting to
6 the hypotheticals being incomplete. Go ahead.
7  A. At that point, I would call an ambulance.    1:02:10
8  Q. And would you shake, push, and/or strike
9 someone with an open hand more than once to determine
10 if they're coherent, or would you just do it one time,
11 and if they're not -- if they don't become alert, then
12 call for medical assistance?
13  A. I think it depends on the situation.
14  Q. So would it be fair to say that you might
15 strike someone who may be having a medical emergency
16 more than once to get them to become alert before
17 calling for a medical professional?
18  MR. BERSANI: Object to the hypothetical.
19 Incomplete. Assumes facts not in evidence. Go ahead,
20 Doug. You can answer.
21  A. I haven't.
22  Q. You've never struck someone more than once?
23  A. No. I mean, if -- I'm -- it's been, you
24 know, one time or -- or you know, pushing that I'm
25 talking about. You know, when I'm talking about

Page 54

1 shoving, I'm not talking about shoving people down.
2 You're trying to wake somebody up if they are -- and
3 determine if they're actually awake, coherent, or not.
4  Q. You struck Eric Lurry with an open hand in
5 the face on January 28th, 2020 in the back of that
6 squad car, correct?
7  A. Yes.    1:03:19
8  Q. Did he became alert after you did that?
9  A. Yes.
10  Q. He did?
11  A. He looked right at me, opened his eyes,
12 looked right at me.
13  Q. Okay. And then what did he do after that?
14  A. Not -- I'm not exactly sure without looking
15 at the video.
16  Q. How long did he look at you for?
17  A. I'm not exactly sure on the -- on the time.
18 I mean, it was -- it was a look.
19  Q. Maybe a second or two, would you agree?
20  A. That's fair.
21  Q. And then would it be fair to say that after
22 that second or two, he then became incoherent? Well,
23 strike that. I'm not even going to use the word
24 "incoherent." After a second or two, he become
25 unresponsive again?

Page 55

1  A. I didn't know if he was unresponsive at that
2 point or if he was attempting to appear as if he -- as
3 if he was unresponsive.
4  Q. Okay. But he wasn't responding to your
5 orders, correct?
6  A. No.    1:04:21
7  Q. Okay. So would you consider that to be
8 unresponsive?
9  A. Well, ma'am, I think it depends on what your
10 -- what your definition of that is. Is -- is he truly
11 unresponsive or is he attempting to act like that?
12  Q. Okay. Well, he wasn't listening to you,
13 correct?
14  A. Yes.
15  Q. He wasn't listening to Officer McCue, right?
16  A. That's correct.
17  Q. Or any other officers giving him orders at
18 that time?
19  A. Not that I recall.
20  Q. Okay. Wouldn't it be fair to say that faking
21 being unresponsive and actually being unresponsive,
22 they -- they look the same?
23  MR. BERSANI: Object to the form. Vagueness.
24 You can answer. Go ahead.
25  A. Yeah. They -- they could. Yes, ma'am.

Page 56

1  Q. And wouldn't it be fair to say that someone
2 who is having a medical emergency, and I'm talking now
3 specifically about a drug overdose, that they may
4 become alert when you hit them or may become alert when
5 you slap them, but then potentially go back into being
6 unresponsive and incoherent?
7  MR. BERSANI: Object to hypothetical,
8 incomplete, and it assumes facts not in evidence.
9  RECORDER: Sorry, Mike. Can you repeat?
10  MR. BERSANI: Sure. I object to the
11 hypothetical. It's incomplete and it assumes facts not
12 in evidence.
13  A. Ma'am, can you repeat that question, please?
14  Q. Sure. Someone can temporarily be -- open
15 their eyes from being hit and then go right back into
16 being unresponsive and incoherent because they're
17 having a medical emergency, would you agree with me?
18  MR. BERSANI: Same objection.
19  A. Yeah. It's possible.    1:06:13
20  Q. And you've seen that before, isn't that fair
21 to say?
22  A. No.
23  Q. You've never seen that before?
24  A. I've never seen a drug overdose.
25  Q. You've never been to a drug overdose call?

Exhibit 5, LLC

Page 57

1  A.  No.
2  Q.  Are you aware that the City of Joliet gets
3  three to five drug overdose calls a week?
4  A.  I was not aware of those numbers. I don't
5  work in patrol, and patrol generally responds to those.
6  Q.  At some point, you worked in patrol, right?
7  A.  I did. And it -- when I was working in
8  patrol, I wasn't going to drug overdoses. If -- if I
9  was assigned as a supervisor, I generally wouldn't go
10 there if it was a drug overdose.
11 Q.  Are you aware that drugs, particularly
12 narcotics, are a major problem in the city of Joliet?
13 A.  Yes, ma'am.
14 Q.  And that's -- that's -- you know that because
15 you're a JNU officer?
16 A.  I've worked in narcotics. Yes, ma'am.    1:07:02
17 Q.  Right. So aside from Mr. Lurry, it's your
18 testimony that you have never seen an individual who
19 you believed to be overdosing?
20 A.  I cannot recall ever seeing a person
21 overdose.
22 Q.  Have you ever received any training from the
23 City of Joliet on what symptoms someone would exhibit
24 who is having -- in the middle of potentially
25 overdosing on drugs?

