PathologyExpert, Inc.

**Judy Melinek, M.D.**

3739 Balboa Street #102
San Francisco, CA 94121

**E** drjudymelinek@pathologyexpert.com
**T** 415/850/7056
**W** *www.pathologyexpert.com*

March 17, 2022

Abby D. Bakos, Esq.
BAKOS & MAISURIA LAW GROUP, LLC
1755 Park Street, Suite 200-1070
Naperville, Illinois 60563

**E** abby@bakosmaisuria.com
**T** Phone: 833.800.2654
**M** Mobile: 312.371.6467

RE: Nicole Lurry v City of Joliet et al.(Case #1:2020cv04545)

Dear Ms. Bakos,

I have reviewed the following material you have sent me regarding the above case:

1. Joliet Police Department report JI-20-0001290-001, and WG-20-0000062 Narrative Supplemental Report Interview of Officer Mike Steurer with associated MP3 file

2. Will County Major Crime Task Force Case Report WG-20-0000062-001

3. MP4 file video showing back of police car

4. Dispatch log

5. Patient Care Report from Joliet Fire Department

6. Medical records for Eric D. Lurry (Bates Stamp# Lurry000068-000449)

7. Will County, Illinois Coroner's report for Eric D. Lurry Jr. including investigative reports, autopsy report authored by pathologist Michel J. Humilier MD, and NMS Labs toxicology report for case 20-0048

8. Death certificate for Eric Dubrock Lurry Jr.

9. Photos from hospital (21 pages)

10. Autopsy photos (74 pages)

11. Photos of visual inspection of evidence (22 pages)

Ex. 12


PathologyExpert, Inc.

12. Coroner's radiology
13. Joliet training documents
14. Memorandum to Alan Roechner, Chief of Police, from Stephen H. DiNolfo dated December 21, 2020 for Case # I2020-012 - Jeremy Harrison #39
15. Interview with Lieutenant Jeremy Harrison dated October 29, 2020
16. Deposition transcripts of EMT Gerald Murphy, Jeremy Harrison, Douglas May, Andrew Paul McCue, Dr. Michel Humilier, Michael Steurer, and Jose Tellez
17. Plaintiff's First Amended Civil Complaint
18. Expert report of Kelly Johnson-Arbor, MD

I am a forensic pathologist who works as an independent consultant in both criminal and civil matters. My education is notable for my magna cum laude undergraduate degree from Harvard University, a medical degree with honors from the University of California Los Angeles School of Medicine, and pathology residency at UCLA Medical Center. I trained in forensic pathology at the Office of Chief Medical Examiner in New York City from 2001-2003. During that time it was part of my duties to identify the human remains from the World Trade Center terrorist attacks of 9/11/2001. I was an Assistant Medical Examiner at the Office of the Chief Medical Examiner in San Francisco for nine years. I worked as a contract pathologist for the Alameda County Sheriff Coroner's Office from May 2013 until June 2020, and for three months operated as interim chief forensic pathologist in response to the emergence of SARS-CoV2 and the COVID-19 pandemic. I am currently practicing forensic pathology and performing coronial and forensic autopsies in Wellington, New Zealand, and am a Clinical Senior Lecturer at the Department of Pathology and Molecular Medicine, Otago University School of Medicine.

I have published in the medical literature on the topics of pathology, surgical complications, transplantation surgery, toxicology, and immunology. I have been qualified as an expert witness in the fields of pathology, forensic pathology, post-mortem toxicology interpretation, trauma interpretation, and cause of death determination over 190 times in California, New York, Florida, Utah, Colorado, Illinois, Missouri, Iowa, and Texas. I am currently licensed to practice medicine in both

PathologyExpert, Inc.

California and New Zealand. I am board certified in anatomic, clinical, and forensic pathology, and I routinely interpret autopsy reports, toxicology reports, medical records, and police reports to determine time of death, mechanisms of injury, and cause of death, and to evaluate the contributory effects of natural disease or intoxicants.

I have investigated many in-custody and police-involved deaths in my career, and I have been qualified in court to opine on mechanism of injury and manner of death based on my own and others' autopsy reports, photographs, and scene reports. I have taught forensic pathology to undergraduates, medical students, and resident doctors at New York University, Stanford University, and the University of California San Francisco Medical Center, and have been an invited lecturer at the University of California Hastings College of the Law, the University of California Davis, and at Barts & The London School of Medicine.

After reviewing the above-referenced sources in this case, it is my opinion that Mr. Eric Lurry Jr. died from complications of an acute mixed drug intoxication (heroin, fentanyl, and cocaine). Asphyxia for several minutes due to the obstruction of his airway is a significant contributing condition to death. The average adult airway narrows to approximately 1.5-2 cm in diameter at the posterior larynx/epiglottis and can easily be obstructed by plastic bags the size of the ones recovered from the decedent's airway. Even when smaller than the airway, foreign objects in the posterior pharynx and larynx can also cause laryngospasm, further narrowing the airway. Asphyxia and laryngospasm can be be exacerbated by pressing the front of the neck, as Sergeant Douglas May is seen doing in the video. We know he did this with sufficient strength to cause injury because of the resultant acute hemorrhage in the right strap muscles of Mr. Lurry's neck and petechia in the right sclera. Mr. Lurry was found unresponsive and apneic (not breathing), and officers removed several plastic baggies from his mouth. An additional baggie was "coughed up" during CPR. Mr. Lurry stopped breathing prior to resuscitation, resumed breathing after all the plastic bags were removed, and had an aspiration bronchopneumonia at autopsy, indicating that asphyxia and aspiration played a role in the mechanism of his cardiorespiratory arrest. Furthermore, the failed



