```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3     NICOLE LURRY, as Special        )   Docket No. 20 C 04545
       Administrator of the Estate of  )
 4     ERIC LURRY, JR., Deceased,      )
                                       )
 5                    Plaintiff,       )   Chicago, Illinois
                                       )   November 30, 2022
 6             v.                      )   8:53 a.m.
                                       )
 7     CITY OF JOLIET, et al.,         )
                                       )
 8                    Defendants.      )


 9
                 TRANSCRIPT OF PROCEEDINGS - Daubert Hearing
10           (Charles Drago, Dr. Judy Melinek, John J. Ryan)
                 BEFORE THE HONORABLE VIRGINIA M. KENDALL
11

12     APPEARANCES:

13
       For the Plaintiff:        BAKOS & MAISURIA LAW GROUP by
14                               MS. ABBY DANA BAKOS
                                 One East Erie Street, Suite 525-4686
15                               Chicago, IL  60611

16                               BAKOS & MAISURIA LAW GROUP by
                                 MS. RONAK PATEL MAISURIA
17                               1755 Park Street, Suite 200-1070
                                 Naperville, IL  60563

18

19     For the Defendants:       HERVAS CONDON & BERSANI PC by
                                 MR. MICHAEL D. BERSANI
20                               MR. GLENN DAVID MATHUES
                                 333 West Pierce Road, Suite 195
21                               Itasca, IL  60143

22

23     Court Reporter:           GAYLE A. McGUIGAN, CSR, RMR, CRR
                                 Official Court Reporter
24                               219 S. Dearborn Street, Room 2504
                                 Chicago, IL 60604
25                               312.435.6047
                                 gayle_mcguigan@ilnd.uscourts.gov
```

Drago - Direct by Bakos

1  professional background?

2  A    I was a police officer for almost 35 years.  Almost 30

3  years of that was with the Fort Lauderdale Police Department.

4  While with the Fort Lauderdale Police Department, I rose

5  through the ranks from entry-level police officer to assistant

6  chief of police.  During that time, I served as, as I said, an

7  officer, a sergeant, a captain, a major, assistant police

8  chief.  Served in the narcotics vice units for nearly 10 years,

9  including as a sergeant of the narcotics unit.  Created the

10 field training officer program for the City of Fort Lauderdale.

11          It was then I retired and became the police chief in

12 the City of Oviedo, which is just outside of Orlando.

13          Served there until I was appointed to be secretary of

14 the Department of Business and Professional Regulation, which

15 is a Florida state agency that regulates most of the businesses

16 in the state of Florida.

17          Was then appointed as the assistant -- or the deputy

18 chief of staff to the governor.

19          I left when the governor left and started my business

20 of police consulting -- police practices consulting.  Did that

21 for now about 10 years.

22          I've recently been appointed by the current governor

23 of Florida to the Florida Gaming Control Commission.  It's a

24 commission of five members who oversee all the gaming and

25 gambling in the state of Florida, which also has a law

Drago - Direct by Bakos

1   symptoms of someone who is under the influence of opioids?

2   A   So I train them in various drugs and the different types of

3   drugs and the different categories of drugs so that they would

4   have some sense of what a person might be on in terms of drugs

5   if they saw certain actions, behaviors, presented to them.

6   They may not know the exact drug, but they can have a sense of

7   the category of drug.

8           For instance, whether it was a drug like amphetamines

9   or cocaine or speed, some type of stimulant drug, I would

10  instruct them on what to look for with somebody that's

11  presenting symptoms of using that drug.

12          If it was something that was more of a depressant,

13  like heroin, fentanyl, the opioids, I would explain to them

14  what to look for with that drug.  And they would be pretty much

15  different or they would be opposite in many cases.

16          So I would explain to them the differences and what

17  the symptoms might be.

18  Q   Okay.  And what are some of the symptoms of opioids that

19  officers are trained to look for?

