# In The Matter Of:

*Nicole Lurry vs*
*City of Joliet*

---

*Kelly Johnson-Arbor*
*April 26, 2022*

---

*ADVANTAGE REPORTING SERVICE*
*110 S.W. JEFFERSON AVE., SUITE 430*
*PEORIA, IL    61602*
*PHONE: 309-673-1881   FAX: 309-673-0341*
*reportingservice@att.net*

Original File 4-26-22, Kelly Arbor.txt
**Min-U-Script® with Word Index**

**Ex. 15**

**Page 1**

1    UNITED STATES DISTRICT COURT NORTHERN

2    DISTRICT OF ILLINOIS EASTERN DIVISION
     NICOLE LURRY, as            )
3    Special Administrator       )
     of The Estate of Eric       )
4    Lurry, Jr., deceased,       )

5         Plaintiff,             )

6    -vs-                        )  No. 20-CV-4545
                                 )
7    CITY OF JOLIET,             )
     JOLIET POLICE               )
8    OFFICERS MAY (Star          )
     #056), MCCUE (Star          )
9    #118), TELLEZ (Star         )
     #311) and LT HARRISON       )
10   (Star #039),                )

11        Defendants.            )
        THE ZOOM EVIDENCE DEPOSITION of KELLY
12   JOHNSON-ARBOR, an expert witness, called by

13   the defendants for examination pursuant to

14   notice, and pursuant to the provisions of the

15   Code of Civil Procedure, and the Rules of the

16   Supreme Court thereof pertaining to the taking

17   of depositions for the purpose of evidence,

18   taken before me, Cindy M. Scribner, CSR-RPR,

19   License #084-004465, in and for the County of

20   Peoria and State of Illinois, at 4063

21   Ridgeview Circle, in the City of McLean, and

22   State of Virginia, on the 26th day of April,

23   A.D., 2022, at the hour of 10:00 a.m.

**Page 2**

1    APPEARANCES:

2

3         Bakos & Maisuria
          1 E. Erie Street, Suite 525-4686
4         Chicago, IL  60611
          By:  Abby D. Bakos, Esq.
5         Abby@bakosmaisuria.com and
          Ronak Maisuria, Esq.
6         Ronak@bakosmaisuria.com
          For the plaintiff;
7

8         Hervas, Condon & Bersani
          333 West Pierce Road, Suite 195
9         Itasca, IL  60143
          By:  G. David Mathues, Esq.
10        Dmathues@hcbattorneys.com
          For the defendants;
11
          Also Present:
12        Nicole Lurry

13

14

15

16

17

18

19

20

21

22

23

**Page 3**

1                    INDEX

2    EXAMINATION                              PAGE

3

4

5    DIRECT EXAMINATION BY MR. MATHUES:         5

6

7    CROSS-EXAMINATION BY MS. BAKOS:          188

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**Page 4**

1                  EXHIBITS

2    EXHIBIT                                   PAGE

3    (Exhibit 1 marked for                       9

4    identification.)

5    (Exhibit 2 marked for                      10

6    identification.)

7    (Exhibit 3 marked for                      11

8    identification.)

9    (Exhibit 4 marked for                      12

10   identification.)

11   (Exhibit 5 marked for                      12

12   identification.)

13   (Exhibit 6 marked for                      71

14   identification.)

15   (Exhibit 9 marked for                      83

16   identification.)

17   (Exhibit 12 marked for                    155

18   identification.)

19   (Exhibit 10 marked for                    169

20   identification.)

21         (All exhibits marked are attached

22   the transcript.)

23

Page 5

1      DR. KELLY JOHNSON-ARBOR,
2  being first duly sworn, deposes and says as
3  follows, in answer to:
4  DIRECT EXAMINATION BY MR. MATHUES:
5      Q.  This is the deposition of Dr. Kelly
6  Johnson-Arbor, retained expert witness for
7  plaintiff, in the Case of Lurry versus City of
8  Joliet, et al., currently pending before Judge
9  Kendall in the U.S. District Court of the
10  Northern District of Illinois.
11      My name is David Mathues.  I am the
12  attorney for the defendants.
13      Dr. Johnson-Arbor, have you had to
14  give a deposition before?
15      A.  Yes, I have.  Thank you.
16      Q.  If we have technical difficulties,
17  we'll just make due.  Let me know if you don't
18  hear me or I don't hear you.
19      A.  I was having difficulty hearing
20  you, but I can hear you fine now.  I adjusted
21  things on my end.
22      Q.  Approximately how many times have
23  you given a deposition?

Page 6

1      A.  That I do not know.  I think that
2  you should have the list of my depositions and
3  trial testimony, which I gave to Ms. Bakos as
4  per your request.  I don't know off the top of
5  my head how many depositions I have done.
6      Q.  So I have the list of cases where
7  you've been retained in the last four years.
8  So going back further than that, in your total
9  life can you estimate -- I'm not asking for a
10  precise number -- could you estimate about how
11  many depositions you've done?
12      A.  Maybe -- maybe eight or 10.
13      Q.  Fair enough.  Since you've given a
14  number of depositions, I will skip some of the
15  preliminary logistics and just go right to the
16  point, which is, is there any reason you
17  couldn't answer questions truthfully and
18  accurately this morning?
19      A.  No.
20      Q.  If I ask you a question and you
21  don't understand it, maybe because my coffee
22  hasn't kicked in or I'm using medical terms
23  incorrectly, will you let me know?

Page 7

1      A.  Yes.
2      Q.  And if I ask you a question and you
3  can't give a precise answer, just like I just
4  did with the number of depositions, but you
5  can give an estimate, like you just did, maybe
6  eight to 10, will you provide that estimate
7  and also make clear to the attorneys here that
8  you're making an estimate and/or
9  approximation?
10      A.  Yes.
11      Q.  Are you physically located in the
12  State of Virginia this morning?
13      A.  No.
14      Q.  Where are you physically located?
15      A.  I am sitting in the District of
16  Columbia.
17      Q.  Is there anyone else in the room
18  with you?
19      A.  No.
20      Q.  In terms of getting ready for this
21  morning's deposition, did you meet with either
22  Ms. Bakos or Ms. Maisuria, counsel for
23  Ms. Lurry?

Page 8

1      A.  I spoke with them on the phone
2  yesterday.
3      Q.  Without going into anything that
4  was said, about how long was that
5  conversation?
6      A.  10 or 15 minutes.
7      Q.  And other than those 10 or
8  15 minutes, how much time did you put in
9  getting ready for this morning's deposition?
10      A.  Two hours.
11      Q.  And you have been retained as an
12  expert witness in the case, correct?
13      A.  Yes.
14      Q.  And for what purpose were you
15  retained?
16      A.  I was retained to review the
17  records and provide an opinion.
18      Q.  And approximately when were you
19  first contacted about the Lurry case?
20      A.  That is another question that I
21  can't answer.  I do not remember if it was in
22  late 2021 or early 2022.
23      Q.  Fair to say that it would be in

Page 9

1 that area, late 2021, early 2022?
2    A. That's correct.
3    Q. Close enough for me. Other than
4 the Lurry case, have you ever been retained by
5 Ms. Bakos or Ms. Maisuria before?
6    A. No.
7    Q. Other than the Lurry case, have you
8 ever been retained in a lawsuit in the greater
9 Chicago area?
10    A. I do not believe so.
11    Q. I'm going to show you a number of
12 exhibits, and first we will mark this as
13 Exhibit No. 1.
14 (Exhibit 1 marked for identification.)
15 BY MR. MATHUES:
16    Q. Are you able the see my screen,
17 Doctor?
18    A. Yes.
19    Q. And do you recognize what's in
20 front of you as Exhibit No. 1?
21    A. Is it marked as an exhibit?
22    Q. Yes, it will be marked as an
23 exhibit. It's not marked on the pdf that

Page 10

1 you're looking at. We will mark it later when
2 we send it to the court reporter.
3    A. I guess if it's not marked, I can't
4 say that I know that it's Exhibit 1.
5    Q. Doctor, do you recognize the
6 document that's in front of you on the screen?
7    A. Yes.
8    Q. And do you recognize it to be the
9 report that you issued in the Lurry case?
10    A. Yes.
11    Q. I'll show you another document.
12 For purposes of Ms. Bakos and the court
13 reporter, I will submit later to be marked as
14 Exhibit No. 2.
15 (Exhibit 2 marked for identification.)
16 BY MR. MATHUES:
17    Q. Doctor, do you recognize the first
18 page of the document in front of you as your
19 CV?
20    A. Yes.
21    Q. And there is your name and a date
22 of 3-15-22 up here in the upper right-hand
23 corner?

Page 11

1    A. Yes.
2    Q. As I continue to scroll through the
3 pages, does that look to you, as the pages are
4 up on the screen, as your curriculum vitae
5 that you submitted to Ms. Bakos as part of
6 your disclosures in the case?
7    A. Yes.
8    Q. And with the obvious understanding
9 that you may have done some more things since
10 3-15-22, or not every single thing you've ever
11 done is on your CV, with those caveats, is
12 your CV accurate as of 3-15-22?
13    A. Yes.
14    Q. I'll show you another document,
15 which for purposes of Ms. Bakos and the court
16 reporter I'll note we'll later mark as
17 Exhibit 3.
18 (Exhibit 3 marked for identification.)
19 BY MR. MATHUES:
20    Q. Do you recognize the one page
21 that's in front of you, Doctor, to be the list
22 of prior trial deposition testimony that you
23 provided for the years of 2018 through 2022?

Page 12

1    A. Yes.
2    Q. Next I will show you what we will
3 ultimately mark as Exhibit No. 4.
4 (Exhibit No. 4 marked for identification.)
5 BY MR. MATHUES:
6    Q. You see the document on the screen
7 in front of you?
8    A. Yes.
9    Q. And do you recognize that to be the
10 fee schedule with a record review rate of $400
11 an hour and then a deposition testimony fee of
12 $500 an hour, minimum of four hours?
13    A. Yes.
14    Q. And then trial testimony.
15    And finally for the moment I'll
16 show you a document which I will mark later
17 for the court reporter as Exhibit No. 5.
18 (Exhibit No. 5 marked for identification.)
19 BY MR. MATHUES:
20    Q. Do you recognize the document in
21 front of you as an invoice that you sent to
22 plaintiff's counsel for work that you've done
23 on the Lurry case?

Page 13

```
 1    A.  Yes.
 2    Q.  And if we go down towards the
 3  bottom -- and I will do my best to highlight
 4  -- there's an entry, bottom record review,
 5  one-and-a-quarter hours on 3-16-2022.  Do you
 6  see that?
 7    A.  Yes.
 8    Q.  Since 3-16-2022 have you worked any
 9  more hours for the Lurry case other than, A,
10  the phone call you had yesterday with
11  Ms. Bakos and/or Ms. Maisuria and, B, the
12  hours that you told me about a few minutes ago
13  getting ready for this morning's deposition?
14    A.  The only other things that I have
15  done are put together the information that you
16  requested.
17    Q.  And so other than the phone call,
18  deposition prep, and putting the together the
19  information, you haven't done any other work
20  on the Lurry case besides what's reflected on
21  the invoice in front of us?
22    A.  That I believe to be correct.
23    Q.  And about how long did it take you
```

Page 14

```
 1  to put together the information that my office
 2  requested through subpoena?
 3    A.  It was pretty quick.  I would say
 4  less than an hour, probably
 5  three-quarters-of-an-hour.
 6    Q.  I'm going to ask you a few more
 7  questions about prior testimony.  I'm going to
 8  go back a little bit further than the 2018
 9  through '22 time frame that was listed on your
10  disclosures and ask you about the last 10
11  years.  So 2012 through 2022.  During the last
12  10 years, approximately how many times have
13  you testified -- whether that be in a
14  deposition or in a courtroom -- as a retained
15  expert?
16    A.  Again, I cannot give you an exact
17  number.  I would estimate, once again, less
18  than 10 times, but more likely much less than
19  that.
20    Q.  Fair enough.  In the last 10 years
21  have there been times when you were retained
22  as an expert in a court matter, be it a civil
23  case or a criminal case, but you ended up not
```

Page 15

```
 1  testifying?
 2    A.  Yes.
 3    Q.  Once again, with the understanding
 4  I'm not asking for a particular, you know, the
 5  exact number, can you estimate approximately
 6  how many times that has happened in the last
 7  10 years?
 8    A.  That, again, I cannot give you an
 9  exact number for.  So you're looking for the
10  number of times that I have been retained, but
11  not testified?
12    Q.  Correct.  I'm looking for an
13  approximation.
14    A.  That is very difficult for me to
15  say.  I don't keep a running tally of the
16  number of cases that I have reviewed.
17    Q.  Fair enough.  Let me ask it this
18  way, do you end up testifying in a majority of
19  cases on which you are retained, or in
20  contrast, is it more common for you not to end
21  up testifying in a case in which you are
22  retained?
23    A.  It is more common that I do not end
```

Page 16

```
 1  up testifying in a case in which I have been
 2  retained.
 3    Q.  Could you estimate whether you have
 4  been retained, but didn't testify in more than
 5  50 or less than 50 cases in the last 10 years?
 6    A.  I would estimate that it's more
 7  than 50, but less than a hundred.
 8    Q.  Close enough for me.
 9    A.  Or maybe in the last 10 years right
10  around a hundred.  But, again, it's right
11  around that number.
12    Q.  Of the cases in which you are
13  retained -- and here I mean both where you
14  testify and do not testify -- can you estimate
15  what percentage are civil versus what
16  percentage are criminal?
17    A.  That is also a difficult question
18  because that number has changed over time.  So
19  10 years ago, so in 2012, I would say that
20  most of the cases that I reviewed were civil.
21  And over the last several years I can say that
22  I have reviewed an increasing amount of
23  criminal cases.
```

Page 17

```
1      Q.  Has it reached a point where
2   criminal cases are around half of your overall
3   cases?
4      A.  That I have reviewed?
5      Q.  Yes.  That was actually a bad
6   question.  Let me ask it again so it's more
7   clear.
8          In the last two or three years, do
9   criminal cases make up around half the cases
10  that you have reviewed or less than half the
11  cases you've reviewed?
12     A.  In the last two to three years I
13  would say that due to the ongoing Covid-19
14  pandemic, I have reviewed a significantly less
15  number of civil cases just because, as I
16  understand it, the civil courts have been
17  closed or on backlog while the criminal cases
18  have been going forward.  So I did notice, for
19  example, within the last couple of years that
20  I reviewed significantly more criminal cases,
21  and that would be the reason that I believe to
22  be the cause of that.
23     Q.  In terms of the civil cases, do you
```

Page 18

```
1   have an approximate breakdown in terms of the
2   number of the percentage of cases where you
3   are retained by the civil plaintiff versus the
4   civil defendant?
5      A.  That number has also changed over
6   time, and I don't have the exact data.  But 10
7   years ago I was reviewing more plaintiffs
8   cases.  And over the last five, maybe six
9   years, I have reviewed significantly more
10  cases for the defense.
11     Q.  Have you ever been retained on
12  behalf of a police officer in a civil case?
13     A.  That's difficult for me to answer.
14  I don't recall.
15     Q.  Do you know or recall whether you
16  ever testified on behalf of a police officer
17  in a civil case?
18     A.  That I don't recall.
19     Q.  Do you know whether your testimony
20  has ever been excluded by a court for one
21  reason or another?
22     A.  Not as far as I'm aware.
23     Q.  Now, looking over your CV, by my
```

Page 19

```
1   reading it seems like you have four main jobs,
2   a practicing physician, teaching, working with
3   the National Capital Poison Control Center,
4   and doing litigation consulting.  Is that a
5   fair breakdown of the four main roles or hats
6   that you wear these days?
7      A.  No.  I don't think I could do four
8   full jobs.
9      Q.  Maybe I didn't ask that question
10  very well.  Doctor, In terms of your overall
11  workload and things that you do, at least
12  within the last four years, are those tasks,
13  for lack of a better word, or hats, the big
14  ones in terms of being a practicing doctor, a
15  teacher, working at the National Capital of
16  Poison Control Center, and doing litigation
17  consulting?
18     A.  No.
19     Q.  How is that not accurate?  Or
20  another way to ask that question is, what am I
21  missing of the different things that you do?
22     A.  So I am currently employed -- for
23  the last four years have been employed as
```

Page 20

```
1   medical director of hyperbaric medicine at
2   Medstar Georgetown University Hospital as well
3   as the co-medical director at National Capital
4   Poison Control.  Those are my jobs.
5      Q.  And in terms of your overall hours
6   that you would work in the last few years,
7   between three things, working at the National
8   Capital of Poison Control Center as medical
9   director, and third doing litigation
10  consulting work, can you estimate a percentage
11  breakdown of how you spend -- how your hours
12  are taken up?
13     A.  Sure.  So I have -- again, I have
14  two jobs.  I work as the medical director of
15  the poison center and I work as medical
16  director of hyperbaric medicine.  The poison
17  center job I am -- I contribute approximately
18  between 16 to 20 hours a week on that.  I am
19  physically in the hospital three times a week,
20  sometimes more.  That's really all that I can
21  say.  The job hours as a physician are quite
22  variable.  So some weeks I may be busier doing
23  poison control duties than hyperbaric duties.
```

Page 21

1  Some weeks I am busy with everything.  Some
2  weeks I'm not as busy with things.  It really
3  does vary from day to day.
4      Q.  Sounds like not that different as
5  life as an attorney.
6          To ask the question a little
7  differently, in the last 10 years,
8  approximately what percentage of your hours
9  overall worked would be litigation consulting?
10     A.  Perhaps 10 to 20 percent, if that.
11     Q.  And has that 10 to 20 percent
12  estimation changed significantly in the last
13  10 years?
14     A.  I would say I did significantly
15  less chart reviews for the last couple of
16  years as a consequence of the Covid-19
17  pandemic than in previous years, but otherwise
18  it's been around that same number.  Again,
19  I've always had a full-time job as a
20  physician.  I do not consider doing case
21  reviews as a full or even part-time job.
22     Q.  And when you were using the phrase
23  "case reviews" in your last couple answers, by

Page 22

1  that do you mean doing consulting work for
2  litigation, be it civil or criminal?
3      A.  Yes.
4      Q.  And I think, given your answers
5  already, I know the answer where you're going
6  to go with this next question, but I'll ask it
7  anyway.  In the last 10 years, approximately
8  what percentage of your overall income has
9  been brought in by doing what you would call
10  case reviews or consulting on litigation
11  matters?
12     A.  I believe it's less than
13  20 percent.
14     Q.  Now, the National Capital Poison
15  Control Center that you work at, is that a
16  government entity or a private entity?
17     A.  Poison centers are not government
18  organizations.  People think they are, but
19  they're not.
20     Q.  It would be a private nonprofit; is
21  that accurate?
22     A.  National Capital Poison Center is a
23  501(C)(3) nonprofit organization.

Page 23

1      Q.  And as the co-medical director of
2  the National Capital Poison Control Center,
3  what do you do on a daily basis for work?
4      A.  It depends.
5      Q.  Can you give me some examples of
6  things that you have done in the last few
7  months?
8      A.  Sure.  So our -- every poison
9  center has poison specialists who answer the
10  phones.  The poison specialists are generally
11  specialty trained nurses or pharmacologists.
12  Each poison center is also required to have
13  physicians as medical backup.  So I am one of
14  the medical backup physicians.
15          And if the poison specialists have
16  a question about a case or if the physician or
17  whoever calls has a specific question that
18  they can't answer, if it's a very severe case
19  of intoxication or if there is a -- I guess if
20  it's a very -- if it's a difficult case, in
21  many cases the poison specialists will call
22  their backup physician.  So that is part of my
23  roles.

Page 24

1          I also have an administration role
2  here.  I am -- I'm involved in fundraising.  I
3  write algorithms for our online poison control
4  database called Web Poison Control.  I field
5  all the media requests for the poison center.
6  And each week I -- probably every day
7  actually -- I provide information to reporters
8  on one or more topics that they have questions
9  on.  I write content for our website,
10  generally between one or more articles a week
11  for the Poison.org website.  I teach rotators
12  who come through the poison center.  So we
13  have medical students, pharm D students,
14  residents and fellows who rotate through the
15  poison center.  We have a case conference
16  every day at Noon that I will sometimes teach.
17          We -- let's see, what else.  We do
18  so much at the poison center.  I am involved
19  in diversity and equity initiatives for one of
20  the national toxicology organizations,
21  although that's probably more private than
22  anything for the poison center.  It's not
23  really poison center duties.

