# In The Matter Of:

*Nicole Lurry vs*
*City of Joliet*

---

*Judy Melinek, M.D.*
*April 29, 2022*

---

*ADVANTAGE REPORTING SERVICE*
*110 S.W. JEFFERSON AVE., SUITE 430*
*PEORIA, IL    61602*
*PHONE: 309-673-1881   FAX: 309-673-0341*
*reportingservice@att.net*

Original File 4-29-22, Judy Melinek.txt
Min-U-Script® with Word Index

Ex. 17

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   NICOLE LURRY, as Special    )
     Administrator of The Estate )
 4   of Eric Lurry, Jr.,         )
     deceased,                   )
 5                               )
                 Plaintiff,      )
 6                               )
           -vs-                  ) Case No:  20-CV-4545
 7                               )
     CITY OF JOLIET, JOLIET      )
 8   POLICE OFFICERS MAY (Star   )
     #056), MCCUE (Star #118),   )
 9   TELLEZ (Star #311) and LT.  )
     HARRISON (Star #039),       )
10                               )
                 Defendants.     )
11   _____)

12

13   DEPOSITION OF:      JUDY MELINEK, M.D.

14   DATE:               April 29, 2022

15   TIME:               2:30 p.m. to 6:58 p.m.

16   WITNESS LOCATION:   Wellington, New Zealand

17   TAKEN BY:           Defendants

18   REPORTER:           Deborah A. Krotz, RMR, RDR, CRR
                         CSR No. 0084-001848
19

20

21

22

23

24
```

Page 2

```
 1                  STIPULATION

 2                  -----------

 3        IT IS HEREBY EXPRESSLY STIPULATED AND agreed

 4   by and between the parties that the deposition of

 5   JUDY MELINEK, M.D., may be taken by Zoom

 6   videoconferencing on the 29th day of April, 2022,

 7   before Debbie A. Krotz, pursuant to the Rules of the

 8   Supreme Court and the Rules of Civil Procedure

 9   governing said depositions.

10        It is further stipulated that the

11   signature of the witness is not waived.

12        It is further stipulated that the necessity

13   for calling the Court Reporter for impeachment

14   purposes is waived.

15

16

17

18

19

20

21

22

23

24
```

Page 3

```
 1   APPEARANCES:

 2   For the Plaintiff:   ABBY D. BAKOS, ESQ.
                          RONAK MAISURIA, ESQ.
 3                        Bakos & Maisuria
                          1 East Erie Street
 4                        Suite 525-4686
                          Chicago, IL 60611
 5                        E-mail:  abby@bakosmaisuria.com

 6   For the Defendants:  G. DAVID MATHUES, ESQ.
                          Hervas, Condon & Bersani, P.C.
 7                        333 W. Pierce Road, Suite 195
                          Itasca, IL 60143-3156
 8                        E-mail: dmathues@hcbattorneys.com

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

4

I N D E X

| WITNESS: | PAGE: |
|---|---|
| JUDY MELINEK, M.D. | |
| DIRECT EXAMINATION<br>BY MR. MATHUES: | 6 |
| CROSS EXAMINATION<br>BY MS. BAKOS: | 176 |
| RE-DIRECT EXAMINATION<br>BY MR. MATHUES: | 178 |
| RE-CROSS EXAMINATION<br>BY MS. BAKOS: | 180 |

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE: |
|---|---|---|
| Exhibit No. 1 | 22-page Report of Dr. Melinek | 9 |
| Exhibit No. 2 | 10-page Curriculum Vitae of Judy Melinek, M.D. | 11 |
| Exhibit No. 3 | two-page Dr. Judy Melinek Four-Year Testimony List February 2018 - February 2022 | 12 |
| Exhibit No. 4 | one-page Invoice 2668 | 18 |
| Exhibit No. 5 | one-page Twitter account home page of Dr. Judy Melinek | 21 |
| Exhibit No. 6 | 11-page Coroner's Report by Dr. Humilier | 39 |
| Exhibit No. 9 | condensed PDF transcript of the Deposition of Dr. Michel Humilier | 56 |

(Continued)

| | | 5 |
| Exhibit No. 10 | six-page ME Independence Position Paper | 56 |
| Exhibit No. 8 | four-page Journal of Forensic Science article "Asphyxial Deaths and Petechiae: A Review | 116 |
| Plaintiff's Exhibit No. 11 | 17-page Patient Care Report and Incident Report, etc., from the Joliet Fire Department | 145 |
| Plaintiff's Exhibit No. 12 | composite of seven slides entitled Image 2017 - Image 2023 | 153 |
| Plaintiff's Exhibit No. 12.1 | Image 2019 with circled area | 159 |

Page 7

1    Suffice it to say is there any reason that
2  you couldn't give truthful and accurate testimony
3  I'll say during this deposition, since I think
4  "today" may be inaccurate, given your location in
5  New Zealand?
6    A.  Well, even for today for me during this
7  deposition there's nothing to hold me back from
8  being truthful.
9    Q.  And if I ask you a question that you do
10  not understand, will you let me know?
11    A.  Absolutely.
12    Q.  Are you physically located in the country
13  of New Zealand as we're doing this deposition?
14    A.  Yes, I am.
15    Q.  What's the nearest city or in what city
16  are you physically located?
17    A.  I am in Wellington, which is the capital.
18    Q.  Is there anyone else physically
19  present in the room with you?
20    A.  My dog, Winston, is at my feet.  Does that
21  count?
22    Q.  Any other human physically present in the
23  room with you?
24    A.  Currently, no.  My husband and daughter --

Page 6

1  THEREUPON,
2         JUDY MELINEK, M.D.,
3  a witness, having been first duly sworn upon her
4  oath, commencing at 1:33 p.m., testified as follows:
5         DIRECT EXAMINATION
6  BY MR. MATHUES:
7    Q.  This is the deposition of Dr. Judy Melinek
8  that's taken in the case of Lurry versus City of
9  Joliet, et al., currently pending before Judge
10  Virginia Kendall in the U.S. District Court for the
11  Northern District of Illinois.
12         My name is David Mathues.  I'm appearing
13  on behalf of Defendants.
14         Ms. Bakos is here on behalf of the
15  Plaintiff, as is Ms. Maisuria, and Ms. Maisuria is
16  present, as well.
17         Dr. Melinek, is it fair to say that in
18  addition to a world-renowned appearance on
19  Mythbusters, you've also had your deposition taken
20  dozens, if not hundreds, of times?
21    A.  Not quite hundreds, but, yes.  Scores.
22  We'll go with scores.  But, yes.
23    Q.  We will go with scores, and we will skip
24  most of the preliminary instructions.

Page 8

1  I'm in my home office, so my husband and daughter
2  are in the house and asleep.  So if there's any kind
3  of disruption, they'll be in hallway, and I've got
4  the door closed, so we should be okay.
5    Q.  Very good.  And you have been retained by
6  the Plaintiff in this lawsuit; correct?
7    A.  That is correct.
8    Q.  And for what purpose were you retained?
9    A.  I was retained in order to review the
10  forensic pathology medical information, the
11  circumstances of death, cause of death, and offer an
12  opinion on cause, manner, and mechanism of death.
13    Q.  And prior to the Lurry case, had you ever
14  worked with Ms. Bakos or Ms. Maisuria before?
15    A.  I think I have.
16    Q.  Do you remember when or the name of the
17  case where you worked with Ms. Bakos or Ms.
18  Maisuria?
19    A.  I didn't recall it myself.  I believe
20  Catherine had it attached in the discovery at some
21  point.  I looked at it this morning.  You asked me
22  now, and I don't even remember it.  Let me look it
23  up.  It was in the production.
24         Lurry -- List of Cases Over Past 10 Years

Nicole Lurry vs
City of Joliet

Judy Melinek, M.D.
April 29, 2022

---

Page 9

1   Which Dr. Melinek Was Retained by Plaintiff's
2   Counsel Or Firm.  So there's two there:  So Raula
3   (phonetic) v. DuPage County and Curry v. Burns.
4       Q.    And when you say "Plaintiff's firm," that
5   would include cases when you were retained by
6   Oppenheimer & Erickson, which would be the firm that
7   Ms. Bakos and Ms. Maisuria formerly worked at?
8       A.    I believe so.  So I don't believe it's --
9   Nothing with this firm.  It's with the previous.
10      Q.    Understood.  I'm going to put up on screen
11  and also mark for purposes of the record as Exhibit
12  No. 1 ...
13          (Exhibit No. 1, 22-page Report of Dr.
14          Melinek, was marked for identification.)
15  BY MR. MATHUES:
16      Q.    Dr. Melinek, do you recognize the first
17  page of the document that's in front of you as
18  Exhibit No. 1?
19      A.    I recognize that.  That is my report for
20  this case.
21      Q.    And do you have a copy in front of you,
22  either a hard copy or an electronic copy on a screen
23  in front of you?
24      A.    It's downloading, but, yes, I do have

Page 10

1   access to it and I can pull it up.
2       Q.    Even though I'm going to share this on my
3   screen, by all means feel free to look at your own
4   screen if that's easier for you.
5           Does Exhibit 1 contain your opinions with
6   respect to the Lurry case?
7       A.    It does.
8       Q.    And does Exhibit 1 contain all of your
9   opinions with respect to the Lurry case?
10      A.    I don't know how to answer that because,
11  you know, opinions depend on the question I'm being
12  asked.  There may be other things that come up in
13  the course of litigation or at trial.  You might ask
14  me questions that Ms. Bakos hadn't thought of.
15          So I think it contains the primary general
16  topics I'm going to be speaking about, which is
17  cause of death, mechanism of death, but there may be
18  other things that come out as you ask me questions
19  that are not specifically written down as an
20  opinion.  They're just adjunct or support my
21  opinion.
22      Q.    All right.  Does Exhibit 1 contain all the
23  opinions that you had with respect to the Lurry case
24  as of March 17th, 2020, when you signed Exhibit 1

Page 11

1   and delivered it to the Plaintiff's counsel?
2       A.    The year was 2022, but --
3       Q.    '22.  I apologize.
4       A.    -- that's right, yes.  That's okay.
5       Q.    I will reask the question with the correct
6   year.  Does Exhibit 1 contain all of the opinions
7   that you had on March 17th, 2022, when you signed
8   Exhibit 1?
9       A.    It does.
10      Q.    Okay.  And as an experienced expert
11  witness, are you familiar with the fact that you
12  need to disclose an opinion or report if you later
13  want to be able to offer that opinion at trial?
14      A.    I am aware of that.
15      Q.    And you were certainly aware of that when
16  you -- on March 17th, 2022, when you signed
17  Exhibit 1 and delivered it to Plaintiff's counsel;
18  correct?
19      A.    That is correct.
20      Q.    I will also show you what I will just mark
21  for purposes of the record as Exhibit 2.
22          (Exhibit No. 2, 10-page Curriculum Vitae
23          of Judy Melinek, M.D., was marked for
24          identification.)

Page 12

1   BY MR. MATHUES:
2       Q.    Are you able to see Exhibit 2 in front of
3   you, at least the first page?
4       A.    Yes.
5       Q.    And do you recognize the first page of
6   Exhibit 2, and as I continue to scroll through here,
7   to be your Curriculum Vitae?
8       A.    That is correct.
9       Q.    I will now show you what I'm going to be
10  marking as Exhibit 3.
11          (Exhibit No. 3, two-page Dr. Judy Melinek
12          Four-Year Testimony List February 2018 -
13          February 2022, was marked for
14          identification.)
15  BY MR. MATHUES:
16      Q.    Are you able to see Exhibit 3 in front of
17  you?
18      A.    Yes.
19      Q.    Okay.  And do you recognize Exhibit 3 as
20  the list of prior testimony from February of 2018
21  through February of 2022?
22      A.    Yes.
23      Q.    I will go down to the end here, and I
24  believe the last -- well, that's the wrong way --

Nicole Lurry vs
City of Joliet

Judy Melinek, M.D.
April 29, 2022

---

Page 13

1  entry that I see is People of the State of
2  California versus Victor Soledad Garcia and the date
3  given is 9-3-2021. Is that what you're seeing?
4      A.  Can you repeat the question, please,
5  because it's very small?
6      Q.  Yes.
7      A.  And so if you could actually zoom in on
8  there, I want to make sure it matches what I have.
9      Q.  Does that help you?
10     A.  Now I can see it better. Thank you. Yes.
11 So the last one on that one is People -- The one
12 that you're showing right now from the February
13 timeline does end with Garcia. That is correct.
14     Q.  And my question would be have you given
15 additional testimony since giving testimony in the
16 Garcia case?
17     A.  I have.
18     Q.  And can you please tell me what those
19 would be.
20     A.  I believe we produced that to you.
21     Q.  Okay.
22     A.  It was Melinek Four-Year Testimony List
23 April 2018 to April 2022. There are three more
24 cases after that.

---

Page 14

1      Q.  And just for purposes of the record, can
2  you give me the names of those cases?
3      A.  Sure. Merrick -- That's spelled
4  M-E-R-R-I-C-K v. State of Washington. And the case
5  number, was 19-2-00099-19.
6          Then the next one was Rosalind Ibarra,
7  spelled I-B-A-R-R-A, as the Special Administratrix
8  of The Estate of Jorge Martinez -- or Jorge
9  Martinez, Deceased, versus Cheyenne Lee Scott
10 Walton, Sheriff of Rogers County, in his official
11 capacity, and the Board of County Commissioners of
12 Rogers County. And that was Case
13 No. 20-CV-00598-TCK-JFJ.
14         And then the last one is V, as in Victor,
15 R, as in Richard, a Minor, so V.R., a Minor, by and
16 through her Guardian Ad Litem Arianna Toscano,
17 Individually, and as Successor in Interest to Juan
18 Ramon Ramos, Deceased, and Ramona Terrazas,
19 Plaintiff v. County of San Bernardino. And that
20 case number is 5:19-CV-01023-JGB-SP.
21     Q.  Thank you. Just wanted to make sure we
22 are looking at the same thing.
23     A.  Sure.
24     Q.  Now in addition to cases where you provide

---

Page 15

1  testimony, there are also cases where you would be
2  retained but don't end up providing testimony; is
3  that correct?
4      A.  That is correct.
5      Q.  I'd like to zoom out a little bit and ask
6  that in the last 10 years, approximately how many
7  cases, or if it's easier for you to estimate
8  approximately how many cases per year have you been
9  retained on regardless of whether you ultimately
10 gave testimony?
11     A.  O-o-h, gosh. I would say per year it's
12 between one to two a month on average, so that you
13 can extrapolate that out.
14     Q.  And --
15     A.  Many of them -- I should note that many of
16 them are just like one or two hours of work. You
17 know, they may be criminal cases where I just review
18 something, answer questions, and I never hear from
19 them again.
20     Q.  And in terms of the total number of cases
21 where you end up providing testimony, approximately
22 what percentage are civil versus criminal?
23     A.  I would say it's about split 50/50 civil
24 and criminal right now.

---

Page 16

1      Q.  And you said "right now." So in the last
2  five years, has that percentage changed
3  significantly?
4      A.  No. I mean, I would say in the past
5  decade, it's been about steady, about 50/50 criminal
6  and civil. At the beginning of my -- You know, at
7  the beginning when I first started doing consult
8  work, it was much more heavily criminal rather than
9  civil, just because it was primarily cases that I
10 had done the autopsies for, so I was being called by
11 the prosecutors for whatever county I was working
12 in. And then the civil has kind of caught up, and
13 it's about 50/50 now.
14     Q.  Given what you just said, I think I can
15 deduce an answer, but I will ask anyhow. Of the
16 criminal cases in which you have been retained in
17 the last approximately 10 years, approximately what
18 percentage would be on behalf of the prosecutor and
19 approximately what percentage of the time have you
20 been retained by the criminal defense?
21     A.  It's about 50/50 now. But, again, like
22 when I first started, it was primarily much more
23 heavily weighted toward prosecution. And then as
24 defense attorneys started consulting me, it came

---

ADVANTAGE REPORTING SERVICE
PHONE: 309-673-1881  FAX: 309-673-0341

Page 17

1 back up to about 50/50, which is where it is right
2 now.
3    Q.    And with respect to the civil cases in the
4 last 10 years where you provided testimony,
5 approximately what percentage has been on behalf of
6 the Plaintiff and approximately what percentage has
7 been on behalf of the Defendants?
8    A.    For civil cases, it's also 50/50.
9    Q.    Have you ever testified on behalf of a law
10 enforcement officer in an in-custody death case?
11    A.    So I testify on behalf of the attorneys.
12    Q.    Okay.
13    A.    But for defense of law enforcement
14 officers, yes.
15    Q.    Let me ask that question more precisely.
16    A.    Okay.
17    Q.    So have you ever given testimony for the
18 defense in a civil case arising out of an individual
19 who died while in custody of law enforcement?
20    A.    Yes.
21    Q.    Do you know the most recent time you
22 provided such testimony?
23    A.    Yes.
24    Q.    What would that be?

Page 18

1    A.    That would be the one that I just
2 testified in Riverside, California, the one I just
3 read on the record, V.R., a Minor.
4    Q.    Very recently would be the --
5    A.    Yes.  Just about last week.
6    Q.    I'm now going to show you what I will mark
7 as Exhibit 4.  And if you have it in front of you,
8 it is an invoice that was produced to me by the
9 Plaintiff's counsel, and the invoice number is 2668.
10         (Exhibit No. 4, one-page Invoice 2668, was
11         marked for identification.)
12 BY MR. MATHUES:
13    Q.    Do you have that?
14    A.    Let me see if I can pull it up.  Okay.
15    Q.    And the Invoice 2668 lists a number of
16 dates worked and amounts worked, and it ends with
17 the last date being March 16th, 2022; correct?
18    A.    Yes.
19    Q.    Since March 16th, 2022, have you billed
20 any additional hours for the Lurry case?
21    A.    I haven't billed them, but I have logged
22 in a few additional hours just on my phone.  I keep
23 track of hours I've worked.  Let me see if I can
24 make sure.  It's about another two more hours, you

Page 19

1 know, to prep for the deposition, things like that.
2    Q.    That was going to be my next question,
3 which would be not counting today, but prior to this
4 morning, how many additional hours have you logged
5 on the Lurry case since the last hours that we see
6 on Exhibit 4?
7    A.    So it's about two hours.  And it would
8 include today, like this morning when I woke up.
9    Q.    And your company, Pathology Expert, Inc.,
10 does it employ any other pathologist besides
11 yourself?
12    A.    I'm the only pathologist.
13    Q.    Are there any other employees at all
14 besides yourself?
15    A.    Yes.
16    Q.    And who would they be?
17    A.    So we have three employees of the company:
18 Myself, my husband, T. J. Mitchell, who is a writer,
19 and our office manager, Catherine, who manages our
20 books and our appointments and things like that and
21 materials.  And then we also have occasional
22 contractors who come and work for us, do IT work,
23 things like that.
24    Q.    And your hourly rate for doing work on

Page 20

1 this case and including for the time today would be
2 $750 per hour; correct?
3    A.    That is correct.
4    Q.    And speaking of Mr. Mitchell, you and he
5 collaborated together and wrote the book Working
6 Stiff; correct?
7    A.    And others, yes.  We've written three
8 books so far.
9    Q.    And the other two books I believe are
10 fiction; is that correct?
11    A.    They're works of fiction, but they're
12 based on some of my cases, so they straddle the
13 line.  They're inspired by, as they say in the film
14 industry.
15    Q.    Based on a true story; is that --
16    A.    Right.  Inspired by a true story.  That's
17 a little weaker connection, but, yes.
18    Q.    Fair enough.  I'm going to mark -- And you
19 also have a Twitter account; correct, Dr. Melinek?
20    A.    I have multiple social media accounts,
21 including Twitter, yes.
22    Q.    So I am going to share my screen with you
23 in just a moment.  Dr. Melinek, I'm showing you what
24 I will mark as Exhibit 5.

Nicole Lurry vs
City of Joliet

Judy Melinek, M.D.
April 29, 2022

Page 21

1    (Exhibit No. 5, one-page Twitter account
2    home page of Dr. Judy Melinek, was marked
3    for identification.)
4  BY MR. MATHUES:
5    Q.   It's a one-page screen shot or printout
6  from Twitter.  And at the top here, it shows Judy
7  Melinek, M.D., with one of those little blue checks.
8  Do you see what I'm pointing to?
9    A.   Yes.  That's my Twitter front page, I
10  guess, on the computer screen.
11   Q.   And underneath that, we also have in blue
12  a hyperlink to a website,
13  pathologyexpert.com/drjudymelinek -- excuse me --
14  judymelinek; do you see that?
15   A.   Yeah.  That is correct.
16   Q.   And the website from the hyperlink
17  pathologyexpert.com, that is also -- that is one of
18  your websites; correct?
19   A.   We have several websites.  Yes, that's
20  correct.
21   Q.   And the Twitter posts that I would see
22  going through your Twitter account, are you the sole
23  author of the Twitter posts in the Twitter account
24  that we're looking at here from Exhibit 5, or is

Page 22

1  there someone who has the authority or ability to
2  post under your name without you reviewing it first?
3    A.   As far as I know, they're all mine unless
4  someone has hacked into the account.  I haven't gone
5  through old ones, but generally I'm the only one I
6  know who has that password.
7    Q.   And, similarly, if I see something on the
8  website pathologyexpert.com, that would be -- that
9  would mean that you put it there?  There's no intern
10  or assistant who would have the authority to put
11  something on that website without you reviewing it
12  first; is that correct?
13   A.   That is not correct.  So
14  pathologyexpert.com, the website, is managed by
15  Catherine, my office manager, generally under my
16  direction.  So I will tell her, "Put this on the
17  website."  But I don't always check after she's put
18  it up if there's a typo or an error in it or a bad
19  link.  It may not -- And she actually -- Then we
20  contract with -- excuse me -- a web designer.  So I
21  believe she told me recently that she forwards it to
22  them, and then they put it up.  So there may be some
23  errors that creep in during that process.
24   Q.   Understood.  None of us can be responsible

Page 23

1  for technical glitches that may --
2    A.   Right.
3    Q.   But before something -- Put it this way:
4  Does anyone besides yourself give your office
5  manager, Catherine, material to post on the website
6  pathologyexpert.com?
7    A.   The web designer.  So sometimes he gives
8  her things that are like templates and things like
9  that.  But in terms of the content of the material,
10  it's, I would say, mostly me, or sometimes T.J.
11   Q.   That's what I'm getting at is the
12  substance or the content of the material that we
13  would find in pathologyexpert.com, that's coming
14  from you; correct?
15   A.   From pathologyexpert.com, yes, I would say
16  mostly me, yes.  Sometimes I put links for other
17  websites and things like that.  Or I've had guest
18  people post on my blog.  So it depends where on the
19  website you're talking about, because there's also a
20  blog section.  But it's -- I'm the one who initiates
21  that.
22   Q.   And if there were to be a guest post on
23  your blog, would the guest poster be identified so a
24  reader can tell that it's a guest poster and not

Page 24

1  you?
2    A.   Yes.
3    Q.   And if there were to be a guest poster or
4  a link to another website on your website, would
5  that also be identified so a reader could determine
6  that this particular article is by a guest poster
7  and not by Dr. Melinek?
8    A.   I would hope so.  I can't account for bad
9  links and stuff, but I expect that.  I don't check
10  the website regularly to make sure that it's
11  accurate and updated, let's put it that way.
12   Q.   In looking over your Twitter, just doing
13  my due diligence, I noticed you had a number of both
14  Twitter posts and articles written about the George
15  Floyd case.  Were you ever consulted in the George
16  Floyd case by either the prosecution or the defense?
17   A.   I was not, no.
18   Q.   Did you generally follow the case in terms
19  of what the prosecution and the defense experts were
20  saying as to the cause of Mr. Floyd's death?
21   A.   I was aware of what they were saying.  I
22  didn't follow it carefully.  I wasn't watching all
23  the testimony.  But I did follow it in the news, and
24  I got secondary reports about what would happen.

