Abby D. Bakos, Esq.
Bakos & Maisuria Law Group, LLC
1755 Park Street, Suite 200-1070
Naperville, IL 60563

March 15, 2022

Re: Lurry v. City of Joliet, et al.

Dear Attorney Bakos,

I have been retained by your office to offer my professional, expert opinion related to the above-referenced case. Specifically, you have asked me to opine as to whether the delay in providing medical treatment to Mr. Lurry (including the administration of naloxone (Narcan®) increased his risk of death (i.e., was it more likely that he would have survived if he had been provided medical treatment sooner than he was) and whether obstructing his airway further increased his risk of death. Each of my opinions provided in this report are to a reasonable degree of medical certainty and are based on my education, experience and the facts of this case.

**I.     Qualifications**

I am a physician licensed to practice medicine in the states of New York, Connecticut, Maryland, and Virginia, as well as the District of Columbia. I currently practice medicine in Washington, DC and am board-certified in emergency medicine, medical toxicology, and undersea and hyperbaric medicine through the American Board of Emergency Medicine. I worked as an Emergency Department Attending Physician from 2005-2010 and from 2015-2018. During that time, I treated hundreds of patients. Many of those patients were treated for opioid/drug overdoses. I have also treated individuals suffering from asphyxiation.

I am currently the co-medical director of National Capital Poison Center in Washington, DC. I am the attending physician at an outpatient medical toxicology clinic at MedStar Georgetown University Hospital. I also teach medical toxicology to Georgetown University emergency medicine residents and medical students, and I am a toxicology consultant for the Connecticut Poison Control Center.

I have been qualified by courts as an expert, have provided trial testimony, and/or have provided deposition testimony in the field of medical toxicology in the following jurisdictions: Parish of East Baton Rouge, Louisiana; New York Court of Claims; Supreme Court of the State of New York; Superior Court JD Tolland at Rockville, Connecticut; Connecticut Superior Court, Hartford Judicial District; Superior Court of New Jersey; Superior Court JD of New Haven at Meriden, Connecticut; State of Connecticut Superior Court; United States District Court for the District of Arizona.

As such, I have the qualifications to review and opine on cases involving intoxicants such as heroin, fentanyl, and other opioid analgesics and drugs of abuse.

Ex. 18

## II. Materials Reviewed

I have reviewed records and video evidence involving the case of Mr. Eric Lurry, a 37-year-old man who experienced a drug overdose in January 2020. All opinions stated here are within a reasonable degree of medical certainty. I reserve my right to change my opinions if I receive additional materials regarding this case. The records and materials I reviewed for this matter include the following:

   i. Deposition transcript of Jeremy Harrison dated 11/2/21
   ii. Deposition transcript of Douglas May dated 10/28/21
   iii. Deposition transcript of Dr. Michael Humilier dated 1/22/22
   iv. Deposition transcript of Michael Steurer dated 1/14/22
   v. Deposition transcript of Nicholas Gerald Murphy dated 12/6/21
   vi. Deposition transcript of Jose Tellez dated 11/22/21
   vii. Hospital photos of Eric Lurry
   viii. Andrew McCue Search of Lurry video
   ix. Andrew McCue 202001281600_00674_200886054 video
   x. McCue 1 hour 1 minute in-car camera
   xi. McCue 1 hour 1 minute dash cam video
   xii. Ranstead 46 min 21 second dash cam video
   xiii. Autopsy photographs and x-rays from City of Joliet
   xiv. Dispatch log
   xv. Joliet 000001-97 (JPD Case Report No. 20-1290)
   xvi. Joliet 00098-106 (JPD Case Repot No. 20-1290)
   xvii. Joliet 000119-135 (JFD Reports)
   xviii. Joliet 000136-154 (Will County Coroner)
   xix. Joliet 000156-564 (Will Grundy Major Crimes Task Force Case Report No. 20-62)
   xx. Joliet 002897-2970- Autopsy photos from Coroner's Office
   xxi. Joliet 3014-3042 (IA I2020-12 Interview Audio Transcripts- Harrison, May, McCue, Ranstead, Tellez)
   xxii. Joliet 3043-3319 (IA I2020-12 Interview Audio Transcripts)
   xxiii. Joliet 7266-7412 (Narcan & CPR AED Training Documents)
   xxiv. Lurry Death Certificate
   xxv. Lurry 000068-00449- Medical Records
   xxvi. Lurry 000544- Hospital Photo
   xxvii. Lurry 000547- Hospital Photo
   xxviii. Steurer audio MP3 file
   xxix. Steurer Narrative Supplement
   xxx. Photos of Visual Inspection Evidence
   xxxi. Expert pathology report of Dr. Judy Melinek
   xxxii. Plaintiff's First Amended Civil Complaint

