# REPORT OF INVESTIGATION

### SUBJECT:

ALLEGED MISSING VIDEO
OF ERIC LURRY'S JANUARY 28, 2020 ARREST

BY:
Sean P. Connolly
Martin P. Walsh

Ex. 26

JOLIET007433

## TABLE OF CONTENTS

I.    Appointment……………………………………………………………………………1

II.   Executive Summary………………………………………………………………………1

III.  Background………………………………………………………………………………2

IV.   Summary of Relevant and Material Facts……………………………………………4

      A.    Documents Reviewed………………………………………………………………4

      B.    Will Grundy County Major Crime Task Force Interviews Reviewed………4

      C.    Interviews……………………………………………………………………………4

            1.    David Braner……………………………………………………………………4

            2.    Jeff D'Aleo……………………………………………………………………5

            3.    Commander John Arizzi………………………………………………………6

            4.    Deputy Chief Michael Batis…………………………………………………7

            5.    Lieutenant John Rosado……………………………………………………7

            6.    James Hagspihl………………………………………………………………8

            7.    Lieutenant Christopher Botzum……………………………………………8

            8.    Phillip Bregner………………………………………………………………8

            9.    Darren Rych……………………………………………………………………9

            10.   Lindsey Heavener……………………………………………………………10

            11.   Christopher Regis……………………………………………………………10

      D.    Site Investigation……………………………………………………………………10

V.    Analysis…………………………………………………………………………………11

      A.    Camera System………………………………………………………………………11

      B.    Will Grundy County Major Crimes Task Force Investigation……………..13

JOLIET007434

VI.     Findings……………………………………………………………………………14

VII.    Recommendations…………………………………………………………………15

Attachment A: Appointment Letter

Attachment B: Arial View of the Joliet Police Department

Attachment C: Photograph of Camera Near Employee Entrance

Attachment D: Photograph of Northwest Corner of Joliet Police Department

Attachment E: Photograph of Southwest Corner of Joliet Police Department

JOLIET007435

I.     **Appointment.** On May 12, 2021, Sean P. Connolly and Martin P. Walsh were appointed Special Inspectors General to investigate whether video footage existed capturing images of Eric Lurry's January 28, 2020, arrest. *See Attachment A (Appointment Letter)*

II.     **Executive Summary.** On January 28, 2020, Eric Lurry was arrested by the Joliet Police Department for resisting/obstructing a police officer. Before being placed into the squad car for transportation to the Joliet Police Department[1], Mr. Lurry placed a bag(s) of suspect cocaine into his mouth. During transportation to the police department, Mr. Lurry chewed on the bag(s) of suspect cocaine causing the substance to be released into his system. Shortly after arriving at police headquarters and before being removed from the squad car, Mr. Lurry went into distress and began losing consciousness and ultimately became unresponsive. Noticing Mr. Lurry's distress, Joliet Police Officers responded, removed Mr. Lurry from the squad car and began performing chest compressions. Paramedics from the Joliet Fire Department were called, responded and took over the administration of life saving measures from the Joliet Police Department. Mr. Lurry was transported to AMITA Health Saint Joseph Medical Center, in Joliet, Illinois. On January 29, 2020, at 2:37 a.m., Mr. Lurry passed away.

As a result of Mr. Lurry dying in the custody of the Joliet Police Department, the Will Grundy Major Crimes Task Force (Task Force) was activated to conduct an investigation. This Task Force was led by Division Commander John Arizzi from the Lockport Police Department. He arrived at the Joliet Police Department at 9:00 a.m., January 29, 2020, six hours and 23 minutes after Mr. Lurry died. During this investigation, Commander Arizzi viewed video footage captured by a camera(s) mounted on the exterior of police headquarters, facing east towards the parking lot where Mr. Lurry went into distress. He viewed other videos captured from cameras in the squad car in which Mr. Lurry was transported to police headquarters.

According to Commander Arizzi, the video from the exterior camera he examined was low-quality and failed to provide any detail from the scene. Every person interviewed, with first-hand knowledge of the perimeter camera system, stated it was outdated and the video was very poor quality. Commander Arizzi and Lieutenant Rosado viewed the perimeter video(s) on the computer screen located in Lieutenant Rosado's office on the second floor of police headquarters. Commander Arizzi recalled seeing several images of the parking lot on Lieutenants Rosado's computer screen, however, Commander Arizzi said he did not see Mr. Lurry at any time on the video(s). While viewing footage from the perimeter cameras, Commander Arizzi stated he was able to see police officers reacting urgently to Mr. Lurry's distress. Neither Commander Arizzi nor Lieutenant Rosado recalled exactly which camera provided the perimeter video they viewed; it may have been from more than one camera.

Commander Arizzi also watched squad car video showing Joliet Police officers trying to wake-up Mr. Lurry. On this video, Mr. Lurry appeared to go in-and-out of

---

[1]  "Joliet Police Department", "police headquarters" and "headquarters" are used throughout this report; they refer to the same building and location, specifically, 150 W. Washington Street, Joliet, Illinois 60432.

JOLIET007436

consciousness while sitting in the back of the squad car. After failed attempts to wake Mr. Lurry, he was removed from the police vehicle and placed on the ground from the rear passenger side door between two cars. The squad car video was greater in clarity and superior in quality to the perimeter video and showed Joliet Police Officers trying to help Mr. Lurry.

