# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Nicole Lurry, as Independent Administrator of the Estate of Eric Lurry, Jr., deceased, | ) ) ) | Case No. 20 CV 4545 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| City of Joliet and Joliet Police Officers May (Star #056), McCue (Star #118), Tellez (Star #311), and Lt. Harrison (Star #039), | ) ) ) ) | Judge Virginia Kendall |
| Defendants. | ) ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Abby D. Bakos
Ronak Maisuria
Bakos & Maisuria Law Group, LLC
1755 Park St., Ste. 200
Naperville, IL 60563
833.800.2654
abby@bakosmaisuria.com
ronak@bakosmaisuria.com

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

STATEMENT OF MATERIAL FACTS .......................................................................................1

LEGAL STANDARD.....................................................................................................................7

ARGUMENT ..................................................................................................................................8

I.     Defendants May and McCue acted unreasonably in attempting to recover drugs from Mr. Lurry's mouth while he was clearly suffering from a medical emergency........8

    A.  May and McCue's use of force was unreasonable under the *Graham* factors..........10

    B.  The cases cited by Defendants in support of their contention that May and McCue's conduct was reasonable are factually distinguishable........................12

II.    May and McCue are not entitled to qualified immunity on Plaintiff's excessive force and unreasonable search claims……………………………………………15

    A.  Disputed facts preclude the qualified immunity defense……………………16

    B.  Disputed facts aside, May and McCue are not entitled to qualified immunity………17

        i.  Qualified immunity does not shield May and McCue from liability for their conduct in restricting Mr. Lurry's ability to breathe……………………17

        ii.  It was well established that striking Mr. Lurry in the face violated his constitutional rights……………………………………………19

III.   Defendants acted unreasonably in denying Mr. Lurry his constitutional right to medical care when faced with his obvious and serious medical need……………….21

    A.  There is no basis to dismiss Plaintiff's denial of medical care claim as Plaintiff is entitled to alter her legal theory…………………………………………..21

    B.  Defendants' failure to provide Mr. Lurry with adequate medical care was unreasonable………………………………………………………………...23

        i.  Defendants were on notice of Mr. Lurry's medical needs………………23

        ii.  Notice does not require specific knowledge……………………………27

        iii.  The severity of Mr. Lurry's medical need outweighed the scope of treatment……………………………………………………………….29

        iv.  Mr. Lurry's well-being was more important than any police interests

at play……………………………………………………………………32

    v. Defendants' conduct exacerbated Mr. Lurry's condition and contributed
       to his death, thus causing him harm………..………………………….…33

IV.   Defendants are not entitled to qualified immunity on Plaintiff's denial of
      medical care claim……………………………………………………………34

    A.  Defendants' conduct was so egregious that it precludes a finding of
        qualified immunity…………………………….…………………………..35

    B.  Defendants are not entitled to qualified immunity where they fail to adequately
        respond to known or suspected drug overdoses……………………………....…38

      i.  The cases Defendants cite to in support of their claim that they
         are entitled to qualified immunity are easily distinguished…………………40

V.    A jury could reasonably conclude that Defendants failed to intervene in
      their co-Defendants' misconduct……………..……………………………..45

VI.   Harrison is not entitled to summary judgment on the supervisory
      liability claim…………………………………………………………………..45

VII.  Defendants are not entitled to summary judgment on any of the state
      law claims……………………………………………………………………46

    A.   Plaintiff's willful and wanton conduct claim survives summary judgment……..46

    B.  Plaintiff's wrongful death, survival action and battery claims survive
       summary judgment…………………………………………………………46

    C.  Spoliation………………………………………………………………47

    D.  *Monell*……..………………………………………………………………50

CONCLUSION…………………………………………………………………50

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Sangamon County*, 705 F.3d 706 (7th Cir. 2013)...................................................9, 15, 16

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005)..............................................9,16, 18

*Acosta v. City of Chicago*, 2018 WL 3630011 (N.D. Ill. July 3, 2018).................................38

*AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611 (7th Cir.1993)...................8

*Anderson v. Creighton*, 483 U.S. 635 (1987) ..........................................................................16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........................................................8

*Await v. Marketti*, 74 F.Supp.3d 909 (N.D. Ill. Nov. 24, 2014).........................................49

*Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016) ...................................................................13

*Boothe v. Wheeling Police Officers*, 190 F.Supp.3d 788 (N.D. Ill. 2016)........................48

*Border v. Trumbull Cty. Bd. of Comm'rs*, 414 Fed.Appx. 831 (6th Cir. 2011) ................38

*Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502 (7th Cir. 2007) ...........................47

*Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267 (Ill. 1995) ........................................................47

*Braun v. Vill. of Palatine,* 56 F.4th 542 (7th Cir. 2022) ................................................31, 32

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ..............................................................................41

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................................7

*Chalmers v. City of Chi.*, 2023 WL 2538962 (N.D. Ill. Mar. 16, 2023) ......................17, 18

*Chessie Logistics Company v. Krinos Holdings, Inc.*, 867 F. 3d 852 (7th Cir. 2017).........22

*Chest v. City of Freeport*, 2011 WL 1225460 (N.D. Ill. Mar. 31, 2011) ...................29,38, 41, 42

*Clark v. Gross*, 2016 WL 6638095 (D.S.D. Oct. 3, 2016) ....................................................15

*CMFG Life Insurance Co. v. RBS Securities, Inc.*, 799 F.3d 729 (7th Cir. 2015) .................22, 23

*Coley v. Lucas County,* 799 F.3d 530 (6th Cir. 2015) .............................................................19

*Currie v. Oklahoma City Police Dep't*, 2008 WL 1946787 (W.D. Okla. Apr. 30, 2008) ..............14

*Darryl H. v. Coler*, 801 F.2d 893 (7th Cir.1986) ............................................22

*de Tavarez v. City of Fitchburg*, 2014 WL 533889 (D. Mass. Feb 6, 2014) ........................ 39, 40

*Deering v. Reich,* 183 F.3d 645 (7th Cir. 1999) ............................................9

*DeShaney v. Winnebago Cnty. Dep't of Soc. Serv.,* 489 U.S. 189 (1989) ............................................21

*Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) ............................................ 28

*Dreher v. Sielaff*, 636 F.2d 1141 (7th Cir. 1980) ............................................ 8

*Dufour-Dowell v. Cogger*, 152 F.3d 678 (7th Cir. 1998) ............................................16

*Duran v. Town of Cicero*, 653 F.3d 632 (7th Cir. 2011) ............................................47

*Egebergh v. Nicholson,* 272 F.3d 925 (7th Cir. 2001) ............................................33

*Ellis v. Columbus Police Dep't*, 2009 WL 1663454 (N.D. Miss. June 15, 2009) ............................................14

*Espinoza v. United States*, 278 F.2d 802 (5th Cir. 1960) ............................................13

*Estate of Lawson ex rel. Fink v. City of Hamilton*, 2009 WL 1444556 (S.D. Ohio May 21, 2009) ............39

*Estate of Levingston v. County of Kern*, 2018 WL 1335410 (E.D. Cal. Mar. 15, 2018) ............................................28

*Estate of Owensby v. City of Cincinnati*, 414 F.3d 596 (6th Cir. 2005) ............................................38

*Estate of Perry v. Wenzel,* 872 F.3d 439 (7th Cir.2017) ............................................38

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................28

*Florek v. Village of Mundelein*, 649 F.3d 594 (7th Cir. 2011) ............................................27

*Gant v. Hartman,* 924 F.3d 445 (7th Cir. 2019) ............................................18

*Gayton v. McCoy,* 593 F.3d 610 (7th Cir.2010) ............................................23

*Gonzalez v. City of Elgin*, 578 F.3d 526 (7th Cir. 2009) ............................................16

*Graham v. Connor*, 490 U.S. 386 (1989) ............................................ 9, 10

*Grieveson v. Anderson,* 538 F.3d 763 (7th Cir.2008) ............................................ 34, 44

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................15

*Heneghan v. City of Chicago*, 2011 U.S. Dist. LEXIS 41788 (N.D. Ill. Apr. 18, 2011) ............................................23

*Jenkins v. Wilson*, 432 F.Supp.2d 909 (W.D. Wis. 2006) ............................................................. 11

*Kentucky v. King,* 563 U.S. 452 (2011) ....................................................................................... 9

*Kilburg v. Mohiuddin*, 2013 IL App (1st) 113408, 990 N.E.2d 292 ........................................ 48

*Lanigan v. Vill. of East Hazel Crest*, 110 F.3d 467 (7th Cir. 1997) ......................................... 45

*Long v. City of La Habra*, 2005 WL 2219442 (9th Cir. Sept. 14, 2005) ................................... 42

*Lopez v. City of Chicago,* 464 F.3d 711 (7th Cir.2006) ............................................................. 21

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) ..................................................... 8

*Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22 (Ill. 2012) ................................................... 47, 48

*McGowan v. Hulick,* 612 F.3d. 636 (7th Cir. 2010) ................................................................... 44

*McRaven v. Sanders*, 577 F.3d 974 (8th Cir. 2009) ................................................................... 39

*Miller v. Gonzalez,* 761 F.3d 822 (7th Cir. 2014) ...................................................................... 20

*Neal v. Bierbaum*, 2018 WL 6268198 (C.D. Ill. Nov. 30, 2018) .............................................. 20

*Nelson v. Union Wire Rope Corp.*, 199 N.E.2d 769 (1964) ...................................................... 47

*Omdahl v. Lindholm*, 170 F.3d 730 (7th Cir. 1999) .................................................................. 16

*Orlowski v. Milwaukee Cnty.*, 872 F.3d 417 (7th Cir. 2017) .................................................... 38

*Ortiz v. City of Chicago*, 656 F.3d 523 (7th Cir. 2011) ...................................................... 21, 26

*Oswald v. Manlove*, 2019 WL 464135 (E.D. Wis. Feb. 6, 2019) .............................................. 28

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) ........................................................................... 8

*Pennington v. Terry*, 644 Fed. App'x 533 (6th Cir. 2016) ........................................................ 15

*Pryor v. Dearborn Police Dep't*, 452 F. Supp. 2d 714 (E.D. Mich. 2006) ............................... 39

*Qian v. Kautz,* 168 F.3d 949 (7th Cir. 1999) ............................................................................... 7

*Rabe v. United Air Lines, Inc.*, 636 F.3d 866 (7th Cir.2011) .............................................. 21,22

*Ramirez v, Martinez*, 716 F.3d 369 (5th Cir. 2013) .................................................................. 11

*Rice v. Burks,* 999 F.2d 1172 (7th Cir. 1993) ............................................................................ 16

*Roe v. Elyea,* 631 F.3d 843 (7th Cir. 2011) ...................................................................16

*Royal v. Fort Wayne,* 2018 WL 4407691 (N.D. Ind. Sep. 17, 2018) ...............................28, 29, 30

*Royal v. Norris,* 776 Fed.Appx. 354 (7th Cir. 2019) .......................................... 30, 44

*Safford Unified Sch. Dist. No. 1 v. Redding,* 557 U.S. 364 (2009)...............................16,37

*Sallenger v. City of Springfield, Ill.,* 630 F.3d 499 (7th Cir. 2010) .......................................44

*Sallenger v. Oakes,* 473 F.3d 731 (7th Cir. 2007) ..................................................................7

*Sanders v. City of Dothan*, 409 F. App'x 285 (11th Cir. 2011) ................................. 15, 42

*Schmerber v. California,* 384 U.S. 757 (1966) .......................................................12

*Scott v. Harris*, 550 U.S. 372 (2007) ..........................................................9, 11, 50

*Sides v. City of Champaign*, 496 F.3d 820 (7th Cir. 2007) ........................................ 24

*Simpson v. Nickel*, 450 F.3d 303 (7th Cir. 2006) ...............................................22

*Singleton v. City of Newburg* 1 F.Supp.2d 306 (S.D.N.Y. 1998) .......................................18

*Spraggins v. Brown*, 2019 WL 4749978 (N.D. Ill. Sep. 30, 2019) .......................................23

*Smith v. City of Huntsville*, 2016 WL 5746216 (N.D. Ala. Sept. 30, 2016) ................................14

*State v. Hodson*, 907 P.2d 1155 (Utah 1995) ......................................................... 18

*Stogner v. Sturdivant*, 515 Fed. App'x 280 (5th Cir. 2013)......................................... 13

*Stoner v. Wal-Mart Stores, Inc.*, 2008 WL 3876077 (C.D. Ill. Aug. 18, 2008).......................... 48, 49

*Surratt v. McClarin*, 851 F.3d 389 (5th Cir. 2017) ............................................ 13, 18

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ............................................. 22

*Taylor v. City of Milford,* 10 F.4th 800 (7th Cir. 2022) .......................................18

*Tennessee v. Garner*, 471 U.S. 1 (1985) ..........................................................9

*Thompson v. Mercer*, 762 F.3d 433 (5th Cir.2014) .......................................................50

*Tolan v. Cotton*, 572 U.S. 650 (2014) .................................................................. 8

*Tolliver v. City of Chicago*, 820 F.3d 237 (7th Cir. 2016) .......................................9

*Trevino v. Hinz,* 751 F. App'x 551 (5th Cir. 2018) ....................................................................31, 32, 43, 44

*Tuuamalemalo v. Greene*, 946 F.3d 471 (9th Cir. 2019) ..........................................................19

*United States v. Marcavage*, 609 F.3d 264 (3d Cir.2010) ........................................................50

*United States v. Place*, 462 U.S. 696 (1983) .....................................................................9

*Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217 (7th Cir. 1996) ...................................................23

*Wallace by Wallace v. Batavia School Dist. 101,* 68 F.3d 1010 (7th Cir. 1995) .............................. 22

*Weaver v. Shadoan*, 340 F.3d 398 (6th Cir. 2003) ............................................................ 43, 44

*Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008)................................................................ 19

*Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015) ...........................................................8

*Whitaker v. Milwaukee Cty.*, 772 F.3d 802 (7th Cir.2014) .................................................... 23

*Williams v. Brooks*, 809 F.3d 936 (7th Cir. 2006) ............................................................11

*Williams v. Rodriguez,* 509 F.3d 392 (7th Cir.2007) ..........................................21, 23, 24, 29, 32

*Winston v. Lee,* 470 U.S. 753 (1985) ........................................................................11

## RULES AND STATUTES

Fed. R. Civ. 56........................................................................................................7

720 ILCS 5/7-5.5 ....................................................................................................18

**INTRODUCTION**

Decedent Eric Lurry, Jr. died on January 29, 2020, roughly ten hours after his fateful encounter with the Defendant Officers began. After Defendants Tellez and McCue watched Mr. Lurry swallow a racquetball-sized plastic bag full of deadly narcotics, they did absolutely nothing. As the minutes ticked by and Mr. Lurry began to exhibit multiple clear symptoms of an opioid overdose, Tellez and McCue continued to do nothing. By the time Tellez and McCue arrived with Mr. Lurry at the police station, 18.5 minutes after watching him swallow the drugs, he was in and out of consciousness and in obvious and severe medical distress. Upon observing this, rather than immediately calling for paramedics, Defendant May (who was by this time aware that Mr. Lurry had swallowed narcotics in front of Tellez and McCue) approached Mr. Lurry as he was still handcuffed behind his back, struck him in the face, called him a "bitch," and then restricted his airflow by squeezing his neck and pinching his nose shut for 90 seconds. Meanwhile, McCue inserted a baton into Mr. Lurry's mouth like a probe potentially causing pieces of plastic to go further into the back of his throat. Only after Mr. Lurry's body went completely limp and his heart stopped beating did any Defendant call for paramedics. Tragically, this was too late.

