UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE LURRY, as Special Administrator of the Estate of Eric Lurry, Jr., deceased, | ) ) ) | |
| Plaintiff, | ) ) | No. 20-cv-4545 |
| v. | ) ) ) | Judge Jeffrey I. Cummings |
| CITY OF JOLIET, JOLIET POLICE OFFICERS MAY (Star #056), MCCUE (Star #118), TELLEZ (Star #311), and LT. HARRISON (Star #039), | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Eric Lurry, Jr. was arrested on January 28, 2020 after Joliet police officers reportedly observed him engaging in a hand-to-hand drug sale. Lurry was taken into police custody, and he died of a drug overdose less than 24 hours later in Presence St. Joseph's Hospital. This case concerns the conduct of four defendant Joliet police officers (Lieutenant Jeremy Harrison, Sergeant Doug May, Officer Jose Tellez, and Officer Andrew McCue (collectively, the "Officers")) who were involved in Lurry's arrest and responsible for his custody prior to when paramedics took him to the hospital.

Plaintiff Nicole Lurry, Lurry's widow and the special administrator of his Estate, asserts that the Officers violated Lurry's constitutional rights by failing to promptly summon medical assistance for him. In particular, plaintiff maintains that Lurry placed one or more baggies containing narcotics into his mouth shortly after he was arrested but before he was placed in a police squad car; one officer (Tellez) knew that Lurry had drugs in his mouth and had possibly swallowed them prior to when Tellez and McCue transported Lurry from the scene of his arrest;

1

and the other three officers learned of these facts and that Lurry was in physical distress while Lurry was transported to the police station or shortly after his arrival. Despite this, the Officers waited more than thirteen minutes from the time Tellez voiced his concern that Lurry had ingested drugs to other officers on the scene until *after* Lurry had completely stopped breathing to call for medical assistance.

Plaintiff further asserts that the Officers violated Lurry's constitutional rights by subjecting him to excessive force after they realized that Lurry had ingested drugs and by failing to intervene to stop the use of such force. Specifically, May forcefully struck a semi-conscious Lurry in the face and called him a "bitch" while Lurry was handcuffed and not resisting in the back of McCue's squad car. May then cut off Lurry's airway and ability to breathe for forty-eight seconds by pinching Lurry's nose closed and squeezing Lurry's neck and then his jaw. Then McCue, at the direction of Harrison, shoved his police baton into Lurry's mouth in an effort to remove the baggies that had contained drugs. Lurry later coughed up a portion of a baggie as he was being administered CPR by non-defendant officers. Plaintiff alleges a violation of his constitutional right to be free from unreasonable searches premised on the same actions.

The Officers have moved for summary judgment, (Dckt. #113), on all claims, asserting that they are entitled to qualified immunity on plaintiff's constitutional claims, and that they are entitled to judgment in their favor on plaintiff's related state law claims for willful and wanton conduct, wrongful death, battery, survival, spoliation (i.e., destruction) of evidence, indemnification, and *respondeat superior*.[1]

---

[1] Plaintiff asserts the latter two claims, which are derivative of the claims against the individual Officers, against the City of Joliet.

For the reasons stated below, defendants' motion is granted in part and denied in part. In particular: (1) summary judgment is denied on plaintiff's denial of medical care claim as to all Officers; (2) summary judgment on the excessive force and unreasonable search and seizure claim[2] against May is denied in part and granted in part on the ground of qualified immunity; (3) summary judgment on the excessive force and unreasonable search and seizure claim against McCue is granted on the ground of qualified immunity; (4) summary judgment is granted in part and denied in part on the failure to intervene claim against all Officers; (5) summary judgment is denied on the supervisory liability claim against Harrison; (6) summary judgment is granted on the willful and wanton claim against all Officers; (7) summary judgment is denied on the battery claims against May and McCue; (8) summary judgment is denied on the wrongful death and survival action claims against all Officers; (9) summary judgment is granted on the spoliation of evidence claim against all defendants; and (10) summary judgment is denied on the indemnification and *respondeat superior* claims against the City.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657

---

[2] Plaintiff's claims against May and McCue for unreasonable search of Lurry's person in violation of the Fourth Amendment are premised on the same facts as plaintiff's excessive force claims against these officers. (*See* Dckt. #54 ¶¶114–28; Dckt. #125, *quoting* Dckt. #115 at 12 at 11 ("whether one characterizes [Defendants'] actions as a 'search' or a 'use of force,' . . . the analysis is the same.")).

(7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment unless it is a genuine dispute as to a material fact); *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (issues of material fact are material if they are outcome determinative).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

## II. FACTUAL RECORD

The Court draws the factual record from: (1) defendants' Local Rule 56.1 statement of uncontested material facts in support of their motion for summary judgment ("DSOF"), (Dckt. #114), and accompanying exhibits, (Dckt. #114-1 to #114-17); (2) plaintiff's response to defendants' Local Rule 56.1 statement of uncontested material facts in support of their motion for summary judgment ("DSOF Resp."), (Dckt. #122); (3) plaintiff's Local Rule 56.1 statement of additional material facts ("PSAF"), (Dckt. #123), and accompanying exhibits, (Dckt. #124-1

to #124-24); and (4) defendants' response to PSAF ("PSAF Resp."), (Dckt. #138), and accompanying exhibit, (Dckt. #138-1).  The following facts are undisputed unless otherwise noted.[3]

### A. Joliet Police Receive a Tip of a Suspected Drug Deal.

On January 28, 2020, the Joliet Narcotics Unit ("JNU"), a division within the Joliet Police Department ("JPD"), received a tip concerning a suspected drug deal.  (DSOF Resp. ¶¶8–9).  Acting on the tip, Lieutenant Harrison, leader of the JNU, and Sergeant May, a member of the JNU, saw a "hand-to-hand transaction" between the passengers of two cars, one of which was later identified as Lurry.  (*Id.*).  Despite believing the hand-to-hand transaction was a drug deal, the officers allowed both cars to leave the scene but requested that an officer follow Lurry's car.  (*Id.* ¶¶12–13, 15).  Officer Marcus Wietting ("Wietting") pursued the car, pulled it over, and conducted a vehicle search after Lurry and the car's driver exited the car.  (*Id.* ¶¶15, 17).  Around this time, additional officers arrived at the scene, including defendants Tellez and McCue.  (*Id.* ¶19).  Although Wietting found illegal drugs in the car and arrested the car's driver, the other officers permitted Lurry to leave the scene.  (*Id.* ¶¶20–23).

Shortly thereafter, Tellez and McCue stopped Lurry again because they wanted to collect the arrested driver's phone that Lurry still had with him. Wietting also told Tellez that he needed

---

[3] Defendants include a blanket objection to PSAF and argue that each fact violates Local Rule 56.1(d) because they are not concise and contain numerous facts.  (*See generally* PSAF Resp.; Dckt. #137 at 6–9).  Defendants recognize that the Local Rules do not explicitly require one fact per paragraph but assert that plaintiff violates the "spirit and letter" of the Local Rules because she "has gone well beyond a natural combining of a few facts."  (Dckt. #137 at 8).  The Court is not persuaded.  Defendants rely on cases with far more egregious violations.  *See Basta v. Am. Hotel Register Co.*, 872 F.Supp.2d 694, 701 (N.D.Ill. 2012) (statement of additional facts was "replete with factual and legal arguments," including plaintiff repeatedly contradicting her own sworn testimony); *De v. City of Chicago*, 912 F.Supp.2d 709, 716 (N.D.Ill. 2012) (plaintiff asserted new facts in response to defendant's Rule 56.1 statement and failed to provide record citations).  Here, defendants were able to substantively respond to PSAF and the Court declines to strike or disregard any facts based on their blanket objection.

to "search [Lurry] good" and that any recovered money was needed for the drug investigation. (*Id.* ¶¶23–24, 27–29). Lurry voluntarily handed the phone to defendants and consented to the search by placing his hands on McCue's squad car. (*Id.* ¶¶27, 30).

## B. Action at the Scene of Lurry's Arrest.

Once Tellez started to pat down Lurry, he felt a "golf ball to racquetball" sized bulge near Lurry's upper leg area and asked, "what's this?" (*Id.* ¶31; PSAF Resp. ¶1). Tellez believed the bulge to be drugs and heard McCue tell Lurry "[d]on't go reaching," and "get your hands out of there," notifying Tellez that Lurry was reaching into his pants. (PSAF Resp. ¶1). Lurry, McCue, and Tellez all slid to the ground in a struggle and Lurry "ended up face down with his hands underneath his stomach area." (*Id.* ¶2). Tellez saw Lurry "bury his face towards his hands," and McCue saw Lurry's "hands and face come near each other once on the ground."[4] (*Id.*). They each grabbed one of Lurry's arms and placed him in handcuffs before McCue radioed for backup at approximately 3:55 PM. (*Id.*). Tellez suspected that Lurry had already put the drugs that Tellez felt during the pat-down into his mouth around this time. (*Id.* ¶8 (citing Dckt. #126 at 234 (Tellez's suspicion was based on Lurry "reaching" and because "that's a common place where, I guess—where people hide stuff. I mean, he can't hide it anywhere else.")). "Tellez understood on scene that there was a possibility that Mr. Lurry may overdose on the drugs he put in his mouth and then die." (*Id.* ¶17). It is undisputed that quicker medical treatment is better than delayed medical treatment for people overdosing on drugs. (*Id.* ¶58). Had effective and aggressive medical care been provided, Lurry's death was not inevitable. (*Id.*).

---

[4] Defendants do not dispute that McCue saw Lurry's "hands and face come near each other once on the ground," but contradict this admission in their asserted facts. (*Compare* DSOF ¶39, *with* PSAF Resp. ¶2).

While Lurry was handcuffed and face-down on the ground, plaintiff, Lurry's widow, arrived and attempted to learn why Lurry was being arrested, but Tellez did not permit her to get close to Lurry to see what was happening. (*Id.* ¶3). Tellez told plaintiff that Lurry "[is] going to have some explaining to do. We are going to take him down to the jail. He's been hiding, I'm pretty sure I know what it is."[5] (*Id.* ¶6). Tellez and McCue then pulled Lurry—who was handcuffed behind his back—up by his arms, walked him over to McCue's squad car, and placed him in the rear passenger seat. (*Id.* ¶4).

Tellez and McCue left Lurry, handcuffed and alone, in the backseat of McCue's squad car for around four and a half minutes. (*Id.* ¶9; DSOF Resp. ¶42). No one monitored Lurry or checked on him while he was in the back of the squad car. (PSAF Resp. ¶9). Prior to entering the car, Lurry did not appear to start chewing the drugs in his mouth, (DSOF Resp. ¶36), but he "began to chew the package of drugs" during the four and a half minutes he was left unsupervised. (*Id.* ¶42).

When faced with an arrestee who put drugs in his mouth, Tellez's usual practice was to "get the person to spit them out by talking to them without using force." (PSAF Resp. ¶15). Yet neither Tellez nor McCue asked Lurry if he swallowed drugs; asked him to spit out the drugs; told him to open his mouth; or otherwise attempted to search his mouth for the presence of drugs. (*Id.* ¶10). In sum: "[t]hey did not investigate at all what was in his mouth." (*Id.*).

---

[5] According to plaintiff, Tellez told her that Lurry "had something in his mouth . . . I'm assuming narcotics." (PSAF Resp. ¶3). Defendants dispute Tellez telling this to plaintiff as "it is not heard on the dash camera video." (*Id.* ¶3). The Court agrees that this statement cannot be heard on the video footage which provides audio for Tellez and plaintiff's interaction. (*See* Dckt. #118, Ex. H). Plaintiff offers no argument or evidence that this statement could have been voiced outside the period captured on video. The Court therefore does not consider this fact because it is discredited by video. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

While Lurry remained in the car, Tellez and McCue searched for the drugs near the front of the squad car where they handcuffed Lurry but did not find any. (*Id.* ¶¶5, 16). Tellez knew the drugs posed a safety hazard, and Tellez was "worried about the well-being of anyone who might run across dangerous drugs left on scene." (*Id.* ¶5). JPD and national policy required Tellez or McCue to search Lurry before he was placed in the car, and Tellez testified that he should have searched Lurry at the scene of arrest. (*Id.* ¶16). "Had Tellez or McCue searched Mr. Lurry and removed the drugs or had they called for medical support when they first suspected that Mr. Lurry might have swallowed drugs at the scene, his death would have most certainly been averted."[6] (*Id.*). Tellez was disciplined for failing to conduct a search of Lurry. (*Id.*).

While Lurry remained unsupervised in McCue's car, Tellez conversed with the other officers on-scene (with McCue nearby) and made the following statements:

- "lets take him down to the jail, because I'm sure he's got something on him, but uh, he might have put a bunch of it in his mouth. He's still got some probably in his crotch," (*id.* ¶7);

- "I'm telling you, it's in his mouth," (*id.*);

- "I felt a bunch of[] dope baggies in his crotch . . . might have got some in his mouth. I don't know how much but he's still got some in there," (*id.*); and

- "He swallowed some of it, so we got to get him down to the station," (*id.*).

### C. Tellez and McCue Transport Lurry to the Joliet Police Station.

Once Tellez and McCue eventually returned to the squad car, McCue heard Tellez say that he thought Lurry had put something in his mouth. (*Id.* ¶8). Tellez said, "let's get him to the

---

[6] Defendants dispute this fact, but it is based on admissible opinion testimony from plaintiff's expert, Dr. Melinek, regarding "how Lurry's death could have been averted had officers searched him and removed the drugs, or called for medical support right away." (*See* Dckt. #106 at 47 n.11 ("Defendants forfeited any argument that such opinions are inadmissible.")). The Court therefore deems this fact admitted.

station" and took a call from another officer, saying, "[w]e'll get [Lurry] down to the jail. We are gonna search him more. He probably might have some in his mouth." (*Id.* ¶¶18–20; DSOF Resp. ¶45). Again, Tellez understood that swallowing drugs could lead to a fatal overdose. (PSAF Resp. ¶17). Tellez knew that "time was of the essence" when dealing with someone experiencing an overdose and that a drug overdose qualified as a medical emergency requiring immediate attention. (*Id.*). Yet Tellez never suggested calling 911, going to the hospital instead of to the jail, or providing Lurry with Narcan.[7] (*Id.* ¶18). Neither did McCue. (*Id.*).

The drive from the scene of the arrest to the police station took approximately eight minutes. (*Id.* ¶21). Neither Tellez nor McCue secured Lurry with a seatbelt or activated the squad car's sirens or lights during the eight-minute drive. (*Id.* ¶¶19, 24). The squad car came equipped with a monitor in the front seat that could be adjusted to better watch an arrestee in the back seat, (*id.* ¶22), but neither officer adjusted nor used the monitor to watch Lurry. (*Id.*). During the drive, "Lurry continued intermittently chewing the package of drugs in his mouth," and ultimately "chewed through the plastic packaging and began directly ingesting the drugs through the mucus membranes of his mouth." (DSOF Resp. ¶50). Lurry chewed for the majority of the car ride. (PSAF Resp. ¶23). Moreover, as the drive progressed, the dash cam video shows that Lurry was blinking slowly, becoming more somnolent, and that he "had a decreased level of consciousness" and would slump over for portions of the ride, unable to right himself.[8] (PSAF Resp. ¶25; DSOF Resp. ¶53).

---

[7] "Naloxone, also called Narcan, reverses the effects of opioids and is an antidote for an opioid overdose." (PSAF Resp. ¶59).

[8] Here, defendants do not dispute plaintiff's version of events, but instead simply dispute this fact to the extent that plaintiff fails to cite to specific timestamps of the video footage. (PSAF Resp. ¶25 (citing *Scott,* 550 U.S. at 380–81)). Thus, defendants do not dispute that the events that plaintiff claims are depicted by the video are, in fact, on the video; instead, they merely dispute plaintiff's lack of citation to the video. Because the video depicts the events in question, the Court deems this fact admitted.