Page 58

1  A.  Yeah. I mean, I've got -- I believe there
2  was -- when Narcan first rolled out, there was an
3  in-service, but I don't remember a lot from that. I
4  know that people can foam from the mouth, and that type
5  of thing, or convulse, you know, but other than that --
6  you know, I have spoke with officers who've been in
7  that, you know, people convulsing or whatnot, but I
8  haven't seen it personally.
9  Q.  Do you know that an individual who's
10 potentially overdosing, their eyes roll in the back of
11 their head? Do you know that that's a symptom of an
12 overdose?
13 A.  It would make sense, yes.    1:08:09
14 Q.  Do you know that the symptom -- another
15 symptom of an overdose is that they become immobile and
16 cannot move?
17 A.  I -- I believe that that would probably
18 happen. Yes, ma'am.
19 Q.  And would you agree with me that another
20 symptom of an overdose is that someone would not be
21 able to speak?
22 A.  Yes, ma'am.
23 Q.  And would you agree that a symptom of an
24 overdose would be someone may exhibit an inability to
25 comprehend what's going on around them?

Page 59

1  A.  Yes, ma'am.
2  Q.  And would you agree with me that Mr. Lurry
3  exhibited each of those symptoms?
4  A.  Yes.    1:08:47
5  Q.  Would you agree with me that you knew that,
6  were aware of that, the time that you interacted with
7  him in the back seat of the car?
8     MR. BERSANI:  No -- form though. You --
9  specific testimony -- lack of foundation --
10    RECORDER:  Mike, can you -- I'm sorry, Mike,
11 can you speak up?
12    MR. BERSANI:  I object to the form of the
13 question and -- and lacking foundation as to what
14 specific time are we talking about.
15    MS. BAKOS:  And just so you know, Mike, I
16 think the microphone is on this one.
17    MR. BERSANI:  Oh --
18    MS. BAKOS:  I know --
19    MR. BERSANI:  I kind of hear it from there,
20 so --
21    MS. BAKOS:  It's coming from this one, but
22 the mic is --
23    WITNESS:  Can I --
24    MR. BERSANI:  -- on this one.
25    WITNESS:  Can I turn a little bit?

Page 60

1     MS. BAKOS:  Yeah. I mean, as long as the --
2  the court reporter --
3     MR. BERSANI:  Yeah.
4     MS. BAKOS:  -- can see you.
5     MR. BERSANI:  Yeah. That's fine.
6     WITNESS:  Is -- is it okay if I just sit off
7  to the side a little bit?
8     RECORDER:  Yeah. As long as your face is in
9  the camera, that's fine.
10    WITNESS:  Okay.
11    RECORDER:  Thank you. I got it.
12 Q.  Would you agree with me that it's not your
13 job to assess whether or not someone is having a
14 medical emergency, it is your job to get someone
15 medical aid who was appearing to have a medical
16 emergency?
17 A.  No.    1:09:47
18 Q.  You don't believe that's your job?
19 A.  I believe it's part of my job, but it's also
20 my job to assess.
21 Q.  Why didn't you just err on the side of
22 caution and get someone medical help who is exhibiting
23 symptoms of having a medical emergency?
24 A.  To be fair, ma'am, I mean, there's -- we have
25 ten ambulances in town, and there's -- there's

Exhibit 5, LLC

Page 77

1  you didn't know one way or another whether he was
2  incoherent, right?
3     A.  That's correct.  I never heard him talk.
4     Q.  All you knew was that he wasn't following
5  orders, correct?
6     A.  That's correct.
7     Q.  Okay.  You said that you didn't see his eyes
8  rolling back, you weren't paying attention to that?
9     A.  I -- I -- I never saw his eyes roll back.
10 His eyes were closed.
11    Q.  Okay. Okay.  So what you saw were his -- his
12 eyes were closed.  Would you say that one's eyes being
13 closed, in addition to some of the other symptoms,
14 being unresponsive, not talking, that could also
15 indicate that someone is overdosing?
16        MR. BERSANI:  At what point in time?  I'm
17 going to object to the form of the question.
18    Q.  At the time that you got into the car, you
19 said he was being --
20        MR. BERSANI:  The time that he first got in
21 the car?
22        MS. BAKOS:  Yes.
23        MR. BERSANI:  Okay.
24    Q.  Before you slap him?
25    A.  It doesn't necessarily mean that he's

Page 78

1  overdosing.
2     Q.  Okay.
3     A.  Just because the eyes are closed.      1:31:03
4     Q.  Okay.  At -- after you slapped him, did you
5  see his eyes rolling back?
6     A.  No, after -- after he was struck, he looked
7  right at me.
8     Q.  Did he appear to be alert and you -- you
9  thought that he was alert at that point?
10    A.  Yes, ma'am.
11    Q.  And then he didn't remain alert, right?
12    A.  Well, his eyes -- he went back to closing his
13 eyes.
14    Q.  And he also slumped over at the same time,
15 right?
16    A.  No.  Not at that time, he didn't slump over.
17    Q.  Okay.  You knew Mr. Lurry was a drug dealer.
18 You just said that, right?
19    A.  Yes.
20    Q.  And you know basically, in your experience
21 with JNU, drug dealers often try to hide drugs to
22 prevent being arrested, right?
23    A.  Not just drug dealers, but yes.
24    Q.  Okay.  And sometimes they hide the drugs in
25 their mouths, would you agree?