attempt by Sergeant May at removing the airway obstruction by forcibly pinching Mr. Lurry's nose and pressing on his neck would have worsened Mr. Lurry's hypoxia by preventing any residual airflow through the nasopharynx if the oropharynx was blocked by bags. This is why Mr. Lurry is seen to fall toward the officer, unresponsive, soon after his nose is released, even though numerous bags had already been removed from his oral cavity by then. The lack of concern or urgency regarding the drugs that were initially palpated on his body and possibly swallowed and the delay in recognizing that his oropharynx and possibly larynx were blocked by the ingested drugs increased the time period for drug absorption; this would elevate the levels of drugs detected in Eric Lurry's bloodstream to lethal levels. The benzoylecgonine detected in the ante-mortem admission blood is likely from cocaine, but metabolism of the parent drug to the inactive metabolite occurred in the blood collection tube through the actions of enzymes in the sampled blood stream because the hospital blood sample was not preserved in sodium fluoride. Had the police officers searched Eric Lurry and removed the drugs, or had they called for medical support when they first suspected that Mr. Lurry might have swallowed drugs at the scene, his death would have most certainly been averted.

As a forensic pathologist in the employment of agencies charged with public health, it has been my job to recognize and highlight potential public health hazards and educate police officers about the ways people can die in custody, in order to protect people taken into custody and to help all parties avoid resultant litigation. I find it unsettling that the coroner and forensic pathologist in this case saw nothing wrong with the video, and that the officers' actions and inaction were not considered on internal review a contributing factor in this man's death. The forensic pathologist's testimony that Mr. Lurry should have had a gag reflex to expel the drugs in his mouth is incorrect: some people do not have strong gag reflexes; Mr. Lurry was clearly under the influence of drugs which can suppress the gag reflex and tighten the jaw; and hypoxia from having his nose pinched while his oral airway was obstructed clearly caused unconsciousness—and an unconscious person also has a suppressed gag. The absence of a gag is an insufficient reason to rule out asphyxia as a contributing factor in Eric Lurry's death.

PathologyExpert, Inc.

Finally, as a trained physician and surgeon I have *never* heard of pinching the nose being used as an approved technique to clear a patient's airway. The anatomy of the airway is such that when the oral cavity is obstructed, pinching the nose would more likely kill the patient, since it would limit any airflow through the nasopharynx. This would still be true if a bag was partially obstructing the posterior pharynx above the level of the epiglottis.

The pertinent facts of the case that lead me to these conclusions are:

1. According to the Joliet Police Department report, Kenan Kinney was arrested on Tuesday 1/28/2020 at 3:12 PM for possession of a controlled substance, suspended/revoked drivers license, and operation of an uninsured motor vehicle. Eric D. Lurry was a passenger in his vehicle. Lurry's height was 6'2" and he weighed 285 pounds. The suspect vehicle turned into a gas station at Briggs and Washington without using a turn signal. A stop was made, and upon speaking with the driver, the officers smelled a strong odor of cannabis. The driver was unable to provide proof of insurance, and it was determined that his drivers license was suspended. A small package containing 3 baggies of white rocklike substance consistent with crack cocaine and 1 baggie of a brown rocklike substance consistent with heroin was in the driver's door. At the station another small package containing 10 baggies of white rocklike substance and 7 baggies of brown rocklike substance fell out of Kinney's crotch area when he went to use the bathroom. The 13 bags of white rocklike substance weighed 7.90 g and field tested positive for traces of cocaine. The 8 baggies of brown rocklike substance weighed 5.31 g and field tested positive for traces of heroin.

2. Kenan Kinney reported that he had picked up Eric Lurry from an apartment complex in Preston Heights and that Lurry asked him to sell crack cocaine to an unknown male. Kinney stated that the cocaine found inside the car in the front driver side door was his, and that Lurry swallowed crack cocaine which is why he became ill.

3. According to a report written by Officer Jose Tellez, Eric Lurry was on the scene during Kenan Kinney's arrest and had been initially patted down by Officer Andrew Paul McCue. Lurry had a large quantity of money in both front pockets. Lurry asked

PathologyExpert, Inc.

for a cellphone in the car, which he described it as a red iPhone. Lurry was given this phone and left the scene, but then the subject in custody complained that Lurry had taken his phone. Officers Tellez and McCue proceeded to where Lurry was walking, as he was still in eyesight, and once they made contact with him they asked him to return the driver's red iPhone, which he did. Officer Tellez then proceeded confiscate Lurry's money and then pat down Lurry. He felt a plastic baggie containing a soft pliable substance at his left inner thigh. He heard Officer McCue say "hey don't go reaching" and "get your hands out of your pants," and Lurry buried his right hand into his crotch area. Lurry was told to get his hands out of his pants. He proceeded to turn around and then drove towards the ground with both of his hands underneath his torso. Tellez and McCue struggled with Lurry, and Tellez observed Lurry "bury his face towards his hands while on the ground." The officers eventually were able to get Lurry's hands cuffed behind his back. They arrested him for obstructing a police officer. Lurry was placed into the rear of Tellez's police car and the video/audio was turned on. While they were driving to the police station, Tellez noted that Lurry was making chewing motions with his mouth, but would stop when he observed the officer looking at him. Once at the police station, Lurry refused to exit the vehicle and additional officers assisted in attempting to remove him from the back of the squad car. Tellez advised officers at the station that he believed that Lurry had placed contraband in his mouth. He reported that while officers were attempting to remove Lurry from the squad car, they recovered various plastic bags from his mouth containing a wet, white residue. Lurry became unresponsive and officers called for an ambulance. Officers were able to remove Lurry from the car, and they initiated first aid procedures. Shortly afterwards, Joliet Fire Department paramedics arrived on scene and transported Lurry to Provena Saint Joseph Hospital for treatment.