20  A   So opioids are depressants.  So the person will be often

21  sleepy, hard to keep their eyes open or stay awake sometimes,

22  unable to speak very well if they speak at all.  Signs of

23  overdose might be where the skin starts to get very clammy, the

24  lips can turn blue, the breathing gets very shallow.  So you

25  look for -- teach them to look for a person who has got a

Drago - Direct by Bakos

1    depressed look about them as opposed to a stimulant that's
2    opposite of that.  So I -- they know to look for those types of
3    symptoms in a person who is on any kind of an opioid.
4    Q    And what about cocaine?  Is cocaine considered a stimulant?
5    A    So cocaine is considered a stimulant.  And that person
6    would be more active, talkative, maybe sweating profusely,
7    hallucinating, maybe have increased strength.  It depends on
8    how much they've taken and the status.  And that can, of
9    course, lead to toxic levels and overdose with them as well
10   where they would lose consciousness, just like with opioids,
11   but lose consciousness, have trouble breathing, in addition to
12   those other effects that you might have seen prior to them
13   losing consciousness.
14   Q    And are officers trained on the importance of getting
15   medical attention quickly for individuals who are at risk of
16   overdosing either on opioids or stimulants?
17   A    Yes.  So an officer doesn't know how much drugs the person
18   took.  They don't know necessarily what it was they took.  They
19   don't know if it was cut with something that they're not
20   familiar with.  So we're taught that if you believe someone is
21   on drugs and either overdosing or having some type of situation
22   like that, or if they swallow drugs and you don't really know
23   how much of it there is, it's considered a medical emergency
24   because time is of the essence with that.  And that's how we're
25   taught, is that the quicker you can get that person help, the

Drago - Direct by Bakos

1   better it will be.  And if you can give them some type of
2   antidote, Narcan or whatever it may be, the sooner you do that,
3   the better chance you're going to have of that person
4   surviving.  So officers are trained to get medical help as soon
5   as possible.
6   Q    And to your knowledge, do all police officers receive this
7   training?
8   A    Yes.  All -- to my knowledge, all police officers do
9   anywhere in the country.
10  Q    Are police officers trained on how to determine whether or
11  not someone is feigning a medical emergency?
12  A    No.  It's really -- the officer's job is to recognize
13  symptoms of a medical emergency and then call for medical
14  assistance.  Officers are not trained to delve into that
15  situation, whether they're feigning it or faking it or how long
16  will this last or how bad is it.  If they -- if they see a
17  medical emergency or symptoms thereof, they're trained to call
18  for medical professionals who then make that determination as
19  to whether or not it's something more serious or whatever kind
20  of care they may need at that point.  So it's not up to the
21  officer, and the officer is not trained to try to figure out
22  whether somebody is faking or feigning an illness.
23  Q    So there are no physical maneuvers or tactics that you're
24  aware of that officers are specifically trained to perform to
25  determine whether or not someone is feigning a medical

Drago - Direct by Bakos

1  emergency; is that fair to say?

2  A    There is none taught, no.  Officers are not taught any --

3  any tactics or tricks or anything like that to try to trick a

4  person into revealing some fake or feigning illness.  No,

5  they're not taught that at all.

6  Q    If a police officer has suspicion that someone may be at

7  risk of an overdose, what, if anything, are they trained to do?

8  A    So they're trained to call for emergency medical assistance

9  immediately, that's the first thing -- EMS, paramedics, trained

10  medical personnel -- to help, to come and evaluate the

11  situation.

12  Q    Are they specifically trained that if they observe an

13  arrestee swallowing illicit drugs, that, in and of itself, is a

14  medical emergency?

15  A    Yes.  If they believe that an individual has swallowed

16  drugs, it is automatically immediately a medical emergency

17  because now time is of the essence and they need to get the

18  professionals there as quickly as possible to treat that

19  person.

20  Q    Is there any training that you're aware of that requires

21  police officers to see the physical manifestations of an

22  overdose before they call for medical assistance for the

23  arrestee?

24  A    No.  When the officer believes that a person has swallowed

25  drugs, that becomes the emergency right there.  It's -- there's

Drago - Direct by Bakos

1    no way of determining how much they swallowed, what they

2    swallowed, how long it will take for the onset of the overdose

3    or -- there's just no way for an officer to determine that.

4    And nobody expects the officers to do that.  The officers are

5    expected then to recognize the fact that they believe that this

6    person swallowed drugs.  They're trained to understand that

7    people can overdose, can become very sick and/or die by

8    swallowing drugs.  And, therefore, it is a medical emergency at

9    that point, and then that's when they call in the professionals

10   to come in and evaluate and treat that person properly.

11   Q    Are officers trained that an arrestee simply putting

12   illicit drugs in his or her mouth and refusing to spit those

13   drugs out, is that then a medical emergency?  Or do they need

14   to wait to determine if the individual has swallowed the drugs

15   or is manifesting physical symptoms of an overdose?

16   A    If they believe a person has got drugs in their mouth or

17   swallowed, and they are not -- they can't get them out or

18   they're not giving them out or they're not spitting them out or

19   whatever the case may be, and the officer knows that that

20   person has drugs in their mouth, then the officer has to assume

21   that it's a medical emergency at that point because he could

22   be, and it's a very good chance, that he is swallowing it at

23   the time.  And there's no way for an officer to determine how

24   much he's swallowing at the time, how -- how toxic it might be,

25   et cetera.  So it immediately becomes a medical emergency when

Drago - Direct by Bakos

1  he realizes that person is hiding drugs in his mouth and/or

2  swallowing them.