Page 25

1     This is not technically a poison
2 center duty, but we do have a medical
3 toxicology fellowship, and I am on the faculty
4 of the fellowship, and I am involved in
5 teaching the medical toxicology fellow who we
6 have in our program.
7     Q. And the National Capital Poison
8 Control Center, is it, for lack of a better
9 way to describe it, the capital, does that
10 refer to nationwide jurisdiction, meaning that
11 you're fielding calls from all across the
12 country? Or by national capital are we
13 talking about the D.C. area and here in
14 Illinois we would -- you know, if someone
15 makes a call, they call a local poison control
16 center?
17     A. Okay. So that's sort of a
18 difficult question.
19     Q. Does that make sense?
20     A. No, it makes perfect sense. We get
21 this question all the time. So there are 55
22 poison centers in the U.S. Some states have
23 one poison center. Some states have more than

Page 26

1 one. Some states have zero poison centers.
2 So each poison center has a name. The
3 National Capital Poison Center is the poison
4 center that covers the District of Columbia as
5 well as Northern Virginia and two counties in
6 Maryland.
7     With that being said, we do get
8 calls from all over, even sometimes
9 internationally because calls are routed based
10 on the area code in exchange of the phone that
11 you're calling from. So I have a Connecticut
12 cell phone. If I call the 800 number for
13 poison control from my cell phone, even though
14 I am physically located right now within the
15 poison center of Washington, D.C., I will get
16 the Connecticut poison center.
17     Q. That answers my question, so thank
18 you.
19     By the way, you talked about these
20 various calls. Do you know approximately how
21 many calls the National Capital Poison Control
22 Center will get in an average month?
23     A. I believe our annual volume is in

Page 27

1 the 30,000 range.
2     Q. Good enough for me.
3     A. And we met --
4     Q. I saw on your --
5     A. Sorry --
6     Q. Go ahead, I am sorry. I didn't
7 mean to interrupt you.
8     A. We manage significantly more poison
9 exposures on our online poison control system,
10 Web Poison Control.
11     Q. And that would be you're being
12 contacted via e-mail or chat, some sort of
13 online communications, asking for assistance;
14 is that correct?
15     A. We don't off chat at this time, but
16 we have an app or a website that people can
17 enter cases on. And I am heavily involved in
18 the development and the maintenance of that
19 program.
20     Q. And we saw on your CV that you are
21 a member of the American College of Emergency
22 Physicians; is that correct?
23     A. That's correct.

Page 28

1     Q. And what do you have to do to be a
2 member of the American College of Emergency
3 Physicians?
4     A. I do not know the exact
5 requirements. I believe that you need to be
6 an emergency medicine physician.
7     Q. Other than the --
8     A. Sorry, I'm not done. I believe
9 that you have to be an emergency medicine
10 physician or a resident in training, because I
11 believe I first was a member of the
12 organization when I was a resident.
13     Q. Other than being an emergency room
14 physician or a resident studying emergency
15 medicine, are there any other requirements or
16 -- you know, the requirements or things,
17 certifications that one must do or get in
18 order to be a member of the American College
19 of Emergency Physicians?
20     A. I do not know the answer to that
21 question.
22     Q. I'm going to go back to what I will
23 mark later as Exhibit No. 2, what you told me

Page 29

1 you recognized as your CV. Going down towards
2 the bottom here of page four, I see that you
3 are listed as an advanced cardiac life support
4 and advanced trauma life support provider. Do
5 you see where I've highlighted there?
6     A. Yes, actually that is incorrect. I
7 don't remember when my ATLS lapsed. I don't
8 believe I'm ATLS certified anymore. I believe
9 I am still ACLS and PALS certified, although I
10 believe that I am due to renew in the imminent
11 future.
12     Q. What do you have -- let's start
13 with the ATLS. What do you have to do to get
14 ATLS certified?
15     A. All of these trainings are courses
16 that one has to take, and then you have to
17 pass an examination.
18     Q. And can you summarize what does one
19 have to learn -- what are the courses that you
20 take to get ATLS certified cover?
21     A. You take the ATLS course.
22     Q. And if you -- your ATLS -- if you
23 think it may have lapsed, would it be fair to

Page 30

1 say that if it has lapsed it lapsed within the
2 last three years?
3     A. I don't remember when it lapsed. I
4 know that I took it in 2015 I believe is the
5 last time that I took it, but I don't think I
6 have taken it since then. And the reason I
7 can say that is because I have not worked at a
8 trauma center since 2015, so I don't need ATLS
9 at this point in my career.
10     Q. And in terms of the ACLS, are you
11 anticipating letting that certification lapse
12 for the same reason that you are no longer
13 working in a trauma center, or is the ACLS
14 different?
15     A. No, ACLS is different. I will keep
16 that certification. I'm pretty sure -- I
17 don't want to say this for certain. I'm
18 pretty sure that it expires this year or in
19 2023. Both ACLS and PALS. I maintain those
20 certifications because of my current hospital
21 position.
22     Q. And what is it about your current
23 hospital position that makes you want to main

Page 31

1 those certifications?
2     A. Sure. So I'm the medical director
3 of a hyperbaric medicine center that is
4 accredited with distinction by the Undersea
5 and Hyperbaric Medical Society, and one of the
6 requirements for accreditation with
7 distinction -- actually for accreditation in
8 general -- is that the physicians need to
9 maintain ACLS and PALS.
10     Q. And you also listed that you were
11 on the National Registry of Certified Medical
12 Examiners. Do you see where I've highlighted
13 that?
14     A. Yes.
15     Q. And is that membership still
16 current?
17     A. As far as I know it is. I actually
18 have not checked that in a while because of
19 Covid.
20     Q. Understood. And is the National
21 Registry of Medical Examiners similar to ACLS
22 and ATLS in that it's a course and you have to
23 take coursework and pass a test?

Page 32

1     A. For the initial certification, yes.
2 I do not know about recertification.
3     Q. And do you have to be a pathologist
4 to get on the National Registry of Certified
5 Medical Examiners?
6     A. No.
7     Q. And what does being on the National
8 Registry of Certified Medical Examiners allow
9 you to do?
10     A. This particular certification
11 allows a physician to perform DOT physicals
12 for people who require CDL licenses or other
13 DOT examinations. It has nothing to do with
14 pathology.
15     Q. And by DOT meaning U.S. Department
16 of Transportation, correct?
17     A. That is correct.
18     Q. And this National Registry of
19 Certified Medical Examiners would have nothing
20 to do with pathology in the sort that would
21 lead one to do an autopsy or write an autopsy
22 report, correct?
23     A. That would be correct.

Page 33

1   Q.   Now, you have already mentioned
2   that you are the medical director for -- and I
3   maybe misquoting it here, but does the title
4   involve hyperbaric medicine; is that correct?
5   A.   Yes.
6   Q.   And if I look at your CV, it would
7   appear that both your present and past
8   appointments seem to be focused on hyperbaric
9   medicine; is that a fair characterization of
10  your CV?
11  A.   No.
12  Q.   Why would you say not?
13  A.   So you can see on the page that's
14  up right now that I have also practiced
15  emergency medicine as well as occupational
16  health and medical toxicology.
17  Q.   And when did you practice
18  occupational health?
19  A.   I was the -- well, you can look at
20  the CV here.  I was the medical director of
21  occupational health -- sorry, go back to that
22  page.  Scroll down, please.  Thank you.  I was
23  the medical director of occupational health at

Page 34

1   Hartford Hospital from July of 2014 to
2   March of 2015.
3   Q.   But since 2015 your title has been
4   -- your appointment has been for the medical
5   director for hyperbaric medicine; is that
6   correct?
7   A.   That is true.  I -- that is my --
8   that's what I was hired to do.  I also did
9   work in the emergency department as MedStar
10  Georgetown University Hospital through 2018.
11  Q.   That was actually where I was going
12  next is when was the last time that you
13  practiced as a practicing emergency room
14  physician, and I take it from your answer that
15  would be 2019 -- 2018?
16  A.   So technically I am still a
17  practicing emergency medicine physician as I
18  am still board certified in emergency
19  medicine.  The last time that I physically
20  worked in an emergency department was -- would
21  be June of 2018.
22  Q.   And for those of us who are just
23  laypersons, can you summarize what is

Page 35

1   hyperbaric medicine?
2   A.   Hyperbaric medicine involves the
3   administration of oxygen at pressures greater
4   than sea level, and it's used to treat
5   many different medical conditions.
6   Q.   Is just my very ignorant layman
7   Googling of the subject makes it look like
8   that it's an evolving field with a lot of new
9   research and a lot of potentiality for
10  treatment of conditions; would you agree with
11  that?
12  A.   That's not specific to hyperbaric
13  medicine.  I think that every field of
14  medicine has new research and evolving
15  treatments for medical conditions.
16  Q.   Fair enough.  What got you
17  interested into doing hyperbaric medicine,
18  focusing on hyperbaric medicine?
19  A.   I was a medical toxicology fellow
20  from 2004 to 2006.  The hospital where we did
21  the majority of our training had just
22  installed a new large hyperbaric chamber.  And
23  as toxicology fellows, we were involved in the

Page 36

1   care of carbon monoxide poisoned patients who
2   were in many cases treated with hyperbarics.
3   So that was how I was introduced to it, and I
4   just took it from there and got more education
5   and training on the subject and was eventually
6   able to be board certified in the subject.
7   Hyperbaric medicine is a subspecialty of
8   emergency medicine.
9   Q.   And so one can be board certified
10  in emergency medicine, as you are, and then
11  additionally board certified in the
12  subspecialty of hyperbaric medicine; is that
13  correct?
14  A.   Yes.  And I'm also board certified
15  in medical toxicology, which is also a
16  subspecialty of emergency medicine.
17  Q.   Thank you for the clarification.
18  Now, this case with Mr. Lurry certainly
19  involves toxicology, correct?
20  A.   Yes.
21  Q.   Does it involve hyperbaric
22  medicine?
23  A.   No.

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 37

1    Q.   And I also saw on your CV -- we'll
2  go back there.  Under the present appointment,
3  associate professor of plastic surgery and
4  emergency medicine, medical director
5  hyperbaric medicine, and then department of
6  plastic surgery, do you see what I'm referring
7  to?
8    A.   Yes.
9    Q.   And we haven't mentioned it yet,
10  but in your practice as a practicing physician
11  are you involved in -- strike that.
12       I should say where does the plastic
13  surgery and department of plastic surgery come
14  into your duties as a practicing medical
15  physician?
16    A.   At my hospital hyperbaric oxygen
17  therapy is available within the department of
18  plastic surgery.  I am a member of that
19  academic department, although I am not a
20  plastic surgeon.  I work with a bunch of
21  plastic surgeons.  Myself and a rheumatologist
22  are the only physicians who are not plastic
23  surgeons within that department.

Page 38

1    Q.   As I understand you, the department
2  of hyperbaric medicine is sort of in the
3  organizational chart of the bureaucratic
4  structure would fall under the department of
5  plastic surgery, is that -- am I hearing you
6  correctly?
7    A.   No.  The academic department is the
8  department of plastic surgery.  Hyperbaric
9  medicine is not its own department, but we
10  fall within the department of plastic surgery.
11  And as you can see, my academic appointments
12  are both within plastic surgery for
13  hyperbarics as well as emergency medicine
14  because that's my board certification.
15    Q.   And when it comes to the academic
16  appointments, I'm going to scroll down to
17  what's page four of what was produced, what I
18  will be marking as Exhibit 2 and what was
19  produced to me as your CV, and you see in the
20  middle here where I'm highlighting formal
21  teaching experience.
22    A.   Yes, but that's not the academic
23  appointment that I was referring to.

Page 39

1    Q.   Understood.  So I understand that,
2  and -- well, I hope I understand that, I
3  should say.  Other than the courses listed
4  here in your CV having fall semester of 2009,
5  2011, and 2013, do you have any other formal
6  teaching experience?
7    A.   I do a lot of teaching.  I listed
8  that only because I was the course director of
9  that course and I was responsible for creating
10  all of the content, scheduling and delivering
11  all of the lectures, grading tests, all of the
12  stuff that goes along with being the sole
13  course director.
14    Q.   When you say you do a lot of
15  teaching, for example, when you are on the
16  floor of the hospital with residents you're
17  certainly teaching them as you and they are
18  attending the needs of the patients; would
19  that be accurate?
20    A.   Yes.
21    Q.   In terms of teaching more narrowly
22  and delivering classroom lectures in a class
23  people are taking for credit, are there any

Page 40

1  other formal classes being offered for
2  academic credit that you have personally
3  taught?
4    A.   Can you please define "academic
5  credit"?
6    Q.   Sure.  Someone is in med school and
7  they have to take a certain number of classes,
8  a certain number of credits in order to
9  graduate.  Does that definition make sense to
10  you?
11    A.   Sort of.  Okay.  So we have
12  undergraduate medical education and then we
13  have graduate medical education.  So the
14  undergraduate medical education where medical
15  students take courses to graduate, yes, I do
16  teach medical students.  I haven't done it in
17  the hospital since Covid because of hospital
18  restrictions on rotators.  But I did offer a
19  hyperbaric and toxicology elective for fourth
20  year medical students that were rotating
21  within the department of emergency medicine.
22       For graduate medical education, I
23  was asking about the definition of academic

Page 41

1 credits because as an attending physician you
2 do need to maintain a certain number of
3 continuing education credits every year. And
4 so I have taught many courses that involve the
5 generation of these CME credits for other
6 physicians.
7    Q. Understood. Now, as your CV
8 continues to go down, we have listed --
9 there's a section for publications, there's a
10 section for lectures, there's also a section
11 here at the bottom of page four it just says
12 abstracts, and then it goes on to list a
13 number of abstracts. What do you -- what is
14 indicated by you listing an entry under the
15 abstracts section of your CV?
16    A. Abstracts are short presentations
17 that are presented at regional, national, or
18 international meetings either orally or in
19 poster format.
20    Q. And I also see going down your CV
21 is there's a section that says lectures. Here
22 we are on page 11. Do you see what I'm
23 referring to?

Page 42

1    A. Yes.
2    Q. What is the difference between
3 putting something under an abstract and
4 putting it under lectures for your CV?
5    A. So the lecture portion I believe at
6 this point in my CV writing process I only
7 included invited lectures. I didn't include,
8 you know, like medical student or resident
9 lectures or anything like that. Lectures are
10 delivered orally in general, frequently are in
11 person, although over the last couple of years
12 many have been virtual. As opposed to
13 abstracts which are short, written paragraphs
14 that are delivered again either in poster
15 format or in oral presentation format over a
16 very short period of time.
17    Q. And when you say "a very short
18 period of time," are we talking 15 minutes or
19 less?
20    A. For abstracts?
21    Q. Yes.
22    A. Yes. And sometimes there's no oral
23 presentation for abstracts. Sometimes

Page 43

1 abstracts are presented in poster format and
2 there's no oral delivery.
3    Q. Have you authored or coauthored any
4 medical textbooks?
5    A. Yes. They have not been published
6 yet, so they are not listed on the CV.
7    Q. That would be a good reason they're
8 not listed. What is the textbook or textbooks
9 that are in process where you are an author or
10 coauthor?
11    A. So I have authored a chapter in a
12 textbook on wound care, I want to say, wound
13 care and plastic surgery. That, as far as I
14 know, has not been published. I wrote a few
15 chapters for an emergency medicine textbook
16 several years ago. I never saw that in
17 publication. I'm not even sure if it got
18 published. The pandemic changed a lot.
19    Q. Any other textbooks where you have
20 been an author or coauthor that, at least as
21 far as you know, have not yet been published?
22    A. No.
23    Q. The emergency medicine textbook

Page 44

1 that you were contributing to, do you remember
2 the publisher of that work?
3    A. No, I don't remember much about
4 that. I remember that I wrote three short
5 segments for it. I don't remember the nature
6 of the textbooks or any more details than
7 that. And I was not involved on the
8 publication side, so I would have no idea who
9 the publisher was.
10    Q. Is it fair to say that for the
11 abstract lectures and publications that you do
12 list in your CV, the title is at least
13 generally reflective of the subject matter
14 contained in the abstract, CV, or lecture at
15 issue?
16    A. That is generally the intent of the
17 a title.
18    Q. Now, in going through the abstract
19 lectures and publications on your CV, I did
20 not see anywhere Narcan or Naloxone are
21 mentioned in the title. Do you have any
22 reason to disagree with that and say, no,
23 Mr. Mathues, I did publish, do an abstract, or

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 45

1  deliver a lecture that mentioned Narcan or
2  Naloxone in the title?
3      A.  No.
4      Q.  So as far as you know, you haven't
5  published, lectured, or done research on the
6  subject of Narcan or Naloxone, correct?
7          MS. BAKOS:  Objection, it
8  mischaracterizes her prior testimony.
9          Go ahead.
10  BY MR. MATHUES:
11     Q.  I didn't get your answer, Doctor.
12     A.  I don't believe that I have
13  published anything regarding Naloxone or with
14  Naloxone in the title.
15     Q.  Have you published, lectured, or
16  issued an abstract with Fentanyl in the title?
17     A.  Define "published."
18     Q.  I will represent to you that in
19  looking through the publications, abstracts,
20  and lectures on your CV I did not see any with
21  Fentanyl in the title.  As you sit here this
22  morning, can you point to anything or can you
23  think of anything that would say, no,

Page 46

1  Mr. Mathues, you're mistaken, I have
2  published, lectured, or given an abstract and
3  put that on my CV that does include Fentanyl
4  in the title?
5      A.  No.
6      Q.  Have you published any peer
7  reviewed materials on the subject of Fentanyl
8  or Fentanyl overdoses?
9      A.  Again, define "published."
10     Q.  For the purposes of this question,
11  I would say I would define "published" as an
12  article that appeared in a peer reviewed
13  professional journal or textbook.
14     A.  No.
15     Q.  Have you -- would it be fair to
16  infer, however, from your answers earlier in
17  this deposition that you have written material
18  on the subject of Fentanyl or Fentanyl
19  intoxication for the National Capital Poison
20  Control Center?
21     A.  That is correct.
22     Q.  And to go back one step, I guess,
23  for purposes of clarity, have you published

Page 47

1  anything on the subject of Narcan or Naloxone
2  that has appeared in a peer reviewed
3  professional journal or textbook?
4      A.  Can you scroll up in my CV, please.
5  I mean, I can't say that --
6      Q.  Absolutely.
7      A.  -- none of my articles -- I cannot
8  say that none of my articles did not mention
9  Naloxone.
10     Q.  Sorry for the delay.  I have two
11  mice, one for my desktop, one for my laptop.
12  The cursor was going crazy, so I turned one of
13  them off.  I'll go back to --
14     A.  I'm just looking at publications
15  actually.
16     Q.  Okay.
17     A.  Next page, please.  (Witness
18  looking at document.)  Next page, please.
19         I don't believe any of those
20  articles mention Naloxone.  I could be wrong,
21  but if it was mentioned, it would have just
22  been mentioned in passing.  It was certainly
23  not the point of the manuscript.

Page 48

1      Q.  Can you -- just like you went
2  through publications for that purpose, can you
3  do the same for your section on lectures and
4  then your section on research and just tell me
5  when you want me to scroll forward.
6      A.  That might be difficult, because I
7  don't remember the lectures as well as I
8  remember the publications.  We can certainly
9  try.  Can you go to the next page?
10     Q.  There we go.  I'm now on page 12.
11     A.  (Witness looking at document.)
12  Next page, please.
13         I don't believe any of those had
14  any relevance to Naloxone for the lectures and
15  the research projects.
16     Q.  Did any of the lectures and
17  research projects have relevance to Fentanyl?
18     A.  I'll take a look again.
19     Q.  Okay.
20     A.  (Witness looking at document.)
21  Okay, next page, please.  Is there a page
22  after that?
23         I don't believe so.  I don't

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 49

1  believe there is any relevance to Fentanyl in
2  any of those topics.
3      Q.  Having reviewed, looked over the
4  lectures and research, same question with
5  respect to cocaine and heroin, anything under
6  your --
7      A.  Under lectures and research?
8      Q.  With respect that it would be
9  relevant to cocaine or heroin.
10     A.  Scroll down, please.  I'm so sorry,
11 I have to go through each one and sort of try
12 to think about what they were about.
13     Q.  That's okay.
14     A.  (Witness looking at document.)
15         The only one on this page that's
16 coming out up is "Stoned on Spices," and I
17 don't believe I mentioned cocaine or heroin in
18 that lecture or the corresponding publication.
19 That would be the only one that I can think
20 of, though.
21         Can you go to the next page,
22 please.
23         The non-cigarette tobacco use

Page 50

1  research project may have involved the mention
2  of these drugs, but that was not the point of
3  the research project.
4         Next page, please.
5         Okay.  That would be it.
6      Q.  Now I'm going to go back to your
7  publications.  And I will represent to you
8  that on page nine of your CV for publications
9  I saw one article that includes "heroin" in
10 the title, and I also saw one article that
11 includes "cocaine" in the title.  Do you see
12 where I have highlighted those in front of
13 you?
14     A.  Yes.  So there may be more in the
15 publications.  Can I look through the rest of
16 them, please?
17     Q.  You absolutely can do that.  But
18 before we get there, I would like just to ask
19 you for the one-paragraph summary of each of
20 these articles that I highlighted.
21         The article that was published
22 entitled The Descriptive Study Of an Outbreak
23 of Clenbuterol-Containing Heroin, can you --

Page 51

1  what would be the one-paragraph summary of
2  that article and its focus?
3      A.  That was a report of a number of
4  individuals, I believe, in New York,
5  New Jersey, and Connecticut who experienced
6  toxic effects after using heroin that was
7  tainted with Clenbuterol.
8      Q.  What's Clenbuterol?
9      A.  Clenbuterol is a drug that's not
10 approved for human use in the U.S.  It may be
11 used in some cases for veterinary asthma.
12 It's a beta-agonist drug.
13     Q.  And do you recall whether any of
14 the individuals who experienced toxic effects
15 from the Clenbuterol-tainted heroin died due
16 to those toxic effects?
17     A.  I don't remember.
18     Q.  And, similarly, what was a
19 one-paragraph or so summary of the article
20 entitled "Cocaine:  The History, Social
21 Implications, and Toxicity:  A Review"?
22     A.  That was a review article about
23 cocaine.