Page 25

1    The time difference was somewhat of a
2 difficulty here, because it was happening in the
3 States in a different time than in New Zealand, so I
4 would have to get secondary reports, not the
5 primary.
6    Q.   Would it be fair to say that at least at a
7 high level, putting aside there may be some things
8 you didn't hear, but at a high level, you were in
9 agreement with the prosecution's experts and in
10 disagreement with the defense experts as to the
11 cause of Mr. Floyd's death?
12    A.   I can't answer that.
13    Q.   Why would you not be able to answer that?
14    A.   Because it's too broad a question.
15 There's so much nuance in that case, and there's so
16 many issues that it would be too broad a question
17 for me to answer.  In some of the things that were
18 presented at trial that I've reviewed, I agreed with
19 the prosecution, and some of the things that were
20 presented at trial, I agreed with the defense.  It's
21 not something that I can blanket endorse one side or
22 the other.  I think it was a very interesting case from a
23 forensic standpoint and complicated case.
24    Q.   Also in doing some of my due diligence, I

Page 26

1 saw some references in your background to a Dr.
2 Hirsch as your mentor.  Would that be Charles Hirsch
3 who was the former Chief Medical Officer for New
4 York City?
5    A.   Chief Medical Examiner, yes.
6    Q.   Chief Medical Examiner?
7    A.   Yes.  He was my mentor when I was in my
8 fellowship training at the New York City office for
9 two years.
10    Q.   Would you say that Dr. Hirsch continued to
11 be a professional mentor to you once you left the
12 New York City office and went to California?
13    A.   For a few years, yes, I called him.  But
14 then he passed away a few years back.  So, I mean,
15 you know, once a mentor, the mentor relationship
16 continues.  You still have warm feelings toward the
17 person whether you agree with them or not going
18 forward.
19    Q.   I clerked for a federal judge.  I
20 understand that feeling.
21    Putting aside any particular agreement or
22 disagreement you might have with your mentor, would
23 it be fair to call Dr. Hirsch a giant in the field
24 of Forensic Pathology?

Page 27

1    A.   He would probably disagree with that.  I
2 know him, and he would not agree with --
3    Q.   Do you?
4    A.   He personally would not agree with that.
5 He was a very modest man.
6    Q.   Well, I get that he's a modest man.  But
7 as one of his mentees, is that a statement that you
8 would agree with?
9    A.   I think he was very influential.  I don't
10 like the term "giant," because it suggests an
11 oversized influence.  I think that he is very
12 influential, and he taught a lot of forensic
13 pathologists who are currently in practice.
14    But, you know, he was a product of his
15 time, and many of his opinions are now -- have been
16 proved to be outdated.  So it's hard to know how you
17 would quantify that in the present day.
18    Q.   Fair enough.  Now I understand from your
19 CV you certainly have been qualified by a court as
20 an expert in the field of Forensic Pathology;
21 correct?
22    A.   (Witness nods head affirmatively).  I have
23 been qualified multiple times.  Yes, that is
24 correct.

Page 28

1    Q.   Do you consider yourself to be an expert
2 in police practices and procedures?
3    A.   I do not give opinions on police practices
4 and procedures in general when it comes to
5 testimony.  However, I'm going to qualify that.  In
6 my position as a forensic pathologist in San
7 Francisco, and Alameda County, and also here in New
8 Zealand, I have been consulted by police and police
9 procedures experts in my job to give input on the
10 medical aspects of what their restraint procedures
11 are.  So it's a little bit broader.
12    You know, it's -- there are -- Police
13 procedures experts don't know medicine.  And so
14 there have been circumstances where I have given
15 lectures or I have taught police procedures or
16 experts or police officers about different
17 physiologic effects of things like restraint
18 techniques or Taser deployment or gunshot wounds,
19 you know, what a gunshot can and cannot do, in order
20 to then inform them on their practices, training,
21 supervision, things like that.
22    So in that capacity, I have worked in
23 conjunction to give medical advice to support and
24 inform police procedures experts so that they can

Page 29

1 then do their job.
2 Q. When you're giving that sort of advice, I
3 take it from what you've said the advice that you're
4 giving is focused on the medical facts, the medical
5 aspect of the police interaction with other people
6 around them; is that fair?
7 A. It is. But it's not necessarily just
8 about a specific decedent, you know, somebody who
9 died and I did the autopsy on them. Sometimes it's
10 broader than that where they've had several deaths
11 in police custody and there's an outcry, and then
12 the agency will come to me and say, "Hey, Dr.
13 Melinek, we need you to educate us. What are we
14 doing? What could we be doing different? What
15 could we be doing better? How could we train people
16 better? Give us some knowledge here. What's the
17 current state of science on excited delirium or on
18 Tasers or on things like that?"
19 So that's where it's not just specifically
20 about a specific individual. It's a much more
21 general training thing.
22 Q. Have you ever been qualified by a court to
23 give an opinion as to police practices and
24 procedures?

Page 30

1 A. Not with that specific terminology, no.
2 Q. And have you reviewed the actual report of
3 the Plaintiff's police practices and procedures
4 expert in the Lurry case?
5 A. What is the name of that expert?
6 Q. His name is Charles Drago. I didn't see
7 Mr. Drago's expert report on your list of reviewed
8 materials, but I was wondering if you looked at Mr.
9 Drago's report.
10 A. I don't recall. If it's not on the list
11 of the materials in my opinion, then I did not
12 review it.
13 Q. Prior to the conversation we just had, did
14 you know that the Plaintiffs had retained a police
15 practices and procedures expert?
16 A. I was aware that they would have. I
17 believe I had discussed it with Counsel. But,
18 again, I'm not a police procedures expert, and I
19 wasn't asked to give police procedures expertise. I
20 was asked to give medical expertise.
21 Q. Would you consider yourself an expert in
22 the field of Emergency Medicine?
23 A. No. Again, I don't testify in Emergency
24 Medicine standards or practice, but, again, I am

Page 31

1 capable of reading Emergency Medicine reports and
2 knowing if something is not medically correct.
3 Let me give you an example. I mean, if an
4 emergency medical technician told me they
5 administered a certain drug for a certain disease
6 state, and I, as a physician, know that that drug is
7 not used in that disease state, I'm going to call
8 them on it. So I don't have to be an expert on
9 paramedic or EMS technique to know when something
10 medically doesn't make sense.
11 Q. Much like even though I don't practice tax
12 law, there are at least a few things someone could
13 tell me, and I'm like, yeah, that's not going to fly
14 with --
15 A. Correct.
16 Q. But if it were to be a specialized --
17 A. Correct.
18 Q. -- point in tax law, I would defer to a
19 tax lawyer. Is that a fair analogy?
20 A. It is, but it's not -- I wouldn't
21 always -- You know, I'm not going to knee-jerk agree
22 to that I would refer to an Emergency Medicine
23 expert, because if they're lying or inexperienced or
24 full of shit, I mean I -- excuse my French -- but if

Page 32

1 they are saying things that are not truthful and are
2 not substantiated by my knowledge of the field,
3 including my review of peer-reviewed materials, I'm
4 going to call them on it.
5 You know, so it needs to at least pass the
6 smell test in order to be something that I'm going
7 to defer to them on. So it's really -- I can't just
8 blanket statement say, "I'm going to defer to
9 another expert," because if they say something
10 that's physiologically incorrect, medically
11 incorrect and not supported, I have a brain, and I
12 have expertise that I can call them on it regardless
13 of their official title.
14 Q. Have you ever personally worked in the
15 field of Emergency Medicine?
16 A. I did Emergency Medicine rotation in
17 medical school. So that's the last time I had the
18 experience in that regard. And when I was a
19 surgeon, we also worked in the emergency room in
20 surgery, but that was over two decades ago.
21 Q. Which brings me to my next question, which
22 would be, Dr. Melinek, approximately how long has it
23 been since a regular part of your practice was
24 dealing with living patients as opposed to those who

Page 33

1 are deceased?
2    A.   Well, I still do deal with living patients
3 to some agree.  So part of my practice as a forensic
4 pathologist is interpreting injuries in people who
5 are alive, too.  So, for instance, if somebody has
6 been strangled and they claim that they were
7 strangled, and there are pictures of marks on their
8 neck, medical records, I may get called by either a
9 prosecutor or defense in a criminal case or an
10 attorney in a civil case to interpret those injuries
11 and occasionally examine the patient, interview
12 them, things like that.
13    Q.   Let me ask --
14    A.   So it's a minor part of my practice, but I
15 still do it occasionally.
16    Q.   Fair enough.  And I can imagine how that
17 would come about.  Let me ask the question a little
18 bit more pre -- try at least to ask the question a
19 little bit more precisely.
20    A.   Mmm-hmm.
21    Q.   When was it -- How long has it been since
22 you provided medical care to living patients?
23    A.   It's been -- I mean, in terms of in a
24 hospital-type setting where I was paid to give

Page 34

1 medical care as opposed to on my own, with --
2    Q.   I'm not counting --
3    A.   -- other colleagues or people on the
4 street.  You know, that's happened before, as well.
5 I mean, once you're a doctor -- You know, you're on
6 an airplane, and they say, "Is there a doctor on
7 board?" and I'm the only person, so I will provide
8 medical care under my license even though I'm the
9 pathologist.
10      But that said, in the context of I'm
11 getting paid in a hospital setting to treat medical
12 patients, the last time would probably be during my
13 residency training at -- I'd have to go to my CV --
14 but at UCLA.
15    Q.   When it comes to this case, are you
16 offering any opinions as to the credibility of any
17 witness?
18    A.   You know, generally, my opinions are about
19 the physical findings and about the anatomy.  And
20 credibility, it's not my -- mine to judge.  That's
21 for the jury to judge.  So I'm going to give an
22 opinion about what I see and what I find.
23      But if somebody is saying something that's
24 inconsistent with that, I will say, "That is

Page 35

1 inconsistent with their testimony," or, "It's
2 consistent with their testimony."
3      That could be interpreted as a credibility
4 assessment.  But, really, I'm just talking about the
5 physical findings.  Does that make sense?
6    Q.   I think so.  So, ultimately, you're going
7 to testify about the physical findings, right,
8 wrong, or indifferent.  But can we -- right, wrong,
9 or indifferent, given whatever anyone may say;
10 correct?
11    A.   Right.  I'm going to talk about the
12 physical findings, but I can also be asked, for
13 instance, "Are the physical findings consistent with
14 what X witness said?"  And then I would be asked to
15 give an opinion about whether what they're saying is
16 consistent or not consistent.  That could
17 potentially be perceived as a credibility assessment
18 by the jury.
19    Q.   It could -- I understand perhaps it could
20 be.  But as you said I think earlier in part of an
21 answer or two ago, ultimately at trial, it's going
22 to be up to the jury to decide who's telling the
23 truth, because that's their role; correct?
24    A.   Exactly.  I completely agree with that.

Page 36

1    Q.   And, likewise, in terms of what the law
2 is, that's going to be up to the judge; correct?
3    A.   The judge gets to decide what the law
4 says, yes.
5    Q.   Now in February of 2021, were you one of
6 several co-authors in a paper that addressed the
7 subject of cognitive bias in forensic pathology
8 decisions?
9    A.   I was one of several co-authors, that is
10 correct.
11    Q.   Suffice it to say there was some
12 controversy generated when that paper was published;
13 is that correct?
14    A.   There was some controversy after it was
15 published, yes, and letters to the editor were
16 written.
17    Q.   And at least one, if not more of those
18 letters to the editor, were asking the editor to
19 withdraw the publication, withdraw the paper, or
20 revise the paper; is that correct?
21    A.   I believe so, yeah.
22    Q.   Was the paper that you were one of the
23 co-authors on ever withdrawn from publication or
24 revised?

Page 37

1    A.    As far as I know -- Well, first of all,
2  that's a compound question.  It was not withdrawn
3  from publication.  There were clarifications made
4  and in subsequent letters to the editor.  I don't
5  know if it was revised.
6    Q.    And if there were clarifications made in
7  subsequent letters to the editor, were those signed
8  by all co-authors or only some of the co-authors?
9    A.    I believe we all signed them.
10   Q.    And I could go look that up and find it
11 out rather than giving you a memory test; would that
12 be fair to say?
13   A.    Yes.  It's all published, so, yeah, I mean
14 I remember it well enough, but not to
15 deposition-level detail.
16   Q.    And reading through some media reports, I
17 had saw there were at least rumors of ethics
18 complaints being filed against the authors or some
19 of the co-authors of the paper.
20        Due to the paper, did you get any ethics
21 complaints filed against you?
22   A.    There was an ethics complaint that was
23 filed against me at the National Association of
24 Medical Examiners by a man named Brian Peterson.

Page 38

1  And that ethics complaint was dismissed as
2  unfounded.
3    Q.    That was going to be my next question,
4  which was the outcome, did it get dismissed or not.
5        Now as to the Lurry case, can we agree
6  that the phrase "cognitive bias" doesn't appear
7  anywhere in your report on the Lurry case?
8    A.    I don't recall.  I'd have to go line by
9  line.  But I don't think so.  I don't remember it
10 being in there.
11   Q.    And, similarly, you don't offer any
12 opinion in your report on the Lurry case that Dr.
13 Humilier's conclusions suffered from cognitive bias;
14 correct?
15   A.    I don't recall saying that, no.
16   Q.    And, as we have said earlier, all of the
17 opinions that you had as of the date the -- And all
18 of the opinions that you had about the Lurry case as
19 of the date you signed your report were in the
20 report; correct?
21   A.    All of the opinions I had were in the
22 report, that is correct.
23   Q.    I'm now going to go to what I will mark as
24 Exhibit 6.  And this is the Coroner's report for Mr.

Page 39

1  Lurry.  I'm going to put it up on the screen, but if
2  you want to look at your own copy, that is fine by
3  me.
4        (Exhibit No. 6, 11-page Coroner's Report
5        by Dr. Humilier, was marked for
6        identification.)
7        MR. MATHUES: Ms. Bakos, the Bates stamp
8        number for the copy that I have is Joliet
9        5902 through 5911.
10       MS. BAKOS: Thanks.
11       MR. MATHUES: And we both produced this to
12       each other multiple times, so I want to
13       make sure you have the right one.
14       MS. BAKOS: Thank you.
15 BY MR. MATHUES:
16   Q.    So I am going to go to what is Page 2 of
17 the autopsy report in this case.  The Bates stamp is
18 Joliet 5903 -- 5903.  And towards the top middle of
19 the page, there's all caps, bold, underlined
20 "EXTERNAL EVIDENCE OF INJURY."
21       Dr. Melinek, either on my screen or in
22 front of you, do you see that location in Dr.
23 Humilier's report?
24   A.    I do.

Page 40

1    Q.    Now there are seven indications under
2  External Evidence of Injury; correct?
3    A.    Yes.
4    Q.    And no where in your report do you dispute
5  or disagree with Dr. Humilier's observations as to
6  external evidence of injury; correct?
7    A.    I don't recall specifically disputing
8  anything.  I may have described other injuries in my
9  own notes, so just give me one second.
10       Yes, so I don't comment on the external
11 evidence of injury in my report specifically.  I
12 just document that it showed the condition of his
13 remains.  So I don't have any disagreements with
14 him, if that's the question.
15   Q.    And that -- Definitely that's another way
16 of phrasing the question.  Similar as to Evidence of
17 Medical Treatment towards the bottom third of
18 Page 2, do you see what -- Page 2 of the autopsy
19 report, do you see what I'm referring to?
20   A.    I do.
21   Q.    And no where in your report did you
22 dispute or disagree with Dr. Humilier's observations
23 as to external evidence of medical treatment for Mr.
24 Lurry; correct?

---

Page 41

1    A.   Correct.  When it comes to the physical
2  findings of the evidence of medical treatment, I
3  document that in my report on Page 13, Paragraph 20,
4  and I don't have any disagreements mentioned there.
5    Q.   And if we go to the next page, that would
6  be Page 3 of the report at the top, there's another
7  section under all caps, bold "INTERNAL EVIDENCE OF
8  INJURY."  Do you see what I'm referring to?
9    A.   I do.
10   Q.   And no where in your report do you dispute
11  or disagree with Dr. Humilier's physical findings as
12  to internal evidence of injury for Mr. Lurry;
13  correct?
14   A.   So there is a little bit of a discrepancy,
15  because if you look at my Paragraph No. 20,
16  I comment on a 1-centimeter hemorrhage in the strap
17  muscles of the neck, and he measures it at 05.5 by
18  0.3 inches.  So there's discrepancies in terms of
19  size, because I'm measuring I believe in
20  centimeters, versus he's measuring in inches.  So I
21  just wanted to note those kind of discrepancies.
22      But I don't have any -- I'm not
23  documenting in my report any injuries that he didn't
24  mention, if that's what you're asking.

---

Page 42

1    Q.   What I'm asking you sort of in summary
2  from what we have seen before is that while you may
3  disagree with some of the opinions Dr. Humilier
4  gave, you're not disagreeing with his physical
5  findings as to evidence of injury or evidence of
6  medical treatment except for what you've already
7  mentioned, that you're using a different -- your
8  measurement of the hemorrhage on Mr. Lurry's strap
9  muscle is in metric rather than English and may be a
10  little bit different than his?
11   A.   Yes.  I didn't see that he missed any
12  major injuries by reviewing the photos.  Nor did I
13  see any injuries that he mentioned that weren't
14  visible in the photos.
15      So I did look through the report and
16  compared it to the photos, and I believe his
17  descriptions of the physical findings are accurate.
18   Q.   And you said you don't believe he missed
19  any major injuries.  Just for clarity, did you
20  believe that Dr. Humilier missed any minor injuries
21  for Mr. Lurry?
22   A.   So, well, when I say "injuries," I'm
23  talking about things like abrasions, contusions,
24  lacerations, things like that.  There may be minor

---

Page 43

1  ones.  I don't recall.  I didn't write them in my
2  report.  But, you know, we'd have to go through the
3  photos again one by one to see if there was anything
4  missed.
5      The most important thing is the
6  interpretation of how those injuries translate into
7  the cause of death.  That was the primary miss, in
8  my opinion.  So that is a major discrepancy between
9  my opinion and his, but it's not about the
10  individual injuries.  It has to do with putting the
11  puzzle together, so to speak.
12   Q.   You mentioned nothing was in your report.
13  Would it be fair to say that in your review of the
14  photos, you didn't observe anything that was
15  sufficiently different from Dr. Humilier's
16  description that you thought it worth pointing out
17  that discrepancy in your report?  Is that --
18   A.   Well, there was.  I believe -- I believe I
19  mentioned -- Sorry.  I didn't realize.  I thought
20  you had finished the question.
21      I believe I mentioned that there was tache
22  noir in the eyes.  So the eyes have tache noir from
23  post-mortem drying in their partially-opened
24  position.  And I don't see that in his report.  So I

---

Page 44

1  mentioned that because I noticed it.  But he does
2  not specifically mention that under his external
3  examination that I can see.
4      So there are some minor things that I'm
5  paying attention to and noting in my report that's
6  different from his.  But the tache noir would not
7  make a difference in terms of the final
8  interpretation of the cause or manner of death.
9    Q.   That was my next question, which you have
10  already answered.
11      As we go through some of Dr. Humilier's
12  opinions, do you recall reading on Page 69 of Dr.
13  Humilier's deposition where he opined that if the
14  levels of fentanyl in Mr. Lurry were so high that
15  Mr. Lurry couldn't open his mouth, the levels of
16  fentanyl were also so high that Mr. Lurry couldn't
17  have breathed at all?
18   A.   I -- It sounds vaguely familiar.  I don't
19  remember every line of his deposition.
20   Q.   Let's go -- I'm going to ask you if you
21  agree or disagree with that statement and then for
22  your reasoning why.  But before I do -- I did the
23  same thing to Dr. Johnson-Arbor on Tuesday.
24      But before I do that, would you like me to

Page 45

1 pull up Dr. Humilier's deposition so you can see
2 that statement in the transcript, or would you like
3 to go ahead and just answer my question?
4   A.   If you could repeat the statement in your
5 question, that's sufficient.  You don't have to put
6 it up.
7   Q.   Okay.  I'm just trying to, you know, put
8 my cards on the table.  I'm not -- you know --
9 Obviously, I have my job to do, but I'm not trying
10 to trick you about --
11   A.   Yes.
12   Q.   -- what someone said.  So, Doc, I will
13 represent to you that Dr. Humilier testified on Page
14 69 of his deposition that if the fentanyl in Mr.
15 Lurry was at such a level that Mr. Lurry could not
16 open his mouth, Mr. Lurry would not have been able
17 to breathe at all.
18       And I will also represent to you that I
19 asked the same question to Dr. Johnson-Arbor on
20 Tuesday.  And her response was that she would agree
21 with Dr. Humilier if the fentanyl had been ingested
22 or consumed intravenously, but would disagree with
23 Dr. Humilier if the fentanyl had been ingested or
24 consumed orally.