## III. Facts

Based on my review of these materials, the facts of the case are as follows. On 1/28/20, at approximately 3:12 pm, Mr. Eric Lurry was a passenger in a vehicle stopped by police officers from the

City of Joliet. The traffic stop was initiated due to suspicion of drug-related activity. Mr. Lurry was initially patted down by the police officers and was allowed to leave the scene of the traffic stop. Mr. Lurry walked away from the traffic stop, but was detained a few minutes later by the same police officers due to concern that he had stolen a cellular phone from the driver of the vehicle involved in the traffic stop. At this time, Mr. Lurry was again patted down by City of Joliet police officers. The officers noted that Mr. Lurry reached into the crotch area of his pants. A struggle ensued, and officers "did observe Lurry bury his face towards his hands while on the ground". Mr. Lurry was subsequently handcuffed and placed into the back of a police car for transport to the City of Joliet Police Station. Shortly thereafter, while speaking to other officers at the scene of the arrest, Officer Tellez indicated that he believed Mr. Lurry may have put some "dope" (i.e., narcotics) in his mouth. Officer Tellez also expressed that he believed Mr. Lurry "probably swallowed some of it".

During the drive to the City of Joliet Police Station, Officer Jose Tellez observed Mr. Lurry on a monitor in the police car. Officer Tellez noted that Mr. Lurry was "making chewing motions with his mouth but would stop when he observed me looking at him". After arriving at the police station, Officer Tellez advised other officers on scene, including Officer May, that he believed that Mr. Lurry had contraband in his mouth.

You have provided me with video camera footage for review, of the aforementioned trip to the police station. The video does show Mr. Lurry making chewing motions while he is detained in the back seat of Officer Tellez' police vehicle. Mr. Lurry was initially awake and alert during this time and can be seen looking around and blinking while seated in the back seat of the vehicle. He continued to exhibit chewing motions as the officers drove their car to the City of Joliet Police Station. The drive took approximately seven minutes. At one point during the drive, one of the City of Joliet police officers present in the vehicle engaged in a phone conversation in which he stated how someone, presumably Mr. Lurry, "probably might have got something in his mouth". Mr. Lurry was visibly still making chewing motions during this time period. Mr. Lurry became increasingly somnolent during the drive to the City of Joliet Police Station, although he continued to exhibit masticating motions while appearing slumped over in the police vehicle. By the time the officers parked the car at the City of Joliet Police Station, Mr. Lurry was barely responsive to verbal stimuli. He was not combative and did not actively resist being removed from the police vehicle. Mr. Lurry had no response to a sternal rub, but he did make eye contact with a City of Joliet police officer (later identified as Sergeant Doug May) who slapped him in the face and yelled "wake up, bitch". Sergeant May then pinched Mr. Lurry's nose shut and stated, "open your mouth". Mr. Lurry remained motionless for approximately 90 seconds while Sergeant May held his nose shut, and during this time another officer inserted a police baton in Mr. Lurry's mouth in an attempt to remove foreign bodies from the mouth. Mr. Lurry never regained consciousness, despite multiple officers performing sternal rubs on him, and was manually removed from the police vehicle more than 3 minutes after his initial arrival at the police station.

The Joliet Fire Department was dispatched to the City of Joliet Police Station at 4:20 pm on 1/28/20 due to a report of an unresponsive subject who was not breathing. They arrived at 4:23 pm, and at that time Mr. Lurry was noted to have no pulse, no spontaneous respirations, and a room air oxygen saturation of 76%. Advanced Cardiac Life Support (ACLS) protocols were initiated, and Mr. Lurry received cardiopulmonary resuscitation (CPR), his trachea was intubated, and mechanical ventilation was

3

performed. He received 14 mg of naloxone and 5 mg of epinephrine, but he remained asystolic despite these interventions.

Mr. Lurry was taken by ambulance to Amita Health St. Joseph Emergency Department (ED) on 1/28/20 and arrived at approximately 4:40 pm. He was asystolic upon arrival, and ACLS protocols were continued by the ED staff. Mr. Lurry regained spontaneous circulation while in the ED and was admitted to the Intensive Care Unit (ICU). While in the ICU, Mr. Lurry did not regain consciousness, and his medical condition continued to deteriorate. He showed no meaningful neurologic activity and had ongoing metabolic acidosis with worsening hypoxemia. He required administration of multiple vasopressor agents to maintain hemodynamic stability. Despite these efforts at resuscitation, he experienced another cardiac arrest at 2:07 am on 1/29/20, and was unable to be revived. He was pronounced dead at 2:37 am on 1/29/20.