Commander Arizzi did not believe the video from the camera on the police headquarters had evidentiary value and he did not specifically request the Joliet Police Department to provide a copy. Further, the Joliet Police Department did not retain a copy of this video, resulting in the footage being overwritten pursuant to its retention policy.

Therefore, this investigation finds video footage existed capturing images of Eric Lurry's arrest on January 28, 2020. Also, this investigation finds this video footage no longer exists as a result of not being retained by either the Task Force or the Joliet Police Department and thereby being overwritten pursuant to the Joliet Police Department's video retention policy.

Further, this investigation finds that while the video did have evidentiary value and should have been retained for the sake of completeness, it may not have provided evidence that could not be garnered from the squad car videos which were retained.

III.   **Background**

On January 28, 2020, at approximately 3:12 p.m., Eric Lurry was a front-seat passenger of a vehicle driven by Kenan Kinney. Mr. Kinney's vehicle was stopped by the Joliet Police Department for failure to use a turn signal. During this traffic stop, police learned Mr. Kinney's driver's license was suspended and found three small bags of suspect crack cocaine and one bag of suspect heroin; he was placed into custody. Also, during this traffic stop, Mr. Lurry was patted down by police and his name was searched in LEADS, revealing he had no active warrants and was thereby clear. Mr. Lurry was told he could leave, but before departing the scene, he requested his cell phone. The police granted his request and Mr. Lurry took a cell phone from Mr. Kinney's vehicle and walked away.

After Mr. Lurry left, Mr. Kinney complained to officers that Mr. Lurry took his cell phone. As a result, Officers Tellez and McCue reestablished contact with Mr. Lurry, performed another pat-down, recovered a large amount of United States currency and felt, on Mr. Lurry's left inner thigh, "a plastic baggie containing a soft pliable substance."[2] Mr. Lurry reached into the crotch area of his pants, turned around, dove to the ground and had both hands under his torso. Officers observed Mr. Lurry quickly move his face towards his hands. After a two-minute struggle, officers were able to handcuff Mr. Lurry and place him in the squad car.

---

[2] Officer Supplemental Report (J1-20-0001290-002), Reporting Officer: Tellez, Jose, dated: January 28, 2020, Page 2 of 2.

JOLIET007437

During transportation to police headquarters, Officer Tellez observed Mr. Lurry making chewing motions. Mr. Lurry was silent during the eight-minute ride to police headquarters. The transport car was followed by another officer into the parking lot. The follow car had its in-car video on the entire trip. This car parked near Officers Tellez & McCue's vehicle. Upon arrival, Mr. Lurry appeared to refuse to exit the squad car and ultimately police officers on scene realized he was in distress and removed him from the vehicle, placed him on the parking lot ground and began providing life saving measures. Additionally, the Joliet Fire Department was called, paramedics arrived, continued performing life saving measures, and transported Mr. Lurry to AMITA Health Saint Joseph Medical Center, in Joliet, Illinois. Unfortunately, the following day, on January 29, 2020, at 2:37 a.m., Mr. Lurry passed away.

As a result of Mr. Lurry dying in police custody, the Will Grundy Major Crimes Task Force was activated to investigate. This Task Force is staffed by approximately 50 experienced investigators, detectives and evidence technicians culled from 32 municipalities and two Sheriff's Departments. The Task Force is deployed for high-profile incidents or when an apparent conflict of interest is evident; it is independent. In the Lurry investigation, the Task Force reported its findings to the Will County State's Attorney Office. There were seven Task Force investigators assigned to the Lurry investigation.

The Task Force assigned to investigate Mr. Lurry's death was led by Commander Arizzi. Commander Arizzi's first investigative action, upon arriving at the Joliet Police Department, was to survey and account for the perimeter cameras. Towards this effort, he looked for cameras capable of capturing activity in the headquarters' parking lot. This is standard operating procedure for any investigation. Additionally, he attempted to locate additional cameras from the surrounding area.

Commander Arizzi is an experienced investigator. He is in charge of investigations for the Lockport Police Department, and he is the Lockport Police Department's Internal Affairs investigator. Further, Commander Arizzi was tasked with revamping the Lockport Police Department's surveillance camera system; he is well-versed in surveillance camera systems.

At the time of the Task Force's investigation, Lieutenant Rosado was the head of the Joliet Police Department Internal Affairs office. It was Commander Arizzi's recollection that only one perimeter video provided images of the area where Mr. Lurry was located. Based on the location of the perimeter cameras in relation to the area where Mr. Lurry was in the police headquarters' parking lot, it is likely the video from the camera mounted above the secure employee entrance represented the best of the perimeter videos. This camera is mounted approximately 15 feet above ground. It is an elongated camera, commonly referred to as a "shotgun" camera, aimed towards the parking lot. This camera is located between 80-90 feet from the area where Mr. Lurry lay. Mr. Lurry was laying on the ground surrounded by parked police vehicles. There is

3

no video that can accurately plot the exact location where Mr. Lurry was placed after being removed from the squad car.