Defendants squandered multiple opportunities to act. Had they taken advantage of even one, experts agree that it is almost certain that Mr. Lurry would have survived. Defendants' contention that their actions were wholly reasonable as matter of law is patently false, and its truth would demand nothing less than a distorted reading of existing case law and complete ignorance to the objective reasonableness standard. Their motion must be met with a resounding denial of summary judgment.

**STATEMENT OF MATERIAL FACTS**

Immediately after feeling a racquetball-sized pliable bulge of suspect plastic-wrapped cocaine near Mr. Lurry's groin during his pat-down search, Defendant Tellez said, "what's this?" twice and then watched with Defendant McCue as Mr. Lurry dug his hand into his pants to retrieve those drugs.

*PSAF ¶1.* After the three men slid down to the ground together, Mr. Lurry, buried his face towards his hands and placed the entire package into his mouth while face down on his stomach. *PSAF ¶2.* Still face down and now handcuffed with one officer kneeling on the back of his neck and the other with his knee in Mr. Lurry's back, Nicole Lurry, Mr. Lurry's wife, arrived at the scene. *PSAF ¶3.* When Nicole asked Tellez why Mr. Lurry was under arrest, Tellez responded, "[b]ecause [Mr. Lurry] had something in his mouth…I'm assuming narcotics," and then told Nicole to get back, preventing her from getting close. *Id.* As the officers pulled Mr. Lurry up from the ground by his arms to be walked from the front of the squad car to the rear passenger side door, Nicole shouted to Mr. Lurry and asked if he was okay. *PSAF ¶4.* Mr. Lurry nodded his head in the affirmative. *Id.*

Tellez and McCue placed Mr. Lurry in the rear of the squad car and then went back to the front of the car to search the ground to make sure none of the drugs had been left in that area. *PSAF ¶5.* They found nothing there, confirming to Tellez that the drugs had to be hidden in Mr. Lurry's mouth and were still on his person. *PSAF ¶¶8, 16.* In addition to searching the scene, after placing Mr. Lurry in the car, Tellez spoke with Nicole and other officers on scene. He told Nicole, "[Mr. Lurry's] going to have some explaining to do. He's been hiding, I'm pretty sure I know what it is." *PSAF ¶6.* To other officers (including McCue), he made four separate statements over the next two minutes indicating that Mr. Lurry had ingested drugs: (1) "take him down to the jail, I'm sure he's got something on him, might have put a bunch of it in his mouth. I don't know how much, but he's still got some in there"; (2) "I'm telling you, it's in his mouth"; (3) "I felt a bunch of dope baggies in his crotch, might have got some in his mouth. I don't know he might still got [sic] some in his crotch" and (4) "He swallowed some of it, so we got to get him down to the station." *PSAF ¶¶7, 8.*

Despite being armed with the knowledge that Mr. Lurry was at risk of a fatal drug overdose and that time was of the essence in preventing the drugs from having a toxic effect, Tellez and McCue left Mr. Lurry unattended and unmonitored while still at the scene of the arrest for a total of 4.5

minutes. *PSAF ¶¶9, 17*. Deviating from Tellez's customary practice and the usual practice of other Joliet police officers, not once did Tellez or McCue ask Mr. Lurry if he had drugs in his mouth, to open his mouth, or to spit out the drugs. *PSAF ¶¶10,14,15*. Moreover, prior to placing Mr. Lurry in the squad car unsecured with a seatbelt, unattended and unmonitored, the drugs that Tellez believed were now in Mr. Lurry's mouth were not recovered or even attempted to be recovered by the officers. *PSAF ¶¶16,19*. Tellez's failure to search Mr. Lurry for those drugs before transporting him to the station was found to have violated JPD policy and resulted in disciplinary action. *PSAF ¶¶16, 77*.

Rather than doing what was reasonable and consistent with their training and customary practice by searching Mr. Lurry, questioning him, monitoring him, and calling EMS immediately to ensure he did not overdose on the large amount of potentially fatal drugs in his body, Tellez and McCue instead drove Mr. Lurry to the station. *PSAF ¶¶11-15, 20*. During their 8-minute leisurely ride to the station with no lights or sirens activated, instead of monitoring Mr. Lurry closely, Tellez took a call informing an officer (likely May) that Mr. Lurry put drugs in his mouth. *PSAF ¶¶20, 21, 24*. The two times that he bothered to glance at Mr. Lurry during the ride, Tellez saw him chewing but ignored it completely. *PSAF ¶¶21, 23*. Mr. Lurry continued chewing through most of the 8-minute ride. *PSAF ¶23*. McCue mostly kept his eyes on the road (though he does admit to observing Mr. Lurry on the monitor at least momentarily), willfully blinding himself to Mr. Lurry in the backseat who, with every chewing motion, was increasing his exposure to the toxic drug. *PSAF ¶¶21, 25*. With this increased exposure came an objective decrease in Mr. Lurry's level of consciousness. *PSAF ¶25*. He became more somnolent, was oddly blinking his eyes, clearly not in a normal state of consciousness, slumped over and not able to right himself as the car went over the bumps in the road. *Id.* Neither officer spoke to Mr. Lurry at all during the ride, nor did Mr. Lurry say a word. *PSAF ¶¶21, 42*.

When McCue and Tellez finally got to the station with Mr. Lurry in tow, Tellez exited the car and immediately brought Defendant May (who was anxiously awaiting their arrival and standing

outside with Defendant Harrison) up to speed regarding what had transpired at the scene of Mr. Lurry's arrest, including the fact that Mr. Lurry had put drugs in his mouth and ingested them. *PSAF ¶26*. By this time, Mr. Lurry had a severely depressed level of consciousness and EMS should have been called, but was not. *PSAF ¶28*. This depressed level of consciousness was immediately apparent to McCue when they arrived at the station. When McCue went around the vehicle to get Mr. Lurry out, he knew something was wrong. *PSAF ¶27*. Mr. Lurry's eyes were closed and he was not moving. *Id.* When McCue ordered him to take his feet out of the vehicle, Mr. Lurry did not respond. *Id.* "Wake up!" McCue said. *Id.* Mr. Lurry briefly opened his eyes and then started blinking as if he was trying to focus his vision. *Id.* McCue then said, "Come on. Get up. Kick your feet out now." *Id.* Mr. Lurry's eyes began to roll back into his head as he remained otherwise motionless. *Id.* "Wake up. Kick your foot out," McCue said again. *Id.* Mr. Lurry's eyes continued to blink and roll back into his head. *Id.* McCue observed that Mr. Lurry had shallow breathing and appeared disoriented. *PSAF ¶29*.

May walked up to the car at about this time and announced to the other officers on scene (including Harrison in the same vicinity), that Mr. Lurry was "either not responsive or faking non-responsiveness." *PSAF ¶¶29, 36*. Harrison saw this for himself, noting that Mr. Lurry's eyes appeared to be blinking oddly as if he was half asleep. *PSAF ¶30*. He was not responding to verbal commands, and Harrison saw Mr. Lurry's mouth opening and shutting as if he was trying to swallow something. *Id.* Harrison recognized Mr. Lurry and knew him to be someone who would hide or "eat" drugs. *PSAF ¶32*. A few weeks prior, during a separate encounter, officers had told him that they thought Mr. Lurry had swallowed drugs on him. *Id.* He and May believed Lurry to be a drug dealer. *PSAF ¶34*. It was a well-known tactic for suspected drug dealers to conceal drugs by swallowing them. *Id.* May and Harrison also knew why Mr. Lurry was under arrest at the time of this incident - for possession of cocaine. *PSAF ¶¶33, 56*. Cocaine was a drug known by the officers to be combined with fentanyl and heroin – powerful opioids. *PSAF ¶¶53-55*.

Harrison's observations and knowledge prompted him to direct McCue to perform a sternum rub on Mr. Lurry - the only JPD-approved technique to determine whether an arrestee is feigning a medical emergency. *PSAF ¶¶30, 38*. McCue performed the sternum rub by digging his knuckles into Mr. Lurry's chest. *PSAF ¶30*. The sternum rub was ineffective, but the Defendants were apparently not yet convinced. *PSAF ¶31*. Consequently, Harrison told May to get in the car and "push [Mr. Lurry] out." *Id.* As McCue's sternum rub was underway and Mr. Lurry's eyes were rolling back, May entered the backseat and while saying "wake up, bitch," he struck Mr. Lurry in the left side of his face so hard that it made an audible sound that McCue was able to hear from the opposite side of the squad car. *PSAF ¶¶35, 36*. Harrison was surprised, later describing the strike as "harder than trying to arouse someone … harder than you seen [*sic*] a doctor do in the hospital." *PSAF ¶37*. Tellez was so appalled that he scrambled to turn off the in-car camera to conceal May's misconduct. *PSAF ¶39*. Later, May admitted that the strike was not warranted and incredibly claimed that it was an accident, resulting from poor aim. *PSAF ¶¶35, 37*. May was later disciplined by JPD for violating its use of force policy, and Tellez was disciplined for trying to conceal May's actions by turning off the camera. *PSAF ¶¶76, 77*. Injuries to the left side of Mr. Lurry's face, including his lip, were seen at autopsy. *PSAF ¶36*.

After striking Mr. Lurry in the face, May squeezed his jaw and neck with his left hand as he pinched Mr. Lurry's nose shut with his right in order to restrict Mr. Lurry's ability to breathe so he would have to open his mouth - an unapproved and untrained technique that is not used by police or in medical settings. *PSAF ¶¶40, 73*. Significantly, May did not ask Mr. Lurry to open his mouth, ask him to spit out the drugs, or ask him if he had anything in his mouth before taking this action. *PSAF ¶40*. Harrison saw what May was doing and at one point heard May say, "he's chewing, he's trying to chew." *PSAF ¶41*. Still, none of the Defendants called EMS. *PSAF ¶47*.

Over the course of the 90 seconds that May pinched Mr. Lurry's nose closed, he also periodically pressed up on Mr. Lurry's jaw from underneath his chin (logically forcing his mouth shut),

and applied pressure to Mr. Lurry's neck with his hand. *PSAF ¶42*. The autopsy report confirmed May's pressure to Mr. Lurry's neck, revealing an internal hemorrhage on the strap muscle in the same spot where May's hand is observed squeezing in the video. *PSAF ¶¶42, 72*. Approximately 48 seconds into the nose pinch, May pulled down on Mr. Lurry's chin hair and opened Mr. Lurry's mouth with ease, suggesting that Mr. Lurry was not previously able to open his mouth voluntarily due to his medical state. *PSAF ¶44*. May's nose pinch deprived Mr. Lurry of oxygen and worsened his clinical condition. *PSAF ¶43*.

After May opened Mr. Lurry's mouth for him, Harrison directed McCue to use his baton to assist in extracting the drugs from Mr. Lurry's mouth. *PSAF ¶45*. McCue used the baton as a probe in a sweeping manner within Mr. Lurry's mouth, which may have caused a bag of drugs to become lodged in his lower airway resulting in a further airway obstruction. *Id.* Around this time, Mr. Lurry's body went limp and finally, 18.5 minutes after Tellez and McCue watched Mr. Lurry put narcotics in his mouth and swallow some of them and only after Mr. Lurry had completely stopped breathing did the Defendants call for EMS. *PSAF ¶¶1-2, 47*. Despite the Defendants' knowledge that (1) the cocaine Mr. Lurry consumed was mixed with the opioids, fentanyl, and heroin; (2) Mr. Lurry was exhibiting multiple clear symptoms of an opioid overdose; and (3) the sooner Narcan is administered to an overdose victim, the more effective it is at counteracting its effects, the Defendants failed to administer Narcan to Mr. Lurry. *PSAF ¶¶ 25, 27-30, 46, 53-55, 64-66*. Had they done so, Mr. Lurry would have survived. *PSAF ¶67*.

When Mr. Lurry was pulled from the vehicle and while CPR was being performed, he coughed up a portion of a plastic baggie, immediately caught his breath and gasped like he had something jammed in his airway and it was released. Afterward, he did not look as dire as he initially looked, but then began to shake and seize violently before EMS arrived. *PSAF ¶48*. Mr. Lurry died from complications of an acute mixed drug intoxication (heroin, fentanyl, and cocaine), with asphyxia for

several minutes due to the obstruction of his airway as a significant contributing condition to death. *PSAF* *¶¶69-71*. In other words, the asphyxiation (from his obstructed oral cavity as well as May's pressure on his nose and neck) made his death more likely to occur. *PSAF* *¶69-71*. Histology slides revealed the presence of foreign material in his lungs, proving that Mr. Lurry aspirated the drugs into his airway. *PSAF* *¶70*.

Had the Defendants administered Narcan to Mr. Lurry at the first sign of respiratory depression, as their training commanded, Mr. Lurry would have survived. *PSAF* *¶67*. Had EMS been called earlier, either at the scene of the arrest, enroute to the station or even when they arrived at the station (which was a mere three minutes before it was ultimately called), Mr. Lurry would be alive today. *Id.* He would have benefited from Narcan and access to life-saving interventions that only medical professionals can provide like oxygen, activated charcoal, and whole bowel irrigation. *PSAF* *¶62*. These officers failed Mr. Lurry at every turn, wholly disregarding their duty to treat Mr. Lurry with dignity and respect and act in a manner to ensure his safety and well-being. It was their actions and inactions that ensured Mr. Lurry's death.

## LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" or, stated differently, "when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." Fed. R. Civ. P. 56(a); *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999). The moving party bears the burden to demonstrate such a failure to state a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When considering a motion for summary judgment, the evidence and all inferences that reasonably can be drawn from the evidence are construed in the light most favorable to the non-moving party, here, the Plaintiff. *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007). A motion for

summary judgment must only be granted where no reasonable juror could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, all the Court needs in order to justifiably deny summary judgment is a single instance "where facts specifically averred by [the] nonmovant contradict facts specifically averred by [the] movant..." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). "In passing on a motion for summary judgment, the trial court may only determine whether or not there exists a dispute as to a material fact. It is not permitted to resolve that dispute." *Dreher v. Sielaff*, 636 F.2d 1141, 1143 fn. 4 (7th Cir. 1980). Even where defendants invoke qualified immunity, the same summary judgment principles apply. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014)*; see also Weinmann v. McClone*, 787 F.3d 444, 449 (7th Cir. 2015) (in qualified immunity context, court's "task is to determine, under [plaintiff's] version of the facts, if [the defendant-officer] was objectively reasonable in his belief that his life was in danger").

It is well-settled that this Court cannot make credibility determinations in ruling on summary judgment and instead must take all of Plaintiff's well-supported material facts as true. The question that this Court must then answer is whether—on those facts—Defendants are entitled to judgment as a matter of law. *See, e.g., Weinmann*, 787 F.3d at 449; *see also Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (must assume non-movant's facts in assessing summary judgment motion); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir.1993) ("[T]he district court cannot weigh credibility issues at the summary judgment stage.").

## ARGUMENT[1]

### I. Defendants May and McCue acted unreasonably in attempting to recover drugs from Mr. Lurry's mouth while he was clearly suffering from a medical emergency.

Plaintiff asserts claims of excessive force and unreasonable search against Defendants May and McCue based on their actions against Mr. Lurry while in the backseat of the squad car. Both

---

[1] Defendants have moved for summary judgment on all counts of Plaintiff's Complaint. Plaintiff hereby voluntarily dismisses Count V (replevin) and Count VII (Tellez's on-scene search of Mr. Lurry).

claims are governed by the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Kentucky v. King*, 563 U.S. 452, 459 (2011). Those actions include May striking Mr. Lurry in the face, pinching his nose, and squeezing his neck to restrict his breathing as well as McCue's use of the baton. The objective reasonableness inquiry requires courts to balance the nature and quality of the intrusion on the individual's liberty against the importance of the governmental interests alleged to justify the intrusion under the totality of the circumstances. *See Tolan*, 572 U.S. at 656; *Scott v. Harris*, 550 U.S. 372, 383 (2007) (citing *United States v. Place*, 462 U.S. 696, 703 (1983)); *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (same). The evaluation of reasonableness "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. As far as searches go, it is well-settled that not all intrusions into a suspect's body are permissible under the Fourth Amendment.

In judging the reasonableness of any particular use of force, courts consider factors such as the severity of the crime, whether the arrestee poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to flee and evade arrest. *Graham,* 490 U.S. at 396; *Abdullahi v. City of Madison,* 423 F.3d 763, 768 (7th Cir.2005). The excessive force inquiry includes the "the totality of the facts and circumstances known to the officer at the time the force is applied." *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013). This Court's analysis of the objective reasonableness of the Defendant Officers' actions must be from the perspective of a reasonable officer on the scene as opposed to with the 20/20 vision of hindsight. *Tolliver v. City of Chicago*, 820 F.3d 237, 245 (7th Cir. 2016). Basically, the totality of the circumstances "includes information which the officer had at the time of his actions, but not information uncovered later." *Deering v. Reich,* 183 F.3d 645, 650 (7th Cir. 1999).

Notably, Defendants do not even address the *Graham* factors in detail, instead opting to focus on the Defendants' actions under case law from the Sixth Circuit that plainly does not control here

(likely because their use of force is problematic within the *Graham* framework). *Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, hereinafter "Memorandum," pp. 10-11*. Defendants' reliance on Sixth Circuit case law instead of binding authority comes from their inability to find a single Supreme Court or Seventh Circuit case indicating that the excessive force analysis changes within the factual context of a medical emergency. This is because such a case does not exist. By choosing to move for summary judgment on this claim and then failing to analyze it under controlling law, Defendants have essentially waived any substantive or meaningful argument on Plaintiff's excessive force claim.

### A.  May and McCue's use of force was unreasonable under the *Graham* factors.

With regards to the severity of the crime at issue, at most, Mr. Lurry was suspected of a non-violent drug offense. *PSAF ¶33*. Nothing about his possession of suspect narcotics justified the use of force by these two Defendants. It is also clear that Mr. Lurry posed no immediate threat to the officers' safety or a threat of escape.[2] *PSAF ¶35*. The video evidence demonstrates that Mr. Lurry did not actively resist at any time after he had been handcuffed and placed in the back seat of the squad car at the scene of the arrest. *PSAF ¶25, 35*. Pursuant to the video from the in-car camera and by all the Defendants' accounts, at the time that May struck Mr. Lurry and at all relevant times thereafter, Mr. Lurry was unarmed, handcuffed behind his back, not moving, in a diminished state of consciousness, and surrounded by many police officers. *PSAF ¶28, 35, 36, 46*.

Notably, in stark contrast to the physical and video evidence proving that May applied significant pressure to Mr. Lurry's neck, Defendants' story is that May's hand was merely "in Lurry's neck area for a few seconds." *Memorandum, pp. 12-13*. Indeed, "[w]hen opposing parties tell two

---

[2] The defense will likely argue that their conduct was reasonable because Mr. Lurry posed a threat to himself. This argument fails because by the time May and McCue used the force at issue, the threat of harm to Mr. Lurry was already realized. He was already in an emergent state. At that point, the force they used was no longer a reasonable option. The reasonable option would have been to call EMS and employ their BLS training to relieve his airway obstruction. *PSAF ¶ 73*.

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Given that the video here blatantly contradicts the Defendants' characterization of May's actions, this Court cannot accept "visible fiction" when reviewing video evidence and must view the facts not only in Plaintiff's favor, but also "in the light depicted by the videotape." *Id.* at 380-81; *Williams v. Brooks*, 809 F.3d 936, 941 (7th Cir. 2006); *Jenkins v. Wilson*, 432 F.Supp.2d 909 (W.D. Wis. 2006). Further still, at the summary judgment stage, a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe her account. *Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013). Here, the Court cannot credit Defendants' assertion that May only applied pressure to Mr. Lurry's jaw and not his neck when the video and physical evidence tell a different story. The placement and actions of May's hand as depicted in the video are not ambiguous; even if it were, any ambiguity must be resolved in Plaintiff's favor.

As Defendants themselves say, "whether one characterizes [Defendants'] actions as a 'search' or a 'use of force,'…the analysis is the same." *Memorandum, p. 12*. Evaluating May and McCue's actions under the *Graham* factors necessarily leads to a conclusion that their conduct was unreasonable. Evaluating their conduct as a search leads to the same conclusion, particularly given that the Supreme Court in *Winston v. Lee* made clear that "a search for evidence of a crime may be unjustifiable if it endangers the life or health of the suspect." *Winston v. Lee*, 470 U.S. 753, 761 (1985). To be clear, May and McCue's "search" was undertaken in the backseat of a car by police officers with no training on how to safely extract items from the mouth of an individual with a rapidly declining respiratory rate in a severely depressed state of consciousness whose organs were rapidly shutting down from the surge of opioids, as opposed to licensed medical professionals in a hospital setting. *PSAF ¶¶40, 43, 74*. Plaintiff's medical experts have opined that May and McCue's search methods exacerbated Mr.

Lurry's condition and were a significant contributed factor to his death. *PSAF ¶¶43, 71.* A jury could certainly conclude that Defendants performed an unreasonable "search" where they intentionally inhibited his ability to breathe by plugging his nose for over 90 seconds while simultaneously applying pressure to his neck and then using a baton to probe inside his mouth (potentially jamming the foreign material down his throat that he aspirated into his airway and later coughed up during CPR) given their knowledge that Mr. Lurry ingested deadly drugs several minutes prior and their admitted observations of the objective symptoms of an opioid overdose that Mr. Lurry was exhibiting at the time. *PSAF ¶¶27, 29, 40, 42-45, 70.* Importantly, the Supreme Court in *Schmerber v. California,* 384 U.S. 757 (1966) cautioned: "That we today hold that the Constitution does not forbid the States['] minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id.* at 772. Under the circumstances here, this search was unreasonable on its face. The only time at which it *may* have been reasonable would have been immediately upon Tellez's belief that Mr. Lurry had ingested drugs at the scene prior to transport, but that is when Tellez and McCue chose to take no action. *PSAF ¶18.*

### B. The cases cited by Defendants in support of their contention that May and McCue's conduct was reasonable are factually distinguishable.

Defendants attempt to evade liability by arguing that "numerous courts…have held that police officers may use reasonable force to prevent a person from ingesting illegal drugs," citing to multiple cases in support, most of which have no precedential value and all of which are factually distinguishable. *Memorandum, p. 11.* The inquiry is not whether officers can generally use force to prevent arrestees from swallowing or ingesting drugs as Defendants frame it to be. Rather, the inquiry is whether an officer can use force (including deadly force) before issuing any commands upon a non-resisting arrestee believed to have swallowed a significant amount of deadly narcotics almost twenty minutes prior and who is at a known significant risk of and/or actively exhibiting signs of an overdose

from those narcotics. The answer to that properly framed, "fact specific" inquiry is an unequivocal no. *See Becker v. Elfreich*, 821 F.3d 920, 924 (7th Cir. 2016)(an excessive force "inquiry is fact specific").

In arguing that May's application of pressure to Mr. Lurry's jaw and neck were reasonable, Defendants cite to three Fifth Circuit cases where the officers' use of force against arrestees suspected of swallowing drugs was found reasonable. Those cases and their relevant facts are set forth below:

| Case cited by defense | Facts of cited case |
|---|---|
| *Espinoza v. United States*, 278 F.2d 802, 803 (5th Cir. 1960) | Officers observed the arrestee put a small package into his mouth. They immediately grabbed his throat and attempted to pry his mouth open to extract the package. Arrestee was not exhibiting any symptoms of an overdose or medical emergency. |
| *Surratt v. McClarin*, 851 F.3d 389, 390 (5th Cir. 2017 | Arrestee was suspected of placing contraband in mouth. Officers immediately ordered her to open her mouth and then applied pressure to her neck and jaw to extract the contraband. Arrestee was not exhibiting any symptoms of an overdose or medical emergency. |
| *Stogner v. Sturdivant*, 515 Fed. App'x 280, 282 n.1 (5th Cir. 2013) | Officers suspected arrestee had put a plastic bag of drugs in his mouth. Arrestee ignored repeated commands to spit out the drugs and then began actively physically resisting officers' attempts to handcuff him. Officers wrapped their arms around arrestee's neck to prevent him from swallowing drugs. Arrestee was not exhibiting any symptoms of an overdose or medical emergency. |

The above cases have the same common facts that are noticeably absent here: (1) the officers' force was used immediately after the offender was observed to have put the contraband in his mouth, and (2) with potentially the exception of *Espinoza*, before using the force, the officers commanded the offender to spit the contraband out and gave him the opportunity to comply.[3]

Here, May and McCue used force upon Mr. Lurry more than 16 minutes after these officers knew he had put deadly narcotics in his mouth and swallowed some of them.[4] Prior to their use of force, no officer at any time asked Mr. Lurry to spit out the drugs and/or open his mouth. In fact, no

---

[3] *Espinoza*, a 63-year-old opinion that consists of a total of three paragraphs, does not contain enough information to confirm whether or not the involved officers issued verbal commands prior to their use of force.
[4] At 3:55 p.m., May and Harrison heard Tellez and McCue over the radio huffing and puffing and requesting backup. *PSAF ¶2*. When Tellez and McCue arrived at the station at 4:11pm, Tellez informed May what had occurred during that struggle in that Mr. Lurry had ingested drugs. *Id at ¶26*. May then got into the car with Mr. Lurry after Tellez and McCue's arrival at the station. Id. at *¶35*. Consequently, May knew that Mr. Lurry had ingested the drugs more than 16 minutes prior to May's interaction with him.

officer even bothered to ask Mr. Lurry if there *were* drugs inside his mouth, likely because they already

knew the answer. It was not until Mr. Lurry was in a dire medical state that was abundantly evident to

the Defendants by their own admissions that May struck him in the face, squeezed his neck, and then

pinched his nose shut to intentionally restrict his ability to breathe.[5] Indeed, it is not the nature of the

conduct alone that dictates its reasonableness; it is the totality of the circumstances. The circumstances

here are not contemplated by any of the cases on which the defense relies.

Defendants cite to the following cases for the proposition that May's conduct in pinching Mr.

Lurry's nose was reasonable:[6]

| Cases cited by the defense | Facts of cited cases |
| --- | --- |
| *Ellis v. Columbus Police Dep't*, 2009 WL 1663454, at *5 (N.D. Miss. June 15, 2009) | Officers believed the arrestee had drugs in his mouth, so they ordered him to spit them out more than 50 times and repeatedly warned him of the life-threatening dangers of drug ingestion. When he still refused to comply, they pinched the arrestee's nose to force him to open his mouth and then immediately called for an ambulance when they saw the bag in his mouth was broken. In finding reasonableness, the court noted that the arrestee could clearly breathe while his nose was pinched because he was talking. |
| *Currie v. Oklahoma City Police Dep't*, 2008 WL 1946787, at *1 (W.D. Okla. Apr. 30, 2008) | Officers employed the nose-pinch technique immediately after the arrestee was suspected of putting a bag of crack cocaine in his mouth and after repeatedly ordering the arrestee to spit out the drugs. |

Again, unlike here, in *Ellis* and *Currie*, officers used force almost immediately after they

observed the offender put the contraband in his mouth and only after first ordering him to spit the

drugs out and giving him an opportunity to do so. Further, in *Ellis* and *Currie*, officers performed the

nose pinch technique to prevent toxicity before the offender could poison himself, not to recover

evidence after it was already known that he had ingested the toxin 16 minutes prior.