At no point during the eight-minute drive to the police station did either Tellez or McCue attempt to talk to Lurry. (PSAF Resp. ¶21). Tellez does admit that he "glanced" at Lurry twice during the drive for one to two seconds each time. (*Id.* ¶22). When glancing at Lurry, Tellez observed him "to be making chewing motions with his mouth" and believed him to be chewing on illicit drugs that he had concealed in his mouth.[9] (*Id.* ¶23). McCue testified that he looked at Lurry on the monitor while he and Tellez transported Lurry to the police station. (*Id.* ¶21). However, McCue asserts that he did not see Lurry chewing when he looked at him. (*Id.*). "If Tellez and McCue had called for an ambulance or taken him to the hospital at the time they first suspected Mr. Lurry had put drugs in his mouth, it is likely within a reasonable degree of medical certainty that Mr. Lurry would have survived."[10] (*Id.* ¶67).

### D. Arrival at the Police Station.

At approximately 4:11 PM, Tellez, McCue, and Lurry pulled into the Joliet police station. (*Id.* ¶26). Lurry's state of consciousness was not normal when he first arrived at the police station. (*Id.* ¶28). It is also clear from the video footage that when Lurry arrived at the station he was still chewing something contained within his mouth and blinking his eyes. (Dckt. #126, Ex. I at 16:00–40).

---

[9] Defendants dispute the fact that Tellez "believed" Lurry was chewing on illicit drugs that he hid in his mouth and claim that plaintiff's cited material does not support it. (PSAF Resp. ¶23). However, the cited evidence *does* support this asserted fact. (*See* Dckt. #124-1 at 25 (Q: "[A]t the time as you are in the squad car transporting [Lurry] to the station, when you see him chewing, you believe that he is chewing on illicit drugs that he has concealed in his mouth, yes or no?"; "A: I would say yes.")); *see also* Fed.R.Evid. 701 (admissibility of opinion testimony by lay witnesses); *United States v. Bogan*, 267 F.3d 614, 619 (7th Cir. 2001) (affirming the admission of lay opinion testimony under Rule 701 that was rationally based on the witness's observation of an incident).

[10] Defendants dispute this fact but it is based on an admissible expert opinion and the Court thus deems it admitted. (Dckt. #106 at 47 n.11); *see also supra*, note 6.

Tellez spoke to May for roughly thirty seconds and "immediately" brought him up to speed, including telling him that Lurry ingested drugs by putting them in his mouth. (PSAF Resp. ¶25; DSOF Resp. ¶58). Harrison, who had returned to the station by this point, believed Tellez and McCue's arrestee "to have been discovered with illegal narcotics and under arrest for possession of a controlled substance." (PSAF Resp. ¶56). Harrison walked to the squad car once it arrived and said out loud that he recognized Tellez and McCue's arrestee to be Lurry. (DSOF Resp. ¶63). Both Harrison and May had encountered Lurry before and knew him to deal cocaine. (*Id.* ¶5). Harrison also knew Lurry to "eat" drugs "because a few weeks before Lurry's arrest, officers told Harrison that they thought Lurry "swallowed drugs on him." (PSAF Resp. ¶32). If Lurry received medical care at the moment he arrived at the station, "his chances of survival would have been substantially higher."[11] (*Id.* ¶67).

When McCue exited the squad car and attempted to get Lurry out of the backseat, Lurry's eyes were closed and he was not moving. (*Id.* ¶27). Nonetheless, McCue ordered Lurry to:

- "take your feet out, bro," (*id.*);

- "wake up," (*id.*);

- "come on. Get up," (*id.*);

- "kick your foot out now," (*id.*);

- "[l]et's go. What's wrong with you?" (*id.*).

As McCue was making these statements, May remarked that Lurry was "either not responsive or faking non-responsiveness." (*Id.* ¶29). Defendants admit that a person who is faking unresponsiveness and a person who is actually unresponsive appear the same. (*Id.*). May

---

[11] Defendants dispute this fact, but it is based on an admissible expert opinion and the Court thus deems it admitted. (Dckt. #106 at 47 n.11); *see also supra*, notes 6, 10.

saw Lurry exhibiting symptoms including: Lurry's eyes rolling back into his head, Lurry being

immobile or unable to move, Lurry not being able to speak, and Lurry showing an inability to

comprehend what was occurring around him—all symptoms that May admits are consistent with

someone suffering a drug overdose. (*Id.*). McCue saw Lurry exhibit shallow breathing and

noted that Lurry appeared disoriented.[12] (*Id.*). Harrison saw Lurry "'blinking oddly' as if half

asleep," not responding to verbal commands, and opening and closing his mouth "as if he was

trying to swallow something." (*Id.* ¶30, *quoting* Dckt. #124-6 at 1).

### E. The Officers' Use of Force on Lurry.

Harrison—who knew that the signs of a drug overdose can include unconsciousness, eyes

rolling in the back into one's head, shallow breathing, and a limp body with the head falling back

or to the side—thereafter directed McCue to perform a "sternum rub"—a pain stimulus used by

officers to "arouse an arrestee who is believed to be feigning being asleep or passed out"—on

Lurry "by digging his knuckles into Mr. Lurry's chest." (PSAF Resp. ¶¶29–31). As McCue

performed the sternum rub, Lurry's eyes were rolling back into his head. (*Id.* ¶35). After Lurry

did not react to the sternum rub, Harrison directed May to "push [Lurry] out" of the car. (*Id.*

¶31). Instead, May got into the car's backseat and forcefully slapped Lurry's face while shouting

"wake up, bitch." (*Id.* ¶35). According to defendants, May deliberately used the word "bitch"

toward Lurry "because he knew it would be offensive and jarring to an experienced street

---

[12] Defendants characterize McCue's deposition testimony as to his observations of Lurry as "speculative and an opinion." (PSAF Resp. ¶29). The Court disagrees. McCue's observation of Lurry and prior testimony describing the same is relevant in analyzing plaintiff's excessive force claim and admissible under Federal Rule of Evidence 701. *See Bogan*, 267 F.3d at 619.

criminal" and because it would "likely provoke a hostile response and thereby expose if [Lurry] was faking an illness."[13]  (DSOF Resp. ¶71).

The parties offer differing interpretations of Lurry's reaction to May's strike.  According to plaintiff, "Mr. Lurry briefly moved his head to stare blankly in May's direction but had no other visible reaction other than to go back to oddly blinking his eyes and later closing them." (PSAF Resp. ¶35).  According to defendants, Lurry "turned toward May after the strike and the cursing, opened his eyes, and appeared to have been aroused but did not make any movements to get out of the car."  (DSOF Resp. ¶72).

The slap is captured on video.  (Dckt. #126, Ex. I at 16:43).  As depicted in the video, one officer is attempting to pull Lurry out of the backseat by his sweatshirt, and Lurry is facing in the direction he is being physically pulled.  May then enters from the opposite rear passenger door and strikes Lurry in the face, causing Lurry's face to turn around to face the direction from which May struck him.  The footage does not "blatantly contradict" either party's version of events, *see Scott*, 550 U.S. at 380, so the Court draws all reasonable inferences in plaintiff's favor and adopts her version of Lurry's reaction.

May later claimed that he only hit Lurry's face because of "poor aim" and that he intended to strike Lurry in his chest or shoulder but "missed."  (PSAF Resp. ¶¶35, 37).  But as evidenced by the video, May's full hand, along with what appears to be a metal ring on his left ring finger, made direct contact with Lurry's face.  (Dckt. #126, Ex. I at 16:40–46).  The autopsy showed that Lurry had a laceration on his upper lip and multiple abrasions to his lower lip. (PSAF Resp. ¶¶36).  May, who admitted that his strike to Lurry's face was not warranted, (*id.*

---

[13]  Plaintiff does not dispute that May used the term "bitch" deliberately, but disputes May's reasoning behind its use.  The Court, however, will not construe May's usage of this offensive term in the light most favorable to him when evaluating defendants' summary judgment motion.

¶¶35, 37), was disciplined for hitting Lurry for "unbecoming conduct, his use of force against Mr. Lurry, and for using profanity towards him," in violation of JPD policy and received a seven-day suspension. (*Id.* ¶76).

Harrison, who heard May strike Lurry, described the strike as "harder than trying to arouse someone," and admitted that he would not expect one of his officers to administer an open hand strike to the face of an arrestee in Lurry's situation. (*Id.* ¶37). McCue heard May strike Lurry even though he was on the other side of the squad car. (*Id.* ¶36). Tellez both saw and heard May strike Lurry, and Tellez intentionally turned off the squad car's dash camera after seeing the strike because he knew it was inappropriate to strike somebody in handcuffs. (*Id.* ¶39). Tellez was disciplined for turning off the dash camera and received a six-day suspension.[14] (*Id.* ¶¶39, 77).

After striking Lurry in the face and calling him a "bitch," May pinched Lurry's nose shut "with the intention of restricting Mr. Lurry's ability to breath to force him to open his mouth." (PSAF Resp. ¶40). The airway is composed of both the nose and mouth. (*Id.* ¶71). Obstructing an individual's nose and mouth prevents air from reaching the airway, "resulting in less oxygen thereby getting into the bloodstream and the person losing their pulse." (*Id.*). May, who knew chokeholds were not permitted unless deadly force was authorized, (*id.* ¶42), nonetheless impacted both portions of Lurry's airway. Further, officers are not trained on how to extract drugs from an arrestee's mouth; nor are officers trained to pinch an arrestee's nose shut or put pressure on an arrestee's jaw to get them to open their mouth. (*Id.* ¶74).

---

[14] "Tellez's manual deactivation of the camera resulted in further audio not being captured, but due to the camera system's internal memory and recording features, investigators were able to recover the (silent) video of the subsequent events despite Tellez actions." (DSOF Resp. ¶81).

Although Lurry's level of consciousness was not normal, (*id.* ¶43), May pinched Lurry's nose shut for approximately ninety seconds. (DSOF Resp. ¶90). At the same time, May also applied pressure to Lurry's neck for three seconds and simultaneously pressed up on Lurry's jaw for forty-five seconds. (PSAF Resp. ¶42). After the forty-eight seconds of total pressure to Lurry's neck and jaw area, May pulled on Lurry's chin hairs and was able to manually open Lurry's mouth without resistance. (*Id.* ¶44; DSOF Resp. ¶91). Lurry's eyes were still blinking when May first started pinching Lurry's nose and pressing against his neck and jaw area, but Lurry's eyes closed shortly after May cut off his airway. (Dckt. #126, Ex. I at 17:09–18:30). Lurry's eyes did not reopen and he did not talk at any point. (*Id.*). May did not verbally ask Lurry to open his mouth until after he already started pinching his nose shut and applying pressure to Lurry's jaw and neck. (PSAF Resp. ¶40). Harrison, who was watching May pinch Lurry's nose, heard May say, "he's chewing, he's trying to chew." (*Id.* ¶41). After Lurry's mouth was open, May smelled cocaine and "saw a large plastic baggie in Lurry's mouth, and said aloud that he saw the baggie." (DSOF Resp. ¶93).

Harrison then ordered McCue to use his police baton and insert it into Lurry's mouth and, at that time, "did not know if Eric Lurry had already ingested drugs or swallowed a plastic baggie or part thereof." (DSOF Resp. ¶¶94–95). "When an officer believes an arrestee is hiding drugs in his mouth (and is not spitting them out) or is swallowing or has swallowed drugs, immediately becomes the emergency." (PSAF Resp. ¶50). "Police officers are not trained to wait to see the physical manifestations of an overdose before they call for medical assistance for the arrestee; they are trained to call for emergency medical assistance immediately if the officer has suspicion that an arrestee may be at risk of an overdose." (*Id.*).

15

McCue followed Harrison's order and shoved his police baton into Lurry's mouth, (PSAF Resp. ¶45), while May continued pinching Lurry's nose shut. (Dckt. #126, Ex. I at 17:45–18:16). The parties' stories diverge as to what happened next. Defendants contend that the baton was used for the purpose of a "bite block"[15]—i.e., to remain stationary and keep Lurry's mouth open—so Lurry "did not bite down and thereby injure McCue's finger" while McCue went to retrieve the drug baggies in Lurry's mouth. (PSAF Resp. ¶45; DSOF Resp. ¶95). In support, defendants cite the video footage of McCue using the baton and Harrison and McCue's depositions. (DSOF Resp. ¶95). Plaintiff, on the other hand, states the baton was used as a "probe" and could have caused an airway obstruction itself or otherwise pushed drug bags to become lodged in Lurry's airway if they were not already obstructing Lurry's airway, causing or exacerbating Lurry's condition. (PSAF Resp. ¶45).

After reviewing the footage, the Court concludes that the footage "utterly discredit[s]" defendants' characterization of events. *See Scott*, 550 U.S. at 380. The Court's review of the video footage confirms that the police baton was not kept in a stationary position within Lurry's mouth but instead used in a sweeping manner and moved within Lurry's mouth in addition to being taken out of Lurry's mouth and re-inserted. (Dckt. #126, Ex. I at 17:48–18:16). The parties agree that the baton remained inside Lurry's mouth for about twenty-five seconds, during which time McCue pulled several "plastic baggies or pieces of plastic baggies" from his mouth. (DSOF Resp. ¶96). Both Harrison and Tellez were in the immediate vicinity during May and McCue's uses of force and did nothing to stop them. (PSAF Resp. ¶46).

---

[15] The Officers have not been trained on how to use a bite block. (PSAF Resp. ¶74).

**F. Lurry Stops Breathing and Defendants Thereafter Call for an Ambulance.**

Shortly after McCue took the baton out of Lurry's mouth, Lurry's body "dropped to the side," and May believed him to not be breathing. (DSOF Resp. ¶98). The video depicts that May was supporting Lurry's body while McCue inserted the baton, and once May moved away after McCue removed the baton, Lurry's body immediately slumped over and fell to the side, unresponsive. (Dckt. #126, Ex. I at 18:15–30). No officers checked Lurry's vitals. (PSAF Resp. ¶47). Several other officers attempted additional sternum rubs and Lurry did not respond. (DSOF Resp. ¶98).

May stated "[w]e gotta get him out, I don't think he's breathing." (*Id.* ¶99). After hearing May's statement, Harrison called for an ambulance "for [a] male who swallowed narcotics." (*Id.* ¶100). Harrison—who called for an ambulance less than three minutes after McCue and Tellez arrived with Lurry at the police station—did not call for medical assistance *until* he realized that Lurry had stopped breathing. (PSAF Resp. ¶47; DSOF Resp. ¶101). While Harrison called for an ambulance, several officers (including May and McCue) moved Lurry out of the backseat and two non-defendant officers began to administer CPR and first aid. (DSOF Resp. ¶¶102–104). Lurry coughed up a portion of a baggie during CPR and "immediately caught his breath and gasped" during CPR "almost like he had something jammed in his airway and it was released."[16] (PSAF Resp. ¶48). Lurry then began to shake violently. (*Id.*).

---

[16] Defendants dispute this factual assertion because the testimony cited in support is from "a lay officer (Steurer), who is not qualified to opine whether at this moment Lurry breathed or acted as if he had something jammed in his airway." (PSAF Resp. ¶48). But Steurer, a non-expert, can provide a lay opinion as to what he witnessed given that his testimony is based on his perception, helpful to determining a fact in issue—Lurry's breathing and airway restriction—and not based on specialized knowledge. *See* Fed.R.Evid. 701; *U.S. v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006) (testimony of officer present at scene of alleged excessive force could testify to there being no law-enforcement reason for defendant to kick arrestee since testimony was framed in terms of eyewitness observation and particularized experience as officer); *Bogan*, 267 F.3d at 619 (affirming the admission of lay opinion testimony under Rule 701 that was rationally based on the witness's observation of an incident).