Page 79

1     A.  Yes.                                    1:32:04
2     Q.  And sometimes they swallow the drugs, right?
3     A.  In my experience, I have seen that.  Yes.
4     Q.  How many times have you seen them swallow the
5  drugs?
6     A.  Well, I've seen them swallow things.  I don't
7  know that every time someone swallows something that it
8  was drugs.
9     Q.  Has there ever been a time when someone
10 swallowed something during an arrest -- well, strike
11 that.  When you say, "swallow things," are you trying
12 to say you don't know what they swallowed?
13    A.  That's correct.
14    Q.  Okay.  And when you don't know what the
15 individual swallowed, do you -- have you, in the past,
16 transported that individual to the hospital right away
17 or called an EMT for that individual right away?
18    A.  No.                                     1:32:57
19    Q.  If you don't know what they swallowed, why
20 wouldn't you do that?  Strike that.  Why didn't you do
21 that?
22        MR. BERSANI:  Object to the form.  Vague.
23    A.  Well, in my experience, you know, when they
24 were talking and we'd ask them, "What did you swallow?"
25 they'd tell us anything but drugs.  "That was gum," or

Page 80

1  "That was candy."
2     Q.  And were there times that you didn't believe
3  them?
4     A.  I don't know.
5     Q.  You ever have a situation where you believed
6  an individual swallowed drugs?  Sorry.  That's the end
7  of my question.
8     A.  Oh.
9        MR. BERSANI:  All right.  I didn't even think
10 that there was --
11       MS. BAKOS:  Yeah.
12    Q.  Has there ever been --
13       MR. BERSANI:  I was waiting for something.
14       MS. BAKOS:  I know.  He was, too.
15       MR. BERSANI:  Yeah.
16    Q.  Has there ever been an instance where you
17 believed that an individual had swallowed drugs, but
18 you hadn't actually seen the individual put the drugs
19 in their mouth?
20    A.  Well, there's times you may suspect, but you
21 truly don't know unless somebody tells you, or I have
22 the ability to field test the drugs.
23    Q.  And if you suspect it, do you get that person
24 medical attention, or do you just -- you won't do it
25 unless they tell you that they swallow drugs?

Page 85

1  Q. Did he ever kick you?
2  A. No.
3  Q. Did he ever try to pull away from you in any
4  way?
5  A. No.
6  Q. Did he ever try to run?
7  A. No.
8  Q. Did he exhibit any -- strike that. Where did
9  you learn about the techniques of a sternum -- well,
10 where did you learn about the sternum rub? Where did
11 you learn about that technique?
12 A. I don't remember.                    1:40:05
13 Q. Do you know if it was actual training from
14 JPD?
15 A. I don't remember.
16 Q. Do you know if it was something that you just
17 observed other officers doing?
18 A. I don't remember.
19 Q. Okay. Did you -- do you know where you
20 learned that -- well, strike that. Would it be fair to
21 say, based on your knowledge and experience, that it's
22 important that individuals who are potentially
23 overdosing on drugs get medical attention as soon as
24 possible?
25 A. If we know they're overdosing, yes.

Page 86

1  Q. Okay. Whether or not you know it?
2  A. Yeah. They -- they --
3  Q. Generally speaking?
4  A. Sure.                                1:41:00
5  Q. Okay. And would it be fair to say that you
6  know that the more time that passes where the narcotics
7  start entering the bloodstream, the less likely it is
8  that the individual will survive?
9  A. That, I don't know.
10 Q. Okay. You said you had these prior
11 interactions with Mr. Lurry. Have you ever created any
12 reports related to those prior interactions that you
13 are aware of?
14 A. I don't know.
15 Q. Do you know if there's any record of those
16 prior interactions anywhere?
17 A. There may be. I don't know, though.
18 Q. Okay. Okay. So when you went around to the
19 passenger's side -- or I'm sorry, to the driver's side
20 rear door, you got into the vehicle, were you
21 frustrated that Mr. Lurry wasn't getting out of the
22 car?
23 A. No.                                   1:42:27
24 Q. Were you frustrated that Mr. Lurry wasn't
25 following Officer McCue's directions?

Page 87

1  A. No.
2  Q. Did it bother you in any way that Mr. Lurry
3  wasn't exiting the vehicle as ordered?
4  A. No.
5  Q. So you were okay with it?
6  A. Just --
7  MR. BERSANI: I'll object. Is he okay with
8  it, what's -- vagueness of the question, if you're okay
9  with it.
10 RECORDER: I'm sorry, Mike. Can you speak
11 up?
12 MR. BERSANI: Yeah. I -- I -- I -- I
13 apologize, Katie. I object based on vagueness. The
14 question, "You're okay with it?" is vague. If you can
15 answer, go ahead.
16 A. It just is what it is.               1:43:07
17 Q. Did you notice that Mr. Lurry had any shallow
18 breathing?
19 MR. BERSANI: Again, at what point in time,
20 Counsel?
21 Q. When you first got into the car.
22 A. Mr. Lurry was breathing when I got into the
23 car.
24 Q. Without any issue, as far as you -- what you
25 could tell?