4. On 1/28/2020, Officer Timothy Shaughnessy reported that Officer Ranstead located two clear plastic bags in the back seat of squad car 9311. The bags were chewed up and bloody. The bags were placed into evidence.

5. Officer Jose Hernandez reported that he collected the personal property belonging to Eric Lurry that was on the ground, and he collected "some drug like substance the subject had vomited." Officer Christopher Darcy reported that he overheard on

PathologyExpert, Inc.

the radio other units indicating that an arrestee was "not breathing." Sergeant Larry Collins came into the jail and indicated that he needed an AED (automatic external defibrillator). Officer Darcy went to the parking lot and found other officers rendering aid to Eric Lurry. Lurry was lying on the ground and unresponsive. Officer Ranstead was doing chest compressions. Darcy stopped Ranstead in order to assess Lurry's pulse, and he felt that Lurry had a strong carotid pulse and agonal breathing. Lurry's pupils were normal size and slow to react. Officer Darcy used his stethoscope to assess Lurry's breath sounds and could hear clear lung sounds from Lurry. Lurry stayed unresponsive and had a seizure. Joliet Fire Department medics arrived on scene and took over care.

6.  Lieutenant Jeremy Harrison reported that he had supervised officers from the Narcotics Unit and Patrol Unit with the surveillance and eventual arrests of 4 subjects for a drug transaction that took place at the Speedway Gas Station. While leaving the scene he overheard an officer is asking for assistance. He arrived at the police department and observed and overheard Officer Andrew Paul McCue try to get Eric Lurry out of the squad car. Lieutenant Harrison called him by his first name and told him to get out of the car. He could see Lurry "blinking oddly" and his mouth opening and shutting "as if he was trying to swallow." He could not tell if Lurry was feigning illness or suffering from a medical emergency, so he told Sergeant Douglas May to go to the other side of the vehicle and try assisting Lurry out of the car. Harrison started to walk around the car with his sergeant and could hear him say that he could see a bag in Lurry's mouth. Lurry's mouth was partially open, and Harrison requested that someone get something to prop his mouth open and pull the bag out. Officers were able to remove portions of a plastic bag from Lurry's mouth, and during this time Sergeant May stated that Lurry was not breathing. Lurry was removed from the squad car, the handcuffs were removed, and CPR was administered by Officer Ranstead. Soon after, Eric Lurry began breathing and had a pulse.

7.  Sergeant Douglas May reported that he went to the driver's side rear door in an attempt to assist Officer Andrew Paul McCue in extracting Eric Lurry from the vehicle. He noted that Lurry was uncooperative. In his mind, Lurry was attempting to feign being unresponsive. He reported that he used vulgar language and

PathologyExpert, Inc.

attempted to stun Lurry in his shoulder area in order to get him to be responsive and comply, and also struck Lurry with an open hand about the head. He put his hand upon Lurry's neck and jaw, and it appeared to him that Lurry was attempting to conceal narcotics in his mouth. Sergeant Douglas May pinched Eric Lurry's nose in an attempt to get him to open his mouth. Lurry did open his mouth, and Officer McCue was able to extract "several plastic bags" from his mouth. While they were attempting to extract Lurry from the car, he became unresponsive. Sergeant May realized that Lurry was having a medical emergency due to "a choking hazard in his mouth." They removed Lurry from the vehicle, and Officer Ranstead started CPR. Officer Christopher Darcy came to the scene and told Sergeant May that he felt a pulse, at which time Officer Ranstead paused chest compressions. Joliet Fire Department personnel then arrived and began giving medical attention to Eric Lurry.

8. Sergeant Larry Collins reported that he observed a large bag lying next to Eric Lurry while he was getting CPR. This bag was the bag that was retrieved from the subject's mouth.

9. The dispatch log indicates that on 1/28/2020 at 15:41:47 "ONE IN CUSTODY." At 15:46:19 it states, "ADDING AGG FLEEING AND ALLUDING TO THE CHARGES AS WELL AS OBSTRUCTING TO A PO." At 16:01:31, "ENROUTE TO STATION." At 16:19:10, "SUBJ NOT BREATHING IN THE JAIL - SWALLOWED DRUGS," and at 1/28/2020 at 16:19:57, "ADVISING A 10-52 IS NEEDED FOR A MALE SUBJ WHO SWALLOWED NARCOTICS. PATIENT IS NOT BREATHING. STARTING CPR."

10. Officer Andreana Armitage reported that at the jail she heard Sergeant Douglas May telling the officers to get Eric Lurry out of the squad car. She then heard Lieutenant Jeremy Harrison ask for an ambulance to be dispatched to the jail. She approached the vehicle and Sergeant May came around to the passenger side and told her to go get an AED. When she brought the AED, she saw Officer Ranstead performing CPR, doing chest compressions. She noticed a large bag on the ground next to the subject while they were rendering aid. This bag was the bag that was coughed up and retrieved from the subject's mouth. While they were rendering aid she heard the subject cough a couple of times and overheard Officer Christopher Darcy say the subject did have a slight pulse prior to the fire department arriving.

 PathologyExpert, Inc.