3  Q    Does it matter whether or not the arrestee has packaged or

4  put unpackaged drugs in his mouth?  And by that, I mean

5  something maybe in a baggie or wrapped up in some way as

6  opposed to just being raw drugs?  Does that matter one way or

7  another, whether or not it becomes a medical emergency?

8  A    No.  It doesn't make any difference.  It doesn't matter

9  whether it is or it isn't.  The baggie itself is dangerous, if

10 it is wrapped up in some type of plastic and can cause

11 suffocation by itself.  And then, in addition to that, the

12 subjects tend to chew on the bag to try to swallow the drugs.

13 So whether it's in a bag or not, it really doesn't make any

14 difference.

15        An officer can't be there walking this line, trying to

16 decide, well, it's bagged, so, therefore, I have 35 minutes

17 longer to wait or -- there's no -- that burden is taken off of

18 officers.  And officers are trained not to try to make that

19 determination and figure that out.

20        But as soon as they realize that person has got drugs

21 in their mouth, you call for emergency help right away, and

22 don't wait to try to decide whether -- how thick the baggies

23 are or anything like that.

24 Q    Police officers are not trained to diagnose arrestees with

25 any physical ailments; would that be fair to say?

Drago - Direct by Bakos

1    A    Yes, that's true.

2    Q    And what kind of medical training, if any, do police

3    officers get?

4    A    So their medical training is pretty basic.  It's CPR.  It's

5    basic first aid.  It's -- recognizing certain things -- a

6    possibility of certain things, such as what an overdose might

7    look like, what an alcohol poisoning might look like, what

8    somebody who is suffering a coma from something, something

9    else, a diabetic coma or something -- give some idea of -- some

10   basic ideas of what things look like when they present, but

11   not -- but that's it.  Officers are very limited in what they

12   can do or trained to do as it relates to first aid and medical

13   assistance.

14   Q    So if I'm hearing you correctly, officers are trained to

15   look for certain signs and symptoms to determine if someone is

16   in a medical emergency or at risk for a medical emergency, but

17   they are not specifically trained to treat someone medically

18   for that emergency; is that true?

19   A    Yes, that's true.

20   Q    And -- I'm sorry, just give me one second here.

21        Are officers trained on how to extract drugs from an

22   arrestee's mouth?

23   A    No.  They're not taught to extract drugs from -- from an

24   arrestee's mouth.  No.

25   Q    Are they trained to plug an arrestee's nose to force the

Drago - Direct by Bakos

1    arrestee to open their mouth in order to get the drugs out?

2    A    No, they're not.  No.

3    Q    Are they trained to put pressure on the arrestee's jaw to

4    get the arrestee to open his or her mouth?

5    A    No, they're not.

6    Q    Are they trained on how to use a bite block?

7    A    No.

8    Q    I'm sorry.  Do you know what a bite block is?

9    A    I don't, no.

10   Q    And to be clear, arrestees are not trained on how to use

11   pain stimuli to determine if someone is feigning a medical

12   emergency; is that true?

13   A    No, they're not trained to use any kind of pain to see if

14   somebody is feigning.  No.

15   Q    Is slapping someone in the face a technique trained to

16   police officers to force someone to open their mouth who is not

17   willing to do so for the purpose of extracting anything?

18   A    No, it is not.  No.

19   Q    Are you familiar with a sternum rub?

20   A    Yes.

21   Q    Can you please tell us what a sternum rub is?

22   A    A sternum rub is sometimes used to determine if somebody

23   is -- or to help somebody come out of unconsciousness if they

24   believe that -- especially if they're intoxicated on alcohol

25   and so forth, it does induce a certain amount of pain to arouse

Drago - Direct by Bakos

1    that individual before he reaches a point where there's no

2    return, he overdoses, and they can't save him.

3           So, therefore, it's obvious to me that they violated

4    those policies that I mentioned by transporting a person in a

5    medical emergency without regard for calling medical

6    assistance.

7    Q    Okay.  So just as it relates to just your very first

8    opinion, that Officers Tellez and McCue disregarded the

9    policies and accepted practices for providing medical

10   assistance to a person, when Officer Tellez initially made

11   remarks regarding his suspicion that Mr. Lurry had put the

12   drugs in his mouth and/or swallowed some of it, did Officer

13   Tellez act consistently with the national policies when he

14   proceeded to take Mr. Lurry to the station instead of calling

15   for medical assistance?