Page 52

1      Q.  And when you say "a review article
2  about cocaine," cocaine is a big topic, so
3  what was the nature of the article?
4      A.  I really don't remember much about
5  it.  It was from over 10 years ago.  I
6  remember that I only wrote one section of the
7  article.  I did not write the entire article.
8      Q.  Do you remember generally the
9  subject matter of the section that you wrote?
10     A.  I believe it had something to do
11 with pharmacokinetics, but I don't recall more
12 than that.
13     Q.  So now I'm going to do exactly what
14 I told you I would do a minute ago and we'll
15 go back and look at publications and see.  We
16 are at the bottom of page eight, and my
17 question is going to be, other than the two
18 articles that we've just talked about, do any
19 of those articles address cocaine or heroin?
20     A.  Can you go to the next page,
21 please?  Can you go to next page, please?
22         "Stoned on Spices" again might have
23 one mention of illicit drugs.  I don't

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 53

1  remember. It's not the point of the article,
2  though.
3         Can you go to the next page,
4  please?
5         I think that would be it.
6     Q. Have there been published studies
7  on the effectiveness of Naloxone, a/k/a
8  Narcan, in reversing opioid overdoses?
9     A. I would say yes.
10    Q. And, more specifically, have there
11  been published studies on the subject of how
12  much Naloxone or Narcan it would take to
13  reverse on opioid overdose of -- strike that.
14  That's a crummy question. Let's ask it
15  different. Strike that. I'll ask it
16  different.
17         Have the published studies on
18  Naloxone, a/k/a Narcan, addressed the question
19  of if a person suffers an opioid overdose by
20  taking X amount of opiates, one needs Y amount
21  of Narcan in order to reverse that overdose?
22         MS. BAKOS: Objection, form,
23  foundation.

Page 54

1         THE WITNESS: I can't really answer
2  that, because I have not reviewed every
3  published study on the use of Naloxone in
4  opioid overdose.
5  BY MR. MATHUES:
6     Q. Okay. Then I will ask a more
7  narrow question. Are you, Dr. Johnson-Arbor,
8  familiar with any published studies on the
9  subject of Naloxone, a/k/a Narcan, that would
10  go towards answering the question of a
11  relationship between the amount of opiates a
12  person consumes and suffers an overdose and
13  the amount of Narcan needed to reduce the
14  effects of that overdose?
15    A. I'm sure there's studies out there.
16  I can't pull any specific ones for you at this
17  moment in time.
18    Q. And did you cite any specific
19  studies of that effect in your report in the
20  Lurry case?
21    A. No.
22    Q. And have there been published
23  studies on the subject of Naloxone, a/k/a

Page 55

1  Narcan, that would go towards answering the
2  question of the relationship between the time
3  that a person consumes opiates and how soon
4  after the consumption of the opiates Narcan,
5  a/k/a Naloxone, needs to be administered in
6  order to reverse the effects of an opioid
7  overdose?
8     A. I don't know. I have not done that
9  literature search.
10    Q. And as you sit here today, are you
11  aware of any particular study that would go
12  towards answering that question of the
13  relationship between when a person consumes
14  opiates leading to an overdose and how soon
15  Naloxone, a/k/a Narcan, needs to be
16  administered in order to reverse that
17  overdose?
18    A. I cannot quote any such study at
19  this moment.
20    Q. Do you cite any such study in your
21  report in the Lurry case?
22    A. I'd have to look at my report.
23    Q. Let's do that.

Page 56

1         MS. BAKOS: I need a break whenever
2  you have a good stopping point.
3  BY MR. MATHUES:
4     Q. Doctor, do you have a copy of your
5  report in the Lurry case in front of you?
6     A. Yes. I can just look at it really
7  quickly if you want.
8     Q. Ms. Bakos, I also need a five- to
9  seven-minute break, so while we're on break,
10  would you be so kind as to look over your
11  report, and we'll come back, and I'll ask you
12  some questions about whether you cite any
13  specific studies in your report. Okay?
14    A. Well, I think I need to have a
15  break, too, then.
16    Q. We'll make it a 10-minute break.
17  And I'll see everyone at 11:15; is that
18  acceptable?
19    A. Sure.
20  (An off the record discussion was held.)
21  (A brief recess was held.)
22  BY MR. MATHUES:
23    Q. Dr. Johnson-Arbor, when you were on

Page 57

1  break, did you have the opportunity to look
2  over the report you issued in the Lurry case?
3      A.   Yes.
4      Q.   And does the report you issued in
5  the Lurry case cite any published medical
6  literature regarding the relationship between
7  the time one consumes opiates and the time one
8  is administered Naloxone or a/k/a Narcan and
9  the effectiveness of the Naloxone, a/k/a
10  Narcan, at reversing an opioid overdose?
11      A.   My report does not reference any
12  specific published medical literature -- does
13  not cite, I should say.
14      Q.   And, in fact, your report doesn't
15  cite any published medical literature at all,
16  correct?
17      A.   That is correct.
18      Q.   And why not?
19      A.   Because most -- I think because the
20  information in my report is based on my
21  experience and training as a board certified
22  emergency physician and medical toxicologist.
23      Q.   Dr. Johnson-Arbor, we can agree in

Page 58

1  the case that at some point on January 28,
2  2020, Mr. Lurry consumed a combination of
3  Fentanyl, heroin, and cocaine, correct?
4      A.   No.
5      Q.   Why would you not agree with that?
6      A.   I don't know when he consumed or
7  when he was exposed to the cocaine or the
8  heroin.  I think within a reasonable degree of
9  medical certainty he consumed Fentanyl shortly
10  before his death, but both the timing and the
11  route of exposure to cocaine and heroin are
12  not clear.
13      Q.   So starting first with the
14  Fentanyl, can you be any more specific to a
15  reasonable degree of medical certainty as to
16  when Mr. Lurry consumed Fentanyl?
17      A.   Yes.
18      Q.   How specific as to when Mr. Lurry
19  consumed Fentanyl can you be?
20          MS. BAKOS:  I'm going to object to
21  the term "consumed" as vague.
22          Go ahead.
23          THE WITNESS:  I'm still thinking

Page 59

1  about this.  I would say that in my opinion
2  within a reasonable degree of medical
3  certainty Mr. Lurry ingested or was exposed to
4  Fentanyl within a short period of time before
5  his death.  "Short" being defined as hours,
6  not days.
7  BY MR. MATHUES:
8      Q.   Beyond saying that Mr. Lurry
9  ingested or was exposed to Fentanyl within a
10  matter of hours before his death, you can't be
11  any more specific as to the minute on the
12  clock of that day when Mr. Lurry ingested or
13  was exposed to Fentanyl, correct?
14      A.   I can tell you that based on my
15  review of the records, I personally believe
16  that he ingested Fentanyl after 3:20, 3:12 in
17  the afternoon on January 28th.
18      Q.   And that would be after the time
19  Mr. Lurry had contact with City of Joliet
20  Police officers on January 28, 2020?
21      A.   Correct, yes.
22      Q.   With -- the moment on January 28th,
23  2020, when Mr. Lurry first made contact with

Page 60

1  City of Joliet Police officers as bookend
2  number one and when members of the Joliet Fire
3  Department arrived at the Joliet Police
4  Station to begin rendering medical care to
5  Mr. Lurry as bookend number two, can you tell
6  us to a reasonable degree of medical certainty
7  at what point between those bookends Mr. Lurry
8  ingested or was exposed to Fentanyl?
9      A.   Yes.
10      Q.   What can you tell us?
11      A.   In my opinion, I believe that
12  Mr. Lurry ingested Fentanyl throughout the
13  time that he is seen chewing on the video.
14      Q.   Fair enough.  Can you tell us to a
15  reasonable degree of medical certainty at what
16  point, and by "what point" I mean minute and
17  second on the clock, Mr. Lurry was first
18  exposed -- first ingested or consumed Fentanyl
19  on January 28, 2020?
20      A.   No.  And the reason for that is
21  that, as far as I can remember, the -- there
22  was no timestamp on the video.
23      Q.   We'll watch the video in a moment,

Page 61

1  in a little bit.  There's -- I will represent
2  to you that there's versions of the video that
3  include the timestamp and versions of the
4  video that do not, and we'll watch it
5  together.
6        But to go back to what you had
7  said -- something you had said before as to
8  cocaine and as to heroin, I want to close that
9  loop.  You can't say whether or not Mr. Lurry
10 consumed heroin on January 28th, 2020, or at
11 some date prior to -- strike that question.
12       Did you see the toxicology report
13 from NMS Labs regarding the blood draw --
14 blood and urine that were drawn from Mr. Lurry
15 prior to his death?
16   A.  Yes.
17   Q.  And those toxicology reports
18 were -- indicated that Mr. Lurry had ingested
19 or been exposed to both heroin and cocaine,
20 correct?
21   A.  Yes.
22   Q.  As to the cocaine, you are saying
23 that -- your testimony is you can't say

Page 62

1  whether that cocaine that was detected in
2  Mr. Lurry's blood and urine was consumed on
3  January 28, 2020, or at some prior date?
4    A.  Several -- so a few points to
5  respond here.  Cocaine, as well as other
6  drugs, can be used in many different ways.
7  Consumption is one of them.  We don't know if
8  this drug was consumed, injected, snorted,
9  et cetera.
10       Number two, the drug screen or the
11 drug testing tested for the presence of
12 cocaine metabolite, specifically
13 benzoylecgonine, not cocaine.
14       And you are correct, I cannot tell,
15 based on that report, when the cocaine was
16 used.  The detection of drugs in the system of
17 circulation can depend on both the amount of
18 use and the frequency of use.
19   Q.  And, similarly, are you able to
20 tell from the NMS Lab toxicology report, or
21 any of the other evidence you reviewed in the
22 case, when Mr. Lurry ingested or was exposed
23 to heroin?

Page 63

1    A.  No.
2    Q.  Now, are you an expert in the field
3  of police practices and procedures?
4    A.  No.
5    Q.  I will represent to you that on
6  Friday I took the deposition of the plaintiff
7  expert in police practices and procedures, a
8  man by the name of Charles Drago, and he
9  issued a report in the case.  Have you seen
10 the report that Mr. Drago issued on behalf of
11 the plaintiffs in the Lurry case?
12   A.  No.
13   Q.  The name Charles Drago, is that
14 familiar to you at all?
15   A.  No.  Just from the deposition
16 notice.
17   Q.  Would it be fair to say you
18 couldn't pick Mr. Drago out of a lineup?
19   A.  Never seen him in my life.
20   Q.  And would it also be fair to say
21 that you would have no idea whether or not you
22 and Mr. Drago have ever been retained in the
23 same case apart from the Lurry case?

Page 64

1    A.  I would have no idea.  I have never
2  heard of that name before I received the
3  deposition notice.
4    Q.  Are you board certified as a
5  pathologist?
6    A.  I'm sorry, you kind of broke up
7  there for a minute.  Can you please repeat
8  that?
9    Q.  Are you board certified as a
10 pathologist?
11   A.  No.
12   Q.  Have you ever done an autopsy?
13   A.  Can you define that a little bit
14 more, please?
15   Q.  Have you ever issued and signed
16 your name at the bottom of an autopsy report?
17   A.  No.
18   Q.  Have you ever been the lead person
19 or primary doctor responsible for the physical
20 conducting of an autopsy?
21   A.  No.
22   Q.  Have you, however, attended
23 autopsies and seen someone else conduct an

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 65

1  autopsy?
2      A.  Yes.
3      Q.  When was the last time that you
4  personally attended an autopsy?
5      A.  Probably in 2005 or 6.  It was
6  during my fellowship.  I may have actually --
7  I may have attended an autopsy after that as
8  well, but it would have been before 2015.  I
9  have not been present at an autopsy since
10 2015.
11     Q.  In all the times that you have
12 testified in court, have you been qualified in
13 court to issue an opinion as -- specifically
14 as to the cause of a person's death?
15     A.  I do not know.
16     Q.  I'm now going to direct your
17 attention to your report, which I will be
18 marking as Exhibit 1.  Are you able to see
19 that on the screen in front of you?
20     A.  Yes.
21     Q.  And in the first paragraph, the
22 first sentence reads, "I have been retained by
23 your office to offer my professional, expert

Page 66

1  opinion related to the above-referenced case."
2  You see what I'm referring to?
3      A.  Yes.
4      Q.  And you, in fact, did render
5  several opinions with respect to the Lurry
6  versus City of Joliet case, correct?
7      A.  Yes.
8      Q.  And did you include all the
9  opinions that you have for the Lurry case in
10 your written report?
11     A.  At the time that I wrote the
12 report, those were all of my opinions.  There
13 may be some additional opinions that come out
14 today or at trial, for example, that would not
15 be included in this report.
16     Q.  And what would cause you to have
17 additional opinions at trial beyond those
18 included in your report?
19     A.  That would depend on the questions
20 that you ask me.
21     Q.  Other than questions being asked by
22 an attorney, is there anything else that would
23 lead you to new opinions for the Lurry case

Page 67

1  beyond those written in your report?
2      A.  I suppose I could form new opinions
3  if I read additional information about this
4  case.  If I was provided with any additional
5  information about the case, I would certainly
6  be likely to form new opinions about that.
7      Q.  Other than -- if we go to page two,
8  there's a list of material reviewed; do you
9  see that?
10     A.  Yes.
11     Q.  Since the date on which you signed
12 and issued your report, have you received any
13 additional materials with respect to the Lurry
14 case?
15     A.  No, except for the deposition
16 notice.
17     Q.  As a person who has been retained
18 as an expert witness a number of times, are
19 you aware of your duty to disclose all of your
20 expert opinions with respect to a case in your
21 report if you later want to offer that opinion
22 at trial?
23     A.  I would answer that as a no

Page 68

1  because, number one, I am not an expert in the
2  laws surrounding these written reports.  And I
3  don't want to assume anything, but I think it
4  may be state dependent, but I am not sure
5  about that.  So, therefore, I'm unable to
6  answer that question.
7      Q.  Do you know whether or not the
8  Lurry case is pending in state court or in
9  federal court?
10     A.  I do not know.
11     Q.  Do you plan, if this case were to
12 end up in trial, to offer any opinions on this
13 case beyond those contained in your written
14 report, which again will be marked as Exhibit
15 No. 1?
16     A.  Again, if additional opinions are
17 asked and rendered by me today, then I would
18 certainly perhaps include those opinions at
19 trial.  But, again, that would depend on the
20 questions that were asked of me today.
21     Q.  Other than opinions contained in
22 your report or that may show up in transcripts
23 from this morning and afternoon where you're

Page 69

1 at, or this morning and this afternoon's
2 deposition, do you plan to offer any other
3 opinions at trial should this case go to
4 trial?
5 　A.　I guess it would depend on the
6 questions that are asked of me at trial.  Do I
7 intend to offer any other opinions, no, but I
8 suppose you might ask me something at trial
9 that might not be included in the report.
10 　Q.　As to the list of materials
11 reviewed -- now, in addition to materials
12 reviewed, you certainly relied on your more
13 than two decades of training and experience as
14 a medical professional, correct?
15 　A.　Yes.
16 　Q.　Setting aside your training and
17 experience as a medical professional, other
18 than the items listed under Materials
19 Reviewed, did you review or consult any other
20 written materials?
21 　A.　No.  And I believe you asked me
22 that in the deposition notice also, but I did
23 not provide any other materials that I

Page 70

1 referenced.
2 　Q.　For example, you did not review any
3 specific published article or study in a
4 medical journal for the process of writing
5 your report, correct?
6 　A.　Correct.
7 　Q.　And, similarly, you did not review
8 or look at any specific medical textbook or
9 instruction manual for -- in the process of
10 writing your report, correct?
11 　A.　That is correct.
12 　Q.　I see under -- towards the top a
13 number of depositions that you reviewed.  Do
14 you see that 1 through 6, do you see what I'm
15 referring to?
16 　A.　Yes.
17 　Q.　There's Jeremy Harrison, Douglas
18 May, and it's -- I will tell you it's Michael
19 Humilier, that's how he pronounces it, Michael
20 Steurer, Nicholas Gerald Murphy, and Jose
21 Tellez.  I don't see listed the deposition of
22 Officer Andrew McCue, who is one of the
23 defendants here.  Did you not review

Page 71

1 Mr. McCue's deposition or did you, in fact,
2 review his deposition and just forgot to
3 include it here under Materials Reviewed?
4 　A.　I may have not included it.  I
5 would have to go back to my files and see if I
6 received it.  Do you want me to do that right
7 now?
8 　Q.　Actually, what I'm going to do,
9 Doctor, is I'm going to show you what you --
10 was produced to me as your notes, and I will
11 mark those, for purposes of the court
12 reporter, as Exhibit 6.
13 　(Exhibit 6 marked for identification.)
14 BY MR. MATHUES:
15 　Q.　For purposes of the record,
16 Ms. Bakos provided these to me with the Bates
17 stamps of LURRY3121 through LURRY3127.
18 Doctor, are you able to see my screen?
19 　A.　Yes.
20 　Q.　And you recognize the handwriting
21 on the document in front of you as my screen
22 as your own handwriting?
23 　A.　Yes.  Oh, McCue dep.

Page 72

1 　Q.　Here on page four do you see where
2 it says "McCue dep"?
3 　A.　Yes.
4 　Q.　I've highlighted notes that look
5 like it's your handwriting?
6 　A.　Yes.
7 　Q.　So based on what we just saw as
8 Exhibit 6, is it reasonable to infer that you
9 did, in fact, review Mr. McCue's deposition,
10 but just by an oversight it wasn't listed
11 under Materials Reviewed?
12 　A.　Yes, that is correct.
13 　Q.　Now, did you review Ms. Lurry's
14 deposition?
15 　A.　No.
16 　Q.　Were you aware that Ms. Lurry
17 observed Mr. Lurry at the moment where Mr.
18 Lurry was placed into the back of the Joliet
19 Police car on January 28, 2020?
20 　A.　I was aware that she was at the
21 scene, yes.
22 　Q.　Were you aware that Ms. Lurry
23 testified at her deposition that at the moment

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 73

1 Mr. Lurry was placed into the back of the
2 Joliet Police car it did not appear to her
3 that Mr. Lurry was in any medical distress?
4 A. No.
5 Q. Would you agree with Ms. Lurry's
6 observations that at the precise moment where
7 Mr. Lurry was placed into the back of the
8 Joliet Police car he did not appear to be in
9 medical distress?
10 A. I don't believe I can answer that
11 question because I don't believe I have a
12 video of that precise moment where he was
13 placed in the back of the police car. I think
14 the video starts after he was in the police
15 car at the point that he was placed in. I
16 don't have a video of him outside the police
17 car being placed in.
18 Q. Based on the video that you saw,
19 did you see the video that -- initially
20 there's a back seat of a police car with
21 nobody in it, and then Mr. Lurry is placed in
22 the back seat of the police car?
23 A. Yes.

Page 74

1 Q. Asking about the moment on the
2 video you saw when Mr. Lurry appears on screen
3 and is put in the back seat of a police car,
4 at that moment does he appear to you to be in
5 medical distress?
6 A. No.
7 Q. Under the list of Materials
8 Reviewed, toward the middle, it's number 14,
9 it says "Dispatch log." Do you see what I was
10 able to highlight there?
11 A. Yes.
12 Q. When you include the dispatch log
13 under Materials Reviewed, are you talking
14 about a print-out of a paper document or are
15 you talking about an audio file that is radio
16 transmissions, including the dispatchers and
17 the police officers?
18 A. I don't recall exactly. I believe
19 it was a written text. But I don't recall
20 exactly.
21 Q. Do you remember receiving and/or
22 listening to a separate audio file, not a
23 video that you can hear audio, but a separate

Page 75

1 audio file of police radio communications
2 related to the Lurry case?
3 A. I do not recall hearing that file.
4 Q. And you have up here a little
5 higher under 10 and 11 you reference the
6 videos from Officer McCue's squad car. Do you
7 see what I've highlighted in front of you?
8 A. Yes.
9 Q. Other than the videos for Officer
10 McCue's squad car, did you review any other
11 police dash cam video?
12 A. So under those two there is a
13 Ranstead second dash cam video listed.
14 Q. You reviewed Officer McCue's squad
15 car and a dash cam video from Officer
16 Ranstead. Did you review any other dash cam
17 video?
18 A. Not that I can recall.
19 Q. As a medical doctor, do you know
20 what histology slides are?
21 A. Vaguely.
22 Q. Do you know whether there were
23 histology slides taken from Mr. Lurry

Page 76

1 postmortem?
2 A. I do not.
3 Q. Which means it's fair to say if
4 there were histology slides from Mr. Lurry,
5 you haven't reviewed them, correct?
6 A. Correct.
7 Q. Would it be fair to say that you
8 don't have the experience and qualifications
9 to review histology slides and render opinions
10 on them?
11 A. Yes.
12 Q. Going to page three of your report,
13 at the top of page three, there's a sentence
14 there, "The traffic stop was initiated due to
15 suspicion of drug-related activity." Do you
16 see that what I'm referring to?
17 A. Yes.
18 Q. And you're not offering any
19 opinions as to the traffic stop or initial
20 search of Mr. Lurry, correct?
21 A. Correct.
22 Q. And you're not offering any
23 opinions that any law enforcement officer

Page 77

1  planted drugs on Mr. Lurry, correct?
2     A.  Correct.
3     Q.  And you're not offering any
4  opinions that any law enforcement officer
5  forced drugs into Mr. Lurry's mouth, correct?
6     A.  That is correct.
7     Q.  If we go down to the end of this
8  first paragraph here at the top of page three,
9  you referenced some audio communications by
10  Officer Tellez where he expresses a belief
11  Mr. Lurry may have put some dope, a/k/a
12  narcotics, in his mouth.  Do you see what I'm
13  referring to?
14     A.  Yes.
15     Q.  And based on the totality of the
16  evidence in the case, can we agree that that
17  is actually what happened, that Mr. Lurry put
18  baggies of narcotics into his mouth?
19     A.  That is my interpretation of that
20  incident, yes.
21     Q.  Would you agree that Mr. Lurry
22  putting baggies of narcotics into his mouth
23  was a voluntary act on Mr. Lurry's part?