Page 46

1       So I'm going to ask you about both of
2 those doctors and if you agree or disagree.  So I'll
3 start with Dr. Humilier.  Do you agree with Dr.
4 Humilier's statement or disagree with Dr. Humilier's
5 statement?
6       MS. BAKOS: Just for the record, I want to
7       object to this.  I don't have the
8       testimony or any particular notes about
9       exactly what Dr. Johnson-Arbor said, and I
10      don't think we have any testimony that we
11      can show the doctor to make sure that
12      everything is in context.
13      Doctor, you can answer if you can.  But
14      with respect to Dr. Johnson-Arbor, I have
15      to object that I'm not sure that you're
16      accurately stating her position on the
17      issue.  But you can go ahead.
18      THE WITNESS: Sure.  So with regards to
19      the question, as I recall -- I'll repeat
20      it so it will be clear on the record -- it
21      was whether I agree with the assertion
22      that Dr. Humilier made that if the
23      fentanyl level was high enough that he
24      can't open his mouth, then it's high

Page 47

1 enough that he would not be able to
2 breathe.
3       I don't agree with that.  I don't know the
4 scientific basis for that statement.  And
5 I don't know what peer-reviewed literature
6 or toxicologic literature he would be
7 relying upon to make that kind of
8 statement.
9       It doesn't make sense to me from a medical
10 or toxicological standpoint.
11 BY MR. MATHUES:
12   Q.   Can you think of or point me to any
13 peer-reviewed medical literature or study or
14 treatise that would help resolve the question of
15 whether your opinion is correct or Dr. Humilier's
16 opinion is correct?
17   A.   Well, I can't off the top of my head since
18 I haven't done the literature search.  But what I
19 would recommend is first of all potentially
20 consulting with a toxicologist, because that's a
21 more appropriate question for a toxicologist rather
22 than a forensic pathologist.
23       Even so, I don't know how to look that
24 question up, to be honest, because it's -- you

Page 48

1 know -- The peer-reviewed literature, when it comes
2 to things like opioids like fentanyl, usually have
3 information about doses in specific cases.  So there
4 will be published literature that says, "Here is a
5 case of a death, and these were the levels."  Okay?
6 So it's a retrospective analysis with case reports.
7       Or, alternately, you have lab data that
8 shows, "We gave these patients a certain amount of
9 fentanyl, and these were their levels in their
10 blood."  Okay?
11      And sometimes you'll have case reports
12 where levels in the blood or plasma correspond with
13 particular behavior in an individual, meaning that
14 they appear obtunded or they are unconscious or they
15 stopped breathing.  So there will be case reports in
16 the literature that I'm aware of that somewhat
17 correlate in individual cases behavior with drug
18 levels.  But my knowledge of physiology and
19 toxicology is such that I'm aware that different
20 individuals will react to drugs differently.  And
21 metabolism and drug levels can vary, depending on
22 absorption.
23      So if, for example, someone is given
24 something intravenously, the drug levels will go up

Page 49

1  a lot faster than if they're ingested and it needs
2  to be absorbed first through the stomach and then
3  enter the bloodstream.
4          There are too many variables with regards
5  to individual tolerance, individual metabolism, and
6  absorption to be able to make that kind of blanket
7  statement.
8          So I think that if you review the
9  peer-reviewed literature, you will see that what I
10 just told you about fentanyl and opioids in general
11 is correct, and the statement that Dr. Humilier made
12 cannot be substantiated by the peer-reviewed
13 literature. You won't find it anywhere. So even if
14 you search for it, you know, taking keywords in
15 quotes, you're not going to be able to find support
16 for his statement.
17 Q.  Am I understanding you correctly that in
18 light of all of the variables that might go into one
19 person's consumption of fentanyl, it could be true
20 that someone's fentanyl levels would be sufficiently
21 high that they could neither open their mouth nor
22 breathe, but it also could not be true, given all of
23 these different variables, and that would be your
24 disagreement with Dr. Humilier, that he's making a

Page 50

1  blanket statement that could be true in some cases
2  but could not be true in other cases?
3  A.  Yes. And there's no peer-reviewed
4  literature or studies that can distinguish between
5  the two ethically. It's really idiosyncratic and
6  individual. It's not a fair statement because it's
7  so broad.
8  Q.  And then I will ask you about Dr.
9  Johnson-Arbor's statement. And I will ask you to
10 assume for purposes of the next question that I am
11 quoting her accurately.
12         Assuming that Dr. Johnson-Arbor gave the
13 statement as to opining on Dr. Humilier's opinion
14 that Dr. Humilier would be correct if he were
15 talking about an intravenous exposure to heroin --
16 to fentanyl, but he would be incorrect with the
17 heroin were consumed or ingested orally, would you
18 agree with Dr. Johnson-Arbor, disagree with Dr.
19 Johnson-Arbor, or just simply -- or would you defer
20 that question and say you have no opinion, given
21 that she is a toxicologist?
22     MS. BAKOS: The same objection as
23     previously stated.
24     THE WITNESS: Give me just one second. I

Page 51

1  want to look something up on the factual
2  level. Give me one sec.
3  So, first of all, in your question, she's
4  not a toxicologist. She's an Emergency
5  Medicine expert. So I think that your
6  question has an incorrect assumption in
7  there about her expertise.
8  And it's hard for me to answer that
9  because I don't know the context in which
10 she was asked that question. So I don't
11 want to, again, blanket disagree or
12 agree with her.
13 What I can say is that when you inject
14 fentanyl, the blood levels go up faster
15 than if you ingest, meaning swallow it.
16 So that might account for her opinion, the
17 discrepancy between IV versus oral
18 consumption or ingestion. But I think
19 that her statement as you've presented it
20 is missing some additional nuance, and
21 that includes issues such as the amount of
22 drug ingested or injected. It assumes --
23 It does not account for time interval,
24 like how much time, over how much time was

Page 52

1  the drug absorbed or ingested. It also
2  does not account for, again, individual
3  tolerance. Individual people have
4  different metabolism, different tolerance
5  levels based on their past history or
6  exposure to the drug.
7  So, again, there are lots of variables
8  that play into this -- variables that play
9  into this. And her statement may be
10 accurate under some circumstances but not
11 necessarily all or a blanket. I can't
12 blanket agree with it.
13 BY MR. MATHUES:
14 Q.  You did review Dr. Johnson-Arbor's report
15 in this matter; correct?
16 A.  I did.
17 Q.  And, by the way, have you ever worked in a
18 case before where both you and Dr. Johnson-Arbor had
19 been retained by the same attorneys?
20 A.  I don't think so. I don't know. I don't
21 recall her name ever coming up before.
22 Q.  Did you refer the Plaintiffs to Dr.
23 Johnson-Arbor?
24 A.  No. I don't know her.

Page 53

1    Q.   Do you have any knowledge -- By the way,
2    just do you have any knowledge whether Dr.
3    Johnson-Arbor -- Strike that.  That's a bad
4    question.
5         Do you have any knowledge how the
6    Plaintiffs -- No, it's a totally dumb question,
7    because you told me you worked with their firm
8    before.  Moving on.
9    A.   Yes.
10   Q.   When you reviewed Dr. Humilier's
11   deposition, do you recall on Page 70 of his
12   deposition where he made the statement that if the
13   fentanyl levels in Mr. Lurry were sufficiently high
14   as to eliminate his gag reflex, the fentanyl levels
15   would be sufficiently high that would eliminate his
16   ability to breathe?
17   A.   Again, I don't remember specific lines,
18   but I do recall commenting on the gag reflex issue
19   in my report.  I believe it's in my opinion.  Let's
20   see.  I think it is under Page 4 of 22 in my report.
21        I say, "The forensic pathologist's
22   testimony that Mr. Lurry should have had a gag
23   reflex to expel the drugs in his mouth is
24   incorrect."  So I specifically address the gag

Page 54

1    reflex in that part of my opinion.
2    Q.   I take it then that you would disagree
3    with the statement that if the levels of fentanyl in
4    Mr. Lurry were --
5         (Whereupon at this point, at 3:32 p.m.,
6         the court reporter lost power and internet
7         connection due to a power company
8         transformer being blown.  The court
9         reporter's power was re-established at
10        3:45 p.m., after which the following
11        proceedings were conducted:)
12   BY MR. MATHUES:
13   Q.   When we were speaking before the break,
14   Dr. Melinek, some of your answers with respect to
15   Dr. Humilier's opinion regarding fentanyl being
16   high -- Dr. Humilier's opinion that if the fentanyl
17   levels in Mr. Lurry were high enough to eliminate
18   his gag reflex, it would also have been high enough
19   to eliminate his ability to breathe.  And since some
20   of your answers got cut off to that, I would like to
21   make sure that comes out clearly.
22   A.   Sure.
23   Q.   Is it fair to say that you would -- is it
24   fair to say that you -- would you agree -- Would it

Page 55

1    be your position that sometimes the levels of
2    fentanyl in a person will be so high that they
3    suppress their gag reflex and also suppress their
4    ability to breathe, but other times, the levels of
5    fentanyl may suppress their gag reflex but not
6    suppress their ability to breathe?  Is that an
7    accurate statement of your position?
8    A.   I think that that is an accurate statement
9    because of the multiple variables that play in,
10   including people's tolerance level.
11   Q.   Now would you agree that the fentanyl that
12   was detected in Mr. Lurry's blood had been recently
13   consumed by Mr. Lurry because it had not yet
14   metabolized into norfentanyl?
15   A.   I would agree with that.
16   Q.   I'm also going to mark as Exhibit No. 10
17   -- This is something that you don't have, Doctor,
18   but you may recognize it.  And I will show it in one
19   moment.
20        MS. BAKOS: I'm sorry.  Did you say this
21        is Exhibit 10?  Is that what I heard you
22        say?
23        MR. MATHUES: Yes, this will be Exhibit
24        10.  Abby, some of my exhibits may be out

Page 56

1    of order.
2         MS. BAKOS: Okay.
3         MR. MATHUES: I may not use them all.  But
4         I put them on my outline with a number,
5         and I'm going to submit them that way --
6         MS. BAKOS: That's fine.
7         MR. MATHUES: -- even if I don't use them.
8         MS. BAKOS: That's fine.
9         MR. MATHUES: Okay.  And I had marked Dr.
10        Humilier's autopsy report as Exhibit 9.
11        (Exhibit No. 9, condensed PDF transcript
12        of the Deposition of Dr. Michel Humilier,
13        was marked for identification.)
14        (Exhibit No. 10, six-page ME Independence
15        Position Paper, was marked for
16        identification.)
17   BY MR. MATHUES:
18   Q.   Dr. Melinek, are you able to see my screen
19   in front of you even though I believe you're on an
20   iPhone?
21   A.   Yes.  I can see the title of the paper.
22   Q.   And this would be a paper for The National
23   Association of Medical Examiners, a position paper
24   on Medical Examiner, Coroner, and Forensic

Page 57

1   Pathologist Independence; correct?
2     A.   That is correct.
3     Q.   And you are one of the co-authors of the
4   paper we see in front of us as Exhibit 10?
5     A.   I believe I'm the first author.  That is
6   correct.
7     Q.   And if you'd scroll down a little bit,
8   there is a section that says "Consensus Process."
9   And then the first sentence reads, "The position
10  paper represents the consensus of the ad hoc
11  committee," and goes on to describe the committee.
12  Did I read that accurately?
13    A.   Yes.  Well, you read pieces of it.  But,
14  yes, you read Consensus Process and --
15    Q.   The parts that I read, did I read
16  accurately?
17    A.   You did, yes.
18    Q.   And, again, you were part of the committee
19  that produced the paper we have in front of us as
20  Exhibit No. 10?
21    A.   I was the chair of the committee,
22  actually.
23    Q.   And the substance or the statements made
24  in the paper, did they reflect your views at the

Page 58

1   time you were on the committee?
2     A.   Yes.
3     Q.   And I'm going to particularly draw your
4   attention to Page 4.  There's a bullet point which
5   I'm going to highlight.  Do you see where I've
6   highlighted?
7     A.   If you could zoom in just a little bit, it
8   would help my aging eyes.
9     Q.   Is that sufficient?  Or would you like me
10  to zoom in a little more?
11    A.   That's perfect.  You've got it.
12    Q.   And can you please read into the record
13  what I have highlighted?
14    A.   Sure.  "Credible experts may have
15  legitimate differences of opinion, based on their
16  skills, education, training, experience, and
17  interpretation of the literature, especially in
18  complicated or unusual cases."
19    Q.   All right.  And I take it from your
20  previous answers so far that what you just -- the
21  statement you just read would have accurately
22  reflected your views at the time you were chairman
23  of the committee that produced Exhibit No. 10;
24  correct?

Page 59

1     A.   That is correct.
2     Q.   And does the statement that you just read
3   still reflect your opinions?
4     A.   It does.
5     Q.   Would you describe the death of Mr. Lurry
6   as an especially complicated or unusual case?
7     A.   No.
8     Q.   And why would you say no?
9     A.   I see cases like this pretty frequently.
10  I don't think it's complicated or unusual.  I've
11  reviewed cases involving drug overdoses, asphyxia,
12  arrest-related deaths I would say scores of times in
13  my career as a forensic pathologist over two
14  decades.
15         But that said, you know, one's perception
16  of whether something is unusual or common is highly
17  dependent on one's experience.  And at this
18  particular point in my career, I'm a fairly
19  experienced forensic pathologist.  This may be
20  considered an unusual case to somebody else who
21  doesn't have my level of experience.
22    Q.   And I know you've done many autopsies.
23  Can you give an approximation as to how many
24  autopsies you've done in your career?

Page 60

1     A.   It's ballpark over 3,000.
2     Q.   Doctor, I would like now to direct your
3   attention to what I marked at the beginning of the
4   case as Exhibit No. 1, which would be your report in
5   this matter.  And I will draw your attention to
6   Page 3, the second full paragraph.  I'm going to put
7   it up on the screen, as well.
8         And you see the first sentence of the
9   second full paragraph that, picking up in the middle
10  of the sentence, it is your opinion that Mr. Eric
11  Lurry died from complications of an acute mixed drug
12  intoxication (heroin, fentanyl, and cocaine).
13         Do you see what I am referring to?
14    A.   Yes.
15    Q.   Of those drugs, heroin, fentanyl, and
16  cocaine, which of those played the greatest role in
17  bringing about Mr. Lurry's death?
18    A.   It's hard to answer that.  I mean fentanyl
19  was probably, if I recall -- let me look at the drug
20  levels -- it was the highest level of the most
21  potent drug of the three.  But -- And the cocaine I
22  believe was just in -- had been metabolized at the
23  point that the toxicology was taken.
24         But that said, they're working in concert.

Page 61

1  So I don't like to think of just pulling out one
2  drug. They're working together.
3    Q.   And can you explain how the heroin,
4  fentanyl, and cocaine would have worked together to
5  bring about Mr. Lurry's death?
6    A.   So heroin and fentanyl are both
7  stimulating opioid receptors. They cause
8  respiratory depression, and they stop a person's
9  breathing. And in the process of stopping their
10  breathing, their brain can swell. And that can
11  cause direct brain death from lack of blood flow to
12  the brain.
13        The cocaine works by stimulating a
14  person's adrenergic system, so that would be the
15  adrenaline fight-or-flight-type response, and it can
16  increase heart rate, increase blood pressure, and
17  cause arrhythmias, which are abnormal rhythms in the
18  heart. So that can also cause or contribute to the
19  death because with the lack of blood flow coming
20  from decreased breathing, it increases the
21  likelihood that a person will have a sudden cardiac
22  arrest.
23    Q.   Let me see if I can ask this question
24  correctly. Does the presence of multiple illicit

Page 62

1  drugs in Mr. Lurry in a situation like this where a
2  person has a mixed drug intoxication, and here we
3  have heroin, fentanyl, and cocaine, does the
4  interaction between the various drugs increase the
5  risk of toxicity and harm to the person who's
6  consumed the drugs?
7    A.   I would generally agree with that
8  statement. Not just in this specific case, but in
9  general, if you mix drugs, there's the possibility
10  of what's called a synergistic effect where instead
11  of one plus one equals two, one plus one equals
12  three. So the mixture can make a lethal consequence
13  more likely in general, you know, as opposed to a
14  pure single drug intoxication.
15    Q.   And that's the word I was looking for but
16  not coming to me, a synergistic effect.
17        Would it be fair to say that in Mr.
18  Lurry's case, there was a synergistic effect between
19  the heroin and fentanyl and cocaine in bringing
20  about his death?
21    A.   I don't know if I can really say that.
22  Some drugs have synergistic effects. I don't think
23  heroin and cocaine do. I'd have to defer to a
24  toxicologist on that. I mean, they definitely would

Page 63

1  have added effect. The heroin and fentanyl would
2  have added effect with regards to respiratory
3  depression. And the cocaine works by a totally
4  different mechanism.
5    Q.   In terms of the fentanyl that Mr. Lurry
6  consumed, are you able to say how much fentanyl he
7  consumed or ingested?
8    A.   I wouldn't feel comfortable doing that.
9  You can't look at a post-mortem drug level and
10  back-calculate to how many grams a person ingested.
11  And remember, there was more in the container that
12  was spit out. So answering that question would be
13  complex. Some of it gets absorbed. Some of it was
14  spit out. Some of it was not absorbed because he
15  died before it was absorbed.
16    Q.   And just like we don't know how much
17  fentanyl Mr. Lurry consumed, we don't know the
18  purity levels of the fentanyl that Mr. Lurry
19  consumed; correct?
20    A.   Well, I mean, whatever the drugs -- You
21  can test whatever drugs he didn't consume. So
22  assuming that they came from the same stash or the same
23  source, that is knowable. But I don't know the
24  answer to that.

Page 64

1    Q.   And, similarly, you can't tell us how much
2  heroin Mr. Lurry consumed; correct?
3    A.   I can't tell you gram amounts, no.
4    Q.   And just like we don't know the number of
5  grams of heroin that Mr. Lurry consumed, we don't
6  know the purity level of those grams of heroin that
7  Mr. Lurry consumed; correct?
8    A.   Well, outside of what we know from
9  visually. I mean, you can make estimates. Clearly,
10  we're dealing with, you know, sufficient quantities
11  to fill up the plastic bindles. We are not dealing
12  with minute quantities here. So it is possible to
13  give estimates that we are dealing with a
14  significant quantity that's visualizeable, that a
15  person would have to chew. And, like I said, it is
16  knowable with regards to the heroin from the source,
17  from the other -- his buddy, who was also selling
18  the drugs, the person he was with. That person, I'm
19  assuming that the drugs came from the same stash or
20  supplier. So that information is knowable. But
21  it's not something that I'm going to be giving an
22  opinion on.
23    Q.   And same questions as to the cocaine. You
24  don't know how much cocaine in terms of grams Mr.

Page 65

1　Lurry had ingested; correct?
2　　A.　Correct.　I don't know how many milligrams
3　or grams he took.　That is correct.
4　　Q.　And, again, you wouldn't -- you don't know
5　-- It might be knowable, but you don't know the
6　purity level of the cocaine that Mr. Lurry ingested;
7　correct?
8　　A.　Correct.
9　　Q.　Now in terms of the time of consumption or
10　ingesting of these drugs, can we agree that Mr.
11　Lurry would have consumed the fentanyl at some point
12　after his first encounter with Joliet police
13　officers on January 28th, 2020?
14　　A.　I believe that it was both fentanyl and
15　heroin in the baggies.　So, yes, both of those were
16　ingested after the encounter with the police.
17　　Q.　Beyond the fact that the heroin and the
18　fentanyl were ingested after the initial encounter
19　with the police, are you able to say at what
20　specific point in time, i.e., what minute and second
21　Mr. Lurry first ingested the heroin or the fentanyl?
22　　A.　Well, I can't give you the minute and
23　second, because I don't know if we have that level
24　of detail.　What we do know is that he was witnessed

Page 66

1　to be reaching for his pants or pocket and then put
2　his hands up above his mouth, and you can see him
3　chewing on the video.　And there's also testimony to
4　support that.　So it's reasonable to conclude that
5　that was when he ingested it.
6　　Q.　We see him chewing on the video over a
7　period of minutes; is that fair to say?
8　　A.　That is fair to say.
9　　Q.　And is it reasonable to infer that he's
10　chewing on plastic bags or baggies that -- he's
11　chewing on plastic bags or baggies that surround the
12　narcotics; correct?
13　　A.　That is reasonable to conclude, because
14　those were taken out of his mouth afterwards, yes.
15　　Q.　And it's also reasonable to infer that at
16　some point during that chewing process, Mr. Lurry
17　succeeds in ripping or tearing or breaking through
18　the plastic wrappings and then begins to ingest at
19　least the heroin and fentanyl; correct?
20　　A.　That is correct.　That's reasonable.
21　　Q.　You certainly can't say exactly when
22　during that chewing process he first succeeds in
23　ripping or tearing the packaging of the narcotics;
24　correct?

Page 67

1　　A.　No.　We don't have a camera inside his
2　mouth, so I can't say when that tearing occurred.
3　　Q.　Now you had said that your, as I
4　understand you, that Mr. Lurry would have consumed
5　the fentanyl and the heroin after his encounter with
6　the police officers.　What about the cocaine?　Do
7　you believe he also consumed cocaine that lead to
8　the presence of benzoylecgonine in his post-mortem
9　blood and urine at the same time that he consumed
10　the heroin and the fentanyl or at a different time?
11　　A.　I don't know the answer to that.
12　　Q.　I will next direct your attention to the
13　next sentence of your report.　"Asphyxia for several
14　minutes due to the obstruction of his airway is a
15　significant contributing condition to death."
16　　　Do you see that sentence?
17　　A.　I do.
18　　Q.　When you say "several minutes," what's the
19　numerical range that you're referring to when you
20　write "several minutes"?
21　　A.　So in order for someone to asphyxiate,
22　typically, they need lack of oxygen going to their
23　lungs and subsequently to their brain for about five
24　minutes.

Page 68

1　　　The time interval that we're dealing with
2　is basically from the point where he puts the drugs
3　in his mouth, presumably at the time that he's
4　arrested.　So I don't remember the exact timestamp.
5　It's in the information in my report.　But at the
6　time that he's arrested when he's putting the drugs
7　in his mouth.　And then there's an interval between
8　then and when he becomes unresponsive.　So it's that
9　number of minutes.　That's the outside period of
10　time.
11　　Q.　And when you reference the obstruction of
12　Mr. Lurry's airway, in your view, when does that
13　obstruction period start?
14　　A.　Well, his airway is already obstructed to
15　some degree just by having the drugs in his mouth.
16　I mean, you saw the size of the bags.　You know,
17　there -- You've got bags in there, and we don't know
18　exactly, you know, at what point they're getting
19　posterior.　Some of the mechanisms that look like
20　chewing may be him also gagging or trying to
21　swallow.　So the position of where those bags are,
22　they could be not completely obstructing but maybe
23　partially obstructing his posterior oropharynx or
24　larynx.

Page 69

1 So the mouth itself is part of your
2 airway. And, again, we are not dealing with an
3 on/off switch. It's not, you know, obstructed
4 versus not obstructed. There's a portion where his
5 oral cavity is partially obstructed, and then
6 subsequently when his nose gets pinched shut, then
7 his nasal passages are also obstructed. So you have
8 two potential sources for air to get into your
9 trachea, and that's from your nasopharynx and your
10 oropharynx. That's it.
11 Q. So as I understand, when you say in your
12 report, you refer to the obstruction of Mr. Lurry's
13 airway, that is not necessarily full occlusion, a
14 hundred percent obstruction, but could also include
15 a partial obstruction?
16 A. That is correct.
17 Q. And you're saying that you believe at
18 least partial obstruction began when he first has
19 the drugs in his mouth. Is that what you're saying?
20 A. Correct, because he could no longer
21 breathe through his mouth because his mouth is full
22 of the drugs. He can only breathe through his nose
23 at that point.
24 Q. Now as you had said earlier, we don't have

Page 70

1 a camera inside Mr. Lurry's mouth; correct?
2 A. Correct.
3 Q. So at any given point in time when Mr.
4 Lurry's mouth is closed, we don't know the precise
5 location of any of those bags or baggies; correct?
6 A. Well, we know enough to know that they're
7 in his mouth. They're in his airway. And at the
8 point that he becomes unconscious, it's pretty
9 certain that they're sufficiently posterior that
10 they're obstructing air supply, because you can see
11 as they're pulling them out, as the police officers
12 pulled them out, they were already broken. They
13 were in pieces, and they're coming out in more than
14 -- They're not just one chunk. It's a whole big
15 piece. It's like a ribbon.
16 Q. How are you able to tell that at the point
17 when Mr. Lurry is approaching unconsciousness or
18 unconscious that the plastic bags are physically
19 located within his mouth at the back of his mouth
20 near his oropharynx as opposed to somewhere else in
21 his mouth?
22 A. Well, you can tell because the officers
23 can't get them out. You know, they sweep his mouth.
24 They try to get them out, but they have to go really

Page 71

1 deep. And then remember there's one baggie that
2 doesn't come up until they're doing CPR on him.
3 So just in terms of the size of the
4 baggies in the evidence photos combined with the
5 size of, you know, a standard oral cavity, it's
6 reasonable to conclude that they're obstructing not
7 just the mouth area, but the posterior portions, as
8 well.
9 Q. Can you exclude the possibility that when
10 the plastic bag or baggies were in Mr. Lurry's mouth
11 as he was approaching unconsciousness or becoming
12 unconscious they were located elsewhere within his
13 oral cavity, say to the side, to the left side or to
14 the right side, rather than at the back of his oral
15 cavity obstructing his oropharynx?
16 A. I mean, it's just not compatible with what
17 we're seeing on the video. They really have to dig
18 in there to get it out. It wasn't just in his
19 cheeks or you would have seen them pull it out right
20 away. So I'm just saying what I see on the video.
21 Q. So your view that the plastic bag or
22 baggies were at the back of Mr. Lurry's mouth
23 obstructing his oropharynx is based on your
24 observations of the squad car video?