The Will County Coroner's Office performed a postmortem examination of Mr. Lurry on 1/29/20. The examination revealed the presence of pulmonary edema and cerebral edema. A postmortem toxicology report, performed at NMS Labs, revealed the presence of benzoylecgonine (560 ng/mL), morphine (64 ng/mL), and fentanyl (32 ng/mL) in Mr. Lurry's antemortem blood as well as the presence of 6-MAM (37 ng/mL) in Mr. Lurry's antemortem urine. The Will County Coroner's Office concluded that Mr. Lurry's death was due to heroin, fentanyl, and cocaine intoxication. In a report, the Will County Coroner's Office stated that "the Joliet Police Department officers played no role and shared no responsibility in the unfortunate and untimely accidental drug overdose death of Eric D. Lurry, Jr." Furthermore, the Will County Coroner's Office concluded that this was because the "levels of narcotics in Mr. Lurry's system were too significant" for multiple doses of naloxone, administered by first responders, to have any effect in reversing the overdose.

### IV. Opinions

**OPINION A: It is my opinion, to a reasonable degree of medical certainty, that the delay in providing Mr. Lurry with immediate medical attention (including failing to administer naloxone) once he was reasonable suspected of placing drugs in his mouth and/or ingested the drugs, increased the likelihood of death. It is my opinion that Mr. Lurry would have survived if medical treatment had been provided to him at or close in time to when Officer Tellez suspected that Mr. Lurry had ingested narcotics.**

    a. Facts relied upon to form my opinion:

On the video Officer Tellez can be heard stating that he believed that Mr. Lurry put the drugs in his mouth and swallowed some of it. This comment was made while Mr. Lurry was in the back of the squad car before leaving the scene of his arrest. Joliet Police Officer Jose Tellez testified that he believed that Mr. Lurry was chewing on illicit drugs that he had concealed in his mouth while en route to the station. Despite having a suspicion that Mr. Lurry had ingested illicit drugs both at the scene and during transport, Officer Tellez continued to transport Mr. Lurry to the Joliet Police Department without calling for medical assistance.

According to Officer Harrison's deposition testimony, he called for paramedics around the time that Mr. Lurry was pulled out of the vehicle after becoming unconscious (pg. 200-202). The video shows Mr. Lurry being pulled out of the vehicle within approximately 30 seconds of then the baton was removed from his mouth. Consequently, between the time that Tellez initially verbally expressed his belief that Lurry put drugs in his mouth, until the time that the baton was removed from Mr. Lurry's mouth (i.e., the approximately time that Officer Harrison called for medical assistance) was 13 minutes and 18 seconds. The EMT's did not arrive on scene until several minutes later.

This delay in medical attention resulted in Mr. Lurry having an increased systemic an increased systemic exposure to the drugs, exacerbated Mr. Lurry's risk for experiencing signs and symptoms of drug overdose, and was a direct contributor to the drug toxicity that he experienced. Had Officers Tellez and his colleagues requested medical assistance earlier in the course of Mr. Lurry's drug exposure, Mr. Lurry would have received definitive medical care (potentially including the administration of naloxone) earlier than he did, and his chances of survival would have been increased. In addition, the longer that Mr. Lurry chewed on the illicit drugs, the more systemic exposure he received. Since the dose of a poison is related to its toxicity, this means that Mr. Lurry would have received a smaller exposure and less toxicity if he had consumed less of the drugs.

Had Mr. Lurry received medical treatment at or near the time that Officer Tellez verbally confirmed his suspicion that Mr. Lurry put the drugs in his mouth, the severity of the overdose could have and likely would have been prevented.

Individuals who consume packages of drugs in an effort to avoid detection by law enforcement officials are often described as "body stuffers" or "body packers". Body packers typically swallow carefully packaged drugs in large quantities, often for the purpose of smuggling drugs across borders. Body stuffers generally ingest smaller quantities of drugs that are often poorly packaged, and consume the drugs in a hasty and unprepared manner while attempting to evade law enforcement officials. Since drugs involved in body stuffing are not well packaged, these patients are at high risk for systemic drug absorption, toxicity, and death. Both body stuffers and body packers can be treated with bowel irrigation to enhance elimination of the drug packages from the body. In addition, systemic effects of drug overdose can often be treated with medications commonly available in most hospital settings, including naloxone, oxygen, and benzodiazepines. For these reasons, it is imperative that patients who are suspected of body stuffing or packing undergo prompt medical evaluation.