IV.    **Summary of Relevant and Material Facts**

A.    During the initial phase of this investigation and in preparation for interviews, Sean Connolly and Martin Walsh reviewed Resolution No. 7161, A Resolution Approving and Authorizing the Execution of a Collective Bargaining Agreement Between the City of Joliet and the Illinois Fraternal Order of Police Labor council for 2016-2019; the Collective Bargaining Agreement Between City of Joliet and Illinois Fraternal Order of Police Labor Council, effective January 1, 2016 through December 21, 2019; Resolution No. 7329 (A Resolution Approving the Collective Bargaining Agreement and Memorandum of Understanding Between the City of Joliet and the Illinois Fraternal Order of Police Labor Council, Joliet Police Supervisor's Association, passed January 15, 2019; Illinois FOP Labor Council and City of Joliet, Joliet Police Supervisors Association Agreement, January 1, 2020 – December 31, 2022; the Joliet Police Department Police Department Case Report for the January 28, 2020, arrest of Eric Lurry and Kenan Kinney (J1-20-0001290-001), to include Officer Supplement Reports, Narrative Supplement Reports; Arrest Affidavit in Support of Probable Cause regarding Mr. Kinney's January 28, 2020 arrest; the Criminal Complaint filed against Mr. Kinney by the Will County State's Attorney's Office on January 29, 2020; Mr. Lurry's Prisoner/Patient Medical Treatment Form, dated January 28, 2020, Mr. Lurry's Prisoner Hold Slip, dated January 28, 2020; Will County Major Crime Task Force Case Report (WG-20-0000062-001) and Narrative Supplement Reports into the death of Mr. Lurry while in Joliet Police Department custody.

B.    Additionally, in preparation for interviews, Sean Connolly and Martin Walsh also looked at documents, files and photographs provided by the City of Joliet. The scope of this investigation was narrow; however, it was crucial for the investigative team to review all actions related to Mr. Lurry's arrest with the goal of gaining and maintaining an independent perspective throughout. This included, but was not limited to, listening to the following interviews of Joliet Police Department personnel conducted by the Task Force: Officer Matthew Campos; Sergeant Larry Collins; Officer Christopher D'Arcy; Lieutenant Jeremy Harrison; Officer Jose Hernandez; Officer Nathan Homan; Officer Eric Hunt; Officer Terry Austin; Sergeant Doug May; Officer Andrew McCue; Officer Peter Ransted; Officer Timothy Shaughnessy; Officer Mark Soustek; Officer Mike Steuer; Officer Jose Tellez; and, Office Marcus Wietting.

C.    Interviews:

1.    **David Braner**: On July 19, 2021, Sean Connolly and Martin Walsh interviewed David Braner in his office located at Joliet City Hall. Mr. Braner is the Chief Information Officer for the City of Joliet's Department of Information Technology. During this interview, Mr. Braner provided Mr. Connolly and Mr. Walsh with detailed information regarding how the City of Joliet and the Joliet Police Department structured information management, information technology, including but not limited to automation, hardware,

JOLIET007439

software, camera systems, video and audio retention and training, as it existed on January 28, 2020, and how it currently exists.

Mr. Braner explained, at the time of Mr. Lurry's arrest, control and management of camera systems used by the City of Joliet and the Joliet Police Department were more autonomous than they are presently. Specifically, the Joliet Police Department managed their camera systems with minimal input or control from the Department of Information Technology. This has since changed, now Joliet Police Department's cameras are managed by the Office of Information Technology. Regarding video retention, Mr. Braner explained, at the time of the arrest, and currently, the retention period is 60-days. After 60-days, video footage is overwritten by more current footage. Mr. Braner stressed that the video is not deleted, rather it is overwritten. Once overwritten, it is no longer available. If desired, specific video footage can be permanently retained by the City of Joliet or the Joliet Police Department and not overwritten, however, this must be requested during the 60-day retention period. Unfortunately, once the footage is overwritten, it is no longer available. The purpose of this retention period is to preserve storage space and manage storage costs. The longer the retention period, the higher the storage costs. Joliet does not have an unlimited storage budget and therefore cannot permanently store video footage captured by perimeter cameras.

On January 28, 2020, two different types/makes of perimeter camera systems were mounted onto the Joliet Police Department; specifically, Cisco and Genetec. Cisco was an older camera system, roughly ten years old and being phased out for the more advanced Genetec system. Presently, all perimeter camera systems are Genetec. When Mr. Lurry went into distress, he was in the Joliet Police Department parking lot. Most likely, only one of the cameras could have recorded video of his arrival in the parking lot in a squad car; officers removing him from the squad car; lifesaving measures being administered to him; paramedics from the Joliet Fire Department arriving on scene and continuing to administer lifesaving measures; and, finally, Joliet Fire Department departing for the hospital with Mr. Lurry.

During the interview, Mr. Braner stated he was never told, either by the Joliet Police Department or the Task Force, to retain perimeter video footage of Mr. Lurry's arrest. Further, he was not contacted regarding the camera footage until May 2020, more than 60 days after Mr. Lurry's arrest. If he was contacted within the 60-day period, he could have retained all perimeter video relevant to Mr. Lurry's arrest. Despite being beyond the retention period, Mr. Braner contacted Cisco to see whether the video footage could be recovered; Cisco confirmed it could not be recovered.

2. **Jeff D'Aleo**: On July 19, 2021, Sean Connolly and Martin Walsh, interviewed Jeff D'Aleo at Joliet City Hall. Mr. D'Aleo is the City Network Engineer who works with the Genetec cameras used by Joliet. He provided greater details than Mr. Braner regarding Genetec capabilities and confirmed a 60-day video retention period. Mr. D'Aleo was not able to provide details regarding how the cameras were set or what the video could have shown on January 28, 2020. Mr. D'Aleo stated no one came to

JOLIET007440

him and advised him to save the video. Further, he believes the Task Force should have saved the video.