---

[5] May and Harrison do not deny that Mr. Lurry was exhibiting symptoms of an overdose/medical emergency when they initially saw him at the police station. *PSAF ¶29-31*. Rather, their defense is that they thought Mr. Lurry was faking the symptoms. *Id.* Thus, these Defendants admit that the symptoms were objectively evident.
[6] Notably, Defendants admit that "research located only two cases expressly addressing the nose pinch technique" *Memorandum, p 13*. The reason the defense had such a difficult time finding analogous cases is because this technique is not an approved or readily utilized technique for police officers to use to force an arrestee to open his mouth. *PSAF ¶74*.

Defendants' reliance on various cases to support McCue's use of the baton is equally misplaced for the same reasons. Those cases and the corresponding relevant facts are as follows:

| Case cited by defense | Facts of cited case |
|---|---|
| *Clark v. Gross*, 2016 WL 6638095 (D.S.D. Oct. 3, 2016) | After repeatedly telling the arrestee to spit out the drugs in his mouth after observing a plastic bag therein, the defendant refused to comply so the officer used a flashlight to pry the suspect's mouth opened but stopped once arrestee the started exhibiting medical distress and immediately took him to the hospital. |
| *Smith v. City of Huntsville*, 2016 WL 5746216 (N.D. Ala. Sept. 30, 2016) | After the arrestee violently resisted officers and then refused to spit out a bag of drugs be put in his mouth, officers immediately began using objects to attempt to prevent the arrestee from ingesting the entire bag and to retrieve its contents. |
| *Pennington v. Terry*, 644 Fed. App'x 533 (6th Cir. 2016) | Defendants used a taser on an arrestee roughly two minutes after he was observed putting contraband in his mouth and while the arrestee was disobeying police orders and refusing to comply with repeated police orders to spit out pills. |
| *Sanders v. City of Dothan*, 409 F. App'x 285 (11th Cir. 2011) | Defendants used a taser on arrestee shortly after officers suspected he had swallowed drugs after the arrestee refused to fully comply with multiple orders to open his mouth and denied swallowing cocaine. |

Again, in each of these cases, unlike here, the object was used immediately after the arrestee was observed to have put the contraband in his mouth and only after officers first ordered him to spit them out and gave him an opportunity to do so. Perhaps these cases would rescue the Defendants if their conduct against Mr. Lurry was more akin to the conduct of the officers in the cases they cited. More importantly, perhaps Mr. Lurry would have been rescued had that been the case. But tragically, it was not, and those differences are precisely what makes the Defendants' conduct unreasonable.

## II.    May and McCue are not entitled to qualified immunity on Plaintiff's excessive force and unreasonable search claims.

Government actors performing discretionary functions are immune from any suit for damages only if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Abbott*, 705 F.3d at 713 (7th Cir. 2013) *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A two-step analysis is therefore involved – (1) whether the defendants violated a plaintiff's constitutional right, and (2) whether defendants should have known that they

were violating plaintiff's constitutional rights when they acted. *Abbott*, 705 F.3d at 713. When a defendant invokes qualified immunity, the plaintiff is required to offer either "a closely analogous case *or* persuade the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24 (internal citation omitted). Any other approach would allow police officers to be "shielded from liability just because their excessive use of force happens to be original." *Rice v. Burks,* 999 F.2d 1172, 1174 (7th Cir. 1993).

For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "To be established clearly, however, there is no need that 'the very action in question [have] previously been held unlawful.'" *Safford Unified Sch. Dist. No. 1 v. Redding,* 557 U.S. 364 (2009) (citation omitted). Therefore, the question the Court must answer is whether the state of the law at the time that Defendant officers acted gave them reasonable notice that their conduct violated the Constitution. *Roe v. Elyea,* 631 F.3d 843, 858 (7th Cir. 2011). The answer to this question is yes.

### A. Disputed facts preclude the qualified immunity defense.

It is well-settled that police officers are not entitled to qualified immunity where facts related to the underlying constitutional violation are disputed. *See Weinman v. McClone*, 787 F.3d 444, 450-51 ("The existence of a factual dispute about the circumstances . . . precludes a ruling on qualified immunity."); *Abdullahi*, 423 F.3d at 775; *see also Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009) (no qualified immunity where there are disputed facts as to force used); *Omdahl v. Lindholm*, 170 F.3d 730, 734 (7th Cir. 1999) ("[W]hether the [plaintiffs] can establish the existence of a constitutional violation turns on how a fact-finder resolves the question of fact regarding deadly force. The existence of a factual dispute prevents us from resolving the issue."); *Dufour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998) ("Because the facts are in hot dispute, the officers cannot seek pretrial refuge behind a

claim of qualified immunity. Raising a defense of qualified immunity in the face of disputed facts that control the answer to the question is a waste of everybody's time.").

Here, as discussed above, Plaintiff disputes the degree of force May used on Mr. Lurry's neck. *PSAF ¶¶40, 42, 72*. Plaintiff also disputes how McCue used the baton within Mr. Lurry's mouth. The defense classifies the use of the baton akin to a bite block. *Memorandum, p. 21*. A bite block is a rigid device that is placed in an individual's mouth between their teeth to keep their mouth open. *PSAF ¶45*. It is left in a stationary position. *Id*. Defendant McCue used the baton in a sweeping manner like a probe, which ultimately caused a bag to become lodged in Mr. Lurry's throat which he later coughed up during CPR. *PSAF ¶¶45, 48*. These disputes alone preclude qualified immunity on Plaintiff's excessive force and unlawful search claims.

**B. Disputed facts aside, May and McCue are not entitled to qualified immunity.**

   i.  Qualified immunity does not shield May and McCue from liability for their conduct in restricting Mr. Lurry's ability to breathe.

Even if there were no disputed facts, May and McCue are nonetheless not entitled to qualified immunity based on the totality of the circumstances because the force they used constricted Mr. Lurry's airway, and they issued no verbal commands or took any other action before resorting to it. May restricted Mr. Lurry's airway by squeezing his neck and pinching his nose closed while knowing that Mr. Lurry had contraband in his mouth that was obstructing his oral airway. *PSAF ¶¶20, 26, 40-42*. McCue used his baton as a probe to fish out the drugs from Mr. Lurry's mouth, potentially forcing the bags further into the back of Mr. Lurry's throat and causing his airway to be further obstructed and contributing to his asphyxia. *PSAF ¶¶45, 70, 73*.

Courts have found that "given that constriction of the airway can have quick and severe consequences, it is an unreasonable use of force to constrict the airway to prevent ingestion of drugs, *before giving a verbal command* or *taking other action* to prevent the ingestion and where the arrestee is not

actively resisting, evading arrest, or otherwise threatening the safety of the officers." *See Chalmers v. City of Chi.*, 2023 WL 2538962 (N.D. Ill. Mar. 16, 2023) (emphasis added), citing to other cases; *see also Surratt,* 234 F.Supp.3d 815 (constitutional violation to apply to force that affects arrestee's breathing because officer believes arrestee is hiding something in his or her mouth, unless officer gives time to elicit voluntary release of the item); *Singleton v. City of Newburg*, 1 F.Supp.2d 306 (S.D.N.Y. 1998) (denying summary judgment on excessive force claim against officer who may have applied pressure to front of suspect's neck when he had cocaine in his mouth but finding other uses of force including Heimlich maneuver and pepper spray were reasonable in the circumstances); *State v. Hodson*, 907 P.2d 1155, 1159 (Utah 1995) (per se rule that officers should not constrict a suspect's throat to prevent them from swallowing drugs).

In fact, courts agree that "restricting an individual's airway is a kind of deadly force." *Chalmers*, 2023 WL 2538962, at *8 citing *Abdullahi,* 423 F.3d at 769–71 (pressure on chest and neck causing collapsed left lung is deadly force); *Philips v. Community Ins. Corp.*, 678 F.3d 513, 521 (7th Cir. 2012) (deadly force "must at least carry with it a substantial risk of causing death or serious bodily harm."); 720 ILCS 5/7-5.5(a), (c) ("A peace officer ... shall not use a chokehold ... unless deadly force is justified under this Article ... chokehold means applying direct pressure to the throat, windpipe, or airway of another."). If a jury were to find that May and McCue restricted Mr. Lurry's airway while he was compliant and did not pose any threat to the officers, then it was clearly established that deadly force was not authorized. *See Chalmers*, 2023 WL 2538962 at *8 citing to *Taylor v. City of Milford*, 10 F.4th 800, 807 (7th Cir. 2022) ("A person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force"); *Gant v. Hartman*, 924 F.3d 445, 451 (7th Cir. 2019) ("Our decisions show that it is unreasonable to use deadly force against a suspect who is not resisting arrest and who is genuinely attempting to surrender.").

It is also well established that use of a chokehold or other restriction on the airway of a non-resisting person or restrained person violates the Fourth Amendment. *See Tuuamalemalo v. Greene*, 946 F.3d 471 (9th Cir. 2019); *Coley v. Lucas County,* 799 F.3d 530 (6th Cir. 2015); *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) (sitting on subject after he has been subdued, causing asphyxiation, constitutes deadly force and is unconstitutional), cert denied, 556 U.S. 1236 (2009). In addition to the Illinois statute and abundant case law that put these officers on notice of their unlawful conduct, May himself admits that he was aware that chokeholds are prohibited. *PSAF ¶42*. He just denies that he used one. The law and the evidence (particularly the video evidence and the hemorrhage in Mr. Lurry's right strap muscle coupled with Dr. Melinek's expert opinion that May's use of force exacerbated Mr. Lurry's asphyxia, which was a significant contributing factor to his death) say otherwise. Under the totality of the circumstances, May and McCue cannot avail themselves of qualified immunity.

ii.  It was well established that striking Mr. Lurry in the face violated his constitutional rights.

May was also on notice that striking Mr. Lurry in the face while he was handcuffed, not resisting or posing a threat, and somnolent was unreasonable. That's precisely why he denies that he did it intentionally and admits that it was unwarranted under the circumstances. *PSAF ¶¶35, 37*. Not only that, but he was also found to have violated JPD's use of force policy for doing it and disciplined as a result. *PSAF ¶76*. Tellez unequivocally disapproved of May's strike so much so that he scrambled to turn off the camera that was capturing it. *PSAF ¶39*. Likewise, Harrison recognized May's strike to Mr. Lurry's face as "harder than trying to arouse someone . . . [and] harder than you seen [sic] a doctor do in a hospital." *PSAF ¶37*. That kind of strike to Mr. Lurry was not what he would expect from a police officer. *Id.* Indeed, no reasonable officer (not even May himself, his colleagues, or his employer for that matter) believed he was acting lawfully and the case law says no different.

It is well-settled that a suspect has a constitutional right not to be subjected to force once subdued. *See Abbot,* 705 F.3d at 727 (7th Cir. 2013) ("[I]t was well-established in 2007 that police

officers cannot continue to use force once a suspect is subdued...."); *Miller v. Gonzalez,* 761 F.3d 822, 829 (7th Cir. 2014) ("This prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon."). When confronted with circumstances very similar to those presented here, in 2018, the court in *Neal v. Beirbaum* ruled that the defendant officer exercised an unreasonable use of force where he struck an arrestee in the mouth before giving verbal commands to spit out suspected drugs. *Neal v. Bierbaum,* No. 17-1495, 2018 WL 6268198, at *5 (C.D. Ill. Nov. 30, 2018)("a reasonable officer in Defendant[]'s position would have attempted to use his voice before his fist"). Though *Neal* ultimately held that the defendant was entitled to qualified immunity because it was not clearly established at the time of the arrest that an officer acts with excessive force where he strikes an arrestee to dislodge what he reasonably believes to be narcotics before attempting to resolve the situation without using force, the incident with Mr. Lurry occurred in January 2020 – after the opinion in *Neal* was issued. Moreover, the defendant's use of force in *Neal* was arguably less egregious because he used force immediately after the suspect was thought to have ingested drugs, not several minutes later as he was largely unconscious and in a state of emergency.

Under controlling law like the Supreme Court's decision in *Graham* and applicable Seventh Circuit case law (which the Defendants fail entirely to raise), it simply cannot be said that no reasonable juror could find May and McCue's use of deadly force against Mr. Lurry unreasonable where (1) Mr. Lurry was not resisting; (2) Defendants resorted to force without first giving Mr. Lurry verbal commands to spit out the drugs and giving him an opportunity to comply; and (3) Defendants resorted to force more than 16 minutes after he had first ingested drugs and only after Mr. Lurry appeared unresponsive, was in a medically emergent state, and was exhibiting multiple clear signs of an overdose. Not a single one of the cases cited by Defendants can support their use of force in the circumstances present here. Nor are Defendants entitled to qualified immunity on Plaintiff's excessive

force claim given the numerous cases clearly establishing that that their use of deadly force by restricting Mr. Lurry's airway in these circumstances violated the Fourth Amendment.

### III. Defendants acted unreasonably in denying Mr. Lurry his constitutional right to medical care when faced with his obvious and serious medical need.

"When the State takes a person into its custody and holds [him] there against [his] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [his] safety and general well-being." *See DeShaney v. Winnebago Cnty. Dep't of Soc. Serv.*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Without question, Defendants flouted this duty. *Ortiz v. City of Chicago*, 656 F.3d 523, 531 (7th Cir. 2011)("Each state actor who encounters a detainee must reasonably respond to medical complaints; a detainee cannot be treated like a hot potato, to be passed along as quickly as possible to the next holder.")

Because Mr. Lurry had not yet benefitted from a *Gerstein* hearing, the Fourth Amendment's objective reasonableness standard governs Plaintiff's claim of inadequate medical care, not the deliberate indifference standard derived from the Eighth Amendment and applied to claims by detainees awaiting a trial by virtue of the due process clause. *See Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir.2006); *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir.2007). This standard of "objective reasonableness under the circumstances" for establishing a Fourth Amendment medical care claim is lower than the "deliberate indifference" standard under the Eighth and Fourteenth Amendments. *Williams,* 509 F.3d. at 403.

### A. There is no basis to dismiss Plaintiff's denial of medical care claim as Plaintiff is entitled to alter her legal theory.

Defendants' argument that Plaintiff's denial of medical care claim must be dismissed because Plaintiff's Complaint pled this as a Fourteenth Amendment violation rather than a Fourth Amendment one is wholly without merit given that the Federal Rules of Civil Procedure do not require a plaintiff to even plead legal theories. *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir.2011)

("A complaint need not identify legal theories...."); *Simpson v. Nickel*, 450 F.3d 303, 305 (7th Cir. 2006), citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (recognizing that plaintiffs are not required to allege factual or legal elements of a prima facie case when presenting federal claims).