An ambulance arrived within three to five minutes of Harrison's call and the paramedics noted Lurry was unconscious and secured his airway before administering all the Narcan they had in the ambulance, to no effect. (DSOF Resp. ¶¶107–108). Both Tellez and Harrison were trained to carry and administer Narcan and Harrison kept Narcan in the glovebox of his car. (*Id.* ¶66). Narcan has a higher likelihood of preventing overdose the sooner it is administered, (*id.* ¶60), and medical professionals administer Narcan regardless of whether they have confirmation the patient is experiencing an opioid overdose "because [] cocaine is often cut with opioids."[17] (*Id.* ¶61). If Lurry received Narcan earlier during his intoxication, "it is highly likely within a reasonable degree of medical certainty that he would have survived."[18] (*Id.* ¶67).

The ambulance transported Lurry to Presence St. Joseph's Hospital. (DSOF Resp. ¶109). However, Lurry never regained consciousness, and he was pronounced dead the following day on January 29, 2020. (*Id.*). Lurry died from a mixed overdose from cocaine, heroin, and fentanyl and asphyxia.[19] (PSAF Resp. ¶69).

### III. ANALYSIS

Defendants move for summary judgment on plaintiff's federal claims for denial of medical care, excessive force, and unreasonable search on the grounds that they acted reasonably and are therefore entitled to qualified immunity. The Officers are protected by qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional

---

[17] Just a few months before Lurry died, the Joliet police chief stated in a news article that "cocaine is now being mixed with fentanyl" and McCue also testified about cocaine being frequently mixed with other drugs. (*Id.* ¶¶53–54 ("everybody's putting the fentanyl into that.")).

[18] Defendants dispute this fact but it is based on an admissible expert opinion and the Court thus deems it admitted. (Dckt. #106 at 47 n.11); *see also supra*, notes 6, 10, 11.

[19] Defendants dispute that asphyxia contributed to Lurry's death. (PSAF Resp. ¶69). But plaintiff presents admissible evidence related to asphyxia being a contributing cause to his death. (*Id.*; Dckt. #106 at 46–50 (Dr. Melinek permitted to opine regarding asphyxia being a contributing cause of Lurry's death)).

rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223 (2009) (cleaned up). "There are two inquiries in determining whether qualified immunity applies: [1] whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a constitutional right; and [2] whether the right at issue was 'clearly established' at the time of the officer's alleged misconduct." *Tousis v. Billiot*, 84 F.4th 692, 697 (7th Cir. 2023) (cleaned up). "Courts may exercise their discretion when choosing which element to address first." *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (en banc). Moreover, "[a]lthough qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendants raise it." *Archer v. Chisolm*, 870 F.3d 603, 613 (7th Cir. 2017).

Given that the Court's jurisdiction over plaintiff's state law claims hinges on the viability of plaintiff's federal claims, the Court will address plaintiff's federal claims first.

**A. Denial of Medical Care.**

Lurry's claim for denial of medical care falls under the Fourth Amendment because the events at issue took place while Lurry was under arrest and prior to a probable cause hearing.[20] *Braun v. Vill. of Palatine*, 56 F.4th 542, 551 (7th Cir. 2022); *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 598 (7th Cir. 2011). The Officers seek qualified immunity on this claim based on their assertion that plaintiff has failed to show the violation of a clearly established right because

---

[20] Defendants argue that the Court should grant summary judgment on this claim because plaintiff originally styled it as arising under the Fourteenth Amendment. (Dckt. #115 at 23). The Court declines to do so. It is well-settled that a plaintiff need not allege or explicitly plead a legal theory, and it is "immaterial" if her legal theories are "not spelled out." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1023 (7th Cir. 2018). Moreover, the Seventh Circuit has expressly rejected the contention that a plaintiff's claim that he received constitutionally inadequate medical care should be dismissed merely because he cited the wrong constitutional amendment as the basis for his claim. *Est. of Perry v. Wenzel*, 872 F.3d 439, 453 (7th Cir. 2017); *Chessie Logis. Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017) (plaintiff is allowed to alter her original legal theory where she pleads her factual basis and defendants are not unfairly harmed or subject to unreasonable delay) (citing cases).

the Seventh Circuit has not held "that officers must immediately call for medical help on a hunch that an arrestee ingested some unknown amount of an unknown drug." (Dckt. #115 at 15). The Officers also cite to a district court decision for the proposition that "an officer's belief that an arrestee 'swallowed something,' without knowledge of 'what the drug was, or how much had been ingested' does not require immediately calling for medical help." (*Id.*).

### 1. Plaintiff has offered sufficient evidence to create an issue of material fact as to whether the Officers violated Lurry's constitutional right to prompt medical care.

The Court will first address whether plaintiff has raised an issue of material fact as to whether the Officers violated Lurry's right to prompt medical care under the Fourth Amendment. The applicable standard for making this determination is one of "objective reasonableness," and courts consider facts such as: "(1) whether the officer[s] ha[d] notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). "[T]he Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Id.* at 530 (cleaned up). Finally, plaintiff must demonstrate some evidence of causation by "show[ing] the delay itself caused some degree of harm." *Jackson v. Sheriff of Winnebago Cnty., Illinois*, 74 F.4th 496, 500 (7th Cir. 2023) (cleaned up).

The "ultimate inquiry is whether the officer's conduct was objectively reasonable under the circumstances." *Braun*, 56 F.4th at 552. The "intuitive, organizing principle is that police must do more to satisfy the reasonableness inquiry when the medical condition they confront is apparent and serious and the interests of law enforcement in delaying treatment are low."

20

*Florek*, 649 F.3d at 600; *Flerlage v. Vill. of Oswego*, No. 13-CV-6024, 2017 WL 5903819, at *10 (N.D.Ill. Nov. 30, 2017) (same).

The Officers do not dispute that the record evidence would allow a reasonable jury to find in plaintiff's favor on several elements of the above test, and plaintiff has produced sufficient evidence to create a genuine issue of material fact as to the remaining elements that the parties dispute.

### a.   The evidence shows that Lurry has a serious medical condition.

The "severity of the medical condition under th[e Fourth Amendment] standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments." *Ortiz*, 656 F.3d at 530.  Here, plaintiff has shown that Lurry—who had ingested cocaine, heroin, and fentanyl, gradually lost consciousness and the ability to breathe, and ultimately died from an overdose—had a "serious medical need" while in the Officers' custody. *See, e.g.*, *Mitchell v. Wisconsin*, 588 U.S. 840, 854 (2019) ("unconsciousness does not just create pressing needs; it is *itself* a medical emergency.") (emphasis in original); *Orlowski v. Milwaukee County*, 872 F.3d 417, 423 (7th Cir. 2017) ("Failure to breathe and failure to regain consciousness are undoubtedly life-threatening medical conditions that are obvious to a layperson."); *Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 463 (6th Cir. 2021) (decedent's condition was "sufficiently severe" where he "likely died of 'multiple drug intoxication'"); *Chest v. City of Freeport*, No. 8 CV 50047, 2011 WL 1225460, at *4 (N.D.Ill. Mar. 31, 2011) ("It cannot be disputed that the decedent ultimately did have a serious medical need, beginning at the point he ingested the cocaine.").  The Officers do not dispute that plaintiff has satisfied this factor.

**b. The scope of the requested treatment was reasonable and non-onerous.**

"Officers dealing with arrestee's medical issues 'will either procure treatment, provide treatment or both.'" *Flerlage*, 2017 WL 5903819, at *10, *quoting Florek*, 649 F.3d at 599.

Here, plaintiff asserts that the Officers should have promptly called paramedics to treat Lurry, that Tellez and McCue should have taken Lurry to the hospital themselves rather taking him back to the police station, or that the Officers could have administered Narcan to Lurry. There is no doubt that calling paramedics to treat an arrestee who has a serious medical need or taking the arrestee directly to the hospital are reasonable responses. *See, e.g.*, *Florek*, 649 F.3d at 599 (concluding that police officers would have responded reasonably to plaintiff's medical needs by calling paramedics); *Ortiz*, 656 F.3d at 534 (finding that "it would not have been difficult to transport [the arrestee] to the hospital."); *Holcomb v. Ramar*, No. 1:13-CV-1102 AWI SKO, 2013 WL 5947621, at *4 (E.D.Cal. Nov. 4, 2013) ("Generally, police officers may meet their constitutional obligations if they promptly seek necessary medical attention for the arrestee by either summoning medical help or taking the injured arrestee to a hospital."). Nor do the Officers assert that they lacked the authority to call paramedics or take Lurry to the hospital themselves or that taking either of these actions was not feasible. *See, e.g., Perry*, 872 F.3d at 456 (noting that defendant officers did "not assert that they did not have the authority to take Perry to the hospital."). Finally, two of the Officers (Harrison and Tellez) were trained to administer Narcan, Harrison had Narcan in the trunk of his car at the police station, and the Officers admit that the "burden of administering Narcan . . . is low." (Dckt. #137 at 16).

**c. There are no police interests that weighed against providing Lurry with prompt medical care.**

Legitimate police interests, such as public safety concerns, the need for an on-site investigation, or other administrative or penological interests, can potentially provide a

reasonable justification for a delay in the provision of aid to an arrestee. *See, e.g.*, *Ortiz*, 656 F.3d at 531 ("The duty to respond reasonably to an arrestee's medical needs is affected by any police policies that may endanger the well-being of those in custody."); *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). Here, however, the Officers have not asserted that it "'would have been burdensome or compromised any police interests'" to delay summoning medical aid for Lurry. *See, e.g.*, *Est. of Williams by Rose v. Cline*, 902 F.3d 643, 650 (7th Cir. 2018), *quoting Ortiz*, 656 F.3d at 530–31.

### d. Plaintiff has produced sufficient evidence to raise a genuine issue of material fact as to whether each Officer had notice that Lurry had a serious medical need.

Because the second, third, and fourth factors in the objective reasonableness test are not contested by the Officers, these factors "are off the table" and the Court's focus narrows to whether each Officer was on notice that Lurry had a serious medical need and whether their failure to act caused Lurry harm. *See, e.g.*, *Ortiz*, 656 F.3d at 530–31; *Est. of Williams*, 902 F.3d at 650–51.

The notice analysis turns on whether a reasonable jury could find each Officer's failure to take action (either to provide medical aid or to call for medical aid) for Lurry was objectively unreasonable based on what he knew at the time. *Ortiz*, 656 F.3d at 531–32. An officer can be placed on notice of an arrestee's serious medical condition, "either by word or through observation of . . . physical symptoms." *Est. of Perry*, 872 F.3d at 454; *Braun*, 56 F.4th at 551 (same). That knowledge can be learned based on personal observation or on what an officer learned from others. *Acosta v. City of Chicago*, No. 15 CV 8333, 2018 WL 3630011, at *5 (N.D.Ill. July 31, 2018). An adverse change in an arrestee's condition—such as the change in Lurry's condition between when he was placed into McCue's patrol car and when he collapsed and stopped breathing at the police station—can place officers "on notice of [a] serious medical

need." *Est. of Perry*, 872 F.3d at 456; *see also Perry v. Roy*, 782 F.3d 73, 80 (1st Cir. 2015) (holding that "[t]he fact that the condition worsened over time says nothing of the condition at the times [the detainee] was evaluated; a reasonable jury could have found that this shows that the medical condition was serious all along, thus meeting the objective prong.").

"[E]xternal signs of internal distress can indicate to a layperson that a detainee has a serious medical need," and many courts "have held that drug or alcohol-related symptoms, like those associated with withdrawal or overdose, are sufficiently serious and obvious to laymen." *Grote v. Kenton Cnty., Kentucky*, 85 F.4th 397, 406 (6th Cir. 2023); *Westbrook v. Bonner*, No. 2:23-CV-02094-SHL-ATC, 2024 WL 4010307, at *4 (W.D.Tenn. Aug. 30, 2024) ("Drug-induced symptoms that lead to overdose" can create "external or physical signs of distress" that would be "obvious" to a lay person). As discussed above (*supra*, at Section II(D)), the Officers were aware that certain physical conditions (such as eyes rolling back into one's head, non-responsiveness, and the inability to speak or to comprehend what is happening) are consistent with a drug overdose.

Courts have also recognized that other conditions (such as the loss of consciousness, the failure to regain consciousness, difficulty staying awake, slumping over while seated, and the failure to breathe) are indicative of a serious medical need. *See, e.g., Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 464 (6th Cir. 2021); *Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 Fed.Appx. 831, 837–38 (6th Cir. 2011); *Lankamer v. Lalley*, No. 24 C 506, 2024 WL 4119152, at *5 (N.D.Ill. Sept. 9, 2024); *Snukis v. Taylor*, No. 3:21-CV-00135-TWP-MFB, 2022 WL 2305697, at *7 (S.D.Ind. June 27, 2022); *Neely v. Garza*, No. 15 C 407, 2017 WL 959014, at *8 (N.D.Ill. Mar. 13, 2017).

Whether, and when, a defendant officer has notice of an arrestee's serious medical needs is a question of fact. *Est. of Williams*, 902 F.3d at 650; *Paine v. Cason*, 678 F.3d 500, 506 (7th Cir. 2012). As explained below, plaintiff has presented sufficient evidence to raise disputed factual questions as to whether each of the Officers had notice of Lurry's serious medical needs prior to the time that Harrison called an ambulance for Lurry such that this issue cannot be resolved on summary judgment:

Officer Tellez. The evidence, considered in the light most favorable to plaintiff, shows that Tellez: (1) along with McCue, walked a handcuffed Lurry to McCue's squad car without incident; (2) knew that Lurry had placed dope baggies in his mouth before he walked Lurry to the squad car with McCue and he believed that Lurry had swallowed some of the drugs; (3) knew that Lurry may overdose on the drugs he put in his mouth and then die; (4) observed Lurry during the eight-minute ride to the police station during which Lurry was chewing what Tellez believed was the illicit drugs that he had concealed in his mouth; (5) was aware that Lurry's physical condition was deteriorating during the eight-minute ride from the scene of the arrest to the police statement (namely, Lurry was blinking more slowly, becoming more somnolent, was slumping over during the ride, and had a decreased level of consciousness); (6) knew that Lurry's state of consciousness was not normal when they arrived at the police station; (7) knew that Lurry had not spoken during the ride to the police station or thereafter; (8) was aware that McCue performed a sternum rub and saw and heard May slap Lurry in the face to rouse him (without success); and (9) observed McCue probe Lurry's mouth with his baton and pull out several plastic baggies or pieces thereof from Lurry's mouth.

Officer McCue. The evidence, considered in the light most favorable to plaintiff, shows that McCue: (1) along with Tellez, walked a  handcuffed Lurry to his squad car without incident;

(2) heard from Tellez that Lurry had put something in his mouth before they left the scene of the arrest; (3) observed Lurry in the course of the eight-minute ride to the police station during which time Lurry was chewing and was physically deteriorating (namely, Lurry was blinking more slowly, becoming more somnolent, was slumping over during the ride, and had a decreased level of consciousness);[21] (4) knew that Lurry's state of consciousness was not normal and that he was exhibiting shallow breathing when they arrived at the police station; (5) knew that Lurry had not spoken during the ride to the police station or thereafter; (6) observed that Lurry was disorientated, unresponsive, and taking shallow breaths; (7) saw that Lurry had his eyes closed and was not moving when he attempted (unsuccessfully) to get Lurry to step out of the squad car; (8) performed a sternum rub on Lurry that failed to rouse him; (9) heard May slap Lurry in the face to rouse him (without success); (10) probed Lurry's mouth with his baton and pulled out several plastic baggies or pieces thereof from Lurry's mouth; (11) thereafter saw Lurry slump over and fall to his side unresponsive; and (12) watched other officers perform additional sternum rubs without a response from Lurry.