Page 88

1  A. As far as I could tell, he was breathing.
2  Q. Okay. And would it be fair to say that in
3  making your assessment, you were paying close attention
4  to Mr. Lurry's behaviors?
5  A. I was paying attention to Mr. Lurry.
6  Q. Because you were trying to determine whether
7  or not he was feigning a medical emergency, right?
8  A. Yes.                                 1:44:10
9  Q. And would you say that you were paying
10 attention to his behavior the whole time that you were
11 in the back seat of the car with him?
12 A. To the best that I could, I guess.
13 Q. Was it important to you to get the drugs out
14 of his mouth?
15 A. Well, it's not a good thing to have plastic
16 in your mouth, so it -- it was important to me that we
17 remove the plastic from his mouth, once --
18 Q. And what -- I'm sorry. Go ahead.
19 A. Once I realized it was in there.
20 Q. Okay. So at what point in time did you
21 realize he had something in his mouth?
22 A. There was a point while in the back of the
23 squad car that Mr. Lurry exhaled and I smelled the
24 distinct odor of cocaine, and he opened his mouth with
25 some assistance. If I remember correctly, I may have

Page 89

1 pushed down or pulled the hair on his chin, and I could
2 see the bags in his mouth.
3  Q. So at the time that Mr. -- when -- when you
4 say Mr. Lurry exhaled, was his mouth still closed? He
5 exhaled from his nose?
6  A. He exhaled from his mouth.          1:45:27
7  Q. From his mouth. So his mouth was open at
8 that time?
9  A. Correct.
10  Q. And that's when you were able to smell what
11 you believed to be cocaine, right?
12  A. Yes.
13  Q. And you knew that smell because you are a JNU
14 officer, and you often --
15  A. I've -- hundreds of times.
16  Q. Right. So would it be fair to say then, you
17 didn't know that there was something in Mr. Lurry's
18 mouth until you pulled his mouth open by his, I think,
19 chin hair or something?
20  A. I suspected that he was clenching his jaw.
21  Q. Okay. So you suspected it before that?
22  A. Yes. I pushed up on his jaw, and he was
23 clenching his jaw.
24  Q. So you suspected it simply because he was
25 clenching his jaw?

Page 90

1  A. Well, it wasn't just -- just because he's
2 clenching his jaw. It was the totality of -- of
3 everything.
4  Q. Okay. So what were all the things that led
5 you to believe that Mr. Lurry had drugs in his mouth?
6  A. Well, we had just done --
7  Q. Before -- I'm sorry. Go ahead.
8   MR. BERSANI: So you're asking about whether
9 -- the drugs in his mouth as opposed to bags?
10   MS. BAKOS: Okay.
11   MR. BERSANI: Because the previous question,
12 you had said, "bags in his mouth."
13   MS. BAKOS: Okay. All right. That's fair.
14   MR. BERSANI: You -- clarify that.
15   MS. BAKOS: Sure.
16  Q. Tell me all the things that led you to
17 believe that Mr. Lurry had bags in his mouth --
18   MR. BERSANI: Well --
19  Q. -- aside from when you smelled cocaine?
20   MR. BERSANI: I should -- I should rephrase
21 my objection.
22   MS. BAKOS: Okay.
23   MR. BERSANI: I think what he said was that
24 he had something in his mouth.
25   MS. BAKOS: Okay.

Page 91

1   MR. BERSANI: Because he was clenching his
2 jaw, and then you asked him what other things he
3 witnessed, so.
4   MS. BAKOS: Okay. Okay. Yeah. We can go
5 back.
6  Q. So at some point then, when you're in the
7 back of the squad car, you start to believe that Mr. --
8 Mr. Lurry has something in his mouth, right?
9  A. Yes.                        1:47:11
10  Q. And you said one of the things that led you
11 to that belief was that he had his jaw clenched, right?
12  A. Correct.
13  Q. And why was it that you even reached for his
14 jaw to determine whether or not it was clenched?
15  A. It's -- it's a totality of it. So we just
16 engaged in a narcotics operation where Mr. Lurry was
17 involved. We had recovered cocaine from the other
18 individual on New Lenox Road. Mr. Lurry's a known drug
19 dealer to me. It's a common hiding place. I felt like
20 he was feigning unresponsiveness, which I've seen
21 numerous times in my career, someone such as Mr. Lurry,
22 who has -- who is a multiple time convicted felon, that
23 if they're caught with drugs, will go back potentially
24 to prison if convicted. So all of those reasons, I
25 pushed my hand up underneath his jaw and -- and felt

Page 92

1 that he was clenching it.
2  Q. So -- so you knew that there was a
3 possibility that Mr. Lurry had not just bags, but drugs
4 in his mouth when he was in the back seat of that car
5 when you went in, and that's why you reached for his
6 jaw?
7  A. It's an assumption based on previous
8 experiences I've had with -- with people.
9  Q. Okay. No one ever said anything to you that
10 led you to believe that there were drugs in Mr. Lurry's
11 mouth?
12  A. The first time --
13  Q. When you got into the car before you grabbed
14 his jaw?
15   MR. BERSANI: I object to the term "grab."   1:49:02
16   RECORDER: I'm sorry, Mike. Can you repeat?
17   MR. BERSANI: Yeah. Object to the term
18 "grabbed." It mischaracterizes his testimony.
19  A. Can you repeat it again, please?
20  Q. Yeah. No one said anything to you that led
21 you to believe Mr. -- Mr. Lurry had drugs in his mouth
22 before you reached for his jaw?
23  A. I did not know that Mr. Lurry had anything in
24 his mouth until I smelled the distinct odor of cocaine
25 coming from his mouth and I saw the bags in his mouth.