11. In the interview with Officer Mike Steurer, he reported that he was at the jail when Officer Jose Tellez and his recruit (Officer Andrew Paul McCue) pulled up with Eric Lurry. Officer Ranstead reported to him that Lurry had fought with Tellez and McCue at the scene of his arrest. Officer Steurer recalled that when Officer McCue opened the door of the squad car to get Lurry out, McCue made a statement to the effect that Lurry was acting like he was passed out and not moving. Officer Ranstead then began CPR on Lurry. Steurer recalled that at one point during CPR, Lurry coughed up a plastic bag from his mouth. Steurer stated that the bag may have been orange or pink in color and that it was tied off at one of the ends. Steurer said that Joliet Fire arrive shortly thereafter and took over life saving measures.

12. The Will County Major Crime Task Force Case Report documents that "officers attempted to remove Lurry from the vehicle and at that time learned that he had placed contraband into his mouth. Officers were able to remove several plastic baggies containing an unknown substance. Lurry was removed in the patrol vehicle and first aid measures were rendered." Joliet Fire Department transported Eric Lurry to Provena Saint Joseph Hospital. He passed away on 1/29/20 at approximately 2:37 AM. Interviews with officers were conducted and were mostly similar to the Joliet police department statements. Officer Andrew Paul McCue stated that prior to the officers' attempts to remove Lurry from the vehicle, McCue was not aware that Lurry had swallowed anything. Sergeant Douglas May handed Officer Timothy Shaughnessy the two chewed up baggies recovered from the rear of Officer Jose Tellez's squad car, and they were placed in evidence. Officer Mike Steurer reported that at one point during CPR, Eric Lurry coughed up a plastic bag from his mouth. Steurer described the bag as orange or pink in color and that it was tied off at one end. Sergeant May reported that he had struck Eric Lurry with an open hand to the side of Lurry's head and that he had placed his hand near Lurry's jaw, "on his neck." He saw that Lurry was clenching his jaw, and alerted the other officers that he suspected Lurry had narcotics in his mouth. May reported that he pinched Lurry's nose closed with his right hand in an effort to force Lurry to expel the narcotics from his mouth. Lurry did open his mouth, and May observed a plastic bag in Lurry's mouth. Then Officer McCue used an ASP (expandable baton) to prevent Lurry from

PathologyExpert, Inc.

biting down as he extracted bags from Lurry's mouth. Sergeant May reported that he had observed Lurry "take a breath" after chest compressions began.

13. MP4 file video showing the back of the police car. (In watching the video I noticed that the time stamps on the player did not correspond well when it was replayed, so the time stamps I cite here may not be accurate.) At the beginning of the video, Eric Lurry is seated in the right back passenger seat of the car with his hands behind his back, and he is audibly breathing heavily. He is turned away from the camera facing out the door. He is wearing a white sweatshirt. An officer is heard to say "he's got something on him." Lurry's breathing slows to a normal pace, and he starts moving his mouth and jaw as if he is moving something around in his mouth or chewing intermittently. At approximately minute 6:45, an officer can be heard to say the words "swallowed something," and another officer responds, "Okay, we will follow you." Lurry is seated upright, stops chewing, and, based on the rise and fall of his chest, is clearly breathing with a normal rhythm. He is conscious and his eyes are open. At around 07:30 the car starts to move, and Lurry leans to his right side and is seen chewing again. He continues to chew intermittently throughout the drive to the police station, sometimes leaning to his right side with his face hidden in the door. An officer is heard to say, "What's up, yeah. We'll going to go down to the jail. we are going to search him more. He might have got something…we'll talk more." At 10:50-10:52 Lurry turns to his right and hits his head against the back seat. At approximately 15:28 he starts chewing with an opened mouth and leans back. He appears to be blinking his eyes. The chewing slows down as they arrive at the jail, and Lurry leans back. An officer is heard to ask him to get out of the car. Lurry is sitting upright and appears unresponsive, then turns toward the officer but doesn't get out. An officer is heard to say, "What's wrong with you?…Let's not do this…We are not doing this today. Get out of the car. C'mon, let's go," and grabs Lurry's shirt. Lurry does not get out. Another officer is heard to say, "Wake up bitch, let's go," and then "open your mouth" multiple times. The audio then cuts out. The officer to Lurry's right grabs him by the shirt and gives Lurry a sternal rub. An officer comes in to Lurry's left and slaps him on the face. Lurry looks at him and the officer grabs Lurry by the neck, then uses his fingers to pinch closed Lurry's nose. The officer keeps Lurry's nose closed for approximately 1 minute 45 seconds as he also

PathologyExpert, Inc.

presses on Lurry's cheeks and then presses his neck at the location of the right anterior strap muscles. Lurry's eyes are initially blinking, but then they close. The officer to Lurry's left then forces open Lurry's jaw by pulling down on his beard, all

 
 

the while holding Lurry's nostrils closed. The officer to Lurry's right puts the end of a baton into Lurry's mouth, then pulls multiple pieces of foreign material out of Lurry's mouth with his gloved hand. He then uses the baton to keep Lurry's mouth open while the other officer pulls down on Lurry's beard and up on his pinched nose to widen Lurry's mouth. One of the pieces of plastic is quite large and comes out of Lurry's mouth like a ribbon. When the officer to Lurry's left releases his grip on Lurry's nose and jaw, Lurry falls to his left side, clearly unconscious. The officers perform sternal rubs. They then remove Lurry from the vehicle. Subsequent resuscitation attempts are partially visible through the open right passenger door and back right window.