16   A    No.  He was not consistent with accepted policies.  It was

17   a contradiction and violated accepted policies for that

18   situation.

19   Q    Now, we hadn't talked about any of the JPD policies

20   specifically as they relate to rendering medical aid for an

21   arrestee.  Did you rely on any of the JPD policies in rendering

22   your opinion?

23   A    Yes, I did.

24   Q    Which policies did you rely on?

25   A    So on the first opinion, I listed the policies that relate

Drago - Direct by Bakos

1  deposition, that he was compliant at that point.

2          So I just -- I'm just pointing out here that, when I'm

3  talking about that they should have searched him, that it

4  didn't appear that he was being unruly or dangerous or

5  struggling in any way when they took -- walked him to the car

6  and put him in the car.  And I base that on the video.

7  Q    So is it your opinion that in order to be consistent with

8  policy, the officers were required to search Mr. Lurry's person

9  before putting him in the car, especially after having the

10  knowledge that they believed he had drugs in his mouth,

11  swallowed them, or on his person?

12  A    Yes, absolutely.  They should have searched him.  They're

13  required to, by their own policy, by accepted police practices,

14  that -- I could see no reason, and I think that's what I -- I

15  was trying to point out was I could see no reason why you could

16  not search him.  There were other officers there with him at

17  the time.

18          So my point was they -- there's no reason why they

19  couldn't search him, no reason why they couldn't comply with

20  the policy and training and should have searched him,

21  especially since they believed that he may have put those drugs

22  in his mouth.

23  Q    Okay.  I just want to turn now to your second opinion.

24          Can you tell us what your second opinion is?

25  A    Yes.  "Officer Tellez and Officer McCue failed to follow

Melinek - Direct by Bakos

1  Q    Okay.  And how do opioids affect the organs of the body?

2  A    Opioids cause depression of the central nervous system, and

3  they bind to receptors that can slow down metabolic processes,

4  relax the person.  The reason people take them is because of

5  the relaxant and sedative effects.  But in large quantities,

6  they can cause respiratory depression, meaning that they slow

7  down people's breathing, and that they can cause somnolence and

8  coma, leading to death.

9  Q    And cocaine, how does cocaine affect the body?

10 A    Cocaine is a stimulant.  And it can cause agitation.  It

11 can cause kind of the feeling of excitement and euphoria, which

12 is why people take it.  But it can also increase the heart rate

13 and blood pressure and quicken the breathing, just like you

14 would if in a fight-or-flight scenario.  And it can stimulate

15 cardiac arrhythmias, which are abnormal rhythms in the heart

16 that lead to death.

17 Q    Are you familiar with naloxone?

18 A    Yes.

19 Q    Can you please tell us what naloxone is?

20 A    So naloxone is also in the class of opiates in the sense

21 that it binds to opioid receptors, but it blocks the attachment

22 of other opioids and, therefore, it reverses their effects.  So

23 it's used as a rescue drug in situations where people are

24 intoxicated with opioids because it will block the effects of

25 the opioids on the receptor, but it doesn't cause the

1    respiratory depression and all the negative effects that the

2    other opioids do.  So it blocks them, and it's --

3    Q    Do you know --

4    A    -- considered a reversal agent.

5    Q    Do you know whether or not naloxone is more effective when

6    taken closer in time to when the opioids are ingested as

7    opposed to later in time?  Does it matter?

8    A    It does matter in the sense that you want to give it before

9    a person arrests.  So if a person is somnolent and having

10   difficulty breathing as a result of an opioid intoxication, you

11   need to give the naloxone sooner rather than later.  If you

12   wait until they stop breathing, it's going to be less

13   effective.  It's going to take time for it to have its effect

14   as well.  It's not instantaneous.  So depending on how -- you

15   know, whether it's injected in a vein versus muscle -- usually,

16   I believe it's in muscle -- it -- it's not instantaneous.  It

17   takes it a little bit to get absorbed.  And the sooner you give

18   it, the more likely you can counteract the effects.

19   Q    And would it be fair to say then the less likely that

20   someone will die of an overdose of opioids?

21   A    Yes.  So if they're known to have taken a toxic dose, for

22   instance, or they're suspected to have taken a toxic dose, and

23   you give the naloxone sooner, you're going to counteract the

24   effects.  They're less likely going to slow down their

25   breathing and die.  But, at the same time, you have to keep an

Melinek - Direct by Bakos

1    eye on them because some drugs have a longer half life than

2    naloxone.  So the naloxone can stop having its effect, and then

3    the drugs will still be in their system.  So you've got to

4    monitor them, too.

5    Q    And I may use the terms Narcan and naloxone

6    interchangeably.  And those are the same thing; is that fair to

7    say?