Page 78

1        MS. BAKOS: Objection to the extent
2  that this falls outside the scope of this
3  expert's expertise and calls for speculation,
4  and it's not an opinion that's provided in the
5  report.
6        You can go ahead and answer.
7        THE WITNESS: I don't know.
8  BY MR. MATHUES:
9     Q.  Are you opining at all that
10  Mr. Lurry's act of putting -- of Mr. Lurry
11  putting bags of narcotics in his mouth was an
12  involuntary act?
13        MS. BAKOS: Same objection.
14        THE WITNESS: No.
15  BY MR. MATHUES:
16     Q.  Are you opining Mr. Lurry's act of
17  putting narcotics in his mouth was something
18  that some law enforcement officers threatened
19  or coerced him into doing?
20     A.  No.
21     Q.  And are you opining that
22  Mr. Lurry's act of putting narcotics into his
23  mouth was some sort of autonomic reflex akin

Page 79

1  to his knee moving when the doctor taps it
2  with the little mallet?
3     A.  No.
4     Q.  And can we agree, just as a matter
5  of common sense and human experience, that
6  Mr. Lurry chose to put the narcotics into his
7  mouth?
8        MS. BAKOS: Objection to the extent
9  that it calls for speculation as to what
10  Mr. Lurry -- what his subjective intentions
11  were.
12        Go ahead.
13        THE WITNESS: I don't know that I
14  can answer that question.
15  BY MR. MATHUES:
16     Q.  And why do you believe that you
17  can't answer the question?
18     A.  Because I don't have the video or
19  any knowledge of the events that transpired at
20  the time that he put the drugs into his mouth.
21     Q.  You watched the video of Mr. Lurry
22  in the back seat of a police car, correct?
23     A.  Yes.

Page 80

1     Q.  And as you note several times in
2  your report, on that video one can see
3  Mr. Lurry making chewing motions, correct?
4     A.  Yes.
5     Q.  And he does that on and off
6  throughout the time that he -- from the time
7  he's first placed into the back of the police
8  car until the time that he arrives at the
9  Joliet Police Department, correct?
10     A.  Yes.
11     Q.  And is it your interpretation that,
12  based on all the facts that you've reviewed in
13  the case, that when Mr. Lurry is making those
14  chewing motions he's chewing on a bag or bags
15  that contained narcotics, including Fentanyl?
16     A.  Yes.
17     Q.  And is it your interpretation,
18  based on all of the evidence that you've
19  reviewed in the case, that when Mr. Lurry is
20  chewing on those bag or baggies of narcotics
21  that contains Fentanyl that causes him to be
22  exposed to or to ingest narcotics, including
23  Fentanyl?

Page 81

1    A.  Yes.
2    Q.  Can we agree that Mr. Lurry's
3  chewing motions that are depicted when he's in
4  the back seat of a police car were voluntary
5  actions?
6    A.  No.
7    Q.  Why would you not agree that
8  Mr. Lurry's chewing motions while he's in the
9  back seat of the police car are voluntary
10  actions?
11    A.  Because at some point during that
12  transport he began to be -- to exhibit signs
13  of intoxication, and at that point he was more
14  likely than not incapacitated and not able to
15  make voluntary, informed decisions to chew.  I
16  don't know if that makes sense.
17    Q.  I think I understand what you're
18  saying.  And we will watch the video, and I
19  would be asking you for your opinion as to
20  when you believe Mr. Lurry first indicates
21  signs of intoxication.
22      But for my next question I'm going
23  to go to -- whatever the time is prior to

Page 82

1  Mr. Lurry's intoxication, physically
2  Mr. Lurry's initial chewing motions, would you
3  at least agree that Mr. Lurry's initial
4  chewing motions, while in the back seat of the
5  police car prior to the time that he starts to
6  exhibit signs of intoxication, were voluntary
7  actions?
8    A.  Yes.
9    Q.  And you say here in the third
10  paragraph on page three of your report that
11  "Mr. Lurry was initially awake and alert
12  during this time and can be seen looking
13  around and blinking in the back seat of the
14  vehicle."  Did I read that accurately?
15    A.  Yes.
16    Q.  And that sentence reflects your own
17  observations after having watched the video of
18  Mr. Lurry in the back seat?
19    A.  Yes.
20    Q.  And go down a little bit further
21  here.  I think the word that you use is
22  "somnolent," that during the time period
23  "Mr. Lurry became increasingly somnolent

Page 83

1  during the drive to the City of Joliet Police
2  Station."  At least the parts that I read, did
3  I read it accurately?
4    A.  Yes.
5    Q.  And when you use the word
6  "somnolent," does that mean sleepy appearing
7  or something else?
8    A.  Sleepy appearing.
9    Q.  Doctor, I am now going to show you
10  what I will end up marking as Exhibit No. 9
11  (An off the record discussion was held.)
12  BY MR. MATHUES:
13    Q.  You had answered my last question
14  when I said I was going to go to the video of
15  Mr. Lurry in the squad car, and it's going to
16  be Exhibit 9.
17      MR. MATHUES:  And, Abby, this is
18  the Q video.  It is the one that ends 054,
19  just for your purposes, and it will be screen
20  three.
21  (Exhibit 9 marked for identification.)
22  (An off the record discussion was held.)
23      MR. MATHUES:  The timestamp didn't

Page 84

1  come up, which might have been the same
2  problem that you encountered, Doctor, so I'm
3  going to a different part of my hard drive
4  with the goal of pulling up a video that
5  actually has a timestamp on it.
6      I know Ms. Bakos has this because
7  she showed it to my witnesses.
8  (Playing video.)
9  BY MR. MATHUES:
10    Q.  Are you now able to see a video on
11  the screen in front of you?
12    A.  I saw it for a minute before and
13  then it a disappeared and now I see your
14  computer desktop.
15    Q.  Let's try this again.
16  (Playing video.)
17  BY MR. MATHUES:
18    Q.  It appears I have to do it this way
19  in order for you to be able to see the
20  timestamp.
21      Are you looking at the -- do you
22  see the timestamp, Doctor, on the video up in
23  the top center of the screen that where it's

Page 85

1 paused right now it reads 1/28/20 16:02 and 27
2 seconds?
3    A.  Yes.  I am just going to adjust my
4 camera a little bit --
5    Q.  Sure.
6    A.  -- because it's overlying the
7 timestamp a little bit.  Is this okay?  Is
8 this angle still okay for right now?
9    Q.  You know, I -- yes, that angle is
10 just fine.
11    A.  Okay.  Thank you.
12 (Playing video.)
13 BY MR. MATHUES:
14    Q.  Okay, I'm stopping at 16:03:00 did
15 you just see the person now known to be Mr.
16 Lurry put into the back seat of the squad car?
17    A.  Yes.
18    Q.  And down over in the lower
19 right-hand corner it says, Joliet PD, Andrew
20 McCue 0674; do you see that?
21    A.  Yes.
22    Q.  I know you haven't watched all of
23 it yet, but from what you've seen so far, does

Page 86

1 this appear to be one of the videos that you
2 would have reviewed in the process of coming
3 to your opinions in the Lurry case?
4    A.  My video that I watched was
5 similar, but did not have any of the text,
6 including timestamp, the name, the mic breaks,
7 lights, sirens, words, or the GPS information.
8    Q.  Understood.  And, again, I think
9 that's a function of what happens when the
10 file is copied from one folder to another.
11        What I'm going to do is I'm just
12 going to push play on the video in front of
13 us.  And I'm going to ask you to tell me to
14 stop when you believe you're observing
15 Mr. Lurry either, A, being somnolent, sleepy
16 looking, as you use in your report, or
17 exhibiting signs of an opioid overdose.  Do
18 you understand?
19    A.  Yes.
20 (Playing video.)
21  BY MR. MATHUES:
22    Q.  I'm just going to stop the video
23 for the moment.  And can we agree that the

Page 87

1 timestamp reads 16:05:47 seconds?
2    A.  Yes.
3    Q.  And in the few seconds before I
4 stopped it, you were able to see on the video
5 Mr. Lurry making chewing motions, correct?
6    A.  Yes.
7    Q.  At this point, 16:05:47, does
8 Mr. Lurry still appear alert and awake to you?
9    A.  Yes.
10    Q.  At 16:05:47, had Mr. Lurry, in your
11 mind, yet shown any signs of an opioid
12 overdose?
13    A.  Not signs that are visible on this
14 camera view to me.
15    Q.  Understood.  I will keep playing
16 it.
17 (Playing video.)
18 BY MR. MATHUES:
19    Q.  Doctor, I've stopped.  The
20 timestamp reads 16:09:01 at the top; do you
21 see that?
22    A.  Yes.
23    Q.  And at this time of 16:09:01, have

Page 88

1 you yet seen on this video any visible signs
2 that Mr. Lurry is suffering an opioid
3 overdose?
4    A.  I think it's difficult to pinpoint
5 an exact time to the second in this video.  At
6 about the 16:08 mark he starts to slump over
7 towards the right side of the police car, and
8 he starts becoming a little bit more sleepy
9 looking.  He's sort of slumped over.  He's not
10 really trying to right himself up.  He's not
11 really looking out the window as much.  I
12 think at this point he was having some ongoing
13 absorption of the drug into his system.
14    Q.  And when you say "this point," are
15 you talking about right now where we're
16 stopped at 16:09:01 --
17    A.  I think that as he --
18    Q.  -- or are you talking about --
19    A.  I'm sorry.  I think that as he's
20 chewing and swallowing the substance he is
21 getting ongoing absorption of the drugs into
22 his system.
23    Q.  By the point that we have in front

Page 89

1   of us, 16:09:01, are you saying that Mr. Lurry
2   is starting to appear sleepy?
3       A.  I would say yes at this particular
4   point, yes.
5       Q.  And I take it that you would say
6   that by this point of 16:09:01 that Mr. Lurry
7   is beginning to show signs visible to you of
8   an opioid overdose?
9       A.  So, again, like I said, it's
10  difficult, because I'm trying to keep in
11  consideration that this is a man that has just
12  been arrested, or at least detained, and maybe
13  he's tired, there was a struggle.  You know,
14  there's certainly other reasons that I am
15  going over in my mind as to why he might not
16  be acting normal.  But certainly an overdose
17  is one of those.
18      Q.  Does there come -- in your review
19  of the video, did there come a point where, in
20  your view, the alternative explanations, for
21  example, being tired from a struggle, no
22  longer made sense and it was clear to you --
23  it was now clear to you that Mr. Lurry was

Page 90

1   suffering from an overdose?
2       A.  Yes, but it's not an exact point.
3   It's a continuum.  So Fentanyl overdoses that
4   are taken orally have to be absorbed within
5   the body, and that doesn't happen in the snap
6   of a finger.  So this is succinctly different
7   than an injection overdose.  This is on oral
8   overdose.  The drug has to go through the
9   system, be absorbed.  It goes through a little
10  metabolism.  And all of that happens before
11  the clinical effects can start to show up.
12          So, you know, yes, in an injection
13  overdose you would just see somebody and then
14  all of a sudden they're not breathing, but in
15  this case it's going to happen slower over
16  time.
17      Q.  Along those lines, when it comes to
18  the speed with which one sees the
19  manifestations of an overdose, does it make a
20  difference between whether a person ingests,
21  in this case, opiates, in this case Fentanyl,
22  directly through the mucus membranes of his or
23  her mouth versus a person ingesting Fentanyl

Page 91

1   from swallowing it and the Fentanyl goes down
2   into the stomach?
3       A.  I would need you to clarify that
4   question, please.
5       Q.  Sure.  You explained to me that
6   with an injection overdose an observer will
7   see the physical manifestations of the
8   overdose sooner than one would with someone
9   who swallows drugs, because in the case of the
10  injection overdose the drug goes directly into
11  the person's bloodstream.  Am I -- is that a
12  fair summary of what you told me?
13      A.  Yes.
14      Q.  What I'm trying to find out is to
15  be a little more precise in terms of the
16  manifestation of someone having overdosed and
17  the method by which they consume the opiate.
18  Does it make a difference in terms of how
19  quickly you're likely to see results whether
20  the person absorbs the opiate, in this case
21  Fentanyl, directly through the mucous
22  membranes of the mouth by chewing it versus
23  swallowing it and it goes down into their

Page 92

1   stomach?
2           MS. BAKOS:  Objection to form as
3   vague as to "results."
4           Go ahead.
5           THE WITNESS:  So that's a really
6   good question.  And my answer is that I
7   believe that it does; however, we don't have
8   good, well-designed pharmacokinetic studies of
9   people who have swallowed bags of Fentanyl, so
10  I cannot give you a precise numerical
11  difference.  But, yes, the route of exposure
12  does affect the pharmacokinetic properties of
13  a drug in many cases.
14  BY MR. MATHUES:
15      Q.  And would it be fair to say that
16  even though you can't give precise numbers or
17  detailed studies given the obvious
18  difficulties of, you know, the ethical and
19  legal problems with doing a study of people
20  directly consuming Fentanyl, that Fentanyl
21  absorbed through the mouth is more likely to
22  manifest itself sooner than Fentanyl ingested
23  and absorbed through the stomach?

Page 93

1    A.  Again, I don't know that I can
2  answer that, because I don't think we have
3  specific data on that.  I would say that in
4  general oral absorption is slower and more
5  erratic than parenteral absorption, meaning
6  intravenous or subcutaneous absorption.
7    Q.  What about -- to the extent you
8  can, and I appreciate scientific precision, so
9  "I don't know" is a perfectly fine answer.
10  But oral absorption versus absorption through
11  the stomach, someone swallows it, generally
12  speaking, would one expect to see, for lack of
13  a better way to put it, quicker results or
14  quicker manifestations of the effects of the
15  drug through oral absorption than simply
16  swallowing the drug and having it go into the
17  stomach?
18    A.  I think it depends on the drug so,
19  therefore, I can't answer that question.
20    Q.  Can you answer the question with
21  respect to Fentanyl?
22    A.  No, again, because we don't have
23  studies about people swallowing bags of

Page 94

1  Fentanyl and the ensuing pharmacokinetic
2  properties.
3    Q.  Similarly, can you answer that
4  question with respect to heroin?
5    A.  No.
6    Q.  I'm going to go forward on the
7  video to the point where they're at the police
8  station.
9    A.  I'm happy to keep looking at the
10  rest of the video, though.
11    Q.  I hear you.
12    A.  If that would help you.
13  (Playing video.)
14  BY MR. MATHUES:
15    Q.  I'm stopping the video at 16:15:13.
16  Do you see that in the timestamp above you?
17    A.  Yes.
18    Q.  And in the few seconds we watched
19  before I paused the video, did Mr. Lurry
20  appear somnolent or sleepy to you?
21    A.  Yes.
22    Q.  And did Mr. Lurry appear to be
23  suffering visible signs of an opiate overdose

Page 95

1  to you?
2    A.  In the context of previously seen
3  him swallow bags of drugs, yes.  Or the
4  contents of bags of drugs.
5    Q.  And what is it that you observed in
6  the few seconds leading up to where the video
7  was paused at 16:15:13 that in the context of
8  this case that would lead you to believe that
9  Mr. Lurry was suffering an opiate overdose?
10    A.  In the context of just knowing that
11  he was previously chewing what were thought to
12  be bags of narcotics, the current signs of
13  somnolence, including not really moving, not
14  really opening his eyes much, and slouching
15  over are consistent with the effects of an
16  opioid overdose.
17    Q.  Any other physical observations
18  that you have observed from Lurry at this
19  point that would lead you to believe that he
20  suffered an opioid overdose?
21    A.  So you just skipped through about
22  eight minutes of the video, I think, so I
23  don't want to comment on things without

Page 96

1  watching the entire video.  But at some point
2  in the video you can tell that the car goes
3  over some bumps in the road and he doesn't
4  really respond or right himself.  But, you
5  know, I can't really say at which point that
6  occurred because, again, you skipped forward
7  in the video to this moment at 16:15.
8    Q.  Understood.
9      So in the next few seconds I
10  believe we will see a police officer open the
11  door beside Mr. Lurry, and I'm going to ask
12  you about what you observe with Mr. Lurry's
13  response or reaction, if any, when that
14  happens.
15  (Playing video.)
16  BY MR. MATHUES:
17    Q.  I'm going to stop it at 16:16:16.
18  Doctor, did you observe on the video the door
19  beside Mr. Lurry open and hear a voice
20  speaking to Mr. Lurry?
21    A.  Yes.
22    Q.  And as noted in your report, did
23  Mr. Lurry turn his head in the direction of

Page 97

1  the individual speaking to him?
2    A.  Yes.
3    Q.  Would you describe Mr. Lurry's
4  turning of his head in the direction of the
5  individual speaking to him as a voluntary
6  motion?
7    A.  Not necessarily.
8    Q.  Why would you not do that?
9    A.  Because there was a bright light
10  and an open door and fresh air that was all of
11  a sudden entering the car. So I can't really
12  say that he was responding voluntarily to a
13  verbal stimulus. He may have just been
14  responding to the presence of light.
15    Q.  Can you say to a reasonable degree
16  of medical certainty whether Mr. Lurry was
17  responding to a verbal stimulus or merely to
18  the presence of light?
19    A.  No.
20    Q.  And in the few seconds before we
21  stopped the video here, did you observe
22  Mr. Lurry continuing to make chewing motions?
23    A.  I wasn't specifically looking at

Page 98

1  that point, I'm sorry.
2    Q.  That's fine. I'll go back a few
3  seconds and we'll watch. We'll go to 15:15:34
4  and we'll watch about a minute.
5  (Video playing.)
6  BY MR. MATHUES:
7    Q.  I'm pausing it at 16:16:25. Were
8  you able to see whether in the few seconds
9  leading up to 16:16:25 Mr. Lurry made any
10  chewing type motions?
11    A.  So it's pretty hard to see with the
12  quality of the video. I believe that I saw
13  chewing type motions at 16:15:50, around that
14  time, but not after that.
15    Q.  In your report you note that
16  Mr. Lurry was unresponsive to a sternum rub,
17  correct?
18    A.  Yes.
19    Q.  And what's a sternum rub?
20    A.  A sternum rub is what is depicted
21  in the video where the police officer makes a
22  fist or uses his hand to rub somebody's
23  sternum, which is the breast bone in the

Page 99

1  middle of the chest. It's a noxious stimuli.
2    Q.  And by "noxious," in layman's
3  terms, would it be fair to call it painful?
4    A.  Yes. Or uncomfortable would be a
5  better term.
6    Q.  Okay. I'll use uncomfortable.
7    And is a sternum rub a specifically
8  taught medical technique?
9    A.  Define "specifically taught,"
10  please.
11    Q.  I'll use a different word. Is a
12  sternum rub a recognized technique for
13  attempting to determine a person's level of
14  consciousness?
15    A.  It is one of many techniques that
16  can be used to ascertain an individual's level
17  of consciousness.
18    Q.  And is a -- would you describe a
19  sternum rub as an acceptable or appropriate
20  technique to use in an attempt to determine a
21  person's level of consciousness?
22    A.  I believe so, yes.
23    Q.  Now, at this point at 16:16:25,

Page 100

1  would you describe Mr. Lurry as unconscious?
2    A.  I'm sorry?
3    Q.  At the point where I paused the
4  video at 16:16:25, would you describe
5  Mr. Lurry as unconscious?
6    A.  Could you play the video again,
7  please, from maybe 16:16?
8    Q.  I didn't quite hear what you said,
9  but what I'm going to -- it sounds like you
10  want me to go to 16:16:00?
11    A.  Please.
12    Q.  Okay. So here's what I'm going to
13  do, I'm going to go to 16:16.
14    A.  That's fine.
15    Q.  16:15:56. I'm going to play the
16  video, and I would like you to interrupt and
17  stop me when you believe Mr. Lurry is
18  unconscious. Understand?
19    A.  Yes.
20  (Playing video.)
21    THE WITNESS: Okay, so can you stop
22  the video, please. Thank you.
23    All right. So it's quite hard to

1  see because he's being moved back and forth.
2  Sometime around this time is when he developed
3  a severely -- at this time he already had a
4  severely depressed level of consciousness.
5  The video quality is such that I'm not going
6  to be able to define to you the exact moment
7  that he goes unconscious because you just
8  can't tell in the video. It's grainy. You
9  know, it's not showing his face clearly.
10       But at this point I can say within
11  a very reasonable degree of medical certainty
12  that he has an extremely depressed level of
13  consciousness.
14  BY MR. MATHUES:
15      Q.  Did there eventually come a point
16  in the video when, for example, Mr. Lurry is
17  being removed from the car that it is -- one
18  can tell from the video that he is
19  unconscious?
20      A.  Yes, but I think because of all of
21  the maneuvers and motions that were being
22  applied to him, it's difficult to define the
23  exact moment at which that point of

1  unconsciousness occurred.
2      Q.  With the understanding -- with the
3  caveat that, you know, there are movements in
4  the video and it's not 1080p HD, if we watch
5  through the rest of the video when Mr. Lurry
6  is removed from the car, would you be able to
7  say when it looks like to you Mr. Lurry is not
8  merely in a severely depressed state of
9  consciousness, but is unconscious?
10      A.  Sure. Why don't you play it, and
11  then I'll let you know when it seems to
12  transition to unconsciousness, but given the
13  caveat that the quality of the video and the
14  movements present in the video is not going to
15  be able to allow anyone to say definitively
16  when that transition occurs.
17      Q.  I understand. With your caveat,
18  let me know when you believe that transition
19  occurs.
20      A.  Okay.
21  (Playing video.)
22       THE WITNESS: Can you stop it right
23  there, please.