Page 72

1 A. And the testimony associated with that,
2 including the testimony of the fact that a bag came
3 out during the CPR process when it was outside of
4 the video, you know, outside of the view of the
5 video outside the car.
6 Q. And what was the testimony as to the
7 approximate size of that bag or baggie that came out
8 of Mr. Lurry during the CPR process?
9 A. They don't testify or make comments about
10 the size, but we have the evidence photos that shows
11 the bags. So I don't know exactly which one came
12 out at which point. But in cumulative, they are all
13 big, and you can add those together.
14 Q. All right. In terms of Mr. Lurry's airway
15 being partially obstructed or being obstructed, and
16 you had said it could be a partial obstruction, are
17 you able to tell us to a percentage or range of
18 percentages how obstructed Mr. Lurry's airway was?
19 A. Well, I mean, like we said in my report,
20 following the yellow highlighter, the average adult
21 airway narrows to about 1-1/2 to 2 centimeters. So
22 it's about an inch in size. Each of the individual
23 baggies are more than that or bigger than that. So
24 they're pushing on that size or are bigger,

Page 73

1  depending on how they are scrunched down. So I
2  think that there's pretty good physical evidence
3  that even a partial obstruction could, you know,
4  could have a significant impact on a person's
5  airway.
6    Q.  I hear you about the size of the bags.
7  But my question was a little bit different. Can you
8  -- Are you able to put a percentage and tell us Mr.
9  Lurry's airway was 50 percent obstructed, 20 percent
10  obstructed at any particular point during this
11  incident?
12    A.  Yes, I can tell you that it was a hundred
13  percent obstructed when his nose was closed.
14    Q.  And how do you know of that?
15    A.  Because he became unconscious, and at that
16  point, they had to pull the bag out in order for him
17  to start breathing again. So it was only after the
18  bags came out of his mouth that he starts breathing
19  again. So he's capable of breathing. It's just
20  that there's an obstruction there.
21    Q.  And how do you know at the point that Mr.
22  Lurry's nose was pinched that his oropharynx was
23  fully obstructed from plastic bags?
24    A.  Because you could see how big they are

Page 74

1  when they're taken out and he stops breathing. Up
2  until that point, people reported that he was
3  somewhat responding or looking. I mean the officers
4  thought that he was -- he was -- It's hard for me to
5  answer because their assessments are not exactly
6  accurate based on what you see on the video.
7        It's clear that he stops breathing after
8  the nose is obstructed and becomes completely
9  unconscious and falls over.
10        Like up until that point, his eyes are
11  somewhat open. He seems to be moving a little bit.
12  I mean he's not completely unconscious. So
13  unconsciousness is a recognition of the fact that no
14  more or insufficient blood is going to the brain.
15    Q.  Would it be fair to say that as starting
16  from the time Mr. Lurry is first put in the back of
17  the police car going up to the time that Mr. Lurry
18  arrives at the Joliet Police Station before any
19  officers approach him in the back of the police car
20  that Mr. Lurry looks increasingly sleepy?
21    A.  He looks like he is having an alteration
22  in consciousness. I wouldn't say sleepy. But I --
23  From a medical term, it seems like his consciousness
24  was shifting and he's becoming more obtunded and is

Page 75

1  showing signs of being under the influence of the
2  drugs during the course of that video up until the
3  point where he's in the back of the car and they
4  open the door.
5    Q.  To try to use a medical term, would it be
6  fair to say that the video of Mr. Lurry from the
7  time that he's first put into the back of the police
8  car until the time that he arrives at the Joliet
9  Police Station shows him moving from a state of
10  consciousness in the direction of a state of
11  unconsciousness?
12    A.  To some degree, though he still appears
13  conscious when they open the door. He doesn't
14  appear completely unconscious.
15    Q.  And, in fact, when they open the door, Mr.
16  Lurry looks towards the officer who opens the door;
17  do you -- correct?
18    A.  That is correct.
19    Q.  All right. Do you think that motion by
20  Mr. Lurry looking towards the officer who opened the
21  door was a voluntary motion?
22    A.  It was. I mean I think it's responding to
23  the stimuli. I don't think it's involuntary. It's
24  not -- Somebody is not making him move his head.

Page 76

1    Q.  And as you see the video, Mr. Lurry
2  doesn't go unconscious until after the nose pinch
3  occurred?
4    A.  When we talk about completely unconscious
5  where he falls over, yes, that is correct. That
6  happens after the nose pinch.
7    Q.  And are you saying that it's the nose
8  pinch that causes him to reach the state of full
9  unconsciousness at the time that he does?
10    A.  It's a combination of factors. It's the
11  nose pinch with the bags obstructing the airway and
12  the levels of drug in his system which are slowly
13  rising up throughout this process.
14    Q.  Can you say whether Mr. Lurry would have
15  reached the state of unconsciousness if his nose had
16  not been pinched?
17    A.  He -- I don't know how to answer that. I
18  mean it depends. There would be a lot of variables.
19  It's possible. It's also possible that not. I
20  don't know. You would have to -- If you didn't
21  pinch his nose, you'd still also have to take the
22  bags out of his mouth and give him supportive care.
23    Q.  And when Mr. Lurry's nose is pinched, is
24  his mouth closed the whole time?

Page 77

1  A. I don't recall. I think it's partially
2 closed. It seems closed for part of the time and
3 then it seems a little cracked open at some point.
4 But I'd have to go through the video again.
5  Q. But in terms of Mr. Lurry's oropharynx,
6 you've told us that you believed his airway was a
7 hundred percent blocked at the moment the nose pinch
8 happens.
9  What about before the -- What about
10 specifically Mr. Lurry's oropharynx before the nose
11 pinch happens? Can you tell us at any particular
12 point whether Mr. Lurry's oropharynx is 90 percent
13 obstructed or 50 percent obstructed or 10 percent
14 obstructed?
15  A. I can give you a rough estimate that it's
16 pretty significantly obstructed. I can't give you a
17 percentage. But what you can do is you could look
18 at those bags and estimate their size and then
19 estimate, you know, the size of an average person's
20 mouth.
21  It seems pretty significant obstruction
22 for an oral cavity with all of the bags involved and
23 the sizes we're dealing with.
24  Q. And the size that you give of 1-1/2 to

Page 78

1 2 centimeters for the average adult airway, is that
2 information or a statement I could find in just an
3 ordinary anatomy textbook? Or where would I go to
4 find peer-reviewed support for that statement?
5  A. That would be in a textbook, either
6 anatomy, physiology. You can look at photos,
7 Netter's Atlas. I don't know if they necessarily
8 have a ruler in all of those. But, primarily, most
9 forensic pathologists will agree that that's about
10 the size, based on the variability of individuals.
11 Some people might be a little bigger. Some people
12 are smaller. But that's a ballpark.
13  Q. And to make sure I understand, that 1.5 to
14 2 centimeters, is that for people while they're
15 alive, or is that something that you -- a size that
16 is based on what a pathologist like yourself would
17 observe after someone has passed?
18  A. It would be the same in life and death.
19 You could see it when you do intubations, as well.
20 So an emergency physician would say that it's about
21 the same. The airway is not markedly different in
22 size. It's not something that is so flexible
23 because it's got cartilage rings. It's not like,
24 for example, the stomach that is elastic and can

Page 79

1 really expand. So the size is the same in living as
2 well as in dead.
3  Q. And you mentioned that some people can be
4 a little bit larger or a little bit smaller. So my
5 next question is let's say we go two standard
6 deviations away from the mean. Not all of the way
7 to the end of the bell curve, but just two standard
8 deviations, approximately. I'm not going to hold
9 you to the exact decimal point, but, approximately,
10 what would be the low end and high end of range for
11 the size of the average adult airway at the
12 posterior cartilaginous rings or epiglottis?
13  A. The number that I gave, 1.5 to
14 2 centimeters. That would be -- The majority of the
15 people would be in that. I mean outliers would be
16 people who have let's say tumors that are
17 obstructing their airways or some sort of abnormal
18 anatomy, you know, achalasia, stenosis. I'm trying
19 to remember the terms. There would be some -- They
20 wouldn't be healthy and wouldn't be normal.
21  Q. And later on in your -- A couple of
22 sentences down, you say, "Even when smaller than the
23 airway, foreign objects in the posterior pharynx and
24 larynx can also cause laryngospasm."

Page 80

1  Do you see that?
2  A. Yes.
3  Q. What is laryngospasm?
4  A. So just like muscles can spasm, people
5 know what that feels like when they have like a
6 muscle contraction or a muscle spasm. The airway
7 itself does have some muscles surrounding the
8 cartilaginous rings and in between them. So when
9 there is irritation to an airway, the airway itself,
10 the muscles can contract and constrict the airway.
11 And also, the inner mucous lining, the mucosa, which
12 is the lining cells, can get thicker and get mucus
13 in there to try to expel the object, and that can
14 narrow the airway, as well.
15  So an example of that would be, for
16 example, somebody who is asthmatic. Even though
17 their airway is a normal size and does not appear
18 obstructed by any foreign object, even irritation by
19 pollen, for instance, can cause a laryngospasm which
20 can narrow the airway significantly to cause them
21 respiratory distress.
22  Q. And are you telling us --
23  A. So there is some variability in that.
24  Q. And are you telling us that Mr. Lurry

Page 81

1 definitely had a laryngospasm, or that that's merely
2 something that's possible, given what you've
3 observed in the video?
4    A.   It's something that's possible given what
5 I observed on the video and my knowledge of airway
6 anatomy.
7    Q.   Can you be entirely certain that Mr. Lurry
8 had laryngospasm at the moment he was in the
9 backseat of the squad car?
10   A.   I don't believe I have to testify to a
11 hundred percent certainty.  I think it's, you know,
12 reasonable probability that that can occur in the
13 context of all of those objects in the airway
14 combined with neck pressure and the drugs involved.
15   Q.   Is there anything, any sort of observation
16 from the video either that you saw or that could be
17 seen that would be indicative of laryngospasm?
18   A.   Well, it's -- I can't say from the video
19 itself, but I think that the conclusion of what
20 happened, which is he's got things in his oral
21 cavity, then his nose is pinched, and then he stops
22 breathing argues that there's an obstruction.
23 Whether that obstruction is directly from the
24 baggies and the nose pinching just on the surface of

Page 82

1 the oropharyngeal cavity or whether it's further
2 back, it doesn't really matter.  I mean, there's
3 clearly obstruction happening here.  And I'm giving
4 a possible explanation for how it can happen in
5 different ways.
6    Q.   In terms of -- You told us that Mr. Lurry
7 stops breathing.  And I think -- Did I hear you
8 correctly to say that you can tell on the video when
9 he stops breathing?
10   A.   To some degree.  I mean, listen, on the
11 video, you can see -- it's not the greatest
12 quality -- but you can see his chest moving and
13 rising in different parts.  And you can see when
14 he's chewing and moving his torso to some degree.
15      So there are parts of the video where you
16 can see him breathing.  But then again, you can also
17 infer that a person's not breathing at the point
18 that they become unconscious and the testimony is
19 that they stopped breathing.  So it's a combination
20 of the video and the testimony.
21   Q.   Are you saying that Mr. Lurry must have
22 stopped breathing prior to the time he became
23 unconscious?
24   A.   It -- He became unconscious -- I don't

Page 83

1 know how to answer that question.  It's a very
2 awkward question.  I don't understand it.
3    Q.   I'll try to ask it a different way.  Did
4 Mr. Lurry stop breathing first, did he lose
5 consciousness first, or are you unable to tell?
6    A.   I believe that he lost consciousness
7 because he stopped breathing.  So he would have had
8 to stop breathing first.  And the reason that I'm
9 concluding that he stopped breathing first is
10 because on the video, I could see that his airway is
11 obstructed.  His mouth has drugs in it, and his nose
12 is obstructed.
13   Q.   And what is it that you saw on the video
14 that leads you to conclude that his airway is
15 significantly obstructed, as opposed to the fact
16 that he merely has drugs in his mouth?
17   A.   The drugs in his mouth is the airway
18 obstruction.
19   Q.   But if you don't know where in Mr. Lurry's
20 mouth the drugs are, how can you know that they're
21 significantly obstructing his airway?
22   A.   Because of their size and the physical
23 evidence of the bags combined with the video showing
24 them pulling them out in pieces.  So it's -- it

Page 84

1 expanded to some degree to fill up that space.
2      We're not dealing with a very, very tight
3 bindle anymore because of the chewing mechanism.
4    Q.   And can you tell when Mr. Lurry is doing
5 that chewing whether he's swallowing any of the
6 narcotics?
7    A.   We can presume that he is, given that he's
8 got the drug levels that suggest he absorbed it.  I
9 mean, I don't -- It's possible he absorbed it just
10 from his oral cavity, but it's unlikely.
11   Q.   Can a person have drugs in their mouth
12 wrapped in plastic bag and the drugs be in a
13 position within their oral cavity, say to their
14 cheeks or to the side or by their tongue, that
15 doesn't significantly obstruct their airway?
16   A.   It's possible.  But they would look
17 different.  They would look full.  I mean, they
18 would look like a chipmunk.  So that's not what I'm
19 seeing on the video.
20   Q.   Now when it comes to laryngospasm, is that
21 something that if it happened, there would be
22 visible evidence of it at autopsy?
23   A.   Not at autopsy, because at autopsy, all
24 muscles relax.  So you wouldn't see the spasm.  You

Page 85

1 could potentially see it during the process of
2 intubation where it could be difficult to intubate
3 them because of the spasm. But once the obstruction
4 is removed, usually the spasm is released. So it's
5 a presumed mechanism given the size of the
6 obstruction.
7 Q. If a person has -- Obviously, a living
8 person. Only living people can have laryngospasms.
9 Stupid me.
10 If a person has laryngospasm and you're
11 standing next to them, is that something that you
12 can physically see?
13 A. Well, you can't see it from looking at the
14 outside of their body, but you may be able to hear
15 it. So they would have stridor in their breathing,
16 and you would be able to observe their face turning
17 blue. They'd have their mouth open. So there are
18 physical signs.
19 So, for example, a person with an asthma
20 attack. Let's not talk about drugs for a second.
21 Let's say someone with an asthma attack has
22 laryngospasm. You can hear them wheezing. You can
23 see that they're having difficulty breathing. They
24 might be kind of hunched over or opening their mouth

Page 86

1 and looking kind of like a fish out of water trying
2 to get more oxygen in.
3 Q. Earlier, I had asked you about whether Mr.
4 Lurry's turning towards the officer who opened the
5 door was a voluntary action. When the officer we
6 now know to be Sergeant May struck Mr. Lurry, Mr.
7 Lurry turned in the direction of Sergeant May;
8 correct?
9 A. I believe so, yeah.
10 Q. I think so, too. So assuming that's
11 correct and Mr. Lurry did, indeed, turn in the
12 direction of Sergeant May when Sergeant May struck
13 him, would you describe Mr. Lurry's turning in
14 Sergeant May's direction as a voluntary action?
15 A. Well, I think it's a reaction. I don't
16 think he would have turned to him had he not been
17 struck. He is reacting to the blow.
18 Q. Can you say whether -- and I may be using
19 the words wrong. If I'm using the words -- the
20 terminology incorrectly, feel free to correct me.
21 Can you say whether Mr. Lurry's turning
22 towards Sergeant May was a volitional action on his
23 part or merely a reflex, like when the doctor taps
24 your knee with the little hammer and your knee

Page 87

1 automatically kicks out, whether you are
2 volitionally controlling those muscles or not?
3 A. It kind of falls in between the two. So
4 that's not a known reflex phenomenon. But we do
5 test people's consciousness by causing, for example,
6 a sternal rub, and they can react to the pain. And
7 that is not exactly volitional, but it shows a
8 certain level of consciousness, that a person might
9 withdraw. It's a reflex to withdraw or react to
10 pain. So this is a little bit of both.
11 Q. And a sternal rub, in fact, we see on the
12 video one of the officers giving Mr. Lurry a sternal
13 rub; correct?
14 A. I believe so, yes. That's later in the
15 sequence.
16 Q. And can we agree that a sternal rub is a
17 recognized medical technique to help determine
18 someone's level of consciousness?
19 A. It is.
20 Q. Now I am going to pull up the video of Mr.
21 Lurry in the backseat. I'm not going to mark this
22 one as an exhibit. Abby, I know these videos all
23 too well. I am going to use, Abby, the same video
24 that I used for the others. It is the video of

Page 88

1 Officer McCue's squad car that ends in 054. And I'm
2 going to use Stream 3. And to give you a preview of
3 coming attractions, Doctor, what I'm going to do is
4 pick up the video once Mr. -- when the officers
5 arrive at the police station and play it. And I'm
6 going to ask you to tell me when you believe Mr.
7 Lurry is no longer breathing, at the first point
8 where you believe Mr. Lurry is no longer breathing.
9 Do you understand what I'm going to ask
10 you?
11 A. I understand. I don't know if I can
12 comply, but I'll try.
13 Q. If you're not able to tell when Mr. Lurry
14 stops breathing, that's -- you can say that, too.
15 A. Well, part of it is, like I said, we're
16 doing this on my phone, so I don't want to say
17 something and then there's a delay and then the time
18 is off because we're dealing with an electronic
19 difference in terms of the period of time and the
20 phone delay, combined with the fact that I'm working
21 on a very small screen. So I'm hesitant to commit
22 to a specific time and say, "Right there he stops
23 breathing," because of the technical limitations
24 that we're dealing with in this deposition.

Page 89

1    Q.   Well, if we have to operate under the
2  technical limitations, we'll do that.  Let's see if
3  we can get around it.  Do you have available to you
4  a copy of Officer McCue's squad car video, the
5  rearview camera that shows Mr. Lurry in the
6  backseat?
7    A.   I do.  I have to find it.  It's in a lot
8  of stuff here, so give me a second.
9         Here we go.  So I do want to mention that
10 one of the things I noticed with regards to this
11 video when I played it even on my iPad is that the
12 timestamps were very unpredictable, meaning that
13 there were times where I would play it and I would
14 identify a particular event, and I would write down
15 the timestamp, and then I'd play it again the next
16 day and that event was not at the timestamp that I
17 wrote it down to be.  It was at a different time.
18        You know, within the ballpark of -- I
19 don't know if it's a problem or with this particular
20 player, but I do want to mention that for the
21 record, because I do think that that's a software
22 issue and not a --
23   Q.   It may be.  I can represent to you that
24 when I copy this file --

Page 90

1    A.   Yeah.
2    Q.   -- if I copy it, sometimes the timestamp
3  at the top disappears.  So what I'm going to do is
4  to direct your -- Are you able to see on your iPhone
5  screen my screen share, and at the top center, there
6  is a date, a time, and even latitude and longitude
7  coordinates?
8    A.   I don't.  That's cut off.  So I see --
9  Well, all it says at the top of my screen, it says,
10 "Zoom," and then I see the top of the window.  I
11 don't see any text at the top at all the way it's
12 cut off.
13        And I have the video on my iPad right now,
14 but for some reason, it's deciding not to play.  It
15 was very -- Oh, now it's going, I think.  I heard
16 audio.  Did you hear that?
17   Q.   That was my audio.
18   A.   Oh, that was your audio.  Okay.  Sorry.  I
19 thought that was mine.
20        Yeah, it's very difficult to manipulate
21 here.  I'm going to hold my -- just so you can see
22 my iPad -- up to the screen, you can see the
23 difficulties I'm having with it as a piece of
24 equipment.  Can you see this?  I just want to see if

Page 91

1  you can see my --
2    Q.   I can see it a little bit.
3    A.   Let me just get the video participants.
4  Okay.  Close.  How do I get you -- Oh-oh.  Now
5  you're rotated wrong.  Ugh.  Let's see.  Come on.
6  Rotate.  There we go.  Rotate.  Okay.  Share content
7  maybe.  Stop video.  More.
8         Okay.  Here we go.  So when I hold this up
9  like this, I have the video on my iPad.  You can see
10 that I can bring it to the front, and I start
11 playing, but then it bounces to where it was last.
12 It's not -- Oops.  It's not the most intuitive
13 video, and it's not very responsive.  And I'm just
14 concerned that any kind of testimony that's reliant
15 on the timestamp of this video is not going to be
16 accurate, I'm going to be blunt with you, because
17 the timestamps, like I said, have been really
18 unpredictable.  I noticed, like I said when I wrote
19 my report, that I would say in the parts where I
20 described the video -- I'll show you where in my
21 report it was actually -- Where is my description of
22 the video?
23        Oh, so it's Page 10 of 22.  And you'll
24 notice that at Line -- Paragraph 13, I even said,

Page 92

1  "In watching the video, I noticed that timestamps on
2  the player did not correspond well when it was
3  replayed, so the timestamp I cite here may not be
4  accurate.
5         And I specifically put that in my report
6  because every time I played it, the same event,
7  whether it was the nose pinching or the strike or
8  the turning, it would be at a different timestamp.
9  It would be off by sometimes several minutes.  And I
10 don't know the reason for that.
11        But I tried to make an accurate record so
12 that you would know exactly when things happened.
13 But I think that if we try to get testimony based on
14 timestamps, it's going to be a problem for the
15 record.
16        MR. MATHUES: I hear you.  Abby, are you
17        able to see the timestamp and date stamp
18        at the top of my screen?
19        MS. BAKOS: Yes.
20 BY MR. MATHUES:
21   Q.   Well, let's do what we can.  Abby and I
22 can see the time, what this timestamp says and
23 acknowledge it.  And then we can at the moment that
24 you believe, based -- again, understanding the

Page 93

1 limitations of your screen, but the moment you
2 believe that Mr. Lurry is no longer breathing, then
3 I would ask you to describe the positions of the
4 people that we see, and we'll do our best, because
5 I'm curious.
6        So I'm going to push the play button here.
7 We're at the police station. The time door is open.
8 And the timestamp that I have in front of me is
9 16:16:09.
10       (Video playing).
11   A.  So he's still breathing there. You could
12 see that he's actually -- You could see his chest
13 rise. And he's turning. I saw a brief chest rise
14 right there. Here is another one.
15   Q.  Okay. Just to say, we're at 16:16:26.
16 I'll start it back now.
17   A.  Okay. Well, the thing we need to pause --
18 Can you just pause for one second?
19   Q.  Sure.
20   A.  The thing that's really hard for me in
21 answering this question, and I don't feel a hundred
22 percent comfortable answering it as a result, is
23 because people don't breathe regularly; okay? We
24 take breaths. We're not constantly breathing in and