Unfortunately, despite the detaining officers' suspicions that Mr. Lurry had ingested drugs on 1/28/20 and their observations of Mr. Lurry's decreased level of consciousness, odd blinking, and other subjective signs that he was in the midst of a drug overdose, he was not referred for medical attention until he lost consciousness due to significant toxicity from the drug ingestion. This delay in receiving medical care more likely than not resulted in a significantly decreased chance of survival. Had Mr. Lurry received immediate medical care, potentially including naloxone, after he ingested the drugs (or was suspected of ingesting drugs), his chances of survival related to the drug overdose would have been significantly greater. Unfortunately, by the time Mr. Lurry received naloxone from the Joliet Fire Department, he was pulseless, had no respiratory rate, and had an abnormally low oxygen saturation, indicating that his body and organs had been deprived of oxygen for a prolonged period of time. The delay in receiving medical care, including

the administration of naloxone, was more likely than not a significant causative factor in Mr. Lurry's subsequent clinical deterioration and death.

The American Heart Association algorithms for both Basic Life Support (BLS) and Advanced Cardiac Life Support (ACLS) provide guidance to laypersons and healthcare professionals who care for unresponsive patients. When faced with an unresponsive patient, first responders should rapidly assess the situation, call for assistance if needed (this includes calling 911 in the United States), and then utilize Basic Life Support (BLS) principles including maintenance of circulation, airway, and breathing. Rescue breathing and/or CPR should be provided for patients who are not breathing and/or lack a pulse. For patients who are not breathing or who have depressed breathing due to suspected drug overdose, administration of naloxone (Narcan®) should also be performed if this antidote is readily available. Naloxone is an effective antidote for opioid overdoses, including heroin, morphine, and fentanyl. Naloxone reverses the respiratory depression associated with opioid overdose. For naloxone to be effective, it must be administered soon after the overdose and before permanent organ damage due to oxygen deprivation has occurred.

Although Mr. Lurry exhibited decreased responsiveness after he arrived at the City of Joliet Police Station, the officers who detained offered him no basic resuscitative efforts. The officers did not assess his airway, breathing, or circulation, and did not administer naloxone. The officers who attempted to remove Mr. Lurry from the police vehicle, including Officers McCue, Tellez, May, and Harrison, all completed Narcan training in 2019 according to the available Joliet Police Department Narcan and CPR Training Documents. The City of Joliet police officers were also trained in American Heart Association Heartsaver CPR/AED skills. Based on their training histories, these officers should have been able to provide basic BLS to Mr. Lurry when they noted that he was unresponsive in the back of the police vehicle. Since Mr. Lurry was involved in a drug-related traffic stop, was suspected to have placed "dope" in his mouth during his detainment, and was witnessed chewing during the drive to the City of Joliet Police Station, the City of Joliet police officers should have recognized that Mr. Lurry may have ingested drugs and/or was chewing on bags of drugs during the drive to the police station. It is my opinion within a reasonable degree of medical certainty that these officers, due to their basic medical training, should also have recognized that Mr. Lurry required immediate medical care due to his suspected drug overdose.

Drug overdoses, especially those involving opioids such as heroin and fentanyl, can result in respiratory depression, including shallow breathing and a slowing of the respiratory rate. This results in decreased oxygen delivery to the brain and other organs and causes clinical symptoms including hypoventilation, apnea, and decreased mental status. Due to the adverse respiratory effects of opioids, it is important to optimize the oxygenation and ventilation of patients affected by opioid overdose. The optimization of oxygenation and ventilation in overdose patients can include the administration of naloxone, relief of airway obstructions, and cardiopulmonary resuscitation. Naloxone can be administered through multiple ways including intranasal, intravenous, and intraosseous routes. Cardiopulmonary resuscitation is performed as recommended by the American Heart Association. Although a blind finger sweep was historically utilized to check for foreign-body airway obstruction, this practice is no longer recommended by the American Heart Association. The use of blind finger sweeps may actually exacerbate a foreign body obstruction and push an intra-oral foreign body deeper into the airway, resulting in airway obstruction, worsening oxygen deprivation and potential death.