3.  **Commander John Arizzi**: On July 20, 2021, Sean Connolly and Martin Walsh interviewed Commander Arizzi in the conference room at Sean Connolly's office located in Westmont, Illinois. Commander Arizzi was the Task Force Commander of the Task Force called in on January 29, 2020, to investigate Eric Lurry's death while in Joliet Police Custody. Commander Arizzi provided very candid and detailed information regarding the Task Force's investigation.

On January 29, 2020, at approximately 7:18 a.m., Commander Arizzi was contacted by the Will Grundy Major Crimes Task Force and advised to report to the Joliet Police Department, with Task Force investigators, at 9:00 a.m. As instructed, Commander Arizzi arrived at the Joliet Police Department at 9:00 a.m., with seven investigators, and began his investigation. Commander Arizzi stated one of the first things he does during an investigation is assemble all video, such as dash cam, taser, body cam and perimeter. Body cam was not in use by the Joliet Police Department at the time of Mr. Lurry's arrest. The first video footage Commander Arizzi viewed was from the perimeter camera or cameras. Lieutenant John Rosado, head of Internal Affairs on January 29, 2020, showed Commander Arizzi perimeter video footage, using his computer located in his office in the Joliet Police Department. Commander Arizzi stated he viewed perimeter video footage of the Joliet Police Department parking lot which captured video images during the time Eric Lurry arrived at the police station in a squad car until Mr. Lurry left in an ambulance for the hospital. Commander Arizzi stated the video was of poor quality and while he was able to see blue and white shirts of the officers, he was unable to see faces and he was unable to see Mr. Lurry. Commander Arizzi stated one of the main things he looked for was whether the officers were displaying a sense of urgency as they reacted to Mr. Lurry's distress; the video confirmed the officers reacted with urgency. After viewing the video, Commander Arizzi determined it had no evidentiary value.

Commander Arizzi is very familiar with police department camera systems. He recently managed the installation of the Lockport Police Department's new camera system for its internal and external cameras. Commander Arizzi recalled looking at the Joliet Police Department building to determine where cameras were located when he arrived at police headquarters at 9 a.m., Wednesday, January 29, 2020.

As his investigation progressed, Commander Arizzi viewed the Watch Guard (squad car dash cam) video. This video was far superior in quality to the perimeter video he previously viewed. He stated the Watch Guard video was the video he needed for his investigation. After Commander Arizzi, and his investigators, finished watching videos and interviewing witnesses, they were provided copies of video footage. Commander Arizzi assumed the perimeter video footage was included in the footage provided by the Joliet Police Department. He did not realize it was not provided because he never went back to view the perimeter video due to the Watch Guard video being superior. Commander Arizzi did not learn the perimeter video was not provided to him

until Corporate Counsel for the City of Joliet told him. By the time he learned, the 60-day retention period had expired.

On October 14, 2020, Martin Walsh followed-up with Commander Arizzi to ask additional questions. During this conversation, Commander Arizzi was asked which perimeter camera supplied video footage he viewed on January 29, 2020. He stated he did not recall the exact camera; however, he believes it was the camera on the east side of the Joliet Police Department building pointing towards the parking lot above the employee entrance and booking area.

4. **Deputy Chief Michael Batis**: Sean Connolly and Martin Walsh interviewed Deputy Chief Batis on September 1, 2021, via Zoom. At the time of the interview, and at the time of Eric Lurry's arrest and death, Deputy Chief Batis was Deputy Chief of the Technical Services Division. During the interview, he explained that Joliet Police Department information technology was separate from the City of Joliet and the head of Joliet Police Department information technology was Philip Bregner. Deputy Chief Batis further stated the perimeter camera system did not fall under his division; it was under information technology.

Regarding Eric Lurry's arrest and death, Deputy Chief Batis was not on duty on January 28, 2020 or January 29, 2020. Further, he was not at police headquarters when the Task Force arrived and conducted its investigation. Further still, Deputy Chief Batis was not involved in the Task Force investigation. As for the videos of the arrest, Deputy Chief Batis never saw the perimeter video and did not see the squad car video until it was released to the media.

Deputy Chief Batis stated it was a misstep by the Task Force to not ensure they had copies of all videos.

5. **Lieutenant John Rosado**: on September 1, 2021, Sean Connolly and Martin Walsh interviewed Lieutenant John Rosado at Sean Connolly's office located at 801 N. Cass Avenue, Suite 200, Westmont, Illinois 60559. Present with Lieutenant Rosado was Fraternal Order of Police Attorney John Roche. At the time of Eric Lurry's arrest and death, Lieutenant Rosado was assigned to Internal Affairs at the Joliet Police Department. Commander Arizzi went to Lieutenant Rosado's office in the Joliet Police Department, in the morning, on January 29, 2020, while conducting the Task Force investigation. Before Commander Arizzi's arrival, Joliet Chief of Police Roachner told Lieutenant Rosado that Commander Arizzi would be coming to see him regarding video footage. Lieutenant Rosado said Commander Arizzi watched the squad car video.