Where a plaintiff has pled legal theories, she is permitted to alter those theories unless the changes result in unfair surprise or prejudice to the defendant. *Chessie Logistics Company v. Krinos Holdings, Inc.*, 867 F. 3d 852 (7th Cir. 2017). Here, there are multiple allegations throughout Plaintiff's Complaint setting forth the factual basis for a claim that Defendants violated Mr. Lurry's rights when they denied him medical attention in the face of his objectively serious medical need. *See Pl. First Amended Complaint, Dkt. 54 at ¶¶22-27, 32-45, 69, 77, 118-120, 124-126, 133-143*. Though Plaintiff's Complaint alleged Defendants' denial of medical care constituted a violation of Mr. Lurry's Fourteenth Amendment substantive due process rights (*Dkt. 54 at ¶¶131-132*), Plaintiff is now offering an alternative legal theory that Defendants' actions violated Mr. Lurry's Fourth Amendment rights. Fourth Amendment and Fourteenth Amendment constitutional claims are merely alternative theories by which to analyze the Defendants' conduct. *See Wallace by Wallace v. Batavia School Dist. 101*, 68 F.3d 1010, 1015 (7th Cir. 1995) (citing *Darryl H. v. Coler*, 801 F.2d 893, 901 n. 7 (7th Cir.1986) ("Fourteenth Amendment due process analysis obviously differs in some respects from Fourth Amendment analysis. However [. . .] we believe both interests can be treated together" because, under both standards, the court must engage in the same balance of interests.). As Plaintiff relies on the exact same factual allegations, there can be no possible prejudice to Defendants by this alternative characterization. Defendants can hardly dispute here that they conducted extensive fact and expert discovery on Plaintiff's allegations that they denied Mr. Lurry medical care when it was clear he had a serious medical need – this has been the parties' focus for the better part of three years.

The Seventh Circuit has consistently allowed plaintiffs to alter their legal theories at the summary judgment phase where the new theory is based on the same set of facts. *See CMFG Life*

*Insurance Co. v. RBS Securities, Inc.*, 799 F.3d 729, 743–44 (7th Cir. 2015) (plaintiff did not inappropriately add new claim during summary judgment briefing when factual basis had been alleged in complaint); *Whitaker v. Milwaukee Cty.*, 772 F.3d 802, 807–09 (7th Cir.2014) (argument raised on summary judgment was not improper "attempt to amend the pleadings" because plaintiff was merely "offer[ing] an alternative legal characterization of" a fact); *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996) ("[T]here is no burden on the plaintiff to justify altering its original theory."). District courts have thus followed in the Seventh Circuit's footsteps. *See Spraggins v. Brown*, 2019 WL 4749978 (N.D. Ill. Sept. 30, 2019) (permitting plaintiff to alter her legal theory at summary judgment from a substantive due process violation to a Fourth Amendment violation because plaintiff was not altering her factual allegations and the factual basis had already been pled); *Heneghan v. City of Chicago*, No. 09-C-759, 2011 U.S. Dist. LEXIS 41788 (N.D. Ill. Apr. 18, 2011) (permitting the plaintiffs to alter their legal theory at summary judgment and noting that the parties had conducted discovery on the circumstances surrounding the action relevant to the challenged theory).

Since the factual basis was alleged in Plaintiff's complaint, dismissal of Plaintiff's denial of medical care claim is improper.

### B. Defendants' failure to provide Mr. Lurry with adequate medical care was obviously unreasonable.

Under the Fourth Amendment, courts examine four factors to determine whether an officer's response to an arrestee's medical needs was objectively unreasonable: (1) whether the officer has notice of the arrestee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. *Williams,* 509 F.3d at 403. A plaintiff must also show that the defendants' failure to act was a source of harm for plaintiff. *See Ortiz,* 656 F.3d 523; *Gayton v. McCoy,* 593 F.3d 610 (7th Cir. 2010).

#### i. Defendants were on notice of Mr. Lurry's medical needs.

To satisfy the first factor, "[t]he officer [must] be given notice of the arrestee's medical need,

whether by word…or through observation of the arrestee's physical symptoms." *Williams*, 509 F.3d at 403, citing *Sides v. City of Champaign*, 496 F.3d 820, 823 (7th Cir. 2007). Plaintiff has met this burden.

### a. *Tellez and McCue's notice at the scene of the arrest*

Tellez and McCue's notice of Mr. Lurry's medical need at the scene of the arrest is indisputable. After feeling a golf ball to racquetball sized package of narcotics inside Mr. Lurry's pants near his crotch, the officers watched Mr. Lurry bury his hand in his pants and then bury his mouth near his hands. *PSAF ¶¶1-2*. After this occurred, Tellez made four separate statements that he believed that Mr. Lurry had put "dope" in his mouth and had swallowed some of it. *PSAF ¶7*. McCue admits to having heard Tellez's statements and was directly next to Tellez when they were made. *PSAF ¶¶7-8*. The officers also knew that the drugs consumed by Mr. Lurry posed a significant risk of death. *PSAF ¶17*. In fact, they are trained that no matter what kind of drug it may be, when an officer believes an individual is concealing drugs in his mouth, is swallowing, or has swallowed drugs, that in itself immediately becomes an emergency. *PSAF ¶50*. Police officers never know the precise quantity or what the drug could be cut (mixed) with, which is why they are not trained to wait to see the physical manifestations of an overdose before calling EMS. *PSAF ¶50, 51*. In this case, however, these two Defendants *were* aware that street drugs are frequently mixed with fentanyl and heroine and were trained in the symptoms of opioid overdoses. *PSAF ¶¶53, 55, 65*.

### b. *Tellez, McCue, and May's notice during transport*

During transport, Tellez observed Mr. Lurry chewing on the illicit drugs he had earlier put in his mouth. *PSAF ¶23*. Moreover, the physical symptoms Mr. Lurry began manifesting during the eight-minute transport to the station further established that both these Defendants had notice of Mr. Lurry's medical needs.[7] *PSAF ¶21*. Mr. Lurry's deterioration during transport is clear – he was silent,

---

[7] McCue provides contradictory testimony regarding his observations of Mr. Lurry while enroute to the station. If McCue observed him, the notice requirement is satisfied because his overdose symptoms were evident as seen on the video. If not, notice is still satisfied because willful blindness is not a defense to notice. See *infra at p. 28.*

increasingly somnolent, blinking his eyes oddly and at times closing his eyes completely. *Id.* He was not able to right himself going over bumps and was not in a normal state of consciousness. *Id.* Evidence of Tellez's phone call to (likely) May in the car further solidifies his notice. *PSAF ¶20.*

### c. May, Harrison, and McCue's notice at the Joliet police station

May knew of Mr. Lurry's serious medical almost immediately after Mr. Lurry arrived at the station when Tellez approached him and told him what had transpired at the scene of the arrest, informing him that Mr. Lurry had put drugs in his mouth and ingested them. *PSAF ¶26.* As previously discussed, May also knew those drugs were ingested 16 minutes prior. *PSAF ¶2; see also p. 14, n.3.* Moreover, May believed that Mr. Lurry was a drug dealer and concedes that it was a well-known tactic for suspected drug dealers to conceal drugs by swallowing them. *PSAF ¶34.* Before getting into the car, May believed Mr. Lurry had drugs in his mouth and even believed that those drugs posed a choking hazard. *PSAF ¶33.* At that time, May also believed that Mr. Lurry was under arrest for possession of *cocaine* in particular. *Id.* We know this because May knew Mr. Lurry to be a cocaine dealer, and because during the JNU investigation just prior to Mr. Lurry's arrest, May and Harrison recovered cocaine from Ivan Davis, the individual who they observed purchase drugs from Mr. Lurry at the Speedway gas station. *DSF ¶¶9-14.* May was also aware that cocaine is often combined with opioids -heroin and fentanyl. *PSAF ¶¶53-55.* Finally, May was trained on and knew the symptoms of an opioid overdose: eyes rolling back into the head, appearing sleepy, becoming immobile or unable to move, not being able to speak, and showing an inability to comprehend what was occurring around them. *PSAF ¶¶29, 65.*

Not only did May have all this information, but he also admits that Mr. Lurry exhibited all the symptoms of an opioid overdose and even stated aloud that Mr. Lurry was "either not responsive or faking non-responsiveness" while McCue was ordering Mr. Lurry out of the car. *PSAF ¶29.* Then, when May finally went to the rear driver's side door, he struck Mr. Lurry and said, "wake up, bitch."

*PSAF ¶35*. The only logical conclusion to draw from the phrase "wake up" is that Mr. Lurry did not appear to be awake. Even more, when May entered the vehicle, McCue was performing a sternum rub on Mr. Lurry, the purpose of which was to arouse an unconscious or sleeping arrestee. *PSAF ¶31, 65*.

Harrison was also on notice of Mr. Lurry's medical need. In fact, Harrison was the one who ordered McCue to perform the sternum rub by digging his knuckles into Mr. Lurry's chest after observing that Mr. Lurry was looking around "blinking oddly" as if he was half asleep, not responding to verbal commands, and opening and closing his mouth as if he was trying to swallow something. *PSAF ¶30*. Harrison also knew Mr. Lurry to be somebody who would hide or "eat" drugs because a few weeks before the incident, members of his Tactical Unit had told him that they thought Mr. Lurry had swallowed drugs on him. *PSAF ¶32*. Like May, Harrison (who was the supervisor of the drug unit) also believed that Mr. Lurry had been arrested by Tellez and McCue for possession of cocaine and knew that cocaine was almost never pure and often mixed with heroin and fentanyl. *PSAF ¶¶53-56; DSF ¶¶9-14*.

Defendants' argument on this subject is not that these officers did not observe the symptoms of medical distress, but rather that they are not liable because they believed that Mr. Lurry was faking a medical emergency. This argument ignores that an arrestee who is unresponsive appears the same as an arrestee who is feigning unresponsiveness, something May himself admits. *PSAF ¶29*. It also ignores the fact the standard is not the officers' subjective interpretation of objective symptoms of medical distress, but the objective evidence itself. A similar argument was made by defendants in *Ortiz* and soundly rejected by the Seventh Circuit. *See Ortiz*, 656 F.3d at 533 (finding "nonsensical" the defendant's assertion that she was not on notice of arrestee's medical need where defendant received calls stating arrestee needed her medication or a doctor but believed caller could have been lying).

McCue was also aware of Mr. Lurry's medical distress at the station. When McCue opened the

door to the squad car, Mr. Lurry's eyes were closed, he was not moving, he appeared disoriented, and his breathing was shallow. *PSAF ¶¶27, 29*. McCue immediately told Mr. Lurry to "wake up," again suggesting that he did not believe Mr. Lurry to already be awake. *Id.* Mr. Lurry's only reaction was to briefly open his eyes and lift his head only to then immediately begin to blink his eyes oddly as if he was trying to focus his vision. *Id.* Within the next few seconds, Mr. Lurry's eyes rolled back in his head. *Id.* He did not otherwise make any movements or speak in response to McCue's order. McCue then said, "Let's go. What's wrong with you?" *Id.* If McCue did not believe there was something wrong with Mr. Lurry, there would have been no reason to ask that question. Mr. Lurry continued to blink oddly as his eyes rolled back. He did not (and likely could not) make any additional movements until he was struck the in face by May. *Id.*

      ii.  <u>Notice does not require specific knowledge.</u>

Defendants attempt to evade notice by arguing that they did not know precisely what Mr. Lurry had ingested, that he ingested any drugs or, if so, how much he ingested. There are two fatal flaws to this argument. The first is that "the question is not whether a particular defendant knew what was wrong with [Mr. Lurry], but rather whether the defendant, based on what [he] observed [himself] and learned from others, should reasonably have known that [Mr. Lurry] needed medical care." *Ortiz*, 656 F.3d at 533. Accordingly, the question on summary judgment "is whether a jury could find that it was objectively unreasonable for each defendant to take no action to seek medical care for [Mr. Lurry] based on what [the officer] knew at the time." *Id.* at 531-32; *Florek v. Village of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011) ("[T]he intuitive, organizing principle is that police must do more to satisfy the reasonableness inquiry when the medical condition they confront *is apparent* and serious and the interests of law enforcement in delaying treatment are low." (emphasis added)).

Here, there is no question that a jury could find that Mr. Lurry's medical need was apparent, and the notice prong was satisfied in light of Defendants' combined knowledge of the events prior to

his arrival at the station and while enroute to the station and his observed medical distress at the station as discussed *supra*. *See Royal v. Fort Wayne*, 2018 WL 4407691 (N.D. Ind., Sep. 17, 2018) ("jury could infer that the defendant officers were on notice that [decedent] may have ingested an unknown quantity of cocaine, which is a serious medical condition"); *Estate of Levingston v. County of Kern*, 2018 WL 1335410, *7 (E.D. Cal. Mar. 15, 2018) (plaintiff need not show that the defendant actually knew that decedent ingested drugs to prevail on a deliberate indifference claim, finding that a rational jury could find that a reasonable officer would have appreciated the degree of risk to decedent where defendant knew or suspected decedent was under the influence of methamphetamine when arrested).

The second flaw in Defendants' argument is that it ignores clear law that holds that officers cannot evade liability by claiming lack of notice where they willfully stick their heads in the sand to avoid it. *See Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994) (prison official cannot escape liability on denial of medical care claim if evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true or declined to confirm inferences of risk that he strongly suspected to exist); *Doe v. Galster*, 768 F.3d 611, 617-18 (officials "cannot escape liability by putting their heads in the sand . . ."); *see also Oswald v. Manlove*, 2019 WL 464135, at *13 (E.D. Wis.., 2019) (noting that defendants could not avoid liability for deliberate indifference as to health and safety risk faced by plaintiff where plaintiff told defendants he was sleeping on urine-soiled linens and blankets as jury could reasonably conclude that defendants should have confirmed whether plaintiff's statements were true and needed to be addressed in light of his known incontinence issues).

As previously discussed, Tellez made numerous statements with McCue by his side expressing his belief that Mr. Lurry had put narcotics in his mouth and swallowed them. *PSAF ¶7-8*. The only thing that Tellez and McCue did to determine where those drugs went after placing Mr. Lurry in handcuffs was to look on the ground where the struggle took place. *PSAF ¶28*. Despite finding nothing there, they did not search Mr. Lurry as required, ask him to open his mouth, or tell him to

spit out the drugs. *PSAF ¶¶10, 16*. They did not make any effort to monitor him whatsoever after placing him in the squad car alone for 4.5 minutes while they were still on scene. *PSAF ¶9*.