Sergeant May.  The evidence, considered in the light most favorable to plaintiff, shows that May: (1) had encountered Lurry before and knew that he was a cocaine dealer; (2) was immediately brought up to speed by Tellez once Lurry arrived at the police station and Tellez

---

[21]  Although McCue denies that he saw Lurry chewing, a reasonable jury could find that McCue (who, again, admits that he looked at Lurry during the ride) actually saw, or studiously avoided seeing, that Lurry was chewing and deteriorating physically.  *See Est. of Williams*, 902 F.3d at 650 (rejecting defendant officers' position that they were entitled to summary judgment based on their testimony that they did not hear that the decedent was having any difficulty breathing where the record would allow a jury to "reasonably infer that each Officer Defendant actually heard, or studiously avoided hearing, Williams' complaints of respiratory distress."); *Smith v. Whitsel*, __ F.4th __, 2025 WL 1135232, at *1–2 (7th Cir. Apr. 17, 2025) (finding issue of fact regarding whether defendant correctional officer observed decedent's symptoms where footage from the video feed that the officer acknowledged watching contradicted his testimony that he did not see decedent vomiting or "anything out of the ordinary during his well-being checks" on the decedent).

told him that Lurry had ingested drugs by putting some in his mouth; (3) knew that Lurry was unresponsive when McCue ordered Lurry to get out of the back of the squad car; (4) saw that Lurry was immobile or unable to move, had his eyes rolling into the back of his head, was unable to speak, and was unable to comprehend what was going on around him; (5) observed that Lurry did not respond to McCue's sternum rub; (6) slapped Lurry hard across the face while shouting "wake up bitch" with only a momentary reaction; (7) pinched Lurry's nose, pressed on his jaw and neck, and later pulled his mouth open without resistance or reaction; (8) smelled cocaine after he pulled Lurry's mouth open and saw a drug baggie in his mouth; (9) continued to pinch Lurry's nose while McCue used his baton to probe Lurry's mouth and remove drug baggies or portions thereof; (11) thereafter saw Lurry slump over and fall to his side unresponsive; and (12) watched other officers perform additional sternum rubs without a response from Lurry.

Lieutenant Harrison.  The evidence, considered in the light most favorable to plaintiff, shows that Harrison: (1) had encountered Lurry before and knew that he was a cocaine dealer whom he heard had swallowed drugs before; (2) walked to McCue's squad car after it arrived, saw the arrestee in the backseat, and announced that he recognized the arrestee to be Lurry (who was not in a normal state of consciousness); (3) saw that Lurry was blinking oddly as if half-asleep and was unresponsive; (4) ordered McCue to perform a sternum rub on Lurry and saw that Lurry remained unresponsive; (5) ordered May to push Lurry out of the car and heard him forcefully slap Lurry's face without rousing him; (6) saw May pinch Lurry's nose (without effect) and ordered McCue to use his baton to probe Lurry's mouth for the drug baggies; (7) was present when Lurry slumped over and fell to his side unresponsive; and (8) watched other officers perform additional sternum rubs without a response from Lurry.

Notwithstanding the above evidence, the Officers did not summon medical aid for Lurry until Harrison heard from McCue that Lurry had stopped breathing and called paramedics roughly three minutes after McCue and Tellez brought Lurry to the police station.  Defendants assert that no reasonable officer would have been placed on notice to summon assistance for Lurry any sooner.  (Dckt. #115 at 27).  In other words, the Officers contend that they had no notice as a matter of law that Lurry had a serious medical need that required medical assistance until they realized that he had stopped breathing.  As shown below, the arguments that the Officers offer in support of their position are contrary to settled law or otherwise unpersuasive and the cases they rely upon are factually distinguishable.

First, the Officers seek to excuse their failure to promptly seek medical assistance for Lurry based on their belief that Lurry was "feigning" the symptoms of medical distress that they observed.  (*See* Dckt #115 at 10 ("Harrison had extensive experience with arrestees faking medical emergencies to avoid going to jail and thought Lurry's conduct fit this pattern."); *id.* ("McCue suspected Lurry was being uncooperative and not in medical distress."); *id.* at 10–11 ("May knew that 'bitch' was particularly offensive to a longtime street criminal like Lurry and used that word on purpose in order to provoke Lurry out of any feigned medical condition."); *id.* at 11 ("He (Lurry) was ignoring their commands, but the officers had encountered many arrestees who feigned unresponsiveness or simply declined to speak with or obey the police.")).  The Officers further assert that when May struck Lurry in the face, Lurry's body "jolted," and he turned his body, (Dckt. #115 at 29), demonstrating that Lurry was "alert and capable of response, rather than in an unconscious state."  (*Id.* (citing DSOF ¶72 ("Lurry turned toward May after the strike and the cursing, opened his eyes, and appeared to have been aroused but did not make movements to get out of the car."))).

However, the fact that the Officers believed that Lurry was "feigning" his symptoms of medical distress does not refute the fact that the Officers had notice of his symptoms. The following observation from the Seventh Circuit's decision in *Ortiz* is instructive:

> The contention that the calls did not put Ramirez on notice that Molina needed her medication because the caller could have been lying is nonsensical. That explanation may shed light on why Ramirez failed to act once she was on notice— because she thought the caller was lying—but it does not refute the receipt of notice. Was it reasonable to do nothing aside from notifying her supervisors after receiving the calls? That, in our view, is the very question that the jury should decide.

*Ortiz*, 656 F.3d at 533; *McAllister v. Price*, 615 F.3d 877, 883 (7th Cir. 2010) (reversing summary judgment where jury could infer defendant's "mistaken belief that [plaintiff] was intoxicated [rather than needing medical attention] was unreasonable."); *Hall v. County of Nemaha, Neb.*, 509 F.Supp.2d 821, 832 (D.Neb. 2007) (denying summary judgment because "a reasonable jury [could] conclude that Hall had objectively serious medical needs, and that [defendant officers] actually knew of, but deliberately disregarded, those needs."). Furthermore, plaintiff—with citation to the video footage—disagrees with the Officers' characterization of how Lurry reacted when May slapped him in the face. (*See* PSAF ¶35 ("Mr. Lurry briefly moved his head to stare blankly in May's direction, but had no other visible reaction other than to go back to oddly blinking his eyes and later closing them.")). Because the video footage does not "utterly discredit" plaintiff's version of how Lurry reacted to May's slap, the Court must accept it as true at this time. *Ferguson v. McDonough*, 13 F.4th 574, 580 (7th Cir. 2021) (cleaned up); *Est. of Perry*, 872 F.3d at 455.

Next, the Officers attempt to minimize McCue's and Tellez's knowledge of Lurry's symptoms by construing the facts in the record in the light most favorable to them, and *not* in the light most favorable to Lurry as Rule 56 requires. To begin, the Officers asset that Lurry appeared only to be "groggy" during the ride between the scene of his arrest and the police

station. (Dckt. #115 at 27). This assertion disregards the evidence that Tellez—who believed that Lurry was chewing the illicit drugs that he had concealed in his mouth during the ride—observed that Lurry was blinking more slowly, was slumping over, and had a decreased level of consciousness. The Officers also assert that Lurry's actions "were the functional equivalent to arrestees who deny having ingested drugs when asked" because he appeared to turn his head away from the video monitor when he saw Tellez looking at him to conceal the fact that he was chewing the drugs.[22] (Dckt. #115 at 26–27). Why Lurry (whom Tellez and McCue failed to secure with a seatbelt) appeared to turn away from the monitor is unknown but even if he was trying to conceal his chewing of the drugs, he was unsuccessful because the video feed shows him chewing and Tellez admitted that he saw him making "chewing motions." (Dckt. #115 at 26).

With respect to McCue, the Officers assert that he reasonably believed that Lurry did not need immediate medical attention while transporting Lurry to the station because he was busy driving and did not observe Lurry. (Dckt. #115 at 26). However, McCue testified that he looked at Lurry on the video monitor during the drive between the scene and the police station and a reasonable jury could choose to disbelieve his testimony that he did not observe the symptoms that are visible on the video feed, which depict Lurry's deteriorating medical condition during

---

[22] The Officers' reliance on the factually distinguishable decision in *Royal v. Norris*, 776 Fed.Appx. 354 (7th Cir. 2019), to support this proposition is misplaced. In *Royal*, the officers noticed the arrestee chewing on something and suspected that he had eaten drugs. *Royal*, 776 Fed.Appx. at 355–56. Even though the arrestee verbally denied eating drugs, the officers took prompt action to safeguard his safety by called for paramedics to examine him and determine whether he needed to be taken to the hospital *before* the officers left the scene of the arrest. *Id.* at 356. The officers took the arrestee to the police station only after the paramedics determined that he did *not* need medical attention. *Id.* As such, *Royal* "serves as an example of the type of prompt medical attention that would not be objectively unreasonable." *Snukis*, 2022 WL 2305697, at *7. Plaintiff has offered evidence to a reasonable degree of medical certainty that Lurry would have survived if Tellez and McCue had called for an ambulance or taken Lurry to the hospital when they noticed Lurry chewing and suspected that he had eaten drugs. (PSAF ¶67).

the drive. *See, e.g., Smith*, 2025 WL 1135232, at *1–2; *Est. of Williams*, 902 F.3d at 650. The Officers also claim that McCue's inexperience (i.e., his "mere 8 days on the street") provides an excuse for his failure to summon medical aid for Lurry. (Dckt. #115 at 28). No case supports this "I'm inexperienced" defense,[23] and, again, courts have recognized the sort of symptoms that McCue observed Lurry to be experiencing would make the need for medical attention obvious even to a *lay person*. *Border*, 414 Fed.Appx. at 837–38 ("huddled and slumped over" detainee that had "difficulty staying awake" and later died from a drug overdose had serious and obvious medical need); *Westbrook*, 2024 WL 4010307, at *4–5 ("Drug-induced symptoms" that lead to overdose can be so obvious that a "lay person would recognize the need."); *Neely*, 2017 WL 959014, at *8 ("a lapse in consciousness could signify a serious condition.").

Next, the Officers imply that they did not have notice that Lurry had a serious medical need prior to when he stopped breathing because his symptoms were "ambiguous," they did not see a specific symptom (namely, "pinpoint pupils") that would have indicated that Lurry was experiencing an opioid overdose, and because Lurry never asked for medical assistance. (Dckt. #115 at 29 (there was no testimony that McCue "observed pinpoint pupils, the clearest signal of an opiate overdose" and "[a]t most, he misread 'ambiguous symptoms'"); *id.* at 11 ("While Lurry was becoming unresponsive due to an opioid overdose, the officers did not yet realize this" even after they extracted pieces of the baggies from his mouth); *id.* at 10, 25, 29 (Lurry never made a request for help)).

None of these arguments are persuasive. For starters, the law does not require that an officer have knowledge of the *cause* of the distress that he or she is observing before the duty to

---

[23] This is not surprising. Allowing the inexperience of an officer to provide a defense to a civil rights claim would incentivize municipalities to staff their police forces with inexperienced officers.

provide medical aid kicks in.  *Grote*, 85 F.4th at 407 (noting that "the officers' lack of knowledge about any actual drug use did not undermine the plaintiff's visibly outward signs of medical distress."); *id.* at 410 (defendant need only see that arrestee was "in fact" experiencing medical distress and need not know "why" the arrestee was experiencing such distress); *Burwell*, 7 F.4th at 465 (same).

Next, a reasonable jury could draw different inferences from the fact that Lurry never requested medical help: perhaps (as the Officers suggest) the jury could infer that he was capable of asking for help but chose to feign distress because he did not need any assistance, *or* the jury could infer that the semi-conscious (or unconscious) Lurry was unable to speak and in desperate need for medical treatment.  *See Ortiz*, 656 F.3d at 532–33 (plaintiff "was unable to speak at the time, we cannot imagine more direct notice that she needed medical care.").  The Court cannot draw inferences in favor of the Officers on summary judgment.  Similarly, to the extent that Lurry's symptoms were "ambiguous," this Court cannot disambiguate them and treat them as innocuous.  *See Huff v. UARCO, Inc.*, 122 F.3d 374, 384 (7th Cir. 1997) ("On the issue of ambiguity, we have already held that the task of disambiguating ambiguous utterances is for trial, not for summary judgment.") (cleaned up); *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 355 (7th Cir. 2009) (where a contract is ambiguous, it is "inappropriate" to resolve its meaning on summary judgment).

Finally, the Officers cite several cases in support of their assertion that they had no notice of Lurry's serious medical need as a matter of law until he was unconscious and not breathing. (Dckt. #115 at 15, 24–29 (citing cases)).  However, each of the cited cases is distinguishable for one or more reasons.  To begin, the three in-circuit cases that the Officers rely on are factually distinguishable.  *See Braun v. Vill. of Palentine*, 56 F.4th 542 (7th Cir. 2022); *Sallenger v. City of*

*Springfield, Ill.,* 630 F.3d 499 (7th Cir. 2010); *Chest v. City of Freeport*, No. 8 CV 50047, 2011 WL 1225460 (N.D.Ill. Mar. 31, 2011). In *Chest*, which concerned an arrestee who ingested drugs, the deceased swallowed cocaine but (unlike Lurry) continuously denied doing so and did not exhibit any symptoms that he was suffering from anything he ingested during his transportation to the police station. *Chest*, 2011 WL 1225460, at *3. Once the decedent arrived at the station, he began to manifest physical symptoms and the officers "acted without hesitation in obtaining prompt medical care" by calling an ambulance. *Id.* at *4 (further noting that "[i]t was not unreasonable for the officers to conclude prior to observing any symptoms that he had not swallowed a significant amount of drugs."). Thus, in *Chest*, unlike here, the evidence showed that the defendant officers "reacted reasonably in obtaining prompt medical care for the decedent" once they observed that decedent was having physical symptoms of medical distress. *Id.* at *3–4.

Neither *Sallenger* nor *Braun* involved decedents who ingested drugs. Instead, the decedent in *Sallenger*—who was suffering from mental illness—was subdued by officers after experiencing a psychotic episode and restrained in a "hobble (a cord that was looped around his lower legs and then connected to his handcuffs with a strap). *Sallenger*, 630 F.3d at 500. The decedent exhibited no signs of physical distress until he became unconscious and all witnesses (including the Estate's primary witness) "testified consistently that as soon as the officers realized [the decedent] was unconscious [and not breathing], they removed the hobble, began CPR, and summoned an ambulance." *Id.* at 504. The differing factual circumstances and the prompt action by the officers in *Sallenger* stands in sharp contrast to this case, and *Sallenger* does not support the proposition that defendant officers who observe an arrestee in physical

distress are entitled to wait until he becomes unconscious and stops breathing before summoning medical assistance.