Page 93

1  Q. Before you opened Mr. Lurry's mouth by
2  pulling his chin down, is it your testimony then that
3  you did not assume that he had drugs in his mouth until
4  that point?
5     A. I didn't know.                           1:49:58
6     Q. Didn't know one way or the other?
7     A. Correct.
8     Q. But you suspected?
9     A. I didn't know.
10    Q. Did you suspect?
11    A. I don't like to assume. It -- once I felt
12 his jaw clench, I felt that there was a possibility he
13 could have something in it. So once the bags were
14 observed, it was confirmed.
15    Q. At some point, you held Mr. Lurry's nose,
16 right?
17    A. That's correct.
18    Q. And you held Mr. Lurry's nose before you
19 pulled down on his chin to open his mouth, right?
20    A. Yes.
21    Q. You held Mr. Lurry's nose for the purpose of
22 restricting his breathing so he would open his mouth,
23 right?
24    A. And in addition to that, it makes it very
25 difficult if somebody has something in their mouth to

Page 94

1  swallow when the nose is pinched.
2     Q. Okay. So you did it for two reasons?
3     A. Correct. Additionally, when you say,
4  "restrict the breathing," it's not -- it's not
5  restricting his breathing. He can open his mouth and
6  breathe.
7     Q. Okay. But he can't open his -- I mean, he
8  can't breathe unless and until he opens his mouth if
9  you're pinching his nose, right?
10    A. That's correct.                          1:51:16
11    Q. Okay. And you were pinching his nose for
12 about a minute and a half, is that true?
13    A. I don't know how long it was.
14    Q. Okay. Anytime during the period that you
15 were pinching his nose, did you see him open his mouth
16 on his own?
17    A. Repeat that one, please.
18    Q. Did Mr. Lurry voluntarily open his own mouth
19 at the time that you were pinching his nose?
20    A. Yes.
21    Q. He did?
22    A. Yes.
23    Q. Without your assistance?
24    A. That's correct. That's how I smelled the
25 cocaine emitting from his mouth.

Page 95

1  Q. Okay. So I'm -- I'm sorry. Maybe I'm just
2  confused. I thought you said that you didn't smell the
3  cocaine until you pulled down on his jaw and he opened
4  his mouth?
5     A. No. I smelled it. That's why I pulled on
6  his jaw.
7     Q. Okay. So he had opened his mouth before
8  that?
9     A. That's correct.                          1:52:01
10    Q. Had he opened his mouth before you pinched
11 his nose?
12    A. I don't -- I'm -- I'm not sure on that. I'm
13 -- if you have the video, I can look at it.
14    Q. Okay. Yeah. We'll go through the video.
15    A. Okay.
16    Q. At any time -- okay. So -- well, strike
17 that. We'll just watch the video. It's fine.
18       WITNESS: Can we take one quick break?
19       MS. BAKOS: Yeah.
20       WITNESS: I want to talk to Mike real quick.
21       MR. BERSANI: Okay.
22       MS. BAKOS: Okay.
23       MR. BERSANI: We're off --
24       RECORDER: Off record --
25       MR. BERSANI: -- the record.

Page 96

1        RECORDER: -- 12:32 p.m.
2           (Off the record)
3        RECORDER: On record, 1:20 p.m.         1:52:59
4     Q. Sorry. Give me one second, please. Officer,
5  did you believe that slapping Mr. Lurry would help him
6  in any way?
7        MR. BERSANI: Object to vagueness.
8     Q. Or would be beneficial to him in any way?
9        MR. BERSANI: Same objection. Go ahead.
10    A. Again, I want to reiterate that the -- the
11 distraction technique that I used was meant to go to
12 his chest or his shoulder, and I -- I missed.
13 Secondly, it was intended to help me in aiding the
14 assessing whether Mr. Lurry was having a true medical
15 issue or if he was feigning it.
16    Q. So my question was, was your intent in
17 slapping Mr. Lurry to benefit Mr. Lurry in any way?
18    A. No. It was to benefit me.               1:54:23
19    Q. And is it your testimony that you did not in
20 any way squeeze Mr. Lurry's throat at any point in time
21 in the back of that squad car?
22    A. Yes.
23    Q. Okay. Is it your testimony that you did not
24 do anything intentional to restrict his breathing
25 through his throat or by his neck?

Page 105

1  coat.
2  Q. Okay. And you entered the squad car, again,
3  through the rear driver's side door, correct?
4  A. Yes.
5  Q. That's McCue's squad car, right?
6  A. It's actually, I believe, Officer Tellez's
7  squad car.
8  Q. Okay.
9  A. It was his squad car that McCue was driving
10 as he's the trainee.
11 Q. I got it. Okay. So I'm just going to back
12 up just a little bit, and again, this is at 16:44. And
13 is this an -- well, you appear to be making physical
14 contact. Well, are you making physical contact with
15 Mr. Lurry at this point?
16 A. I can't tell.                               2:05:03
17 Q. Okay. Is it your left arm --
18 A. Yeah.
19 Q. -- that's reaching out at least toward Mr.
20 Lurry?
21 A. Yeah. That's my left arm. I just can't tell
22 in the video if I'm touching him.
23 Q. I got it. All right. I'm going to start
24 playing this. 16:44, starting again.
25     (Video Exhibit 2 played)