14. Patient Care Report from Joliet Fire Department dated 01/28/2020 reported that Eric Lurry was unconscious/unresponsive for approximately 8 minutes, and that when crew arrived his airway was patent. He had no carotid pulses and was not breathing. His first monitored rhythm was ventricular tachycardia which then changed to PEA (pulseless electrical activity). Upon crew arrival the patient was found on the ground in the parking lot with police. The patient was not breathing

PathologyExpert, Inc.

and pulseless. The crew began CPR with chest compressions and ventilations. Police on scene stated that the patient had been in police custody when he took what appeared to them to be a baggie of crack cocaine and put it in his mouth and attempted to swallow it. Police stated that they tried to remove a ripped baggie from the patient's mouth. The crew suctioned the patient's airway, intubated him, and transported him to the hospital, where ED staff resumed CPR.

15. Medical records for Eric D. Lurry documented that Lurry had elevated lactate on admission to the hospital. Urine drug screen was positive for cocaine metabolites. In the ED, return of spontaneous circulation was achieved with cardiopulmonary resuscitation and patient developed ventricular tachycardia. He had a secondary cardiac arrest, and pulses were regained with epinephrine and one round of CPR. A chest X-ray showed diffuse pulmonary edema. A plain head CT was unremarkable, but interpretation was limited by motion artifact. He was placed in the ICU in critical condition but subsequently had another cardiac arrest. He expired on 1/29/20 at 02:37.

16. The autopsy report for Eric D. Lurry Jr. indicates that the autopsy was performed on January 29, 2020 at 09:15 AM. The date and time of death was 1/29/2020 at 02:37 AM. Decedent was 37 years old. Evidence of injury include a right scleral petechial hemorrhage, lower lip abrasions, and a lower lip laceration. There are also contusions and an abrasion of the bilateral hands and right wrist. Internal evidence of subcutaneous injury includes hemorrhages of the bilateral wrists, left forearm, right elbow and right sternothyroid muscle. Hospital urine was positive for 6-MAM at 37 ng/mL. Hospital blood was positive for morphine (64 ng/mL), fentanyl (32 ng/mL), and benzoylecgonine (560 ng/mL). The organs were remarkable for pulmonary and cerebral edema, right pleural adhesions, and right sternothyroid muscle hemorrhage. The pathologist concluded that Eric Lurry's cause of death was heroin, fentanyl, and cocaine intoxication.

17. The toxicology report from NMS Labs is positive in the peripheral blood for 4-ANPP, caffeine and naloxone. Benzoylecgonine is measured at 560 ng/ml. Free morphine is at 64 ng/ml. Fentanyl is at 32 ng/ml. The urine is positive for cocaine metabolites, fentanyl metabolites, and urine 6-MAM is at 37 ng/ml.

PathologyExpert, Inc.

18. Microscopic sections of the lungs (5 sections) show diffuse edema and intra-alveolar hemorrhage with abundant brown, crystalline golden brown, and black pigment, some in alveolar spaces and some within foamy macrophages. Foci with intra-alveolar neutrophils (early bronchopneumonia) and rare multinucleated cells and poorly formed noncaseating granuloma are suggestive of an aspiration pneumonia. Brain sections show some rarefaction of the neuropil and focal microscopic hemorrhages. A few neurons are shrunken with hypereosinophilia of the cytoplasm and nuclear pyknosis. Sections of heart muscle (2), liver (1), and kidney (2) are unremarkable.

19. The death certificate for Eric Dubrock Lurry Jr. states that the cause of death was heroin, fentanyl, and cocaine intoxication. No other significant conditions contributing to death were noted. The date of death was January 29, 2020 and the date and time of injury were noted at January 28, 2020 at 4:15 PM. The place of injury was noted as "outside of Joliet police department." The death certificate was signed by Patrick K. O'Neil, who is listed as the medical examiner/coroner.

20. Hospital and autopsy photos show the condition of Eric Lurry's remains. There is evidence of medical intervention including electrocardiography pads, endotracheal intubation, defibrillator pads, needle puncture marks, intravenous catheters, and a Foley catheter. The eyes have tache noir from post-mortem drying in the partially opened position. Incisions at the wrist show focal areas of subcutaneous hemorrhage. The liver appears tan in color. There is a 1 cm focal hemorrhage at the right anterior strap muscles of the neck (sternothyroid muscle). The diameter of the trachea at the epiglottis or vocal cords is not photographed. Upon reflection of the skin, there is a 2 cm subcutaneous hemorrhage at the right upper arm/elbow.

21. Photos of visual inspection of evidence show a plastic bag containing 13 smaller bindles of white granular material. Each bindle measures between 3/8 inch to 1/2 inch in diameter. Another bag contains 8 small bindles of dry green vegetable matter. A small bag of evidence contains what appears to be a broken plastic bindle with white or tan granular material within it. The broken plastic bindle comprises two large pieces of plastic which measure approximately 1 inch (2.2 cm) in aggregate and greater than 2 inches when opened up. Another piece of evidence

PathologyExpert, Inc.

consists of two purple gloves and a tan colored torn plastic bag which is over 4 inches in size.

22. Stephen H. DiNolfo's memorandum to Alan Roechner, Chief of Police, concluded that Lieutenant Jeremy Harrison did not violate any of the general orders listed in the Notice of Investigation. He assessed that Sergeant Douglas May violated orders 7.1 and 3.1 by speaking to Eric Lurry using crude language and striking him. In DiNolfo's assessment, the plugging of Lurry's nose does not constitute a "chokehold," as Sergeant May took no action to restrict intake of air through Lurry's mouth. Officer Andrew Paul McCue violated General Order 13-1 because he did not secure Lurry in the rear of his vehicle, and General Order 9-21 when he failed to activate the Watch Guard system after the interaction with Eric Lurry changed from attempting to retrieve a phone to a search of his person. DiNolfo found that Officer Jose Tellez violated numerous police department General Orders: Order 13.1, 1.7B by not securing Eric Lurry during transport; 9-21 when he did not activate his video system; 13.1 and 1.7A by not searching Eric Lurry prior to placing him in the squad car, and by not checking Lurry's mouth for the drugs; 7-1 by turning the video system off due to the conduct of Sergeant May.