8    A    That's correct.  Narcan is the brand name.

9    Q    Based on your review of the evidence in this case, do you

10   know whether Narcan was administered to Mr. Lurry by any of the

11   police officers at any time during the officers' interaction

12   with Mr. Lurry?

13   A    I don't believe there's any evidence that the officers

14   administered it.  I believe it was administered by paramedics

15   once they arrived.

16   Q    Did you consider all of -- all of what we just discussed,

17   as far as the fentanyl and heroin, opioids, the way that they

18   work on the body and what not, in -- as part of the analysis

19   that formed your opinion that Mr. Lurry died of a complication

20   of acute mixed drug intoxication?

21   A    I considered all that.  That is correct.

22   Q    You also watched a video as part of your review of this

23   case, correct?

24   A    I did.

25   Q    And you watched a video that depicted Mr. Lurry in the back

Melinek - Direct by Bakos

1    pulse.  The common forensic understanding of asphyxia is that

2    it encompasses a category of injury or death whereby people

3    cannot get oxygen into their bloodstream.  But the oxygen can

4    be restricted from getting into the bloodstream in multiple

5    different ways, so it's a very broad category.

6            It includes things like obstruction of the nose and

7    mouth.  So if you obstruct someone's nose and mouth, they can't

8    get air into their airway, and so there's less oxygen thereby

9    getting into the bloodstream, and then the person will lose

10   their pulse.  They will become pulseless.

11           And you can have asphyxia from pressure on the neck,

12   either by manual strangulation or with a ligature, like in

13   hanging.  You can -- that will both obstruct the airway by

14   lifting up the tongue and collapsing the airway, but also by

15   blocking the blood flow to the brain with pressure on the

16   carotid arteries or jugular veins.

17           Then there's also internal obstruction, for example,

18   when someone chokes on food, that there's an object in the back

19   of their throat that prevents air from getting down into their

20   trachea and lungs.

21           And then also there is chemical asphyxia, meaning that

22   there is displacement of oxygen in the air or replacement by

23   chemicals, such as carbon monoxide, that replace oxygen off the

24   red blood cells.  So the person is still breathing.  For

25   example, let's say they're breathing in smoke.  There's not

Melinek - Direct by Bakos

1  enough oxygen in the air, and carbon monoxide binds to the red

2  cells so there's not enough oxygen in the bloodstream.  So even

3  though they're breathing and their blood is circulating, their

4  oxygen levels go down.

5          So all of these are different types of asphyxia.

6  Q    What sort of asphyxia are you referring to in your opinion?

7  A    In this case, there are multiple potential modes of

8  asphyxia here.  The biggest one is there is an object, a large

9  object, which is the plastic bag with drugs in the mouth, and

10  it was obstructing the oral cavity, which is part of the

11  airway, the oral airway.

12          In addition, there was pressure placed on the nose for

13  over a minute.  I think it was close to a minute and a half,

14  something like that.  So now the nose -- the nasal airway is

15  also obstructed.

16          Additionally, there was a plastic bag that was coughed

17  up, so it indicates that it was near the back of the throat so

18  that it could be coughed up, during which time before that was

19  coughed up, the patient wasn't breathing, and then after it was

20  coughed up, he was breathing again.  So that indicates that

21  that was an obstruction to breathing.  And that's based on the

22  testimony.

23          And then, of course, there were drugs that were being

24  chewed on, so the drugs were becoming particulate, and some

25  were swallowed, but some were also aspirated, meaning that they

Melinek - Direct by Bakos

1    went into the airways.  And you could see that foreign material

2    in the back -- you could see it, you know, attached to the

3    baggie, but you can also see it microscopically in the lungs.

4    Q    Now, you say that asphyxia for several minutes due to the

5    obstruction of his airway is a significant contributing

6    condition to death.  What do you mean by "a significant

7    contributing condition"?

8    A    So according to public health death certification

9    standards, we have to write a death certificate.  That's part

10   of our job as forensic pathologists.  So any time a death is

11   sudden, unexpected, or violent, according to state law,

12   throughout the United States, the responsibility of determining

13   the cause and the manner of death rests with the medical

14   examiner or coroner.  And in determining the cause and the

15   manner of death, we have to slot that in to a form that's

16   called a death certificate.

17            The death certificate has two parts to the cause of

18   death.

19            Part 1 is the cause of death, which is split up into

20   A, B, and C.  So you can have three -- a sequence of three

21   different things where you say A is due to, B is due to, C.  So

22   there's Part 1, which is cause of death.

23            But there's another part of the death certificate,

24   Part 2, which is other significant conditions contributing to

25   death.