1  BY MR. MATHUES:
2      Q.  Sure.  16:17:05.
3      A.  Okay. And I just saw this
4  randomly. This particular time point has
5  nothing to do in particular with what I'm
6  going to say, but right around the time that
7  the officer slaps him and says, "Wake up,
8  bitch," he doesn't really respond too much.
9  He's, again, having a very severely depressed
10  level of consciousness. I would say that
11  sometime around this time -- I think once the
12  officer lets go of his nose, he doesn't really
13  do too much after that. So I would say some
14  time in this continuum is when he had
15  progressed to unconsciousness. But, again,
16  it's impossible to say what time that
17  occurred.
18      Q.  Now, in your report you note that
19  the officer, whom you now know to be a
20  Sergeant Douglas May, pinches Mr. Lurry's nose
21  shut, correct?
22      A.  Correct.
23      Q.  He pinches Mr. Lurry's nose shut

1  for approximately 90 seconds, correct?
2      A.  Correct.
3      Q.  Is Mr. Lurry's mouth also closed
4  for the entirety of the 90 seconds that
5  Mr. Lurry's nose is pinched shut?
6      A.  I would have to watch the 90-second
7  clip of that.
8      Q.  Let's do that.
9      A.  Okay.
10  (Playing video.)
11  BY MR. MATHUES:
12      Q.  Okay. So 16:16:49, do you see the
13  timestamp?
14      A.  I do.
15      Q.  And this is when the officer, now
16  known to be Sergeant May, first pinches
17  Mr. Lurry's nose shut, correct?
18      A.  Yes.
19      Q.  Okay. And at 16:15:49 Mr. Lurry's
20  mouth is also closed, correct?
21      A.  That's what it appears from this
22  angular view.
23      Q.  Fair enough.

Page 105

1   A.  I will say that the -- can you stop
2   it for a minute, please.  I will say that it's
3   very difficult based on the quality of the
4   video.  I am going to say that over and over
5   again.  The quality and the angle of the
6   video.
7           You can go ahead and restart it,
8   please.
9   (Playing video.)
10  BY MR. MATHUES:
11      Q.  Doctor, I am pausing the video at
12  16:17:35; do you see that timestamp?
13      A.  Yes.  Yes, I do.
14      Q.  And notwithstanding the quality,
15  angle, and locations that may exist with
16  respect to the camera, does Mr. Lurry's mouth
17  now appear to be partially open?
18      A.  Yes, it was pulled open by Officer
19  May.
20      Q.  And I'm going to continue watching
21  the video up through the point where Officer
22  May stops the nose pinch.
23  (Playing video.)

Page 106

1   BY MR. MATHUES:
2       Q.  Pausing the video at 16:18:18; do
3   you see that?
4       A.  Yes.
5       Q.  And Officer May has just let go of
6   the nose pinch on Mr. Lurry's nose, correct?
7       A.  Yes.
8       Q.  And throughout the clip that we
9   just watched, notwithstanding the limitations
10  of clarity, angle of the video, did
11  Mr. Lurry's mouth appear to you to be at least
12  partially open?
13      A.  Yes.
14      Q.  Do you know how much time passed in
15  terms of minutes and seconds from the time
16  that the squad car with Mr. Lurry in it pulled
17  into the parking lot of the Joliet Police
18  Station and Lieutenant Harrison called for an
19  ambulance?
20      A.  I think that's in my report.  I'm
21  just going to refer to that for a minute.  I
22  think it was around seven minutes, but I want
23  to check my report for the exact time.

Page 107

1           Can you repeat the question again,
2   I'm sorry?
3       Q.  Sure.  And, in fact, we're at
4   12:30, so let's take a short break.
5       A.  Oh, no, I would like to answer the
6   question, please.
7       Q.  Okay.  Okay.  I was going to give
8   you a chance to look at that time report over
9   the break.
10      A.  No, I think I'm good.  I just need
11  to get the question again, please.
12      Q.  My question is, do you know how
13  much time passed in terms of minutes and
14  seconds from the time that the squad car
15  pulled into the parking lot at the Joliet
16  Police Station and Lieutenant Harrison called
17  for an ambulance?
18      A.  No.  So we don't know exactly what
19  time Lieutenant Harrison called for the
20  ambulance.  I know, based on my review of the
21  video, that he was removed from the police car
22  approximately three minutes after his initial
23  arrival at the police station.  But I can't

Page 108

1   give you the minutes and seconds that you're
2   asking for, because I was not -- there's no
3   documentation exactly what time Lieutenant
4   Harrison called the ambulance.
5       Q.  Now that you've answered the
6   question, let's take five minutes.  Does
7   that -- five to 10 minutes.  Does that work
8   for everyone?
9       A.  Yes.
10  (An off the record discussion was held.)
11  (A brief recess was held.)
12  BY MR. MATHUES:
13      Q.  Now, taking back up in your report,
14  you don't offer any criticisms of the medical
15  care rendered by the paramedics/EMT's from the
16  Joliet Fire Department, correct?
17      A.  Correct.
18      Q.  Do you have any criticisms of the
19  medical care rendered by the paramedics/EMT's
20  from the Joliet Fire Department?
21      A.  No.
22      Q.  In your report on page four, you
23  mentioned the results from the NMS Labs on

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 109

1  Mr. Lurry's blood and urine.  Do you see what
2  I'm -- it's not on the screen in front of you,
3  but do you see what I'm referring to in your
4  report?
5      A.  Yes.
6      Q.  And the toxicologist -- are you
7  familiar, or were you familiar even before
8  this case, with NMS Labs?
9      A.  Absolutely, yes.
10     Q.  Have you ever used NMS Labs in your
11 professional career?
12     A.  Yes.
13     Q.  Do you have any reason to doubt or
14 question the accuracy of the blood and urine
15 test results contained in the NMS Labs report?
16     A.  No.
17     Q.  And the blood and urine that were
18 tested were drawn from Mr. Lurry before he
19 passed away, correct?
20     A.  Yes.
21     Q.  And since it's a premortem draw,
22 there's no issue with what is sometimes known
23 as postmortem redistribution, correct?

Page 110

1      A.  Yes.
2      Q.  Going down to your report on page
3  four, opinion A, the first and second
4  sentences reads, "It is my opinion, to a
5  reasonable degree of medical certainty, that
6  the delay in providing Mr. Lurry with
7  immediate medical attention (including failure
8  to administer naloxone) once he was reasonably
9  suspected of placing drugs in his mouth," and
10 your opinion goes on from there.
11         But my question is specifically as
12 to the phrase "providing Mr. Lurry with
13 immediate medical attention."  What do you
14 mean when you write "providing Mr. Lurry with
15 immediate medical attention"?
16     A.  I think it depends on the medical
17 condition of the patient.
18     Q.  In this particular case, what
19 actions are you saying that the police
20 officers should have done, but did not do
21 other than failing to administer naloxone,
22 a/k/a Narcan?
23     A.  Other than administering Norco?

Page 111

1      Q.  Yes.
2      A.  Yes, so it's my opinion that when a
3  patient has a strongly suspected ingestion of
4  bags of drugs that that patient should be
5  taken to a hospital for observation and
6  potentially additional treatment.
7      Q.  So I want to draw your -- focus
8  your attention specifically at the point in
9  time when Mr. Lurry is on scene with Officers
10 Tellez and McCue and he is put into the back
11 of the police car.  I take it that you believe
12 that Officer Tellez and/or Officer McCue
13 should have called for an ambulance at that
14 point, correct?
15     A.  That is correct.  Or taken him to a
16 hospital.  I don't know that they had to call
17 for an ambulance.
18     Q.  I will represent to you the
19 testimony in this case has been that the
20 Joliet Police Department's protocols and
21 procedures are to call for an ambulance rather
22 than take detainees to the hospital directly.
23         So my question is, what else, if

Page 112

1  anything, are you saying that Officer Tellez
2  and McCue should have done on scene for
3  Mr. Lurry besides call for an ambulance?
4      A.  Can you please define "on scene"?
5      Q.  Yes.  At the point when Officer
6  Tellez and McCue put Mr. Lurry into the back
7  seat of the squad car before the time they
8  leave en route to the Joliet Police Station.
9      A.  That's it, just call an ambulance.
10     Q.  Now I will direct your attention to
11 the time when Mr. Lurry arrives at the Joliet
12 Police Station and you see the officer, who I
13 will represent to you is Officer McCue,
14 telling him to get out of the car and pulling
15 on his jacket.  Do you understand the point in
16 time in which I'm referring to?
17     A.  Yes.
18     Q.  At that point, is there anything
19 else besides call an ambulance and administer
20 Naloxone, a/k/a Narcan, that you believe the
21 officers should have done?
22     A.  Yes.
23     Q.  And what is that?

Page 113

1    A.  Assess his airway and breathing
2  status.
3    Q.  How do you believe they should have
4  assessed Mr. Lurry's airway and breathing
5  status at the point when Officer McCue was
6  ordering Mr. Lurry out of the car?
7    A.  They could have administered or
8  utilized basic BLS techniques that they were
9  all trained in those.
10    Q.  And for those of us who aren't
11  trained or experienced in BLS techniques, what
12  specific techniques are you saying the
13  officers should have done?
14    A.  Very simple, and, to be honest,
15  this might not even be basic BLS.  But just
16  looking for breathing would be important.  So
17  looking for a chest rise, looking to make sure
18  that somebody is breathing when they are in a
19  severely depressed level of consciousness.
20    Q.  So we have -- at the point in time
21  where Officer McCue is ordering Mr. Lurry out
22  of the car, we have call an ambulance,
23  administer Naloxone, a/k/a Narcan, and assess

Page 114

1  via observation Mr. Lurry's breathing.  What
2  else, if anything, are you saying the officers
3  should have done at that time?
4    A.  Well, I think that's all that they
5  reasonably could have done being that they
6  were laypersons and not more advanced medical
7  personnel.  (Audiovisual interruption.)  I
8  mean, would there be a (audiovisual
9  interruption) less knowledge they could also
10  have checked for a pulse, for example, maybe
11  even provided a chin lift and a jaw thrust if
12  they determined that he was not breathing
13  effectively, but that would be it.  They were
14  not trained past basic BLS.
15    Q.  Are you aware that after Mr. Lurry
16  was removed from the back seat of the squad
17  car other officers, not the ones who are
18  defendants here, but other officers provided
19  Mr. Lurry CPR?
20    A.  I believe that was in a report
21  somewhere.  Again, I don't have an actual
22  video of that occurring.
23    Q.  Do you have -- are you aware of any

Page 115

1  testimony or other information in the
2  documents you reviewed that would dispute the
3  fact that other officers provided Mr. Lurry
4  CPR after he was removed from the back seat of
5  the squad car?
6    A.  I don't believe so.
7    Q.  And, by the way, are you seeing
8  your report on the screen in front of you?
9    A.  Yes.
10    Q.  The first part of Opinion A, the
11  first whole sentence in Opinion A, you talk
12  about the delay in providing Mr. Lurry medical
13  attention once he was reasonably -- once he
14  was -- I think it's a typo, but reasonably
15  suspected of placing drugs in his mouth and/or
16  ingested the drugs increased his likelihood of
17  death.
18    Did I read the remainder of that
19  sentence accurately?
20    A.  Yes.
21    Q.  And when you in Opinion A write
22  specifically, once he was reasonably suspected
23  of placing drugs in his mouth and/or ingesting

Page 116

1  drugs, what part of the time frame of this
2  incident are you referring to?
3    A.  I believe that he was reasonably
4  suspected of placing drugs in his mouth at the
5  time that he was placed in the police car.  So
6  I would start at that time, be it the time of
7  the initial arrest when he was placed in the
8  police car and they started to drive off.
9    Q.  So another way to -- or strike
10  that.
11    In the first sentence of Opinion A
12  when you use the phrase, "once he was
13  reasonably suspected of placing drugs in his
14  mouth and/or ingesting drugs," what you mean
15  by that is at the point Mr. Lurry is put in
16  the back seat of the squad car by Officers
17  Tellez and McCue?
18    A.  Yes.  And it could have happened
19  before that as well.  When they saw him making
20  motions and they assumed that he was
21  swallowing drugs, that would be the time to
22  get him to the hospital to get the drugs out
23  of his system --

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

---

Page 117

1  Q.  And when you say at the point --
2  A.  I said and prevent --
3  Q.  Can you give that part of your
4  answer again?  I --
5      THE WITNESS: The last part of what
6  I said, Cindy, was "and prevent toxicity."
7  BY MR. MATHUES:
8  Q.  In the answer that you gave just
9  before I had some technical difficulties, you
10  referenced officers observing Mr. Lurry making
11  motions; do you remember that?
12  A.  Yes.
13  Q.  And which motions are you talking?
14  Are you talking about their observations of
15  Mr. Lurry making chewing motions in the back
16  seat of the squad car or are you talking about
17  something else?
18  A.  I'm talking about something else.
19  I'm talking about when they observed him -- I
20  forgot the exact terminology that was used,
21  but moving his hands toward his mouth in an
22  attempt to conceal a contraband substance, I
23  believe that was similar to the language that

---

Page 118

1  was used.  So this is not on video that I was
2  able to watch, but it was their report of the
3  incident.
4  Q.  And you say that the officers'
5  failure -- or you say the delay in providing
6  Mr. Lurry with immediate medical attention
7  "increased the likelihood of death."  Did I
8  read that part of your report accurately?
9  A.  Yes.
10  Q.  And you -- in that opinion, you
11  don't give us a -- any sort of numerical
12  percentage for increasing the likelihood of
13  Mr. Lurry's death; is that correct?
14  A.  That is correct.
15  Q.  And why not?
16  A.  Because in general we don't
17  administer drugs to people and let them
18  overdose on it without intervention.  So we do
19  not have controlled studies on this, so that
20  is why I'm not able to give you an exact
21  percentage.
22      I can say that the toxicity of the
23  drug depends on the dose.  So the longer that

---

Page 119

1  the officers allowed him to chew the drugs and
2  absorb the drugs into his system, that
3  increased the dose of the drug that he was
4  exposed to, and that increased his likelihood
5  of clinical deterioration and death.
6  Q.  And when you were talking about the
7  dose, you get into that a little bit later in
8  your report, this is the old phrase that even
9  lay people know, "the dose makes the poison,"
10  correct?
11  A.  Yes.
12  Q.  And in the case of Mr. Lurry, do
13  you know how much Fentanyl in terms of grams
14  Mr. Lurry ingested or was exposed to on
15  January 28, 2020?
16  A.  There's no way to know.
17  Q.  And have you heard the phrase
18  "purity levels" or some similar terminology to
19  refer to illicit drugs or street drugs?
20  A.  I've not heard those specific
21  terms.
22  Q.  Are you at least generally aware as
23  a toxicologist that when it comes to illicit

---

Page 120

1  drugs on the street, cocaine, heroin,
2  Fentanyl, et cetera, a person goes to buy
3  them, the level of purity, by which I mean the
4  active drug that they think they're buying,
5  may vary?
6  A.  That is correct, there is no
7  quality control in the street drug trade.
8  Q.  For example, someone goes to buy
9  powder cocaine and they may get a high
10  percentage of powder cocaine, they may get a
11  low percentage of powder cocaine because it's
12  been heavily cut with baking soda or some
13  other inert ingredient, correct?
14  A.  Or they may not get cocaine at all.
15  Q.  Also true.
16      And would it be fair to say the
17  same is true for heroin or Fentanyl, if
18  someone purchases what they believe to be
19  heroin or Fentanyl on the street, there's no
20  way to know, without doing chemical testing,
21  the actual chemical composition of what they
22  had purchased, correct?
23  A.  Yes.

---

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 121

1  Q. So a person purchases 10 grams of a
2  substance, there's no way of knowing if it's
3  nine grams of Fentanyl and one gram of inert
4  items or one gram of Fentanyl and nine grams
5  of inert items or no Fentanyl at all, correct?
6  A. Can you define where you say you're
7  purchasing it from?
8  Q. They're purchasing it on the street
9  from an illegal source.
10  A. That would be correct.
11  Q. And the same would be true for
12  heroin, if one purchases heroin on the street
13  from an illegal source, they don't know the
14  purity level or concentration level of heroin
15  as opposed to some other ingredient?
16  A. That is correct, yes.
17  Q. And when it comes to Mr. Lurry, not
18  only do we not know how many grams of illicit
19  drugs he consumed, we also don't know the
20  concentration levels or purity levels of
21  whatever substance he consumed?
22  A. That is correct. I mean, I think
23  all we can say is that it contained Fentanyl

Page 122

1  and potentially cocaine and heroin. But I
2  cannot -- I'm not going to offer any opinions
3  on the purity level or the concentration or
4  the amount that he consumed or was exposed to.
5  Q. We don't know how much --
6  A. Sorry. Except that it was a toxic
7  amount.
8  Q. The bottom line is, we don't know
9  how many grams he consumed and we don't know
10  the actual breakdown of those grams between
11  heroin, Fentanyl, cocaine, or any other
12  ingredient, correct?
13  A. That is correct.
14  Q. Now, the second half of the
15  sentence in your Opinion A reads, "It is my
16  opinion that Mr. Lurry would have survived if
17  medical treatment had been provided to him at
18  or close to the time when Officer Tellez
19  suspected Mr. Lurry had ingested narcotics."
20  Did I read that sentence accurately?
21  A. Yes.
22  Q. Now, you do not opine in Opinion A
23  that it's your opinion that Mr. Lurry would

Page 123

1  have survived if medical treatment had been
2  provided to him at or close to the time
3  Mr. Lurry arrived at the police station,
4  correct?
5  A. That is correct.
6  Q. And can you say to a reasonable
7  degree of medical certainty that Mr. Lurry
8  would have survived if he had received medical
9  treatment at the time he arrived at the police
10  station as opposed to at the time -- at or
11  close to the time Officer Tellez suspected
12  that Mr. Lurry had ingested narcotics?
13  A. Yes, I can say that I believe that
14  any medical attention that was rendered sooner
15  than it actually was would have been
16  beneficial and would have reduced his
17  likelihood of death.
18  But I think that earlier
19  intervention; i.e., intervention at the time
20  when he was initially put in the police car
21  and reasonably suspected to have consumed
22  drugs, would have resulted in a better outcome
23  than a delayed intervention, such as when he

Page 124

1  arrived at the police station.
2  Q. Certainly when you're dealing --
3  when one is dealing with an opioid overdose,
4  all of those things being equal, earlier
5  medical intervention is better, correct?
6  A. Yes.
7  Q. And to be going more precisely,
8  however, to the second sentence in your
9  opinion where you say, "If medical treatment
10  had been provided to him at or close to the
11  time when Officer Tellez suspected Mr. Lurry
12  had ingested narcotics." When you say "at or
13  close to the time Officer Tellez suspected
14  Mr. Lurry had ingested narcotics," are you
15  talking about time where Officer Tellez is
16  fully -- is audible on the police radio
17  saying, I think he swallowed some or I think
18  he put dope baggies in his mouth or words to
19  that effect?
20  A. Not necessarily.
21  Q. What time are you then referring to
22  when you say that it was your opinion that
23  Mr. Lurry would have survived "if medical

Page 125

1  treatment had been provided to him at or close
2  to the time when Officer Tellez suspected that
3  had Mr. Lurry had ingested narcotics"?
4     A.  I think the window for intervention
5  extended all the way back to when the officers
6  had the initial struggle with him and saw him
7  making movements that they suspected to
8  represent the concealment of illicit drugs in
9  his mouth.
10    Q.  So given that answer, when you
11  write in the second sentence of Opinion A,
12  "medical treatment had been provided to him";
13  i.e., Mr. Lurry, "at or close to the time when
14  Officer Tellez suspected that Mr. Lurry had
15  ingested narcotics," we're talking about the
16  time on scene from when there was an initial
17  struggle and the officers observed Mr. Lurry
18  making motions with his hands, however that's
19  written in the report, up until the time we
20  hear Officer Tellez on the radio making
21  statements to the effect of I think he
22  swallowed some or I think he put it in his
23  mouth?