Page 94

1 out and in and out and in and out. We take breaths,
2 you know, every, you know, 20 to -- 10 to
3 20 seconds, depending on our respiratory rate. So
4 if a person, for example, is under the influence of
5 opioids, their respiratory rate slows down. So
6 instead of maybe taking, you know, 15 or 10 breaths
7 a minute, they might be taking 8.
8        So a person can stop breathing, and the
9 absence of breathing is not going to necessarily
10 show up on video. Does that make sense?
11   Q.  It does make sense.
12   A.  Because you can't see it.
13   Q.  It's kind of where I'm going --
14   A.  Okay.
15   Q.  -- when you say, based on your
16 observations of the video, or based on your
17 observations of even your observations of the video
18 and the testimony when Mr. Lurry stopped breathing.
19   A.  Okay. Well, I need to qualify something.
20 Stopped breathing. The process of breathing is more
21 than just trying to breathe. It's also being able
22 to get oxygen into their lungs. So if I cover my
23 nose and mouth right now like this, as I'm covering
24 them, I can't breathe. I can try to breathe. My

Page 95

1 chest might be rising, but there's an obstruction;
2 okay?
3        And so I identify to you in my testimony
4 that at the point that someone pinches his nose and
5 we know that his oral airway is obstructed, at that
6 point, I know for certain he cannot breathe, because
7 anatomically, there's a complete obstruction of both
8 his nose and his mouth at that point, and you can
9 see that on the video, so that's why I said that's
10 when he stopped breathing. His diaphragm might
11 still be trying to move. His chest might still be
12 trying to expand. But there's an obstruction at the
13 nose and mouth level. Okay? Does that make sense?
14   Q.  Once Mr. Lurry's nose is no longer
15 pinched, but he's still in the backseat of the car
16 with the officers, can you tell whether he's
17 breathing?
18   A.  He appears to not be breathing. He
19 immediately falls over unresponsive, and the
20 officers say he is not breathing.
21   Q.  Can --
22   A.  And they testified and they made in their
23 statement that he was not breathing at that point.
24   Q.  Can you tell whether Mr. Lurry stopped

Page 96

1 breathing prior to the time his nose was pinched?
2   A.  I don't know. I haven't specifically
3 looked. It's possible, but I don't know. I don't
4 think so.
5        He seems more alert and conscious before
6 the nose was pinched. He was at least reacting, as
7 you pointed out, you know, when he got hit. So it
8 depends -- You know, we're dealing with seconds
9 here. So I don't know if I can answer that
10 question.
11       When you say stopped breathing, do you
12 mean on his own because of respiratory depression?
13 Is that what you're asking?
14   Q.  Correct.
15   A.  I don't think that that's looks like that.
16 He's still responding. He's still looking around.
17 And, again, respiratory depression is not, again, an
18 on/off switch, because you breathe about, you know,
19 10 to 15 breaths per minute. You could be down to
20 maybe 8 breaths per minute and still be conscious.
21 There's some depression, but you're not completely
22 stopped. It's a process.
23   Q.  You said just a couple of answers ago that
24 once the nose -- Mr. Lurry's nose was pinched, both

Page 97

1 his nasopharynx and -- I always use the wrong
2 word -- and his oropharynx were fully obstructed.
3 And how do you know that at that moment of the nose
4 pinch his oropharynx is fully obstructed as opposed
5 to say partially obstructed or only slightly
6 obstructed?
7    A.   Because of the size of the bags that are
8 taken out of his mouth and the size of his oral
9 cavity based on the autopsy photos and the video,
10 because he's not an abnormally enormous person.  You
11 know, like he's got a standard oral cavity.
12    Q.   We've been going about another hour.
13 I'm -- Five minutes.  I'm also going to shift gears
14 and ask about the hemorrhage in his strap muscle.
15 So this seems to me to be a good time to take a
16 break.  Does that work for everybody?
17    A.   Yeah.  Yeah, I could use a bathroom break.
18 Thank you.  So 5 minutes or 10?  How many minutes?
19    Q.   Between 5 and 10.  Whatever works for you.
20    A.   Okay.  All right.  Thanks.  Sounds good.
21 See you in a bit.
22    (Whereupon at this point in the
23    proceedings, a recess was held from 4:42
24    p.m. to 4:53 p.m., after which the

Page 98

1    following proceedings were conducted:)
2 BY MR. MATHUES:
3    Q.   Before we move on to the hemorrhage on the
4 strap muscle of Mr. Lurry's neck, I wanted to go
5 back to the bag that Mr. Lurry is reported to have
6 coughed up at the CPR -- after he had received CPR.
7    Would that bag or piece of bag itself have
8 been enough to significantly obstruct Mr. Lurry's
9 airway?
10    A.   Based on its size.  I'm assuming it's the
11 one that was darker in color, because I think it was
12 described as orange by one of the officers.  But,
13 yeah, based on its size, that alone could have
14 obstructed his airway, correct.
15    Q.   Is it possible that that alone obstructed
16 his airway before, during, and after the nose pinch?
17    A.   It's possible.  But if it was completely
18 obstructing his airway before the nose pinch, I
19 would expect him to have become unconscious.  So the
20 timing of the unconsciousness following the nose
21 pinch kind of falls in with the nose pinch being a
22 significant contributor here.
23    Q.   I will now direct your attention to your
24 report again, Exhibit 1, where you have a sentence

Page 99

1 about, "Asphyxia and laryngospasm can be exacerbated
2 by pressing on the front of the neck as Sergeant
3 May is" -- "Douglas May is seen doing in the video.
4 We know he did this with sufficient strength to
5 cause injury because of the resultant acute
6 hemorrhage in the right strap muscle of Mr. Lurry's
7 neck and the petechiae in the right sclera."
8    Do you see that part of your report?
9    A.   Yes, I do.
10    Q.   And are you saying in this part of your
11 report that you believe Sergeant May's actions of
12 pressing on Mr. Lurry's neck are the cause of the
13 hemorrhage in his strap muscle that both you and Dr.
14 Humilier observed?
15    A.   Yes.  It corresponds to the location of
16 where his hand is.  So you see it on the video where
17 his hand is, and that's exactly where the hemorrhage
18 is.  So I do believe it is the cause.
19    Q.   And can you exclude the medical treatment
20 that Mr. Lurry received at the hospital as the cause
21 of the hemorrhage on Mr. Lurry's right strap muscle?
22    A.   I think it's unlikely, because that's not
23 a place that you normally press during medical
24 treatment.  It's not usually on the right.  If you

Page 100

1 are going to be doing pressure, it's cricoid
2 pressure.  It's higher up and midline.  So it
3 doesn't really fit in.
4    Q.   Can you exclude with certainty any of the
5 actions of the EMTs and paramedics who treated Mr.
6 Lurry as the cause of that hemorrhage?
7    A.   Again, I would exclude it because I think
8 it's unlikely.  It's not part of standard medical
9 therapy.
10    Q.   All right.  Now when a person is
11 intubated, particularly they are intubated by
12 endotracheal intubation, isn't it customary or even
13 expected to stabilize the person's neck during
14 intubation?
15    A.   It is, but not by pressing on the right
16 strap muscles.  Wrong location.  You don't stabilize
17 the neck by doing that.
18    Q.   Can you exclude the possibility that the
19 paramedics caused the hemorrhage by pressing on Mr.
20 Lurry's neck or stabilizing his neck even if it was
21 in the wrong location for them to do that?
22    A.   I don't have any testimony from them or
23 documentation from them to believe that they would
24 have done that.  So I can exclude it just based on

Page 101

1   that. It's not -- I think it's incredibly unlikely.
2     Q.   And if you go back to what I will be
3   marking as Exhibit 6, Dr. Humilier's autopsy report,
4   I'm going to direct your attention to No. 2 under
5   Evidence of Medical Treatment where it reads, "On
6   the right side of the neck, there is a catheter."
7       Do you see that part of the autopsy
8   report?
9    A.   Yes.
10    Q.   And can you exclude the insertion of the
11   catheter on the right side of Mr. Lurry's neck as
12   the cause of the hemorrhage in Mr. Lurry's right
13   strap muscle?
14    A.   I think it's unlikely. Wrong location.
15   The strap muscle is in the front. The catheter
16   would be in the vein, which is more lateral. It's a
17   different -- I mean, they're about a centimeter to
18   even an inch away from each other based on the
19   anatomy.
20    Q.   Is it possible for the insertion of a
21   catheter to cause a hemorrhage in a person's muscle
22   an inch or a centimeter away from the location the
23   catheter is inserted?
24    A.   If Dr. Humilier felt that that hemorrhage

Page 102

1   was a direct result of the medical treatment, he
2   would have put it under Evidence of Medical
3   Treatment. He did not. He put it separately under
4   Evidence of Injury. And so that indicates to me, as
5   a forensic pathologist, that it is not caused by the
6   medical therapy, because I know that standard
7   practices, and in reviewing other people's reports,
8   that if there is hemorrhage as a direct result of
9   something like a catheterization, I will write it
10   under Evidence of Medical Treatment, and I will say,
11   "In the right side of the neck, there is a catheter.
12   There is subjacent hemorrhage extending from the
13   catheter to the strap muscle of the neck." Okay?
14       So it is possible to get hemorrhage from a
15   catheter that goes to the strap muscle, but you can
16   see that it's connected. You can see that it's
17   coming from the catheter. And that is not the case
18   here.
19    Q.   And so would you say that it's impossible
20   in this case for the insertion of the catheter to
21   have been the cause of the hemorrhage in Mr. Lurry's
22   right strap muscle?
23    A.   I'm not going to say impossible. I'm
24   going to say unlikely. It's not reasonable.

Page 103

1    Q.   Would you describe Sergeant May's actions
2   as choking Mr. Lurry?
3    A.   I think Sergeant May is putting pressure
4   on his neck. He's causing neck compression. Okay?
5       The term "choking" is broad and means lots
6   of different things to different people. So I would
7   prefer to use the term "causing neck compression."
8    Q.   Did Sergeant May strangle Mr. Lurry?
9    A.   Strangulation can be accomplished with
10   neck compression. So I don't think he intended to
11   strangle him. I think he intended to put pressure
12   on his neck. I think it contributed to the
13   asphyxia. But I don't think he strangled him. I
14   think that that would be -- that would discount the
15   other components of what's going on here.
16    Q.   And understanding that you're not a police
17   procedures expert, can we at least agree that
18   Sergeant May did not use a choke hold on Mr. Lurry?
19    A.   This did not appear to be an arm --
20   crossarm choke hold or bar arm hold, that is
21   correct.
22    Q.   And --
23    A.   But he was putting pressure on his neck,
24   which would have contributed to asphyxia or choking.

Page 104

1    Q.   Now you also in that part of your report
2   also reference the petechia in Mr. Lurry's right
3   sclera; correct?
4    A.   Correct.
5    Q.   And Dr. Humilier also observed the
6   petechia in Mr. Lurry's right sclera; correct?
7    A.   I was relying on his observations, yes.
8    Q.   And a petechia is a pinpoint round spot
9   that would appear either on the skin or, in this
10   case, on the person's eye; is that accurate?
11    A.   It's usually on the whites of the eye or
12   on the inner lids. But, yes, what happens is that
13   there's a small burst blood vessel due to pressure
14   changes.
15    Q.   I think Dr. Humilier's report uses the
16   phrase "petechial hemorrhage," and you use the word
17   "petechia."
18       Is there any material difference between
19   those phrases, or is that potatoe/potato,
20   tomatoe/tomato?
21    A.   I would go with potatoe/potato.
22    Q.   And the sclera, is that the white outer
23   coating of a human's eye?
24    A.   It's the white part of the eye, yes.

Page 105

1    Q.   Is there any material difference between
2  saying that someone had conjunctival petechia and
3  petechia on their sclera, or is that also --
4    A.   Yes, so conjunctival petechiae are usually
5  -- So conjunctiva has to do with the lining covering
6  the eye, and you can have conjunctival petechiae
7  either on the sclera, which is on the white of the
8  eye, or on the palpebrae, which is on the inner
9  eyelids.
10   Q.   Would it be at least accurate to call a
11 petechia on your sclera a subspecies or a subset of
12 conjunctival petechia?
13   A.   Yes, that would be correct.
14   Q.   And Mr. Lurry had a single petechia on his
15 right sclera; correct?
16   A.   Yes.
17   Q.   And you have done many autopsies where
18 individuals have not one petechia but many
19 petechiae; is that also correct?
20   A.   That is correct.
21   Q.   How many autopsies have you done where
22 there is the presence of petechia, but only one?
23   A.   A handful.  It happens.  It really depends
24 on the case.

Page 106

1    Q.   And what's the significance to you of the
2  single petechial hemorrhage or petechia on Mr.
3  Lurry's right sclera?
4    A.   In the context of the fact that you can
5  see on the video that he's having pressure applied
6  to the right side of his neck, and in the context of
7  the fact that he was known to be choking on
8  something obstructing his neck, so that there's
9  pressure coming from the outside as well as from the
10 inside -- okay -- and in the context that he then
11 subsequently became unconscious, it indicates to me
12 that it is part of the parcel of the fact that this
13 patient asphyxiated.  It's not just a death from an
14 overdose, because deaths from overdoses you don't
15 often get petechiae.
16      I mean, I've done, you know, hundreds of
17 deaths from overdoses.  Petechiae are rare to find
18 in those cases unless the person is facedown, which
19 he was not.
20   Q.   But you have done autopsies in the past
21 with overdoses where you have seen petechiae?
22   A.   Yeah, but usually in cases where people
23 asphyxiate, like they have fallen into a position
24 and there's positional asphyxia, or they're

Page 107

1  restrained and placed facedown.  It's -- I've seen
2  plenty of -- Let's put it this way:  It's more
3  likely that I will see petechiae in cases of
4  overdoses when people are also asphyxiated or where
5  asphyxia is part of the mechanism of the overdose.
6    Q.   Have you done autopsies where you observe
7  petechiae and the person did not die from asphyxia?
8    A.   Yes.
9    Q.   And is petechia -- Would you say petechia
10 is indicative of death by asphyxia?
11   A.   It's not sufficient to say that it's
12 indicative.  But it's one of the findings that we
13 can have in an asphyxial death.
14      You don't make a diagnosis based on just
15 one finding.  If you tell me, "I found a petechia on
16 this person who was asphyxiated," that would not be
17 sufficient.  You want to put it in the context of
18 what else is going on with the body.  What other
19 physical findings do you have?
20      So in the context of a person who's got
21 drugs in their airway, has got pressure being
22 applied on their neck, and has hemorrhage in the
23 strap muscle, I would say that the petechiae is
24 significant in that it is part and parcel with the

Page 108

1  diagnosis of asphyxia in that case.
2    Q.   Is petechiae alone a non-specific sign at
3  autopsy?
4    A.   So petechiae can be a non-specific sign.
5  It depends on the context.
6    Q.   Does asphyxia cause petechiae?
7    A.   Asphyxia does not necessarily cause
8  petechiae, because you can asphyxiate and not have
9  petechiae.  People, for example, who drown, their
10 airway is full of fluid.  They asphyxiate, but they
11 don't necessarily have petechiae.
12      A person who is smothered, meaning that
13 their nose and mouth are covered, do not necessarily
14 have petechiae.
15      Petechiae are a vascular phenomenon.  They
16 occur from pressure on the blood vessels.  That's at
17 least our understanding, based on the peer-reviewed
18 literature.
19      So the fact that there is pressure being
20 applied to the neck at the side of the neck where
21 the blood vessels are, that's more likely to
22 contribute to petechiae than situations such as just
23 obstruction of nose and mouth.
24   Q.   Would you say there is a relationship

Case 1:20-cv-04545 Document #180-25 Filed 06/15/23 Page 29 of 48 PageID #2906
Nicole Lurry vs                                               Judy Melinek, M.D.
City of Joliet                                            April 29, 2022

Page 109

1 between the development of petechiae and the
2 presence or absence of asphyxia?
3 A. Sorry. I don't understand the question.
4 Q. Let me ask a little different question.
5 Can petechiae develop in a person who survives an
6 attempted strangulation?
7 A. Yes.
8 Q. Can petechiae develop in a person who
9 survives an attempted strangulation and doesn't even
10 lose consciousness, say they fight off their
11 attacker before they lose consciousness?
12 A. Yes, that is correct.
13 Q. And when it comes to the significance of
14 petechiae as potentially evidence of asphyxia, is it
15 an on/off switch in that the decisive factor is that
16 you've got petechia or you don't have petechia, or
17 does the presence of multiple petechiae offer
18 stronger evidence?
19 A. I can't really answer that. It depends on
20 the individual case.
21 Q. What are the factors that would be
22 relevant to you in determining whether a single
23 petechia has the same weight as say dozens of
24 petechiae at autopsy?

Page 110

1 A. Well, it depends on the context. So I've
2 had cases where people have had dozens of petechiae,
3 but they're found facedown, and they have heart
4 failure. And so the fact that the blood is backing
5 up, their heart is not pumping effectively, and
6 they're facedown so there's more pressure on the
7 blood vessels in their eyes, makes the petechiae
8 significant of the fact that they're in heart
9 failure.
10 It doesn't diagnose asphyxia. It helps me
11 in that context interpret the cause of death.
12 But then, again, I've also had cases where
13 there were no petechiae and a person was clearly
14 strangled or hanging either with a ligature or in
15 some other mode. That just indicates to me the
16 mechanism, where when the pressure was applied to
17 the neck, it was uniform and quick so that there
18 weren't fluctuations in the pressure.
19 So if I were, for instance, to hang
20 somebody or hang myself -- okay --
21 Q. But this --
22 A. Hypothetically.
23 Q. Understood.
24 A. But in a hanging where you have the full

Page 111

1 weight of the neck and head on the ligature, and the
2 body is suspended by that point of tethering, you
3 can have in some cases petechiae, especially if a
4 person is partially supported, like by the tips of
5 their toes or something like that, they're not
6 completely hanging with their legs dangling, or you
7 can have no petechiae at all because the pressure
8 was such that it was uniform and on both sides of
9 the neck at the same time, and no blood flow is
10 going to the head, and you have no petechiae.
11 I've also seen cases of manual
12 strangulation and ligature strangulation where a
13 person had just a single petechia. So you have to
14 interpret the petechia in the context of the
15 individual case.
16 And in this case, we have pressure being
17 applied to the neck, hemorrhage in the strap muscle,
18 obstruction to the airway, and the petechiae. So in
19 that context, it fits in. It makes sense as being
20 part of a diagnosis of asphyxia, as opposed to just
21 an incidental finding.
22 Q. And, ultimately, the reason that you have
23 to look at all of the context is because standing
24 alone, in and of themselves, petechiae are a

Page 112

1 non-specific sign?
2 A. If you were just telling me about
3 petechiae, I wouldn't be able to interpret it. I
4 need the context of the case. So standing alone,
5 yes, you are correct, they're non-specific. But
6 it's not standing alone here.
7 Q. In this case, if Mr. Lurry had been found
8 with not one petechia but a hundred petechiae, would
9 you consider that stronger evidence of death by
10 asphyxiation?
11 A. I would consider it equivalent. I mean,
12 it would add to it, but it would not -- It doesn't
13 minimize the single petechia. It's just additive.
14 Q. Would it be equivalent to you if you
15 observe -- if everything else was the same with
16 respect to this case except that instead of having
17 only one petechia, Mr. Lurry had more than a hundred
18 petechiae?
19 A. It wouldn't matter to me really because,
20 ultimately, I'm just looking at the whole picture.
21 You know, so if he -- If all of the other facts of
22 the case were the same and he had a hundred
23 petechiae as opposed to one, it wouldn't change my
24 opinion that he died in the way that he did from a

Page 113

1 mixed drug intoxication in the context of neck and
2 airway compression. Those two are working in
3 concert. I wouldn't be saying that my opinion would
4 be any different. So I guess I don't really
5 understand why we're quibbling about petechiae,
6 because one versus two versus a hundred doesn't make
7 a difference. The fact that they're even there
8 suggests that there was some sort of differential
9 pressure to burst a blood vessel.
10 Q. Can CPR cause petechiae?
11 A. You know, there's debate in the literature
12 about whether it does. I've seen, you know,
13 thousands of bodies who have had CPR. And some have
14 petechiae. Some don't.
15 Generally, my understanding is that it has
16 to do to some degree with, like I said, differential
17 pressures. But I can't really say that there's
18 sufficient support in the peer-reviewed literature
19 that CPR causes petechiae.
20 Q. Can intubation cause petechiae?
21 A. I don't think so. I mean, like I said,
22 same thing: I've seen thousands of people who have
23 been intubated. Some have petechiae. Some don't.
24 I don't think it's the intubation necessarily that

Page 114

1 causes it.
2 Remember, if we have to come to these
3 conclusions, we have to have someone specifically do
4 a prospective study in an individual to see, first,
5 what they look like, they have no petechiae,
6 document them, then intubate them, and then look to
7 see if the petechiae show up as a result of
8 intubation. Do you see what I mean? And I don't
9 think that those studies have ever been done.
10 So there are some assumptions or
11 presumptions that they could, but I don't think that
12 there's enough medical support to say that it does.
13 Q. Speaking of the medical literature, are
14 you familiar with an article published in The
15 Journal of Forensic Science in the year 2000 by
16 Charles Hirsch and Susan Ely entitled --
17 A. Yes.
18 Q. -- Asphyxial --
19 A. Yes.
20 Q. -- Deaths and Petechiae: A Review?
21 A. Yes. I'm familiar with it.
22 Q. And The Journal of Forensic Science, by
23 the way, is the official peer-review journal of The
24 American Academy of Forensic Science; is that right?

Page 115

1 A. It is, mmm-hmm.
2 Q. And you have been a member of The American
3 Academy of Forensic Science for a couple of decades;
4 is that also right?
5 A. Yes. Still am, I think.
6 Q. Would you generally agree with the
7 conclusion -- By the -- Oh, actually before I go
8 there, I know who Dr. Hirsch is. Who is Susan Ely?
9 A. She was a colleague of mine at the New
10 York City Medical Examiner's Office. She was one of
11 the staff members there when I was training.
12 Q. And since you've said that you are
13 familiar with the article, would you agree with the
14 article?
15 A. I don't agree with everything that's in
16 there. I mean, it depends on the context, and it
17 depends what the question is.
18 Q. I'll go there in just a moment, but before
19 I do, are you aware of any peer-reviewed articles
20 that have been published since this article came out
21 in 2000 that have challenged or attempted to
22 challenge any of the opinions that Dr. Hirsch and
23 Dr. Ely did?
24 A. There have been, but I don't -- I can't

Page 116

1 necessarily quote them. I mean, I remember
2 petechiae do get mentioned in articles having to do
3 with neck compression or asphyxia. So it wouldn't
4 necessarily be a direct challenge to the article,
5 but there have been other articles since then.
6 I mean, that's a pretty old article. So I
7 am aware of the literature since then. I just can't
8 pull up articles from the top of my head like that.
9 Q. I'm going to go and pull up -- just a
10 moment -- the article. And this will be Exhibit 8,
11 Abby.
12 MS. BAKOS: Okay.
13 (Exhibit No. 8, four-page Journal of
14 Forensic Science article "Asphyxial Deaths
15 and Petechiae: A Review," was marked for
16 identification.)
17 BY MR. MATHUES:
18 Q. Before we go there, Dr. Melinek, do you
19 see the first page of the article here with the
20 title "Asphyxial Deaths and Petechiae: A Review,"
21 and then the authors' names up at the top?
22 A. Yes.
23 Q. Just a moment here. I want to make sure I
24 go to the right spot.