**OPINION B: It is my opinion, to a reasonable degree of medical certainty, that Officers May and McCue exacerbated Mr. Lurry's condition and further increased his risk of death when May pinched Mr. Lurry's closed for approximately 90 seconds. Officer McCue's conduct in putting the baton in Mr. Lurry's mouth may have further exacerbated his condition.**

a. Facts relief upon to form my opinion:

On the patrol car video, Officer May is seen holding Mr. Lurry's nose for a prolonged period of time. Officer May reported that this was done in an attempt to make Mr. Lurry open his mouth and spit out the contraband substance. However, Officer May held Mr. Lurry's nose closed for approximately 90 seconds, depriving Mr. Lurry of oxygen and further contributing to Mr. Lurry's ongoing airway obstruction during that time. Given that Mr. Lurry, more likely than not, already had abnormal respirations and decreased systemic oxygen delivery due to his recent (and witnessed) ingestion of drugs, the nasal obstruction performed by Officer May contributed to an additional degree of asphyxia for Mr. Lurry. This, in combination with the potential airway obstruction caused by the insertion of a baton into Mr. Lurry's mouth, more likely than not worsened Mr. Lurry's degree of hypoxia, caused a further deterioration in his clinical status, and reduced his overall chances of survival.

Once Mr. Lurry was removed from the police car at the City of Joliet Police Station on 1/28/20, several small bags full of a white substance, as well as partially chewed bags, were extracted from his mouth. On the patrol car video, a police officer (later identified as Officer Andrew McCue) is seen placing a baton in Mr. Lurry's mouth, after he was instructed to do so by Lieutenant Jeremy Harrison in order to remove bags of drugs and prevent Mr. Lurry from potentially injuring the officers when they extracted the drugs from Mr. Lurry's mouth. Officer McCue removed several small bags, intact and full of an unknown substance, from Mr. Lurry's mouth as well as a larger torn bag. The practice of placing a baton or other foreign object into a subject's mouth is similar in practice to a blind finger sweep to remove a foreign body. The insertion of a baton into Mr. Lurry's mouth by City of Joliet police officers was described by the officers as a bite block but may in fact have contributed to a worsening airway obstruction. This practice of baton insertion may also have contributed to Mr. Lurry's worsening clinical status.

According to Officer Michael Steurer, Mr. Lurry coughed or spit up a baggie after he was removed from Officer Tellez' squad car and while Officer Ranstead administered cardiopulmonary resuscitation. You have provided me with pictures of what appears to be a chewed plastic bag or bags, approximately 1-2 inches in length. In an adult such as Mr. Lurry, who had an already suppressed gag reflex due to systemic opioid exposure, this type and size of intraoral foreign body can cause an upper or lower airway obstruction when pushed into the back of the oropharynx with an item such as a baton. Due to this, the baton placed into Mr. Lurry's mouth by Officer McCue may have caused or worsened an airway obstruction in Mr. Lurry. In his deposition, Dr. Humilier stated that he believed it was unlikely that Mr. Lurry experienced an airway obstruction due to the lack of gag reflex in Officer Tellez' squad car videos. However, as noted above, opioid intoxication can suppress the gag reflex, and some individuals also have a variable gag reflex at baseline. Due to these factors, I disagree with Dr. Humilier and believe that Mr. Lurry may have experienced an airway obstruction due the presence of plastic bag material in his oropharynx.

EMT Nicholas Murphy testified at his deposition hat he has seen paramedics, doctors, and nurses forcibly slap patients on the face and pinch an individuals' nose to restrict their breathing and force mouth opening for retrieval of an object. I have been a physician for more than 20 years, and I have never witnessed

7

a paramedic, nurse, or doctor either pinch a patient's nose to force oral opening or slap a patient on the face. I attended medical school in Chicago and completed rotations at multiple hospitals in the Chicagoland area. Throughout this time, I also never witnessed doctors, nurses, or paramedics slapping patients on the face or pinching their noses.

In summary, I believe that the City of Joliet police officers who detained Mr. Eric Lurry on 1/28/20 contributed to his clinical deterioration and death by failing to promptly provide or refer him for medical attention after he was suspected of ingesting drugs. In addition, I believe that the police officers' actions, including manually obstructing Mr. Lurry's nose and inserting a baton into his mouth, further exacerbated his existing airway obstruction. These actions likely reduced Mr. Lurry's chances of surviving his drug overdose, which was witnessed by the officers but not adequately treated.

A list of my deposition and trial testimony, fee schedule, as well as my current CV as of 3/15/22, are attached.

Thank you again for allowing me to review this case. If you have any additional questions regarding this matter, please contact me at kkja@me.com.

Sincerely,

Kelly Johnson-Arbor, MD, FACEP, FUHM, FACMT