Lieutenant Rosado did not recall which videos he showed Commander Arizzi. He said there were numerous cameras at the time of Lurry's arrest and death. Lieutenant Rosado said Commander Arizzi only asked him for a copy of the squad car video. Later in the interview, Lieutenant Rosado said he did show Commander Arizzi perimeter camera video, however, he does not recall which camera provided the video; he was inconsistent in his recollections and his statements conflicted with Commander Arizzi's.

JOLIET007442

Lieutenant Rosado had difficulty downloading the Watchguard video, therefore he went to the evidence room and had an evidence sergeant help him save the video to a DVD. He also said Commander Arizzi did not ask for all the video to be saved to a DVD.

Lieutenant Rosado said he logged onto the Cisco system and showed Commander Arizzi the Cisco video. He explained it does not have to be downloaded to be viewed, rather it can be viewed by logging into and watching it on the Cisco system. If desired, Lieutenant Rosado said Cisco video can be downloaded, but he did not know whether it is downloaded onto the Cisco System or into a file.

6. **James Hagspihl**: on September 9, 2021, Martin Walsh interview James Hagspihl by telephone. Mr. Hagspihl is a Systems Technician for the City of Joliet. Prior to January 28, 2020, Mr. Hagspihl worked on perimeter and interior camera systems at police headquarters if they were experiencing technical problems. If the information technology staff could not fix or address problems, they would call the vendor for service.

Mr. Hagspihl had access to the perimeter and interior systems servers at police headquarters, however, he was not involved with Mr. Lurry's arrest in any way. Further, he stated he does not recall a request for assistance from the Joliet Police Department or Joliet Information Technology to him regarding this event. Finally, Mr. Hagspihl said upgrades to the Joliet Police Department camera systems were long overdue.

7. **Lieutenant Christopher Botzum**: on September 15, 2021, Martin Walsh interviewed Lieutenant Botzum by telephone. Fraternal Order of Police attorney John Roche was also present during the telephone interview. Lieutenant Botzum took over for Lieutenant Rosado in Internal Affairs in March 2020.

At the time of Eric Lurry's January 28, 2020, arrest and January 29, 2020, death, Lieutenant Botzum was the Public Affairs Officer for the Joliet Police Department. He recalled receiving information from Deputy Commander Gavin and writing a press release on January 30, 2020, about Mr. Lurry's death. He never conducted a parallel investigation or any type of investigation regarding Mr. Lurry's arrest and death. Further, Lieutenant Botzum stated he never saw any perimeter video of the arrest, however, at our request, he did conduct an extensive search for any video/disks/other data storage devices of Eric Lurry's arrest, without success.

8. **Phillip Bregner**: On November 2, 2021, Martin Walsh conducted a telephone interview with former Joliet Police Department Detective Phillip Bregner. Mr. Bregner was not present, or involved, with Mr. Lurry's January 28, 2020, arrest, and subsequent death; he was detailed to the FBI's Cyber Unit since 2019. Mr. Bregner was employed by the Joliet Police Department for 13 years; three years on patrol and ten

8

years working on technical and computer issues for the department. He left the department in March 2020.

While with the Joliet Police Department, Mr. Bregner worked closely with David Braner and was very familiar with the Watch Guard video system and internal and external camera systems. Mr. Bregner believed the camera systems had been in place since 2010 and by 2020 the system was old and obsolete. Mr. Bregner said discussions to replace or upgrade the existing system were under way for several years prior to the Lurry arrest. Further, he stated the video resolution was poor and you could not make out an individual's face or a car's license plate. Also, Mr. Bregner explained the external and internal camera system was integrated and not under separate systems. Accordingly, since 2020, both the internal and external camera systems at the Joliet Police Department have been replaced.

Regarding video retention, Mr. Bregner stated it was not difficult to access or watch the internal or perimeter video, many people had access to it and accessing it was routine. Also, he stated he would download and save video from the system a few times per month for various reasons. Additionally, if a video was marked as saved it would not be overwritten pursuant to the 60-day retention policy. Further, Mr. Bregner stated a video could be downloaded just like any other computer file. Some of the various reasons videos were marked as saved or downloaded included, but were not limited to, court orders to preserve, Freedom of Information requests, subpoenas, and internal investigations. Downloading or saving a video to a DVD or thumb drive is not extraordinary. It is done routinely by a any number of sworn or civilian Joliet Police Department personnel.

Mr. Bregner said Deputy Chief Batis, Lieutenant Rosado and Officer Cline had access to perimeter videos, and he believes Lieutenant Rosado had the capabilities to easily retrieve perimeter video and view it on his desktop computer. He also stated the area where Mr. Lurry was being given life saving measures was not well covered by perimeter cameras. Mr. Bregner based his statement regarding which areas the perimeter cameras could cover on his familiarity with the perimeter cameras and the parking lot topography.

Regarding altering video, Mr. Bregner said it would be 99.9% impossible to tamper or alter the system in place on January 28, 2020. He explained every file has a digital fingerprint and if someone attempted to alter the digital fingerprint, it would be evident and detectible.

Finally, Mr. Bregner stated he does not understand why the perimeter video was not saved; he absolutely would have downloaded and saved the video as a matter of practice because of the significance of the incident.