Once in the car, Tellez observed Mr. Lurry chewing on drugs over the course of 8 minutes and yet incredibly still made no effort to even inquire about what he was chewing on. *PSAF ¶¶21, 23*. And even though the monitor that allows officers from the front seat to monitor arrestees behind them was adjustable, Tellez did not adjust the screen to point it toward himself so he could better keep watch on Mr. Lurry while McCue was driving. *PSAF ¶22*. The Defendants' willful blindness and complete disregard to Mr. Lurry's health and safety must not be rewarded with immunity.

### iii. The severity of Mr. Lurry's medical need outweighed the scope of treatment.

Defendants essentially argue that Mr. Lurry's medical need did not qualify as serious until he stopped breathing and became completely unconscious instead of just going in and out of consciousnesses and exhibiting shallow breathing. This argument runs contrary to the facts, the law, and logic. "[T]he severity of the medical condition under [the Fourth Amendment] standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments. Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Williams*, 509 F.3d at 403. "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton*, 593 F.3d at 620 (citing *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999)). Courts have found in similar factual circumstances that the serious medical need begins at the point of narcotics ingestion. *See Chest v. City of Freeport*, 2011 WL 1225460 (N.D. Ill. Mar. 31, 2011) ("decedent ultimately did have a serious medical need, beginning at the point he ingested the cocaine"); *Royal v. Fort Wayne*, 2018 WL 4407691 ("jury could infer that the defendant officers were on notice

that [decedent] may have ingested an unknown quantity of cocaine, which is a serious medical condition"), *rev'd on other grounds*, *Royal v. Norris*, 776 Fed.Appx. 354 (7th Cir. 2019).

When balancing the seriousness of Mr. Lurry's condition here with the scope of the medical treatment that would have been required, it is absurd to argue this is a close question. Here, the scope of the requested medical treatment was twofold: (1) for the Defendants to have administered Narcan to Mr. Lurry as soon as he began exhibiting the symptoms of an overdose; and (2) for the Defendants to have called for paramedics to assess Mr. Lurry and take him to the hospital at any point before Mr. Lurry had ceased breathing and was completely unresponsive. The risk of death versus the minimal effort involved in making a phone call or administering Narcan – the reasonable choice is obvious.

Defendants argue that (1) paramedics administered Narcan with no effect, suggesting that if the officers had administered Narcan it would have been ineffective also; and (2) they had no reason to think about administering Narcan because Narcan is only an effective rescue drug for reversing an opioid overdose and that cocaine (the drug they believed Mr. Lurry had ingested) is not an opioid. The first argument fails because Plaintiff's medical experts make clear that Narcan works best the earlier it is administered and that had Mr. Lurry received it earlier during his intoxication, it is highly likely that he would have survived. *PSAF ¶67*. The reason why the paramedics' Narcan was ineffective was because it was administered after Mr. Lurry had suffered a cardiac arrest, which was too late. *Id.*

The second argument fails for numerous reasons. In 2020, drugs like cocaine were "cut up," meaning they were mixed with other substances like fentanyl and heroin and not pure. *PSAF ¶53*. In fact, as articulated by JNU team member, Officer Soustek, it would be exceedingly rare for cocaine on the streets to be pure and it was not at all unusual for it to be combined with heroin. *Id.* Moreover, just a few months before Mr. Lurry's death, the chief of police at the time, warned the public and his police officers that fentanyl was being combined with cocaine as well. *PSAF ¶¶54, 55*. And, finally, McCue and other officers were trained at the Academy that fentanyl was being mixed with cocaine

and heroin; it was common knowledge amongst officers. *PSAF ¶ 55*. Harrison and Tellez were trained to carry and administer Narcan, and all the Defendants were trained on how an opioid overdose presents in a victim. *PSAF ¶ 65, 66*. They all witnessed these symptoms, but nonetheless chose not to administer the life-saving drug to Mr. Lurry. *PSAF ¶¶ 25, 27, 29, 30, 66*.

Defendants cannot dispute that Mr. Lurry had a serious medical need, beginning at the point of drug ingestion and escalating from there. Tellez knew drug overdoses can be fatal and qualify as a medical emergency and that Mr. Lurry was at risk of an overdose and death once he placed narcotics in his mouth. *PSAF ¶ 17*. Tellez saw Mr. Lurry repeatedly chewing on the illicit drugs during transport, which he admitted carried with it the risk of a medical emergency. *PSAF ¶ 23*. Adding to Mr. Lurry's serious medical need was the fact that swallowing drugs contained in a plastic bag can and does result in death by asphyxiation from airway obstruction, something officers are trained in. *PSAF ¶ 17*.

Defendants minimize Mr. Lurry's state and mischaracterize what is in the video, at most conceding that Mr. Lurry appeared groggy and sleepy in the car but arguing that these symptoms are ambiguous. They cite *Braun v. Vill. of Palatine* and *Trevino v. Hinz* as support for their claim that they cannot be held liable for failing to immediately recognize these "ambiguous" symptoms. *Memorandum, p. 20*. What this argument conveniently overlooks is that Mr. Lurry's sleepiness or grogginess is by no means an ambiguous symptom in the context of what these Defendants knew, which is that Mr. Lurry had swallowed cocaine mixed with fentanyl and heroin.

Neither *Braun v. Vill. of Palatine,* 56 F.4th 542 (7th Cir. 2022) nor *Trevino v. Hinz*, 751 F. App'x 551 (5th Cir. 2018) have any applicability here because the facts are so drastically different. In *Braun*, the plaintiff was arrested for driving while intoxicated after suffering a seizure and crashing his car into a telephone pole. After telling the officers that he did not need medical care, was not injured and did not suffer from any medical conditions, officers called for paramedics anyway and he declined treatment when they arrived. *Braun,* 56 F.4th 542. After failing the field sobriety tests, he was taken to

the hospital for blood and urine tests. He suffered another a seizure later at the station. *Id.* The *Braun* court held that the plaintiff's appearance and behavior were entirely consistent with intoxication as opposed to a traumatic brain injury and that based on this, coupled with the plaintiff's statements to officers, there was no notice that Braun needed additional medical care. *Id.* Unlike *Braun*, Mr. Lurry's symptoms were entirely consistent with a drug overdose from the cocaine, fentanyl, and heroin that the Defendants knew Mr. Lurry had put in his mouth, chewed on, and ingested over 16-18 minutes.

In *Trevino*, the decedent surreptitiously ingested methamphetamine hidden in her pants while seated in a patrol car alone - a fact that "neither defendant had any way of knowing." *Trevino v. Hinz*, 751 F. App'x 551 (5th Cir. 2018). She began vomiting and shaking. *Id.* Unlike this case, the defendants in *Trevino* repeatedly asked her if she was hiding contraband on her person, whether she had medical issues, whether she had ingested drugs, and if she wanted an ambulance. *Id.* Trevino denied everything, so the officers did not call for EMS but instead monitored her carefully (something that the Defendants here failed to do). *Id.* The *Trevino* defendants contended they thought the decedent was faking a medical emergency to avoid going to jail. *Id.* In finding that the defendants did not act unreasonably, the court noted that the arrestee's symptoms of vomiting and shaking did not clearly indicate that she was undergoing an emergency needing immediate medical attention *since the defendants had no way of knowing she ingested drugs. Id. at 556*. Here, unlike *Trevino*, every Defendant knew that Mr. Lurry had ingested narcotics and knew that his symptoms were indicative of an opiate overdose. Try as they might to distance themselves from the facts of this case, the Defendants cannot avoid the fact specific inquiry that the law demands.

iv.   <u>Mr. Lurry's well-being was more important than any police interests at play.</u>

Because Defendants do not analyze Plaintiff's denial of medical care claim by explicitly applying the *Williams* factors to the facts present here, it is unclear whether this factor is even disputed. Defendants appear to make a half-hearted argument that their failure to procure medical attention for

Mr. Lurry sooner is justified by police interests, namely concerns raised by Mr. Lurry resisting being taken into custody on the scene and obtaining authorization of a strip search. *Memorandum, p. 19*. In doing so, Defendants ignore that any resistance by Mr. Lurry ended once he was placed in cuffs and that he was compliant when placed in the squad car. *DSF Ex. H*. As for Tellez's desire to expeditiously have a strip search authorized, the desire to obtain evidence for use in a future prosecution cannot justify failing to call for paramedics given the risks to Mr. Lurry from his drug ingestion, especially considering that taking Mr. Lurry to a hospital likely would have resulted in that same evidence being discovered and preserved anyway (pumping his stomach or other likely medical treatments would have caused Mr. Lurry's body to eject the drugs and a toxicology screen could have been obtained). Thus, any argument that police interests justified Defendants' failure to obtain medical care fails.

> v. <u>Defendants' conduct exacerbated Mr. Lurry's condition and contributed to his death, thus causing him harm.</u>

"Proximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation." *Gayton*, 593 F.3d at 624. The causation inquiry here is not whether the Defendants caused Mr. Lurry's death (though it was a significant contributing factor), but rather whether the Defendants' failure to provide adequate medical care in response to Mr. Lurry's serious medical need exposed him to substantial danger and caused him harm. *See id.* at 619; *Ortiz*, 656 F.3d at 535 (jury could infer from medical records and witness testimony that the defendants caused decedent harm when they failed to take her to the hospital after they knew she suffered from a serious medical condition); *see also Egebergh v. Nicholson,* 272 F.3d 925, 928 (7th Cir. 2001) (reversing summary judgment because a jury could infer that depriving arrestee of one insulin shot exposed him to substantial danger).

Just as in *Ortiz*, a jury here could infer from the evidence (video footage, medical records, etc.) that illustrated Mr. Lurry's rapid deterioration that Defendants' failure to administer Narcan or call for

EMS earlier caused him harm and unnecessary suffering. Plaintiff is not required to proffer expert testimony to establish adequate causation evidence to get to trial. *See Gayton*, 593 F.3d at 624; *Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir.2008) (holding that absent expert testimony, a jury could infer that the defendant's delay in providing care caused the plaintiff "many more hours of needless suffering for no reason."). However, though unnecessary, the opinions of Plaintiff's retained medical experts more than satisfy Plaintiff's burden on causation. Both Dr. Melinek (a forensic pathologist) and Dr. Johnson-Arbor (an emergency medicine physician and toxicologist) opined that had Mr. Lurry obtained medical attention earlier, including Narcan, he likely would have survived. *PSAF ¶67.*

Finally, Defendants grossly downplay the significance of a three-minute time lapse from the moment that Tellez and McCue arrived at the station until EMS was called. This lapse was significant because the longer an individual is exposed to a drug, the higher the dose of the drug he will be exposed to and the more likely it is that he will die. *PSAF ¶58.* Dr. Johnson-Arbor made clear that had Mr. Lurry received medical care when he arrived at the station, his chances of survival would have been substantially higher. *PSAF ¶67.* Moreover, during those three minutes, May and McCue exacerbated Mr. Lurry's deteriorating medical condition by cutting off his oxygen supply and making his death even more likely. *PSAF ¶¶71, 73.* Defendants' behavior during these three minutes determined Mr. Lurry's fate, and the idea that any second of this time was insignificant is preposterous.

**IV.     Defendants are not entitled to qualified immunity on Plaintiff's denial of medical care claim.**

Defendants' argument for qualified immunity on the failure to provide medical care claim is that they did not know that they had a duty to call for EMS sooner than they did. This is false and flies in the face of their own admissions, training, and common practices that dictates that officers are to call for an ambulance if they believe that an arrestee has put drugs in his mouth and/or swallowed drugs, irrespective of whether the arrestee is exhibiting physical manifestations of a drug overdose. *See*

*PSAF ¶¶ 12, 13, 17, 50, 51.* Their admitted knowledge of this duty does not alone doom their argument for qualified immunity; so too does the egregiousness of their actions and controlling case law.

### A. Defendants' conduct was so egregious that it precludes a finding of qualified immunity.

The egregiousness of the Defendants' conduct that led to the death of Mr. Lurry in this case is demonstrated by not just by the appalling facts, but also by how others (including the Joliet Police Department and their fellow officers) viewed their conduct.

***Tellez -*** For Tellez's part, aside from his co-Defendants' admissions that JPD officers are trained to call for EMS for an arrestee who they suspect has placed drugs in his mouth, Tellez admits to inexplicably deviating from his customary practice by failing to even ask Mr. Lurry to spit out the drugs or to open his mouth after strongly suspecting that he had put narcotics in his mouth and swallowed some of them. *PSAF ¶¶13, 15.* This is particularly important because on the five prior occasions that Tellez had encountered this situation, simply talking to the arrestee had been a successful method in getting the arrestee to spit out the drugs. *Id.* Not only that, but both Parties' police procedures experts agreed that Tellez and McCue should have searched and located the drugs they suspected to be in Mr. Lurry's mouth and on his person before transporting him to the station. *PSAF ¶68.* In fact, Tellez was disciplined for failing to perform that search by the Joliet Police Department and even more, he admits that his failure to search Mr. Lurry was unreasonable. *PSAF ¶¶14,77.* The fact that Tellez, his fellow officers, the Joliet Police Department, and two former high-ranking law enforcement officers who are now police procedures experts recognize the egregiousness of Tellez's conduct is enough to establish that no reasonable officer would have believed he was acting lawfully. The failure to search is relevant to the failure to provide medical attention claim because a proper search would have prevented Mr. Lurry's from continuing to consume the drugs over the next 16 minutes, so his medical emergency and death would have been averted altogether. *PSAF ¶¶16, 47.*

The egregiousness of Tellez's conduct continued when he chose to leave Mr. Lurry alone and unmonitored at the scene in the back of the squad car for 4.5 minutes while still believing he had narcotics on his person, in his mouth, and in his body from ingestion. *PSAF ¶¶7- 9.* To make things worse, once Tellez and McCue finally entered the squad car, they made no real effort to monitor Mr. Lurry aside from a few quick glances. *PSAF ¶21.* The two times Tellez bothered to look at Mr. Lurry, Tellez saw him chewing, yet inexplicably said and did nothing after making these observations. *PSAF ¶23.* Then, when he observed Mr. Lurry in the backseat of the squad car displaying symptoms of an opioid overdose that were consistent with his training (including demonstrating difficulty keeping his eyes open, being unable to speak and appearing disoriented, exhibiting shallow breathing, and not being responsive to pain stimuli), Tellez chose not to administer Narcan. *PSAF ¶¶25, 65-67.* And finally, instead of calling for EMS when May announced that Lurry was "unresponsive" just before May entered the squad car, Tellez turned off the camera with the intention of concealing May's egregious use of force (something else Tellez was disciplined for). *PSAF ¶¶29, 39, 77.*

**May -** May knew that chokeholds were prohibited. *PSAF ¶42.* That's why he denies using one, despite significant evidence to the contrary. As previously established, May was aware Mr. Lurry had ingested cocaine during the struggle that he heard on the radio more than 16 minutes before he squeezed Mr. Lurry's neck and nose. *PSAF ¶¶2, 20, 26.* May knew that Mr. Lurry was under arrest for possession of cocaine and that cocaine was combined with dangerous opioids. *PSAF ¶¶33, 53-55.* He also knew the symptoms of an opioid overdose, observed Mr. Lurry exhibit those symptoms and not only ignored them, but also took action to further restrict Mr. Lurry's breathing and make his death more likely. *PSAF ¶¶29, 40, 42, 69-71.*

**Harrison** - Harrison, who specifically knew Mr. Lurry to "eat" drugs to conceal them from police officers, and to be a cocaine dealer, also believed that Mr. Lurry had been arrested by Tellez and McCue for possession of suspect cocaine. *PSAF ¶¶32, 56.* Harrison was also aware that cocaine,

fentanyl and heroin were often combined. *PSAF ¶¶53-55*. When he observed Mr. Lurry at the station while McCue was trying to get him out of the car, Harrison immediately saw that Mr. Lurry was blinking oddly as if he was half asleep, was not responding to verbal commands, and was chewing but ordered McCue to perform a sternum rub rather than calling for EMS. *PSAF ¶¶30, 47*. When McCue's sternum rub that he ordered was visibly ineffective, Harrison's belief that Mr. Lurry was feigning a medical emergency was patently unreasonable. Yet rather than call for medical assistance, Harrison simply watched as May suffocated Mr. Lurry instead. *PSAF ¶¶41, 46*.