*Braun* is likewise distinguishable on its facts. In that case, the plaintiff was arrested for driving while intoxicated after he was involved in a late-night accident. Although the plaintiff suffered a seizure prior to the accident, the court concluded that there was insufficient evidence that the defendant officer knew or should have known of plaintiff's medical needs because plaintiff exhibited "classic symptoms of intoxication at the scene of a single-car accident shortly after midnight," and the plaintiff told the officer that "he was not injured, did not suffer from any medical conditions, and did not need medical assistance." *Braun*, 56 F.4th at 552. As such, the defendant officer was entitled to summary judgment on plaintiff's failure to provide medical care claim. *Id.*

The remaining out-of-circuit cases cited by the Officers are not controlling for two reasons. First, they are factually distinguishable because the officers in those cases—unlike the Officers here—summoned medical assistance immediately after the arrestees began to exhibit signs of medical distress. *See Trevino v. Hinz*, 751 Fed.Appx. 551, 556 (5th Cir. 2018) ("When it became apparent [the decedent] needed medical attention, an ambulance was called."); *Sanders v. City of Dothan*, 409 Fed.Appx. 285, 288 (11th Cir. 2011) (defendant officer told the jail sergeant to call the paramedics once the officer observed that the arrestee, who had previously showed "no signs of impairment or intoxication," was "dazed" and "in some kind of medical distress"); *Long v. City of La Habra*, No. 3-57219, 2005 WL 2219442, at *1 (9th Cir. Sept. 14, 2005) ("As soon as [the deceased] began to exhibit signs of distress, Officer Quirarte immediately called paramedics."); *Weaver v. Shadoan*, 340 F.3d 398, 411 (6th Cir. 2003) (when

the arrestee who had previously denied swallowing any drugs "appeared to become ill, the Officers immediately summoned the paramedics.").[24]

Second, the courts in these out-of-circuit cases evaluated the failure to provide medical assistance claims at issue under the more rigorous deliberate indifference standard that is used by other Circuits rather than the objective reasonableness standard that is applicable to such claims in the Seventh Circuit. *See Est. of Perry*, 872 F.3d at 453 (recognizing that the objective reasonableness standard is "less demanding" than the deliberate indifference standard); *Sides v. City of Champaign*, 496 F.3d 820, 827–28 (7th Cir. 2007) (finding that the parties mistakenly argued that the "deliberate indifference" standard applied to an arrestee's failure to provide medical care claim). Proof of a failure to provide medical assistance under the deliberate indifference standard requires a plaintiff to establish: "(1) that each defendant had subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn, (2) that each defendant actually drew that inference; and (3) that each defendant's response to the risk indicates that [he] subjectively intended that harm occur." *Trevino*, 751 Fed.Appx. at 554 (cleaned up); *Sanders*, 409 Fed.Appx. at 288–89 (same); *Weaver*, 340 F.3d at 410 ("It is insufficient for a plaintiff to allege that there existed a danger that an officer should have been aware of . . . . Deliberate indifference is something more than negligence.") (cleaned up).

By contrast, the objective reasonableness standard applicable here does not require plaintiff to prove anything regarding each Officer's subjective knowledge and intent; instead, plaintiff need only show that each Officer was placed on notice of Lurry's serious medical

---

[24] In a fifth case, the Eleventh Circuit held that the defendant officer was entitled to qualified immunity because no particularized case law established that a reasonable police officer would have concluded that the decedent's rights were violated by the officer. *Presley v. City of Blackshear*, 340 Fed.Appx. 567, 569–70 (11th Cir. 2009).

condition through observation or the words of another.  *Ortiz*, 656 F.3d at 530–31; *Est. of Perry*, 872 F.3d at 454.  As such, even assuming for the sake of argument that plaintiff is unable to meet the rigorous deliberate indifference standard set forth in the cases cited by the Officers, that would not compel the entry of summary judgment against plaintiff under the objective reasonableness standard.  Furthermore, as shown above, plaintiff has produced enough evidence to, at a minimum, raise a genuine issue of material fact as to whether each Officer had sufficient notice of Lurry's need for medical assistance.

Based on the above, a reasonable jury could find that each of the Officers had notice of Lurry's medical need.

> **e.  Plaintiff has produced sufficient evidence to raise a genuine issue of material fact as to whether the Officers' delay in calling for medical assistance caused Lurry harm.**

At this juncture, plaintiff has the burden of presenting evidence sufficient to raise a genuine issue of fact as to whether the Officers' delay in summoning medical assistance for Lurry caused him "some degree of harm."  *Miranda v. Cnty. Of Lake*, 900 F.3d 335, 347 (7th Cir. 2018) (plaintiff need not show that the decedent "definitely would have lived" and it is enough "to show that the resulting harm was a diminished chance of survival."); *Jackson*, 74 F.4th at 500.  Where, as here, "an obviously ill detainee dies in custody and the defendants' failure to provide medical care is challenged, the causation inquiry is quite broad."  *Ortiz*, 656 F.3d at 534–35.  Plaintiffs may rely on expert testimony, medical records, and even non-expert evidence "as long as it permits the fact-finder to determine whether the delay caused additional harm."  *Id.* at 535; *Jackson*, 74 F.4th at 501; *Miranda*, 900 F.3d at 347.  As the Seventh Circuit has recognized, "[i]t is the 'rare' case that does not meet this threshold at summary judgment," and the issue of causation is removed from the jury's consideration only if "a plaintiff can proffer

*no* evidence that a delay in medical treatment exacerbated an injury." *Jackson*, 74 F.4th at 501 (cleaned up).

In this case, because the Officers ultimately called paramedics to treat Lurry, "the issue is whether [they] made the call in a reasonably 'prompt' manner." *Holcomb v. Ramar*, No. 1:13-CV-1102 AWI SKO, 2013 WL 5947621, at \*4 (E.D.Cal. Nov. 4, 2013). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010); *LaSalvia v. City of Evanston*, 806 F.Supp.2d 1043, 1050 (N.D.Ill. 2011). Even a brief delay in providing care may be unconstitutional, *Snukis*, 2022 WL 2305697, at \*7, and the Seventh Circuit has held that a delay of as little as three minutes in seeking medical assistance can create a factual dispute sufficient to preclude summary judgment. *See Est. of Perry*, 872 F.3d at 458 (holding that the district court improperly concluded that there was no factual dispute as to whether defendant's actions were objectively reasonable where she did not immediately call for help after learning that the decedent was "medically unfit" but instead waited "three minutes . . . before an ambulance was called."); *see also Est. of Booker v. Gomez*, 745 F.3d 405, 433 (10th Cir. 2014) ("The Defendants argue preexisting authority did not give them adequate notice that they could be deliberately indifferent by failing to summon medical care within a three-minute period. We disagree.").

The evidence, construed in the light most favorable to plaintiff, shows the following:

- Lurry had an extremely serious medical condition created by his ingestion of cocaine, heroin, and fentanyl;

- The burden of obtaining medical treatment for Lurry was low. Placing a call for paramedics was quick and simple. The Officers do not argue that it would have been burdensome to take Lurry to the hospital in lieu of making the eight-minute drive from the scene of the arrest to the police station. Likewise, it would have taken very little effort for Harrison—who was trained to administer Narcan—to go out to his car at the police station, retrieve Narcan from his glove box, and administer it to Lurry;

- The quicker someone suspected of ingesting drugs is treated medically, the higher the likelihood is that he will not have as severe symptoms from the overdose;

- A person who takes a drug that has an antidote available, such as heroin or fentanyl, has a very good chance of survival if they get medical treatment within a prompt amount of time;

- If Lurry had received Narcan earlier during his intoxication, it is likely within a reasonable degree of medical certainty that he would have survived;

- If Tellez or McCue had called for medical support while at the scene of his arrest when they first suspected that Lurry had swallowed drugs, his death would have most certainly been averted;

- If Tellez or McCue had called an ambulance or taken Lurry to the hospital when they first suspected Lurry had put drugs in his mouth, it is likely within a reasonable degree of medical certainty that Lurry would have survived;

- If Lurry had received medical care when he arrived at the police station, his chances of survival would have been substantially higher;

- Harrison did not call for paramedics until roughly three minutes after McCue and Tellez transported Lurry to the police station and none of the Officers administered Narcan to Lurry; and

- An ambulance arrived within three to five minutes after Harrison's call for assistance and the paramedics—who noted that Lurry was unconscious—administered to Lurry all the Narcan they had on the ambulance, to no effect.

(PSAF Resp. ¶¶16, 57, 67; DSOF Resp. ¶¶101, 107–08).

Each Officer was on notice that Lurry was experiencing physical symptoms of medical distress prior to or immediately after he was transported to the police station. The above evidence, at a minimum, creates a genuine dispute of material fact as to whether the Officers' delay in summoning or providing medical assistance to Lurry caused him to experience "some degree of harm," *Jackson*, 74 F.4th at 501; *Est. of Perry*, 872 F.3d at 458 (jury could determine

that the delay "was objectively unreasonable").  Given plaintiff's showing regarding all the applicable factors, the Court finds that she has produced sufficient evidence to defeat each Officer's request for summary judgment on this claim.  *See, e.g.*, *Ortiz*, 656 F.3d at 534 ("Certainly, the evidence is of varying strength against each defendant, but at this stage we do not weigh the proof, make credibility determinations, or resolve narrative disputes.  Those tasks are left for the trier of fact.").

**2. The right to prompt medical care in response to a serious medical need was clearly established on the date that Lurry was arrested.**

As government officials, the Officers are protected by qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson*, 555 U.S. at 231 (cleaned up).  As the Supreme Court has explained:

> Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. . . . In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate. . . . This demanding standard protects all but the plainly incompetent or those who knowingly violate the law. . . .

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be settled law, . . . which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. . . .

> The clearly established standard also requires that the legal principle clearly prohibits the officer's conduct in the particular circumstances before him.  The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . . This requires a high degree of specificity.

*D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up).

Plaintiff asserts that Lurry had a constitutional right to receive prompt medical care for the serious medical condition created by his ingestion of drugs.  Multiple courts in this Circuit

have held that such a constitutional right to prompt medical care was clearly established by the Seventh Circuit's 2017 decision in *Estate of Perry*. *See, e.g., Snukis*, 2022 WL 2305697, at *6 (citing *Est. of Perry*, 872 F.3d at 454, 458) ("*Estate of Perry* clearly establishes not only a Fourth Amendment right to medical care, but also a right to *prompt* medical care.") (emphasis added); *Acosta*, 2018 WL 3630011, at *7 (citing *Est. of Perry*, 872 F.3d at 459) ("Here, the right is prompt access to medical care, and whether officers can deny or delay an arrestee's access to a hospital when faced with a serious need is beyond debate."); *Lankamer v. Lalley*, No. 24 C 506, 2024 WL 4119152, at *6 (N.D.Ill. Sept. 9, 2024) (same); *Rayford v. McLean Cnty.*, No. 21-CV-1129, 2024 WL 712858, at *15 (C.D.Ill. Feb. 21, 2024) (same); *see also Est. of Booker*, 745 F.3d at 434 ("failing to check Mr. Booker's vital signs, perform CPR, or seek medical care for three minutes when he was limp and unconscious as a result of the Defendants' use of force could violate the Constitution.").

In sum: this Court finds that plaintiff has presented sufficient evidence to raise an issue of material fact as to whether the Officers' delay in summoning/providing medical care to address Lurry's serious medical need caused him harm and, because Lurry's right to receive prompt medical care was clearly established, the Officers are not entitled to qualified immunity at this stage.

**B. Plaintiff's Excessive Force Claims Against May and McCue.**

Plaintiff claims that May and McCue used excessive force against Lurry when: (1) May slapped Lurry while he was handcuffed and unresponsive; (2) May pinched Lurry's nose shut while simultaneously applying pressure to Lurry's neck and pressing up on his jaw; and (3) when McCue shoved his police baton into Lurry's mouth while he removed plastic baggies or pieces of

40

baggies from Lurry's mouth. The Officers assert that May and McCue are entitled to qualified immunity because their actions were reasonable and not prohibited by clearly established law.

It is well-settled that "[a]ll claims that law enforcement officers have used excessive force should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Doxtator v. O'Brien*, 39 F.4th 852, 860 (7th Cir. 2022). This reasonableness standard is an objective one in the sense that it is based on the facts and circumstances presented to the officer at the time of the conduct at issue, rather than the officer's subjective intent. *Id.* The analysis of the officers' actions must be "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Weinmann v. McClone*, 787 F.3d 444, 448–49 (7th Cir. 2015) (cleaned up).

While the test of reasonableness is fact-specific and "not capable of precise definition or mechanical application," *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021), the Supreme Court has articulated a three-factor test to aid the courts in assessing objective reasonableness: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Moreover, "courts should consider medical necessity, and the role that a law enforcement officer plays in addressing that medical necessity, as part of their assessment of the *Graham* factors." *Taylor v. City of Milford*, 10 F.4th 800, 809 (7th Cir. 2021). This is so because "a medical emergency may in some cases justify the use of force when providing medical aid" with the proviso that responding to a medical emergency does not "give[] police officers an absolute license to disregard the Fourth Amendment." *Id.*

Each challenged use of force must be analyzed separately beginning with the earliest allegation of excessive force even though each use of force occurred sequentially as part of the same interaction that the Officers had with Lurry. *See Pryor v. Corrigan*, 124 F.4th 475, 490 n.4 (7th Cir. 2024); *Handy v. Weathersby*, No. 22-CV-4809, 2025 WL 27500, at *6 (N.D.Ill. Jan. 3, 2025); *Mills v. Owsley Cnty. Kentucky*, 483 F.Supp.3d 435, 458 (E.D.Ky. 2020); *Campbell v. City of Indianola*, 117 F.Supp.3d 854, 869 (N.D.Miss. 2015). In recognition that "the person most likely to rebut the officers' version of events—the one killed—can't testify," the Court will "scrutinize[] the evidence carefully" to ensure fairness to Lurry. *King*, 954 F.3d at 985 (citing *Maravilla v. United States*, 60 F.3d 1230, 1233–34 (7th Cir. 1995)). The Court can grant summary judgment as to plaintiff's claim for each use of force only if May or McCue is entitled to qualified immunity or the undisputed facts establish that their actions were reasonable as a matter of a law. *See Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020).

### 1. May is not entitled to summary judgment on plaintiff's excessive force claim arising from his action in slapping Lurry in the face.

Plaintiff asserts that May violated Lurry's Fourth Amendment rights when he slapped Lurry across the face while saying "wake up bitch," as Lurry sat unresponsive, non-resistant, and handcuffed behind his back and, further, that Lurry's right to be free from excessive force under these circumstances was clearly established. The Court first finds that Lurry's right to be free from such a use of force was clearly established on the date that May slapped him. The Court further finds that plaintiff has presented evidence that, at a minimum, raises a genuine issue of fact as to whether May's slapping of Lurry was an objectively unreasonable use of force.

"To overcome qualified immunity in an excessive-force case, the plaintiff must either (1) identify a closely analogous case that established a right to be free from the type of force the police officers used on him or (2) show that the force was so plainly excessive that, as an

objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Cibulka v. City of Madison*, 992 F.3d 633, 639 (7th Cir. 2021) (cleaned up).

The Seventh Circuit made it clear long before the date of Lurry's arrest that "officers may not use unnecessary force when a civilian is already subdued or compliant." *Taylor*, 10 F.4th at 810; *Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018) ("If the facts and circumstances show that an individual who once posed a threat has become subdued and complying with the officer's orders, the officer may not continue to use force.") (cleaned up); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("It is clear . . . that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever."); *see also Austin v. City of Pasadena, Texas*, 74 F.4th 312, 319, 327 (5th Cir. 2023) ("[A]t the time of this incident (March 28, 2019) it was clearly established that the continued use of force . . . against a restrained and subdued subject who was not actively resisting due to a medical emergency violates the Fourteenth Amendment"); *Cornelius v. City of Mount Washington, Kentucky*, No. 318CV00341GNSCHL, 2021 WL 3082246, at *5 (W.D.Ky. July 21, 2021) (recognizing that "the right to be free from physical force when one is not resisting the police is a clearly established right.") (cleaned up).