Page 106

1  Q. Okay. So we're stopped at 16:46. Do you
2  hear your voice? Did -- did we just hear your voice?
3  A. Yes.
4  Q. And what did you say?
5  A. "Wake up, bitch."
6  Q. Okay. And what was the purpose of you
7  saying, "Wake up, bitch"?
8      MR. BERSANI: Objection. Asked and answered.
9  We already went through this. Go ahead.
10 A. Like I said before, it was to get his
11 attention, to rouse him. I realize that it's something
12 that could get his attention.
13 Q. Okay. And it looks like -- well, at 16:46,
14 it -- are you making physical contact with Mr. Lurry?
15 A. Yes.                                        2:06:06
16 Q. And where on Mr. Lurry's body are you making
17 physical contact?
18 A. Underneath his chin.
19 Q. Okay. And what was the purpose of grabbing
20 Mr. Lurry underneath his chin at this point?
21     MR. BERSANI: Object to the form. He didn't
22 say, "grab."
23 Q. Oh, I'm sorry. What was the purpose of
24 making contact with Mr. Lurry's chin at that point?
25 A. I was pushing up against his jaw --

Page 107

1  Q. Okay. So it looks like --
2  A. -- to see if he was clenching.
3  Q. Sorry. Okay. And for the record, your --
4  would it fair to say your hand appears to be underneath
5  Mr. Lurry's chin?
6  A. Yes.
7  Q. Okay. And was the palm of your hand touching
8  Mr. Lurry's neck?
9  A. I don't remember.
10 Q. And so is it your testimony that at that
11 point, you were trying to make contact with Mr. Lurry's
12 jaw?
13 A. I was pushing up against his jaw.
14 Q. Were you pushing up from the bottom, or were
15 you pushing in through the sides?
16 A. I was pushing up from the bottom.           2:07:11
17     MS. BAKOS: Okay.
18     MR. BERSANI: What's the time on this?
19     MS. BAKOS: I'm sorry. It's 16:46.
20 Q. So you were pushing up from the bottom, so
21 from underneath Mr. Lurry's jaw, is that correct?
22 A. Yes.
23 Q. And the purpose of that, you said, was to see
24 if the jaw was locked?
25 A. I could tell Mr. Lurry was clenching his jaw.

Page 108

1  Q. Just from pushing up from underneath his jaw,
2  is that your testimony?
3  A. Yes.
4  Q. Okay. And from doing that, you were able to
5  tell that Mr. Lurry's jaw was clenched?
6  A. You -- you could feel that he was clenching
7  his jaw.
8  Q. And what is it that you felt that made you
9  feel that he was clenching his jaw?
10 A. The tightening of his jaw muscles.
11 Q. So you could feel that from underneath Mr.
12 Lurry's neck?
13 A. Yes.                                        2:08:13
14 Q. Okay. And so you immediately -- would you
15 agree with me that you -- when you got in the car, and
16 we can replay this if you'd like to, you immediately --
17 well, actually let's replay this just so we make sure
18 the record is clear. So I'm starting now at 16:46.
19     (Video Exhibit 2 played)
20 Q. You open the door at 16:41, would you agree
21 with me?
22 A. Yes.
23 Q. Starting again.
24     (Video Exhibit 2 played)
25 Q. You are now just leaning into the back seat

Page 125

1  A. Yes.                                    2:26:14
2  Q. Okay. Do you know what you were doing there?
3  A. I'm not sure. I don't know if I was checking
4  for a pulse or what I was doing.
5  Q. Okay. And are you trained on where to check
6  for a pulse on someone?
7  A. I've had first aid, you know, the CPR
8  training, and they talked about checking the carotid,
9  yes.
10 Q. Okay. Can you describe for me where that is
11 -- like, where that's located?
12 A. It's on either side of the neck, and as far
13 as where it's located at specifically, I don't have
14 measurements, wherever you -- we kind of feel around.
15 Q. Is it right around the windpipe or is it
16 further back along the -- further back behind the jaw.
17 A. I think it's adjacent to.              2:27:00
18 Q. Okay. Okay. So it's your testimony that you
19 think that at 17:30, what you were doing was trying to
20 feel for a pulse?
21 A. No. That's not what I said.
22 Q. Oh.
23 A. I said I didn't know if I was. I -- I don't
24 know.
25 Q. You don't know what you were doing at this

Page 126

1  point?
2  A. Correct.
3  Q. But you would agree with me when you're
4  making that pinching motion, you are making physical
5  contact with Mr. Lurry's neck, correct?
6      MR. BERSANI: Object to the form of the
7  question. You said, "pinching motion," and it
8  mischaracterizes his testimony. Go ahead if you can
9  answer.
10 A. My fingers are making contact with Mr.
11 Lurry's neck, yes.
12 Q. Okay.
13 A. I'm going to have to use the restroom soon,
14 too. So whenever is a good time.
15 Q. Okay. Yeah, if you could just -- I just have
16 a little --
17 A. Sure.
18 Q. -- more, and then it'll be a good time, I
19 think, to take a break. Okay. And just for the
20 record, your hand appears to be -- strike that. I'm
21 getting there. Okay. At 17:30, you still have your
22 right hand pinching Mr. Lurry's nose, correct?
23 A. Yes.                                    2:28:02
24 Q. And at this point, his eyes appear to be
25 closed, right?