23. EMT Gerald Murphy testified that he was trained to remove foreign materials from an individual's mouth by using an oropharyngeal airway and McGill forceps. He would not restrict their breathing by squeezing on their neck (p.43-44). Murphy said that if he was called to a scene and knew that an individual had swallowed a large amount of narcotics but was not exhibiting signs of a medical emergency, he would take them to the hospital (p.69). He reported that they transported Eric Lurry to the hospital after he had "his airway secure," meaning Lurry had been intubated (p.85). When they arrived at the scene, they asked the officers how long Lurry had been unresponsive and were told that Lurry had been unconscious and unresponsive for 8 minutes (p.87). He testified that the officers told him that there was a baggie in Lurry's mouth, that it had torn, and that Lurry had possibly swallowed more (p.94). When he was not breathing, Lurry's SpO2 was 76 percent (p.96), but it went up when they gave him oxygen (p.102). They administered Narcan and epinephrine. Lurry began to foam at the mouth, and Murphy stated that based on the white color of the froth, Lurry most likely "had regurgitated what—something that he had

PathologyExpert, Inc.

swallowed" (p.112). Murphy stated that pinching someone's nose in order to get them to open their mouth is something that he has personally done and has witnessed other medical professionals do (p.122-123), although this was not something that was taught in training (p.132). He said that most people can hold their breath for a minute to a minute and a half (p.134).

24. Lieutenant Jeremy Harrison testified that he became aware that Sergeant Douglas May did not conduct himself in accordance with the general orders was when he reviewed the car video from the squad car. Harrison thought that May's use of a swear word violated the general orders, and that the use of a strike of the subject was "debatable" (p.28-29). Harrison only saw the video until a few seconds after that moment, because Officer Jose Tellez had stopped the recording (p.37-38). Harrison said that Tellez was violating general orders when he turned off the video in his squad car (p.46). He stated that he did not believe it was against Joliet policy to hold the nose of an arrestee in order to get him to open his mouth (p.68). In his understanding, the Joliet Police Department does not permit officers to restrict the airway of an individual who is believed to be overdosing (p.116). He agreed that the sooner you get an individual who is overdosing to a medical professional, the more likely they will survive (p.122). He believed that Eric Lurry was exhibiting an overdose, but he did not administer Narcan (p.129-130). Harrison instructed Sergeant May to give Lurry a sternal rub "to arouse him," because Lurry appeared to be feigning or "messing around and playing dead weight" (p.169). He thought the strike to the face was "inappropriate" (p.175). When Harrison was on scene, he saw Sergeant May pinching Lurry's nose (p.182). Harrison stated that May said at the time that he smelled cocaine. Harrison believed Lurry was feigning a medical emergency (p.187-188). He wanted Sergeant May to take the drugs out of Lurry's mouth because he didn't want it to turn into a medical emergency (p.190). He instructed Officer Andrew Paul McCue to use the ASP baton to prop Lurry's mouth open to keep Lurry from biting down on his fingers while he attempted to extract the drugs from Lurry's mouth (p.194-196). At no time did Lieutenant Harrison tell Sergeant May to stop pinching Lurry's nose (p.205). He stated that in his report, he wrote that he saw Eric Lurry "opening his mouth and shutting it almost as if he was trying to swallow," and testified that he saw this after he called out Lurry's name

PathologyExpert, Inc.

(p.238). He stated that the Joliet Police Department does not have a policy that requires medical professionals to be immediately called if an arrestee is known to have ingested or is believed to have ingested narcotics during the course of an arrest (p.258).

25. Sergeant Douglas May testified that he was standing in the sally port when officers Jose Tellez and Andrew Paul McCue pulled in (p.22). McCue and Tellez did not tell him anything about Eric Lurry having put anything in his mouth (p.32). He heard a commotion over the radio when the officers arrived at the station, and he saw Officer McCue go around the car from the front of the vehicle to the passenger's rear door, instructing Eric Lurry to get out of the car. At some point Lieutenant Jeremy Harrison asked Sergeant May to go around the driver's side of the vehicle and assist (p.44). When May opened the door of the vehicle, Eric Lurry's eyes were closed (p.47). He admitted that he struck Lurry with an open hand to the face (p.54). He stated that slapping an individual to determine whether or not they are having a medical emergency was not in his training (p.64). He said he called Eric Lurry a bitch as a distraction technique, to offend him and get him to respond (p.70-72). May stated that he didn't realize Lurry was having a medical emergency until Lurry slumped over (p.76). He could tell Lurry was breathing when he got in the car (p.87-88). At one point while May was in the back of the car, Eric Lurry exhaled and May smelled the distinct odor of cocaine; he states that that was when he realized that Lurry had something in his mouth (p.88). Sergeant May pushed his hand up underneath Lurry's jaw and felt that Lurry had his jaw clenched. He admitted to holding Eric Lurry's nose for the purpose of restricting his breathing so that Lurry would open his mouth (p.93). He denied squeezing Lurry's throat (p.96). Sergeant May stated that his strike to Eric Lurry's face was intended to land on Lurry's chest or shoulder, but he missed (p.237).