Melinek - Direct by Bakos

1    And so, as a pathologist, we are trained in writing
2    death certificates to not only identify the primary cause, but
3    also identify contributing causes.  And significant
4    contributing causes are ones where they would have accelerated
5    the death or made the death more likely from the thing that's
6    listed in Number 1.
7    Q    Thank you.
8         Now, did you rely on anything from the autopsy report
9    in order to make the determination that asphyxia was a
10   contributing -- contributed to Mr. Lurry's death?
11   A    I did.
12   Q    And what from the autopsy report did you rely upon for this
13   opinion?
14   A    Give me one second to refer to my report so I can remember
15   what I have here.
16   Q    Let me ask you this:  Did you rely upon --
17   A    Sure.
18   Q    Did you rely upon the fact that there was a petechial
19   hemorrhage in Mr. Lurry's right sclera?
20   A    Among other things, yes.
21   Q    Okay.
22   A    So the physical findings at the autopsy included a
23   petechial hemorrhage, but there was also hemorrhage in the
24   strap muscle on the right side of the neck.
25   Q    Okay.  Can you please tell the Court, what is a petechial

1  hemorrhage?

2  A    So petechiae are burst blood vessels, and they can occur as

3  a pressure phenomenon.  So if pressure is applied on the neck,

4  then what happens is more blood is flowing to the head than is

5  draining down, and you can burst those blood vessels in the

6  eyes and they cause petechiae.  And sometimes there's just one

7  or two of them.  They just look like little red dots in the

8  whites of the eyes or on the inner lids if you pull the lids

9  down.

10  Q    Okay.  And do you always see a petechial hemorrhage when

11  you have a person who is asphyxiated?

12  A    No.

13  Q    Okay.  So that wasn't the only thing from the evidence that

14  you relied upon; is that fair to say?  From the autopsy, I

15  should say.

16  A    That's fair to say.

17  Q    Okay.

18  A    Correct.

19  Q    And you also mentioned the hemorrhage in the right strap

20  muscle.  What is a hemorrhage?

21  A    Hemorrhage is bleeding.  So that means that pressure was

22  applied on that muscle, and it damaged the small blood vessels.

23  And there was bleeding in an area that was about 1 centimeter

24  in size.

25  Q    And where is the right strap muscle on the human body?

Melinek - Direct by Bakos

1    A    And it's surrounded by -- oh, and it's I should say

2    surrounded by a sheath.

3    Q    Is there anything that leads you to believe that the

4    hemorrhage in Mr. Lurry's right strap muscle was caused from

5    any medical interventions?

6    A    No, I don't think it was caused by medical intervention.

7    There's no evidence to support that.

8    Q    Okay.  And what -- do you have any evidence to support the

9    fact that it was not caused by medical intervention?

10   A    Yes.

11   Q    What evidence is that?

12   A    So number one is the location.  That strap muscle is on the

13   front right of the neck, and it is in the location that you can

14   see -- clearly see on the video an officer putting pressure on

15   that location, which indicates that that's the source of the

16   hemorrhage.

17           Second of all, both Dr. Humilier's autopsy report and

18   his testimony, as I recall, indicate that this hemorrhage is

19   from pressure and did not appear to come from the vasculature.

20   The two are physically removed from one another when you

21   perform an autopsy.

22           So in my experience and training, when someone has had

23   a catheter in a blood vessel and it causes a large amount of

24   hemorrhage in that area that extends to the musculature, it

25   causes -- it's obvious.  Like, you can see the hemorrhage

Melinek - Direct by Bakos

1  surrounding the blood vessel, surrounding the sheath that

2  encircles the blood vessels, and then it connects to the area

3  where it's spreading to.

4          In this particular case, both the description in the

5  autopsy and what's written, how it's written, it's under

6  Evidence of Injury.  It's not under Evidence of Medical

7  Therapy, which is where we put -- doctors who are forensic

8  pathologists, that's where we will put complications of

9  therapy.  So not only my opinion, but also in the original

10  forensic pathologist's opinion, this hemorrhage came from some

11  sort of external pressure or injury and did not come from the

12  catheter.

13  Q   Can you see what is on my screen right now?

14  A   So my --

15  Q   Can you see the autopsy report that I have up?

16  A   I want to be able to -- I'm trying to figure out how to

17  make it bigger so I can see it bigger because right now it's

18  very small.

19          I don't know this software.  Kendall Host --

20          MS. BAKOS:  Your Honor, for the record, I'm showing

21  the witness the autopsy report, Plaintiff's Exhibit Number 4.