Page 126

1     A.  I don't know if I can set an end
2  point, because really I think that any
3  intervention that was given to him along that
4  period of time would have increased his
5  likelihood for survival.  The sooner that the
6  intervention happened, the greater that his
7  chances of survival would have been.
8    Q.  Understood.
9     Now, the first section of Opinion A
10  you make -- you end that by referencing
11  officers behavior that, quote, "increase the
12  likelihood of death."  Do you see what I'm
13  referring to?
14    A.  Yes.
15    Q.  And the second sentence has
16  different phrases here the words you used are
17  Mr. Lurry would've survived.  Do you see what
18  I'm referring to there?
19    A.  Yes.
20    Q.  Would you agree that there is a
21  distinction between offering an opinion that
22  delayed medical care increased the likelihood
23  of someone's death versus more specifically

Page 127

1  offering an opinion not merely that someone is
2  more likely to have survived, but that
3  someone, quote, would have survived?
4    A.  Yes.  And I'm telling you that
5  you're asking for definitive time periods, but
6  I'm not able to give those.  So I cannot tell
7  you, I don't think anybody in the world can
8  tell you, at what time there was no chance of
9  him surviving, right.  We know that -- I can
10  tell you that within a reasonable degree of
11  medical certainty if he had been taken to the
12  hospital immediately after the suspicion of
13  drug ingestion came up that he could have been
14  treated at the hospital and observed and the
15  drugs could have been flushed out of his
16  system and toxicity would have been prevented,
17  he would have survived.
18    Q.  And I hear you that you've rendered
19  the opinion that Mr. Lurry would have survived
20  if medical treatment had been provided to him
21  at or close to the time when Tellez suspected
22  Mr. Lurry had ingested narcotics.  But you do
23  not have -- you did not issue an opinion that

Page 128

1  Mr. Lurry, quote, would have survived if
2  medical treatment had been provided to him at
3  the time Mr. Lurry arrived at the police
4  station, correct?
5    A.  That is true.  I don't know that
6  it's not true.  And, you know, I'm sorry, I
7  need to add some more.
8     So I can say that within a
9  reasonable degree of medical certainty
10  immediate treatment would have prevented his
11  death.  Because we don't know all the details,
12  because nobody assessed his breathing or
13  anything like that when they got to the police
14  station, I don't know what state he was in
15  overall.  I know he was in a bad state.  I
16  don't know what exact medical state he was in
17  at the time that he arrived, meaning that I
18  cannot say that he would have definitively
19  survived if he had gotten medical care.  I
20  think his chances of survival would have been
21  increased had he received medical care, but I
22  don't know how badly his organs were already
23  damaged by the time they arrived at the police

Page 129

1    station. So I cannot give you a numerical
2    answer about what the chances would have been,
3    whether it would have been a hundred percent
4    survival or not.
5        Q.  You can say, and you do say, that
6    if he would have gotten medical attention at
7    the police station his chances would have been
8    better, but you cannot say to a reasonable
9    degree of medical certainty that had he gotten
10   medical care on arrival at the police station
11   he would have survived?
12       A.  That is correct. And the reason
13   for that, again, is because we don't know what
14   state his internal organs were in. Sometimes
15   when people are brought to the hospital after
16   an overdose, the effects of the drugs and the
17   treatments that are given and just the general
18   nature of being critically ill in a hospital
19   can result in death. People can get
20   infections, people can have other things
21   happen that can result in death in a hospital
22   setting.
23       Q.  And is one of the reasons why you

Page 130

1    can't be certain what would have happened if
2    Mr. Lurry -- well, strike that.
3        Is one of the reasons why you can't
4    speak to Mr. Lurry's condition at the time he
5    arrived at the police station is because
6    nobody knows how much Fentanyl he had
7    consumed?
8        A.  No, that's actually not the reason.
9        Q.  What are the reasons?
10       A.  We don't have a set of vitals. We
11   don't have a respiratory rate. I don't have a
12   mental status exam that was done on scene.
13   There was really no medical -- no assessment
14   done at the time they got to the police
15   station, except for a sternal rub, which he
16   was minimally responsive to, and a slap to the
17   face. There was really no assessment done
18   that could tell me what clinical state he was
19   in.
20       I think the reasonable thing to do
21   at that time would have been to activate EMS.
22       Q.  Going forward a little bit on your
23   report to page five, the second paragraph from

Page 131

1    the bottom, you talk about "body stuffers" and
2    "body packers." Do you see what I'm referring
3    to?
4        MS. BAKOS: Hey, real quick, David,
5    I'm sorry to interrupt you. I need literally
6    30 seconds. We don't have to go off the
7    record, but I need 30 seconds. Can we just
8    pause for a sec?
9        MR. MATHUES: That's fine.
10   (An off the record discussion was held.)
11   BY MR. MATHUES:
12       Q.  My question for you, Doctor, when
13   you talk about body stuffers and body packers
14   in your report, do you see Mr. Lurry as a body
15   stuffer or body packer as you define those
16   terms?
17       A.  A body stuffer.
18       Q.  Now, if you go to the last
19   paragraph on page number five. Just a moment
20   here. Are you able to see my screen?
21       A.  Yes.
22       Q.  First sentence reads,
23   "Unfortunately, despite the detaining

Page 132

1    officers' suspicion that Mr. Lurry had
2    ingested drugs on 1/28/20 and their
3    observations of Mr. Lurry's decreased level of
4    consciousness, odd blinking, and other
5    subjective signs that he was in the midst of a
6    drug overdose, he was not referred for medical
7    attention until he lost consciousness," and
8    the sentence goes on from there. The part
9    that I read, did I read that accurately?
10       A.  Yes.
11       Q.  And in the first paragraph -- part
12   of this paragraph when you reference
13   "Mr. Lurry's decreased level of consciousness,
14   odd blinking, and," quote, "other subjective
15   signs," what are the "other subjective signs"
16   you are referring to?
17       A.  I don't recall specifically, but I
18   took this information from the deposition
19   transcripts and the -- I believe also the
20   investigative report of the officers.
21       Q.  Now, on the next page, over on page
22   six, let's -- never mind.
23       The last sentence of the first full

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 133

1  paragraph reads, "For Naloxone to be
2  effective, it must be administered soon after
3  the overdose before permanent organ damage due
4  the oxygen depravation has occurred." Did I
5  read that part accurately?
6    A.  Yes.
7    Q.  And my question, Doctor, is, how
8  soon after a person is exposed to opiate
9  overdoses do they need to receive Naloxone in
10  order for the Naloxone to be effective in
11  reversing the overdose?
12    A.  As soon as possible.
13    Q.  And can you -- certainly we can all
14  agree sooner is better than later. But in
15  order for Naloxone to be effective at all, how
16  soon does someone need to get the Naloxone?
17    A.  So, again, there actually may be
18  literature about this, I'm just not aware of
19  it. In general, we don't give drugs to people
20  and wait until they stop breathing and then
21  try to revive them. That sort of goes against
22  the Hippocratic Oath of why we practice
23  medicine.

Page 134

1     I believe that the pathologist
2  testified that it takes about, I think he
3  said, three to six minutes for irreversible
4  brain damage to occur, and I would agree with
5  that statement.
6     So I would say that before that
7  time period when irreversible brain oxygen
8  deprivation occurs would be the time in which
9  Naloxone could be the most beneficial or could
10  be beneficial. But, again, I don't know that
11  there is a firm set time. You're asking me a
12  lot of questions about specific times, and,
13  unfortunately, I just don't think we have data
14  for specific times that you are asking about.
15    Q.  Narcan can be effective to reverse
16  the effects of an opioid overdose, correct?
17    A.  Yes.
18    Q.  And it can be effective to reverse
19  a variety of opioid overdoses, correct?
20    A.  Yes.
21    Q.  And is Narcan, a/k/a Naloxone,
22  effective at all for a cocaine overdose?
23    A.  It would depend. Depends.

Page 135

1    Q.  How would it -- what would it
2  depend on for Naloxone, a/k/a Narcan, to be
3  effective in reversing a cocaine overdose?
4    A.  Naloxone will not specifically
5  reverse a straight up cocaine overdose. But,
6  as we discussed before, many street drugs are
7  contaminated with other drugs, and so if there
8  was cocaine mixed with heroin, for example,
9  and somebody stopped breathing, Naloxone could
10  help reverse that. Many times when we give
11  Naloxone, we don't necessarily have
12  confirmation that there was an opioid
13  overdose. Many times we give it when somebody
14  has inadequate breathing, inadequate
15  respirations. It may be from an opioid
16  overdose, it may not be, but generally
17  Naloxone is not harmful to administer to most
18  patients, and so it's perfectly reasonable to
19  give it for somebody who has decreased
20  respirations of unknown etiology.
21    Q.  If you go on to the bottom of
22  page six, you make reference to a procedure as
23  a "blind finger sweep" that you say is "no

Page 136

1  longer recommended by the American Heart
2  Association." At least from your report in
3  front of you, do you see what I'm referring
4  to?
5    A.  Yes.
6    Q.  So what is a blind finger sweep?
7    A.  Just what it sounds like, when
8  somebody inserts their finger into someone's
9  mouth and moves it around in an attempt to
10  dislodge a foreign body.
11    Q.  And would you call it a blind
12  finger sweep only if someone's fingers are
13  attempting to dislodge a foreign body or if
14  they're also simply searching to see whether
15  or not there is a foreign body present?
16    A.  Sorry, can you repeat that?
17    Q.  Sure. Is a blind finger sweep only
18  if someone inserts fingers into a person's
19  mouth trying to dislodge a foreign object that
20  they know is there, or would you still call it
21  a blind finger sweep if someone is putting
22  fingers in his mouth in an attempt to find out
23  if there's a foreign object in the mouth in

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

---

Page 137

1  the first place?
2  A. Sounds like you're asking the same
3  question. So if somebody puts their fingers
4  in their mouth -- in somebody's mouth to find
5  out if there's a foreign body there in the
6  first place, that means they have a suspected
7  foreign body, which is sort of what you asked
8  in the first part of that sentence, I believe.
9  Q. When -- approximately when did the
10 AHA stop recommending a blind finger sweep?
11 A. I don't know for sure. I know that
12 it was before 2020, I can say that.
13 Q. Do you know whether it was, you
14 know, five years before 2020, 20 years before
15 2020? Can you be any more specific than prior
16 to 2020?
17 A. No.
18 Q. When the AHA changed it's
19 recommendation for blind finger sweep, did it
20 change the recommendation for infants,
21 children, adults, or all of the above?
22 A. I am going to say I don't know for
23 sure. I don't want to answer this the wrong

---

Page 138

1  way. I believe that the algorithm for foreign
2  body obstruction was an infant algorithm, but
3  I actually don't recall for sure. I should
4  not answer that question at all.
5  Q. Do you know are there any other
6  organizations, medical organizations, say,
7  akin to the American Heart Association, that
8  have recommendations with whether to use or
9  not use a blind finger sweep?
10 A. I don't know. There are many
11 medical organizations, and I certainly cannot
12 speak for all of them.
13 Q. Do you know, as you sit here today,
14 whether there are any other medical -- are you
15 aware of any medical organizations that
16 discourage or disapprove of the use of a blind
17 finger sweep?
18 A. No. Besides the AHA?
19 Q. Besides the AHA, yes.
20 A. No.
21 Q. Do you know -- what's your
22 understanding or belief as to why the AHA
23 changed its recommendations with respect to

---

Page 139

1  the blind finger sweep?
2  A. From my understanding, as well as
3  from my experience and training as an
4  emergency medicine physician, the reason is
5  that that procedure can actually inadvertently
6  push a foreign body deeper into the airway and
7  cause further occlusion. So it can be more
8  harmful than beneficial in some cases. In
9  many cases.
10 Q. Do you know whether there is any --
11 whether either in the AHA's recommendations or
12 any of the published literature there is a
13 distinction between potential risks of doing a
14 blind finger sweep for an infant versus an
15 adult?
16 A. I am not a pediatrician, so I
17 cannot comment on that.
18 Q. Now, as a practicing emergency
19 physician, have you ever heard the phrase
20 "bite lock" before?
21 A. Yes.
22 Q. Can we agree that if one puts your
23 fingers into the mouth of an unconscious

---

Page 140

1  person, there's a risk that their fingers may
2  get bitten?
3  A. Even happens with a conscious
4  person, yes.
5  Q. Have you, yourself ever used or
6  directed medical personnel working under you
7  to use a bite lock?
8  A. Yes.
9  Q. And did you -- in your review of
10 the depositions in the case, did you see the
11 testimony from Sergeant May that Lieutenant
12 Harrison directed that the baton be used as,
13 quote, a prop to keep the officers' fingers
14 from being bitten by Mr. Lurry?
15 A. I don't recall that specific
16 language. I remember that that was how it was
17 supposed to be used. I don't remember the
18 specific language of "prop."
19 Q. Fair enough.
20 Would you agree that, at least
21 based on the testimony that you reviewed, that
22 the officers were using the baton as a crude
23 or makeshift -- for the purposes of a crude or

---

ADVANTAGE REPORTING SERVICE
PHONE: 309-673-1881  FAX: 309-673-0341

Page 141

1  makeshift bite lock?
2      A.  No.
3      Q.  Why would you disagree with the
4  fact that the officers were using the baton as
5  a makeshift bite lock?
6      A.  Well, it may have been their
7  intention to use it as a bite lock.  Officer
8  McCue, who I believe was handling the baton,
9  seemed to actually use the baton as a probe to
10  reach into Mr. Lurry's mouth and attempt to
11  extract bags of drugs.  It was not put
12  there -- put in his mouth, left in one place
13  as a bite lock.  It was definitely used for an
14  extended reason.
15      Q.  Would you agree that the baton
16  was -- even though -- strike that.
17          Would you say that the baton was
18  used, at least in part, as a bite lock to
19  reduce the odds of Mr. Lurry biting down on
20  Officer McCue's fingers as well as a probe as
21  you described?
22      A.  I mean, I guess that was their
23  intent, but to me it did not appear to be put

Page 142

1  in his mouth and remain in one place.  It was
2  definitely moved around his mouth, which would
3  not really be the definition of a bite lock.
4      Q.  Now, if you go to Opinion B on page
5  seven of your report.  Are you able to see
6  that on the screen in front of you?
7      A.  Yes.
8      Q.  And the second sentence under
9  Opinion B reads that, "Officer McCue's conduct
10  in putting the baton in Mr. Lurry's mouth may
11  have further exacerbated his condition."  Did
12  I read that part accurately?
13      A.  That's correct.
14      Q.  And when you say "exacerbated
15  Mr. Lurry's condition," what are you referring
16  by those words?
17      A.  Worsening the already present --
18  actually, I'm sorry, I need to rephrase that.
19  Worsening the degree of airway obstruction.
20      Q.  How do you know from watching the
21  video that the baton obstructed Mr. Lurry's
22  airway?
23      A.  I'm not saying that the baton

Page 143

1  obstructed his airway.
2      Q.  What is it that you are saying?
3      A.  I'm saying that the act of putting
4  the baton in Mr. Lurry's mouth may have caused
5  a further airway obstruction.
6      Q.  And when you say "further airway
7  obstruction," what do you mean by that?
8      A.  The bags of drugs could have been
9  pushed deeper into his mouth and obstructed
10  his airway through that maneuver of using the
11  baton to push them around.
12      Q.  Do you know where in Mr. Lurry's
13  mouth the bags of drugs were located?
14      A.  No.  Within the mouth.
15      Q.  And can you be certain -- can you
16  say to a reasonable degree of medical
17  certainty that when Officer McCue inserted a
18  baton into Mr. Lurry's mouth that his airway
19  was being partially obstructed or fully
20  obstructed by the plastic bag?
21      A.  My opinion is, as I already stated
22  it, that Officer McCue's conduct in putting
23  the baton in Mr. Lurry's mouth may have

Page 144

1  further exacerbated his condition.
2      Q.  And you used -- your wording, your
3  opinion, as you stated it, was "may have,"
4  correct?
5      A.  That is correct.
6      Q.  And you know how to give opinions
7  to a reasonable degree of medical certainty
8  because some of your other opinions that we've
9  already covered today you do use that phrase
10  "to a reasonable degree of medical certainty,"
11  correct?
12      A.  Correct.
13      Q.  And here with respect to the baton,
14  all you can say is may have exacerbated
15  Mr. Lurry's condition, because ultimately you
16  don't know where the plastic bags were located
17  in Mr. Lurry's mouth, correct?
18      A.  That is correct.  That is why I
19  chose that wording.
20      Q.  And you don't know whether or not
21  the baton, in fact, pushed any of the plastic
22  bags to a position where they further
23  obstructed Mr. Lurry's airway?

Page 145

1    A.  That is correct.
2    Q.  Now, to state the obvious, the
3  exited airway from our mouth is at the back of
4  our throat, correct?
5    A.  Can you repeat that, please?
6    Q.  Inside of a person's mouth the
7  airway and passage that leads to the trachea
8  and ultimately to our lungs is at the back?
9    A.  That's correct.
10    Q.  It's not at the side where
11  someone's cheeks are, correct?
12    A.  I mean, technically the entire
13  mouth could be considered part of the airway.
14    Q.  The opening, shall we say, to the
15  pharynx and then down on one end to the
16  esophagus and the other to the trachea, that
17  opening is at the back of our mouth, right?
18    A.  Yes.  Yes.
19    Q.  Now, if we go down to the first
20  full paragraph under Exhibit B (sic), you see
21  the -- I'm not going to put it up on the
22  screen because it's acting up on me.  But if
23  you have your report in front of you, do you

Page 146

1  see where that report, that last sentence
2  says, "This, in combination with potential
3  airway obstruction caused by the insertion of
4  a baton into Mr. Lurry's mouth, more likely
5  than not worsened Mr. Lurry's degree of
6  hypoxia, causing a further deterioration in
7  his clinical status."  The part that I read,
8  did I read that accurately?
9    A.  Let me read it, please.  You're
10  referring -- so Exhibit B is my report then?
11  I want to make sure we're all on the same
12  page.
13    Q.  You know, despite the difficulty, I
14  will put it on the screen.
15    A.  No, I have the report in front of
16  me.  You don't have to do that.  But you said
17  Exhibit B, and I don't know what Exhibit B is,
18  so if you could --
19    Q.  You corrected me.  I misspoke.
20  Your report is going to be Exhibit 1.  I'm
21  referencing Opinion B on page seven of your
22  report, the last sentence of the first full
23  paragraph under "Facts relief upon which to

Page 147

1  form my opinion."
2    A.  Okay, let me take a look at that.
3  (Witness looking at document.)
4      Okay.
5    Q.  The part that I read, did I read
6  that part accurately?
7    A.  Yes.
8    Q.  Now, based on your previous
9  testimony, can you agree that we don't
10  actually know Mr. Lurry's degree of hypoxia at
11  the time that he's in the back seat because
12  there's no medical equipment and the officers
13  aren't checking?
14    A.  At what time he's in the back seat?
15    Q.  Fair enough.  I'll ask the question
16  more precisely.
17      Do you know Mr. Lurry's exact degree
18  of hypoxia at the time the officers put a
19  baton in his mouth?
20    A.  No.
21    Q.  And do we know Mr. Lurry's exact
22  degree of hypoxia in the 10 to 15 seconds
23  before the officers put a baton in his mouth?