Page 117

1    All right. Knowing that this is small
2  print, I'm doing my best. This is Page 4. Are you
3  able to see the writing in front of you, Dr.
4  Melinek?
5    A.   It's somewhat blocked by your picture.
6  Let me move you. Yes, I do see.
7    Which part are you -- Why don't you read
8  the part that you think is important, and I'll tell
9  you whether I can see it.
10    Q.   I highlighted the part. And so I will
11  read the sentence I have highlighted. It's on
12  Page 4 towards the bottom of the article. "The
13  importance of defining the pathogenesis of
14  conjunctival and facial petechiae lies in the
15  potential implications of their misinterpretation.
16  They are simply markers of increased cephalic venous
17  pressure."
18    And this is the sentence I'm going to ask
19  you about: "In and of themselves, they, i.e.,
20  petechiae, should not be regarded as supportive
21  evidence of asphyxia. In a vacuum, conjunctival and
22  facial petechiae point to no particular cause of
23  death."
24    The part that I read, did I read that

Page 118

1  accurately?
2    A.   You did.
3    Q.   And I think I know what your answer is
4  going to be, but to confirm, that last sentence,
5  the, "In and of themselves, petechiae should not be
6  regarded as supportive evidence of asphyxia. In a
7  vacuum, conjunctival and facial petechiae point to
8  no particular cause of death."
9    Would you agree with that statement in
10  this article?
11    A.   I agree with that statement in the context
12  of this article especially in light of the following
13  sentence immediately afterwards: "Only in
14  conjunction with a complete autopsy and thorough
15  death investigation can their potential importance
16  be ascertained."
17    And so that's the really important point
18  in this paragraph is that we don't look at petechiae
19  in a vacuum. We have to look at it in the context
20  of the scene, the circumstances, and the autopsy
21  findings.
22    Q.   And you don't look at petechiae in a
23  vacuum because, in and of themselves, they point to
24  no particular cause of death; correct?

Page 119

1    A.   Just a petechiae can't tell me a cause of
2  death. I need to know the whole circumstances. I
3  need to know the autopsy findings. That is correct.
4    Q.   Speaking of autopsy findings, let's go
5  back to Exhibit No. 1 on your opinions. Towards the
6  bottom of the third page, you reference that Mr.
7  Lurry had an aspirational bronchopneumonia at
8  autopsy indicating that asphyxia and aspiration
9  played a role in the mechanism of his cardiovascular
10  arrest."
11    Do you see that portion of your report?
12    A.   Yes.
13    Q.   And for purposes of the record, what is
14  aspiration bronchopneumonia?
15    A.   So when a person aspirates something,
16  meaning that there is a foreign object that enters
17  into their airway, it can irritate the cells in the
18  lungs and in the airway, and then there will be an
19  inflammatory response, an immune reaction response,
20  and that's what the bronchopneumonia is.
21    So the bronchopneumonia is the
22  inflammatory or immune system response to the
23  foreign object.
24    Q.   And as to Mr. Lurry when you looked at the

Page 120

1  histology slides, did you see bronchopneumonia?
2    A.   I believe I did or I wouldn't have written
3  that. I believe the description of the microscopic
4  slides are in my report further down.
5    Q.   Okay. We'll get there in a few minutes
6  about the slides.
7    So what is it about the presence of
8  aspirational bronchopneumonia that points to
9  asphyxia as a cause -- as a contributing factor to
10  Mr. Lurry's death?
11    A.   So it indicates that there's foreign
12  object in his airspaces, because you can see them
13  under the microscope. They're in the small
14  airspaces called the alveoli. But they are also --
15  clearly would have had to get down there through the
16  bronchial passages.
17    So we know from the circumstances that he
18  had a foreign material, the drug bindles, in his
19  oral cavity and that the drug bindles had burst.
20  Some of them clearly got swallowed and were absorbed
21  that way. But others of them also went -- Some of
22  that particulate material also went down his airway
23  into his lungs and caused this inflammatory
24  reaction.

Page 121

1       And the combination of the foreign
2  material in the airway and the inflammatory reaction
3  decreases airflow to the lungs and decreases the
4  ability of oxygen to get into the bloodstream.
5       Q.   And so you're saying that in this case,
6  the foreign material that would have gotten into Mr.
7  Lurry's lungs would be material from the, I think
8  you used "particulate material" from the bags that
9  he was chewing on?
10      A.   Yes, it appears to be foreign material.
11  It could be from the bags. It fits in with that
12  mechanism, given what we know about the
13  circumstances here.
14      Q.   Now can the process of intubation also
15  cause aspiration bronchopneumonia?
16      A.   Well, it's supposed to protect you from
17  that. But it's not specifically the intubation that
18  causes the aspiration. The intubation actually
19  protects you from bronchopneumonia to some degree.
20  I mean, it's supposed to protect your airway so you
21  don't aspirate.
22      Q.   Can the process of intubation cause
23  foreign particulate matter to enter a person's
24  lungs?

Page 123

1  unlikely, because if they were entering his lungs
2  at that -- I would expect that he would be coughing.
3  You know, he was clearly capable of coughing up that
4  last bindle once it was sufficiently dislodged
5  during CPR, like during the resuscitative efforts.
6       So he still had a cough reflex at that
7  point. So we don't see him coughing, so I don't
8  think that the drugs were in his lungs at that
9  point, at the point that you were asking about, you
10  know, when he arrived at the station.
11      Q.   Is it possible that any of the medical
12  care Mr. Lurry received at the hospital once he was
13  taken there caused the aspirational pneumonia in his
14  lungs?
15      A.   I don't think that's likely, I mean,
16  because the medical care is supposed to be
17  preventing that from happening. So at the time he's
18  already in the hospital, he's already intubated.
19  His airway is protected. The material is already
20  down there.
21       So it's not that the medical care is
22  causing the pneumonia or the aspiration. He's
23  already aspirated. The medical care is trying to
24  support him so that he survives it.

Page 122

1       A.   It's possible that if there is foreign
2  particulate material higher up in the air passages
3  or the back of the throat that during intubation the
4  tube shoves it further down, if that's what you're
5  asking.
6       Q.   And is it possible for CPR to cause
7  aspirational pneumonia?
8       A.   Yeah. So the process of CPR, when a
9  person is having their chest pressed on, they can
10  vomit or cough up material from the back of their
11  throat, the back of their airway, or the back -- or
12  even from their stomach, and that can cause an
13  aspiration bronchopneumonia, as well.
14      Q.   If we were to assume that the foreign
15  particulate matter in Mr. Lurry's lungs is fragments
16  of the bags he was chewing on, can you tell us where
17  in the process of chewing from beginning to end
18  those particulate materials entered Mr. Lurry's
19  lungs?
20      A.   I don't know when they entered his lungs.
21      Q.   Is it possible that they would have
22  entered his lungs even before Mr. Lurry arrived at
23  the police station?
24      A.   It's possible; but I think that's

Page 124

1       Q.   Is it possible that the medical care that
2  he received at the hospital is what caused some
3  foreign particulate matter to enter his lungs?
4       A.   I don't have any reason to believe that.
5  I mean, you know, it's foreign material. The most
6  likely source of it is from the foreign object that
7  was in his mouth and was subsequently taken out.
8       I have nothing in the medical records to
9  indicate that an aspiration phenomenon happened in
10  the hospital between when he was intubated and when
11  he was declared dead.
12      Q.   I hear you that what you don't see in the
13  medical records. My question was a little bit
14  different, which was just simply is it possible that
15  the medical care he received in the hospital caused
16  some foreign particulate matter to enter his lungs?
17      A.   I think it's unlikely.
18      Q.   I hear you that it's unlikely. My
19  question was unlike -- My question wasn't whether
20  it's likely. My question is whether it's possible.
21      A.   You know, I'm not going to speculate.
22  Anything's possible. But I don't think it's likely.
23  I don't think that that explains this.
24      Q.   When we go to the next page of your report

Page 125

1  and towards the middle of that paragraph, you note
2  that, "The benzoylecgonine detected in the
3  antemortem admission blood is likely from the
4  cocaine, but the metabolism of the parent drug to
5  the inactive metabolite occurred in the blood
6  collection tube through the actions of enzymes in
7  the sampled bloodstream because the hospital sample
8  was not preserved in sodium fluoride."
9        Do you see the passage that I'm referring
10 to?
11    A.  Yes.
12    Q.  What significance, if any, is there to the
13 cause of Mr. Lurry's death whether the cocaine
14 metabolized into benzoylecgonine either in Mr.
15 Lurry's body or in the blood tube?
16    A.  I don't understand the question.
17    Q.  Well, how does the -- your inference that
18 the metabolism of the cocaine into its inactive
19 metabolite occurring in the blood collection tube as
20 opposed to in Mr. Lurry when he was still alive
21 affect your opinions in this case?  Or what's the
22 relevance of that fact to your opinions in this
23 case?
24    A.  Well, it's only relevant in that it

Page 126

1  acknowledges that it can occur in the tube or in his
2  body.  It could have occurred in his body.  It's
3  possible that he didn't have any cocaine circulating
4  in his bloodstream and he just had benzoylecgonine,
5  which is the breakdown product.
6        I just needed to note that for the record
7  the blood tubes in the hospitals are not sodium
8  fluoride tubes.  Usually, they're collected in red
9  or purple-topped tubes, and they don't have the
10 preservative to keep the conversion of cocaine to --
11 we'll call it BE.  It's easier.  Benzoylecgonine is
12 BE.
13       It can happen in the tube or it can happen
14 in the body.  If it was -- If the conversion from
15 cocaine to BE had already happened in his body, then
16 cocaine is not a contributor to his death at all.
17 Okay?  If he only had BE at the time that this was
18 happening, then it's an inactive compound.  It would
19 not affect his death at all.
20       But if the conversion happened while it
21 was in the tube and he did have parent cocaine in
22 his system, then it would be contributing to the
23 death because I included it as one of the mixed
24 drugs affecting him.

Page 127

1    Q.  And if I understood your testimony, you're
2  not definitively saying that the metabolism occurred
3  in the blood collection tube.  You're pointing out
4  the possibility it could have occurred in the blood
5  collection tube or it could have occurred in Mr.
6  Lurry's body; correct?
7    A.  That is correct.
8    Q.  Is -- Can persons still experience the
9  effects of cocaine even after their liver has
10 metabolized the cocaine into benzoylecgonine?
11   A.  I don't understand the question.  It's
12 vague.  What do you mean by "effects"?
13   Q.  I will define "effects" for purposes of
14 that question as "the physiological effects of
15 cocaine on the human body."  Can that still be going
16 on even after the cocaine has been metabolized?
17   A.  So, again, it's too vague because of the
18 way cocaine works.  So if you're talking about the
19 elevated heart rate, the effect on blood pressure,
20 the effect on the likelihood of an arrhythmia, an
21 abnormal rhythm in the heart, that will only occur
22 when you've got the parent compound cocaine.  You
23 will not have that with just the BE, as far as I
24 understand.

Page 128

1        However, cocaine can cause damage to blood
2  vessels that are chronic effects that can develop
3  over repeated exposure over many years, and those
4  chronic effects can stay.  So people who are chronic
5  cocaine users can have increased narrowing of their
6  coronary arteries, for instance.  And even when the
7  cocaine is gone, the damage has already been done.
8        So I hope that answers your question.  I
9  mean, I think in the context of this case if he only
10 had BE and not cocaine, it would not have
11 contributed to his death.
12   Q.  In the next sentence, you give the opinion
13 that, "Had the officers searched Mr. Lurry and
14 removed the drugs or had they called for medical
15 support when they first suspected Mr. Lurry might
16 have swallowed drugs at the scene, his death most
17 certainly would have been averted."  Do you see that
18 part?
19   A.  Yes.
20   Q.  How can you say that Mr. Lurry's death
21 would certainly have been averted when we don't know
22 the amount or in terms of grams or purity level of
23 the fentanyl and heroin which he consumed?
24   A.  It's irrelevant.  I mean, the bottom line

Page 129

1   is that he didn't -- he was not under their
2   influence when he was first engaged with their
3   officers. There's multiple testimony to support
4   that. And he put it in his mouth during the time
5   that he was being taken down. So the exposure
6   happened between when he is first encountered and
7   when he is in the vehicle. So if you take him away
8   from -- If you take the drugs away from him, if you
9   search him and remove the drugs, he can't put them
10  in his mouth. I mean, this is just a logical
11  consequence of -- You don't have to know the exact
12  drug level to answer this question.
13     Q.   And so in this sentence, are you telling
14  us that Mr. Lurry's death would have been averted if
15  the officers had taken the drugs off his person and
16  he never would have been able to put them in his
17  mouth, then his death would have been averted, or
18  are you telling us that if the officers would have
19  called for an ambulance immediately after they
20  believed Mr. Lurry had drugs in his mouth, his death
21  would have certainly been averted?
22     A.   Both. So that's -- it's a compound
23  question, and it's a compound sentence. It said,
24  "Had the officers searched Eric Lurry and removed

Page 130

1   the drugs" -- So if you take the drugs away from
2   him, he can't swallow them. So that's the first
3   part.
4      Q.   That part I completely understand. That
5   part I completely understand.
6      A.   Okay. So -- But let me finish the second
7   part. "Or had they called for medical support when
8   they first suspected that he might have swallowed
9   the drugs at the scene."
10       So based on their testimony and based on
11  the video where you see him chewing and the officer
12  said, "I think he put it in his mouth." So that
13  happened at the scene. That -- Even before they
14  were driving in the car, there was suspicion that he
15  might have swallowed the drugs at the scene or that
16  he might have put the drugs in his mouth at the
17  scene. Okay?
18       So even had they called for medical
19  attention right there, he was still alive at that
20  time. He was still breathing at that time. Medical
21  personnel and/or the officers in combination could
22  have taken the drugs out of his mouth. So
23  regardless of the level, he would have had immediate
24  medical support. Even if it was a really

Page 131

1   concentrated drug, he would have had immediate
2   medical attention to counteract the drugs. He would
3   have been able to be given Naloxone which
4   counteracts opioids. He would have been able to be
5   intubated to breathe for him when we stopped
6   breathing. Okay?
7        So I think that it is almost certain;
8   okay? I can't say a hundred percent, but it's way
9   beyond the more likely than not that this death
10  would have been averted if either of these two
11  things occurred: The drugs were taken away and/or
12  medical personnel were alerted earlier in the
13  sequence before the drugs could be chewed,
14  swallowed, and absorbed.
15     Q.   And your report does not say that if
16  officers had called for medical assistance at the
17  moment they arrived at the police station, Mr.
18  Lurry's death would most certainly have been
19  averted; correct?
20     A.   Correct. My report does not say that.
21     Q.   And it doesn't say that because you can't
22  say to a reasonable degree of medical certainty that
23  if officers had called for medical assistance at the
24  moment they pulled into the police station that Mr.

Page 132

1   Lurry's death would have been averted; correct?
2      A.   I think that it still would have been a
3   more increased rate than the five minutes or
4   whatever it was later after they got him out of the
5   car and tried to do CPR for a while. I mean,
6   there's only a few minutes between when he arrived
7   at the station and when they called for medical
8   attention. So that's a much closer timeframe.
9        I mean, we most certainly know -- At any
10  point during the drive, they could have pulled over
11  and called for medical assistance, too; do you see
12  what I mean?
13     Q.   I see what you mean, but I'm not sure that
14  answers my question. I will ask a different
15  question --
16     A.   Okay.
17     Q.   -- which is do you know how much time
18  actually passed from, in terms of minutes and
19  seconds, from the time the officers stopped the
20  squad car at the Joliet Police Station to the time
21  that one of them called for an ambulance?
22     A.   I don't recall. I'm sure it's in the CAD
23  or in the material, but I don't recall it without
24  going through the material.

Page 133

1   Q.  And can you say to a reasonable degree of
2 medical and scientific certainty that if the
3 officers had called for medical assistance at the
4 moment they arrive at the police station, as opposed
5 to back on scene, Mr. Lurry's death would have most
6 certainly been averted?
7   A.  I would not say it with that degree of
8 certainty. I wouldn't say most certainly. I would
9 say instead that it would be more likely to have
10 been averted than later. The longer you delay, the
11 risk of death goes up.
12   Q.  Certainly. Sooner medical care is always
13 better than later medical care; fair enough?
14   A.  Fair enough.
15   Q.  Is there a level of fentanyl dosage that a
16 person can ingest that is so high that it will be
17 fatal even if that person receives medical care from
18 a fully-equipped ambulance within five minutes?
19   A.  Don't know if I can answer that. I mean,
20 you know, it's possible we can come up with an
21 answer, but I don't know if there's literature to be
22 able to answer that.
23   Q.  "I don't know" is a -- "I don't know" is a
24 perfectly fine answer.

Page 134

1   A.  Yeah.
2   Q.  Is your answer to my question that you
3 don't know?
4   A.  Yeah, I don't know.
5   Q.  In the next paragraph, there is a note
6 that says -- the first part of that sentence says
7 that, "It has been my job to recognize and highlight
8 the public health hazards and educate police
9 officers about the way people can die in custody in
10 order to protect people in custody and help all
11 parties avoid resultant litigation."
12     Do you see what I am referring to?
13   A.  Yes, I do.
14   Q.  When you write that it's been your job to
15 highlight public health hazards, is that a job that
16 some person has particularly assigned to you, or is
17 that something that you have more taken on yourself
18 as you believe that's your responsibility?
19   A.  That is part of the mission of every
20 single coroner and medical examiner's office I've
21 ever worked with. And it's very well documented in
22 textbooks, peer-reviewed literature, the history of
23 the job, including the legal responsibilities of the
24 position of a medical examiner or coroner, is that

Page 135

1 our job is to recognize public health hazards and
2 alert agencies. In fact, sometimes by law we have
3 to alert agencies when we see public health hazards.
4 So that is the definition -- That is my job
5 description.
6   Q.  And later in this paragraph -- I want to
7 make sure I quote you accurately. You say you --
8 Oh, there. It's the next sentence. "I find it
9 unsettling that the coroner and the forensic
10 pathologist saw nothing wrong with this video."
11     Do you see that clause?
12   A.  Yes.
13   Q.  And when you reviewed Dr. Humilier's
14 deposition, did you review -- did you see the part
15 where he described the language used towards Mr.
16 Lurry as offensive?
17   A.  Yes.
18   Q.  So isn't it true that Dr. Humilier did see
19 something on the video that he did find was wrong,
20 which is, i.e., the language directed at Mr. Lurry?
21   A.  I agree with you that he did say that the
22 language was offensive. But the second part of that
23 sentence is -- speaks to the context with which I
24 would have said nothing wrong. I meant it in

Page 136

1 context of whether it contributed to his death. And
2 so my understanding is from the subsequent questions
3 that were asked of him, that he didn't think that
4 the bad language, obviously, killed him.
5     I think that specifically the full
6 sentence here indicates that neither the coroner nor
7 the forensic pathologist in my opinion from
8 reviewing their testimony as well as their reports
9 were alerted to the fact that the physical actions
10 being documented on the video were somehow
11 contributing to Mr. Lurry's death.
12   Q.  And you said the language didn't cause Mr.
13 Lurry's death. Can we also agree that the blow or
14 slap, whatever word you want to use, that Sergeant
15 May delivered also did not cause Mr. Lurry's death?
16   A.  It did not cause Mr. Lurry's death, but
17 it's part and parcel of the inadequate response.
18 You don't hit someone in the head in order to get
19 their attention. That's not an approved or
20 appropriate way to see whether a person is
21 responsive or not. A sternal rub is, but not a
22 punch to the face.
23   Q.  And when you say in the sentence, the part
24 of the clause that comes after the part that I

Page 137

1 highlighted about the officers' actions and
2 inactions were not considered. By "considered," are
3 you saying that Dr. Humilier didn't even think about
4 whether or not the officers played any role in Mr.
5 Lurry's death? Or are you using "considered" more
6 to mean that you are disagreeing with Dr. Humilier's
7 final conclusion about the officers' involvement?
8   A.   I'm -- I would use -- I would define
9 "considered" in that context as being determined or
10 concluded.
11   Q.   Here when you say "considered," it is --
12 it's a synonym for "concluded," not that he didn't
13 even ask the question whether the officers played a
14 role; is that fair?
15   A.   It is fair. It seems that they did
16 consider it, otherwise, they wouldn't have been
17 reviewing the video in the first place. But they
18 concluded differently.
19   Q.   Now if we go further down, do you see
20 noted at the end of the sentence that, "An
21 unconscious person has a suppressed gag or gag
22 reflex"? Do you see what I'm referring to?
23   A.   Yes.
24   Q.   Do -- Generally speaking, do unconscious

Page 138

1 persons have no gag reflex or a suppressed gag
2 reflex?
3   A.   It depends. It depends why they're
4 unconscious.
5   Q.   Can we agree that at least some
6 unconscious persons do have a gag reflex?
7   A.   Yes. It depends.
8   Q.   And what are the reasons leading to
9 unconsciousness -- Let me ask the question a little
10 better way. What sort of unconscious persons would
11 have a gag reflex versus unconscious persons who
12 would not have a gag reflex?
13   A.   I can't answer that. It's too broad a
14 question. And it also assumes that unconsciousness
15 is an on/off switch. It's -- Again, like I said,
16 it's not whether you're conscious versus
17 unconscious. There's a spectrum where you can have
18 deteriorating consciousness, and so the suppression
19 of the gag is part of that, as well. So I can't
20 really answer that. It's just too broad.
21        I mean, I can give you a huge differential
22 that would be a lecture for over an hour if you
23 want, but I don't think that that's what you want.
24   Q.   Now when an unconscious person is

Page 139

1 intubated, is it standard medical procedure to use
2 an anesthetic on the person's neck and throat
3 muscles?
4   A.   Well, not just an anesthetic, but, I mean,
5 you give them intravenous -- Not just on the neck
6 and throat. You're giving then intravenous
7 anesthesia or intramuscular anesthesia in order to
8 relax them.
9   Q.   And you want to -- One of the reasons you
10 want to give them anesthesia and to relax them would
11 be to suppress any gag reflex that would prevent
12 this endotracheal intubation; correct?
13   A.   Again, it depends on the reason for the
14 intubation. But, yes, that is correct.
15   Q.   And I think I know that you mentioned, and
16 I think it's also common sense and human experience,
17 different people have different sensitivities to
18 their gag reflex?
19   A.   Correct.
20   Q.   And some are obviously much more sensitive
21 than others; correct?
22   A.   Yes.
23   Q.   And do you have any knowledge or did you
24 see any facts or evidence in the record as to Mr.