9. **Darren Rych**:  On November 4, 2021, Martin Walsh interviewed Darren Ryce by telephone. Mr. Rych worked for the City of Joliet in the Department of Information Technology since 2014. During his employment, he did considerable work

JOLIET007444

with the Joliet Police Department and is familiar with previous and current internal/perimeter camera systems. On occasion, he has been called upon to mark and save video from internal and external cameras; it was a routine task. Mr. Rych stated it would have taken about an hour to download all of the data from the perimeter cameras which captured Mr. Lurry in the Joliet Police Department parking lot. Under the old camera system, each camera had to be downloaded individually. He also stated several people had the technical ability to save and download camera video. Like others interviewed, Mr. Rych said the camera system in place on January 28, 2020, was old and at the end of its lifespan. The only newer camera on January 28, 2020, was on the northeast corner of police headquarters.

10. **Lindsey Heavener**: On November 16, 2021, Martin Walsh conducted a telephone interview with Lindsey Heavener. Mr. Heavener retired from the Joliet Police Department after nearly 30-years on January 30, 2020, two days following Mr. Lurry's arrest. Sergeant Heavener was on duty in charge of the department's evidence room and was on duty January 28, 2020. He also worked January 29, 2020. Mr. Heavener was training his replacement, Sergeant Mauer, the morning the Task Force began its investigation. Mr. Heavener could not say for certain if he was asked to assist the Task Force. He stated it was possible he assisted in securing video from the Axion system that stored video from the in-car Watch Guard system. He stated he could not have supplied video/data from the perimeter camera system. It was not part of his job duties. He did not have access or a password to enter the Cisco internal/perimeter system. Joliet Police Department's evidence section is located on the first floor of the building in the southwest corner. Mr. Heavener stated it was possible he provided video from the WatchGuard system but could not recall with 100 percent certainty.

11. **Christopher Regis**: On December 8, 2021, Martin Walsh conducted a telephone interview with Christopher Regis, City of Joliet Inspector General. Mr. Regis said his office had no role in the investigation.

D. **Site Investigation**: On November 1, 2021, Sean Connolly and Martin Walsh conducted a site investigation of the Joliet Police Department parking lot located east of the headquarters' building. Also present was Jeff D'Aleo, to answer questions about camera locations and capabilities. This site investigation revealed the following:

1. On January 28, 2020, there were five exterior cameras capable of capturing parts of the parking lot and/or police headquarters. Three of the cameras were shotgun style cameras running on the Cisco system. One shotgun camera was located in the recessed area of the headquarters, closest to the northeast corner of the building, near the employee entrance. This camera most likely recorded the video Commander Arizzi viewed on January 29, 2020. The second shotgun camera was located in the Sally Port and pointed towards an entrance to the building. It is unlikely this camera captured video of Mr. Lurry on January 28, 2020. Viewing the squad car video, this camera appears to be pointed towards the building entrance and not the parking lot. The other two cameras were mounted on the southeast corner and the other was on the

northeast corner. The camera on the northeast corner was a newer, Genetec camera. Unfortunately, this camera's view of where Mr. Lurry was located was blocked by a large generator located in the parking lot. The view of the camera on the southeast corner was blocked by the evidence building. This leaves the shotgun camera, near the employee entrance, as the only camera that could have captured video footage of officers trying to assist Mr. Lurry, however, this camera's line of sight to where Mr. Lurry was receiving life saving measures would have been blocked by a car.

2. The approximate distance from the shotgun camera, near the employee entrance, to where the squad car with Mr. Lurry was located, was 80 feet. This camera is mounted in the corner near a secure entrance, perched approximately 15 feet above ground.

3. The approximate distance from the shotgun camera, located in the Sally Port, to the squad car Mr. Lurry was located, was 65 feet; this camera was pointed 45 degrees away from the Lurry transport vehicle.

4. The East wall of the Joliet Police Department is approximately 245 feet long end-to-end. There were, and are today, cameras mounted on each corner. The Camera mounted farthest from the main entrance of the Joliet Police Department building is mounted approximately 15 feet off the ground. The Camera mounted near the main entrance is noticeably higher. Both corner cameras' line of site would have most likely been partially blocked by the generator, electric line poles and the evidence building.

V.    **Analysis**

A. **Camera systems**: It is clear the Joliet Police Department had a camera system in place on January 28, 2020, capable of capturing video images of Eric Lurry being brought to the Joliet Police Department in a squad car. Specifically, there were at least five perimeter cameras mounted on the Joliet Police Department headquarters on January 28, 2020, facing the parking lot. Only one of the cameras, a Cisco shotgun style camera pointed toward the area of interest, located near the employee entrance, could have potentially provided partial coverage of the area in question. This camera was mounted at least 80 feet away from the vehicle that transported Mr. Lurry to Joliet Police Department.  It is likely, based on the totality of information secured during this investigation, that the Task Force lead investigator did indeed view video from this camera. It is possible additional perimeter camera video was also viewed by investigators

On the morning of Mr. Lurry's death. Commander Arizzi and Lieutenant Rosado recalled viewing the perimeter video. Neither could recall the number of videos viewed. There was another camera located approximately 55 feet west of the location where the Lurry transport car was parked in the Joliet Police Department lot. However, a review of various in car video footage from January 28, 2020, shows this camera was pointed at a 45-degree angle away from the area Mr. Lurry received medical attention.