**McCue** - McCue saw Mr. Lurry displaying the same overdose symptoms he was trained to look for while enroute to the station. *PSAF ¶¶21, 25, 68*. If there was any doubt, his observations at the station clearly indicate that Mr. Lurry was experiencing a medical emergency. As discussed in detail *supra,* from the moment that McCue opened the back door of the squad car, he knew there was something wrong with Mr. Lurry and expressed verbally expressed it. *PSAF ¶27*. Yet, instead of calling for medical help, he unreasonably made Mr. Lurry's condition worse by using his baton as a probe within Mr. Lurry's mouth. *PSAF ¶45*.

If any of these Defendants questioned whether their conduct was lawful, they need only turn to case law. What they would find however, is just as important as what they would not find. It is true that there is no case law where the facts are exactly analogous to the facts here, though for Mr. Lurry's rights "to be established clearly, however, there is no need that 'the very action in question [have] previously been held unlawful.'" *See Safford Unified Sch. Dist. No. 1,* 557 U.S. 364 (citation omitted) Indeed, in every case in this nation that involves an arrestee suspected of swallowing and/or consuming illegal narcotics, unlike here, the suspicious officer commanded that the arrestee spit out the drugs, asked the arrestee if he had drugs in his mouth, and/or asked the arrestee to open his mouth before using force or calling EMS. Moreover, the defendants in those cases called for medical assistance at the first sign of overdose symptoms. They did not first strike the arrestee to determine

whether his medical emergency was in fact a real one or squander precious time further harming the arrestee by restricting his airway as he was going in and out of consciousness. *See Ellis*, 2009 WL 1663454 (calling for an ambulance as soon officers saw that bag of drugs in mouth had broken); *Chest*, 2011 WL 1225460 (calling 911 for medical assistance as soon as arrestee who was believed to have swallowed drugs exhibited symptoms).

The reason why all these cases do not involve the facts that exist here – where the Defendants did nothing whatsoever after suspecting that Mr. Lurry had consumed deadly narcotics– is because reasonable police officers would not behave in such an egregious manner. Reasonable police officers are aware of their duty to investigate their well-grounded, strong suspicions by asking questions and monitoring an arrestee for signs that would expel or verify those suspicions. They are also aware of their duty to call for EMS immediately when their suspicions are realized and symptoms of an overdose are present.

**B. Defendants are not entitled to qualified immunity where they fail to adequately respond to known or suspected drug overdoses.**

Since at least 2010, the "failure to take *any* action in light of a [detainee's] serious medical need" has precluded qualified immunity. *Estate of Perry v. Wenzel,* 872 F.3d 439, 460 (7ᵗʰ Cir.2017). An arrestee has a clearly established right to prompt medical care. *Acosta v. City of Chicago*, No. 15 CV 8333, 2018 WL 3630011, at *7 (N.D. Ill. July 3, 2018). "A condition can be 'obvious' to a layperson even where he or she is unable to diagnose or properly identify the cause of an observed ailment." *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 432 (7th Cir. 2017) (reversing summary judgment for officers where detainee died of methadone overdose).

Multiple federal courts have found denial of medical care claims cognizable when law enforcement officers and/or prison officials have failed to adequately respond to known or suspected drug overdoses. *See Border v. Trumbull Cty. Bd. of Comm'rs*, 414 Fed.Appx. 831, 837– 39 (6th Cir. 2011) (denying qualified immunity where officer believed decedent was under the influence of narcotics and

decedent was severely intoxicated and obviously disoriented); *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005) ("Each officer viewed Owensby in significant physical distress, yet made no attempt to summon or provide any medical care until several minutes later, when [one officer] checked on Owensby and discovered that he was not breathing. This evidence is sufficient to demonstrate that each officer's failure to provide medical care to Owensby constituted a violation of the Fourteenth Amendment."); *Estate of Lawson ex rel. Fink v. City of Hamilton*, 2009 WL 1444556, at *17 (S.D. Ohio May 21, 2009) (denying qualified immunity where officer was aware decedent was under the influence of some unknown drug); *Pryor v. Dearborn Police Dep't*, 452 F. Supp. 2d 714, 719–21 (E.D. Mich. 2006) (denying summary judgment where officers were aware of symptoms of a drug overdose after arrestee swallowed cocaine and yet failed to summon medical assistance).

Defendants' failure to administer Narcan to Mr. Lurry when they were trained in it and it was easily accessible is also patently unreasonable and violated Mr. Lurry's clearly established rights. *See McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) (concluding officer who was trained in but did not perform CPR on unconscious prisoner for seven minutes not entitled to qualified immunity).

The facts here are remarkably like those in *de Tavarez v. City of Fitchburg*, where the court found that the defendants were not entitled to qualified immunity on plaintiff's denial of medical care claim. *de Tavarez v. City of Fitchburg*, 2014 WL 533889 (D. Mass. Feb 6, 2014). In *de Tavarez*, the decedent died in police custody following drug ingestion. The defendant officers, Maki and Siciliano, were conducting surveillance and stopped the vehicle occupied by Perez. *Id.* at *1. Upon their approach, Siciliano, observed Perez "going into his mouth." *Id.* Siciliano "probably" told one or more officers that Perez had swallowed something during the arrest. *Id.* In the area where Perez had been sitting, Maki observed plastic bags of suspected narcotics, along with a bag that looked like it had been torn open but did not observe residue or saliva on any bag. *Id.* Maki claimed that he asked Perez if he swallowed anything or wanted to go to the hospital, but the plaintiff disputed this. *Id.* at *1, *4. Perez

was arrested for possession and did not exhibit any signs of being under the influence of any substance or being sick during the thirty minutes they were at the scene waiting for transport. *Id.* Perez was taken to the police department. Maki noted in his arrest report that Perez "swallowed something from another plastic bag when the vehicle was stopped." *Id.*

The next morning, when officers delivered breakfast, Perez appeared to be sleeping. *Id.* When they delivered lunch, they saw foam coming out of his mouth, and Perez was then transported to the hospital by ambulance. *Id.* Almost 24 hours after he was first suspected of swallowing narcotics, Perez died at the hospital of opiate intoxication. *Id.* at 3. The *de Tavarez* court held that the facts showed "that Maki knew that there existed a high risk of harm to Tavarez Perez but did nothing to address it" and "in light of the specific context of this case, a reasonable officer in Maki's position would know that not providing medical care to one who ingested narcotics would be a violation of constitutional rights. *Id.* at 4. (internal quotations omitted).

The parallels between Maki and the Defendants here are obvious – both reasonably suspected that their arrestee had swallowed narcotics and yet both did not inquire as what, if anything, had been swallowed. The facts in the instant case are even more egregious given that in *de Tavarez* it was undisputed that Perez showed no signs of sickness until after he was booked. Here, Mr. Lurry began exhibiting symptoms of an opioid overdose during transport and was in and out of consciousness when he arrived at the station. *PSAF ¶¶25, 28-30.* Further, Maki's suspicions of drug ingestion were based on what he heard Siciliano say on scene and from his observations of plastics bags containing suspect narcotics in the area where Perez had been seated. Here, Tellez's suspicions (then broadcast to McCue verbally) were based on feeling a racquetball sized bag of "dope" in Mr. Lurry's pants and seeing him make motions towards his mouth as they were taking him into custody. *PSAF ¶¶1-2.* His suspicions were cemented when he observed him chewing on at least two occasions during transport. *PSAF ¶23.*

i. <u>The cases Defendants cite in support of their claim that they are entitled to qualified immunity are easily distinguished.</u>

All the cases cited by Defendants to support their argument for qualified immunity are distinguishable. They assert that "federal courts do not hold that police officers must immediately summon medical care if they suspect that an arrestee has ingested some unspecified amount of an unknown drug" and that mere suspicion without actual knowledge is not enough. *Memorandum, pp. 17-18*. Not only does this argument ignore the fact that concrete knowledge as to what someone has ingested is unavailable to all officers absent drug testing a substance on scene by way of a mobile laboratory (which obviously does not happen), it also frames the inquiry much too broadly. *See Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (noting that qualified immunity inquiry "must be undertaken in light of the specific context of the case").

a. *Chest v. City of Freeport*, 2011 WL 1225460 (N.D. Ill. Mar. 31, 2011)

Defendants' reliance on *Chest* to support their argument that officers are not required to summon medical help without first obtaining the weight and chemical composition of the ingested drug is misplaced. In *Chest*, just before stopping a van occupied by the decedent, Pendleton, for a traffic violation, officers saw Pendleton put something in his mouth and drink from a bottle shaped object. Later, after Pendleton was stopped and while still handcuffed, officers observed that he had something in his mouth. *Chest*, 2011 WL 1225460 at *1. The defendants later found two empty plastic baggies and asked Pendleton if he had anything in his mouth. Pendleton did not answer but instead swallowed. When asked by the defendants what he swallowed, Pendleton responded by saying "a pencil." Pendleton displayed no symptoms of an overdose at the scene of the arrest or during transport. After arriving at the station, defendants continued to repeatedly ask him what he swallowed and whether he swallowed any drugs and Pendleton continued to insist that he only swallowed a pencil. When Pendleton began to convulse and fell to the floor, the officers called 911.

Here, unlike in *Chest*, no officer even spoke to Mr. Lurry much less asked him questions about what was in his mouth despite their earlier observations and strong suspicions. Contrary to *Chest*, Tellez felt the bag, knew it was large, and then saw Mr. Lurry put it in his mouth. Officers in *Chest* had no evidence that Pendleton had drugs on him aside from empty plastic bags. Here, unlike Pendleton, Mr. Lurry did not provide any alternative explanation for what was in his mouth. And finally, unlike the officers in *Chest*, when Mr. Lurry exhibiting signs of an overdose, Defendants did not call for EMS. The court's finding of reasonableness in *Chest* is due to facts that simply are not present in this case.

      *b.*   *Sanders v. City of Dothan,* 409 F. App'x 285 (11th Cir. 2011)

Defendants misleadingly cite to *Sanders* for the proposition that "even when officers *strongly suspect* that an arrestee has swallowed illicit drugs, if there are no signs of medical distress, or request [for] medical attention or treatment," officers do not violate the Constitution when they transport such a person to jail rather than a hospital. *Memorandum, p. 18*. This misconstrues the holding of *Sanders* altogether. The court in *Sanders* found it was reasonable for the defendants to drive Sanders to the jail for booking instead of the hospital because the officers first, repeatedly asked him if he had swallowed drugs (which he denied) and explained that they would drive him to the hospital for his safety if he had. Here, there was no effort made to investigate what Mr. Lurry may have ingested, despite their own testimony that it is their normal practice to do so.

      *c.*   *Long v. City of La Habra, 2005 WL 2219442 (9th Cir. Sept. 14, 2005)*

Defendants similarly mischaracterize the holding in *Long v. City of La Habra* by stating that "[the *Long*] court has gone so far as to hold that suspicion that an arrestee 'had swallowed something' and showed signs of drug intoxication did not alert officers to 'specific risk of drug overdose.'" *Memorandum, p. 19*. But in *Long* (as in *Sanders*). "Long denied having used drugs, coherently answered questions, and exhibited no signs of drug use other than dilation of her pupils…" Then, as soon as

42

she began to exhibit signs of distress "[the officer] immediately called the paramedics." *Long v. City of La Habra*, 2005 WL 2219442 (9th Cir. Sept. 14, 2005). Not so here.

> d.   *Weaver v. Shadoan,* 340 F.3d 398 (6th Cir. 2003) *& Trevino v. Hinz,* 751 F.App'x, 551 (5th Cir. 2018)

Defendants cite to *Weaver* and *Trevino* as support for their argument that it was reasonable for May to believe that Mr. Lurry was feigning a medical emergency. In *Weaver*, unlike here, the defendants did not have any knowledge that Weaver had ingested cocaine. They simply knew that he put something in his mouth. When they requested that he open his mouth, he swallowed. *Weaver v. Shadoan*, 340 F.3d 398, 402 (6th Cir. 2003). Weaver repeatedly denied swallowing any drugs. When Weaver began shaking violently and slumping over in the car, paramedics were immediately summoned. While waiting for EMS, the officer checked Weaver's vital signs which appeared normal. The paramedics did not observe any signs of drug ingestion and Weaver appeared to EMS to be alert and oriented. Weaver also refused to be taken to a hospital, and the paramedics determined he did not need emergency treatment. Within a few minutes after EMS left, Weaver appeared ill again and upon arriving at the jail, he was mumbling and had to be carried in as he could not walk. The defendant told jailers he believed Weaver was "faking" his illness.