Furthermore, the Fifth and the Sixth Circuits have held prior to the date of the incident with Lurry that a slap to the face of a suspect who is neither fleeing nor resisting is "excessive and unreasonable." *Sam v. Richard*, 887 F.3d 710, 714 & n.2 (5th Cir. 2018) (citing *Carico v. Benton, Ireland, & Stovall*, 68 Fed.Appx. 632, 637 (6th Cir. 2003)); *Pigram ex rel. Pigram v. Chaudoin*, 199 Fed.Appx. 509, 513 (6th Cir. 2006) ("a slap to the face of a handcuffed suspect—even a verbally unruly suspect—is not a reasonable means of achieving anything more than

perhaps further antagonizing or humiliating the suspect."); *Bultema v. Benzie County*, 146 Fed.Appx. 28, 37 (6th Cir. 2005) ("[W]e have . . . held for more than twenty years that it is clearly established in this circuit that a 'totally gratuitous blow' to a suspect who is [1] handcuffed and [2] offering no resistance violates the Fourth Amendment.") (cleaned up); *Colson v. City of Alcoa, Tennessee*, No. 3:16-CV-377, 2018 WL 1512946, at *9 (E.D.Tenn. Mar. 26, 2018) ("When a person is neutralized—restrained and non-resistant—even an officer's de minimis use of force against that person, including a slap, will constitute excessive force under the Fourth Amendment.").[25]

Here, plaintiff has presented evidence that May forcefully slapped Lurry across the face at a time when Lurry was neutralized (i.e., handcuffed behind his back and non-resistant), non-responsive, apparently unconscious having just failed to react to a sternum rub, and posing no threat whatsoever to the Officers or to himself. May *admitted* that his strike to Lurry's face was unwarranted. (PSAF Resp. ¶37). The force with which May slapped Lurry stunned Harrison (who admitted that the strike was harder than trying to arouse someone and that he would not have expected one of his officers to administer an open hand strike to the face of an arrestee in Lurry's situation) and Tellez (who intentionally turned off the squad car camera after May struck Lurry because he knew it was inappropriate to strike someone in handcuffs). (*Id.* ¶¶36–37, 39).

---

[25] The district court's decision in *Neal v. Bierbaum*, No. 1:17-cv-1495, 2018 WL 6268198 (C.D.Ill. Nov. 30, 2018), is factually distinguishable. In that case, an officer who performed a traffic stop of plaintiff's vehicle believed—albeit mistakenly—that he saw plaintiff place narcotics in his mouth and struck plaintiff in the mouth to keep him from swallowing the drugs. *Id.* at *1, 4. Although the court held that the officer's use of force was "objectively unreasonable," it further found that plaintiff's right to be free from such a use of force was not clearly established. Unlike here, though, the *Neal* plaintiff was not handcuffed, unresponsive, subdued, or apparently unconscious at the time the defendant officer struck him and the officer did not admit that his strike to plaintiff's face was unwarranted.

Moreover, there is evidence that Lurry sustained physical injury to his mouth on account of May's slap. (PSAF ¶36).[26]

Given this evidence, a reasonable jury could find that May's slap to Lurry's face was an objectively unreasonable use of force notwithstanding the Officers' claims that May struck Lurry's face by mistake and that his slap "accompanied by the profanity of 'wake up, bitch,' [was] intended to rouse Lurry and determine if he was faking a medical condition." (Dckt. #115 at 21–22). May's subjective intent is irrelevant to the determination of whether his slap to Lurry's face was objectively unreasonable. *Taylor*, 10 F.4th at 809 n.4.

The Officers' contention that May's forceful slap to Lurry's face is analogous to McCue's use of a sternum rub on Lurry (an action that plaintiff does *not* challenge as excessive) is also unpersuasive. (Dckt. #115 at 22–23). To begin, the Officers' contention that "[s]ome doctors and paramedics will [] use a slap to the face as a painful stimulus to determine a patient's consciousness" is not supported by the record.[27] Furthermore, courts have recognized that:

> [T]he head is a particularly fragile part of the human body. It lacks a layer of muscle or fatty tissue that can absorb the impact of a blow, unlike body parts like the shoulder or thigh. Because the head contains the brain, it is commonly understood that head injuries can pose a substantial risk of serious and lasting physical harm. Courts have accordingly recognized the unique danger of strikes to the head. *See, e.g., Davenport v. Causey*, 521 F.3d 544, 553–54 (6th Cir. 2008) (fist blows to the head could cause serious injury or death); *Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007) (same); *cf. United States v. Mitchell*, 78 F.4th 661, 670 (4th Cir. 2023) (noting in the sentencing context that "as little as one punch to the head . . . may cause a substantial risk of serious bodily injury within the meaning of the [Sentencing] Guidelines.").

---

[26] Although the Officers dispute that the autopsy showed injury to Lurry's face because it showed lacerations and abrasions to Lurry's upper and lower lips, (PSAF Resp. ¶36), the Court has deemed this fact admitted because Lurry's lips are located on his face.

[27] In particular, the Officers rely on the deposition testimony of a Nicholas Murphy, a paramedic who arrived on the scene after May slapped Lurry. (DSOF Resp. ¶108 (citing Dckt. #114-11 at 5)). However, Murphy's testimony establishes that: (1) he has never slapped someone in the face as a pain stimulus; (2) face slapping is *not* a technique that paramedics are trained to employ; and (3) he would not smack a person in the face even if he knew that they had drugs in their mouth. (Dckt. #114-11 at 5–6).

*Lewis v. Caraballo*, 98 F.4th 521, 531 (4th Cir. 2024).  For these reasons, comparing a forceful strike to the face to a sternum rub is like comparing a scorpion's sting to a pin prick.

In sum: the fact that Lurry was experiencing a medical emergency did not "eviscerate" his Fourth Amendment rights and provide May with carte blanche to slap him across the face. *Taylor*, 10 F.4th at 810.  Accordingly, May is not entitled to qualified immunity on plaintiff's excessive force claim related to the slap across Lurry's face.

### 2. May is entitled to qualified immunity on plaintiff's excessive force claim related to his application of pressure to Lurry's jaw and neck and pinching of Lurry's nose.

Plaintiff claims that May used excessive force in violation of the Fourth Amendment when he pinched Lurry's nose shut and applied pressure to Lurry's jaw and neck in an effort to force Lurry's mouth open.  The Officers assert that May is entitled to qualified immunity on this claim on the grounds that it was not clearly established that May's actions violated Lurry's constitutional rights and because his actions were objectively reasonable.  For the reasons below, the Court finds that plaintiff has failed to show that clearly established law barred May's use of this type of force and the Court does not (and need not) reach the question of whether May's actions were objectively reasonable.

The facts regarding this claim, presented in the light most favorable to plaintiff with all disputes resolved in her favor, are as follows.  Immediately after May slapped Lurry's face, he began to apply pressure to Lurry's jaw and neck area with his left hand while contemporaneously pinching Lurry's nose shut with his right hand.  (PSAF Resp. ¶40).  May continued pinching Lurry's nose shut for approximately ninety seconds "with the intention of restricting Mr. Lurry's ability to breathe to force him to open his mouth."  (*Id.* ¶¶40–41).  Only after May started pinching Lurry's nose and placing his hands in Lurry's neck/jaw area did May order Lurry to

open his mouth.  (*Id.* ¶40).  Harrison also heard May state that Lurry was "chewing, he's trying

to chew."  (*Id.* ¶41).  During the first forty-five seconds of pinching Lurry's nose, May

"periodically pressed up on Lurry's jaw" and applied pressure to Lurry's neck for three seconds.

(*Id.* ¶42).  Shortly after those first forty-five seconds, and with his hand still pinching Lurry's

nose, May pulled down on Lurry's chin hairs to open his mouth and Lurry's mouth easily

opened.  (*Id.* ¶44).  Once Lurry's mouth opened, May smelled cocaine and stated that he saw a

large plastic baggie inside Lurry's mouth.  (DSOF Resp. ¶93).  Throughout the ninety seconds,

Lurry never spoke or exhibited any movement.  (*Id.* ¶42).  Lurry's autopsy showed an "internal

hemorrhage on the strap muscle of Mr. Lurry's neck."  (PSAF Resp. ¶42).

To establish that a constitutional right is clearly established, "except in the 'rare obvious

case,' a plaintiff must point to a case that every reasonable official would interpret . . . to

establish the particular rule the plaintiff seeks to apply."  *Wesby*, 583 U.S. at 63–64 (cleaned up).

Although plaintiff has cited several cases in opposition to May's bid for qualified immunity

regarding this use of force, none of these decisions clearly informed May as of the date of

Lurry's arrest (January 19, 2020) that his actions violated the Fourth Amendment.  (Dckt. #125

at 26–27 (citing cases)).[28]

Plaintiff principally relies on *Chalmers v. City of Chicago*, No. 21 CV 1531, 2023 WL

2538962 (N.D.Ill. Mar. 16, 2023), where the plaintiff alleged that the defendant officers used

---

[28]  A number of these cases concerned officers' application of force to restrict the airways of arrestees in
scenarios that did *not* involve the factual circumstances here (namely, where an arrestee has illegal drugs
in their mouth and the officers act to recover the drugs and prevent the arrestee from swallowing them).
*See Abdullahi v. City of Madison*, 423 F.3d 763, 764–77 (7th Cir. 2005); *Tuuamalemalo v. Greene*, 946
F.3d 471, 474–75 (9th Cir. 2019); *Coley v. Lucas County*, 799 F.3d 530, 534–35 (6th Cir. 2015); *Weigel v.
Broad*, 544 F.3d 1143, 1147–49 (10th Cir. 2008).  As such, the general principles articulated in these
factually distinct cases do not resolve the qualified immunity issues raised here.  *See, e.g., Bray v.
Shiparski*, No. 3:21-CV-855 JD, 2024 WL 1885781, at *7–9 (N.D.Ind. Apr. 30, 2024) (holding that
factually distinct Seventh Circuit decisions did not control the determination of qualified immunity in a
case where officers tased and choked an arrestee to remove drug-filled baggies from his mouth).

excessive force while arresting him for drug-dealing. *Id.* at *7. The plaintiff alleged, among other things, that one officer put his hand on the front and back of plaintiff's throat, applied pressure before he gave verbal instructions to spit out narcotics, and continued to apply pressure after the plaintiff denied he had narcotics. *Id.* at *8. The *Chalmers* court noted that "there is no case that establishes that a police officer cannot use less than deadly force to prevent ingestion of drugs, particularly when the arrestee is not responding to verbal commands." *Id.* at *9 (citing cases). At the same time, the court recognized a limit to the amount of force that an officer can use to prevent a suspect from ingesting drugs, and opined that it was clearly established that an officer's use of deadly force by restricting plaintiff's airway while plaintiff was compliant and did not pose any threat to the officer was not authorized. *Id.* at *7–8. In the end, the court denied summary judgment after holding that there were "too many disputes over material facts" to determine if the officer "used excessive force and if it was clearly established at the time that the force used was unconstitutional." *Id.* at *9.[29]

*Chalmers* does not defeat Mays' claim to qualified immunity for three reasons. First, the Seventh Circuit has held that district court decisions cannot clearly establish a constitutional right. *See, e.g., Mason-Funk v. City of Neenah*, 895 F.3d 504, 509 (7th Cir. 2018). Second, even if *Chalmers* could clearly establish a constitutional right, the decision in that case was issued more than three years *after* Lurry's arrest so it could not have possibly provided Mays with notice that his conduct was unlawful. Third, *Chalmers* arguably contradicts a line of decisions

---

[29] The *Chalmers* court similarly declined to resolve the qualified immunity defense of a second officer whom plaintiff asserted pinched his nose shut while the first officer was applying pressure to his neck because there was a factual dispute as to whether the second officer even touched plaintiff's nose. *Id.* at *10.

from the Fifth and Eleventh Circuits and district courts in other circuits which imply that May's

actions were lawful:

> *Stogner v. Sturdivant*, 515 Fed.Appx. 280, 283 n.1 (5th Cir. 2013) (citing *United States v. Harrison*, 432 F.2d 1328, 1330 (D.C.Cir. 1970) (recognizing that the "application of force to the throat to prevent destruction of evidence is not in itself legally impermissible" in a case where defendant officer wrapped his arms around decedent's neck to prevent him from swallowing a drug-filled baggie);

> *German v. Sosa*, 399 Fed.Appx. 554, 557 (11th Cir. 2010) ("It is constitutional for officers recognizing an attempt to swallow and destroy what appears to be narcotics to hold the suspect's throat and attempt to pry open the suspect's mouth by placing pressure against his jaw and nose.");

> *Espinosa v. United States*, 278 F.2d 802, 803–04 (5th Cir. 1960) (constitutional for an officer to place pressure against a suspect's throat and nose to attempt to pry open their mouth in order to prevent the suspect from ingesting narcotics);

> *Clark v. Gross*, No. 4:15-CV-04068-KES, 2016 WL 6638095, at *9 (D.S.D. Oct. 3, 2016), *report and recommendation adopted*, No. 4:15-CV-04068-KES, 2016 WL 6637941 (D.S.D. Nov. 9, 2016) (holding that it was not clearly established that "an officer's use of a flashlight/pen or a chokehold" to extract drugs from an arrestee's mouth "would violate the Fourth Amendment rights of an uncooperative arrestee suspected of secreting drugs in his mouth.");

> *Johnson v. Rogers*, No. 3:10-CV-50-WKW, 2012 WL 3231327, at *8 (M.D.Ala. July 11, 2012), *report and recommendation adopted*, No. 3:10-CV-50-WKW, 2012 WL 3206238 (M.D.Ala. Aug. 6, 2012) (finding that defendant officer "did not use excessive force when he put Plaintiff in a chokehold to prevent him from swallowing the drugs suspected to be in his mouth as it does not violate any clearly established right for law enforcement officers, who reasonably believe a suspect is attempting to swallow and/or destroy drug evidence, to use reasonable force to prevent such occurrence, including holding the suspect's throat and/or attempting to pry open the suspect's mouth by placing pressure against his/her jaw and nose.");

> *Ellis v. Columbus Police Dep't*, No. 1:07CV124-A-A, 2009 WL 1663454, at *5 (N.D.Miss. June 15, 2009) ("Pinching a suspect's nose, holding his throat, and applying pressure to his jaw to retrieve evidence (namely, cocaine) that the suspect is trying to swallow is a constitutionally acceptable practice."); and

> *Currie v. Oklahoma City Police Dept.*, No. CIV-08-194-HE, 2008 WL 1946787, at *1–2, 4 (W.D.Okla. Apr. 30, 2008) (defendant officer acted reasonably in effectuating plaintiff's arrest when he pinched plaintiff's nose closed and placed his hand below plaintiff's Adam's apple to get him to open his mouth and prevent plaintiff from ingesting a bag of crack cocaine).

This caselaw, which—unlike *Chalmers*—was in existence at the time May acted, suggests that his "use of force was within the bounds of the Fourth Amendment." *Clark*, 2016 WL 6638095, at *12.[30]  Finally, given the cases cited above, this is not the sort of "rare obvious case" where the unlawfulness of May's conduct is sufficiently clear even though plaintiff does not point to a closely analogous case that clearly establishes the constitutional right in question. *See Bray*, 2024 WL 1885781, at *9.

In sum: plaintiff has failed to show that Lurry had a clearly established constitutional right to be free from this type of force and May is entitled to qualified immunity on this portion of plaintiff's excessive force claim.

### 3. McCue is entitled to qualified immunity on plaintiff's excessive force claim related to his insertion of his police baton into Lurry's mouth.

Next, plaintiff alleges McCue used excessive force in violation of the Fourth Amendment when he "forc[ed] a baton into Mr. Lurry's mouth to retrieve narcotics without medical assistance." (Dckt. #54 ¶124).  The Officers assert that McCue (like May) is entitled to qualified

---

[30] Plaintiff cites two cases that concerned factual circumstances where arrestees concealed drugs in their mouths, but they do not undercut May's qualified immunity defense here.  In one case, the Fifth Circuit rejected the claim that officers acted objectively unreasonably in light of clearly established law when they applied force to the jaw and throat of a suspect who was believed to be hiding evidence (namely, narcotics) in her mouth.  *Surratt v. McClarin*, 851 F.3d 389, 390–93 (5th Cir. 2017).  In the second case, the court recognized that "[w]hile a person has a clearly established right to be free from excessive force by police, it is equally clear that a person has no constitutional right to secrete evidence."  *Singleton v. City of Newburgh*, 1 F.Supp.2d 306, 313 (S.D.N.Y. 1998).  The court further recognized that it was permissible for officers to use reasonable force to prevent the swallowing of evidence.  *Id.* at 314 (citing *Harrison*, 432 F.2d at 1330, for the proposition that "during execution of warrant, it was reasonable for officer to grab suspect by throat to prevent suspect from swallowing envelope of heroin.").  Nonetheless, the court denied an officer's motion for summary judgment on qualified immunity grounds where there was a material question of fact whether he used reasonable force in seizing contraband from the deceased's mouth.  *Id.* at 313–15.  Specifically, the officer pressed his hand on the deceased's neck for thirty to sixty seconds and the medical review board's report (which determined that the cause of his death was neck compression and classified the death as a "homicide") suggested that the decedent died because of the pressure applied to his neck by the officer.  *Id.* at 314.  Here, by contrast, May applied pressure to Lurry's neck for three seconds (not thirty to sixty seconds), and he died of a drug overdose and asphyxia (and not neck compression).

immunity because it was not clearly established that his actions violated Lurry's constitutional rights and because his actions were objectively reasonable. For the reasons below, the Court finds that plaintiff has failed to show that clearly established law barred McCue's use of this type of force and the Court does not (and need not) reach the question of whether McCue's actions were objectively reasonable.