Page 127

1  A. From this vantage point, it appears that his
2  right eye is closed.
3  Q. Okay. And would it be fair to say you
4  weren't able to see Mr. Lurry's eyes at this point?
5  A. I don't know if I could see his eyes or not.
6  Q. Okay. Were you in any way focused on his
7  eyes?
8  A. It's hard for me to recall. It was a pretty
9  rapidly evolving situation.
10 Q. Okay. Would it be fair to say that your --
11 your focus was on Mr. Lurry's mouth because you were
12 trying to get it open?
13 A. Again, I don't recall that or if I can fairly
14 say what I was focused on because it was rapidly
15 evolving.
16 Q. Okay. I'm going to start again at 17:30.
17     (Video Exhibit 2 played)
18 Q. All right. Stopping at 17:34. And can you
19 describe, for the record, what it is you're doing here?
20 A. It appears that I'm opening Mr. Lurry's
21 mouth.
22 Q. Okay. And you're doing so by pulling his
23 chin hair down, is that fair to say?
24 A. I think I got a hold of his chin hair.
25 Q. Okay. And that's with your left hand,

Page 128

1  correct?
2  A. Yes.                                    2:29:19
3  Q. Okay. And then your right hand is still
4  pinching Mr. Lurry's nose?
5  A. Correct.
6  Q. And Mr. Lurry has not -- and we can go back
7  and look if you wanted to, but he has not -- it doesn't
8  appear that he's moved voluntarily from -- well 17:34
9  -- we'll see where it starts. So we're going to start
10 it -- never mind. Strike the question. So we started
11 at 17:34, and I just -- my question is going to be,
12 have you seen Mr. Lurry move voluntarily at any point
13 between now at 16:51 and I'll stop and let you know --
14 A. Before you start --
15 Q. Yeah.
16 A. -- can you -- what do you mean,
17 "voluntarily"?
18 Q. I mean, do you see --
19     MR. BERSANI: You -- you said, "voluntarily"?
20     MS. BAKOS: Yeah.
21 Q. Did you see him -- I mean because Officer
22 McCue and you are kind of making physical contact with
23 him, so he's moving a little bit back and forth.
24 A. Okay. Are you talking about his body, or are
25 you talking about anything on him?

Page 133

1 the squad car, he was breathing when I entered the
2 squad car and blinking his eyes. I -- I felt that he
3 was feigning illness, unresponsiveness, and -- and once
4 I got that information, I -- to me, that reiterated the
5 fact that he was feigning, and at that point right
6 there, I -- I did not think he was having any issues.
7 I thought that he would be able to open his jaw.
8     Q. You're saying at which point? At this --
9 where we're at 17:33?
10    A. Nothing up until this point led me to believe
11 that he would be helpless.
12    Q. And you did not, up until this point,
13 manually try to open his jaw, correct?
14    A. Are you asking me if -- if I saw myself
15 before I opened his jaw? No. That was the first time
16 I manually opened his jaw.
17    Q. Okay. And is this practice of pinching
18 someone's nose to get them to open their mouth, is that
19 something that you believe is permitted by the Joliet
20 Police Department?
21    A. Ask that again. Are you -- I'm sorry, we
22 weren't facing each other.
23    Q. Yeah. I'm sorry.                    2:36:54
24        MR. BERSANI: Go ahead, ask it again, and
25 I'll object.

Page 134

1    Q. Yeah. Do you -- do you know whether or not
2 it's against Joliet Police Department policy to pinch
3 someone's nose in order to extract drugs from their
4 mouths?
5        MR. BERSANI: Go ahead.
6    A. I don't believe it -- it's addressed at all.
7    Q. Okay. So had you ever seen any other police
8 officers pinch someone's nose in order to get them to
9 open their mouths to extract drugs?
10   A. Yes.
11   Q. Okay. How many times had you seen that
12 before?
13   A. It's hard for me to categorize it, to put a
14 number to it. Several.
15   Q. Okay. What does "several" mean to you?
16   A. More than three.
17   Q. Okay. More than three, less than ten?
18   A. No. I've seen it over ten times.
19   Q. Have you seen it over 20 times?
20   A. I -- I don't know.
21   Q. Okay. And does it typically work, in your
22 experience?
23   A. Yes.                                 2:37:56
24   Q. Okay. Have you seen any of your -- any
25 higher ranked officers, officers who are of a higher

Page 135

1 rank than you are, use that practice to get an arrestee
2 to open his mouth?
3    A. Are you talking about on this day, or are you
4 talking about --
5    Q. Just in general.
6    A. Well, at the time, which was many years ago,
7 there were senior officers I saw do that, and so, I
8 mean, technically speaking, they were of higher ranked
9 seniority or whatnot, so.
10   Q. And would it be fair to say that you've done
11 that with other arrestees in the past, aside from this
12 incident?
13   A. Yes.
14   Q. Have you done that since this incident?
15   A. No.
16   Q. And when you have done that --
17   A. Can -- can I back that up one --
18   Q. Yeah.
19   A. -- second?
20   Q. Yeah.
21   A. You asked me if I've done it since that
22 incident, but I haven't worked the streets since this
23 incident.
24   Q. Okay. I got it.
25   A. I -- it's not my assignment to work the