26. Officer Andrew Paul McCue testified that he had not been given any training related to what to look for to determine whether or not someone is overdosing on drugs (p.54). He did not call for medical assistance for Eric Lurry (p.60). He had not been given any formal training regarding how to determine if someone is feigning a medical emergency (p.62-63). He observed Lurry's eyes rolling back when they were both in the rear of the patrol car at the station (p.66-67). When he patted down

PathologyExpert, Inc.

Lurry at the scene, he felt two large bulges in Lurry's front pants pocket, which appeared to be a wad of currency (p.100). Eric Lurry was initially allowed to leave the scene, but then Officer McCue and Officers Tellez and Wietting went back to get the money and cellphone from Lurry. Officer Tellez searched Lurry at that time, and Lurry started reaching into his pants. Lurry was able to get his hands in his pants and McCue was trying to remove Lurry's hands, and then all three of them—Tellez, Lurry, and McCue—fell to the ground. In reviewing the video, Officer McCue identified the voice of the officer saying that Lurry had put something in his mouth and possibly swallowed it as Officer Jose Tellez (p.141-144). He witnessed Sergeant Douglas May slap Eric Lurry (p.162-163). He also witnessed Sergeant May pinch Lurry's nose (p.171). McCue said that he was instructed to use a flashlight or baton to put in Lurry's mouth so that he doesn't "get bit" (p.176). He inserted the ASP into Lurry's mouth and pulled out plastic material from Lurry's mouth (p.176-177).

27. Officer Michael Steurer testified that he had not ever received any training that holding a nose is the proper method of getting an arrestee to open his mouth to extract drugs (p.25). He was behind the vehicle during the incident with Eric Lurry in the sally port, so he couldn't see what was going on (p.46). He saw Lurry get pulled out of the car and Officer Ranstead start CPR, and that Lurry looked like he was in "dire medical duress" (p.55). He saw Lurry cough up a baggie while Ranstead was "feverishly doing CPR" on him (p.56-57). After the baggie came out, Lurry appeared to gasp for air slightly, and then he started seizing. Steurer saw the baggie, and said it looked like it had been chewed open (p.58). Lurry coughed more than once (p.61). Lurry was able to "gain some breaths once he obviously coughed the baggie up" (p.67-68). Steurer said the baggie was empty and flat, and that the evidence photographs did not depict it (p.70-71). The baggie had one knot, and the other end appeared bitten off (p.80).

28. Officer Jose Tellez testified that in hindsight he would have done a few things differently: he would have asked if Eric Lurry had anything in his mouth at the scene, and he would not have shut the camera off (p.22). He turned off the camera because he had just seen Sergeant Douglas May slap Lurry, and he knew that you shouldn't slap someone in handcuffs (p.24). The other reason he turned it off was because they were at the police station (p.27). Tellez had been trained that people

PathologyExpert, Inc.

try to conceal illicit drugs when they are arrested (p.45). He testified that on prior occasions when people have hidden things in their mouth, he has gotten them to spit it out by asking them to (p.47). He never tried to get Eric Lurry to spit out the drugs that were in his mouth (p.49). After struggling with Lurry on the ground, trying to get him handcuffed, Officer Tellez was tired and winded, and he thought to get Lurry to the station and get a strip search authorized. He stated that he hadn't seen Lurry put anything in his mouth, "100 percent sure," until he was in the back of the squad car and the other officers were taking something out of Lurry's mouth (p.50-51). Officer Tellez received a 6 day suspension for discipline in the Lurry incident. When he observed Eric Lurry for the first time getting out of the car at the scene, Lurry did not appear to be under the influence of anything (p.87). Officer Andrew Paul McCue patted Lurry down and found that Lurry had cash in his pockets (p.88). After drugs were recovered in the vehicle and the driver, Kenan Kinney, was handcuffed, they checked Eric Lurry for outstanding warrants and when it was established that he was clear, they let him go (p.94). Kenan Kinney stated that Eric Lurry had his phone, so Officers Tellez and McCue went after Lurry in their squad car. Tellez spoke to Officer Wietting on the phone, who told him that the "drug guys" wanted them to seize the money Eric Lurry had on him (p.101). Tellez took the money out of Lurry's pockets and did a pat-down, and when he patted down Lurry's left leg, he felt what he believed to be narcotics (p.114). It was approximately half way down, towards his inner thigh quad area (p.126). He said it was between the size of a golf ball and racquetball (p.128). He said "What's this?" and then heard Officer McCue say "Hey, don't go reaching" or "Get your hands out of there." Tellez said "What's this?" a second time, and then Lurry pulled away, so Tellez thought he was trying to flee. A struggle ensued, and all three of them fell on the ground (p.133). Lurry's hands were under his stomach and then he moved his head toward his hands (p.150). The officers pulled Lurry's hands behind His back and handcuffed him. The struggled with him for about a minute and a half. Lurry was face down on the ground and they tried to flip him, but Lurry had his legs spread out to prevent it (p.161). They eventually flipped Lurry into a seated position on his butt, then onto his feet, and then put him in the police car. Once Lurry was in the police car, Tellez believed "there was a possibility that he had maybe put some

PathologyExpert, Inc.

of it (the drugs) in his mouth" (p.170). Tellez said it was only one packet and it was big, so Tellez didn't think Lurry had got all of it in his mouth, because he didn't see any "bulges" or anything in Lurry's mouth (p.171). Officer Tellez confirmed that it was his voice on the video saying, "Take him down to the jail, I'm sure he's got something on him, might have put a bunch of it in his mouth" (p.186); "It's in his mouth"; and "Bunch of dope baggies, might have got some in his mouth" (p.187). He searched the scene with a flashlight and did not find any drugs at the scene (p.221). As they were transporting Lurry from the scene, Officer Tellez saw him chewing but did not monitor him or call for medical assistance (p.238). He estimated that the drive was between 7 to 10 minutes (p.240). He didn't think Lurry was in any kind of medical distress (p.241). He did state that he "looked back" on Lurry on two occasions (p.242). After reviewing video, Officer Tellez testified that he believes he told Sergeant May when they arrived at the police station that he found drugs on Eric Lurry, and that (based on Lurry's motions on the video), Lurry may have put them in his mouth (p.252). When he turned around to look at Lurry while they were in the car together, he thought Lurry was alert because his eyes were open, but Lurry's face was turned to the window, so Officer Tellez only saw the left side of his face.