22          THE COURT:  Okay.

23  BY MS. BAKOS:

24  Q   Just so we can --

25  A   If you would zoom in on it --

Melinek - Direct by Bakos

1      There's also testimonial evidence that his nose was

2   pierced -- or pinched for a period of time.  And you can see

3   that on the video.

4      And you can see on the video, obviously, the pressure

5   on the neck that we demonstrated earlier.  And that was also

6   testified to, that the neck was being pressed and the nose was

7   being pinched in an attempt to open up his mouth and take the

8   drugs out.

9      And then there's also testimony, most importantly,

10  that he stopped breathing after the pressure was placed on his

11  neck and his nose was pinched.

12     And when the -- he had stopped breathing when the

13  plastic material was still in his mouth.

14     And then they took him out of the vehicle and started

15  CPR.  And when they started CPR, he coughed up plastic

16  material, and then took some more coughs and gasps and started

17  breathing again.  So that testimony, I believe, was given by

18  Steurer, Officer Steurer.  And it indicates that there was an

19  airway obstruction that caused him to stop breathing.  And then

20  when the airway was no longer obstructed because he had coughed

21  up the obstruction, he was breathing again.  And they were

22  capable of getting a pulse back on him.

23  Q    And what, if anything, did the nose pinching -- what, if

24  any, significance did that have related to your opinion?

25  A    So pinching the nose, as far as I know, from having done,

Melinek - Direct by Bakos

1    you know, ACLS training in the past and from my surgical

2    training and my clinical training, it's not something that's

3    done to clear an airway.  If someone has something in their

4    airway, you want to keep the nose open because that -- if

5    their -- so let me explain by explaining what the airway is in

6    the first place anatomically.

7            Our airway is composed of both our nose and our mouth.

8    You know, if you pinched your nose, you can breathe through

9    your mouth.  If you close your mouth, you should be able to

10   breathe through your nose.

11           Now, some people have natural obstructions.  For

12   example, they might have a deviated septum.  That means that

13   they can't breathe through one nostril or the other, or maybe

14   they can't breathe through their nose at all because of sinus

15   congestion, and then they're relying primarily on their mouth

16   to breathe.

17           But both the oral airway and the nasal airway are

18   parts of the airway.  And they're wider at the top, especially

19   at the mouth.  At the nose, we have the nostrils that are

20   limiting the size.  But at the mouth, we have a relatively big

21   mouth to be able to eat with.  But then it narrows in the back

22   of the throat.  And in the back of the throat, it narrows to

23   about 1 1/2 to 2 centimeters.  So that's about an inch in size

24   for most people.  Even big people, the airways are pretty

25   standard in size.  They're not -- they're not super big.  We're

Melinek - Direct by Bakos

1    And he stopped breathing while this material was in

2  his oral and possibly pharyngeal airway.

3    And then he was taken out of the car and CPR was

4  started.  The bags were taken out.  He was still not breathing.

5  And only in the process of, you know, doing CPR, he -- it --

6  the pressure on the chest from CPR dislodged this baggie, the

7  smaller one, that then he regurgitated or coughed up.  And

8  there was testimony that he subsequently took breaths and he

9  had a pulse.  So they started CPR because he was not responsive

10 and not breathing.  And then once the airway obstruction was

11 alleviated, he was breathing.  So that indicates that there was

12 airway obstruction because if his not breathing was just from

13 the drug intoxication, he wouldn't have started breathing

14 again.

15    MS. BAKOS:  Your Honor, may I have just one moment,

16 please?

17    THE COURT:  You may.

18    (Counsel conferring.)

19 BY MS. BAKOS:

20 Q  Dr. Melinek, in your opinion, did anything that Officer May

21 do to Mr. Lurry exacerbate the asphyxia?

22 A  So the things that made the asphyxia worse as opposed to

23 alleviating it are, number one, the delay in getting out the

24 material and getting medical attention because, of course, the

25 faster you get him out of the vehicle and call 911, the

Melinek - Direct by Bakos

1    paramedics can come and use forceps and use their techniques,

2    because they have actually got equipment like intubation

3    equipment that allows you to remove things from people's

4    airway, asp -- you know, an aspirator, things like that.  So

5    that's part of it.  It's also delay.

6          But there's also, you know, pinching someone's nose,

7    when you know that their oral airway is obstructed, all it does

8    is restrict the air going into their lungs even more.

9          So the officer knew that there was something in the

10   mouth, and his attempt to pinch the nose and put pressure on

11   the neck is not going to help the situation.  In fact, just the

12   opposite.  It's going to make the situation worse.