Page 148

1    A.  No.
2    Q.  In fact, we don't actually know
3  Mr. Lurry's exact degree of hypoxia until the
4  paramedics come and hook him up to oxygen
5  equipment and check his oxygen levels; is that
6  accurate?
7    A.  That is unfortunately correct.
8    Q.  Now, given your use of the word
9  "may" under your opinion, can you exclude the
10  possibility that the use of the baton had no
11  effect on Mr. Lurry's hypoxia?
12    A.  Okay, there's a lot of negatives in
13  that sentence.  Can you please rephrase that.
14    Q.  Can you exclude the possibility
15  that the baton did not affect Mr. Lurry's
16  level of hypoxia?
17    A.  No.
18    Q.  Can you exclude the possibility
19  that the baton did not affect Mr. Lurry's
20  clinical condition?
21    A.  No.
22    Q.  Can you exclude the possibility
23  that the nose pinch did not affect Mr. Lurry's

Page 149

1  level of hypoxia?
2      A.  That I am more inclined to say I
3  don't know.  The nose pinch was different than
4  the baton in that it was an actual witnessed
5  occlusion of his nose.  So I think that did
6  cause harm more likely than not.
7      Q.  I hear you that you believe that it
8  more likely than not caused harm.  My question
9  was a little different as whether you could
10  exclude the possibility that the nose pinch
11  had no effect on Mr. Lurry's level of hypoxia?
12      A.  I'm going to say yes to that.
13      Q.  And why do you give a yes answer to
14  that?
15      A.  Because at the time that his nose
16  was being pinched, he was already in a state
17  of significantly depressed mental status.  And
18  given that he had a known drug ingestion at
19  that time, or strongly suspected drug
20  ingestion, it was likely hypoventilatory, so
21  he was likely not breathing normally.  And any
22  degree of nasal obstruction would have further
23  worsened his ability to oxygenate and

Page 150

1  ventilate normally.  I cannot see how it did
2  not cause any harm to him.
3      Q.  If we go down towards to the bottom
4  of page seven.  I will try to show this to you
5  on screen.  The last full paragraph here, I
6  will direct your attention to the next to the
7  last sentence, and it reads, "However, as
8  noted above, opioid intoxication can suppress
9  the gag reflex, and some individuals have a
10  variable gag reflex at baseline."  The part
11  that I read, did I read that accurately?
12      A.  Yes.
13      Q.  Now, are you saying that opioid
14  intoxication is capable of suppressing
15  someone's gag reflex, or are you saying that
16  opioid intoxication will invariably lead to
17  someone's gag reflex being suppressed?
18      A.  So every individual has a different
19  response to opioids.  Some individuals are
20  more tolerant than others, and in those
21  individuals an opioid exposure may not
22  suppress the gag reflex.  However, in this
23  case I used the phrase "opioid intoxication,"

Page 151

1  and I believe that opioid intoxication would
2  suppress the gag reflex to some degree in
3  almost every individual, if not everyone.  I
4  think opioid exposure could certainly not
5  suppress the gag reflex in everyone, but
6  opioid intoxication/incapacitation would be
7  expected to suppress the gag reflex.
8      Q.  And when you say "opioid
9  intoxication can suppress the gag reflex," do
10  you mean that it will reduce the gag reflex,
11  eliminate the gag reflex, or it could do
12  either?
13      A.  It could do either.
14      Q.  Now, with respect to Mr. Lurry, do
15  you have any idea what his baseline gag reflex
16  is?
17      A.  I do not.
18      Q.  Now, also in the same paragraph the
19  last sentence says, you say, "Due to these
20  factors, I disagree with Dr. Humilier and
21  believe that Mr. Lurry may have experienced an
22  airway obstruction due to the presence of
23  plastic bag material in his oropharynx."  Did

Page 152

1  I read that accurately?
2      A.  Yes.
3      Q.  Putting aside temporarily for the
4  moment your disagreeing with Dr. Humilier on
5  that point, I want to ask you about
6  Dr. Humilier's physical observations of
7  Mr. Lurry at autopsy.  Now, you did review the
8  autopsy report and the photos of the autopsy,
9  correct?
10      A.  Yes.
11      Q.  And when you reviewed the autopsy
12  report in particular, Dr. Humilier made a
13  number of observations of Mr. Lurry's body at
14  autopsy; i.e., injury or hemorrhage at certain
15  points, no sign of injury or nothing abnormal
16  at other points; is that correct?
17      A.  I believe so.
18      Q.  So my question to you is, putting
19  aside your disagreement with Dr. Humilier as
20  to his opinion on the gag reflex, do you
21  dispute or disagree with any of Dr. Humilier's
22  physical observations of Mr. Lurry's body at
23  autopsy?

Page 153

1    A.  I am not a pathologist, and I don't
2  believe I can give any opinions on the
3  pathology aspects of this case, especially the
4  autopsy report as described by Dr. Humilier.
5  I will defer that to the pathologist.
6    Q.  So just to tie that up before I
7  move on, you're not offering and you're not
8  going to offer any opinions regarding
9  Dr. Humilier's physical observations at
10  autopsy, correct?
11    A.  That is correct.
12    Q.  Now, when you reviewed
13  Dr. Humilier's deposition, did you see where
14  on page 69 he expressed the view that if the
15  Fentanyl dose -- or Fentanyl levels for
16  Mr. Lurry were so high that Mr. Lurry could
17  not open his mouth, Mr. Lurry could not have
18  breathed at all?
19    A.  I remember reading that, yes.
20    Q.  As to that statement, do you agree
21  with Dr. Humilier, disagree with Dr. Humilier,
22  or is that something -- an opinion that you
23  would defer to a pathologist on?

Page 154

1    A.  So I think that Dr. Humilier said a
2  lot of things that made sense in the context
3  of a parenteral Fentanyl exposure, but, again,
4  this was a different type of Fentanyl
5  exposure.  This was an oral exposure where the
6  effects are going to be more erratic and
7  slower because of the nature of the root of
8  exposure.
9    So I would agree that with an
10  intravenous or parenteral exposure, yes, the
11  symptoms happen rapidly.  If it's bad enough
12  to cause you to not open your mouth, it's also
13  bad enough to make you not able to breathe,
14  but that would be specific to an intravenous
15  or parenteral exposure.  I believe that the
16  pharmacokinetic and the pharmacodynamic
17  properties of the drug may have been different
18  in the case because it was an oral exposure,
19  not intravenous.
20    Q.  So are you saying that given that
21  this was an oral exposure to Fentanyl, you
22  would disagree with Dr. Humilier's statement
23  and you would say that if the Fentanyl levels

Page 155

1  in Mr. Lurry's body were so high that he could
2  not open his mouth to breathe, it's still --
3  excuse me, he could not open his mouth to
4  breathe, Mr. Lurry could not still could have
5  breathed?
6    A.  Do you mind pulling up his report,
7  please?  I want to make sure that I'm
8  interpreting this in the correct context of
9  what he's saying.
10    Q.  That's fine.  And I will add this
11  to our list and mark it as Exhibit 12.
12    (Exhibit 12 marked for identification.)
13  BY MR. MATHUES:
14    Q.  Can you see my screen in front of
15  you, or do I need to push share screen again?
16    A.  I cannot see it, I'm sorry.
17    Q.  Not your fault.
18    A.  I feel bad your computer is just
19  malfunctioning so much today.
20  (An off the record discussion was held.)
21    THE WITNESS: I can pull it up on
22  my other screen.
23  BY MR. MATHUES:

Page 156

1    Q.  It would be on page 69 of his
2  deposition down towards the bottom.  I have it
3  pulled up.
4    A.  Let me pull it up and we can read
5  the preceding sentences to make sure I'm in
6  the right place, if that's okay with you.
7    Q.  That's fine.
8    A.  What page is it on?
9    Q.  It's page 69.
10    A.  Do you have line numbers?
11    Q.  I do.  I would direct you to start
12  at line number 8 and down to line number 23,
13  and that's for context.  The particular part
14  I'm focusing on is from lines 20 to 23.
15    A.  (Witness looking at document.)
16    Okay.  So he says -- so the
17  question is, and you know that although that
18  you have no idea how much Fentanyl was in his
19  bloodstream at that time?  And the answer is,
20  well, if the Fentanyl was high enough that he
21  was unable to open his mouth to breathe, then
22  the Fentanyl was high enough that he would not
23  have been able -- he would not have breathed

Page 157

1   at all. Correct?
2     Q. Yeah, that is what I am referring
3   to. And I'm asking you if you agree with
4   Dr. Humilier's opinion or disagree with his
5   opinion or cannot be certain whether you agree
6   or disagree and, if so, why can't you be
7   certain?
8     A. Okay. So I, again, believed that
9   he is referring to cases of intravenous
10  Fentanyl exposure what he's describing in this
11  section. But I don't know if what he's saying
12  is true. So I'm unable to really answer yes
13  or no to this. I don't know that we have data
14  to support these specific clinical points that
15  he's mentioning. I don't know -- I don't know
16  that there's studies to support this. It may
17  be true, but it may not be true I guess is
18  what I'm saying in the context of oral
19  Fentanyl exposure.
20     Q. Are you done, Doctor? I
21  interrupted you a couple times.
22     A. I'm done, yes.
23     Q. And what is it that leads you to

Page 158

1   believe that in making the statement on
2   page 69 Dr. Humilier is speaking from the
3   context of intravenous Fentanyl exposure?
4     A. Mainly because he keeps referring
5   to Fentanyl as, I think he called it, the drop
6   dead drug or the drop down drug or something
7   like that, and that's because
8   characteristically after IV Fentanyl
9   exposures, individuals would be found dead
10  suddenly with -- frequently with a needle
11  still in their arm, for example. So that's --
12  you know, when he mentioned that in his
13  testimony, I sort of understood that that's
14  what he was referring to. And more likely
15  than not, I believe that that's what most of
16  his exposures to Fentanyl at that time had
17  been was probably intravenous exposures.
18     Around 2019, 2020 is when we
19  started seeing -- I believe that's the time
20  that we started seeing increased amounts of
21  illicit Fentanyl in the street drug supply.
22  Prior to that we had seen a lot of just
23  intravenous Fentanyl abuse.

Page 159

1     So my interpretation of his
2   testimony was that he was basing his responses
3   on intravenous Fentanyl deaths which he had
4   seen or that he had worked on.
5     Q. I'm going to direct your attention,
6   since Dr. Humilier's deposition is up, to
7   page 71 and I'll ask you some similar
8   questions.
9     A. Okay. I have it up. Go ahead.
10     Q. Just a moment. I want to make sure
11  I give you the right -- actually, I misspoke,
12  Doctor. It is page 70. And I would direct
13  your attention to lines -- for context I could
14  say start at line 10 and down to line 17, but
15  what I'm particularly focused on and going to
16  ask you about is Dr. Humilier's statement in
17  lines 15 through 17.
18     MS. BAKOS: Sorry, what page are we
19  on?
20     MR. MATHUES: We're on page 70.
21  I'm sorry, Abby. I wrote 71 in my outline,
22  and I was mistaken.
23     MS. BAKOS: That's okay.

Page 160

1     THE WITNESS: (Witness looking at
2   document.)
3     Okay. So the question was, and
4   that would be whether or not he was under the
5   influence of high dosage of Fentanyl? The
6   answer was, if the Fentanyl was high enough to
7   have eliminated the gag reflex, it had already
8   eliminated his ability to breathe, period.
9   BY MR. MATHUES:
10     Q. And that's exactly what I was
11  referring to. And my question would be, as to
12  the statement in lines 15 through 17, if the
13  Fentanyl was high enough to have eliminated
14  the gag reflex, it already eliminated his
15  ability to breathe, period. I would say do
16  you agree or disagree with Dr. Humilier as to
17  that statement and why?
18     A. I would disagree with that
19  statement. From my experience, patients can
20  receive opioids and have suppression of the
21  gag reflex, but still be able to breathe.
22  They may not be breathing normally, but they
23  could still breathe.

Page 161

1    Q.  I'm going to direct your attention
2  to page 77 of Dr. Humilier's deposition, in
3  particular to lines 5 through 9.
4    A.  Okay.  "Would it surprise you to
5  hear that Mr. Lurry was exhibiting signs that
6  other police officers recognized as him having
7  a seizure?"  Answer, "Not at all.
8  Seizure-like activity commonly occurs during
9  the end of an overdose."
10   Q.  My question is, for Dr. Humilier's
11 statement that seizure-like activity commonly
12 occurs at the end of overdose, would you agree
13 or disagree with that and why?
14   A.  I would disagree.  Many overdoses
15 do not cause seizure-like activity.
16       The other concern that I have is
17 that many laypersons will interpret myoclonic
18 jerks as seizure activity when it is not.  So,
19 yes, patients can have muscle twitching and
20 jerking due to oxygen deprivation.  That is
21 not always the same thing as seizure activity.
22 Seizure activity can occur in an overdose.  I
23 wouldn't say that it commonly occurs during

Page 162

1  the end of an overdose.
2       Actually, can I actually also go
3  back to the previous statement?  I just want
4  to say that the gag reflex and the breathing
5  are not necessarily synonymously tied together
6  with overdose.  I mean, we know -- I'm sorry,
7  with opioid exposure.  We know that opioid
8  exposure can cause loss of the gag reflex as
9  well as cessation of breathing, but they don't
10 necessarily mirror each other as far as I'm
11 aware.
12   Q.  When you say "they don't
13 necessarily mirror each other," what do you
14 mean by that?
15   A.  One doesn't necessarily follow the
16 other in a specific pattern.
17   Q.  Are you saying that one doesn't
18 necessarily occur first, or are you saying
19 that one or both of them doesn't always take
20 place?  I'm a little confused.
21   A.  I'm a little confused, too.  I
22 guess I'm saying that I am not aware of any
23 known relationship between opioid overdoses

Page 163

1  and both the suppression of gag reflex and
2  cessation of breathing.  So we know it can
3  happen, but I cannot say definitively that
4  they both happen at the same time.
5    Q.  And your inability to say
6  definitively that they both happen at the same
7  time would include that you can't say
8  definitively when -- if -- you can't say
9  definitively when Mr. Lurry's gag reflex would
10 have been suppressed from his consumption of
11 the Fentanyl?
12   A.  I think I can state within a
13 reasonable degree of medical certainty that at
14 the time that he had the significantly
15 depressed level of consciousness that his gag
16 reflex was depressed at that time.  I think
17 that is something that I could say.  But I
18 can't say that once the gag reflex is
19 suppressed that it will also mean that your
20 breathing is stopped.
21   Q.  Do you recall what the level of
22 Fentanyl in Mr. Lurry's blood was determined
23 to be by the NMS Labs report?

Page 164

1    A.  It was in the 30's.  I'm going to
2  look at my report to reference.
3    Q.  I direct your attention to page
4  four, full paragraph.
5    A.  Page four.  So it was 32 nanograms
6  per ML.
7    Q.  And that is certainly a fatal dose
8  of Fentanyl, correct?
9    A.  It's not a fatal dose.  It's a
10 fatal concentration of Fentanyl in the blood.
11 We don't know what the actual dose was.
12   Q.  You are right on that one.  So,
13 yes, thank you for the correction.
14       Dr. Humilier testified on page 121
15 that any levels of Fentanyl in the blood above
16 10 nanograms per milliliter are almost certain
17 to be fatal.  Would you agree with that
18 statement or disagree with that statement?
19   A.  I have not reached page 121 yet.
20 Please give me a second.  (Witness looking at
21 document.)
22       So in my experience, that is true;
23 however, we do need to keep in mind that

Page 165

1 different individuals may have a different
2 tolerance to the effects of a drug. And some
3 individuals who chronically use high levels of
4 or high doses of Fentanyl may be more tolerant
5 to a dose than others. So because of that, I
6 think it is impossible to say that this is
7 always true, but certainly the vast majority
8 of the time it would be true.
9 Q. And do you have any knowledge or
10 information as to how much, if at all,
11 Mr. Lurry had consumed opiates prior to
12 January 28, 2020?
13 A. You mean in the days preceding or
14 the years preceding the overdose?
15 Q. Yes, that's what I'm getting at.
16 You were talking about tolerance in people who
17 chronically overuse opiates. And my question
18 is, do you know whether or not Mr. Lurry had
19 ever abused opiates prior to January 28, 2020?
20 A. So definitively, no. The only
21 thing that I can say is that one or more of
22 the police officers testified that Mr. Lurry
23 was known to, I believe, sell cocaine, but I

Page 166

1 believe that they did not know him to be a
2 user of any drugs.
3 So my inference was that he was
4 naive to the effects of Fentanyl at the time
5 of the overdose, but I have not reviewed any
6 of his previous medical records or
7 hospitalizations or anything like that to know
8 any greater detail about his potential level
9 of tolerance.
10 Q. In terms of what you've seen, you
11 certainly haven't seen any documents or
12 testimony that would suggest that Mr. Lurry
13 had abused opiates prior to January 28th,
14 2020, correct?
15 A. That is correct.
16 Q. What would -- as a toxicologist,
17 medical toxicologist, I should say to be more
18 precise, what would you say is the minimum
19 fatal concentration of Fentanyl in someone's
20 blood measured in terms of nanograms per
21 milliliter?
22 A. I would agree with Dr. Humilier.
23 The current published literature that is

Page 167

1 available suggests that fatal levels of
2 Fentanyl range from three to whatever he said,
3 like 28 I think he said, nanograms per ML. I
4 don't disagree with his assessment there.
5 Q. I'm now -- the last document I'm
6 going to show you -- we're almost done, but
7 I'm going to owe you for another hour.
8 A. I think I should say one more
9 thing. I'm so sorry. I'm so sorry. I do
10 need to qualify that by saying that that would
11 be a case of fatal Fentanyl exposure to only
12 Fentanyl. If other drugs were present, such
13 as morphine, heroin, any other opioids, the
14 additive effect could cause death at a lower
15 Fentanyl concentration. So that range of 3 to
16 28 nanograms per ML is only for a full
17 intoxication of Fentanyl, not a multidrug
18 intoxication.
19 Q. And Mr. Lurry, we know from the NMS
20 Labs report, did have a multidrug
21 intoxication?
22 A. That is correct.
23 Q. Now, as I said, we don't know when

Page 168

1 he consumed the heroin, but we can infer from
2 the NMS Labs report he had, in fact, consumed
3 heroin?
4 A. No. He had --
5 Q. Why would you say no?
6 A. We don't know that he consumed it.
7 Yes, he could have injected it, he could have
8 snorted it. We don't know that he consumed
9 heroin. We don't know the route of exposure
10 to heroin or cocaine in this case.
11 Q. Well, I'll use a different word. I
12 guess I used the wrong word. We know from the
13 NMS Labs report that Mr. Lurry had been
14 exposed to heroin?
15 A. Yes.
16 Q. And we also know from the NMS Labs
17 report that Mr. Lurry had been exposed to
18 cocaine?
19 A. That is correct.
20 Q. And you're saying that the exposure
21 to these additional illicit drugs in effect
22 may lower the levels of Fentanyl necessary for
23 someone to have a fatal amount of Fentanyl in

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 169

1    their blood?
2        A.   That depends.
3        Q.   Why or how does it depend?
4        A.   Because we don't know when he was
5    exposed to the cocaine and heroin.  So those
6    metabolites can be detectable in the absence
7    of any signs or symptoms of intoxication.  You
8    know, heavy cocaine users, for example, can
9    have detectable levels of benzoylecgonine for
10   weeks after the last use of the drug.  So I'm
11   not able to say when he used the drugs, and
12   because of that I'm not able to say that those
13   drugs definitively had any relationship with
14   his Fentanyl overdose on January 28th of 2020.
15   He could have used them the day before.  I
16   don't know.
17       Q.   The last document I'm going to show
18   you, which will be marked later for the court
19   reporter as Exhibit No. 10, is the Joliet Fire
20   Department Patient Care Report, and the Bates
21   stamps are JOLIET119 through 135.
22   (Exhibit 10 marked for identification.)
23   BY MR. MATHUES:

Page 170

1        Q.   And as before, we talked about you
2    reviewed the fire department's patient care
3    report as part of coming to your opinions in
4    this case, correct?
5        A.   Yes.
6        Q.   And how, if at all, did the
7    information contained in Exhibit -- what will
8    be marked as Exhibit 10, the fire department
9    report, assist you in coming to your opinions
10   in this case?
11       A.   I'm not really sure how to answer
12   this.  I guess it just substantiated the
13   opinions that I had formed.  It helped me form
14   my opinions.
15       Q.   As you reviewed the JFD's Patient
16   Care Report, in particular the care rendered
17   to Mr. Lurry and Mr. Lurry's vital signs, did
18   any particular vital sign or active care
19   strike you as particularly important?
20       A.   So I think everything is
21   potentially important here.  So it was helpful
22   to have the initial vital signs, right, which
23   were essentially absent.  It was helpful to

Page 171

1    have an initial GCS.  This was the first time
2    at 4:25 p.m. that any actual assessment had
3    been done of Mr. Lurry once he had a depressed
4    level of consciousness.  I think this report
5    was helpful.
6    (Whereupon there was an audiovisual
7    interruption.)
8        THE WITNESS: I was telling him
9    that his camera is frozen on my end.  I can
10   still hear you okay, but you've been frozen
11   for a while.
12   (An off the record discussion was held.)
13       THE WITNESS: So if you just
14   articulate to me the question very clearly,
15   then I will answer it, but I can't see you.
16   BY MR. MATHUES:
17       Q.   Well, we've already proven that
18   sometimes my question asking skills are a
19   little bit lacking, but I'll do my best.
20       I'm going to direct your
21   attention -- do you have in front of you or
22   are you able to access the Joliet Fire
23   Department's Patient Care Report for

Page 172

1    Mr. Lurry?
2        A.   Yes.
3        Q.   I could try to put it up on the
4    screen.
5        A.   No, please don't.  I have that
6    document up.
7        Q.   I'm going to direct your attention
8    to the bottom part of the page that has the
9    Bates stamp, that's the little number in the
10   bottom, JOLIET -- and the number JOLIET121.
11       A.   I'm there.
12       Q.   And there's a section under Trauma,
13   and then it says "Vital Signs," correct?
14       A.   Yes.
15       Q.   And it's 16:25 on 1/28/20, and
16   that's what you were referring to earlier of
17   the first documentation we have for
18   Mr. Lurry's vital signs; is that accurate?
19       A.   Yes.
20       Q.   And you referenced earlier that
21   GCS, the Glasgow Coma Score, and that's 3,
22   correct?
23       A.   Yes, that's correct.  That's as low