Page 140

1 Lurry, whether his gag reflex was average, more
2 sensitive, less sensitive?
3   A.   I don't have any reason to give that kind
4 of opinion. I don't know what his baseline was. I
5 don't think there was any evidence given for that
6 prior to this event.
7   Q.   Now if we go to the next page, the top of
8 the next page -- And Abby, I really am. I should be
9 done by 7:00. I know we're --
10        MS. BAKOS: Okay.
11        MR. MATHUES: -- but I hear you.
12 BY MR. MATHUES:
13   Q.   Now the first sentence is, "Finally, as a
14 trained surgeon, I have never heard of pinching the
15 nose being used as an approved technique to clear a
16 patient's airway." Do you see what I'm referring
17 to?
18   A.   I do.
19   Q.   In your mind, is clearing a patient's
20 airway, as you have written in your report,
21 synonymous with getting a person to open their
22 mouth?
23   A.   Well, one is part of the other. You need
24 to get them to open their mouth in order to be able

Page 141

1 to clear their airway. So if I have something in my
2 mouth, like an object that's obstructing my
3 posterior pharynx, I have to get the -- I have to
4 get the mouth to open first before I can remove the
5 object.
6 Q. Have you ever heard of the technique of
7 pinching a person's nose to get the person to open
8 their mouth, regardless of whether their airway is
9 otherwise obstructed?
10 A. No. No. I mean, I went through
11 Pediatrics rotations where kids might have stuff in
12 their mouths. I've never been taught this, ever,
13 through CPR training, through any, like, basic --
14 All of the basic airway training that I've had,
15 including full ACLS training, never ever mentioned
16 pinching the nose as any technique -- This was
17 shocking to me.
18 Q. So you've never heard in the Pediatric
19 context, for example, of pinching a child's nose in
20 order to cause the child to open his or her mouth?
21 A. The only time I've heard of pinching the
22 nose is if the nose is bleeding to keep the blood
23 from, you know, continuing, to stop epistaxis.
24 That's when it's approved. And I've heard of it

Page 142

1 when they have got something stuck up their nose.
2 So kids can sometimes have beads stuck up their
3 nose. And there's a kiss. You know, it's called
4 the -- What's it called? The kiss of life or
5 something, where you can -- you can blow into the
6 mouth and pop the thing out of their nose. And for
7 that, you have to close the outer nostril. But you
8 do that very, very briefly. But, still, those are
9 the only contexts where somebody's nose might get
10 pinched.
11 Q. Let's go forward to Paragraph 14 of your
12 report. This is Page 11 where you're talking about
13 the observations of the Joliet Fire Department.
14 Towards the bottom of that paragraph, there's a
15 sentence that reads, "His," i.e., Mr. Lurry's,"
16 "first monitored rhythm was ventricular tachycardia
17 which then changed to PEA, a pulseless electrical
18 activity."
19 Do you see what I am referring to?
20 A. Mmm-hmm.
21 Q. And what was the significance to you in
22 coming to your opinions that Mr. Lurry's first
23 monitored rhythm was ventricular tachycardia and
24 then changed to pulseless electrical activity?

Page 143

1 A. Can you repeat the question?
2 Q. Yeah. What was the significance to your
3 opinions in this case that Mr. Lurry's first
4 monitored rhythm was ventricular tachycardia, which
5 then changed to PEA, pulseless electrical activity?
6 A. Well, he is essentially -- Just because
7 his electrical rhythm is ventricular tachycardia,
8 that's still pulseless electrical activity, though,
9 because he's got no pulse. So it's just -- I'm just
10 noting what was in the patient care report. And I'm
11 regurgitating what I'm reading in the report in this
12 section. This isn't the opinion part of the
13 section.
14 Q. So in this -- It's your view that
15 ventricular tachycardia and pulseless electrical
16 activity are the same thing?
17 A. No, they're not. So ventricular
18 tachycardia is the -- Electrical rhythm is a
19 ventricular rhythm, and it's going quickly. I could
20 draw it on an EKG.
21 Pulseless electrical activity is not
22 ventricular tachycardia or ventricular fibrillation.
23 But it's any other type of rhythm other than
24 tachycardia or fibrillation where there is no pulse.

Page 144

1 So you can have a normal sinus rhythm and it's --
2 still be pulseless. That's pulseless electrical
3 activity.
4 Q. Pulseless electrical -- So am I
5 understanding you that pulseless electrical activity
6 and ventricular tachycardia are, in fact, two
7 different cardiac rhythms?
8 A. They are two different cardiac electrical
9 monitored rhythms. I want to distinguish between
10 the electricity coursing through the heart versus
11 whether the person actually has a pulse.
12 Q. If a person -- So when you say "two
13 different cardiac monitor rhythms," if one is hooked
14 up to a cardiac monitor, it could indicate
15 ventricular tachycardia, or it could indicate
16 pulseless activity, or it could indicate other
17 things such as a normal pulse; is that accurate?
18 A. No, because you can't monitor a pulse.
19 The pulse you're monitoring with your wrist. The
20 electrical activity is just telling you what the
21 electricity through the heart is doing. It doesn't
22 tell you whether the person has a pulse.
23 You can have perfectly normal electrical
24 rhythm and still not have a pulse. That's what

Page 145

1 pulseless electrical activity is. So you've got
2 good-looking electrical activity, but your heart's
3 not pumping.
4    Q.    And I got a little bit confused with your
5 earlier answer. The pulseless electrical activity
6 is a different cardiac rhythm from ventricular
7 tachycardia?
8    A.    It is a different electrical cardiac
9 rhythm, correct.
10    Q.    And I'm going to go to what I will mark as
11 Exhibit No. 11. It's Bates stamped Joliet 119
12 through 135.
13         (Plaintiff's Exhibit No. 11, 17-page
14         Patient Care Report and Incident Report,
15         etc., from the Joliet Fire Department, was
16         marked for identification.)
17 BY MR. MATHUES:
18    Q.    And I'm in particular going to scroll down
19 to Page 121. And most of the way down, there's a
20 section under Trauma, and it shows where Mr. Lurry's
21 vital signs were taken by members of the Joliet Fire
22 Department. Do you see what I'm referring to?
23    A.    You will have to Zoom in.
24    Q.    I will. I will do that. It's really

Page 146

1 small print. It's hard to see.
2    A.    I see.
3    Q.    Now -- Okay. I'm -- Here, we have a time
4 and date indication of 1-28-20 at 16:25. Do you see
5 that?
6    A.    I do.
7    Q.    And if we go down a little bit, the second
8 line where I'm highlighting, "Mr. Lurry's cardiac
9 rhythm is indicated as ventricular tachycardia
10 pulseless." Is that accurate?
11    A.    That is correct.
12    Q.    And if we go down a little bit more, if we
13 go to the next entry, there is an entry for 16:30.
14 Do you see that?
15    A.    Yes.
16    Q.    And Mr. Lurry's cardiac rhythm is
17 indicated as asystole; correct?
18    A.    Yeah.
19    Q.    And asystole, that's what we lay people
20 would call a flat line on the cardiac monitor?
21    A.    Yes.
22    Q.    And then if we go down again, there's
23 another entry for Mr. Lurry, 16:35. Do you see
24 that?

Page 147

1    A.    Yeah.
2    Q.    And Mr. Lurry's cardiac rhythm remains
3 asystole?
4    A.    Okay.
5    Q.    And then 16:40; do you see that?
6    A.    Yes.
7    Q.    Mr. Lurry's cardiac rhythm, I'll scroll
8 over here, remains asystole?
9    A.    Okay.
10    Q.    And I will go down a little further,
11 again, 16:40; correct?
12    A.    Okay.
13    Q.    And cardiac rhythm is asystole; correct?
14    A.    Yep.
15    Q.    And if we keep going down, that's the end
16 of the Vital Sign section. And you will see it
17 starts off next with Trauma Scores. Do you see
18 that?
19    A.    Okay.
20    Q.    So where do the Joliet Fire Department
21 records indicate that Mr. Lurry had pulseless
22 electrical activity as opposed to ventricular
23 tachycardia or being in asystole?
24    A.    I would have to pull up the report. I

Page 148

1 don't know if I put it in there. I must have seen
2 it at some point. It might have been reported
3 somewhere else, but let me just double check.
4    Q.    Can you -- I will represent to you that I
5 have not been able to find it.
6    A.    Oh, okay.
7    Q.    I look and I did not see it. And --
8    A.    I'm surprised. But, I mean, I could have
9 made a mistake. Let me just double check. I have
10 to find the Joliet Fire Department report. I don't
11 know where it is, so give me a minute.
12         MR. MATHUES: Do you want to take just a
13         two- or three-minute break to do that?
14         And, hopefully, that will be our last
15         break. And I can tell you that my
16         remaining set of questions are almost all
17         about the slides and asking you to show me
18         what you see.
19         So let's take a couple of minutes and come
20         back. That will be our last break, and
21         we'll finish up.
22         THE WITNESS: Okay. Thanks. Yeah. I'm
23         just looking for it.
24         MS. BAKOS: Thanks.

1    (Whereupon at this point in the
2    proceedings, a recess was held from 6:01
3    p.m. to 6:06 p.m., after which the
4    following proceedings were conducted:)
5    MR. MATHUES: I am ready to pick back up
6    whenever everyone else is.
7    You're on mute, Abby.
8    MS. BAKOS: Sorry about that. I said,
9    "I'm ready whenever you guys are."
10   THE WITNESS: Are we on the record now?
11   MR. MATHUES: Yeah, let's go back on the
12   record.
13   THE WITNESS: I'm just really confused,
14   because I know how I work, and I just
15   regurgitate what's in the report in here.
16   And as I'm looking at this Joliet Fire
17   Department report, usually I go straight
18   to the narrative. And it says, "He was
19   unconscious, unresponsive for
20   approximately eight minutes," and I can't
21   see where that is in this narrative.
22   I would not have made that up. Like I
23   would have taken that -- I just copy and
24   paste sometimes, like I'm typing as I'm

1    reading. So I'm just really confused.
2    Is there another Joliet Fire Department
3    report that said eight minutes that he's
4    unresponsive? Because it's not in the
5    narrative.
6    I'm very confused by this myself, because
7    I don't make stuff up. And so either it's
8    a typo or I got it from another Joliet
9    report, and this isn't the one that popped
10   up here that you were showing me.
11   BY MR. MATHUES:
12   Q.   My -- I wasn't particularly concerned with
13   the eight minutes.
14   A.   Well, no, that, to me, is a marker. So
15   that's a marker of something I would have -- I don't
16   interpret these reports. What I do is I literally
17   take what's written, and I put it in my thing. So
18   this is taken from something. And it may be a
19   summary of the fire department report or a different
20   patient care report.
21   I'm just very confused myself, and I would
22   need a lot more time to go through where I got this
23   from.
24   And it may be an error, because, clearly,

1    in the report, it says, "Going from ventricular
2    tachycardia to asystole." So I agree with you on
3    that. But I'm just very confused, because there's a
4    lot of other facts in here that are not in this
5    report, like the eight-minute thing.
6    So I must have gotten it from somewhere.
7    I just don't know where.
8    Q.   I can tell you I'm not aware of any other
9    Joliet Fire Department report. But in light of --
10   After looking over the Joliet Fire Department --
11   A.   Yeah.
12   Q.   -- report with the Bates stamps 119
13   through 135, did you see anywhere in that report
14   that indicated that Mr. Lurry had pulseless
15   electrical activity?
16   A.   I haven't gone through all of the reports
17   all over. All I've done is gone through the Joliet
18   Fire Department report that you posted, and I don't
19   see pulseless electrical activity there. So this
20   paragraph does not represent what's in there.
21   Now it may represent something else in the
22   medical records, and that may be an error. But I
23   don't see PEA or pulseless electrical activity
24   anywhere here. That said, it's not going to change

1    my opinion in this case, so ...
2    Q.   Which would be my next question.
3    A.   Okay.
4    Q.   Does -- How, if at all, would the fact
5    that Mr. Lurry's cardiac electrical rhythm did not
6    change to PEA affect your opinion as to Mr. Lurry's
7    cause of death?
8    A.   It doesn't change my opinion with regards
9    to the cause or contributing cause of death.
10   Q.   And --
11   A.   The Joliet Fire Department came on after
12   resuscitation efforts by the police first. So
13   there's a delay. He was not resuscitated first by
14   them. He was resuscitated first by the police.
15   Q.   So I'm going to ask you for the purposes
16   of the next question to just assume that the PEA is
17   in error. Why would the fact that Mr. Lurry's
18   cardiac rhythm did not change from ventricular
19   tachycardia to PEA have no effect on your opinion as
20   to the cause or contributing factor of Mr. Lurry's
21   death?
22   A.   Because the circumstances that started the
23   lethal sequence of events occurred before the
24   arrival of the paramedics. The whole thing started

Page 153

1　with him putting the drugs in his mouth and with all
2　of the events that transpired before the paramedics
3　even got there. They're getting there because he's
4　already unconscious and unresponsive. He's already
5　on his way to dying at that point.
6　　Q.　Let's go to Paragraph 18 of your report.
7　It's on Page 13 where you discuss the microscopic
8　sections of Mr. Lurry's lungs.
9　　A.　Okay.
10　　Q.　And I'm going to mark for purposes -- or
11　mark as an exhibit -- It's a Group Exhibit 12.
12　　　　(Plaintiff's Exhibit No. 12, composite of
13　　　　seven slides entitled Image 2017 - Image
14　　　　2023, was marked for identification.)
15　BY MR. MATHUES:
16　　Q.　And I will represent to you it is the
17　photographs of the slides that were produced to me
18　by your -- by Ms. Bakos in response to my deposition
19　subpoena. And so I'm going to go through these as
20　quickly as I can here, and I'm going to ask you to
21　tell me -- I'll give you the number of the slide as
22　it was produced to me, and I'm going to ask you for
23　each slide (a) what organ is this from, and (b), do
24　you see the bronchopneumonia. And we'll try to find

Page 154

1　a way to mark for -- on the slides where that is.
2　　　　So let's start with what I will represent
3　-- Let's see if I can pull this to the side. And
4　even at the top left-hand corner, you can see it's
5　Image -- IMG_2017 and then there's a slide.
6　　　　Do you see that?
7　　A.　Yes.
8　　Q.　Is Image 2017 a slide from Mr. Lurry's
9　lung tissue or some other organ?
10　　A.　It's from his lung.
11　　Q.　Are you able to see on Image 2017 the
12　bronchopneumonia?
13　　A.　Yes.
14　　Q.　And as I understood from earlier in the
15　deposition, you don't have a paper printout copy of
16　this slide in front of you; is that correct?
17　　A.　I haven't printed it. It's on my iPad.
18　　Q.　I'm trying to think of --
19　　A.　I try to avoid killing trees.
20　　Q.　I'm also -- I'm open to suggestions from
21　you or from Ms. Bakos as to the most efficient way
22　to do this to have you identify where on Image 2017
23　you observe the bronchopneumonia.
24　　　　MS. BAKOS: Is this being recorded?

Page 155

1　　　　MR. MATHUES: I don't believe it is.
2　　　　MS. BAKOS: Okay. I was going to say she
3　could circle it or -- you know --
4　　　　THE WITNESS: Well, I can describe it.
5　　　　MS. BAKOS: Okay.
6　BY MR. MATHUES:
7　　Q.　Let's do that. Can you describe it?
8　　A.　Yes. So what we're looking at in this
9　picture is the lungs. And the alveolar sacs, which
10　are supposed to be full of air and white, are not
11　full of air. Instead there's pink material and
12　purple dots.
13　　　　And the image just disappeared. There you
14　go.
15　　　　So you've got the really broad swaths of
16　light pink material, and then speckled throughout
17　the light pink material, there are tons and tons of
18　little purple dots. Do you see those?
19　　Q.　I do see the little purple dots.
20　　A.　Those are inflammatory cells. That's the
21　pneumonia.
22　　Q.　So --
23　　A.　It's all over. The whole picture is
24　pneumonia right there. It's not just in one teeny

Page 156

1　little area. It's all over the place.
2　　Q.　It's not as though if you had a piece of
3　paper in front of you, you would circle -- you would
4　draw a circle somewhere on this slide and say,
5　"That's where the pneumonia is." If I understand
6　you, you're saying that it's these dark purplish
7　dots that are all over Image 2017 that are
8　indicative of the bronchopneumonia. Is that
9　correct?
10　　A.　That is correct. If you asked me to
11　circle the pneumonia, I would circle the entire
12　picture.
13　　Q.　Let's go to Image 2018. Share screen.
14　　　　Is Image 2018 also a histology slide from
15　Mr. Lurry's lungs?
16　　A.　It is. It's actually a close-up of the
17　area visible in 2017. So this is a higher power.
18　So you can see more cellular detail.
19　　Q.　And if I asked -- If you had a printed
20　copy of Image 2018 in front of you and I asked you
21　to circle the bronchopneumonia, would you circle the
22　entire slide?
23　　A.　I would.
24　　Q.　And are you saying that these dark

Page 157

1  purplish dots, as opposed to the sort of smooth
2  light areas and the white areas and the dark brown
3  areas, it's the dark purplish dots that are
4  indicative of the bronchopneumonia?
5     A.   The dark purplish dots are the nuclei of
6  the inflammatory cells, so they include monocytes,
7  macrophages, and neutrophils.  That's the immune
8  system reacting to the foreign particulate material.
9  And you can also see the foreign particulate
10  material in more detail here.  It's the brown clumpy
11  stuff.
12     Q.   Can you tell from Image 2018 what the
13  foreign particulate material is?
14     A.   You could tell it's foreign and
15  particulate.  What do you mean by what it is?  You
16  can tell it's not human.  I can't give you a
17  chemical composition of it.
18     Q.   Can you tell anything more from Image 2018
19  that the -- about the foreign particulate material
20  besides the fact that it's not natural human tissue?
21     A.   It looks clumpy.  I mean, I can't tell you
22  much more than that.  I know it's foreign material.
23  I can tell you what it doesn't look like.  It
24  doesn't look like plant.  It doesn't look like

Page 158

1  fungus.  It doesn't look like, you know, seeds.  It
2  looks like some sort of foreign compound.  It could
3  be drugs.
4     Q.   Let's go to -- I'm showing you an
5  image which was marked to me as Image 2019.  Do you
6  see that in front of you?
7     A.   I do.
8     Q.   And is Image 2019 an even higher
9  magnification of what we looked at for Image 2018?
10     A.   Let me look on my screen first.  No.  It's
11  just a different region of 2017.
12     Q.   Is there anything that you said about 20
13  -- Let me ask it this way to make it short-circuit.
14  Is there anything that you see in Image 2019 that
15  would add to your descriptions of what you described
16  in Images 2017 and 2018?
17     A.   Yes.
18     Q.   What is that?
19     A.   At the center of the photo, there's a
20  multinucleated giant cell.
21     Q.   Let's try this.  I just drew a blue
22  circle.  Is what I circled inside that blue circle
23  the multinucleated giant cell?
24     A.   Yes.

Page 159

1     Q.   I'm going to take that and see if I can
2  print it PDF and e-mail it.
3          Okay.  Dr. Melinek, can you give me your
4  e-mail address one more time?
5     A.   Sure.  ████████████████.
6     Q.   All right.  I'm going to e-mail an image
7  of what I just drew that I'm going to mark as
8  Exhibit 12.1 to both you and to Ms. Bakos.  I will
9  give it a title.  And either of you let me know when
10  you get that.
11          (Plaintiff's Exhibit No. 12.1, Image 2019
12          with circled area, was marked for
13          identification.)
14          MS. BAKOS: I got your e-mail.
15          MR. MATHUES: Abby, were you --
16          MS. BAKOS: What was that, David?
17          MR. MATHUES: Were you able to get the
18  attachment and pull it up?
19          MS. BAKOS: Yes.
20          MR. MATHUES: And does the attachment that
21  I e-mailed to you, Abby, marked as Exhibit
22  12.1 fairly and accurately depict the blue
23  circle that I marked on the image and that
24  Dr. Melinek said included the

Page 160

1  multinucleated cell?
2          MS. BAKOS: It does.
3  BY MR. MATHUES:
4     Q.   Dr. Melinek, were you able to get that
5  attachment?
6     A.   Yes.  It just downloaded.
7     Q.   Were you able to pull it up?
8     A.   Yes.
9     Q.   And does the e-mail attachment that you
10  received from me fairly and accurately depict the
11  slide with the blue circle as I drew in front of you
12  and you had told me was around the rare
13  multinucleated cell?
14     A.   Well, it's not a rare cell, but, yes, it's
15  around the multinucleated giant cell.
16     Q.   Multinucleated giant cell.  Thank you for
17  correcting me on the terminology.
18          So to get our terms correct, the blue
19  circle is around the multinucleated giant cell that
20  you pointed out to me?
21     A.   Yes.
22     Q.   Let's go to Image 2020.  Do you see Image
23  2020?
24     A.   Yes.

Page 161

1    Q.   Is Image 2020 from Mr. Lurry's lungs or
2  from another part of his body?
3    A.   It's from his lungs.
4    Q.   And is Image 2020 an even more zoomed-in
5  or higher magnification view of Mr. Lurry's lungs?
6    A.   It is, but it's not of the same area as
7  2019.  It's a different area showing a different set
8  of cells.
9    Q.   And does Image 2020 -- What does Image
10  2020 reveal to you that the previous images that we
11  have looked at did not reveal?
12    A.   It shows that there's red blood cells in
13  the airspaces.  And there's also inflammatory cells
14  in the airspaces.  And it shows another one of these
15  giant cells.
16    Q.   The giant cell, I think we can -- I know
17  what that is.  The red blood cells, can you describe
18  or point to them?
19    A.   They're all over the slide.  They are red
20  in color compared to the other cells which are pink
21  and purple.
22    Q.   And you mentioned the red blood cells.
23  You mentioned another giant cell.  And you said
24  something else; I believe it had to do with air that

Page 162

1  you observed in Image 2020.
2    A.   I did not say there was air.  There's very
3  little air.  I mean, there's some -- The white
4  spaces would be where the air would go.
5    Q.   Then refresh my recollection, Dr. Melinek.
6  I may have no doubt misheard you as it's simply just
7  getting late here.  In addition to the red blood
8  cells and the additional giant cell, what else do
9  you observe in Image 2020 that you didn't observe or
10  didn't observe to the same degree in the previous
11  slides we looked at?
12    A.   So you can see -- What I did say, I
13  believe, was "airspaces."  So I used that term to
14  mean alveoli.  And alveolus or alveoli are the
15  airspaces at the lungs.  They are like little air
16  pockets.  And they're supposed to be white under
17  microscopic examination.
18         In this particular case, they're filled
19  with pink and purple cells, including the giant
20  cells and red blood cells.
21    Q.   And the fact that they are not white but,
22  in fact, filled with the cells, that's the
23  intra-alveolar hemorrhage that you are talking about
24  in Paragraph 18 of your report?

Page 163

1    A.   Yes, it is.
2    Q.   And what is the cause of the
3  intra-alveolar hemorrhage that Mr. Lurry sustained?
4    A.   So when a person is intoxicated with
5  opioids, the heart stops or slows down, and, as a
6  result, blood backs up into the lungs, and it can
7  leak out of the blood vessels into the airspaces.
8  And that's -- The backing up into the lung is called
9  congestion.  And leaking out into the airspaces
10  would be the intra-alveolar hemorrhage.  So this is
11  a consequence of either the slowing down of the
12  heart with blood backing up into the lungs or a
13  direct trauma from the upper airway being
14  irritated/obstructed either by the drugs or by
15  intubation and blood then being aspirated into the
16  airspaces from above.  Either one.
17    Q.   And when you have intra-alveolar
18  hemorrhage, you get both red blood cells and white
19  blood cells; is that correct?
20    A.   If you just have intra-alveolar
21  hemorrhage, you usually have mostly red cells
22  without the white cells or with just a few
23  smattering of white cells.  Here, we have a lot more
24  white cells, so there's also pneumonia here.