JOLIET007446

Further, it is clear at least one of these cameras recorded video showing the squad car parked in the Joliet Police Department parking lot while Mr. Lurry was inside the vehicle, while he was removed from the car to administer life saving measures, and when the Joliet Fire Department arrived and subsequently transported Mr. Lurry to the hospital. This camera was not able to capture video of Mr. Lurry while he was on the ground receiving life saving measures because he was between two cars and one of the cars blocked the camera view. However, the camera was able to record video of Joliet Police Department personnel reacting with a sense of urgency to Mr. Lurry's distress. All perimeter cameras in place at the time of Mr. Lurry's arrest could have captured snippets of the transport car entering the parking lot. The cameras could have also captured the Joliet Fire Department ambulance and engine company called to the scene. The camera on the far corner could have captured the ambulance and police follow car leaving the parking lot. In theory, every perimeter camera (including those recessed in the doorways) could have possibly captured images of vehicles or individuals involved or present during the incident. Every perimeter camera mounted at the time could have recorded/captured bits and pieces of events taking place throughout the 33 minutes Mr. Lurry was physically present in the Joliet Police Department parking lot, assuming they were in working order.

 This investigation was unable to accurately determine which cameras were, or were not, working. The system in place on January 28, 2020, and its server, were at least ten years old except the newer camera mounted closest to City Hall nearest the public entrance of the Joliet Police Department building. Maintenance records and repair logs for the cameras and server were not available. Despite requests, these documents were not provided. This investigation asked for but was not provided installation date(s) and maintenance records for Joliet Police Department camera systems in use on January 28, 2020. The age of the perimeter cameras in use on January 28, 2020, was based on information provided by Joliet information technology staffers familiar with the system.

Additionally, the perimeter camera system was integrated with internal security cameras located inside police headquarters. The servers were also located inside the building. System maintenance was primarily provided by Detective Phillip Bregner; he was assigd to information technology duties. Detective Bregner was detailed to a federal agency at the time of Mr. Lurry's arrest and was not present the day he was arrested or any time during the follow-up investigations.

During the interviews, several individuals, to include Mr. Braner, Mr. D'Aleo and Lieutenant Rosado, stated there were two different perimeter camera systems in use by the Joliet Police Department on January 28, 2020; specifically, Cisco and Genetec. Cisco was an older system nearing or at the end of its useful lifecycle on January 28, 2020. Genetec was the newer system and currently all perimeter camera systems are Genetec. This investigation was not able to determine with absolute certainty which perimeter camera system captured video footage of Mr. Lurry on January 28, 2020, however, based on Lieutenant Rosado's interview, and Mr. Connolly and Mr. Walsh's

JOLIET007447

site investigation, the video footage Commander Arizzi viewed on January 29, 2020, was most likely from the Cisco system, commonly referred to as a shotgun camera.

Camera systems require storage for video recordings. The Joliet Police Department retention period for video footage captured by cameras is 60-days. After 60-days, footage is overwritten with new footage. The purpose of this 60-day retention period is to manage storage space and costs; longer retention periods require greater amounts of storage space and is more costly.

B. **Will Grundy County Major Crimes Task Force Investigation**: The Task Force responded quickly and was at the Joliet Police Department at 9:00 a.m. the morning Mr. Lurry died. The Task Force was led by Commander John Arizzi. One of the first things Commander Arizzi did was view video footage from one or more perimeter camera. Lieutenant Rosado showed Commander Arizzi this video in his Internal Affairs office. During his interview, Commander Arizzi stated the video was of poor quality, however, he was able to see officers moving with a sense of urgency. Further, he stated while he could not make out faces, he was able to see the blue and white shirts of the officers. He was not able to see Mr. Lurry on this video due to the camera's line of sight being blocked by a car. Commander Arizzi determined this video had no evidentiary value.

After viewing the perimeter video, Commander Arizzi viewed the Watch Guard (squad car dash cam) video. He stated the Watch Guard video was far superior to the perimeter video and as a result he never again went back to view the perimeter video. Commander Arizzi stated he was provided with a DVD with video footage and assumed the perimeter video footage was included, however, he did not specifically request a copy of the perimeter video. Further, Lieutenant Rosado stated Commander Arizzi never requested a copy of video, and Lieutenant Rosado did not maintain a copy for the Joliet Police Department. Commander Arizzi did not learn he was not provided with the perimeter video until the General Counsel for the City of Joliet called and asked if he had a copy. By this time, the retention period passed, and the video was overwritten and no longer available.

Commander Arizzi was ultimately responsible for every action in the investigation, however, he was one of seven Task Force investigators (including an evidence technician) assigned to the Lurry investigation. Joliet Police also had a role in the failure to retain the perimeter video. Commander Arizzi was aware this video had a limited (60-day) useful life. The Lurry investigation was his third or fourth as lead investigator for the Task Force. Protocol required the Joliet Police Department to not actively participate in the Task Force's investigation. However, the Task Force relied on the Joliet Police Department for various resources including interview rooms, workspace, making personnel available for interviews and providing relevant records, documents, and video footage. Simply put, all relative information must be provided by the Joliet Police Department to the Task Force.

JOLIET007448

After the Task Force completed its investigation, the City of Joliet did not conduct a parallel investigation and did not maintain copies of all videos shown to the Task Force.

VI.    **Findings**. After carefully considering the evidence, this investigation finds the following:

A.    Perimeter video footage, in addition to the squad car video, of Eric Lurry's January 28, 2020, arrest existed and was viewed by Commander John Arizzi on January 29, 2020.