In finding no deliberate indifference for failing to call paramedics a second time, the court relied on the officers' knowledge of the first time that paramedics were called, noting: "When the paramedics were first called to the police station Weaver went from exhibiting seizure-like symptoms to being alert, oriented, coherent, and medically cleared for transportation to jail. Based on this first episode, it would not be unreasonable for [the defendant] to discount the significance of Weaver's second set of symptoms during his transportation to the jail." *Id. at 412*.

Here, there was no effort to check Mr. Lurry's vital signs or to summon paramedics before he stopped breathing, even though he was showing objective signs of an overdose. *PSAF ¶47*. There was also no effort to ascertain what, if anything, he swallowed or how much. *PSAF ¶10, 21, 23*. By the

time paramedics arrived to evaluate Mr. Lurry, he was pulseless and not breathing. *PSAF ¶47.* There was no prior medical clearance that would suggest he was faking his symptoms. Here, and unlike the officer in *Weaver*, Defendants' belief that Mr. Lurry was feigning a medical emergency was baseless.

As previously discussed, Defendants' reliance on *Trevino* similarly fails. *See above, pp. 32-33.*

e. *Royal v. Norris,* 776 Fed.Appx. 354 (7th Cir. 2019) & *Sallenger v. City of Springfield, Ill., 630 F.3d 499, 504 (7th Cir. 2010).*

Defendants curiously cite to *Royal* for the proposition that Mr. Lurry's turning away from the camera while chewing drugs in the backseat is tantamount to explicitly denying that he had drugs in his body or needed medical attention. *Royal* is not helpful to Defendants as it clearly illustrates everything the Defendants should have done to comport themselves reasonably. *Royal v. Norris,* 776 Fed.Appx. 354 (7th Cir. 2019).

In *Royal*, after being put on notice that the decedent might have swallowed cocaine, defendants repeatedly asked him whether he had swallowed any, asked how he felt, explained the danger of ingesting cocaine, and assured the arrestee that he would not face additional criminal penalties for telling them if he had. *Id.* Despite the plaintiff's lucid and categorical denials that he had swallowed any cocaine, the defendants nonetheless asked paramedics to independently evaluate him, leading to a determination that he did not require medical care. The Seventh Circuit found that the defendant officers acted reasonably and did not violate clearly established law. As already discussed to the point of exhaustion, the facts in this case are simply nowhere near the same.

Defendants' reliance on *Sallenger v. City of Springfield, Ill.,* 630 F.3d 499, 504 (7th Cir. 2010) demonstrates is far-fetched. Acknowledging that *Sallenger* is not "an overdose case," they cite to it as support for the proposition that "the duty to call for medical assistance arises when an arrestee is unconscious, not breathing, or both." *Memorandum, p. 22.* This sentence contradicts a mountain of established case law on denial of medical care claims. An individual does not have to be "unconscious, not breathing, or both" in order for law enforcement officials to be obligated to call for medical

assistance. *See Grieveson*, 538 F.3d at 779 ("delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a [medical treatment] claim"); *McGowan v. Hulick*, 612 F.3d. 636, 640 (7th Cir. 2010) ("[d]elay is not a factor that is either always, or never, significant. Instead, the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.) It is frankly ludicrous to contend that the duty to obtain medical care for an arrestee is triggered by only these two symptoms – medical needs can and do run the spectrum.

A careful analysis of the egregiousness of Defendants' conduct and of the case law concerning similar situations makes clear that the Defendants are not entitled to qualified immunity.

## V. A jury could reasonably conclude that Defendants failed to intervene in their co-Defendants' misconduct.

Defendants' argument for dismissal of Plaintiff's failure to intervene claim hinges on their ability to prevail in dismissing the underlying constitutional violations of excessive force, unlawful search, and failure to provide medical attention. Given that the evidence set forth by Plaintiff establishes that those constitutional violations must survive summary judgment, so too does the failure to intervene claim. As such, Defendants' request to dismiss this claim should be denied.[8]

## VI. Harrison is not entitled to summary judgment on the supervisory liability claim.

With regards to the supervisory liability claim against Harrison, "supervisory liability will be found…if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct. and the basis for it." *Lanigan v. Vill. of East Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997) (citations omitted). "The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.*

---

[8] Defendants have made no substantive arguments about the validity of the failure to intervene claim. As a result, any such arguments have been waived. Even so, Plaintiff has presented evidence that Defendants were in the immediate vicinity of one another at the time of the constitutional violations demonstrating that they had the opportunity and ability to intervene, but failed to do so. *PSAF ¶46.*

The conduct at the crux of this claim is May's nose pinch, McCue's use of the baton, and the failure to call for an ambulance for Mr. Lurry after observing him in clear medical distress. Harrison observed May pinching Mr. Lurry's nose closed. *PSAF ¶41*. Harrison then directed McCue to put the baton in Mr. Lurry's mouth. *PSAF ¶45*. If the jury finds McCue's baton probing to be unlawful, Harrison may be found liable for ordering him to do it. As for the failure to call for medical assistance sooner, Harrison admits that he observed that Mr. Lurry was in medical distress and ordered McCue to perform a sternum rub because of it and yet took no action to call for EMS himself or to have anyone administer Narcan to Mr. Lurry. *PSAF ¶30, 45-47*. Here, there is ample evidence that Harrison was involved in, approved, and tacitly condoned this misconduct. Summary judgment must be denied on this claim.

## VII. Defendants are not entitled to summary judgment on any of the state law claims.

### A. Plaintiff's willful and wanton conduct claim survives summary judgment.

Plaintiff has established that the facts as taken in her favor are such to establish that Defendants acted unreasonably in denying medical care to Mr. Lurry when they were on notice he had a serious medical need. Based on those same facts, a jury can conclude that the Defendants acted willfully and wantonly in ignoring Mr. Lurry's serious medical need until he had stopped breathing (despite obvious signs of deterioration) and by exacerbating his condition and contributing to his death by further restricting his breathing. Were a jury to conclude that Defendants knew Mr. Lurry was in need of immediate medical care and delayed it, they could (and likely would) find that Defendants' actions were willful and wanton. Summary judgment on this claim should be denied.

### B. Plaintiff's wrongful death, survival action & battery claims survive summary judgment.

Because Plaintiff has established that there is evidence to conclude that Defendants acted unreasonably in denying and delaying medical treatment to Mr. Lurry, these claims cannot be dismissed as a jury can also thus conclude that Defendants' actions resulted in Mr. Lurry's death. This

is especially true given the experts' testimony that the Defendants' conduct exacerbated Mr. Lurry's condition and contributed to his death. *PSAF ¶67, 69-73*. Likewise, because Plaintiff has established that there is evidence to conclude that May and McCue acted unreasonably in using force against Mr. Lurry, these claims cannot be dismissed as a jury can also thus conclude that Defendants' actions were willful and wanton and constitute battery under Illinois law.

### C. Spoliation[9]

"Under Illinois law spoliation of evidence is treated as a negligence action." *Duran v. Town of Cicero*, 653 F.3d 632, 644 (7th Cir.2011) (citing *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 270–71 (1995)); *see also Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509-10 (7th Cir. 2007). "Accordingly, a plaintiff claiming spoliation of evidence must prove that: (1) the defendant owed the plaintiff a duty to preserve the evidence; (2) the defendant breached that duty by losing or destroying the evidence; (3) the loss or destruction of the evidence was the proximate cause of the plaintiff's inability to prove an underlying lawsuit; and (4) as a result, the plaintiff suffered actual damages." *Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22, 27 (Ill. 2012). Although true that there is generally no duty to preserve evidence, a "voluntary undertaking" may give rise to such a duty, particularly where "a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action." *Id.* at 28. A voluntary undertaking requires a showing of affirmative conduct by the defendant evincing defendant's intent to voluntarily assume a duty to preserve evidence. *Boyd*, 652 N.E.2d at 731 (citing *Nelson v. Union Wire Rope Corp.*, 199 N.E. 2d 769 (1964).

The evidence at issue here is the perimeter camera footage and the in-car camera audio that was not captured because Tellez intentionally turned off the in-car camera after May struck Mr. Lurry. Mr. Lurry died on January 29, 2020, within 24 hours of being taken into custody. Defendants should

---

[9] Plaintiff reserves her right to move for an adverse inference instruction at trial in accordance with this Court's deadlines on pretrial motions.

have and did in fact foresee that the perimeter camera footage depicting the parking lot where Mr. Lurry took his last breath during CPR would be pivotal to a future civil case. In fact, Phillip Bregner, a former 13-year Joliet police detective, informed investigators who were contracted to search for the missing perimeter video that it was JPD's practice to download and save videos related to such a significant incident. *PSAF ¶79*. Those investigators also concluded that the Joliet Police Department should have maintained a copy of the perimeter video. *Id.* The materiality of the audio from the in-car camera footage (that was not captured because Tellez intentionally turned off the video) to future litigation is obvious. Thus, Defendants' duty arose by virtue of foreseeability alone. However, foreseeability was not the only thing that triggered their duty to preserve the perimeter camera footage. Defendants also assumed a duty to preserve by their affirmative conduct in immediately preserving the in-car camera footage and audio recordings of dispatch communications.

There was also a "special circumstance" requiring Defendants to preserve the perimeter video. Contrary to Defendants' contention, well within 60 days of the incident, on March 2, 2020, Plaintiff's counsel, Ms. Bakos, issued a preservation letter to the City of Joliet Police Department requesting that all evidence pertaining to the encounter between Defendants and Mr. Lurry be preserved. *See Kilburg v. Mohiuddin*, 2013 IL App (1st) 113408, Para. 24 (finding of special circumstance where plaintiff's counsel sending a letter three days after a traffic accident to taxi driver to preserve event data recorder); *Martin*, 979 N.E. 2d at 31 (request by plaintiffs to preserve evidence can act to create a duty for defendants to preserve evidence).

Defendants breached their duty when Tellez took action to turn off the in-car camera before the incident was over and when Defendants failed to archive or otherwise preserve the parking lot footage from the incident date. *See Boothe v. Wheeling Police Officers*, 190 F.Supp.3d 788, 801 (N.D. Ill. 2016). By preserving all other evidence relevant to this encounter other than the parking lot video, the jury could infer that Defendants destroyed it because it was helpful to Plaintiff. *See Stoner v. Wal-Mart*

*Stores, Inc.*, 2008 WL 3876077, at *4 (C.D. Ill. Aug. 18, 2008) (motion to dismiss spoliation claim denied where Wal-Mart employees segregated and preserved some of the relevant footage but destroyed the footage that had the most potential to help the plaintiff); *Await v. Marketti*, 74 F.Supp.3d 909, 946 (N.D. Ill. Nov. 24, 2014).

The third and fourth elements necessary to state a valid cause of action in negligence are causation and damages. Here, the lost audio and video evidence could very well be a proximate cause of Plaintiff's inability to win this litigation. Because of how the in-car camera works, there is video footage after Tellez stopped the recording, but no audio. If Tellez had not turned off his dashcam when he did, the audio that is now missing would have cast light on May's observations of Mr. Lurry's deteriorating condition, may have captured sounds of Mr. Lurry struggling to breathe and conversation between Defendants shedding light on who knew what and when. This is especially important because none of the Defendants can recall most of anything that was said during that time aside from a few statements that just so happen to be favorable to their defense.

The missing perimeter video footage is also crucial evidence because key parts of the interaction at issue occurred in the parking lot area that would have been captured by that video. When officers performed CPR on Mr. Lurry in the parking lot, he coughed up a plastic bag that he had been asphyxiating on. *PSAF ¶48*. Dr. Melinek's opinion that Mr. Lurry asphyxiated was premised on the testimonial evidence of Officer Steurer regarding the coughed-up baggie. Dr. Johnson-Arbor relied on the same testimonial evidence in opining that May and McCue's actions exacerbated his asphyxia. Video evidence would have provided additional crucial information as to when precisely Mr. Lurry coughed up the bag as well as the size of the bag, which would inform the medical opinions as to asphyxiation.[10] Additionally, it would have also conclusively established where Harrison and Tellez

---

[10] Notably, even Defendants' own emergency medicine expert, Dr. Smock, admitted that if Steurer's testimony is taken as true (as it must be for the purposes of this motion), it would indicate that Mr. Lurry had an airway obstruction. Ex. 7, 149:18-150:5.

were positioned during the critical events that unfolded while May and McCue were in the backseat, information that is crucial to Plaintiff's failure to intervene and supervisory liability claims.

Because of the lack of audio and video footage, the only evidence available for certain significant portions of the encounter is documentary and testimonial evidence only. Video evidence may "tell[ ] quite a different story" than documentary and testimonial evidence. *Scott,* 550 U.S. at 379, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *see also Thompson v. Mercer*, 762 F.3d 433, 439 (5th Cir.2014) ("[T]he Thompsons' characterization of the scene is belied by the video evidence."); *United States v. Marcavage*, 609 F.3d 264, 285 (3d Cir.2010) ("The video evidence ... tells a very different story from the one the government evoked at trial.").

Defendants are not entitled to summary judgment on this claim. *See*, 190 F.Supp.3d at 801 (denying defendant's motion for summary judgment on plaintiff's spoliation count in Section 1983 case where surveillance video of the incident in question contained a 69 second gap during plaintiff's arrest at a time when defendants were allegedly using unlawful force).

### D. *Monell*

Plaintiff's *Monell* claim has been bifurcated. Because Plaintiff has offered facts in support of her underlying claims from which a jury could determine that Defendants violated Mr. Lurry's constitutional rights, Defendants are not entitled to summary judgment on this claim.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully asks this Court to deny Defendants' motion for summary judgment in its entirety. This case should be decided by a jury.

Respectfully submitted,

*/s Abby D. Bakos*
For Plaintiff

*/s Ronak P. Maisuria*
For Plaintiff

Abby D. Bakos
Ronak Maisuria
Bakos & Maisuria Law Group, LLC
1755 Park St., Ste. 200
Naperville, IL 60563
833.800.2654
ronak@bakosmaisuria.com
abby@bakosmaisuria.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that she served a copy of the foregoing upon all

attorneys of record via CM/ECF Filing system on June 15, 2023.

/s *Abby D. Bakos*
For Plaintiff

/s *Ronak P. Maisuria*
For Plaintiff

Bakos & Maisuria Law Group
1755 Park St., Ste. 200
Naperville, IL 60563
833.800.2654