The facts regarding this claim, presented in the light most favorable to plaintiff with all disputes resolved in her favor, are as follows. After May opened Lurry's mouth and said he saw "a large plastic baggie" inside, Harrison instructed McCue to use a police baton to prop open Lurry's mouth. (DSOF Resp. ¶¶93, 95). McCue inserted the baton into Lurry's mouth after May had to manually pull his mouth open and while he remained handcuffed and non-responsive in the back of McCue's squad car. (*Id.* ¶95; *see also* Dckt. #126, Ex. I at 17:45). McCue used the baton as a "probe or probing device" that he moved "in a sweeping manner in [Lurry's] mouth like a blind finger sweep" to probe for drug baggies. (PSAF Resp. ¶45). The baton remained inside Lurry's mouth for about twenty-five seconds, during which McCue pulled several "plastic baggies or pieces of plastic baggies" from Lurry's mouth. (DSOF Resp. ¶96).

The analysis of whether McCue is entitled to qualified immunity on this claim is very similar to the qualified immunity analysis in the preceding section concerning May. Plaintiff has not pointed to a case that clearly establishes Lurry's right to be free from the sort of force that McCue applied. Instead, she relies on the same cases discussed above in Section III(B)(2) to support the proposition that Lurry's constitutional right was clearly established, (Dckt. #125 at 25–28), and these cases fail to meet her burden of establishing a clearly established right for the reasons previously stated.

Furthermore, a number of decisions that were issued prior to the date of Lurry's arrest suggest that McCue's use of force was within the bounds of the Fourth Amendment. *See Randle v. Tregre*, 670 Fed.Appx. 285, 286–87 (5th Cir. 2016) (affirming district court's grant of summary judgment on qualified immunity grounds where defendant officer—who suspected that plaintiff was concealing drugs in his mouth—did not violate plaintiff's clearly established rights by using a sleeper hold and a flashlight to pry open plaintiff's mouth to retrieve the drugs); *Clark*, 2008 WL 6638095, at *2, 9 (holding it was not clearly established that an officer's insertion of a flashlight and pen into the mouth of an uncooperative arrestee who was suspected of secreting drugs in his mouth while using a chokehold would violate the arrestee's Fourth Amendment rights); *Smith v. City of Huntsville*, No. 5:15-CV-00555-AKK, 2016 WL 5746216, at *1 (N.D.Ala. Sept. 30, 2016) (holding that an officer's use of the butt of a flashlight, ink pen, and glitter eye pen to pry the arrestee's teeth apart to stop him from ingesting drugs and to retrieve the drug-filled baggie did not violate the arrestee's clearly established constitutional rights).

Finally, given the cases cited above, this is not the sort of "rare obvious case" where the unlawfulness of McCue's conduct is sufficiently clear even though plaintiff does not point to a closely analogous case that clearly establishes the constitutional right in question. *See Bray*, 2024 WL 1885781, at *9.

In sum: plaintiff has failed to show that Lurry had a clearly established constitutional right to be free from this type of force and McCue is entitled to qualified immunity on this portion of plaintiff's excessive force claim.

**C. Plaintiff's Unreasonable Search Claims Against May and McCue.**

As stated above (*supra*, at fn.2), plaintiff's claims against May and McCue for unreasonable search of Lurry's person under the Fourth Amendment are premised on the same facts as plaintiff's excessive force claim. (*See* Dckt. #125 at 19 ("As Defendants themselves say, 'whether one characterizes [Defendants'] actions as a 'search' or a 'use of force,' . . . the analysis is the same.'")). Moreover, it well-settled that an officer can search an arrestee's mouth for drugs where there is probable cause to do so,[31] and it is undisputed that May and McCue had probable cause to believe that Lurry had drugs in his mouth at the time they took the actions in question. Given this, and because summary judgment has been granted on plaintiff's excessive force claims against May (for his action to squeeze Lurry's throat and pinch his nose) and against McCue (for his use of the baton) based on qualified immunity, summary judgment on plaintiff's unreasonable search claim pertaining to those uses of force is likewise appropriate.

**D. Plaintiff's Failure to Intervene Claims Against the Officers.**

Plaintiff asserts a failure to intervene claim based on assertions that: (a) Tellez and Harrison had a reasonable opportunity to prevent McCue and May's unreasonable search and excessive force against Lurry; (b) McCue and May had a reasonable opportunity to prevent each other's unreasonable search and excessive force against Lurry; and (c) all defendants had a reasonable opportunity to prevent one another from failing to provide medical care to Lurry. (Dckt. #54 ¶¶147–52).

As the Seventh Circuit has explained:

---

[31] *See, e.g., Johnson*, 2012 WL 3231327, at *8 (citing *Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999); *Nickols v. Morris*, 705 F.Supp.2d 579, 589 n.32 (N.D.Tex. 2010), *aff'd*, 419 Fed.Appx. 534 (5th Cir. 2011) (citing cases); *Singleton*, 1 F.Supp.2d at 313 (noting that "courts have upheld the constitutionality of searches of a suspect's mouth when the suspect has been properly detained under the Fourth Amendment.").

> [a]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under §1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). A "realistic opportunity to intervene" can exist if the officer(s) could have "called for a backup, called for help, or at least cautioned [the officer] to stop." *Abdullahi*, 423 F.3d at 774, *quoting Yang*, 37 F.3d at 285. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* (cleaned up).

Plaintiff asserts that the Officers' argument for summary judgment on her failure to intervene claims "hinges on their ability to prevail in dismissing the underlying constitutional violations of excessive force, unlawful search, and failure to provide medical attention." (Dckt. #125 at 53). This is not entirely correct.

The Officers did argue that "as to May's slap of Lurry, none of the other officers could have prevented it; it was over by the time any person could react." (Dckt. #115 at 30). This argument—which plaintiff does not address—is a winner because no reasonable jury could conclude that any of the other Officers had sufficient time to intervene to prevent May from slapping Lurry. *See Abdullahi*, 423 F.3d at 774. Harrison ordered May to get Lurry out of the car, not to strike him, let alone slap his face. May's act in slapping Lurry's face was a surprise to *each* Officer (including May himself, who testified that he slapped Lurry's face because he "missed" and was instead intending to hit Lurry in the shoulder or chest). Consequently, Tellez, McCue, and Harrison lacked a reasonable opportunity to stop May from striking Lurry and no reasonable jury could find otherwise. *Stewardson v. Titus*, 126 F.3d 1264, 1279 (7th Cir. 2025)

("The law does not require officers to act as fortune tellers, anticipating when their fellow officers might use excessive force."); *Doxtator*, 39 F.4th at 865 (granting summary judgment to two officers on failure to intervene claim where "there was no period of time before [one officer] actually fired in which [the two officers] could have known that he was going to shoot."); *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014).

The Officers are also entitled to summary judgment on the failure to intervene claims associated with the excessive force claims concerning the use of force by May and McCue to remove the drugs from Lurry's mouth because Lurry's constitutional right to be free from such force was not clearly established. *See, e.g.*, *Gill v. City of Milwaukee*, 850 F.3d 335, 341–42 (7th Cir. 2017) (where the constitutional right in question was not clearly established and defendants are therefore entitled to qualified immunity, the corresponding claim against other defendants for the failure to intervene "must also fail" because the other defendants "would not have known a constitutional violation was committed.").

Finally, the Officers assert that they are entitled to summary judgment on plaintiff's failure to intervene claims against them based on the failure to provide medical care because "different officers were present at different times and knew (or suspected) different things." (Dckt. #115 at 31). However, as explained in Section III(A)(1)(d), plaintiff has presented sufficient evidence that each Officer had notice of Lurry's serious medical need to survive summary judgment, the evidence shows that each Officer was always in the presence of one or more other Officers, and the Officers' subjective knowledge (while relevant under the inapplicable deliberate indifferent standard) is not relevant to the objective reasonableness standard that governs plaintiff's claims. Because the Court declines to grant summary judgment as to denial of medical care claims against the Officers and the Officers make no other specific

arguments as to why the associated failure to intervene claims should otherwise be dismissed, the Court will deny summary judgment as to these claims.[32]  *See, e.g.*, *Watson v. Fulton*, No. 15 C 11559, 2020 WL 1248678, at *13 n.10 (N.D.Ill. Mar. 16, 2020) ("Because the Defendants failed to make any arguments that Watson's state law claims should be dismissed even absent tort immunity (or even if the Defendants' conduct was not justified), the Court will not address those claims on the merits.").

### E. Plaintiff's Supervisory Liability Claim Against Harrison.

Plaintiff asserts that Lt. Harrison (the highest-ranking Joliet police officer on the scene and leader of the JNU) has supervisory liability under Section 1983 based on his subordinates' actions that plaintiff claims deprived Lurry of his constitutional right to be free from excessive force and to receive prompt medical care.  (Dckt. #54 ¶¶153–57).

Harrison may be subject to supervisory liability for the acts of his subordinates if he is personally involved, knows about his subordinates' conduct, and approves of the conduct and the basis for it.  *Lanigan v. Vill. of East Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997).  For a supervisor to be "personally involved" he must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.  They must in other words act either knowingly or with deliberate, reckless indifference."  *Jones v. City of Chi.*, 856 F.2d 985, 992 (7th Cir. 1998).  Put another way, supervisory liability can be found "if the conduct causing the constitutional deprivation occurs at [the supervisor's] or with his knowledge

---

[32]  The Court notes that the question of whether plaintiff can bring her failure to intervene claim based on the Officers' failure to provide medical care appears to be unsettled in this Circuit.  In particular, although one district court in this Circuit (and others in the Second Circuit) have allowed such claims, the Third and Eighth Circuits have held that there is no clearly established law regarding a duty to intervene to prevent constitutional violations outside of the excessive force context.  *Compare Cox v. Med. Coll. of Wisconsin, Inc.*, 651 F.Supp.3d 965, 1018–22 (E.D.Wis. 2023) *and Huber v. County of Erie et al.*, No. 20-CV-00748V(F), 2021 WL 3635207, at *11 (W.D.N.Y. Aug. 17, 2021) *with Thomas v. City of Harrisburg*, 88 F.4th 275, 285 n.55 (3d Cir. 2023); *Hess v. Ables*, 714 F.3d 1048, 1052 (8th Cir. 2013).

and consent." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (cleaned up); *Bostic v. Vasquez*, 652 F.Supp.3d 971, 985 (N.D.Ind. 2023).

Harrison has no supervisory liability related to the excessive force claims that plaintiff asserts against May and McCue for the reasons stated above in the discussion of the failure to intervene claims. (*See* Section III(D), *supra*). In particular, Harrison did not order May to slap Lurry in the face and there is no evidence that he expected May to do so; he had no realistic opportunity to stop him from slapping Lurry (*see Bostic*, 652 F.Supp.3d at 985); and there is no evidence that he condoned May's conduct after the fact. Furthermore, since May and McCue are entitled to qualified immunity on plaintiff's remaining excessive force claims, Harrison has no supervisory liability for their actions that formed the basis of these claims.

However, plaintiff has presented sufficient evidence to raise a disputed issue of material fact as to whether Harrison is subject to supervisory liability for his actions with respect to the failure to promptly provide Lurry with medical aid at the police station. Harrison recognized Lurry when he arrived at the station, he knew that Lurry had previously swallowed drugs after encountering police officers, and he observed that Lurry was not in a normal state of consciousness, was blinking oddly, and was unresponsive. Despite this, Harrison ordered the other Officers to take actions (such as giving Lurry a sternum rub and pushing him out of the car) that were designed to determine whether Lurry was feigning medical distress rather than ordering the Officers to take actions (such as retrieving the Narcan from his squad car and calling for paramedics) that would have promptly provided Lurry with medical aid. Even after Harrison ordered McCue to insert his baton in Lurry's mouth and Lurry slumped over after McCue removed plastic baggies (or pieces thereof) and the baton from his mouth, Harrison did not

promptly order the Officers to provide or summon medical aid for Lurry. Instead, he waited until May stated that Lurry had stopped breathing to call for medical assistance.

Because a reasonable jury could find that Harrison's actions and orders to the other Officers displayed deliberate or reckless indifference to Lurry's constitutional right to receive prompt medical care, summary judgment on this portion of plaintiff's supervisory liability claim is inappropriate. *Lanigan*, 110 F.3d at 477; *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982) ("An official satisfies the personal responsibility requirement of section 1983 if she *acts or fails to act* with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.") (emphasis added).

### F. Plaintiff's Various State Law Claims Against the Officers.

Plaintiff asserts state law claims against May and McCue for battery, and against all Officers for willful and wanton conduct, wrongful death, survival, and spoliation. The Officers seek summary judgment on all state law claims based on their overarching argument that these claims should be dismissed because they are entitled to summary judgment on plaintiff's federal claims, and they assert other arguments that are particularized to each claim.

### 1. Plaintiff's Willful and Wanton Conduct Claim.

Plaintiff's willful and wanton conduct claim alleges that defendants acted unreasonably in denying Lurry medical care when they had notice of his serious medical need and by "exacerbating his condition and contributing to his death by further restricting his breathing." (Dckt. #125 at 54). This claim is premised on the same factual allegations involved in plaintiff's constitutional claims for excessive force, unreasonable search, and denial of medical care.

The Officers seek summary judgment on this claim because, among other things, Illinois does not recognize a standalone claim for willful and wanton conduct. The Court agrees. As the Illinois Supreme Court has made clear, "[t]here is no separate and independent tort of 'willful and wanton' misconduct." *Ziarko v. Soo Line R. Co.*, 641 N.E.2d 402, 406 (Ill. 1994). Accordingly, the Officers are entitled to summary judgment on this claim. *See, e.g.*, *Love v. Rockford Illinois Mun. Police Dept.*, No. 08 C 50254, 2013 WL 159246, at *2 (N.D.Ill. Jan. 15, 2013); *Rhyan v. City of Waukegan*, 819 F.Supp.2d 755, 758 (N.D.Ill. 2011).

**2. Plaintiff's Battery Claims against May and McCue.**

Plaintiff brings battery claims against May and McCue based upon their uses of force against Lurry that are described above in Section III(B), which she asserts were "offensive and harmful" and made intentionally without just cause. (Dckt. #54 ¶¶78–82). The Officers point to the Illinois Tort Immunity Act, which limits a police officer's liability for actions while enforcing the law to "willful and wanton" conduct, and they argue that plaintiff's "inability to establish her excessive force claims dooms her battery claim" as a matter of law. (Dckt. #115 at 33 (citing *DeLuna v. City of Rockford*, 447 F.3d 1008, 1013 (7th Cir. 2006) and *Gill v. Vill. of Melrose Park*, 35 F.Supp.3d 956, 967 (N.D.Ill. 2014)).