Page 136

1 street anymore.
2    Q. Okay. And what was my question?
3    A. Are we close to the bathroom?
4    Q. Yeah. Let me just ask one more question.
5 Have you ever included in a report that you used --
6 that you've pinched someone's nose in order to get them
7 to open their mouth to extract drugs?
8    A. I don't believe I have.             2:39:30
9    Q. Have you ever seen that in any of your
10 colleagues' reports?
11   A. I don't know if they put it in their report
12 or not because I never read -- read their report.
13   Q. Right. But just the ones you have read, have
14 you ever seen it?
15   A. Not that I'm aware of.
16   Q. Okay. Do you know how many --
17       MR. BERSANI: That's two questions.
18       MS. BAKOS: I'm sorry. Okay. We'll take a
19 break. We can take a break.
20       RECORDER: Off record, two --
21       MS. BAKOS: No, it's okay.
22       RECORDER: -- 2:09 p.m.
23          (Off the record)
24       RECORDER: On record, 2:17 p.m.        2:39:57
25   Q. Okay. So the video, we were in the middle of

Exhibit 5, LLC

Page 281

 1  or of the back seat of the squad car that we watched
 2  earlier today.
 3     A.  Okay.
 4     Q.  Have you ever watched that video and heard
 5  audio all the way through?
 6     A.  No.                                    5:35:09
 7     Q.  Do you know what it means when someone says,
 8  "We're hot"? If an officer were to say, "You are hot,"
 9  do you know what that means?
10     A.  No, I don't mean to laugh, but, no, I've
11  never heard that before.
12         MS. BAKOS: Okay. Where are we at on time,
13  Katie?
14         RECORDER: We are close to six hours.
15         MS. BAKOS: Six hours?
16         RECORDER: Yeah.
17         MS. BAKOS: Okay. I'm not -- this probably
18  won't take another hour, just so you guys know.
19         MR. BERSANI: Why don't we take a short
20  break?
21         MS. BAKOS: Yeah --
22         WITNESS: Please.
23         MS. BAKOS: Break, please --
24         RECORDER: Okay. Off record, 5:39 p.m.
25            (Off the record)

Page 282

 1         RECORDER: On -- on record, 5:46 p.m.    5:36:00
 2     Q.  All right. I'm going to show you what I have
 3  marked here as Exhibit 4. And, sir, do you recognize
 4  this document?
 5     A.  Yeah, this is the interrogatory, correct,
 6  that I filled out? Yes.
 7     Q.  Yes, these are Defendant Doug May's answers
 8  to Plaintiff's first set of interrogatories, and I
 9  assume you've seen this before, correct?
10     A.  Yes.
11     Q.  And it appears to be a true and accurate copy
12  of what it purports to be?
13     Q.  Yes. And on the last page of this document,
14  there is a verification -- page 13, I'm sorry, the
15  second to last.
16     A.  Okay.
17     Q.  And that's a verification that was signed by
18  you, correct?
19     A.  Yes.
20     Q.  And this -- in signing this, you are saying
21  that all your answers in this document are true and
22  correct to the best of your knowledge and belief,
23  correct?
24     A.  Yes.
25     Q.  And you, in fact, signed the original of this

Page 283

 1  document?
 2     A.  Yes.                                    5:37:00
 3     Q.  Have you had a chance to review this document
 4  prior to today's deposition?
 5     A.  Yes.
 6     Q.  I want to turn your attention to your answer
 7  to interrogatory number five. Interrogatory number
 8  five asks, "State your assigned beat and duties on the
 9  incident date, the circumstances surrounding, one, how
10  you came to know of Mr. Lurry's arrest and/or detention
11  in the area of South Briggs Street and East Washington
12  Street, and two, how you came to interact with Mr.
13  Lurry in the parking lot of the Joliet police station."
14  Your attorney did include some objections --
15         MS. BAKOS: Counsel, if you don't mind, I'm
16  just going to skip over those and go to the answer.
17         MR. BERSANI: Yeah, as long as the answer is
18  -- whatever testimony he gives is still subject to
19  those objections.
20         MS. BAKOS: Yes.
21     Q.  And then it says -- I'm starting with,
22  "Without limiting my answer --
23     A.  Okay.
24     Q.  -- I was assigned to Joliet Narcotics Unit,
25  and my duties were to conduct narcotics investigations

Page 284

 1  and operations." That sentence is true, correct?
 2     A.  Yes.                                    5:38:02
 3     Q.  Then it says, "I heard radio communications
 4  that sector 14 was transporting the subject who had
 5  struggled with the officers, and I waited at the
 6  station parking lot for his arrival." Do you see that?
 7     A.  Yes.
 8     Q.  Is that an accurate sentence -- statement?
 9     A.  Yes.
10     Q.  Okay. What is sector 14, what does that
11  mean?
12     A.  So that's an -- that's an assignment, like a
13  beat assignment. So sector 14 in our city is the unit
14  on that shift that's assigned to, like, the downtown
15  area. Now, I'm not exactly sure of the boundaries of
16  the sector --
17     Q.  Okay.
18     A.  -- anymore, but for all intents and purposes,
19  it's like the downtown area. It may extend a little
20  bit out of the downtown. I'm just not sure on that.
21     Q.  Okay. So just so I'm clear here, because I
22  know we had talked about you hearing commotion on the
23  radio, and it just says that you heard radio
24  communications that sector 14 was transporting a
25  suspect who had struggled with the officers. At the