29. Dr. Michel Humilier, the forensic pathologist, testified that he saw in the video that a police officer had held Eric Lurry's nose in an attempt to get him to open his mouth (p.29). Dr. Humilier acknowledged that he saw brain swelling in Lurry (p.44). He mentions sternothyroid hemorrhage and pressure placed on neck (p.47). He stated that cerebral edema occurs in people who have overdosed (p.54). He opined that fentanyl was the most significant of the three drugs in Eric Lurry's bloodstream because of its relative level, and he did not think that post-mortem redistribution would have played a role in the level, because the blood was drawn when Lurry was still alive. He assumed Eric Lurry may have been breathing through his mouth when his nose was plugged (p.67). Dr. Humilier though Lurry was breathing when his nose was being pinched because Lurry didn't struggle and he didn't open his mouth gasping for air (p.68). Dr. Humilier was not aware that Eric Lurry, during the course of CPR, coughed up a plastic bag and then was gasping for air immediately afterwards (p.70). He found that surprising, because, he testified, Lurry did not

PathologyExpert, Inc.

show any gag reflex at the time they were clearing out his mouth (p.71). Dr. Humilier gave no opinion in deposition about whether this fact would change his medical opinion in the case (p.72). It didn't surprise him that there would have been blood on the coughed-up bag, because the "nasal mucosa breaks down very quickly." He said there was congestion when he cut the lungs (p.74). He stated that there was no blood in the respiratory path airways (p.74). Dr. Humilier stated that he could rule out airway obstruction as a contributing factor because he saw no evidence of a gag reflex (p.81). He agreed that if someone's mouth cavity is blocked and their nose is obstructed, it could cause them to asphyxiate (p.90). Dr. Humilier stated that pinching the nose shut in order to force someone to open their mouth is a legitimate medical technique (p.107). He testified there was a petechia in Lurry's right sclera (p.110).

30. According to the opinion of Kelly Johnson-Arbor M.D., and emergency medicine expert, the delay in providing Mr. Lurry with immediate medical attention once he was reasonably suspected of placing drugs in his mouth and/or of ingesting drugs, increased the likelihood of death. Mr. Lurry would have survived if medical treatment had been provided to him at or close in time to when Officer Tellez suspected that Mr. Lurry had ingested the drugs. It is also her opinion that officers exacerbated Mr. Lurry's condition and further increased his risk of death when they pinched Mr. Lurry's nose closed and put a baton in his mouth.

These opinions are based on my experience and training, as well as my knowledge of the peer-reviewed forensic medical literature. I am relying on the information you have provided me at the present time; thus, my opinions may change if other information is offered to me for review. The forensic methodology employed in my work in this case is identical to the methodology I employ when I perform an autopsy or write a report as part of my job for the medical examiner or coroner's office, or in my work as a medico-legal expert in other cases involving drug intoxication and asphyxia. It is also consistent with the standards of my profession. I review the above-referenced records and then I analyze that information in the context of the current peer-reviewed medical literature. The peer-reviewed medical literature is searched via an online search engine

**PathologyExpert, Inc.**

at the National Library of Medicine (http://www.ncbi.nlm.nih.gov/pubmed) for the relevant terminology.

I am available to testify to these opinions in a mediation hearing, deposition, or trial, if necessary. Please feel free to contact me at the above address and phone number if you have any questions or need further clarification.

Sincerely,

Judy Melinek, M.D.

Selected References:

1. Baselt RC. Disposition of Toxic Drugs and Chemicals in Man, Tenth Edition; 2014 Biomedical Publications, Foster City, CA
2. Collins KA. Autopsy Performance & Reporting, Third Edition. 2017 College of American Pathologists, Northfield, IL
3. DiMaio VJ and Dana SE. Handbook of Forensic Pathology. 2007, CRC Press, Boca Raton, FL.
4. DiMaio VJ and DiMaio D. Forensic Pathology Second Edition. 2000, CRC Press, Boca Raton, FL.
5. Dolinak D, Matshes E, Lew E. Forensic Pathology Principles and Practice. 2005, Elsevier Academic Press, Burlington, MA.
6. Spitz WU. Spitz and Fisher's Medicolegal Investigation of Death, Fourth Edition, 2004, Charles C Thomas Publisher LTD.
7. Stocker JT, Dehner LP, Husain AN. Stocker & Dehner's Pediatric Pathology. Third Edition. 2011, Walters Kluwer/Lippincott Williams & Wilkins, Philadelphia, PA.
8. Wetli CV, Mittleman RE, Rao VJ. An Atlas of Forensic Pathology. 1999 ASCP Press. Chicago, IL.

Enclosures:

1. Dr. Melinek's curriculum vitae

PathologyExpert, Inc.

2. Dr. Melinek's testimony in last 4 years

3. Dr. Melinek's contract and fee schedule