13   Q    Thank you, Dr. Melinek.

14         MS. BAKOS:  Your Honor, I have no more questions.

15         THE COURT:  Okay.  Cross?

16         MR. MATHUES:  Your Honor, I'd ask for five minutes

17   just to use the restroom.

18         THE COURT:  Sure, go right ahead.  I'll take five

19   minutes.

20         THE WITNESS:  I second that.

21         LAW CLERK:  All rise.  Court is in recess.

22      (Recess at 1:30 p.m., until 1:36 p.m.)

23         THE COURT:  I am ready if you're ready.

24         MR. MATHUES:  Yes, your Honor.

25         MS. BAKOS:  Yes, your Honor.

Ryan - Direct by Bersani

1    lieutenant and had responsibility -- overall responsibility for

2    the entire city.  And that would include oversight of all the

3    specialty units, unless they had a ranking supervisor working,

4    which was -- would be unusual in the -- at night.  Generally,

5    it was the ranking personnel, working at night, they largely

6    worked days.  So I would oversee detectives, narcotics,

7    organized crime, all the different bureaus within the police

8    department that would be on duty at night, as well as obviously

9    the Patrol Division, the jail, and what not.

10          Somewhere around 1994 or 1995, I was detailed to

11   become in charge of the police academy in Providence.  The

12   police academy is responsible for all basic training, as well

13   as all in-service training for the department.

14          As part of that assignment, when I went there I

15   rewrote the entire training for the entire department's basic

16   academy for purposes of all patrol officers that would come on

17   to the Providence Police Department.

18          We also trained some other departments as well because

19   the state municipal academy sometimes didn't have enough seats

20   for other departments, so we were authorized to train others as

21   well.

22          I held a position either as the director of training

23   or in charge of training from 1994, 1995, to 2000.

24          I also wore some other hats at that time that included

25   an administrative staff position where I served as the

Ryan - Direct by Bersani

executive officer to the Chief of Police.  I was the department

spokesman.  I was moved down to the administrative staff wing

where I oversaw several different divisions within the police

department.  But also as the executive officer, I had

responsibilities to oversee a lot of major investigations that

had to be run by me so that I could brief the Chief of Police

on a daily basis as to what was occurring and help make some of

the decisions as to the appropriate methods of investigation

and things of that nature.

And then, you know, I promoted to Captain and finished

up in the administrative staff.  That's where I completed my

career.  Right before I finished, I rewrote all the department

policies.  That was one of my final assignments, rewriting all

the department policies for the agency.

Q    And, sir, sticking to that last point you made about

rewriting all the policies, can you just briefly describe the

process you went through to do that?

A    Yes.  So it's the same thing that I do today.

So one of the things you do is you take the existing

department policy, if there is one, you take department

policies, you put out a survey for other agencies of similar

size, of similar demographics.  Sometimes you even look to

smaller and bigger agencies that are progressive, if you will,

professional.  And then you look at Supreme Court decisions,

Federal Circuit court decisions.  And Providence, in this case,

Ryan - Cross by Bakos

1   pat-down is for weapons, yes.

2   Q    Okay.  But you believe that Mr. Lurry should have been

3   searched for the drugs that he put in his mouth before he was

4   transported to the station, right?

5   A    Well, bear in mind, as I said, would it have been a good

6   idea if you thought he put drugs in his mouth?  Yes, I think it

7   would be a good idea to have him open his mouth, if you can get

8   that done.

9   Q    And you actually admit in your deposition that you would

10  have searched him, right?

11  A    I would have -- I would have tried to get him to open his

12  mouth, yes, if I -- if I was -- felt strongly that he had put

13  drugs in his mouth.

14          MS. BAKOS:  I have no further questions.

15          THE COURT:  All right, everyone.  Thank you for the

16  testimony today, sir.  And you can be released, meaning you can

17  turn off your camera and your system.

18          And I will see all of you tomorrow.  Okay?  Take care.

19          THE WITNESS:  Thank you, your Honor.

20          MULTIPLE SPEAKERS:  Thank you.

21          LAW CLERK:  All rise.  Court is adjourned.

22          THE WITNESS:  It's an hour later here.

23          THE COURT:  Oh, there you go.  Well, have a late

24  dinner then.

25      (Proceedings concluded at 5:39 p.m.)

Ryan - Cross by Bakos

1                      C E R T I F I C A T E

2          I certify that the foregoing is a correct transcript, to

3     the extent possible, of the record of proceedings in the

4     above-entitled matter, given the limitations of conducting

5     proceedings via videoconference.

6

7
      _/s/ GAYLE A. McGUIGAN_____          _January 6, 202_3
8     Gayle A. McGuigan, CSR, RMR, CRR                      Date
      Official Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25