Page 173

1  as you can go.
2      Q.  His oxygen levels are 76 percent;
3  is that accurate?
4      A.  Yes.  Well, it's accurate in terms
5  of that's what was documented, yes.
6      Q.  And then I'm going to ask you a few
7  questions about what is documented here.  But
8  before we do that, sitting here this
9  afternoon, do you have any reason to dispute
10 the accuracy of Mr. Lurry's vital signs as
11 documented by the Joliet Fire Department
12 paramedics/EMT's?
13     A.  I don't exactly know what the
14 oxygen saturation means, because that can be
15 inaccurate -- or that cannot be what we think
16 it means in cases of cardiac arrest, just
17 because of how the pulse oximeter devise
18 works.
19     Q.  When you say it "cannot be what we
20 think it means," I'm --
21     A.  I'm sorry.  So normally the pulse
22 oximeter is a device that goes on your finger
23 and it measures your oxygen absorption as two

Page 174

1  different UV wavelengths, and it turns that
2  into a percentage based on some numerical
3  calculation.
4      Normally in people who are awake
5  and breathing, you have a pulse, an oxygen
6  level and an oxygen saturation of 76 means an
7  oxygen saturation of 76.  But in somebody who
8  does not have a pulse, the pulse oximeter can
9  be inaccurate, just because you don't really
10 have any blood circulating in your body, so it
11 doesn't always measure the saturation as
12 accurately as we want it to.
13     So I don't know that it changes
14 anything here, but I just wanted to put that
15 out there.  So he definitely has an abnormal
16 oxygen saturation, but that's as far as I can
17 go with that.
18     I guess I should say, you know, I
19 don't dispute the vitals here.  I'm fine with
20 them.
21     Q.  And in terms of the other vitals,
22 if we go down a little bit more, what was
23 Mr. Lurry's initial cardiac rhythm according

Page 175

1  to the firefighter paramedic?  I would direct
2  your attention to the second line of writing
3  of -- that's under the section for Mr. Lurry's
4  vital signs at 16:25.
5      A.  Sorry, I was on the wrong page.
6      Q.  We're still on JOLIET121.
7      Am I unfrozen yet?  I can try and
8  show it to you.
9      A.  No, you're frozen.  Just let me
10 know what page.  So JOLIET121 and --
11     Q.  I'd like to direct your attention
12 towards the bottom with the section for
13 Mr. Lurry's vital signs.  At 16:25 you see
14 where Mr. Lurry's initial cardiac rhythm is
15 documented to be the ventricular tachycardia,
16 pulseless?
17     A.  I see that somewhere else in this
18 document, but I don't see it on this.  Oh, no,
19 I see it.  No, I'm sorry.  I'm sorry.  I see
20 it.
21     Q.  So the initial cardiac rhythm for
22 Mr. Lurry when he was hooked up to -- initial
23 cardiac rhythm for Mr. Lurry as determined by

Page 176

1  the firefighter paramedic was he was in
2  ventricular tachycardia without a pulse; is
3  that correct?
4      A.  That's correct.
5      Q.  And as an emergency room doctor,
6  you know what ventricular tachycardia is,
7  correct?
8      A.  Yes.
9      Q.  And you've no doubt unfortunately
10 encountered it many times, correct?
11     A.  Yes.
12     Q.  And can you just in a sentence or
13 two -- in layman's terms, what is ventricular
14 tachycardia?
15     A.  It's an unstable cardiac rhythm
16 when it's pulseless.
17     Q.  And is ventricular tachycardia a
18 type of ventricular arrythmia?
19     A.  Yes.
20     Q.  And I'll -- do you see in the next
21 section, still here on JOLIET121, the next
22 section for Mr. Lurry's vital signs as they
23 were taken at 16:30, meaning five minutes

Page 177

1    after they were initially taken?
2      A.  Yes.
3      Q.  And Mr. Lurry's oxygen saturation
4    rate is now documented as having gone up to
5    92 percent?
6      A.  Yes, that is correct.
7      Q.  His Glasgow Coma Score is still a
8    3, correct?
9      A.  Yes.
10     Q.  And his cardiac rhythm is asystole,
11   correct?
12     A.  Yes.
13     Q.  Now, once again, as an emergency
14   room doctor, you know what asystole is and
15   encountered it many times, correct?
16     A.  Yes.
17     Q.  And in a sentence or two in
18   layman's terms, what is asystole?
19     A.  It's the absent cardiac rhythm
20   basically.  It's a flat line, more or less, in
21   layman's terms.
22     Q.  When it came to forming your
23   opinions about Mr. Lurry, did you draw any

Page 178

1    conclusions from the fact that Mr. Lurry's
2    initial cardiac rhythm was ventricular
3    tachycardia?
4      A.  No.
5      Q.  When it came to forming your
6    opinions about Mr. Lurry, did you draw any
7    conclusions from the fact that Mr. Lurry's
8    next cardiac rhythm five minutes after the
9    first was asystole?
10     A.  No.  I mean, I guess I can say
11   that, yes, this information did help me in
12   forming opinions, but it wasn't significant,
13   because at this point we already knew that he
14   was in grave distress.
15     Q.  I'm going to direct your attention
16   a couple of pages down to the narrative
17   section, and that is on JOLIET125.
18     A.  I see it.
19     Q.  And towards the third line down
20   going into the fourth, the narrative reads,
21   "Crew applies cardiac monitor showing v-tach
22   crew prepares to defibrillate but when
23   charging shock, crew notices the patient goes

Page 179

1    into asystole."  Did I read that accurately?
2      A.  Yes.
3      Q.  And when the paramedics -- per the
4    narrative, it indicates that when the
5    paramedics attempted to apply electrical
6    current or shock to Mr. Lurry's heart, the
7    ventricular tachycardia he was in turns into
8    asystole, correct?
9      A.  Yes.
10     Q.  And when it came to forming your
11   conclusions about Mr. Lurry, did you place any
12   significance or draw any conclusions from the
13   fact that when the paramedics applied
14   electricity or shock to Mr. Lurry's heart his
15   rhythm changed from ventricular tachycardia to
16   asystole?
17     A.  Well, I don't believe they actually
18   defibrillated, I think he went into asystole
19   before they had a chance to defibrillate him,
20   but that change in rhythm occurred while they
21   were charging.
22     Q.  I will accept -- I will make a
23   correction and rephrasing with your

Page 180

1    correction.
2          When it came to forming your
3    opinions about Mr. Lurry, did you place any
4    significance on or draw any conclusions about
5    the fact that Mr. Lurry's heart rhythm changed
6    from ventricular tachycardia to asystole while
7    the paramedics were preparing to deliver
8    shock?
9      A.  Not really.  I mean, pulseless
10   v-tach and asystole are both very unstable and
11   bad cardiac rhythms that have a very poor
12   prognosis.  So really this information just
13   confirmed to me that by the time that EMS got
14   there that he was critically ill and in a
15   very, very grave state of health.
16     Q.  I had asked you about ventricular
17   tachycardia and asystole.  In terms of cardiac
18   rhythms, are you also familiar with PEA or
19   pulseless electrical activity in the heart?
20     A.  Yes.
21     Q.  And, once again, as a practicing ER
22   doctor, you have encountered people with PEA,
23   or pulseless electrical activity, numerous

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 181

1 times, correct?
2     A.  Yes.
3     Q.  And pulseless electrical activity
4 for the heart is a different rhythm or
5 different status than ventricular tachycardia?
6     A.  Yes.
7     Q.  And in pulseless electrical
8 activity for the heart also a different
9 condition or status from asystole, correct?
10     A.  That's correct.
11     Q.  So per the documentation and vital
12 signs recorded on the Joliet Fire Department
13 Patient Care Report, did Mr. Lurry ever show
14 pulseless electrical activity for his heart?
15     A.  I don't believe so, no.
16     Q.  I don't think so either.  I'm not
17 trying to trick you.  Let's look at -- and I'm
18 almost done.  Let's go through the signs
19 together and confirm that, in fact, he did not
20 show pulseless electrical activity.
21         So on page 121, we've got the vital
22 signs at 16:25, and his cardiac rhythm is
23 ventricular tachycardia, correct?

Page 182

1     A.  That is correct.
2     Q.  And then at 16:30, still on
3 JOLIET121, his cardiac rhythm is asystole,
4 correct?
5     A.  Yes.
6     Q.  Then turning the page over to
7 JOLIET122, we have an indication of vital
8 signs at 16:35, correct?
9     A.  Yes.  And he's in asystole.
10     Q.  And then we have 16:40, and he
11 is -- and what is his cardiac condition?
12     A.  He's still in asystole.
13     Q.  And then we have another -- a
14 second set of readings for 16:40, correct?
15     A.  Still in asystole.
16     Q.  And that is the end of the
17 documentation on what I will be marking as
18 Exhibit No. 10, the Joliet Fire Department
19 Patient Care Report for Mr. Lurry's cardiac
20 status, correct?
21     A.  Yes.
22     Q.  Doctor, in your career as an ER
23 doctor, have you ever even heard of the

Page 183

1 technique of pinching a person's nose in order
2 to get that person to open their mouth?
3     A.  Never.
4     Q.  If you were in a situation where
5 you wanted -- a patient was unwilling to open
6 their mouth and you wanted to get the patient
7 to open his or her mouth, what would you do?
8     A.  Talk to them.
9     Q.  Let's say you talk to them and your
10 talk is unsuccessful.  You're treating a
11 patient in the ER, you want the person to open
12 his or her mouth, they won't do it.  You talk
13 to them, they still won't do it.  What are
14 your options at that point?
15     A.  I suppose it would depend on the
16 patient's condition.  If the patient is
17 unresponsive, I would consider intubation.
18     Q.  And intubation, that would include
19 the administering of some sort of anesthetic,
20 correct?
21     A.  Yes.
22     Q.  And if the patient is conscious or
23 is responsive and he or she is not willing to

Page 184

1 open their mouth when you ask them to and
2 they're still not when you keep asking, what
3 are your options at that point?
4     A.  It would depend on the cause of why
5 they can't open their mouth.
6     Q.  What do you mean by that?
7     A.  So in some cases somebody might
8 have a medication reaction, for example, that
9 leaves them unable to open their mouth.  In
10 some cases maybe they just weren't willing to
11 open it, and I would talk with them.  And I
12 don't know that I've ever had a patient who is
13 not willing to open their mouth once we talked
14 with them about it.  If somebody is having
15 masticatory spasm, for example, from a
16 medication reaction or something of that
17 nature, then we would treat that accordingly.
18     Q.  If you did have a situation arise
19 where all of your persuasive words are
20 unsuccessful and you need a person to open
21 their mouth and you believe they're simply
22 refusing to do it, what are your options as a
23 medical professional?

Page 185

1  A. I don't know that I've encountered
2 that situation before. There's not many
3 situations in which somebody has a medical
4 reason to need to open their mouth.
5  Q. If you did encounter the situation
6 of that nature, can you say what you would do?
7  A. No, because it would really depend
8 on the patient and their previous medical
9 history and the events surrounding their
10 presence in the emergency department. Every
11 patient is different, so I can't really tell
12 you what I would do without a specific
13 clinical scenario and a lot more information.
14  Q. If you had a person in the ER who
15 you believe is concealing or has illicit drugs
16 in their mouth that's posing medical risk to
17 that person and you ask them to open his or
18 her mouth, he or she refused to do it. You
19 continue to try to persuade and talk to them
20 because you believe that they have illicit
21 drugs in their mouth, you want to get them
22 out, the person still refuses to do it, what
23 would -- can you say what you would do in that

Page 186

1 situation?
2  A. You know, I've been in that
3 situation, and people open their mouths. If
4 someone doesn't open their mouth and they're
5 not responsive, then that requires additional
6 medical treatment. But generally people that
7 come into the ED with something concealed in
8 their mouth, once you talk with them and
9 explain to them the ramifications of having
10 that potentially poisonous substance get into
11 their body, they will open their mouth.
12  Q. Can you say what you would do if
13 you encountered the situation where someone
14 comes into the ER or is brought to the ER, you
15 believe they have illicit drugs in their
16 mouth, you tell them this substance in your
17 mouth it's dangerous, it's poisonous, if you
18 ingest it, it could cause harm or death,
19 please open your mouth, they won't do it, can
20 you say what you would do at that point?
21  A. I've never had a patient refuse to
22 open their mouth once we've had that
23 discussion.

Page 187

1  Q. So are you saying that since you've
2 never encountered that situation before,
3 you're not sure what you would do?
4  A. So, I mean, there's many things
5 that you can do. So you could observe the
6 patient. If the patient swallows the drugs,
7 which you would be able to see, then you could
8 treat them medically with medications to get
9 the drugs out of their system. So you can
10 place a tube from their nose into their
11 stomach and put GoLYTELY, which is more or
12 less colonoscopy prep, through that tube to
13 flush out the drugs once it's in the stomach.
14 You could also watch the patient for an hour
15 or so, or however long that you wanted, to see
16 if there were any signs. But you would
17 preferably try to get the drug out of the
18 system as fast as possible.
19  But, again, this is not something
20 that I have encountered. I've always been
21 able to get patients to open their mouths.
22  MR. MATHUES: Doctor, that's all I
23 have for you. I'm done. I don't know if I'm

Page 188

1 still frozen or not.
2  THE WITNESS: You're still frozen.
3  MR. MATHUES: Before Ms. Bakos
4 starts, if she wants to ask any questions,
5 which, of course, she can, can we take just a
6 short break to use the restroom?
7  MS. BAKOS: Yeah. Can we do like
8 seven minutes? Do you mind? I know that's
9 kind of specific.
10  MR. MATHUES: No, I don't mind. In
11 fact, what I'm going to do --
12 (An off the record discussion was held.)
13 (A brief recess was held.)
14  MS. BAKOS: Back on the record.
15 CROSS-EXAMINATION BY MS. BAKOS:
16  Q. Mr. Mathues asked you a series of
17 questions related to your opinion that
18 Mr. Lurry would've survived if he had been
19 provided medical attention sooner; do you
20 recall that?
21  A. Yes. But when you were speaking,
22 you're kind of going in and out.
23  Q. I know. It's my computer. Can you

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 189

1  hear me okay?
2      A.  Now I can, but when you turn your
3  head, I can't.
4      Q.  Yeah, my computer does that.
5          Do you recall that line of
6  questioning?
7      A.  Yes.
8      Q.  And would it be fair to say that
9  the reason why you believed Mr. Lurry would
10 have survived is because he would have been
11 ventilated pretty quickly after receiving --
12 or after the paramedics or hospital staff had
13 begun rendering treatment to him; is that
14 true?
15     A.  At which time, when he was in the
16 police car or when he was at the police
17 station?
18     Q.  Well, at any point that the
19 paramedics would have gotten to Mr. Lurry,
20 would you agree with me that ventilation would
21 have been a treatment option for him?
22     A.  I think he was ventilated fine
23 initially when he was initially in the police

Page 190

1  car.  I think when he started to have
2  inadequate ventilations and a depressed level
3  of consciousness around the time that they
4  arrived at the police station, yes, I think
5  that adequate ventilation would have been
6  extremely beneficial for him.
7      Q.  And why would adequate ventilation
8  be important?
9      A.  Opioids decrease the respiratory
10 rate, and so patients are not able to
11 ventilate adequately.  They're not able to
12 breathe normally.
13     Q.  Okay.  Is that --
14     A.  I'm sorry, they're not able to
15 breathe normally.
16     Q.  And is that -- for lack of better
17 words, is that the way that individuals die
18 from opioid overdose, is it because they are
19 unable to breathe?
20     A.  That is part of it, yes.  So that
21 results in oxygen deprivation.
22     Q.  And if -- when Mr. Lurry's nose was
23 plugged, would that have furthered his

Page 191

1  inability to breathe?
2      A.  In my opinion, yes.
3      Q.  And would that have furthered his
4  risk of death?
5      A.  Yes.
6      Q.  Do you know at what point in time
7  the blood that was tested by the lab was taken
8  from Mr. Lurry?
9      A.  I can pull up the documents and let
10 you know, if you just give me a minute.  The
11 collection time is listed on the NMS document
12 as 17:56, so 5:56 p.m.
13     Q.  Okay.
14     A.  On January 28th.
15     Q.  So at 5:56 p.m., that was after
16 Mr. Lurry was already at the hospital; is that
17 correct?
18     A.  That's correct.
19     Q.  So would it be fair to say that at
20 the time that the blood was drawn that was
21 ultimately tested by the lab was
22 approximately two hours after Mr. Lurry had
23 initially been suspected of ingesting

Page 192

1  narcotics?
2      A.  Approximately, yes.
3      Q.  So it would be fair to say that
4  it's more likely than not that Mr. Lurry's --
5  the concentration of Fentanyl in Mr. Lurry's
6  blood was significantly less within five
7  minutes of him ingesting the narcotics?
8          MR. MATHUES: Objection to the
9  extent it calls for a previously undisclosed
10 opinion.
11         THE WITNESS: I don't know if I can
12 answer that.
13 BY MS. BAKOS:
14     Q.  Okay.  Do you know whether
15 Mr. Lurry's -- the concentration of Fentanyl
16 in his blood was the same at 5:56 p.m. on the
17 28th than it was at 4:56 p.m.?
18     A.  I cannot answer that.
19     Q.  What about at 3:56 p.m.?
20     A.  I don't have any measurements of
21 concentrations at those times, so I can't tell
22 you what his concentration of Fentanyl in his
23 blood was at that time.

Page 193

1     Q.  But we do know that he did not lose
2  consciousness until sometime after Officer May
3  had plugged his nose; would you agree with
4  that based on your viewing of the video?
5     A.  I believe so.  Again, it's so hard
6  to tell from the video, but it was somewhere
7  around that time.  I cannot give you an exact
8  time to the second and the minute.
9        MS. BAKOS:  Okay.  I don't think I
10  have anything else.
11        Do you have anything else, David?
12        MR. MATHUES:  Nothing based on
13  that.
14        FURTHER DEPONENT SAYETH NOT;
15        BY AGREEMENT SIGNATURE RESERVED.
16
17
18
19
20
21
22
23

Page 194

1  STATE OF ILLINOIS      )
2                         ) SS
3  COUNTY OF PEORIA       )
4       C E R T I F I C A T E
5     I, Cindy M. Scribner, CSR-RPR, License
6  #084-004465, a Notary Public duly commissioned
7  and qualified in and for the County of Peoria
8  and State of Illinois, DO HEREBY CERTIFY that,
9  pursuant to notice, there came before me on
10  the 26th day of April, A.D., 2022, at 4063
11  Ridgeview Circle, McLean, Virginia, the
12  following named person, to wit:
13        KELLY JOHNSON-ARBOR,
14  called by the defendants who was by me first
15  duly sworn to testify to the truth and nothing
16  but the truth of her knowledge touching and
17  concerning the matters in controversy in this
18  cause and that she was thereupon carefully
19  examined upon her oath, and her examination
20  immediately reduced to shorthand by means of
21  stenotype by me.
22     I ALSO CERTIFY that the deposition is a true
23  record of the testimony given by the witness,

Page 195

1  that the reading and signing of the deposition
2  by the said witness were expressly reserved,
3  and that the necessity of calling the court
4  reporter at time of trial for the purpose of
5  authenticating said transcript was waived.
6     I FURTHER CERTIFY that I am neither attorney
7  or counsel for, nor related to or employed by,
8  any of the parties to the action in which this
9  deposition is taken, and, further, that I am
10  not a relative or employee of any attorney or
11  counsel employed by the parties hereto, or
12  financially interested in the action.
13     IN WITNESS WHEREOF, I have hereunto set my
14  hand at Peoria, Illinois, this 19th day of
15  May, A.D., 2022.
16
17
18                CSR-RPR
19
20
21
22
23

Page 196

1  STATE OF ILLINOIS        )
2                           )
3  COUNTY OF PEORIA         )
4
5     I, Dr. Kelly Johnson-Arbor, do hereby
6  certify that I have read the foregoing
7  transcript, consisting of pages numbered 1
8  through 197, inclusive, and that the same is
9  true and correct, except as may be noted on
10  the attached sheet(s).
11     Dated at _____, Virginia, this _____ day
12  of _____, 2022.
13
14
15
16  _____
17
18
19
20
21
22
23

Nicole Lurry vs
City of Joliet

Kelly Johnson-Arbor
April 26, 2022

Page 197

```
 1        STATEMENT OF CORRECTION
 2   Page and Line Number:_____
 3   Reason:_____
 4   Page and Line Number:_____
 5   Reason:_____
 6   Page and Line Number:_____
 7   Reason:_____
 8   Page and Line Number:_____
 9   Reason:_____
10   Page and Line Number:_____
11   Reason:_____
12   Page and Line Number:_____
13   Reason:_____
14   Page and Line Number:_____
15   Reason:_____
16   Page and Line Number:_____
17   Reason:_____
18   Page and Line Number:_____
19   Reason:_____
20   Page and Line Number:_____
21   Reason:_____
22   Page and Line Number:_____
23   Reason:_____
```