Page 164

1  There's more white cells than I would expect to just
2  be in the circulating bloodstream.  It's a lot more
3  dense.  It's aggregated.  And it seems to be
4  reacting to the particulate material in other parts
5  of the slide, not so much on this one.  So I think
6  that there's pneumonia and hemorrhage both.
7    Q.   And from the images that are on the
8  slides, you described the red blood cells as the
9  small -- they're bright red objects that we see, as
10  opposed to pink and purple.  Where are the white
11  blood cells?
12    A.   The white blood cells are the ones with
13  the purple nuclei.  And they have a little bit of
14  rim of pink around them.  But they're mostly the
15  purple nuclei.  Some of those nuclei look like
16  they're circles, and some of them look like they're
17  dumbbell-shaped.
18    Q.   I was going to say kidney bean-shaped?
19    A.   Or kidney bean-shaped, yes.  So if they're
20  dumbbell-shaped or kidney bean-shaped or have
21  multiple little lobes, those are neutrophils, which
22  are acute inflammatory cells.  And if they're more
23  round, they are probably monocytes or macrophages,
24  which are more chronic inflammatory cells.

Page 165

1   Q.   Neutrophils are a subtype of white blood
2   cells; correct?
3   A.   That is correct.
4   Q.   And neutrophils make up somewhere between
5   40 and 70 percent of a person's white blood cells;
6   is that correct?
7   A.   It could.  It depends on whether they have
8   an infection going on or an inflammatory reaction.
9   Q.   And when you say that Mr. Lurry had
10  bronchopneumonia, are you saying that he had an
11  infection?
12  A.   I'm saying that as a result of the
13  aspiration of the drugs into his airway, he
14  developed an immune reaction to that.
15  Q.   And as a lay person, when I hear the word
16  "pneumonia," I think bacterial or virus.  Or that's
17  what caused pneumonia when I've had pneumonia.
18       So in this particular case as to Mr.
19  Lurry, is the pneumonia that you observed in Mr.
20  Lurry at all due to a bacteria or a virus?
21  A.   I have no reason to believe that it's from
22  a bacteria or virus.  I think it's from the drugs
23  being aspirated, based on the fact that you could
24  see the foreign particulate material in his

Page 166

1   airspaces.
2   Q.   And you also referenced viewing what your
3   report describes as multinucleated cells and
4   poorly-formed non-caseating granuloma.
5       Looking back at Paragraph 18 of your
6   report, do you see that?
7   A.   Yes.
8   Q.   And are you saying that multinucleated
9   cells and poorly-formed non-caseating granuloma are
10  indicative of aspirational pneumonia?
11  A.   Yes.
12  Q.   Can multinucleated cells and poorly-formed
13  non-caseating granuloma be suggestive or indicative
14  of anything else besides pneumonia?
15  A.   You can see them in other disease states
16  like infectious disease, but we have no reason to
17  believe that Mr. Lurry was infected before his
18  interaction with the police.  He wasn't coughing.
19  You know, he wasn't sick.  He didn't have a fever.
20  I don't have any reason to interpret this in any
21  other way from the clinical history.
22  Q.   My question was a little bit different.
23  Can the presence of multinucleated cells and
24  poorly-formed non-caseating granuloma be suggestive

Page 167

1   of anything besides aspirational pneumonia?
2   A.   You can have it in other disease states,
3   usually an infection by bacteria or something.  You
4   can have it in -- you know -- Usually with
5   tuberculosis, they're going to be caseating.  But
6   you can have non-caseating granuloma, as well.  It
7   just kind of depends on the clinical picture.
8       In this particular case -- I mean, you're
9   asking a hypothetical.  I just don't see it as being
10  relevant for the diagnosis in Mr. Lurry's case.
11  Q.   And looking back again to Paragraph 18 of
12  Exhibit 1, your report, you go on to say that,
13  "Brain sections show rarefaction of the neurophil
14  and focal microscopic hemorrhage.  A few neurons are
15  shrunken with hypereosinophilia of the cytoplasm and
16  nuclear pyknosis."  And I'm sure I butchered a
17  couple of those words.  But do you see what I'm
18  referring to?
19  A.   Yes.
20  Q.   And the rarefaction of the neurophil and
21  the microscopic hemorrhages that you observed in the
22  slides of Mr. Lurry's brain, is that indicative of
23  lack of oxygen to Mr. Lurry's brain?
24  A.   I believe so, yes.

Page 168

1   Q.   And standing on themselves, does the
2   rarefaction of the neurophil and the focal
3   microscopic hemorrhages indicate how Mr. Lurry's
4   brain came to be deprived of oxygen?
5   A.   No.  You have to look at it in the context
6   of the case.  You can't just look at the slide and
7   know how they got lack of oxygen.  You have to look
8   at the whole picture.
9   Q.   Looking at the slide, the person could
10  have had a lack of oxygen from anything from a heart
11  attack to manual strangulation to an opioid
12  overdose; correct?
13  A.   The slide itself does not tell you how the
14  lack of oxygen happened.  You have to look at the
15  circumstances.
16  Q.   If asphyxia were not a significant
17  contributing factor to Mr. Lurry's death, what would
18  you expect to be different about his histology
19  slides?
20  A.   I don't understand the question.
21  Q.   I will try to lay a little bit of what we
22  lawyers call foundation.  You have opined that --
23  and I'll quote you accurately here -- "Asphyxia for
24  several minutes due to the obstruction of his airway

Page 169

1  is a significant contributing factor to Mr. Lurry's
2  death."
3      A.   Mmm-hmm.
4      Q.   And we've been talking about our
5  observations of Mr. Lurry's histology slides,
6  particularly of his lungs.  If, as a counterfactual,
7  asphyxia for several minutes due to the obstruction
8  of his airway was not a significant contributing
9  factor to Mr. Lurry's death, would you expect his
10 lungs histology slides to look different?
11         MS. BAKOS: I'm going to object to the
12         vagueness and --
13         THE WITNESS: They might look different.
14         MS. BAKOS: -- I'm sorry -- an incomplete
15         hypothetical.  Go ahead.
16         Go ahead.
17         THE WITNESS: Yeah, so they might look
18         different.  They might not.  It kind of
19         depends.  It depends on the circumstances
20         of what other parts of the hypothetical
21         are relevant.
22         If the death was just from an overdose
23         without an asphyxia component, I wouldn't
24         expect to see the foreign material in his

Page 170

1  airway.  I wouldn't expect to see the
2  multinucleated giant cells trying to chomp
3  and eat that foreign material.  I wouldn't
4  necessarily see the pneumonia.  You know,
5  in an overdose, a person would not
6  necessarily have aspiration-type pneumonia
7  with foreign material.
8  They could still have it, but it's not --
9  But the fact that we have a lot of
10 particulate material in the context of
11 particulate material in the oral cavity
12 fits in with the picture.  So you --
13 Again, you can't just take little pieces
14 of the picture and say it's not an
15 asphyxia because you can also have it in
16 other cases.  You have to look at it in
17 the context of this particular case.
18 But, you know, in my prior cases where
19 it's just an overdose, it would be
20 hemorrhage without the pneumonia.  There
21 wouldn't be the foreign body reaction.  We
22 wouldn't see the particulate material.
23 And that's how it would be -- I would
24 expect it to be different if it was just

Page 171

1      an overdose.
2  BY MR. MATHUES:
3      Q.   When reaching your conclusion that looking
4  at the histology slides of Mr. Lurry's lungs you
5  observed bronchopneumonia, would you look to a
6  particular textbook or treatise or published article
7  for a sample slide or an example slide of what
8  bronchopneumonia looks like?  Or did you just rely
9  on your clinical experience as a forensic
10 pathologist?
11     A.   It's both.  I mean, I diagnose
12 bronchopneumonia all the time, so I know what it
13 looks like, and I know what normal looks like.  It's
14 from years and years of experience.  But if you need
15 references, they're in the Selected References at
16 the end of my report.  Those are the ones I often
17 use for demonstrative exhibits if you need to get an
18 idea of what normal looks like or what other lungs
19 look like.
20     Q.   Let's go to those Selected References.
21 Are you able to see my screen in front of you, Dr.
22 Melinek?
23     A.   Yes.
24     Q.   At the bottom, one question that I had,

Page 172

1  No. 7 was Stocker and Dehner's Pediatric Pathology.
2  Does pediatric pathology have anything to do with
3  this case?
4      A.   No, it does not.
5      Q.   Are these eight sort of your standard
6  go-to references that you give for many of your
7  reports?
8      A.   I have lots of go-to references.  I would
9  say I have more than eight.  Sometimes I delete
10 certain ones.  I probably forgot to delete the one
11 about pediatric pathology.
12        So I have, you know, a standard list of
13 references that I use for many reports, and I
14 usually delete parts of the ones that aren't
15 relevant.
16        You know, that particular pediatric
17 pathology book does have some pictures, for
18 instance, of lungs.  But this is not a pediatric
19 case, so I wouldn't think that it's particularly
20 relevant.  That's why it says "Selected References."
21 That's just giving you an idea about books I have.
22     Q.   Can you point me to a chapter or a page
23 number in any of the Selected References that you do
24 have that I would go to look and see an example of a

1  slide where a person has aspirational pneumonia and
2  then be able to compare it against Mr. Lurry's and
3  say, "Okay, here's a slide in the book. It shows
4  aspirational pneumonia. Here is Mr. Lurry's slide.
5  We put them together. This is how we can determine
6  that Mr. Lurry has aspirational pneumonia."
7     A.  You know, it's been a while since I've had
8  the textbook in front of me, because these textbooks
9  are actually on my shelf in San Francisco, and I'm
10  here in New Zealand. But to my recollection, the
11  ones that I would go to that more likely have photos
12  of pneumonia -- It may not be aspiration. It just
13  would be pneumonia in general, most likely.
14     Probably in Dolinak. I would probably go
15  there. DiMaio tends to have more gross photos.
16  Spitz and Fisher might have it. And, actually, the
17  pediatric text might have it, because children
18  aspirate, so that might be in there, as well. And
19  then I would also look at An Atlas of Forensic
20  Pathology, Chuck Wetli's book, No. 8. That has both
21  gross and microscopic pictures. I don't recall
22  whether they have specifically an identical photo of
23  aspiration pneumonia that would be an exact match
24  because, as you know, everybody is a little

1  different. You're not going to get an exact match
2  from people. But it will explain to you how to make
3  that diagnosis and how it's done.
4     Q.  In terms of coming to your conclusions in
5  the Lurry case of the Selected References that you
6  have listed, is there any particular reference, or
7  more precisely, would you point to any particular
8  either chapter or page number for any of these
9  references as particularly significant to the
10  conclusions that you've reached here?
11     A.  I can't really do that because, you know,
12  like you have to know the whole textbook. It's not
13  a particular chapter or reference. I mean, I can
14  tell you that, for example, Baselt's, that's the
15  textbook that has to do with toxicology. That's the
16  first one on the list. So, obviously, the relevant
17  ones would be related to fentanyl, the morphine,
18  acetomorphine, and cocaine. So it would be -- I
19  don't know the page number, but it would be -- You
20  could look it up based on the index.
21     And then for the others, the relevant
22  chapters and pages would be, again from the index, I
23  would look up under asphyxia, so the chapters on
24  asphyxia in DiMaio and Dolinak and Spitz and

1  Fisher's and Wetli, and the chapters on drug-related
2  deaths.
3     So there are entire chapters on the
4  subject. And sometimes it's sprinkled into text in
5  other parts.
6     Q.  One moment. I might be done.
7     A.  Okay.
8        MR. MATHUES: Dr. Melinek, I am done. I
9     don't have any more questions for you.
10     Ms. Bakos may. Or she may just say, "You
11     demolished my questions sufficiently
12     well," and she has nothing to say.
13        MS. BAKOS: I will, I think, have a couple
14     more.
15     I need to take two minutes.
16        THE WITNESS: Okay. Can I have two
17     minutes, too? I need to go to the
18     bathroom.
19        MS. BAKOS: Of course.
20        THE WITNESS: Okay.
21     (Whereupon at this point in the
22     proceedings, a recess was held from 6:45
23     p.m. to 6:48 p.m., after which the
24     following proceedings were conducted:)

1        CROSS EXAMINATION
2  BY MS. BAKOS:
3     Q.  Okay. Sorry about that.
4     Okay. I just have a few quick follow-up
5  questions. Okay. So, Doctor, you mentioned in your
6  deposition that the size of the airway was typically
7  about 1-1/2 to 2 centimeters; is that correct?
8     A.  That is correct.
9     Q.  Okay. And I know that you didn't recall
10  earlier as to the size of the bag that Mr. Lurry
11  coughed up, but if I told you that Officer Steurer
12  said that the size of the bag was -- let me see here
13  -- Sorry. I had this up and then -- Okay. He said
14  it was maybe 2 inches by 2 inches approximately.
15     Would that be larger than the 1-1/2 to 2
16  centimeters that is the size of a typical airway?
17     A.  Yes, it would.
18     Q.  And would that be large enough to block
19  the airway completely?
20     A.  Yes.
21     Q.  You mentioned, and I know this was a
22  little bit in passing, that pressure on the neck
23  would have contributed to both asphyxia and choking.
24  Do you recall that?

Page 177

1    A.   I did.
2    Q.   Can you tell me what it is about pressure
3  in the neck that would have contributed to choking?
4    A.   So we're dealing with obstruction both on
5  the outside and on the inside.  So there's
6  obstruction on the inside from the drug packets in
7  the back of the throat or in the back of the airway.
8  And then from the outside, when you press on the
9  neck, you compress the blood vessels that are on the
10 sides of the neck near the strap muscles.  So by
11 putting pressure like this on the strap muscles, you
12 are also compressing the blood vessels that are
13 behind it.  And those blood vessels drain the head.
14 So as long as there's still blood pressure for the
15 carotid arteries for blood to get to the head, then
16 you've got oxygen going to the head.  But by
17 compressing both -- putting extra pressure on the
18 airway but also extra pressure on the blood draining
19 the head, that's what causes the back pressure which
20 can form the petechiae, the burst blood vessel,
21 because blood can get to the head, but it's being
22 stopped from going back down.
23       So that combined, in combination of the
24 pressure on the neck compressing the airway and

Page 178

1  compressing the blood flow, preventing blood from
2  being able to drain from the head.
3       MS. BAKOS:  Sorry.  I'm just looking
4          through my list.
5       I don't think -- I don't think I have
6          anything else.
7       Do you have anything based on that?
8       MR. MATHUES:  A little in clarity.
9          RE-DIRECT EXAMINATION
10 BY MR. MATHUES:
11   Q.   So, Dr. Melinek, when you are talking
12 about putting pressure on the neck and its
13 significance in this case, am I understanding you
14 that what's of particular significance is not
15 pressure on the neck generally, but pressure on the
16 carotid artery and the vicinity of the carotid
17 artery?
18   A.   No, it's all of the above.  So the term
19 "choking" is a general term; okay?  And when
20 somebody chokes, whether -- Choking can occur from
21 lots of different methods.  So you can choke because
22 you've got something in your airway, and that's
23 obstruction from the inside.  So he choked on a
24 chicken bone.  The chicken bone went in, and then

Page 179

1  there was laryngospasm trying to get it out, you
2  know, coughing, and then you choke on the chicken
3  bone.  So choking can happen from the inside.
4       But choking can also happen from the
5  outside.  So if, for example, you have a ligature or
6  a bar arm hold or, in this particular case, pressure
7  being applied on the neck -- okay -- that pressure
8  is compressing the airway, depending on how much
9  strength is behind that.  It's narrowing the airway
10 at the level where the pressure is being applied.
11 And, also, it's compressing not the carotid artery,
12 which is what you asked; it's the jugular veins.  So
13 it's the veins draining the head that it's
14 compressing.  The artery is actually free and clear.
15 The artery is pushing the blood up to the head, but
16 what's happening is back pressure.  It can't drain,
17 at least for a period of time.
18       And, remember, we're not dealing with the
19 pressure being applied.  The pressure on the neck
20 was not applied for a very long period of time.
21 What was much longer was the pressure on the nose
22 obstructing air from getting in in the first place.
23       That's not considered a choking.  It's
24 still an asphyxia, because there's a lack of air

Page 180

1  getting into the airspaces, but it's not a choking.
2  Specifically, choking is focusing on the neck.
3       MR. MATHUES:  Thank you for the
4          clarification.  I don't have any other
5          questions.
6          RE-CROSS EXAMINATION
7  BY MS. BAKOS:
8    Q.   I have one more question, and I promise
9  we're done.  It just reminded me because we were
10 talking about the pressure on the neck.  And I'm not
11 sure if you recall, but if I submit to you that
12 Officer May testified that when he was touching Mr.
13 Lurry's neck, he was doing so to check for a pulse,
14 Doctor, in your experience and based on your
15 expertise and your viewing of the video, does it
16 appear to you that that is, in fact, what Officer
17 May was doing when he was making physical contact
18 with Mr. Lurry's neck?
19       MR. MATHUES:  I would object to that
20          question as outside the scope of redirect.
21          But, obviously, you can answer.
22       THE WITNESS:  Well, it's a little odd, to
23          be honest.  Because, you know, when you
24          feel someone's pulse, it's much more

Page 181

1　lateral. This looked much more anterior.
2　It looked like to me in watching the video
3　like pressure was being applied and it was
4　part and parcel with pulling down on his
5　chin hairs to try to get his mouth open.
6　So it seemed to be part and parcel with
7　the mechanism of obstructing the nose or
8　pulling down the jaw to try to get the
9　articles out.
10　It was not the typical maneuver that I
11　think of when someone is feeling a pulse,
12　which is, you know, you just slightly put
13　your hand on the side of the neck. You
14　don't go to the front. And feeling for a
15　pulse shouldn't leave hemorrhage in the
16　strap muscle. So that's also very odd.
17　That does not seem compatible with that
18　for me.
19　MS. BAKOS: Thank you. I have no further
20　questions.
21　MR. MATHUES: Nothing based on that.
22　MS. BAKOS: Okay. Are you going to order?
23　MR. MATHUES: I will order. And, Ms.
24　Krotz, what e-mail should I direct the

Page 182

1　exhibits to?
2　THE COURT REPORTER: Could you send the
3　exhibits to me at depositions@aol.com,
4　please?
5　MR. MATHUES: And I will just put in the
6　subject line today's date and "Lurry
7　case." And I will send those to you,
8　including Exhibit 12.1.
9　Dr. Melinek, you've gone off the screen,
10　but I will remind you --
11　THE WITNESS: Oh.
12　MR. MATHUES: No, you can go off screen.
13　THE WITNESS: I don't know why I went off
14　the screen. I didn't touch it. I don't
15　know why. Electronics.
16　MR. MATHUES: It looks to me like we
17　started at 2:30, and we're going to finish
18　at 7:00, so that's 3:30, 4:30, 5:30, 6:30.
19　So I will owe you for four and a half
20　hours of your time. So I will --
21　THE WITNESS: Yeah, four and a half hours.
22　Got it. And I will send the -- I will
23　have Catherine send the invoice and the
24　W-9 to you at the e-mail that you gave me.

Page 183

1　MR. MATHUES: And if it gets kicked back,
2　call Ms. Bakos or e-mail Ms. Bakos. She
3　has my e-mail.
4　THE WITNESS: Yeah.
5　MR. MATHUES: And once I receive it, we
6　will get a check in the mail to San
7　Francisco.
8　THE WITNESS: And if I may request, I
9　prefer a full transcript as opposed to the
10　minis. The minis are really hard for me
11　to read, and I miss stuff. I'm getting
12　old. I need the big print.
13　THE COURT REPORTER: I've got you, Doctor.
14　And send it to you at
15　drjudymelinek@yahoo.com?
16　THE WITNESS: Yes. But send me the PDF,
17　not the transcription software one.
18　THE COURT REPORTER: Absolutely. Okay.
19　May I just ask, David and Abby, how do you
20　like your transcripts?
21　MR. MATHUES: E-Trans will be fine. And I
22　will put in the e-mail whether or not
23　regular time is fine or if I want it
24　within two weeks.

Page 184

1　MS. BAKOS: I don't need a copy right now.
2　THE COURT REPORTER: All right. Thank
3　you.
4　MR. MATHUES: Thank you.
5　THE WITNESS: Thank you. Have a nice
6　weekend, everyone.
7　(Deposition concluded at 6:58 p.m.)

Page 185

1                CERTIFICATE OF OATH

2

3  STATE OF ILLINOIS   )

4  COUNTY OF CHRISTIAN )

5

6        I, the undersigned authority, certify that

7  JUDY MELINEK, M.D., personally appeared before me

8  via Zoom and was duly sworn.

9        WITNESS my hand and official seal this

10  29th day of April, 2022.

11

12

                    Deborah A. Krotz, CSR, RMR, CRR
                    Notary Public - State of Illinois
                    My Commission No:  781016
                    My Commission Expires 6/27/2025

---

Page 186

1        REPORTER'S DEPOSITION CERTIFICATE

2

3  STATE OF ILLINOIS   )
   COUNTY OF CHRISTIAN )

4
         I, Deborah A. Krotz, Certified Shorthand
5  Reporter of the State of Illinois, Registered
   Diplomate Reporter, Registered Merit Reporter,
6  Certified Realtime Reporter, and Notary Public in
   and for the State of Illinois at Large, certify that
7  I was authorized to and did stenographically report
   the deposition of JUDY MELINEK, M.D., by Zoom
8  videoconferencing on the 29th day of April, 2022,
   the deponent appearing from Wellington, New Zealand;
9  that a review of the transcript was requested; and
   that the transcript is a true and complete record of
10  my stenographic notes.

11        I further certify that I am not a relative,
   employee, attorney, or counsel of any of the
12  parties, nor am I a relative or employee of any of
   the parties' attorneys or counsel connected with the
13  action, nor am I financially interested in the
   action.

14
         DATED this 10th day of May, 2022.
15

16

17

18

19

                    Deborah A. Krotz, RMR, RDR, CRR
                    Illinois CSR No. 084-001848

---

1              SIGNATURE AND ERRATA SHEET
   NICOLE LURRY, as Special Administrator of The Estate
   f Eric Lurry, Jr., deceased -vs- CITY OF JOLIET, JOLIET
   POLICE OFFICERS MAY (Star #056), MCCUE (Star #118),
   TELLEZ (Star #311) and LT. HARRISON (Star #039)
   DO NOT WRITE ON TRANSCRIPT--ENTER CHANGES HERE:

Page #    Line #        Change                    Reason

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

2  ____/_____/_____/_____

3  ____/_____/_____/_____

4

5  Under penalties of perjury, I declare that I have
   read my deposition held April 29, 2022, and that it
6  is true and correct, subject to any changes in form
   or substance entered here.
7

8  _____   _____
9      JUDY MELINEK, M.D.                  DATE

   Subscribed and sworn to before me this _____ day of

   _____, 2022.


                              _____
                                   Notary Public