B.    The perimeter video was overwritten pursuant to the Joliet Police Department's 60-day retention policy and is no longer available or recoverable. On Saturday March 28, 2020, the server/system in place at the Joliet Police Department handling storage of internal/perimeter video was overwritten and became unrecoverable. This action was not triggered by an outside force. Retention can be set for periods of 30, 60 and 90 days or longer. According to Joliet information technology professionals, retention periods are set by policy and stored video cannot be deleted or altered.

Pursuant to this investigation's request, the Joliet Information Technology Department contacted the Cisco company to determine whether perimeter video from January 28, 2020, was recoverable. We were informed by Mr. Braner, and other information technology staffers involved with the effort, that they were unable to recover any data. There is no evidence the perimeter camera storage was altered in any way. Any access to the perimeter/internal camera system requires a password. The time and date of any access is logged and recorded in a log.

C.    According to Commander Arizzi, the perimeter video did not have evidentiary value. It depicted portions of the parking lot of the Joliet Police Department where Mr. Lurry was brought after being placed into custody in the vicinity of Briggs Street and Washington Street, Joliet, Illinois. This video showed officers with a sense of urgency as they provided life saving measures after Mr. Lurry went into distress. This video also showed the Joliet Fire Department arriving at the parking lot and leaving to transport Mr. Lurry to the hospital. Even though the squad car video was clearer, Commander Arizzi should have specifically requested a copy of all available video footage.

D.    Lieutenant Rosado did not save or order anyone to download a copy of the perimeter video showing Mr. Lurry's arrest. The Joliet Police Department should have maintained a copy of this perimeter video and all video footage shown to the Task Force. Further, after the Task Force completed its investigation, the Joliet Police Department should have conducted a parallel investigation of Mr. Lurry's arrest and subsequent death while in police custody.

JOLIET007449

E.     After 60 days, the perimeter video was overwritten pursuant to the Joliet Police Department's 60-day retention policy. As of March 28, 2020, any video recordings of the Joliet Police Department internal and external camera system were lost. A 60-day retention period is common among police departments and municipalities. The City of Joliet also has a 60-day retention period for its various camera systems.

F.     By the time it was discovered that neither the Task Force nor the Joliet Police Department had a copy of the perimeter video, it was past the 60-day retention period and the video was overwritten and unrecoverable. During his initial interview, Commander Arizzi believed there was a chance copies of the perimeter did exist and may have been discarded or lost. Commander Arizzi said he contacted the Will County State's Attorney Office and asked them to search their evidence for a DVD containing the perimeter video. He also said he searched his own workspace for the video.

VII.     **Recommendations**. In view of the above findings, this investigation recommends the following:

A.     The Will Grundy County Major Crimes Task Force specifically request copies of all relevant video footage, despite perceived evidentiary value, from all possible sources, including but not limited to, perimeter video cameras, squad car video cameras, body cameras, Taser cameras, and privately owned cameras.

B.     The Joliet Police Department maintain copies of all video footage viewed by an outside entity investigating the department.

C.     The Joliet Police Department conduct parallel investigations, after the Will Grundy County Major Crimes Task Force, or the Illinois State Police, complete its investigation resulting from an arrestee death while in police custody.

By: _____

Sean P. Connolly

_____

Martin P. Walsh

JOLIET007450

OFFICE OF THE MAYOR
# BOB O'DEKIRK
MAYOR
PHONE: 815/724-3700
FAX: 815/724-3715
ROdekirk@jolietcity.org



150 WEST JEFFERSON STREET
JOLIET, ILLINOIS 60432-4158

May 12, 2021

Sean P. Connolly
Attorney at Law
801 N. Cass Avenue
Suite 200
Westmont, IL 60559
Sean.connolly@connollylawoffice.com

Re:     Appointment of Special Inspectors General

Dear Mr. Connolly:

The Office of the Mayor of the City of Joliet is hereby appointing you, Sean P. Connolly, and Martin P. Walsh, to serve as Special Inspectors General to investigate the following matters:

1. Video which may have captured video images of Eric Lurry's arrest on January 28, 2020;

REDACTED

As Special Inspectors general you shall have all authority currently held by the Inspector General of the City of Joliet and responsibilities as set forth in the Joliet Code of Ordinances for purposes of investigating the above matters.

Sincerely,

Robert O'Dekirk
Mayor

cc:     James V. Capparelli, City Manager
        Sabrina Spano, Corporation Counsel

Attachment A

JOLIET007451



This is a view from Google Maps showing the Joliet Police Department building and parking lot.

https://www.google.com/maps/@41.5233815,-88.0851041,121m/data=!3m1!1e3!5m1!1e1, accessed January 7, 2022.

Attachment B



This photograph shows the "shotgun" style camera which was operated by the Cisco system on January 28, 2020. This is the camera believed to have captured the perimeter video viewed by Commander Arizzi and Lieutenant Rosado. This camera is located near the employee entrance on the east side of the Joliet Police Department building, pointing towards the parking lot.

Attachment C

JOLIET007453



This photograph shows the Cisco "shotgun" style camera near the employee entrance and also the generator and utility poles blocking the line of sight of the Genetec camera mounted on the northwest corner of police headquarters.

Attachment D

JOLIET007454



This photograph shows the southeast corner of the Joliet Police Department. A Cisco "shotgun" style camera was mounted on this corner on January 28, 2020, however, the line of sight to where Mr. Lurry was located would have been blocked by the evidence building depicted on the left-hand side of this photograph and by one of the vehicles Mr. Lurry was in between.

Attachment E

JOLIET007455