In Illinois, a battery is the "unauthorized touching" of a person that offends a "reasonable sense of personal dignity." *Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008) (cleaned up). Moreover, "Illinois follows the common law rule that any contact, however slight, may constitute a battery." *Garcia-Meza v. Mukasey*, 516 F.3d 535, 538 (7th Cir. 2008). Indeed, "[t]he amount of force required by the State of Illinois is so minimal that the Seventh Circuit has noted that 'in Illinois, an individual angry at being given a parking ticket might crumple up the

ticket and throw it on the ground and face charges of aggravated battery if the ticket hit the issuing officer's shoe.'" *Gill*, 35 F.Supp.3d at 965, *quoting Garcia-Meza*, 516 F.3d at 538.

Nonetheless, the Immunity Act "shields public employees from liability for actions committed 'in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct.'" *Chelios*, 520 F.3d 692–93, *quoting* 745 ILCS 10/2-202. As the Seventh Circuit has explained:

> The Illinois courts have held that a police officer is not guilty of willful or wanton conduct unless he acted with actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others. . . . Although willful and wanton conduct consists of more than mere inadvertence, incompetence, or unskillfulness, it need not be an intentional act; rather, it may be an act committed under circumstances exhibiting a reckless disregard for the safety of others. . . . Whether an officer acted in such fashion is normally a question of fact to be determined by the jury.

*Id.* at 693 (cleaned up).

As stated above, May had two distinct uses of force against Lurry. With respect to May's action in slapping Lurry across the face, the Court has found that qualified immunity is inappropriate and that a reasonable jury could find that May used excessive force against Lurry. "In general, when an officer's use of force rises to the level of being unconstitutionally excessive, it will also constitute willful and wanton conduct for purposes of Illinois' Tort Immunity Act." *Karkoszka v. Dart*, No. 13 C 1635, 2016 WL 164331, at *5 (N.D.Ill. Jan. 14, 2016); *Chavez Garcia v. Arona*, No. 17 C 6136, 2020 WL 902827, at *6 (N.D.Ill. Feb. 25, 2020) ("The reasons justifying a denial of qualified immunity at summary judgment often also justify denial as to Section 2-202 of the Illinois Tort Immunity Act.").

Furthermore, evidence that May failed to follow JPD policy when he slapped Lurry (while not relevant to the excessive force claim) is relevant to plaintiff's efforts to prove that May battered Lurry by acting with willful and wanton misconduct. *See Lurry v. City of Joliet*,

60

No. 20 C 4545, 2023 WL 2138763, at *15 (N.D.Ill. Feb. 21, 2023) ("Defendants' failure to comply with certain JPD rules and regulations tends to show they acted with intent, rather than mere negligence or ignorance.  This is relevant both to Plaintiff's punitive damages claim and her willful and wanton misconduct claim.").  Given this, the Court denies summary judgment on the claim that May committed a battery against Lurry when he slapped him.  *See Watson*, 2020 WL 1248678, at *13 (holding that plaintiff's battery claim survived summary judgment "because a reasonable jury could conclude that the alleged excessive force was willful and wanton").

Summary judgment is likewise inappropriate on the portion of plaintiff's battery claim against May that relates to his use of force in placing pressure on Lurry's neck (for three seconds) and jaw (for forty-five seconds) and  pinching his nose closed (for approximately ninety seconds).  Action to "'intentionally imped[e] the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual or by blocking the nose or mouth of that individual'" constitutes a battery under Illinois law and the "application of pressure or blocking airways necessarily requires force capable of causing physical pain or injury."  *United States v. Dowthard*, 948 F.3d 814, 819 (7th Cir. 2020), *quoting* 720 ILCS 5/12-3.3(a-5); *Slabon v. Sanchez*, No. 15-CV-08965, 2020 WL 5763760, at *20 (N.D.Ill. Sept. 28, 2020) (plaintiff stated a battery claim against defendant officer by, among other things, alleging that he placed his forearm on plaintiff's throat); *see also People v. Patzer*, 2018 IL App (2d) 160546-U, ¶¶17–23, 2018 WL 6721989, at *3–4 (finding evidence sufficient to prove aggravated domestic battery notwithstanding defendant's assertion that he applied pressure to the victim's neck "for no more than a second" and that the victim suffered no injury).

Moreover, plaintiff has presented evidence that: (1) May was not trained to pinch an arrestee's nose shut or to put pressure on an arrestee's jaw to get them to open their mouth; (2)

pinching a person's nose to force the person to open their mouth is not a recommended way to clear an airway because you want to keep the nose open; (3) if you obstruct an individual's nose and mouth, they cannot get air into their airway, resulting in less oxygen thereby getting into the bloodstream and the person losing their pulse; and (4) May exacerbated Lurry's asphyxia by putting pressure on his neck and pinching his nose closed. (PSAF Resp. ¶¶71, 73, 74); *see also People v. Campbell*, 2016 IL App (3d) 140381-U, ¶18, 2016 WL 555728, at *3 ("We note that any constriction of the throat affects 'normal' breathing by restricting air or blood flow or inducing anxiety.").

A reasonable jury could find that this use of force by May was a battery that exhibited a reckless disregard for Lurry's safety and, as such, there is a question of fact as to whether he acted with willful and wanton conduct that must be determined by the jury. *Chelios*, 520 F.3d 693; *Chavez Garcia*, 2020 WL 902827, at *6. The Court further notes that its finding May entitled to qualified immunity related to this use of force on the ground that Lurry did not have a clearly established constitutional right to be free from such force does *not* preclude this aspect of plaintiff's battery claim because the Court—unlike in the decisions relied upon by the Officers[33]—did not find that May's conduct was objectively reasonable.

Finally, the Officers' motion for summary judgment on the battery claim against McCue based on his use of his baton to probe inside Lurry's mouth is denied for similar reasons. Plaintiff offers evidence that: (1) McCue used the baton in a manner similar to a blind finger sweep and it could have caused or worsened an airway obstruction; (2) one should not stick a

---

[33] *See DeLuna*, 447 F.3d at 1013–14 (grant of summary judgment on plaintiff's wrongful death claim affirmed where finding that officer's use of deadly force was reasonable precluded a finding that the officer's conduct was willful and wanton); *Gill*, 35 F.Supp.3d at 966–67 (where court found that the officer's actions were objectively reasonable, plaintiff could not establish that the officer lacked lawful justification for his physical contact with plaintiff as a matter of law).

baton in someone's mouth to fish out a foreign body obstruction in the mouth because they could potentially worsen the obstruction by pushing it further down into the airway; (3) the baton itself could have posed an airway obstruction or it could have caused a bag of drugs to become lodged in Lurry's airway, causing an upper or lower airway obstruction; and (4) "putting a baton in someone's mouth does not accord with generally accepted use of that tool" per accepted practices nationally. (PSAF Resp. ¶¶45, 74); *Lurry*, 2023 WL 2138763, at *18, 22.

Given this evidence, a reasonable jury could find that this use of force by McCue was a battery that exhibited a reckless disregard for Lurry's safety and, as such, there is a question of fact as to whether he acted with willful and wanton conduct that must be determined by the jury. *Chelios*, 520 F.3d 693; *Chavez Garcia*, 2020 WL 902827, at *6. And, again, the fact that this Court found that McCue is entitled to qualified immunity on the excessive force claim because Lurry did not have a clearly established constitutional right to be free from such force does *not* preclude plaintiff's battery claim because the Court did not find that McCue's conduct was objectively reasonable.

### 3. Plaintiff's Wrongful Death and Survival Claims Against the Officers.

The Officers argue (and plaintiff agrees) that the fate of plaintiff's wrongful death and survival claims turn on whether she can prove her federal excessive force claims against May and McCue and her denial of medical care claims against all of the Officers. (Dckt. #115 at 33; Dckt. #125 at 54–55). Although the Court has held that May and McCue are entitled to qualified immunity on plaintiff's excessive force claims related to May's application of pressure to Lurry's jaw, neck, and nose and McCue's use of his baton in Lurry's mouth, the Court has denied the Officers' motion for summary judgment as to plaintiff's failure to provide prompt medical care claims. Given this, and in light of the Officers' failure to provide any other

substantive argument in support of their motion as to these claims, the Court declines to grant summary judgment on plaintiff's wrongful death and survival claims.  *See Knoblauch v. DEF Exp. Corp.*, 86 F.3d 684, 686–87, 691 (7th Cir. 1996) (reinstating plaintiff's wrongful death and survival claims after finding that a trier of fact could reasonably conclude that defendants were liable on many of the underlying substantive claims asserted against them); *Watson*, 2020 WL 1248678, at *13 n.10.

### 4. Plaintiff's Spoliation Claim Against Defendants.

Plaintiff's spoliation of evidence claim is premised on defendants' alleged failure to preserve dash-cam audio from McCue's squad car for the time after May struck Lurry in the face and Tellez intentionally turned off the squad car's dash camera[34] and footage from outdoor cameras that captured the perimeter of the police station.  (Dckt. #54 ¶¶89–101).  Spoliation of evidence is a tort based on underlying negligence principles.  *Ramos v. Drews*, No. 14 CV 2556, 2018 WL 5046087, at *14 (N.D. Ill. Oct. 16, 2018).  As such:

> To prove a spoliation claim, a plaintiff must demonstrate that: (1) the defendant owed the plaintiff a duty to preserve the evidence; (2) the defendant breached that duty by losing or destroying the evidence; (3) the loss or destruction of the evidence was the proximate cause of the plaintiff's inability to prove an underlying lawsuit; and (4) as a result, the plaintiff suffered actual damages.

*Grayson v. City of Aurora*, 157 F.Supp.3d 725, 748 (N.D.Ill. 2016), *quoting Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22, 27 (Ill. 2012); *Ramos*, 2018 WL 5046087, at *14.

Defendants seek summary judgment on this claim for multiple reasons including that plaintiff is unable to establish the element of proximate cause, which requires her to provide

---

[34] "Tellez's manual deactivation of the camera [also] resulted in further audio not being captured, but due to the camera system's internal memory and recording features, investigators were able to recover the (silent) video of the subsequent events despite Tellez actions."  (DSOF Resp. ¶81).  Tellez was subject to an internal investigation and disciplined for turning off the dash camera.  (PSAF Resp. ¶77).

"sufficient facts to support a claim that the loss or destruction of the evidence *caused the plaintiff to be unable to prove* an underlying lawsuit." *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 271 (Ill. 1995) (emphasis in original); *Midwest Tr. Servs., Inc. v. Cath. Health Partners Servs.*, 910 N.E.2d 638, 643 (Ill.App. 2009). Plaintiff lacks sufficient evidence to meet this burden as a matter of law for two reasons.

First, as discussed above, this Court has denied defendants' motion for summary judgment on a majority of plaintiff's claims because she has produced sufficient evidence that would allow a reasonable jury to find in her favor at trial on these claims even *without* the evidence that she claims that defendants lost or destroyed. Consequently, the loss or destruction of the evidence in question has not rendered plaintiff unable to prove her underlying lawsuit and she cannot establish the proximate cause element. *See, e.g., Grayson*, 157 F.Supp.3d at 748 (granting summary judgment where "[t]he record before the Court presents no evidence or inference that Grayson will be unable to prove his due process and malicious prosecution claims absent evidence of the Urzua letter."); *Midwest Tr. Servs.*, 910 N.E.2d at 643; *Chidichimo v. Univ. of Chicago Press*, 681 N.E.2d 107, 110–11 (Ill.App. 1997); *cf. Boothe v. Wheeling Police Officer Sherman (Star #155)*, 190 F.Supp.3d 788, 802 (N.D.Ill. 2016) (denying summary judgment on spoliation of evidence claim where the lost video evidence could be the proximate cause of plaintiff's inability to win her case).

Second, "the importance of the unpreserved evidence [is] speculative at best." *Jones v. UPR Prods., Inc.*, No. 14 C 1248, 2015 WL 3463367, at *4 (N.D.Ill. May 29, 2015); *Chidichimo*, 681 N.E.2d at 111. With respect to the missing dash-cam audio, plaintiff asserts that "the audio that is now missing would have cast light on May's observation of Mr. Lurry's deteriorating condition, [and] may have captured sounds of Mr. Lurry struggling to breath and

conversation between Defendants shedding light on who knew what and when." (Dckt. #125 at 57). However, the dash-cam video (which is available) casts light on Lurry's deteriorating condition and what May saw, and plaintiff does not know whether the dash-cam audio would have captured the sounds of Lurry's efforts to breathe. Nor does she know what conversation, if any, occurred between the Officers over and above what they have admitted to in their testimony.[35]

Furthermore, defendants have offered evidence that the perimeter camera footage has no evidentiary value because the camera's line of sight was blocked and Lurry was not visible on the footage. (PSAF Resp. ¶79). In any event, even if the perimeter camera footage captured what occurred when other officers performed CPR on Lurry after the Officers removed him from the squad car, the acts and omissions that form the basis of plaintiff's claims against the Officers occurred *before* this footage was recorded. This is not to say that such footage would have been irrelevant if it had been made available. Perhaps the footage may have shown "when precisely Mr. Lurry coughed up the bag as well as the size of the bag," as plaintiff hypothesizes. (Dckt. #125 at 57). The issue, however, is not whether the lost or destroyed evidence may have been helpful. Instead, as explained above, the pertinent question is whether the lack of the perimeter camera footage leaves plaintiff without the ability to prove her claims, and the Court finds that it does not.

---

[35] Defendants also assert that plaintiff cannot bring a spoliation claim with respect to the missing dashcam audio because "Illinois does not recognize a spoliation claim based on evidence not yet in existence." *Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 644 (7th Cir. 2011); *see also Jenkins v. White Castle Management Co.*, No. 12-cv-7273, 2016 WL 5476234, at *13 (N.D.Ill. Sept. 29, 2016) (summary judgment granted where "the evidence that Jenkins claims was lost never existed in the first place."). The Court finds that is argument is persuasive, and it provides an additional reason why plaintiff's spoliation of evidence claim fails with respect to the missing dashcam audio.

Because plaintiff has failed to make a showing sufficient to establish proximate cause, there is no genuine issue of material fact regarding her spoliation of evidence claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts [concerning the claim] immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 265 (7th Cir. 1996). As such, defendants are entitled to summary judgment on this claim.

### G. Plaintiff's *Respondeat Superior* and Indemnification Claims Against the City of Joliet.

Plaintiff brings claims against the City of Joliet for indemnification and *respondeat superior*. (Dckt. #54 at ¶¶179–86). The Court declines to grant summary judgment for these claims in light of the potential liability of the Officers on a number of the remaining claims that are discussed above. *See, e.g., Anderson v. City of Rockford*, 932 F.3d 494, 513 (7th Cir. 2019) (grant of summary judgment on *respondeat superior* and indemnification claims against the City of Rockford was inappropriate in light of the potential liability of certain individual officers on other claims); *Boothe*, 190 F.Supp.3d at 801 (same); *Cole v. Meeks*, No. 15 CV 1292, 2018 WL 4682297, at *9 (C.D.Ill. Sept. 28, 2018) (Because claims against officers "will proceed toward trial, Plaintiff's indemnification and *respondeat superior* claims against the City of Peoria will move forward as well.") (cleaned up).

### CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in part and denied in part. In particular: (1) summary judgment is denied on plaintiff's denial of medical care claim as to all Officers; (2) summary judgment on the excessive force and unreasonable search and seizure claim against May is denied in part and granted in part on the ground of qualified immunity; (3) summary judgment on the excessive force and unreasonable search and

seizure claim against McCue is granted on the ground of qualified immunity; (4) summary judgment is granted in part and denied in part on the failure to intervene claim against all Officers; (5) summary judgment is denied on the supervisory liability claim against Harrison; (6) summary judgment is granted on the willful and wanton claim against all Officers; (7) summary judgment is denied on the battery claims against May and McCue; (8) summary judgment is denied on the wrongful death and survival action claims against all Officers; (9) summary judgment is granted on the spoliation of evidence claim against all defendants; and (10) summary judgment is denied on the indemnification and *respondeat superior* claims against the City.

**Date: May 7, 2025**

**Jeffrey I. Cummings**
**United States District Court Judge**